IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JOHN T. FLYNN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 1:07-CV-00501 (RJL)** |
| | ) | |
| **MAARV WATERPROOFING, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFFS' OPPOSITION
## TO DEFENDANT'S MOTION FOR LEAVE TO FILE A THIRD-PARTY COMPLAINT

### INTRODUCTION

This case is a straightforward ERISA collection action brought by several international fringe benefit funds against an employer, Maarv Waterproofing, Inc. ("Maarv"). From the moment this dispute arose, Maarv has argued that its failure to pay fringe benefit contributions should be excused because it never intended to sign any collective bargaining agreement and did so only because of fraudulent representations purportedly made by a local union official in New Jersey. It is only now, however, with discovery completed and the summary judgment deadline looming, that Maarv has chosen to move for leave to bring the local unions into this case as third-party defendants to various state law tort claims.

Maarv's motion for leave to file a third-party complaint against the local unions should be denied. Even before this litigation was instituted, Maarv claimed that it had been defrauded by false representations from local union officials. Yet Maarv never before sought to bring any of the local unions in as additional parties. Allowing Maarv to bring in the local unions as new parties now, at this advanced stage in the litigation, with the discovery completion deadline past, all written discovery and depositions already completed, and the summary judgment deadline here in less than three weeks, would undoubtedly, and needlessly, delay resolution of this case.

This case is ripe for summary judgment and should not be sidetracked while new parties, represented by attorneys other than those representing the existing parties, propound their own written discovery and take their own depositions. This is not a case where the purported fraud was first revealed during discovery. To the contrary, allegations of fraud against the local unions were made by Maarv long ago, and should have been asserted soon after the original Complaint was filed, so that those local unions could participate in discovery, depositions, and summary judgment on the same schedule as the existing parties. Moreover, addition of the local unions would needlessly complicate this action, contrary to Congressional intent that delinquency collection actions be simple, straightforward, and efficient for funds. Finally, leave to amend should also be denied because the state law claims asserted in Maarv's proposed third-party complaint are preempted by Section 301 of the Labor-Management Relations Act ("LMRA") and thus without merit. For these reasons, this Court should exercise its discretion to deny Maarv's motion for leave and allow this case to proceed with the existing parties on the existing schedule.

## BACKGROUND

On March 15, 2007, the Bricklayers & Trowel Trades International Pension Fund, International Masonry Institute, and International Union of Bricklayers and Allied Craftworkers (collectively, "Funds"), filed a Complaint against Maarv seeking recovery of $463,312.10 in delinquent fringe benefit contributions and related damages, based on an audit, owed under certain collective bargaining agreements entered into with local Bricklayer unions in New Jersey. Both before that Complaint was filed, and ever since, Maarv has asserted that it owes nothing to the Funds because it never intended to enter into any general collective bargaining agreements with any Bricklayers union and only signed because of fraud committed by a local union official. Specifically, Maarv admits that its President and Owner, Attila Szamosszegi, signed one of the

2

documents at issue in this case – the "Local 5 Independent Agreement," attached hereto as Exhibit A.  But Maarv contends that Mr. Szamosszegi signed the Local 5 Independent Agreement without ever seeing the collective bargaining agreement purportedly incorporated by the first sentence of that agreement and, most importantly, in reliance on the representation made by a local union official, Dominic Longo, to a subcontractor of Maarv's and to Maarv's deceased office manager that the Local 5 Independent Agreement only required Maarv to make contributions for work performed by union members on a single project – a parking garage in Princeton, New Jersey – rather than for all covered work performed by any employees within the jurisdiction of the local union.

On October 18, 2007, the Fund filed an Amended Complaint, correcting the exhibits and updating the list of Fund trustees named in the original Complaint but making no other changes. Maarv answered that Amended Complaint on October 25, 2007.  As with its original Answer filed back in May, Maarv again failed to name the local unions as Defendants.  Consistent with the schedule established by this Court, the parties engaged in written discovery and completed all depositions by the discovery completion deadline of October 29, 2007.  Pursuant to that same schedule, summary judgment motions are due by December 14, 2007, just over three weeks from today.

On October 29, 2007, the last day for completion of discovery, Maarv finally filed a Motion for Leave to File a Third-Party Complaint, seeking to add Local Union Nos. 4, 5, and 2 of New Jersey, and the Administrative District Council of New Jersey (collectively, "Local Unions"), as parties to this action so that it can pursue state law claims of fraudulent and negligent misrepresentation, breach of the covenant of good faith and fair dealing, and contribution/indemnity against the Local Unions, all arising out of the alleged misrepresentations of Mr. Longo, the local union official in New Jersey.

DSMDB-2352208v03

## ARGUMENT

### I.    Standards For Leave To File A Third-Party Complaint Under Rule 14

Under Federal Rule of Civil Procedure 14(a), Maarv cannot file its third-party complaint against the Local Unions without leave of court. This Court has wide discretion in deciding the motion for leave and should look at various factors, including whether the proposed third-party complaint would unduly complicate the issues, delay the case, or potentially prejudice the plaintiff, whether the defendant unreasonably delayed filing the third-party complaint, and whether the third-party complaint lacks merit or fails state a claim on which relief may be granted. *See, e.g., Kopan v. George Washington University*, 67 F.R.D. 36, 38 (D.D.C. 1975); *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 272 F. Supp. 2d 217 (W.D.N.Y. 2003); Wright & Miller, *Federal Practice & Procedure*, § 14.21(3).

### II.    Leave Should Be Denied Because It Would Unnecessarily Delay And Complicate This ERISA Collection Action, Contrary To Congressional Intent

This Court should deny Maarv's motion for leave to file a third-party complaint because adding additional claims and parties to the present action will needlessly delay and complicate the Funds' delinquency case, contrary to Congressional intent that such collection actions be simple, straightforward, and efficient for funds such as the Plaintiffs.

#### A.    Congress intended that ERISA delinquent contribution actions be straightforward, simple, and efficient for funds

When ERISA was first passed in 1974, Congress intended that the enforcement provisions "should have teeth."[1]  Congress therefore provided "the full range of legal and equitable remedies available . . . to remove jurisdictional and procedural obstacles which in the past appear to have hampered effective . . . enforcement . . ." *Id.*  But over the subsequent years, the provisions of Section 502 proved insufficient to deter employer procedural maneuvers

---

[1] *See Laborers' Fringe Benefit Funds v. Northwest Concrete & Construction, Inc.,* 640 F.2d 1350, 1352 (6th Cir.1981).

4

impeding collection efforts. In response, Congress passed Section 515 of ERISA as part of the Multiemployer Pension Plan Amendment Act ("MPPAA") in 1980, an Act which completely revised and strengthened the tools under ERISA for dealing with employer delinquencies. In enacting the MPPAA, Congress stated:

> Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously.
>
> The public policy of this legislation to foster the preservation of the private multiemployer plan system mandates that provision be made to discourage delinquencies and simplify delinquency collection.[2]

Congress's purpose in enacting Section 515 was "to allow multiemployer welfare funds to rely upon the terms of collective bargaining agreements and plans as written, thus 'permit[ting] trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law . . .'" inasmuch as employer delinquencies "detract[ed] from the ability of plans to formulate or meet funding standards and adversely affect[ed] the financial health of plans." *Central Pennsylvania Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1102 (3d Cir. 1996) (quoting 126 Cong. Rec. 23,039 (1980) (remarks by Rep. Thompson)).[3]

---

[2] *See* S. Comm. on Labor & Human Res., 96th Cong., The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration (Comm. Print 1980). *See also* 126 Cong. Rec. H 7863 (1980).

[3] The court further explained that, through Section 515, "Congress sought to ensure that benefit plans are able to rely on contribution promises of employers 'because plans must pay out to beneficiaries whether or not employers live up to their obligations.'" *McCormick*, 85 F.3d at 1103 (citing *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314 (2d Cir. 1990) (citing *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) (en banc)).

DSMDB-2352208v03

### B.    Granting Maarv's motion for leave will unnecessarily delay and complicate this action, contrary to Congressional intent

Allowing Maarv to file third-party complaint against the Local Unions at this point in this point in the litigation would be at odds with these Congressional goals and policies underlying ERISA.  As pled in the Amended Complaint, the Funds' action against Maarv is a simple, straightforward action for collection of employer delinquencies.  Moreover, it is an action that is ripe for resolution by summary judgment.  The discovery completion deadline established by this Court – October 29th – has already passed.  Pursuant to that schedule, the existing parties to this action exchanged detailed initial disclosures, propounded and responded to numerous written interrogatories and requests for the production of documents, and took a number of depositions.  The deadline for filing of summary judgment motions – December 14th – is quickly approaching and will arrive in just over three weeks.

Despite the advanced stage of this litigation, Maarv now wants to broaden the case to include the Local Unions as additional parties.  Contrary to Maarv's contention, each of these Local Unions is a separate entity, with entirely separate attorneys, from the *International* Union of Bricklayers and Allied Craftworkers that is an existing Plaintiff in this litigation.[4]  Furthermore, the claims that Maarv seeks to assert against the Local Unions are entirely new, state law claims, which have never before been part of this action.  Expansion of the litigation through the addition of new parties and new claims should not be permitted because it would clearly delay this case.  If Maarv is permitted to add the Local Unions as new parties, not only will the Local Unions' attorneys need time to "get up to speed" on this case, but the Local Unions will likely want to engage in their own discovery efforts before filing any dispositive motions of their own.  The Local Unions might even want to take their own depositions,

---

[4] *See Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46, 52 (D.D.C. 2006) (finding the International Union of Bricklayers and Allied Craftworkers and a local Bricklayers union to be separate entities, as "it is well settled that in the absence of statutory or applicable common-law rules of agency, international unions and their local affiliates are considered separate and distinct bodies").

DSMDB-2352208v03

including depositions of witnesses already deposed.  Inasmuch as engaging in such discovery is clearly within the Local Unions' rights, this Court may have little choice but to open discovery up again in this case, thereby delaying both resolution of summary judgment and any trial in the event that the case is not resolved on summary judgment.

Moreover, addition of new state law claims against new parties would unduly complicate this action, and move it far afield from the type of simple collection action that Congress envisioned in passing ERISA. There is no reason to permit this.  Maarv has known about its fraud claims against the Local Unions since before this case was ever filed.  Indeed, these very same fraud allegations have been Maarv's main defense to the Funds' collection action from day one.  Had Maarv wanted to file claims against the Local Unions, it had months to do so.  Instead, Maarv waited until after discovery was completed and summary judgment briefing was imminent.  As there is no reasonable justification, and no good cause, for this delay, leave to amend should be denied.  Such a denial would not bar Maarv from seeking relief from the Local Unions in another court.  In the event that Maarv is ultimately found liable to the Funds for delinquent contributions in the present lawsuit, Maarv can proceed at that time to file against the Local Unions.  But at this point, with discovery complete and summary judgment approaching, resolution of the Funds' straightforward ERISA collection action should not be delayed through the addition of state law fraud claims against new parties.  Maarv's motion for leave to file a third-party complaint against the Local Unions should be denied.

III.    **Leave Should Also Be Denied Because The State Law Claims Asserted By Maarv In The Third-Party Complaint Are Preempted By Section 301 Of The LMRA**

Congress enacted Section 301 of the LMRA to provide federal jurisdiction over "suits for violation of contracts between an employer and a labor organization," 29 U.S.C. § 185, in order to fashion a body of federal common law for the purpose of resolving labor disputes in a uniform manner across the country. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985).  For purposes

DSMDB-2352208v03

of preemption, the Supreme Court has determined that the claims preempted by Section 301 include not only state law claims founded on rights created by a labor agreement, but also any claim whose resolution is substantially dependent upon or "inextricably intertwined" with interpretation of the terms of such an agreement. *Lueck*, 471 U.S. at 213. In applying this rule, the Supreme Court has distinguished between claims which require interpretation or construction of a labor agreement from those which only require reference to a labor agreement. While a claim will not be preempted if the labor agreement need only be consulted during its adjudication, preemption will apply if the claim requires the court to interpret or construe any term of the labor agreement. *See Livadas v. Bradshaw*, 512 U.S. 107, 124-25 (1994). Under these precedents, the key to determining the scope of preemption is not how the complaint is *cast*, but whether the claims can be resolved only by *analyzing the terms of the collective bargaining agreement. See id.* at 211.

In the present case, Maarv's state law claims against the Local Unions are preempted by LMRA Section 301 because they require the court to interpret and construe the terms of the Local 5 Independent Agreement signed by Maarv. Counts I and II of the Third Party Complaint set forth state law causes of action for fraudulent misrepresentation and negligent misrepresentation against the Local Unions.[5] To maintain these claims, Maarv must prove not only that the purported statements of Mr. Longo were false and that Maarv relied upon them, but also that this reliance was "reasonable" or "justifiable." *See, e.g., Gennari v. Weichert Co. Realtors*, 691 A.2d 350 (N.J. 1997) (setting out the elements of common law fraud under New Jersey law, including "reasonable reliance"); *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 143 (1983) (nothing that negligent misrepresentation also requires justifiable reliance). Whether a

---

[5] The other two state law claims asserted by Maarv in the proposed third-party complaint – breach of the covenant of good faith and fair dealing and contribution/indemnification – are based on the same alleged misrepresentations as the fraud and negligent misrepresentation claims. Thus, to the extent that the fraud and negligent misrepresentation claims are preempted, these claims are preempted as well.

DSMDB-2352208v03

plaintiff's reliance was reasonable or justifiable is determined in light of the totality of information available to the plaintiff at the time of the purported misrepresentation:

> [the court must] consider the total circumstances under which the reliance occurred. Such circumstances certainly include the contract for sale, the deed, and the Handex report along with its accompanying disclaimer. The claim of negligent misrepresentation cannot be analyzed in a vacuum, as plaintiffs would have it, and without considering the conditions under which it arose.

*DeAngelo v. Exxon Corp.*, 1999 WL 34014043, at *7 (N.J. App. Oct. 15, 1999), attached hereto as Exhibit B.[6] Here, the Funds contend that, even accepting Maarv's version of the facts, Mr. Szamosszegi's reliance on Mr. Longo's supposed misrepresentations was not reasonable or justifiable in light of the other information available to, and in fact right in front of, Mr. Szamosszegi when he signed.[7] But the Court need not decide this issue to resolve the preemption issue. For purposes of preemption, all that matters is that the Local 5 Independent Agreement was information available to Mr. Szamosszegi when he signed and that this Court cannot decide Maarv's tort claims without interpreting the terms of that agreement.

While Maarv claims that Mr. Szamosszegi was never provided with the November 1, 2002 CBA referenced in the Local 5 Independent Agreement, he was provided with the Local 5 Independent Agreement itself. Indeed, he admits that he signed it. Thus, for purposes of deciding whether Mr. Szamosszegi's reliance on Mr. Longo's representations was "reasonable" or "justifiable," the Local 5 Independent Agreement was indisputably information available to

---

[6] *See also, e.g., Int'l Minerals and Mining Corp. v. Citicorp.*, 736 F. Supp. 587, 598 (D.N.J. 1990) (stating that reliance must be reasonable under the circumstances, meaning that facts to the contrary of the alleged misrepresentation were not obvious and did not provide a warning making it patently unreasonable for plaintiff not to pursue further investigation); *Fleming Cos. v. Thriftway Medford Lakes, Inc.*, 913 F. Supp. 837, 844-45 (D.N.J. 1995) (stating that reliance on misrepresentation is not justified or reasonable when the plaintiff has opportunity to ascertain the truth of the misrepresentations or the true nature of its agreement, but fails to do so).

[7] While the Funds do not believe that Maarv can satisfy "reasonable reliance" or the other elements of its fraud and negligent misrepresentation claims, or that such claims affect Maarv's obligations to the Funds, the Funds do not rely on these arguments as a basis for their opposition to the motion for leave.

DSMDB-2352208v03

Maarv.  Unlike situations where an employer is presented with a blank signature page, the Local

5 Independent Agreement signed by Mr. Szamosszegi contains numerous detailed, substantive

provisions describing the obligations to which any executing employer was consenting.  For

instance, the first sentence states:

> The undersigned Employer has read and hereby approves the signed
> Collective Bargaining Agreement between the Building Contractors
> Association of New Jersey and the Masonry Contractors Association of
> New Jersey dated November 1, 2002, and Bricklayers and Allied
> Craftworkers Locals No. 4, No. 5 of New Jersey and Local No. 2 of
> Delaware-New Jersey . . . and becomes one of the parties thereto and
> agrees to be bound by all the terms and conditions of the effective
> Collective Bargaining Agreement . . .

*See* Exhibit A.  The Local 5 Independent Agreement also contains provisions stating, *inter alia*,

that by signing the agreement the employer recognizes the union "as the exclusive bargaining

agreement for all employees within the bargaining unit on all present and future sites within the

jurisdiction of the Local Union" and "agrees to the payment of all Employee fringe benefit

hourly contributions as specified in the effective Collective Bargaining Agreement."  *Id.*

      In order to determine whether Maarv's reliance on Mr. Longo's purported statements was

"reasonable" or "justifiable," the court has no choice but to examine what these provisions of the

Local 5 Independent Agreement mean and determine whether (as the Funds believe) they should

have alerted Maarv to the fact that the agreement it was signing required contributions not just

for union employees working on the Princeton parking garage project, but for all work

performed on projects within the jurisdiction of the union.[8]  For example, if this Court

determines that the first sentence of the Local 5 Independent Agreement clearly incorporates, and

binds Maarv to, all terms of the agreement referenced in that first sentence (as the Funds

---

[8] The Local 5 Independent Agreement served as a signature page to the collective bargaining agreement
attached as Exhibit B to the Funds' Amended Complaint; thus, the terms of that Local 5 Independent
Agreement are terms of a labor agreement for purposes of Section 301 preemption.  *See* Longo Dep. at
96, attached hereto as Ex. C; Perrone Dep. at 32-33, 37-38, attached hereto as Ex. D.

DSMDB-2352208v03

contend), then Maarv's reliance on Mr. Longo's statements at odds with provision was not reasonable or justifiable. If, however, this Court determines that the language of the first sentence is ambiguous, or does not incorporate any other agreement, then Maarv's reliance on the local union's statements might have been reasonable or justifiable. Similarly, resolution of Maarv's fraud claims requires this Court to analyze what the "exclusive bargaining agent" and "contribution" provisions in the Local 5 Independent Agreement mean, determine whether these provisions conflict with Mr. Longo's purported limitation of the contribution obligation to the Princeton parking garage project and, if they do conflict, determine whether it was reasonable for Maarv to rely on Mr. Longo's representations. Because resolution of Maarv's state claims is "inextricably intertwined" with the Local 5 Independent agreement, preemption applies.[9]

## CONCLUSION

This Court has broad discretion in deciding whether to grant a motion for leave to file a third-party complaint. For the reasons stated above, it should exercise that discretion to deny Maarv's motion for leave to file a third-party complaint against the Local Unions.

---

[9] Maarv's proposed third-party claims against Local Unions Nos. 4 and 2 and the Administrative District Council of New Jersey are also without merit for the independent reason that Mr. Longo was not an employee, official, or business representative of any of these entities in 2004 when he made the alleged misrepresentations. Rather, at that time, he was a business representative of Local No. 5 New Jersey only. *See* Longo Dep. at 20-22; Capo Dep. at 9, attached hereto as Ex. E. The Administrative District Council, in fact, was not even created until June 2006. Capo Dep. at 9. Thus, the claims against these other entities are without merit and leave to file a third-party complaint against them should be denied.

DSMDB-2352208v03

Respectfully submitted,

Dated: November 21, 2007                  By: _____

Ira R. Mitzner, DC Bar No. 184564
Charles V. Mehler III, DC Bar No. 475909
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403
(202) 420-3674

*Counsel for Plaintiffs*

12

DSMDB-2352208v03

EXHIBIT A

MAARV WATERPROOFING INC. P-02

16093241605

000665

NJ0424

INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
LOCAL #5 – NEW JERSEY
INDEPENDENT

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agree to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed Independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement, or as they shall be set out from time to time in any such successor Agreements as may be negotiated. The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its representative on the Board of Trustees such Employer Trustees together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund, Agreement and Declaration of Trust instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its' successor assigns, and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

MAARV WATERPROOFING INC.
Company Name

317 OAK STREET
Physical Street Address

PASSAIC, NEW JERSEY   07055
City                State        Zip Code

(973) 470-0686        (973) 470-8716
Telephone Number        Fax Number

22-2527189
Federal Identification Number

608103-00-5
New Jersey Employment Compensation Number

ST. PAUL INSURANCE COMPANY
Workmen's Compensation Insurance Carrier

Please complete and remit to:
BAC Local #5, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-0500
(609) 324-1805 - Fax

Initial if you have received a full copy of this Collective Bargaining Agreement _____

_____   ATTILA SZAMOSSZEGI        FEBRUARY 4, 2004
Officers Signature            Printed Name            Date

_____   Michael R. Perrone        2/4/2004
Business Managers Signature   Printed Name            Date

Dominic Longo            Dominic Longo            2/4/04
Field Representatives Signature   Printed Name            Date

EXHIBIT # Longo-1
DATE 10-22-07
MASTROIANNI & FORMAROLI, INC. plp
CERTIFIED SHORTHAND REPORTERS

EXHIBIT B

Westlaw.

Not Reported in A.2d                                                                                       Page 1

Not Reported in A.2d, 1999 WL 34014043 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

C
DeAngelo v. Exxon Corp.
N.J.Super.A.D.,1999.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
 Superior Court of New Jersey,Appellate Division.
 Eugene DEANGELO, Jr., Brake-O-Rama, Inc., and
 260 Franklin Maple, L.L.C., Plaintiffs-Appellants,
                             v.
 EXXON CORPORATION and Handex of New
 Jersey, Inc., Defendants-Respondents,
 andFairfield Maintenance, Inc., Defendants.
            Submitted Sept. 27, 1999.
            Decided Oct. 15, 1999.

On appeal from the Superior Court of New Jersey,
Law Division, Bergen County.

Gallo Geffner Fenster, for appellants (Anthony J.
Andolino, Valerie A. Vladyka and Mr. Andolino,
on the brief), of counsel.
Patrick J. Conlon and McCusker, Anselmi, Rosen,
Carvelli & Walsh, for respondent Exxon
Corporation (Mr. Conlon, on the brief).
Lindabury, McCormick & Estabrook, for
respondent Handex of New Jersey, Inc. (Donald F.
Nicolai and Kathleen M. Connelly, on the brief).

Before Judges HAVEY, KEEFE, and A.A.
RODRIGUEZ.
PER CURIAM.
**\*1** This appeal results from a judgment entered in
favor of defendants, Exxon Corporation (Exxon)
and Handex of New Jersey, Inc. (Handex),
notwithstanding a jury verdict in favor of plaintiffs,
Eugene DeAngelo, Jr., Brake-O-Rama, Inc., and
260 Franklin Maple, L.L.C. (plaintiffs or
DeAngelo).[FN1]

> FN1. Plaintiff Eugene DeAngelo is the
> president of plaintiff corporation

Brake-O-Rama and principal in plaintiff
corporation 260 Franklin Maple, L.L.C.

Plaintiffs purchased property from Exxon in
Ridgewood. The property had been previously used
as a gasoline service station. Handex, an
environmental remediation company engaged by
Exxon to perform various functions on the property,
issued several reports, including one in July 1994
representing that all underground storage tanks had
been removed from the site. After title passed to
plaintiffs, Handex, who was conducting ongoing
remediation functions at the site, found additional
tanks. Exxon engaged a contractor to remove them
and Handex performed the necessary soil and water
tests to obtain ultimate DEP approval. Plaintiffs
claimed, however, that Exxon's and Handex's
negligence caused five months delay in plaintiffs'
ability to use the property and instituted suit against
Exxon, Handex, and Fairfield Maintenance
Company, the subcontractor engaged by Exxon to
remove tanks in 1991 and the tanks discovered in
March 1995. Plaintiffs filed a complaint against
defendants, alleging breach of contract, strict
liability, negligence, and misrepresentation, and
later amended the complaint to add an additional
count for violation of the New Jersey Consumer
Fraud Act and another for violation of the New
Jersey Spill Compensation and Control Act. The
claim against Fairfield was dismissed. The matter
was then tried before Judge Stark and a jury. Upon
application by defendants, the trial court dismissed
plaintiffs' Consumer Fraud claim. At the close of
plaintiffs' case, defendants moved for the dismissal
of all claims. Judge Stark denied that motion.

The jury thereafter returned a unanimous verdict
finding defendant Exxon 80% liable for negligent
misrepresentation, defendant Handex 15% liable for
negligence, and plaintiffs 5% comparatively
negligent. The jury awarded plaintiffs damages in
the amount of $118,000. Defendants filed
respective motions for a new trial and/or judgment
notwithstanding the verdict and/or remittitur. Their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2

Not Reported in A.2d, 1999 WL 34014043 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

motion for judgment notwithstanding the verdict was granted. Plaintiffs now appeal, raising several issues.

The trial record reveals the following relevant facts. In 1987, Exxon, the owner of the subject property since the late 1920s, discovered that certain underground storage tanks located on the site may have been leaking petroleum hydrocarbon products. After hiring a subcontractor to remove the tanks, Exxon hired defendant Handex to observe the excavation of the tanks and to document the soil conditions.

In 1991, Exxon again hired Handex to observe and document ongoing tank removal activities. Handex at this time requested Exxon to provide site maps and related information regarding the location of tanks on the property. In response, Exxon provided Handex closure information and site plans identifying the existence and location of the tanks. Karen Barnes, a project manager for the Exxon team employed by Handex, testified that the information and site plans did not reflect the existence or location of any tanks other than those already removed. From 1987 through 1995, Exxon directed Handex to perform specific work through a series of work orders, generally calling for Handex to investigate and remediate groundwater contamination. According to Barnes, none of the work orders from Exxon to Handex directed Handex to look for additional underground storage tanks.

**\*2** Also in 1991, DeAngelo became interested in two of Exxon's properties, one in Fairfield and the subject site in Ridgewood. DeAngelo had four existing locations, two of the properties had been purchased from other oil companies. According to DeAngelo, Exxon advised him that both sites were for sale, although both were undergoing remediation. In order to determine whether the sites were worth pursuing, DeAngelo asked Exxon for any environmental reports regarding the cleanup of the properties. In response, Exxon turned over some data regarding the contamination levels at both sites, including reports authored by Handex.

DeAngelo also hired Eric Sepulveda, an expert in

remediation, to interpret the data collected by Handex to determine whether "the site conditions were ... feasible for purchase or acquisition." Sepulveda advised DeAngelo that the contamination at the Franklin site was not under control, but that, according to Exxon's reports, the Ridgewood site appeared to be free of any continuing source of contamination and should be considered for purchasing. According to Sepulveda's trial testimony, he informed DeAngelo that the work performed by Handex "was adequate for determining what tanks existed and adequate for determining the remediation that should be undertaken."As such, Sepulveda did not believe further investigation for underground tanks was warranted.

Thereafter, on November 11, 1992, DeAngelo signed a contract for the purchase of the Ridgewood site from Exxon.[FN2]The relevant provisions of the contract will be identified in the discussion of the legal issues presented on appeal.

> FN2. This contract was dated April 16, 1992.

During the period between the execution of the contract and the date of closing, Exxon, through Handex, continued with the remediation efforts at the site. DeAngelo, who was aware of such efforts, testified that he had ongoing contact with Exxon representatives during this time regarding the environmental condition of the property.

On or about July 28, 1994, DeAngelo's real estate counsel, John B. Hall, sent DeAngelo a Remedial Action Workplan prepared by Handex, dated July 12, 1994, as well as Exxon's letter to him enclosing Handex's Workplan. Exxon's enclosure letter, consistent with its contract with DeAngelo, provided as follows with respect to the Remedial Action Workplan:
Exxon does not make any representation or warranty whatsoever, express or implied, regarding any aspect of the report, including but not limited to, the accuracy or completeness of the report, its preparation, or any information upon which it is based, and has not performed any independent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 3

Not Reported in A.2d, 1999 WL 34014043 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

analysis of any aspect of such report. Any reliance by you on the report, or any information therein shall be at your own risk. You should conduct your own investigation to determine the accuracy of the report and the condition of the property.

Included in the Workplan was the following relevant language: "All underground storage tanks, associated product piping, and product dispensers have been removed from this site. There are no on-going sources of contamination."DeAngelo testified that he relied on this report in deciding to go forward with the purchase of the Ridgewood property.

**\*3** DeAngelo further testified that in addition to the Workplan prepared by Handex, he spoke with various Exxon representatives prior to the closing regarding the environmental condition of the property. According to plaintiffs, these representatives assured him that all underground tanks had been removed and that "this was a clean piece of property."DeAngelo also asked Exxon to provide documentation that would identify where the tanks had been located prior to their alleged removal. In response, Exxon gave him a 1931 site map depicting the location of several tanks, that according to Exxon employees and DeAngelo's understanding, had already been removed. As it turned out, this map depicted the six tanks discovered and removed after the closing.

On December 2, 1994, title to the subject property passed to the plaintiff corporation 260 Franklin Maple, L.L.C., a corporation established by DeAngelo for the purpose of purchasing the property and operating the business thereon. Similar to the contract for sale, the deed contained the following relevant provisions:

Grantee acknowledges that the Property has been used as a service station for the storage, sale, transfer and distribution of motor vehicle fuel, petroleum products or derivatives containing hydrocarbons, and that such fuel, products or derivatives or other related substances may have been spilled, leaked, or otherwise discharged onto or into the Property causing contamination to the soil or groundwater on or under the Property.

....
Grantor shall undertake such investigation and remediation of the Baseline Condition of the Property as Grantor deems necessary or appropriate to comply with applicable laws, regulations or government orders (collectively "Legal Requirements"). Grantor will prepare and deliver to Grantee a remedial action plan for the Property if Grantor determines that such a plan is necessary or advisable to comply with applicable Legal Requirements.
If Grantor undertakes remediation of the Baseline Condition, then the following provisions shall apply ... (c) Grantee understands that such remediation actions may interfere with Grantee's use of the Property.... Grantor will not be liable to Grantee ... for business disruption or any other damage, injury or loss whatsoever resulting from such access.

DeAngelo planned to renovate his newly-acquired property to utilize it as an automobile repair facility. On February 7, 1995, DeAngelo received site plan approval from the Borough of Ridgewood. On February 8, 1995, Handex employees discovered the existence of six additional underground tanks while conducting post-remediation soil borings. According to Karen Barnes of Handex, following the discovery of the tanks, DeAngelo produced for the first time the 1931 site map that depicted the existence of the six tanks. Barnes testified that she had never seen the 1931 site map. Her testimony on that point is undisputed.

Exxon thereafter removed the six tanks on March 16, 1995. Following the removal of the tanks, Exxon filled in the excavations with certified clean fill. DeAngelo attempted to obtain the Handex reports analyzing the soil samples taken during the first day of excavation to determine whether his building project could proceed. Handex had the results of the analysis within a few days of the excavation, which it subsequently sent to Exxon. DeAngelo ultimately received the reports from Exxon on September 8, 1995, almost six months from the date the soil samples were taken. On September 29, 1995, the New Jersey Department of Environmental Protection (NJDEP) sent Exxon a closure letter providing that no further action was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 4

Not Reported in A.2d, 1999 WL 34014043 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

necessary for the removal of the six underground tanks, although one tank still had to be registered.

**\*4** According to DeAngelo, the discovery of the additional tanks left his development project at a standstill; without Handex's report, he had no way of knowing whether he could go forward with the project or whether further remediation of the property was required. DeAngelo maintained that he suffered a five-month delay in the opening of his business, ultimately obtaining a temporary certificate of occupancy on August 24, 1995.[FN3] DeAngelo estimated damages caused by the delay to be $32,890.58, which included interest on the mortgage, taxes on the property, insurance premiums, and a bill from Terra Bio Chem for Sepulveda's work during the March 17, 1995 excavation. In addition, DeAngelo asserted that Brake-O-Rama incurred five months of lost profits, having had its first full month of operation in October 1995. As such, DeAngelo claimed that the owner of the site, 260 Franklin Maple, L.L.C., incurred total damages of $118,711.17.

> FN3. DeAngelo received a final certificate of occupancy on December 12, 1995.

*I.*

In ruling on a motion for a judgment notwithstanding the verdict under *R.* 4:40-2, the trial court "must accept as true all the evidence which supports the position of the party defending against the motion and must accord him the benefit of all legitimate inferences which can be deduced therefrom, and if reasonable minds could differ, the motion must be denied."Pressler, *Current N.J. Court Rules,* comment on *R.* 4:40-2 (1999); *seealso Lanzet v. Greenberg,* 126 *N.J.* 168, 174 (1991); *Dolson v. Anastasia,* 55 *N.J.* 2, 5-6 (1969). The appellate court must afford due deference to the trial court with respect to the intangible aspects of the case, such as witness credibility, demeanor, and "feel of the case." *Dolson,supra,* 55 *N.J.* at 7. However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."*Manalapan Realty v. Township Comm.,*

140 *N.J.* 366, 378 (1995).

Plaintiffs first argue that the trial court disregarded well-established case law "in finding that, as a matter of law, the contractual relationship between plaintiffs and Exxon somehow insulates Exxon from a claim of negligent misrepresentation."Plaintiffs further contend that the court misinterpreted the caselaw as requiring the existence of a professional duty between Exxon and a third-party as a pre-requisite to a negligent misrepresentation claim.

Plaintiffs rely on *Rosenblum v. Adler,* 93 *N.J.* 324 (1983), to demonstrate that a claim for negligent misrepresentation is well recognized in New Jersey. Indeed, there is no question that negligent misrepresentation is a cognizable cause of action; the only question is whether plaintiffs proved the required elements of the claim. This they failed to do. In actuality, *Rosenblum* is more relevant to plaintiffs' claim against Handex, in that it extended the "legally sound concept" of negligent misrepresentation available to parties in privity with the negligent actor, to third parties not in privity with the offending actor.[FN4]*Id.* at 334, 338-39.In this case, Exxon was, of course, in direct privity with plaintiffs. It is well recognized that "[a]n incorrect statement, negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance."*Id.* at 334;*seealsoKaru v. Feldman,* 119 *N.J.* 135, 147 (1990) (noting that "[t]he aggrieved party must be a reasonably foreseeable recipient of the company's statements for its proper business purpose, who relies on the statements, ... and the statements must be a proximate cause of the plaintiff's damages"); *Berry v. Playboy Enters., Inc.,* 195 *N.J.Super.* 520, 522, 527 (App.Div.1984) (holding that plaintiff pled a *primafacie* case of negligent misrepresentation as against her employer who failed to inform her of a health plan that did not have a waiting period and that would have thereby covered her spouse's medical expenses incurred during that period), *certif. denied,*99 *N.J.* 231 (1985) ; *Pabon v. Hackensack Auto Sales, Inc.,* 63 *N.J.Super.* 476, 497 (App.Div.1960) (holding that the plaintiff established a cause of action for negligent misrepresentation against the car

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1999 WL 34014043 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

dealership that sold him a car, and to whom he had complained about a problem with the steering wheel prior to being involved in a car accident due to a defective steering wheel).

> FN4. The *Rosenblum* Court addressed a situation where an accountant negligently prepared inaccurate financial statements that were relied upon by a third party who was not the party for whom the financial information had been prepared. *Id.* at 329.

*5 Unlike the plaintiffs in the aforementioned cases, plaintiffs here are unable to establish a claim for negligent misrepresentation. Even if plaintiffs can demonstrate that Exxon negligently represented to them that all underground storage tanks had been removed and that-as provided in Handex's Remedial Action Workplan-"[t]here are no ongoing sources of contamination," plaintiffs cannot prove the essential element of justifiable reliance. In fact, both the contract for sale and the deed expressly preclude a finding that plaintiffs might have justifiably relied on Exxon's representations about the condition of the property. Both documents are laden with express disclaimers on Exxon's behalf and knowing waivers by plaintiffs.

Specifically, section 11 of the contract provides that commensurate with Exxon's duty to undertake environmental remediation, plaintiffs would not be indemnified for "any damages or losses arising from loss of profits or business opportunity, or any other special or consequential damages, nor ... any attorney's fees" incurred during remediation of the property. Exxon reiterated this in Exhibit "C" of the contract, wherein it agreed to "undertake such remediation of the Baseline Condition as Seller deems necessary or appropriate to comply with applicable laws, regulations or government orders.... " In turn, plaintiffs understood "that such remediation actions may interfere with Purchaser's use of the Property....*Seller will not be liable to Purchaser ... for business disruption or any other damage, injury or loss whatsoever resulting from such access.*"(Emphasis added.) The deed reflects this same provision.

Section 12 of the contract provides that Exxon " does not make any representation or warranty regarding any aspect of any report delivered to Purchaser.... Any reliance on the report or any information contained in the report shall be at Purchaser's risk."In that same section, Exxon advised plaintiffs "to conduct its own investigation to determine the accuracy of any report delivered to Purchaser, and the condition of the Property." Accordingly, section 13 granted plaintiffs the right to enter the property for a period of ninety days from the date of the contract in order to inspect the site and perform tests to determine its environmental condition.

In section 14, plaintiffs acknowledged that the property had been previously used as a service station
for the storage, sale, transfer, and distribution of motor vehicle fuel, petroleum products or derivatives containing hydrocarbons, and that such fuel, products or derivatives or other related substances may have been spilled, leaked, or otherwise discharged onto or into the Property causing contamination to the soil or groundwater on or under the Property.

The deed reflects this same provision.

In section 15, plaintiffs acknowledged that they had (or, prior to closing, will have had) "the opportunity to independently and personally inspect the Property (including the environmental condition of the Property), and that Purchaser has entered into this contract based upon this right of inspection." Section 15 further provided:
*6 It is expressly agreed and understood that Seller has made no representation or warranty as to the condition of any of the Property or its suitability or usefulness for any particular purpose (except as expressly set forth in this contract).*Purchaser agrees that the Property is to be sold to and accepted by Purchaser "AS IS" AND "WHERE IS", WITH ALL FAULTS, IF ANY, INCLUDING, WITHOUT LIMITATION, THE ENVIRONMENTAL CONDITION OF THE PROPERTY AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED (except as expressly set forth in this contract).*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 6

Not Reported in A.2d, 1999 WL 34014043 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

[Emphasis added.]

Section 23 provides that "[t]he provisions of paragraphs 11, 12, 14, 15, 16, 17, and 24, and the provisions of Exhibit 'C' shall survive the closing of this transaction and the delivery of the deed ." Moreover, the agreements in sections 14, 16, and 17 as well as Exhibit "C" constitute covenants running with the land.

Furthermore, in forwarding plaintiffs the Remedial Action Workplan, Exxon attached a letter that provided:
Exxon does not make any representation or warranty whatsoever, express or implied, regarding any aspect of the report, including but not limited to, the accuracy or completeness of the report, its preparation, or any information upon which it is based, and has not performed any independent analysis of any aspect of such report. *Any reliance by you on the report, or any information therein shall be at your own risk. You should conduct your own investigation to determine the accuracy of the report and the condition of the property.*
[Emphasis added.]

These documents, all signed and accepted by plaintiffs, could not be any clearer in setting forth Exxon's intent to not make any express or implied warranties about the environmental condition of the property or any of the reports submitted to plaintiffs; to transfer the property "AS IS;" to specifically prevent plaintiffs from relying on any of its or Handex's environmental reports; to strongly encourage plaintiffs to conduct their own investigation of the property; to have plaintiffs accept the contract for sale based upon DeAngelo's right of inspection; and to be absolved of any liability to plaintiffs for any business disruption, loss, or damage resulting from any future remediation of the property. DeAngelo signed these documents with full knowledge and understanding of their meaning and consequences. Indeed, DeAngelo is an experienced businessman, who during the relevant time period, owned four commercial properties similar to the one at issue-two of which he had purchased from other oil

companies. Moreover, DeAngelo was assisted during his transactions with Exxon by an environmental consultant, hired for the specific purpose of investigating the environmental risks of the property and who gave him the green light to purchase the site. In light of these circumstances, and particularly the unambiguous contractual provisions signed and accepted by plaintiffs, it cannot be said that DeAngelo was justified in relying on Exxon's representations, by way of the Handex report, that all tanks had been removed. Judge Stark, although using a different analysis, properly concluded that even if plaintiffs' evidence is accorded all legitimate inferences, reasonable minds could not differ as to whether plaintiffs met the requirements of a negligent misrepresentation claim.[FN5]

> FN5. An order or judgment will be affirmed on appeal if it is correct, even though the judge gave the wrong reasons for it. *Irving Isko v. Planning Bd. of Tp. of Livingston,* 51 *N.J.* 162, 175 (1968).

*7 Plaintiffs, however, argue that the contractual provisions do not preclude a claim for negligent misrepresentation. Plaintiffs maintain that Judge Stark's reliance upon these provisions "underscores her total misconception of the theory upon which plaintiffs sought recovery against Exxon,"*i.e.,* negligent misrepresentation, not breach of contract. Plaintiffs thus contend that the trial court "relied upon contractual provisions which legally do not preclude this separate and distinct tort claim."

Plaintiffs' argument is unpersuasive for the simple fact that the contractual provisions are directly intertwined with their claim for negligent misrepresentation. In other words, in order to determine whether plaintiffs met the requirements of a claim for negligent misrepresentation, specifically the requirement of justifiable reliance, one must consider the total circumstances under which the reliance occurred. Such circumstances certainly include the contract for sale, the deed, and the Handex report along with its accompanying disclaimer. The claim of negligent misrepresentation cannot be analyzed in a vacuum,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as plaintiffs would have it, and without considering the conditions under which it arose.

Plaintiffs nonetheless rely on *Huck v. Gabriel Realty,* 136 *N.J.Super.* 468 (Law Div.1975), to support their argument. In *Huck,* the defendant real estate brokers had agreed to indemnify plaintiffs for any claims asserted by another broker based on the misrepresentation of plaintiffs that the other broker had never offered for sale the property that they were about to purchase through defendants. *Id.* at 470-71.The Law Division thereby addressed the question of whether "a material misrepresentation which induced the indemnification contract [may] be enforced by the indemnitee[.]"*Id.* at 473.The court answered this question in the negative, holding that the result of the misrepresentation or concealment, which was significantly material and induced the contract, was "to release the indemnitor from being bound by his undertaking."*Id.* at 474.

*Huck* is inapplicable to the present matter in light of the contractual provisions, because any misrepresentation or concealment by Exxon could not have reasonably induced DeAngelo to purchase the land. To reiterate, Exxon clearly set forth in the contract for sale that it did not make any representations or warranties about the condition of the property or about the accuracy of any report submitted to plaintiffs. Exxon advised DeAngelo that reliance on any report would be at his own risk and that he should conduct his own investigation of the site. Exxon unambiguously reiterated this in a letter when it forwarded the Handex report to plaintiffs' counsel. Thus, unlike the situation in *Huck* where the plaintiffs' misrepresentations *directly* induced the indemnification contract, any misrepresentation or concealment by Exxon was not an inducement, let alone material or significant, to enter into the contract.

**8** The several out-of-state cases upon which plaintiffs rely are equally inapplicable. In *Agristor Leasing v. A.O. Smith Harvestore Prods., Inc.,* 869 F.2d 264, 268 (6th Cir.1989), the court held that " disclaimer[s] of reliance" were not effective as applied to a lessor of silos who made misrepresentations, by way of promotional literature, to the lessee prior to entering into a contract. According to that case, "Tennessee law ... gives no effect to disclaimers in the presence of fraud or negligent misrepresentations."*Ibid.* However, the actual facts of *Agristor Leasing* concern only a fraudulent misrepresentation. *Id.* at 268-69.Plaintiffs here have not advanced any sort of fraud claim, nor is there any evidence that Exxon's misrepresentations were in fact fraudulent.

In *Yeitrakis v. Schering-Plough Corp.,* 804 *F.Supp.* 238, 242 (D.N.M.1992), the defendant employer told the plaintiff employee during hiring negotiations that, despite the "at will" provision of the application form and hiring agreement, "there should be no problem with job security."The *Yietrakis* court noted that "[n]egligent misrepresentation 'requires that the person receiving information have a right to rely upon it.' " *Ibid.* (citation omitted). The court commented that the issue of whether plaintiff was justified in relying upon the information presented to him was factual. *Ibid.* As such, the trier of fact had to determine " whether the representations could have overridden the clear import of the words in the application form and the hiring agreement or prevented Plaintiff from attaching to those words the significance they would otherwise have had." *Ibid.* The court also observed that " 'where the information concerns a fact not known to the recipient, he is entitled to expect that the supplier will exercise that care and competence in its ascertainment which the supplier's business ... requires....' " *Ibid.* (quoting *Restatement (Second) of Torts* § 552 comment e (1977)).

*Yietrakis* is also distinguishable from the present matter. First, the *Yietrakis* case arose within the employment context, an entirely different context from that of commercial transactions between experienced business persons. Second, the plaintiffs in the present case were never told by any Exxon representative to disregard the plain language of either the contract, the deed, or any other relevant document. Third, unlike *Yietrakis,* the relevant information here (*i.e.,* the existence of underground tanks) was neither exclusively within Exxon's possession nor unattainable by plaintiffs. Indeed, plaintiffs had every opportunity, and in fact were strongly advised by Exxon to inspect the property and to investigate for any remaining tanks or any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 8

Not Reported in A.2d, 1999 WL 34014043 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

other sources of contamination. As testified to by plaintiffs' own environmental expert, a search for underground tanks would have been a relatively simple process.

*9 Finally, in *Limoge v. People's Trust Co.,* 719 A. 2d 888, 890-91 (Vt.1998), the Supreme Court of Vermont held that an "as is" disclaimer in a sales agreement and deed did not preclude a claim based on the negligent misrepresentation of the boundaries of the property. In that case, the purchaser argued that the seller misrepresented the acreage of the property as being .53 acres, when in fact, the acreage was no greater than .43 acres.*Id.* at 889-90. The *Limoge* court held that the trier of fact should determine the weight to be given to the "as is" clause in deciding whether there was justifiable reliance and a misrepresentation. *Id.* at 891.

The present matter is distinguishable from *Limoge* to the extent that there is more in this case beyond an "as is" clause. In fact, there are express provisions stating that Exxon was not making any representations or warranties regarding any aspect of the very report upon which DeAngelo claims he relied, advising him not to rely upon such a report and that any resulting reliance would be at his own risk, and suggesting that he conduct his own investigation. Unlike the out-of-state cases holding that justifiable reliance is an issue for the trier of fact, plaintiffs here had every opportunity, and in fact were strongly encouraged by Exxon to inspect the property and to uncover for himself the truth or falsity of Exxon's representations regarding the tanks.

Further, is noted that plaintiffs' claim for damages is contractually barred by both contract and deed. Section 11 of the contract provides that in undertaking remediation of the property, Exxon is not responsible to indemnify plaintiffs for "damages or losses arising from loss of profits or business opportunity...." Exhibit "C" of the contract similarly provides that Exxon will not be liable to plaintiffs " for business disruption or any other damage, injury or loss whatsoever resulting from" access to the property to remediate environmental conditions. The deed also prohibits plaintiffs from pursuing a claim for business disruption damages in the event

Exxon reenters the property for remediation purposes. Plaintiffs understood and knowingly accepted these unequivocal waivers, and as such, are now precluded from bringing any claims for business damages resulting from Exxon's removal of the six tanks.

*II.*

Plaintiffs maintain in their appellate brief that "[t]he claims asserted against Handex are not for negligent misrepresentation, but rather plain negligence" and are in no way "derivative" of the claims gainst Exxon. As such, plaintiffs maintain that Judge Stark erroneously dismissed the jury's finding of negligence against Handex simply because Handex was an agent of Exxon, and since plaintiffs had no viable theory against Exxon, it could not have a viable cause of action against Handex.

We note at the outset of our discussion that plaintiffs' assertion that their cause of action against Handex relies upon negligent misrepresentation tactically avoids the question of whether plaintiffs' reliance on Handex's July 1994 report was justifiable. Clearly, it would not have been in light of our discussion on the subject in Part I of this opinion. Thus, plaintiffs argue that the evidence at trial sufficiently demonstrated Handex's negligence, primarily based on the report it submitted to Exxon and the NJDEP stating that "[a]ll underground storage tanks, associated product piping, and product dispensers have been removed from this site. There are no on-going sources of contamination."Plaintiffs take issue with the fact that Handex neither utilized a magnometer, nor did it dig any test pits, measures that could have located the tanks. Plaintiffs further contend that Handex improperly failed to investigate for other tanks in 1991, upon the discovery of one unknown tank. Lastly, plaintiffs reiterate the opinion testimony of their environmental remediation expert, Sepulveda, that Handex deviated from standards of care in the field.

*10 Whether the evidence before the trial court was sufficient to establish negligence on the part of Handex begs the root issue of whether Handex

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1999 WL 34014043 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

owed a duty to plaintiffs. "A prerequisite to recovery on a negligence theory is a duty owed by defendant to plaintiff."*Strachan v. John F. Kennedy Mem'l Hosp.,* 109 *N.J.* 523, 529 (1988) (citations omitted). Whether a duty exists is a question of law for the court to decide, not a jury. *Ibid.* Privity between the plaintiff and an alleged tortfeasor is no longer required to establish a tort duty. *Rosenblum, supra,* 93 *N.J.* at 338-41.However, "[w]hether a *duty* exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution."*Id.* at 341 (quoting *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583 (1962)). Further, in analogous settings, courts have focused on the course of dealings between the parties and the express contractual undertaking in deciding whether a tort duty should be imposed. *Karu,supra,* 119 *N.J.* at 150;*Berry,supra,* 195 *N.J.Super.* at 522-25.

Plaintiffs essentially claim that Handex owed them a duty to investigate the property for underground storage tanks. Handex, however, did not even owe such a duty to Exxon, to whom it was contractually bound. Exxon presented overwhelming evidence at trial that it had retained Handex for the limited purpose of observing and documenting underground tank excavation activities, performing soil and groundwater testing, remediating soil or groundwater contamination, and preparing reports and workplans to be filed with the NJDEP by Exxon. Not one of Exxon's work orders directed Handex to detect or excavate underground storage tanks. Moreover, Handex's assertion in its Remedial Action Workplan that all underground tanks had been removed was justifiably based upon Exxon's closure information and site maps that reflected the location of tanks that had already been removed. None of the maps provided by Exxon to Handex reflected the six tanks discovered in February 1995, and no witness cast doubt on Handex's assertion that Exxon did not provide it with the 1931 map showing the additional tanks until the tanks were inadvertently located. Further, the testimony was undisputed that the presence of the additional tanks could not have been discovered by careful, visual inspection of the site.

Unable to refute this evidence, plaintiffs simply present the opinion of their environmental expert that Handex could have easily found the additional tanks had it voluntarily employed the two previously mentioned techniques. To place that requirement on Handex as a matter of tort law would have the practical effect of forcing a party to a contract to enlarge the scope of its work without compensation in order to protect itself against the possibility of a negligence suit by some third party. Aside from the fact that it would be unfair to impose such a duty on Handex, the relationship between the parties evidences no practical need to do so as a matter or policy. Plaintiffs' expert was given access to Handex's reports which fairly depicted the scope of its work. Sepulveda knew that a tank was found in 1991 that had not previously been shown on any map previously furnished by Exxon. There was nothing to stop him or plaintiffs from inquiring of Exxon what was being done to determine if other such tanks existed. Clearly, if Sepulveda was not satisfied with the efforts being undertaken to locate other tanks, plaintiffs' contract with Exxon permitted plaintiffs to undertake such inspections as were necessary to determine their existence. Undoubtedly, Exxon's contract was worded as it was to warn plaintiffs against reliance upon Handex's report in light of the 1991 experience, and in view of the fact that it had not engaged Handex to undertake an exhaustive examination of the site to locate remaining underground tanks. Simply stated, the means to avoid the risk of reliance on Handex's work was available to DeAngelo, and he chose not to employ it by paying Sepulveda to perform the "simple" additional tests that Sepulveda in retrospect claims Handex should have performed.

**\*11** Accordingly, we conclude that Handex owed no duty to plaintiffs in these circumstances and affirm the judgment notwithstanding the verdict in its favor.

*III.*

Prior to trial, Judge Guida denied plaintiffs' motion to hold Exxon strictly liable under the theory that Exxon conducted an abnormally dangerous activity

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 10

Not Reported in A.2d, 1999 WL 34014043 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

on the site. In arguing that the judge erred, plaintiffs rely primarily on *T & E Industries v. Safety Light Corp.,* 123 *N.J.* 371 (1991), a case they characterize as directly on point.

In *T & E Industries,* the Supreme Court held that the owner of a radium-contaminated property could hold a distant predecessor in title strictly liable for an abnormally dangerous activity, *i.e.,* depositing radium "tailings" on the property. *Id.* at 375-76.The Court noted that determining what constitutes an abnormally dangerous activity is to be made on a case-by-case basis. *Id.* at 391.Quoting from the *Restatement (Second) of Torts* § 520 (1977), the Court listed six factors to be considered in making that inquiry:
(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.
[*Id.* at 390.]

The storage of gasoline in underground tanks by an oil company using the property as a gasoline service station falls far short of the elements set forth in *T & E Industries.*Indeed, the Court suggested that the storage of an underground gasoline tank back in the 1940s by the operators of a small general store would not meet the *Restatement* criteria, particularly factor (d), dealing with the common usage of the property. Perhaps the strongest argument for not characterizing the use of underground gasoline storage tanks as an abnormally dangerous activity is the simple fact that such activity is a matter of common usage by gasoline service stations throughout the country.

Additionally, plaintiffs cannot satisfy another significant factor, *i.e.,* the extent to which the activity's "value to the community is outweighed by

its dangerous attributes."Certainly the operation and maintenance of gasoline stations play a crucial and essential role in the daily lives of citizens, as well as the nation's economy as a whole. Thus, although an argument could be made that storing petroleum in underground tanks poses a high degree of risk to people and land (factor (a)), and that any resulting harm will be great (factor (b)), such dangerous attributes are outweighed by the gasoline service stations' obvious value to the community.

With respect to factor (c), plaintiffs have offered no reason to find that the risk of accident caused by underground storage tanks cannot be eliminated by the exercise of reasonable care by service stations.

**\*12** Plaintiffs also fail to offer any persuasive evidence regarding factor (e)-the "inappropriateness of the activity to the place where it [was] carried on. "There is simply nothing about the location and operation of the gas station previously owned by Exxon that renders it abnormal or uncommon to other gas stations. In light of plaintiffs' inability to prove the six factors enumerated in *T & E Industries,* Judge Guida properly ruled that Exxon was not strictly liable. Such a ruling comports with those of other jurisdictions. *See,e.g.,Hahn v. Chevron,* No. 94-5466, 1995 U.S.App. LEXIS 17528 (6th Cir. July 5, 1995); *Triffler v. Hopf,* No. 92 C7193, 1994 U.S. Dist. WL 643237 (N.D.Ill. Nov. 4, 1994); *Schwartzman, Inc. v. General Elec. Co.,* 848 *F.Supp.* 942 (D.N.M.1993); *Arlington Forest Assocs. v. Exxon Corp.,* 774 *F.Supp.* 387 (E.D.Va.1991).

*IV.*

Plaintiffs argue that Judge Stark erred in ruling prior to the commencement of trial that plaintiffs did not have a Consumer Fraud claim as a matter of law. Plaintiffs maintain that the transaction between plaintiffs and Exxon does not fall within the line of cases holding that the Act does not apply to nonprofessional sellers of real estate. *Byrne v. Weichert Realtors,* 290 *N.J.Super.* 126 (App.Div.), *certif. denied,*147 *N.J.* 259 (1996); *DiBernardo v. Mosley,* 206 *N.J.Super.* 371 (App.Div.), *certif. denied,*103 *N.J.* 503 (1986). Plaintiffs specifically

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 11

Not Reported in A.2d, 1999 WL 34014043 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d)**

argue that Exxon falls outside the realm of a "
nonprofessional seller" because it owns many
properties around the country, it has its own real
estate division in Texas, and many Exxon
employees in the state handle real estate matters in
New Jersey. Plaintiffs further maintain that, unlike
*Byrne* and *DiBernardo,* the sale of the subject
property by Exxon "was a normal course of events
for Exxon as opposed to an isolated sale of property
by a homeowner."

Plaintiffs' argument is unpersuasive. The law is
clear that the Act does not apply to nonprofessional
sellers of real estate, such as "the homeowner who
sells a house in the normal course of events."*Byrne,
supra,* 290 *N.J.Super.* at 134;*DiBernardo,supra,*
206 *N.J.Super.* at 376.These cases have held only
professional real estate brokers, agents, or
salespersons subject to the Act's provisions.
Plaintiffs' attempt to paint Exxon, a major oil
company, as a professional seller of real estate is
nonsensical. Notwithstanding that Exxon, like most
corporations, may regularly buy and sell real estate
for its offices, franchises, and related uses, such
sales are only tangential to Exxon's primary
business of selling gasoline. As such, Judge Stark
properly held that plaintiffs did not have a viable
Consumer Fraud claim against Exxon.

The judgment under review must be affirmed.

N.J.Super.A.D.,1999.
DeAngelo v. Exxon Corp.
Not Reported in A.2d, 1999 WL 34014043
(N.J.Super.A.D.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT C

Dominic Longo

October 22, 2007

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No. 07-cv-0501 (RJL)

JOHN FLYNN, JAMES BOLAND, GERALD
O'MALLEY, KEN LAMBERT, GERARD SCARANO,
H.J. BRAMLETT, EUGENE GEORGE, PAUL
SONGER, WILLIAM McCONNELL, MATTHEW
AQUILINE, GREGORY R. HESS, MICHAEL
SCHMERBECK, VINCENT DELAZZERO, and
BENJAMIN CAPP,
as Trustees of and on behalf of the
BRICKLAYERS & TROWEL TRADES
INTERNATIONAL PENSION FUND,
        620 F Street, N.W.                    ORAL DEPOSITION OF
        Washington, DC 20004                  DOMINIC LONGO
        (202) 783-3788,
JIM ALLEN, MATTHEW AQUILINE, LON BEST,
JAMES BOLAND, TED CHAMP, RAYMOND
CHAPMAN, VINCENT DELAZZERO, BRUCE
DEXTER, JOHN FLYNN, EUGENE GEORGE,
GREGORY HESS, FRED KINATEDER, DAN
KWIATKOWSKI, KEN LAMBERT, SANTO
LANZAFAME, DICK LAUBER, WILLIAM
McCONNELL, EDWARD NAVARRO, GERALD
O'MALLEY, JOHN PHILLIPS, CHARLES
RASO, MARK ROSE, KEVIN RYAN, GERARD
SCARANO, MICHAEL SCHMERBECK, PAUL
SONGER, JOSEPH SPERANZA, and FRED
VAUTOUR,
as Trustees of and on behalf of the
INTERNATIONAL MASONRY INSTITUTE,
        620 F Street, N.W.
        Washington, DC 2004
        (202) 783-3788

(CAPTION CONTINUED)

        *   *   *   *   *
        Monday, October 22, 2007
        *   *   *   *   *

        MASTROIANNI & FORMAROLI, INC.
Certified Court Reporters and Videoconferencing
    251 South White Horse Pike, Suite 200
        Audubon, New Jersey 08106
            856-546-110

Dominic Longo                                                    October 22, 2007

| Page 18 |
| --- |

1    him the contract or gave him the contract at the time
2    by hand, I really can't remember because it was no
3    big deal to me and it was almost four years ago.
4        Q.    Anything else you told Mr. Perrone
5    regarding this case?
6        A.    No, I don't believe so.
7        Q.    And after you told this information to
8    Mr. Perrone, what, if any, response did he have to
9    you?
10       A.    I don't believe anything.
11       Q.    And approximately when was this
12   conversation with Mr. Perrone?
13       A.    Probably, I don't know, several weeks
14   ago, six weeks ago. You know, I'm not really
15   positive of the time frame. To be honest with you,
16   when you get 55, apparently the time frames become a
17   little blurred.
18       Q.    Was it one conversation with Mr. Perrone
19   regarding this case or did you have more than one
20   conversation with him?
21       A.    We probably had more than one
22   conversation, but, again, it wasn't a sit-down
23   detailed conversation. It probably came up because
24   it was probably reported to Mr. Perrone that I had to
25   give a deposition. And, again, Mr. Perrone, his

| Page 20 |
| --- |

1        A.    The facts meaning that I gave him the
2    contract and he faxed it back, or however it went
3    down, probably, yes.
4        Q.    Okay. Did Mr. Jones have any response
5    to you?
6        A.    No.
7        Q.    Was this one conversation or was it more
8    than one?
9        A.    I would think only one. Me and Mr.
10   Jones are very good friends, and I believe it came up
11   in conversation. My car was getting an oil change,
12   so we had to ride together for the day.
13       Q.    And Mr. Capo, what did you tell him
14   regarding this case? What were the conversations
15   that you had with him?
16       A.    Basically, the conversation that I had
17   with the other two gentlemen, the other three
18   gentlemen, the fact that, you know, I just signed
19   Maarv Waterproofing. You know, I was aware of the
20   contract with Local 4, but we didn't really get
21   involved in that. I have no knowledge of what
22   Local 4 does. I only have knowledge of my personal
23   actions in the case.
24       Q.    How did the conversation with Mr. Capo
25   come up? Did you initiate that? Did he initiate it?

| Page 19 |
| --- |

1    office is in my office, so we -- you know, maybe when
2    I stopped in his office to say hello, you know, I
3    said I have to go give a deposition, you know, and
4    that's about it. There was nothing -- I mean, this
5    is not earth shattering to us or, you know, really --
6    you know, it's very simple. Simple to us. We give
7    somebody a contract and he signs it, and we assume
8    that's it.
9        Q.    How about Leon Jones, what were the
10   conversations you had or conversation you had with
11   Mr. Jones regarding this case?
12       A.    I probably just brought it up that I had
13   to give a deposition and that, you know, that I
14   signed, you know, that I signed them to the contract,
15   and that was it. There is really not that much to
16   talk about, you know. You know, it's a little
17   upsetting to me personally that this has to come
18   about, you know, but it's not a...
19       Q.    With Mr. Jones did you bring up the fact
20   that you had to go to a deposition? Did you initiate
21   that?
22       A.    Probably did.
23       Q.    Okay. And did you tell him the facts
24   regarding the signing of what you are calling the
25   contract with Maarv Waterproofing?

| Page 21 |
| --- |

1        A.    I probably initiated. Mr. Capo is the
2    secretary/treasurer for the ADC, so he is -- you
3    know, he's another one of my bosses, I guess you can
4    say. Again, we are all in the same office, so it's
5    not like we are tracking each other down and calling
6    each other up. It did come up in conversation,
7    though.
8        Q.    Mr. Longo, who is your current employer?
9        A.    Administrative District Council of New
10   Jersey, Bricklayers and Allied Craftworkers.
11       Q.    And how long have you been employed by
12   ADC?
13       A.    The ADC came in creation about 15 months
14   ago, okay, which is actually a combination of Local
15   2, 4 and 5. Before then, I worked from -- September
16   of 2002, I became a field representative and business
17   agent for Local No. 5, New Jersey.
18       Q.    Okay. Before the creation of ADC, you
19   were employed by Local 5?
20       A.    Yes.
21       Q.    And how long were you employed with
22   Local 5?
23       A.    I guess a little over three and a half
24   years before it became the ADC, and now I am employed
25   by the ADC. I have been in my position for a little

Pages 18 to 21

Dominic Longo

October 22, 2007

Page 22

1   over five years covering the counties of Mercer and
2   Burlington County.
3       Q.     Before Local 5, who were you employed
4   with?
5       A.     I have been a member of Bricklayers and
6   Allied Craftworkers for 35 years.  At the time, I
7   worked for various employers.  Most of the time in
8   the last 10 years as a foreman for a company called
9   V.J. Scozzari & Sons, S-C-O-Z-Z-A-R-I.
10      Q.     So before you became employed directly
11  with Local 5, you were a member of B.A.C. doing
12  various jobs?
13      A.     As a bricklayer.
14      Q.     As a bricklayer through the union?
15      A.     Yes.
16      Q.     Okay.  Do you recall what year you first
17  became employed with Local 5?
18      A.     1972.  November of 1972.
19      Q.     I'm talking when you were actually
20  working directly for the local like in an
21  administrative capacity.
22      A.     Oh, September of 2002, I believe, which
23  is just a little over five years ago.
24      Q.     This is when, so to speak, you are in
25  the office?

Page 23

1       A.     Yes.
2       Q.     And before that, you were doing jobs
3   through the union?
4       A.     Yes.  I have been involved in union
5   affairs for most of my career as a -- I have been a
6   trustee on Local 5 funds for a number of years.
7   Okay.  I have been doing pension and welfare for over
8   25 years.
9       Q.     Okay.  Let me just go back through a
10  little bit.
11      A.     Sure.
12      Q.     You have been with the bricklayers for
13  35 years?
14      A.     Right.
15      Q.     Take me through just generally speaking,
16  I don't want to go through your whole history, but
17  just generally what you started out doing.  Were you
18  a bricklayer in the beginning?
19      A.     Yes.  Basically, I've been a bricklayer
20  in my, my whole career.  I started my apprenticeship
21  in 1972.
22      Q.     Okay.
23      A.     I would say about 1980 or '82, I was
24  former president of Local No. 6.  There's been
25  several mergers.  I have been on the pension and

Page 24

1   welfare board mostly for 25 years, a little break in
2   between with certain mergers or stuff.  Also been an
3   instructor for Mercer County Community College as the
4   masonry teacher, okay, which I also developed my own
5   curriculum information for the homeowners.  I have
6   been employed as an instructor for the IMI, which is
7   the International Masonry Institute.
8       Q.     Okay.
9       A.     I spent 10 years, 10 years as foreman
10  for V.J. Scozzari.
11      Q.     I apologize.  Give me the spelling again
12  for that.
13      A.     S-C-O-Z-Z-A-R-I.
14      Q.     Where are they located?
15      A.     Lawrenceville, New Jersey.
16      Q.     Okay.  What do they do?
17      A.     They are a project management company.
18      Q.     You worked for them 10 years as a
19  foreman?
20      A.     Yes.  You know, give or take a little
21  bit, nine and a half or whatever.
22      Q.     Okay.  And I'm saying you were directly
23  employed by Scozzari?
24      A.     Yes.  Well, still a member of the B.A.C.
25      Q.     Sure.  Sure.

Page 25

1       A.     Okay.  But I worked almost exclusively
2   for V.J. Scozzari for the vast majority of that 10
3   years.
4       Q.     Okay.  When did you stop working with
5   them?
6       A.     Maybe about six months before I became a
7   business agent, basically, because they just ran out
8   of work.
9       Q.     You left sometime in early 2000?
10      A.     I would think so.
11      Q.     And then from Scozzari, you went right
12  to the administrative offices of the local?
13      A.     No.  They ran out of work.  I worked for
14  a couple different outfits.  One was Conarino
15  Brothers.  And to honest with you, the type of
16  business we do, you work for people and you finish a
17  job, and I really can't remember who I was with
18  exactly when I, when I made the change from the field
19  to the office.
20      Q.     Other than Scozzari -- well, how long
21  were you with them?  Were you with them more than the
22  10 years?
23      A.     No.  No.  I started out as a foreman
24  with them, and they were a management company and I
25  took care of their masonry, but -- and there was some

Pages 22 to 25

Dominic Longo                                          October 22, 2007

Page 94

1    Q.   Do you know of a company named Garden
2  State Caulking, Inc.?
3    A.   The name is familiar.
4    Q.   Okay.  I am going to ask you if you are
5  familiar with any contributions they have paid or
6  haven't paid?
7    A.   No.
8    Q.   Are you aware of any disputes with that
9  company at all?
10    A.   No.  Again, caulk companies come in and
11  out.  They are very hard to keep track of.
12    Q.   Give me a second.  I think I am wrapping
13  up here.  Longo-1 --
14    A.   Yes.
15    Q.   -- which is, I am calling it a signature
16  page, have you had any other contractors sign the
17  same type of --
18    A.   Yes.
19    Q.   -- agreement or page?  You have?
20    A.   Yes.
21    Q.   Do you know who those contractors are?
22    A.   Not off the top of my head.
23    Q.   Okay.
24         MR. DIAZ:  I think that's all I have.
25         MR. MEHLER:  I probably have a couple.

Page 95

1  Why don't we take a five or ten minute-break.
2         (Recess.)
3  (Examination of MR. LONGO by MR. MEHLER:)
4    Q.   I just want to clarify a couple
5  things --
6    A.   Okay.
7    Q.   -- that you testified to.  Mr. Longo --
8  let me make sure I get this straight.  Your memory is
9  Longo-1, which is this exhibit --
10    A.   Yes.
11    Q.   -- is what you provided to Maarv,
12  whether via fax or handing it to them?
13    A.   That is absolutely correct.
14    Q.   And that's what came back to the office
15  signed?
16    A.   Yes.
17    Q.   Now, this document has various pieces of
18  information about, purportedly about the company.  It
19  has an address, telephone number, a federal
20  identification number, a New Jersey employer
21  compensation number, a worker's compensation
22  insurance carrier number.  Would the union or you
23  have had that information or would that have had to
24  come from the company?
25    A.   That would have to come from the

Page 96

1  company.
2    Q.   Now, was it your understanding that by
3  having Maarv or somebody from Maarv sign this page,
4  they were agreeing to the Collective Bargaining
5  Agreement which has been identified as Longo-2?
6    A.   Correct.
7    Q.   And is it common that you or the local
8  would have an employer sign a document like Longo-1
9  rather than the signature page attached to Longo-2?
10    A.   That is correct.
11    Q.   Did you ever tell anyone at Maarv that
12  by signing Longo-1, they were agreeing to a
13  Collective Bargaining Agreement just for that one
14  project?
15    A.   Absolutely not.
16         MR. MEHLER:  I don't think I have
17  anything further.
18  (Examination of MR. LONGO by MR. DIAZ:)
19    Q.   Why would it be common for you to use
20  the signature page, which has been marked as Longo-1,
21  instead of the actual signature page of the contract?
22    A.   Actually, we have a book that has all
23  the contracts in them.  We have probably hundreds of
24  contracts, and it's much easier for us to store it
25  like this than like that.

Page 97

1    Q.   What would be the problem with taking
2  off the last page of the contract that is marked as
3  Longo-2, which is one page, and faxing that page to
4  Maarv Waterproofing?
5    A.   As far as I am concerned, I am not
6  really sure, but I would think that the documentation
7  on this page over here would be a lot more
8  satisfactory than the last page over there.
9    Q.   Okay.  But why didn't you just send the
10  actual signature page of the actual contract to Maarv
11  Waterproofing?
12         MR. MEHLER:  Objection.  Asked and
13  answered.  You can answer.
14    A.   It's not standard procedure.
15    Q.   Who sets the standard -- who sets the
16  procedure?
17    A.   Procedure was set before I got there.
18    Q.   Okay.  So you are telling me the
19  procedure of Local 5 is not to send the signature
20  page to the actual contract, but the procedure
21  instead is to use --
22    A.   The procedure is --
23    Q.   Let me finish the question.
24    A.   Okay.
25    Q.   But the procedure instead is to use

info@mfreporting.com        Mastroianni & Formaroli, Inc.        856-546-1100
Professionals Serving Professionals

```
 1                   C E R T I F I C A T E

 2

 3          I,  PATRICIA LEE PAGE, a Notary Public and

 4     Certified Court Reporter of the State of New

 5     Jersey, do hereby certify that the foregoing is

 6     a true and accurate transcript of the testimony

 7     as taken stenographically by and before me at

 8     the time, place, and on the date hereinbefore

 9     set forth.

10          I DO FURTHER CERTIFY that I am neither a

11     relative nor employee nor attorney nor counsel

12     of any of the parties to this action, and that I

13     am neither a relative nor employee of such

14     attorney or counsel, and that I am not

15     financially interested in the action.

16

17

18

19

20     _____
       PATRICIA LEE PAGE, C.C.R.
21     Notary Public, State of New Jersey
       My Commission Expires February 22, 2008
22     Certificate No. XI01377

23

24

25
```

MASTROIANNI & FORMAROLI, INCORPORATED
PROFESSIONALS SERVING PROFESSIONALS

EXHIBIT D

Michael Robert Perrone                                      October 23, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 07-CV-0501(RJL)

JOHN FLYNN, JAMES BOLAND,              ORAL DEPOSITION OF
GERALD O'MALLEY, KEN
LAMBERT, GERARD SCARANO,        MICHAEL ROBERT PERRONE
H.J. BRAMLETT, EUGENE
GEORGE, PAUL SONGER, WILLIAM
MC CONNELL, MATTHEW
AQUILINE, GREGORY R. HESS,
MICHAEL SCHMERBECK, VINCENT
DELAZZERO, and BENJAMIN
CAPP, as Trustees of, and on
behalf of the BRICKLAYERS &
TROWEL TRADES INTERNATIONAL
PENSION FUND, 620 F Street,
NW, Washington, DC 20004
(202)783-3788, JIM ALLEN,
MATTHEW AQUALINE, LON BEST,
JAMES BOLAND, TED CHAMP,
RAYMOND CHAPMAN, VINCENT
DELAZZERO, BRUCE DEXTER,
JOHN FLYNN, EUGENE GEORGE,
GREGORY HESS, FRED
KINATEDER, DAN KWIATKOWSKI,
KEN LAMBERT, SANTO
LANZAFAME, DICK LAUBER,
WILLIAM MC CONNELL, EDWARD
NAVARRO, GERALD O'MALLEY,
JOHN PHILLIPS, CHARLES RASO,
MARK ROSE, KEVIN RYAN,
GERARD SCARANO, MICHAEL
SCHMERBECK, PAUL SONGER,
JOSEPH SPERANZA, and FRED
VAUTOUR as Trustees of, and

            *     *     *     *
        Tuesday, October 23, 2007
            *     *     *     *


        MASTROIANNI & FORMAROLI, INC.
    Certified Court Reporting and Videoconferencing
        251 South White Horse Pike, Suite 200
            Audubon, New Jersey 08106
                (856) 546-1100

Michael Robert Perrone                                      October 23, 2007

| Page 30 | Page 32 |
|---|---|

**Page 30**

1  Q.  Yeah, they do actually.

2  A.  But there's a window where if an employer wishes

3  not to be part of the bargaining agreement, he or she

4  has to notify in writing within a specific period of

5  time, and then there's certain stipulations and things

6  like that.

7  Q.  Let me backtrack.  Are you aware of any

8  decertification petitions on behalf of employees --

9  A.  Employees?

10  Q.  -- or workers.

11  A.  From my union?

12  Q.  Yeah.

13  A.  No.

14  Q.  Okay.

15  A.  In other words, they would not basically say I

16  quit.  What they would, you know, basically not pay

17  their dues, and they would be dropped for nonpayment of

18  dues.

19  Q.  Okay.

20  A.  I've never had somebody -- not to my

21  recollection.  I've never had a written letter saying I

22  no longer want to be part of this union.  I've never had

23  that from a member.

24  Q.  Okay.  Are you aware of any companies that are or

25  were unionized that recognized, for example, Local 5

**Page 31**

1  where in that specific company, the employees of that

2  company sought to desert Local 5 as their bargaining

3  rep?

4  A.  Not to my recollection, no.

5  Q.  Okay.  I take it if you're not familiar with

6  Maarv Waterproofing, at least not until this litigation,

7  you would not be familiar with any employees of Maarv

8  Waterproofing?

9  A.  No, not personally.

10  Q.  I think I just have a few documents, and then I'm

11  done.  I'm just going to start by showing you this.  I'm

12  showing you a signature page agreement, and it looks

13  like there's a date of May of 2000.  Have you ever seen

14  this document before?

15  A.  I've seen this document, which was presented to

16  me by Chuck, asking me basically the same thing, did I

17  ever see this document before.  Not until he showed it

18  to me, I've never seen it.

19        MR. DIAZ:  Okay.  Let's mark this as

20  Perrone-3.

21        (Exhibit No. Perrone-3, Signature Page, BAC

22  Local No. 4 New Jersey, 5/10/00, was marked for

23  identification.)

24  BY MR. DIAZ:

25  Q.  All right.  We've marked as Perrone-3, it's Bates

**Page 32**

1  numbered 0159, and it's a signature page.  It says "BAC

2  Local #4 New Jersey" on the top.  And I think, Mr.

3  Perrone, you testified that before this litigation

4  you've never seen what we've marked as Perrone-3?

5  A.  No.

6  Q.  Has Local 5 ever used any documents similar to

7  the one you see before you at Perrone-3?

8  A.  No, these are the only documents that we've ever

9  used.  I guess you're referring to Longo-1?

10  Q.  Longo-1, right.

11  A.  Okay.

12  Q.  A company named Garden State Caulking, Inc., did

13  you ever hear of that company?

14  A.  No.

15  Q.  All right.  I think I'm zero for 3 on that one in

16  prior deps.  All right.  That's all I have.

17        MR. MEHLER:  I just have a couple

18  questions.  Just a couple follow-up.

19  (EXAMINATION OF MR. PERRONE BY MR. MEHLER:)

20  Q.  Looking at Longo-1 and the last page of

21  Perrone-2, is it your understanding that Local 5, if

22  they had an employer sign Longo-1, they would not have

23  them sign the last page of this other -- of Perrone-2?

24  A.  No, no.  We added this, this language here for

25  people that, you know, didn't get books -- I mean the

**Page 33**

1  contract books and stuff.

2  Q.  You would use this in place of this signature

3  page?

4  A.  Yes.

5  Q.  Okay.

6  A.  That was the norm.

7  Q.  And this signature page that's Page 54 to

8  Perrone-2, I believe you testified previously that at

9  one point at least, field reps would use this signature

10  page?

11  A.  Yes, I guess it would be kind of an exceptional

12  situation.  If they didn't have any of these and they

13  had a contract book and an employer would just turn

14  around and say, look, just let me sign the agreement.  I

15  want to get going.  I've got to get going.  Just send me

16  the rate sheets.

17  Q.  What about prior to when Longo-1 was created, was

18  there a time when Longo-1 had not been created yet?

19        MR. DIAZ:  Objection to the form as to what

20  time.

21  Q.  Or has Local 5 always used Longo-1, as far as you

22  know?

23  A.  To my recollection, always used Longo-1.

24  Q.  I have nothing further.

25  (CONTINUED EXAMINATION OF MR. PERRONE BY MR. DIAZ:)

info@mfreporting.com           Mastroianni & Formaroli, Inc.           856-546-1100
                          Professionals Serving Professionals

Michael Robert Perrone                    October 23, 2007

## Page 34

1    Q. Okay. You've got me a little confused, but --
2    A. Unions can get a lot of people confused. That's
3    the reason for the restructuring.
4    Q. Okay. When was the restructuring?
5    A. Restructuring took place -- '07, '06 --
6    officially, May 30th of '06, I would believe.
7    Q. And I understood that your testimony before was
8    that due to the restructuring or because of the
9    restructuring, that's when you went to a uniform
10   signature page?
11   A. We're still in the process of it.
12   Q. Did Longo-1, did that come into creation with the
13   restructuring?
14   A. No, no. That's been there. That's been there.
15   Q. Okay. Because I understood that you said that
16   you would use the last page to the contract as a
17   signature page.
18   A. Right.
19   Q. Is that incorrect?
20   A. No. What Chuck is saying, here, you see this
21   last page here, we can go to it.
22   Q. Right.
23   A. That is actually this bottom part, okay? See
24   what we're saying, it's actually just about the same,
25   the bottom part, but if you were an employer looking at

## Page 35

1    that, you would not sign that if you were in a hurry.
2        You're not going to sign nothing with nothing
3    above it unless you got the whole book. What we did to
4    expedite things, we added paragraphs here, you know.
5        MR. MEHLER: Let the record reflect he's
6    referring to Longo-1.
7    Q. Were there times when you just used the last page
8    to the contract, for example, the last page to
9    Perrone-2?
10       MR. MEHLER: Page 54 of Perrone-2?
11       MR. DIAZ: Yes, and just gave that one page
12   to an employer?
13   BY MR. DIAZ:
14   A. Rarely. That's, like I said, that's the reason
15   why we stopped that, because if an employer got a
16   contract book, and he signed it, then we needed all the
17   other information and things like that. So, you know,
18   we would --
19   Q. What other information would you need?
20   A. Well, you're talking about ID numbers and things
21   like that. The employer on the job site, unless he's
22   got a computerized mind, doesn't know all that stuff.
23   So we -- the signature, then we'd have to get all that
24   stuff done, and basically, we would give the signature
25   page, and we would, you know, sign it, have him sign it,

## Page 36

1    fax it back to us with all the information, then mail
2    the hard copies and things like that.
3    Q. Couldn't you do that with the last page of the
4    contract?
5    A. Well, if it's all in one book, you can't. You
6    know what I mean? This page here, we have these books.
7    These are contract books.
8    Q. Right.
9    A. This is the paper form.
10   Q. Right.
11   A. And you know, you could sign it and make him sign
12   two books, and this, that, and all that, and it just got
13   kind of crazy. Restructure moves quickly.
14   Q. Sure. Why didn't you just copy the last page of
15   the book?
16   A. The last page of this, or in other words --
17   Q. Yeah.
18   A. -- what you're saying is this, so to speak, the
19   last page of that?
20       MR. MEHLER: He's referring to Page 54.
21   Q. I'm saying why didn't you just copy the last
22   page, the signature page to the actual collective
23   bargaining agreement? Why didn't you copy that page
24   separately to give to employers?
25   A. Well, I can't give you an honest answer, because

## Page 37

1    I -- I just carried on after Joe DiRienzo.
2    Q. Okay.
3    A. And added this when I -- in my term of office.
4    These were all done under DiRienzo's regime as manager.
5    I couldn't answer that, you know.
6    Q. When you said you added "this", you're referring
7    to the field rep's signature line?
8    A. Field rep's signature line.
9        MR. MEHLER: On Longo-1.
10   Q. On Longo-1 in the first paragraph where it makes
11   reference to a specific contract, is that uniform in all
12   of these signature pages?
13   A. I --
14   Q. I mean, do you go back in, for example, and
15   change the name of the contract based on which contract
16   you have?
17   A. No. All contractors sign the one agreement.
18   That is -- this signature page refers to this agreement.
19   Q. Okay. The problem, maybe you can help me with
20   this, the problem is that the title of the contract,
21   which is Perrone-2, doesn't match up to what is in
22   Longo-1 in the first paragraph.
23   A. Which is -- read to me what you're saying.
24   Q. The first paragraph references a contract between
25   the Building Contractors Association of New Jersey and

Pages 34 to 37

Michael Robert Perrone                                    October 23, 2007

Page 38

1    the Masonry Contractors Association of New Jersey, but
2    it doesn't -- it doesn't reference this group called
3    Building Contractors Association of Atlantic County.
4    That's not in the first paragraph here of Longo-1. Do
5    you know why that is?
6        A. No.
7        Q. All right. That's all I have.
8    (CONTINUED EXAMINATION OF MR. PERRONE BY MR. MEHLER:)
9        Q. One last question. When an employer signs
10   Longo-1, your understanding is what they're agreeing to
11   is the agreement that's been marked as Perrone-2?
12       A. Yes.
13       Q. Okay. I have nothing further.
14   (CONTINUED EXAMINATION OF MR. PERRONE BY MR. DIAZ:)
15       Q. Do you tell that to the employer?
16       A. I as business manager would not be dealing with
17   those employers, the field reps.
18       Q. When you were a field rep, would you tell the
19   employer?
20       A. Sure.
21       Q. When would you tell them that?
22       A. If they asked.
23       Q. If they asked, you tell them?
24       A. Yes.
25       Q. Thank you. That's all I have.

Page 40

1              C E R T I F I C A T E
2
3        I, NORA M. GALLAGHER, a Certified Court Reporter of
4    the State of New Jersey, do hereby certify that prior to
5    the commencement of the examination, MICHAEL ROBERT
6    PERRONE was duly sworn by me to testify the truth, the
7    whole truth, and nothing but the truth.
8        I DO FURTHER CERTIFY that the foregoing is a true and
9    accurate transcript of the testimony as taken
10   stenographically by and before me at the time, place,
11   and on the date hereinbefore set forth, to the best of
12   my ability.
13       I DO FURTHER CERTIFY that I am neither a relative nor
14   employee nor attorney nor counsel of any of the parties
15   to this action, and that I am neither a relative nor
16   employee of such attorney or counsel, and that I am not
17   financially interested in the action.
18
19
20       _____
         NORA M. GALLAGHER,
21       A Certified Court Reporter of the
         State of New Jersey
22       Certificate No. XI00091100
23
24
25

Page 39

1        MR MEHLER: That's it. Thank you.
2        (Testimony concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

info@mfreporting.com        Mastroianni & Formaroli, Inc.        856-546-1100
                     Professionals Serving Professionals

```
1                    C E R T I F I C A T E

2

3       I, NORA M. GALLAGHER, a Certified Court Reporter of

4   the State of New Jersey, do hereby certify that prior to

5   the commencement of the examination, MICHAEL ROBERT

6   PERRONE was duly sworn by me to testify the truth, the

7   whole truth, and nothing but the truth.

8       I DO FURTHER CERTIFY that the foregoing is a true and

9   accurate transcript of the testimony as taken

10  stenographically by and before me at the time, place,

11  and on the date hereinbefore set forth, to the best of

12  my ability.

13      I DO FURTHER CERTIFY that I am neither a relative nor

14  employee nor attorney nor counsel of any of the parties

15  to this action, and that I am neither a relative nor

16  employee of such attorney or counsel, and that I am not

17  financially interested in the action.

18

19

20  _____
    NORA M. GALLAGHER,
21  A Certified Court Reporter of the
    State of New Jersey
22  Certificate No. XI00091100

23

24

25
```

EXHIBIT E

John F. Capo                                    October 22, 2007

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No. 07-cv-0501 (RJL)

---

JOHN FLYNN, JAMES BOLAND, GERALD
O'MALLEY, KEN LAMBERT, GERARD SCARANO,
H.J. BRAMLETT, EUGENE GEORGE, PAUL
SONGER, WILLIAM McCONNELL, MATTHEW
AQUILINE, GREGORY R. HESS, MICHAEL
SCHMERBECK, VINCENT DELAZZERO, and
BENJAMIN CAPP,
as Trustees of and on behalf of the
BRICKLAYERS & TROWEL TRADES
INTERNATIONAL PENSION FUND,
    620 F Street, N.W.                ORAL DEPOSITION OF
    Washington, DC 20004              JOHN F. CAPO
    (202) 783-3788,
JIM ALLEN, MATTHEW AQUILINE, LON BEST,
JAMES BOLAND, TED CHAMP, RAYMOND
CHAPMAN, VINCENT DELAZZERO, BRUCE
DEXTER, JOHN FLYNN, EUGENE GEORGE,
GREGORY HESS, FRED KINATEDER, DAN
KWIATKOWSKI, KEN LAMBERT, SANTO
LANZAFAME, DICK LAUBER, WILLIAM
McCONNELL, EDWARD NAVARRO, GERALD
O'MALLEY, JOHN PHILLIPS, CHARLES
RASO, MARK ROSE, KEVIN RYAN, GERARD
SCARANO, MICHAEL SCHMERBECK, PAUL
SONGER, JOSEPH SPERANZA, and FRED
VAUTOUR,
as Trustees of and on behalf of the
INTERNATIONAL MASONRY INSTITUTE,
    620 F Street, N.W.
    Washington, DC 2004
    (202) 783-3788

---

(CAPTION CONTINUED)

        *   *   *   *   *
      Monday, October 22, 2007
        *   *   *   *   *

MASTROIANNI & FORMAROLI, INC.
Certified Court Reporters and Videoconferencing
251 South White Horse Pike, Suite 200
Audubon, New Jersey 08106
856-546-110

John F. Capo                                                    October 22, 2007

| Page 6 | Page 8 |
|---|---|

**Page 6**

1  functions -- or result of the union, and one was I
2  coach high school hockey and I was deposed in that.
3      Q.    The ones that were union related, do you
4  know what the subject of the claims were there?
5      A.    I think there were two labor charges --
6  unfair labor practices brought against the union.
7      Q.    Okay.
8      A.    And I know there was one other one. It
9  was a lawsuit that members had brought against the
10 International Union.
11     Q.    Well, the two that were unfair labor
12 practices, was that actually before the board, before
13 the NLRB?
14     A.    You mean the questioning?
15     Q.    Yes. Because usually you are not
16 deposed.
17     A.    No. One was, one was definitely -- I'm
18 trying to think. It was a while ago. Maybe it was
19 both the NLRB.
20     Q.    The one where the union member was
21 brought against the International, do you know what
22 the nature of that was for, the nature of the claim?
23     A.    It was three years ago. We were putting
24 in cedar shake. It was something over cedar shake.
25     Q.    Okay. Which local was putting in cedar

**Page 8**

1  have you ever been convicted of a crime?
2      A.    No.
3      Q.    If you need a break at all, I don't
4  think this is going to go very long, but if you need
5  a break, let us know.
6          Have you been sued before ever?
7      A.    No.
8      Q.    Have you sued anyone before?
9      A.    I was injured on a picket line at one
10 time. I guess I sued the owner.
11     Q.    Other than that, any other lawsuits that
12 you might have filed?
13     A.    No.
14     Q.    And who is your current employer?
15     A.    The Bricklayers and Allied Craftworkers
16 Administrative District Council of New Jersey.
17     Q.    They go by A D.C.?
18     A.    B.A.C., A.D.C. of New Jersey.
19     Q.    And what do you do with them?
20     A.    I am the secretary/treasurer.
21     Q.    What was the title before A.D.C. was
22 formed?
23     A.    Well, it was -- my title or the --
24     Q.    The company. It was just Bricklayers?
25     A.    It was the Bricklayers and Allied

**Page 7**

1  shake?
2      A.    Local 4.
3      Q.    Even though it looks like you have been
4  deposed before, I'm going to tell you briefly what
5  happens. You have been sworn under oath. You are
6  obligated to testify truthfully to the questions that
7  I pose to you. Do you understand that?
8      A.    Yes.
9      Q.    Is there any reason why you can't
10 testify truthfully today?
11     A.    No.
12     Q.    Are you under any medication at all?
13     A.    No.
14     Q.    If you have a question at all during the
15 scope of the questioning or during the questioning,
16 just let me know. If you don't understand the
17 question I pose to you, let me know. I will do the
18 best I can to rephrase the question for you. If you
19 answer, I will assume you understood. Is that fair
20 enough?
21     A.    Yes.
22     Q.    Even though we're in an informal
23 conference room today, your testimony will have the
24 same effect as if we are in a court of law. It may
25 be read to a judge or a jury. I ask all witnesses,

**Page 9**

1  Craftworkers, but it was an individual local. Now
2  they all fall under --
3      Q.    A.D.C.?
4      A.    Yes.
5      Q.    Which individual local were you employed
6  with before?
7      A.    Local 4.
8      Q.    Just sticking with Local 4, how long
9  have you been employed by Local 4?
10     A.    As an officer or field rep?
11     Q.    Any administrative type of duty that you
12 had.
13     A.    1999 until present -- well, until...
14     Q.    Until A.D.C. took over?
15     A.    Yeah. June of '06 the A D.C. was
16 created.
17     Q.    And before '99, I take it you were just
18 a member of the union local doing jobs?
19     A.    Yes.
20     Q.    When you started in an administrative
21 capacity with Local 4, what job title was it?
22     A.    Field representative.
23     Q.    And then what position did you have
24 after field representative?
25     A.    Well, I remained as a field

Pages 6 to 9

```
1                    C E R T I F I C A T E

2

3          I,   PATRICIA LEE PAGE, a Notary Public and

4    Certified Court Reporter of the State of New

5    Jersey, do hereby certify that the foregoing is

6    a true and accurate transcript of the testimony

7    as taken stenographically by and before me at

8    the time, place, and on the date hereinbefore

9    set forth.

10         I DO FURTHER CERTIFY that I am neither a

11   relative nor employee nor attorney nor counsel

12   of any of the parties to this action, and that I

13   am neither a relative nor employee of such

14   attorney or counsel, and that I am not

15   financially interested in the action.

16

17

18

19

20   _____
     PATRICIA LEE PAGE, C.C.R.
21   Notary Public, State of New Jersey
     My Commission Expires February 22, 2008
22   Certificate No. XI01377

23

24

25
```

MASTROIANNI & FORMAROLI, INCORPORATED
PROFESSIONALS SERVING PROFESSIONALS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 07-CV-0501 (RJL) |
| | ) |
| MAARV WATERPROOFING, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>ORDER</u>

Upon consideration of the Defendant's Motion for Leave to File a Third-Party Complaint, Plaintiffs' Opposition, and any reply, the Court finds that the motion should be denied.  **ACCORDINGLY**, it is hereby

**ORDERED**, that the motion be, and it hereby is, **DENIED**.

**SO ORDERED**, this _____ day of_____, 2007.

_____
Richard J. Leon
United States District Judge

2348285.01

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN FLYNN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-0501 (RJL) |
| | ) | |
| MAARV WATERPROOFING, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## LOCAL RULE 7(K) STATEMENT

Pursuant to Local Rule 7(k), the following persons are entitled to be served with orders, judgments and stipulations:

Ira R. Mitzner, Esq.
Charles V. Mehler III, Esq.
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, DC 20006
Telephone: (202) 420-2234
Facsimile   (202) 420-2201

Alexander Nemiroff, Esq.
Peter L. Frattarelli Esq.
Douglas Diaz, Esq.
Archer & Greiner
One Centennial Square
Haddonfield, NJ 08033
Telephone: (856) 795-2121
Facsimile   (856) 795-0574

2270185.01