IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al.<br><br>                    Plaintiffs,<br><br>          v.<br><br>MAARV WATERPROOFING, INC.,<br><br>                    Defendant. | CASE NUMBER: 1:07CV00501<br><br>JUDGE: Richard J. Leon |

**REPLY BRIEF OF DEFENDANT IN SUPPORT OF ITS MOTION FOR LEAVE TO FILE A THIRD PARTY COMPLAINT**

Defendant Maarv Waterproofing, Inc. ("Maarv") submits the following reply brief in response to Plaintiff's opposition to Maarv's motion for leave to file a third party complaint.

**I.     Granting Maarv's Motion For Leave Will Not Result in Any Undue Delay or Complication in this Case Which Was Filed Just Eight Months Ago.**

In opposition to Maarv's motion for leave to file a third party complaint, Plaintiffs first contend that granting leave would unduly delay this case through the possibility that the Local Unions will, as new parties, wish to propound their own discovery.  As an initial matter, this "undue delay" argument is deficient on its face when considering that this case is not even a year old and was in fact filed just eight months ago, with the complaint being served just seven months ago.[1]  Second, to the extent the Local Unions wish to seek additional discovery, there is no reason why that should involve any significant amount of time.  This is especially so when considering that (1) the Local Unions have already been participating in this case since several of their members, including officers, have already been interviewed by Plaintiffs' counsel and

---

[1] For these reasons, the case cited by Plaintiffs, Kopan v. George Washington Univ., 67 F.R.D. 36 (D.D.C. 1975), is distinguishable since there the case had been two years old and had already been pre-tried at the time a motion for leave to file a third party complaint was filed.

deposed by Maarv's counsel; (2) the fact dispute that forms the basis of the proposed third party complaint is fairly straightforward: either a Union official did or did not make certain misrepresentations to Maarv as set forth in the proposed third party complaint; and (3) these Local Unions have recently merged into one organization called the Administrative District Council of New Jersey, as revealed in deposition testimony. (See Ex. B filed with Plaintiffs' Brief, Deposition of Dominic Longo, at 21:8-17). Moreover, to the extent the Local Unions seek additional discovery, Maarv is agreeable to providing any such discovery on an expedited basis.

      Plaintiffs also take issue with Maarv's motion being filed with "the summary judgment deadline looming." Plaintiffs, however, are free to file their summary judgment motion any time they wish and should not be hindered by a third party complaint in this regard. Moreover, Plaintiffs' timing argument ignores that Maarv's motion was diligently filed within days of the deposition testimony of members of the Local Unions and, in fact, was filed *because of* this deposition testimony. A claim of fraud must be pleaded with particularity. See Fed. R. Civ. P. 9(b). Therefore, Maarv could not in good faith have set forth a claim of fraud against the Local Unions without having sufficient and specific information to form a basis for such a claim. In this regard, a secretary for Maarv who had spoken to a Local Union official would have had knowledge of the specific facts surrounding the fraud but she had died, thereby potentially hindering a successful fraud claim. (See Deposition of Attila Szamosszegi, Ex. 1 hereto, at 62:14-63:8). However, with the deposition testimony of the Local Union officials, and specifically testimony regarding what they did and did not communicate to Maarv and its employees, including the deceased secretary, Maarv was in a position to set forth a claim of

fraud with the specific particularity that is required for such a claim. Maarv diligently did so less than a week thereafter.[2]

Plaintiffs' additional argument that Maarv can simply file its claim against the Local Unions in another court ignores the essential purposes behind Rule 14(a), namely, the avoidance of duplication of suits on closely related matters and the promotion of judicial economy.  The Local Unions and their employees and officers are very much a part of this matter and will be called upon to testify during the trial of this case (and, indeed, they have already been deposed). It simply would frustrate the purposes behind Rule 14(a)----and frankly be nonsensical-- to then duplicate this effort again against the Local Unions in another forum.

## II. The Claims in the Proposed Third Party Complaint Are Not Preempted by Section 301 of the LMRA[3].

Relying on general principles announced by the Supreme Court, Plaintiffs also claim that leave should be denied because Maarv's state law claims are  preempted by section 301 of the Labor Management Relations Act ("LMRA"). Section 301 provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees…may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. §185(a).  Supreme Court jurisprudence has held that "state law is preempted by § 301 of the LMRA if its application requires the interpretation of a collective bargaining agreement." International Union of Bricklayers and Allied Craftworkers v. Ins. Co. of the West, 366 F. Supp.2d 33, 40 (2005)(citing Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 413 n. 12

---

[2] Plaintiffs also take issue with Maarv's failure to name the Local Unions as Defendants in Maarv's answer to Plaintiffs' Amended Complaint filed on October 25, 2007. However, this ignores Rule 14(a) which provides that once 10 days elapse from service of the "*original* answer", a party must seek leave to add a non-party. See Fed. R. Civ. P. 14(a)(emphasis added).

[3] Maarv notes initially that since Plaintiffs rely on facts outside of the pleadings with respect to their preemption argument, this issue is more appropriately addressed on a motion for summary judgment than on a motion for leave to file a third party complaint.

(1988)). The reasoning for this is because the "possibility that individual contract terms might have *different meanings* under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." <u>Teamsters v. Lucas Flour Co.</u>, 369 U.S. 95, 103 (1962)(emphasis added). Based on this rationale, "not every dispute…tangentially involving a provision of a collective bargaining agreement, is preempted by § 301 or other provisions of the federal labor law." <u>Allis-Chalmers Corp. v. Lueck</u>, 471 U.S. 202, 211 (1985). It is only "when resolution of a state-law claim is *substantially dependent* upon *the analysis of the terms* of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." <u>Id.</u> at 220 (emphasis added).

    A.    **LMRA Preemption Does Not Apply Because the One Page Signature Form Referenced by Plaintiffs is Not the Collective Bargaining Agreement and the <u>Union Never Provided Maarv With the Collective Bargaining Agreement.</u>**

Here, Plaintiffs claim that Maarv's state law claims are preempted by § 301 of the LMRA because they "require the court to interpret and construe the terms of the *Local 5 Independent Agreement* signed by Maarv. (Plaintiffs' Brief, at 8)(emphasis added). As an initial matter, this "agreement" referenced by Plaintiffs is not a collective bargaining agreement but rather a one page signature form. A similar form presented under similar facts was at issue in <u>Northwestern Ohio Administrators, Inc. v. Walcher & Fox, Inc.</u>, 270 F.3d 1018 (6th Cir. 2001). There, in response to a complaint that it owed delinquent contributions to a union trust fund, an employer filed a third party complaint against a union for fraudulent misrepresentations made before an employer signed project agreements titled "Employer Participation Agreements." <u>Id.</u> at 1021. Similar to the signature form relied upon Plaintiffs here, the project agreements in <u>Walcher & Fox</u> only made references to a collective bargaining agreement, including a reference that the employer agreed to make payments of fringe benefits for all employees "as specified in the

4

Bargaining Agreement." Id. at 1022.  In holding that the third party complaint was not preempted by the LMRA, the Court reasoned in part that the agreement at issue was not even a collective bargaining agreement. Id. at 1028, 1031.

The same is true here with respect to the signature form relied upon by Plaintiffs and which, similar to the agreement in Walcher & Fox, only appears to note that the employer agrees to make fringe benefit contributions "as specified in the effective Collective Bargaining Agreement." (See Ex. A filed with Plaintiff's Brief, Independent Agreement).[4]  Any interpretation of this one page signature form, which is not even required as set forth below, will not entail any interpretation of the terms of the collective bargaining agreement.  Indeed, the owner of Maarv, Attila Szamosszegi, was never even provided with a copy of the collective bargaining agreement. (See Deposition of Attila Szamosszegi, Ex. 1 hereto, at 46:10-17).  In fact, the Union testified that it is "standard" to provide a copy of the collective bargaining agreement only if an employer asks for a copy. (See Deposition of Michael Perrone, Ex. 2 hereto, at 15:16-23; 24:1-7). Thus, as the Independent Agreement is not a collective bargaining agreement and the collective bargaining agreement itself with its specific terms was never provided to Maarv, Plaintiffs' preemption argument is without merit.

    **B.**    **None of the Terms in the Collective Bargaining Agreement or Signature Form Need to be Interpreted to Resolve The Third Party Complaint.**

As noted above, § 301 preemption applies only when a court must *interpret* the terms of a collective bargaining agreement, and when the resolution of a state-law claim must be "*substantially dependent*" upon such interpretation. See Allis-Chalmers, 471 U.S. at 211(emphasis added).  The reasoning for this is to avoid different meanings of labor contract terms under state and federal law.  Lucas Flour Co., 369 U.S. at 95.  Here, Plaintiffs claim that as

---

[4] This agreement is in fine print and was sent by facsimile and is thus difficult to read.

5

part of the misrepresentation claims in the proposed third party complaint, Maarv must show reasonable reliance on any such misrepresentations. (Plaintiffs Brief, at 8-9). Plaintiffs then make the leap that § 301 preemption must apply because "the Local 5 Independent Agreement was indisputably information available to Maarv" and thus its terms will need to be interpreted to determine if reliance on the misrepresentations was unreasonable. (Id. at 9-10). Even assuming for the moment that this "Independent Agreement" was a collective bargaining agreement, Plaintiffs ignore the disputed facts in this case and the distinction that mere reference to a labor agreement, as opposed to actual interpretation, will not result in § 301 preemption. See Livadas v. Bradshaw, 512 U.S. 107, 124-25 (1994).

     As to the first point, there is no need to interpret any of the terms in the Independent Agreement. Rather, and as was noted by the court in Walcher & Fox based on similar facts, the relevant inquiry on the misrepresentation claims is based on the Union's actions prior to the execution of any agreement. Walcher & Fox, 270 F.3d at 1031. Here, Maarv contends that misrepresentations were made before it was even provided with any agreements from the Union. Indeed, there are numerous issues of fact in this case regarding what the Union said to Maarv; whether Maarv even read or could have read the Independent Agreement;[5] whether Maarv even should have read the Independent Agreement when considering the prior representations of the Union; and whether Maarv's owner, Mr. Szamosszegi, who is Hungarian and for which English is his second language, was even able to understand what was written on this Independent Agreement. (See Deposition of Attila Szamosszegi, Ex. 1 hereto, at 10:21-11:6). Based on these circumstances, the Independent Agreement would not even have to be consulted, let alone interpreted, for purpose of Maarv's misrepresentation claims.

---

[5] See n. 4 supra.

6

Moreover, even assuming this Agreement did need to be consulted, it would not require the interpretation of any of its terms. Indeed, *the meaning* of these terms are not at issue, even when considering the defense raised by Plaintiffs to the misrepresentation claims. In this regard, Plaintiffs contend that Maarv's reliance on any misrepresentations was unreasonable because the Independent Agreement was "available" to him. Assuming for the moment that Plaintiffs can show that this Agreement was actually read, should have been read, and/or could have been read, the issue for a jury is simply whether it was reasonable for Maarv to rely on the Union's misrepresentations based on what is stated in this Independent Agreement. This requires a mere reference to the Agreement, not any interpretation of its terms. Plaintiffs nonetheless attempt to manufacture an "interpretation" argument by claiming that the Court will need to determine if the Independent Agreement incorporates the collective bargaining agreement. This, however, is not even in dispute and is not the issue for the misrepresentation claim. Rather, and based on what Plaintiffs now present as their defense, the issue would be whether reliance on a prior misrepresentation was reasonable considering that the form Independent Agreement incorporated a collective bargaining agreement that the Union never provided to Maarv. The critical point here is that this would not require the interpretation of any of the terms of the collective bargaining agreement, or even the Independent Agreement. Thus, § 301 preemption does not apply.[6]

---

[6] Maarv notes that while Plaintiffs focus their preemption argument on the misrepresentation claims in the proposed third party complaint, they engage in no substantive analysis to show why the other claims--breach of the covenant of good faith and fair dealing and contribution and indemnification--should be preempted beyond generally claiming that they are based on the same misrepresentation allegations. However, these claims entail separate legal elements from the reasonable reliance prong associated with a misrepresentation claim that Plaintiffs focus upon. For example, a contribution claim generally only requires a showing that another is also at fault, and an indemnification claim generally requires a showing that another is primarily liable for reimbursing another who has had liability imposed on it. See Black's Law Dictionary, 329, 772 (7th ed. 1999).

**III.  Even if the State Law Claims Were Preempted By § 301 of the LMRA, They Could Still Proceed as § 301 Claims.**

Maarv also briefly notes that even were the state law claims in the proposed third party complaint preempted, which they are not, they could still then be treated as § 301 claims. The Supreme Court stated as much in <u>Allis-Chalmers</u> when it noted that if the state claim required the interpretation of a collective bargaining agreement, it could then "be treated as a § 301 claim." <u>Allis-Chalmers</u>, 471 U.S. at 211.  Indeed, if one was to accept as true Plaintiffs' contention that Maarv's state law claims are preempted by federal law, and thus subject to removal if a state action was filed, the claims would have to be treated as § 301 claims in order for Maarv to have a means of redress against the Union.

**IV.  <u>CONCLUSION</u>**

Based on the above, Defendant's motion for leave to file a third party complaint should be granted.

                                                 Respectfully submitted,

                                                 ARCHER & GREINER

                                               BY:  /s/ Alexander Nemiroff
                                                     ALEXANDER NEMIROFF
                                                     Bar No. 454408
                                                     PETER L. FRATTARELLI
                                                     DOUGLAS DIAZ
                                                     One Centennial Square
                                                     Haddonfield, New Jersey 08033
                                                     (856) 795-2121
                                                     Attorneys for Defendant

Dated: December 5, 2007

## CERTIFICATE OF SERVICE

    I, Alexander Nemiroff, hereby certify that on this 5th day of December 2007, I caused the foregoing to be electronically filed with the Court and, therefore, the aforementioned document is available for viewing and downloading from the Electronic Case Filing System.

                                                 s/ Alexander Nemiroff
                                                 ALEXANDER NEMIROFF

2988974v1

# EXHIBIT 1

Attila Szamosszegi           October 24, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CASE NO.: 1:07CV00501(RJL)

JOHN FLYNN, JAMES BOLAND,
GERALD O'MALLEY, KEN LAMBERT,
GERARD SCARANO, H.J. BRAMLETT,
EUGENE GEORGE, PAUL SONGER,
WILLIAM McCONNELL, MATTHEW
AQUILINE, GREGORY R. HESS,
MICHAEL SCHMERBECK, VINCENT
DELAZZERO, and BENJAMIN CAPP,
as Trustees of, and on behalf     ORAL DEPOSITION OF
of, the
BRICKLAYERS & TROWEL TRADES
INTERNATIONAL PENSION FUND,     ATTILA SZAMOSSZEGI
  620 F Street, N.W.
  Washington, DC 20004
  202-783-3788,
                           * * * * *
JIM ALLEN, MATTHEW AQUILINE,     OCTOBER 24, 2007
LON BEST, JAMES BOLAND, TED         * * * * *
CHAMP, RAYMOND CHAPMAN,
VINCENT DELAZZERO, BRUCE
DEXTER, JOHN FLYNN, EUGENE
GEORGE, GREGORY HESS, FRED
KINATEDER, DAN KWIATKOWSKI,
KEN LAMBERT, SANTO LANZAFAME,
DICK LAUBER, WILLIAM McCONKELL,
EDWARD NAVARRO, GERALD O'MALLEY,
JOHN PHILLIPS, CHARLES RASO,
MARK ROSE, KEVIN RYAN, GERARD
SCARANO, MICHAEL SCHMERBECK,
PAUL SONGER, JOSEPH SPERANZA,
and FRED VAUTOUR
as trustees of, and on behalf
of, the
INTERNATIONAL MASONRY INSTITUTE
  620 F Street, N.W.
  Washington, D.C. 20004
  202-783-3788

(Caption Continued)

MASTROIANNI & FORMAROLI, INC.
Certified Court Reporting and Video Conferencing
251 South White Horse Pike - Suite 200
Audubon, New Jersey 08106
856-546-1100

info@mfreporting.com      Mastroianni & Formaroli, Inc.      856-546-1100
Professionals Serving Professionals

Page 10

1  oath before in a courtroom?
2  A. No.
3  Q. Or any other manner?
4  A. No.
5  Q. There is a question I ask of all witnesses.
6  Have you ever been convicted of any crimes?
7  A. No.
8  Q. Have you ever been held in contempt by any judge
9  or a court?
10 A. No.
11 Q. As we go through this, me asking you questions,
12 try to wait for me to finish my question because it
13 makes it hard for the court reporter to take it down if
14 we are both talking at the same time. And also try to
15 answer audibly since she can't take down nods of the
16 head or gestures, that type of thing.
17    Other than that one lawsuit you mentioned where
18 your deposition was taken before, have you been involved
19 in any other lawsuits?
20 A. No.
21 Q. Where were you born?
22 A. In Hungary.
23 Q. When did you come to this country?
24 A. July 7th, 1970.
25 Q. Are you currently married?

Page 11

1  A. I am divorced.
2  Q. What is your educational background? Did you
3  graduate high school?
4  A. Yeah. I graduated high school.
5  Q. In Hungary?
6  A. Yes.
7  Q. Any college?
8  A. I took a couple of semesters over here. I took
9  one semester, a few courses.
10 Q. Can you tell me what did you do to prepare for
11 your deposition here today?
12    MR. DIAZ: Just an instruction to the
13 witness not to reveal any conversations we have had.
14 You can reveal the fact that we have met.
15 Q. Who did you talk with other than your attorney,
16 what documents did you review, anything else you did to
17 get ready for today?
18 A. Just talk to my attorney.
19 Q. You didn't talk to anybody else at the company?
20 A. No.
21 Q. Did you speak with Peter Cuomo in preparation for
22 today?
23 A. No. Peter Cuomo is not around.
24 Q. Is not around?
25 A. No. He lives in Texas.

Page 12

1  Q. He is no longer part of the company?
2  A. No longer party of the company.
3  Q. Did you speak with your accountant to prepare for
4  today?
5  A. No.
6  Q. Is your accountant still Roy Bushover?
7  A. Bushover, yes. That is correct.
8  Q. Did you review any documents to prepare for
9  today?
10 A. Did I review?
11 Q. Did you take a look at any documents?
12 A. Whatever my attorney presented to me to look at.
13 Q. Do you understand that you are here today not
14 just as an individual but also as the witness for the
15 defendant, Maarv Waterproofing, Inc.?
16 A. Yeah.
17 Q. You are here to testify on behalf of the company?
18 A. Yeah.
19 Q. I assume you didn't do anything special or
20 anything different to prepare for your testimony on
21 behalf of the company versus your testimony here just as
22 an individual?
23    MR. DIAZ: Objection to the form. You can
24 go ahead and answer.
25 Q. You can answer.

Page 13

1  A. What?
2  Q. Did you do anything else to prepare?
3  A. No.
4  Q. Let me show you —
5     MR. MEHLER: Let me have this marked as
6  Plaintiff's 1.
7     (P-1 marked for identification.)
8  Q. Take a look at this document. Any time I hand
9  you a document if you need a minute to look through it
10 or so, just feel free.
11 A. Okay.
12 Q. Have you seen this document before?
13 A. No. You just handed it to me.
14 Q. But you never saw it before today?
15 A. No.
16 Q. Can you tell me are you prepared to testify to
17 each of the topics listed on behalf of the company?
18 A. Yes, I am.
19 Q. Where are you currently employed?
20 A. Maarv Waterproofing.
21 Q. That's Maarv Waterproofing, Inc.?
22 A. Yes.
23 Q. What's your title there?
24 A. I am the president.
25 Q. Are you the owner?

Attila Szamosszegi                                                October 24, 2007

### Page 46

1  A. No.
2  Q. And you don't recall ever receiving anything in
3  writing from either of those people, Gerald Della Salla
4  or Pete Caputo?
5  A. No. Because -- no.
6  Q. Let me show you another document.
7      MR. MEHLER: It's Bates No. 100 through 132.
8  Mark this as Plaintiff's Exhibit No. 3.
9      (P-3 marked for identification.)
10 Q. Take a look at that document.
11 A. And this is -- what agreement is this?
12 Q. It's a collective bargaining agreement with Local
13 Union 4 and 5 of the B.A.C.
14 A. And the question is?
15 Q. First question is: Have you ever seen this
16 before?
17 A. No.
18 Q. Did Maary ever agree to this agreement as far as
19 you know?
20 A. No.
21 Q. If John Capo had said we can only send union guys
22 over if you agree to this agreement, would you have done
23 so?
24     MR. DIAZ: Objection to the form.
25 A. Done what?

### Page 47

1  Q. Would you have signed this agreement?
2  A. Maybe for the job, you know, if that's what you
3  require, you know.
4  Q. You would have signed it for that specific job?
5  A. For that specific job.
6  Q. But you wouldn't have signed it generally?
7  A. No.
8  Q. Why is that?
9  A. Why should I?
10 Q. I assume you didn't have an interest in being a
11 union company?
12 A. No. I was just fine as I was.
13 Q. So if John had said the only way we can send
14 union guys is by you signing this agreement you would
15 have said no?
16     MR. DIAZ: Asked and answered. He already
17 answered the question.
18 A. No. Because I would sign for one job, for the
19 job only, not for whatever.
20 Q. In relation to that Fort Lee project, do you
21 recall signing any agreement with a union for that job
22 specifically?
23 A. I don't recall.
24 Q. You don't recall signing any agreements regarding
25 that job with a union?

### Page 48

1  A. That is correct.
2      MR. DIAZ: You don't have to look at it any
3  more.
4      THE WITNESS: I am just curious myself what
5  is in it.
6  (BY MR. MEHLER:)
7  Q. Did Maary to the best of your memory ever sign
8  any collective bargaining agreement with Bricklayers
9  Local 5 New Jersey?
10     MR. DIAZ: Objection to the form. Objection
11 to agreement, but go ahead.
12 A. No. Not that I know of.
13 Q. Was there anybody else in the company that would
14 know?
15 A. No. I would be the one.
16 Q. Did Maary ever sign any agreement with
17 Bricklayers Local 2 Delaware-New Jersey?
18     MR. DIAZ: Objection to the form. Go ahead.
19 A. No.
20 Q. Let me show you another exhibit.
21     MR. MEHLER: Douglas, this is Bates No. 739.
22 Please mark this as Plaintiff's Exhibit 4.
23     (P-4 marked for identification.)
24 Q. Take a look at this document and let me know when
25 you are ready.

### Page 49

1  A. Yes. You have a question?
2  Q. Have you seen this document before?
3  A. Yeah. It came to the attention through my
4  attorney when we were talking about this case.
5  Q. Had you seen it before, before this lawsuit?
6  A. Obviously I have because I got my signatures on
7  it.
8  Q. That is your signature?
9  A. Yeah. That is my signature.
10 Q. Do you remember when you first saw this document?
11 A. Since I know I signed only one paper it had to be
12 done at Princeton job.
13 Q. You signed this in relation to the Princeton job?
14 A. I am pretty sure that's what it was.
15 Q. By the Princeton job, you mean the Princeton
16 Parking Garage job?
17 A. That is correct.
18 Q. Do you remember signing this document?
19 A. Not really, but I remember something that was
20 said to they are going to make something up, my
21 secretary explained something, the union was going to
22 send an agreement for the job. You need to sign it so I
23 said okay. So I signed the paper.
24 Q. Do you remember meeting with anybody from
25 Bricklayers Local 5 in relation to that Princeton

Attila Szamosszegi                                                          October 24, 2007

Page 62

1   A. I have no attorney.
2   Q. Had you signed any collective bargaining
3   agreements prior to that?
4   A. No.
5   Q. Just so I am clear on your testimony, you
6   understand Plaintiff's Exhibit 4 as requiring your sub,
7   Pallos, to hire union guys?
8   A. Well, he was doing the job so, you know, he is...
9   Q. After you signed Plaintiff's Exhibit 4 it was
10  faxed back to the union?
11  A. I suppose. I really don't know.
12  Q. Would you have given it to Anne for that purpose?
13  A. I would have given it to Anne.
14  Q. After this lawsuit was filed did you talk to Anne
15  about this situation with Local 4 and 5 in New Jersey?
16      MR. DIAZ: Just objection. If you can maybe
17  give a time reference. I don't know offhand when the
18  lawsuit was filed.
19      MR. MEHLER: I don't remember exactly
20  either.
21  Q. Since the time the lawsuit was filed up until
22  Anne's death, did you ever speak with her about the
23  allegations in this lawsuit?
24      MR. DIAZ: I forget when Anne died. That's
25  why I was looking for a time frame.

Page 63

1       MR. MEHLER: I can get you that.
2       MR. DIAZ: I thought it was filed in the
3   beginning of '07.
4       MR. MEHLER: It was filed in '07.
5   (BY MR. MEHLER:)
6   Q. I think Anne had already passed away by 2007?
7   A. Yes.
8   Q. That answers my question.
9       So, you signed Plaintiff's Exhibit 4 and it was
10  faxed back to the union presumably by Anne. What
11  happened after that?
12  A. I finished the job.
13  Q. Did Pallos hire a union guy?
14  A. I suppose, yeah.
15  Q. Do you know who that union guy was?
16  A. Not offhand.
17  Q. That union guy was paid by Pallos, not by Maarv?
18  A. Yeah. That is correct.
19  Q. You didn't see Plaintiff's Exhibit 4 as requiring
20  Maarv to hire union people?
21  A. No. Because we subbed the job out.
22  Q. And you didn't see it as requiring Maarv to file
23  reports of their employees with the union?
24  A. That is correct.
25  Q. And you didn't see it as requiring Maarv to pay

Page 64

1   dues for any of its employees?
2   A. Absolutely.
3   Q. And you didn't see it as requiring Maarv to make
4   fringe benefit contribution for any of its employees?
5   A. True, too.
6   Q. All those questions whether in relation to the
7   Princeton job or any other job?
8   A. Yeah.
9   Q. Did you ever speak with a person named Mike
10  Perrone who else goes by Chuck Perrone?
11  A. Who is he?
12  Q. He is a union official with Local 5.
13  A. No.
14  Q. You don't recognize the name?
15  A. No.
16      MR. MEHLER: I am going to mark an exhibit.
17  This is one of your documents. M-71 through M-75.
18      Mark that as Plaintiff's Exhibit 6.
19      (P-6 marked for identification.)
20  Q. Take a look at that and let me know when you are
21  ready.
22  A. Okay.
23  Q. Have you seen this document before?
24  A. Just came about recently.
25  Q. In connection with the lawsuit?

Page 65

1   A. Yeah.
2   Q. You don't remember seeing it around the time -- I
3   am trying to see if it has a date on here. There is a
4   fax date of 4/04 at the top?
5   A. Uh-huh.
6   Q. You don't remember seeing it around that time?
7   A. No. No.
8   Q. You don't remember receiving this from Anne at
9   some point?
10  A. No.
11  Q. Do you remember the circumstances of Anne handing
12  you Plaintiff's Exhibit 4 to sign?
13  A. Somewhat, yeah. Because she mentioned to me, you
14  know, I said regarding union and she said, Look as I
15  said, we received this thing for that particular job, we
16  need to send it back. That was the extent of it.
17  Q. Did she just give you the one sheet that is
18  marked Plaintiff's Exhibit 4 to sign?
19  A. That's all she gave me.
20  Q. She didn't give you Plaintiff's Exhibit 6, this
21  fax with the attachments?
22  A. No. Why would I -- as far as we know it doesn't
23  concern us because we subbed the job out.
24  Q. So the rates --
25  A. I see her signature, I mean her handwriting over

**EXHIBIT 2**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 07-CV-0501(RJL)

| | |
|---|---|
| JOHN FLYNN, JAMES BOLAND, GERALD O'MALLEY, KEN LAMBERT, GERARD SCARANO, H.J. BRAMLETT, EUGENE GEORGE, PAUL SONGER, WILLIAM MC CONNELL, MATTHEW AQUILINE, GREGORY R. HESS, MICHAEL SCHMERBECK, VINCENT DELAZZERO, and BENJAMIN CAPP, as Trustees of, and on behalf of the BRICKLAYERS & TROWEL TRADES INTERNATIONAL PENSION FUND, 620 F Street, NW, Washington, DC 20004 (202)783-3788, JIM ALLEN, MATTHEW AQUALINE, LON BEST, JAMES BOLAND, TED CHAMP, RAYMOND CHAPMAN, VINCENT DELAZZERO, BRUCE DEXTER, JOHN FLYNN, EUGENE GEORGE, GREGORY HESS, FRED KINATEDER, DAN KWIATKOWSKI, KEN LAMBERT, SANTO LANZAFAME, DICK LAUBER, WILLIAM MC CONNELL, EDWARD NAVARRO, GERALD O'MALLEY, JOHN PHILLIPS, CHARLES RASO, MARK ROSE, KEVIN RYAN, GERARD SCARANO, MICHAEL SCHMERBECK, PAUL SONGER, JOSEPH SPERANZA, and FRED VAUTOUR as Trustees of, and | ORAL DEPOSITION OF<br><br>MICHAEL ROBERT PERRONE |

\* \* \* \*
Tuesday, October 23, 2007
\* \* \* \*

MASTROIANNI & FORMAROLI, INC.
Certified Court Reporting and Videoconferencing
251 South White Horse Pike, Suite 200
Audubon, New Jersey 08106
(856) 546-1100

Michael Robert Perrone                                October 23, 2007

Page 14

1  situation?
2    A. I would survey the situation, try to get them to
3  sign. I would, you know, come to the conclusion whether
4  it's a prevailing wage job or a private funded job, I
5  would decide what my course of action would be, if any
6  at all --
7    Q. Okay.
8    A. -- to achieve the results that we would want.
9    Q. Has there ever been communication, I'll just deal
10 with you, ever been communication from you when you were
11 a field rep when you'd come across a union job where you
12 tell the sub on the job that he has to do this union or
13 he has to use union men because it's a union job?
14   A. Uh-huh, yeah.
15   Q. Have you ever communicated something, sum and
16 substance to that extent?
17   A. Yeah, to a degree. A new contractor may come on
18 the job and say, you know, well, I wasn't told that this
19 was all union or what have you, and, you know, I would
20 inform him that, yes, this is a union job. You should
21 have known or you should have been told, and, you know,
22 at that point, I would proceed just like I would with
23 any other contractor.
24   Q. Okay. Let me turn to the actual contracts,
25 collective bargaining agreements. In your experience or

Page 15

1  what you did when you were field rep, what actual
2  document or documents would you give to a contractor in
3  an effort to sign them up?
4    A. Well, what I did was, well, I would have to go
5  back to my previous business manager, Joe DiRienzo. His
6  policy was that we never signed one job agreements, and
7  we never worked what we call split gangs.
8    Q. Okay.
9    A. And I continued that. I followed that to the
10 letter, and when I took over, that was my program too.
11   Q. What is split gangs? What do you mean by that?
12   A. Split gangs means that the union guys would work
13 with nonunion people.
14   Q. Okay.
15   A. Never works out, never.
16   Q. And what if any documents would you present to
17 the contractor at hand to get that person to sign, sign
18 an agreement?
19   A. What I would do is I would talk to the employer
20 and just tell him that these are our wage sheets. These
21 are our rate sheets as far as fringe benefits. I would
22 give him a copy of the contract, if he so choosed (sic),
23 if he asked for it.
24      If he did not ask for it, I would, you know, give
25 them a copy of the signature page, and, you know, if

Page 16

1  he -- if he wanted a copy of the agreement, you know,
2  certainly it was there.
3    Q. Okay.
4    A. And you know, actually, the signature page which
5  I have in my hand is the person in question, and sign
6  it, go to work, pay the fringe benefits. That's it.
7    Q. The signature page or pages that you use when you
8  were field rep, were they the signature pages to the --
9  to the relevant contract? What I mean by that, were
10 they the actual signature page from the actual contract?
11   A. To my knowledge, yes.
12   Q. Have you ever seen contracts where the signature
13 page is the last page of the contract, you can kind of
14 like tear it out, for example?
15   A. Yes, yes.
16   Q. Is that what you would use or did use?
17   A. That's what we would use of Local 5.
18   Q. Okay. Were other locals -- do they do it
19 differently?
20   A. I can only speak for Local 5. Prior to the
21 restructuring, you know, that was the reason for the
22 restructuring. People were using, you know, different
23 managers were using different methods to achieve the
24 same goal, but the reason for the restructuring was that
25 everybody does the same thing now.

Page 17

1    Q. Okay. Was there ever any training given on what
2  documents to use to sign up contractors or how you would
3  do that?
4    A. What -- well, what we started doing and then I
5  got into it further when I became the business manager
6  was that any new field reps went to leadership classes
7  sponsored by our international union. They were made
8  aware of RICO laws, things like that, but the actual
9  training was on the job.
10   Q. Okay.
11   A. If any of the field reps had any questions, they
12 knew that they would call me.
13   Q. When you were a field rep, did you maintain the
14 collective bargaining agreement somewhere or the
15 signature pages?
16   A. Yeah. Well, usually we worked, you know, we had
17 our pertinent documents that had to be signed at a
18 moment's notice. We carried them in our cars and in our
19 trunks.
20   Q. Okay. So you, if you were on the -- on a site,
21 and you wanted to sign someone up and they're agreeable,
22 you'd have a signature page ready to go in your car?
23   A. Yes.
24   Q. Let me -- Maury Waterproofing, are you familiar
25 with that company?

Pages 14 to 17

Michael Robert Perrone                                                  October 23, 2007

Page 22

1  A. Not since this all started with Chuck, and, you
2  know.
3  Q. Let me start then that time period. Since this
4  lawsuit started, has Mr. Longo had any discussions with
5  you regarding this lawsuit or Maarv Waterproofing?
6  A. Well, the only thing I asked him, you know, I
7  called him in just like I would call anybody else in and
8  said, what's going on here? All of a sudden, we're
9  being asked questions.
10  Q. Okay.
11  A. And --
12  Q. You've had a recent discussion with Mr. Longo
13  regarding this lawsuit?
14  A. Yes, and the only answer to that question was I
15  don't know any more about it than you do, and that's
16  what brought Chuck in, and we just got whatever we had.
17  Q. Okay. Approximately when did you have this
18  conversation you're referring to with Mr. Longo?
19  A. God, a couple weeks back.
20  Q. Okay. This is not a test at all, but can you
21  tell me what you remember of that conversation, what you
22  said to him, what he said to you?
23  A. Well, the actual, what brought all this on was
24  that I had talked to Chuck, and he had asked me, you
25  know, about Maarv Waterproofing, and there was a

Page 23

1  question of fringe benefits paid, and was there an
2  agreement signed and all that, and, you know, when we --
3  when I saw the name of the contractor and got this get,
4  you know, I talked to Dominic.
5  Q. Okay.
6  A. And I says, I don't know any more about this than
7  you. What's going on? And he said I got the same call
8  you did.
9  Q. Did Mr. Longo in the conversation you're
10  describing, did Mr. Longo relate to you the
11  circumstances in which he said he signed Maarv
12  Waterproofing to a contract?
13  A. Yeah, it didn't seem like anything out of the
14  norm. Went on the job, came in contact with a -- with
15  an employer that had people on the job, and, you know,
16  got them to sign the agreement. It didn't seem like
17  anything out of the norm.
18  Q. All right. I'm trying to understand now
19  everything that Mr. Longo told you in this conversation.
20  He told you that he went on the job site and came
21  into contact with the employer and signed him to a
22  contract?
23  A. As I know it, yes.
24  Q. Did he tell you anything else?
25  A. No, nothing.

Page 24

1  Q. Did he tell you whether or not he gave the
2  contract, the actual collective bargaining agreement, to
3  the employer?
4  A. No.
5  Q. He didn't tell you that one way or the other?
6  A. No, but it's standard if an employer asks for the
7  complete full agreement, we have thousands of them.
8  Q. Did Mr. Longo tell you how he gave a contract to
9  Maarv Waterproofing?
10  A. No.
11  Q. For example, mail or fax?
12  A. No.
13  Q. Other than Mr. Longo, have you had conversations
14  with anyone else regarding this case other than Mr.
15  Mehler as well?
16  A. The only other person now since the restructuring
17  is my supervisor ttRichard E. Tolson.
18  Q. What discussions -- can you describe the
19  discussions you had with Mr. Tolson?
20  A. He asked me exactly what, do you know anything
21  about Maarv Waterproofing, and I said it doesn't ring a
22  bell to me.
23  Q. Okay.
24  A. And that was it. And then the call came from
25  Chuck and everything, and I ended up here.

Page 25

1  Q. Anything else communicated between you and Mr.
2  Tolson?
3  A. No.
4  Q. Did Mr. Longo tell you -- strike that. Did Mr.
5  Longo tell you that he actually met with the owner or
6  principal of Maarv Waterproofing?
7  A. That, I don't -- I can't say. All I know is that
8  he said he met on the job with Maarv Waterproofing.
9  Now, who he met with, I don't know, but apparently
10  whomever had the authority to sign this agreement. So
11  what their title is, I don't know.
12  Q. The document I put in front of you, this one
13  right here, which we've marked Longo-1, have you ever
14  used a document -- strike that.
15  Have you ever used -- well, in 2004, you weren't
16  still a field rep in 2004, you were a business manager?
17  A. Yes.
18  Q. When you were a field rep, did you ever use a
19  document that is reflected in Longo-1?
20  A. Could you repeat that, please?
21  Q. Sure. When you were a field rep --
22  A. Yes.
23  Q. -- you mentioned you used signature pages.
24  A. Right, right.
25  Q. Did you ever use the document such as the one

Pages 22 to 25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al.<br><br>                  Plaintiffs,<br><br>v.<br><br>MAARV WATERPROOFING, INC.,<br><br>                  Defendant. | CASE NUMBER:  1:07CV00501<br><br>JUDGE:  Richard J. Leon |

## LOCAL RULE 7(K) STATEMENT

Pursuant to Local Rule 7(k), the following persons are entitled to be served with orders, judgments, and stipulations:

> Ira R. Mitzner, Esquire
> Charles V. Mehler, III, Esquire
> DickStein Shapiro LLP
> 1825 Eye Street NW
> Washington, DC 20006-5403

                                                 BY:   /s/ Alexander Nemiroff
                                                             ALEXANDER NEMIROFF
                                                             Bar No. 454408

2997126v1