## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN FLYNN, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-00501 (RJL) |
| | ) | |
| MAARV WATERPROOFING, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs, by their attorneys, and in accordance with Federal Rule of Civil Procedure 56, move this Court to enter partial summary judgment in favor of the Plaintiffs and against Defendants Maarv Waterproofing, Inc. on the 2002 – 2007 collective bargaining agreement at issue in this case. As set forth more fully in the accompanying Memorandum of Points and Authorities, Statement of Material Facts As To Which There Is No Genuine Issue, Declaration of David F. Stupar, Declaration of Patrice Clarke, transcripts (or selected pages thereof) of depositions taken of Attilla Szamosszegi, Robert Perrone and Dominic Longo and supporting Exhibits, Plaintiffs are entitled to partial summary judgment and an amount in their favor of

$129,308.05 on the ground that there is no genuine issue as to any material fact and Plaintiffs are entitled to partial summary judgment as a matter of law.  Fed.R.Civ.P. 56.

Dated:  December 14, 2007                          Respectfully submitted,

                                                  By

                                                  Ira R. Mitzner, DC Bar No. 184564
                                                  Charles V. Mehler III, DC Bar No. 475909
                                                  Dickstein Shapiro LLP
                                                  1825 Eye Street, N.W.
                                                  Washington, D.C.  20006
                                                  (202) 420-2234

                                                  *Attorneys for Plaintiffs*

1632093 v1; YZBX01!.DOC

2367554.01

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, et al.,

      Plaintiffs,

    v.

MAARV WATERPROOFING, INC.,

      Defendant.

Civil Action No. 1:07-CV-00501 (RJL)

## PLAINTIFFS' MEMORANDUM
## IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

December 14, 2007

Ira R. Mitzner, D.C. Bar No. 184564
Charles V. Mehler III, D.C. Bar No. 475909
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, DC 20006
(202) 420-2200

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. i

INTRODUCTION ........................................................................ 1

FACTS................................................................................ 2

ARGUMENT........................................................................... 6

    I.      Summary Judgment Standards............................................. 6

    II.    Maarv Signed A Collective Bargaining Agreement Which
          Required It To Make Fringe Benefit Contributions, But
          Failed To Make Such Contributions In Violation Of The
          Agreement, ERISA, And The IPF's Collection Procedures............ 7

    III.   An Audit Reveals That Maarv Owes The Funds $129,308.05 In
          Damages Under The 2002 CBA, Plus Attorney's Fees................... 8

    IV.   Maarv Cannot Avoid Liability For The Delinquent Contributions
          It Owes Under The 2002 CBA Based On An Alleged Fraudulent
          Oral Statement By A Local Union Official.............................. 9

          A. Most Contract Defenses That An Employer Might Have
             Against A Union, Including Fraud In The Inducement,
             Are Not Assertable Against ERISA Funds Like The
             Plaintiffs.................................................................. 10

          B. This Case Involves Alleged "Fraud In The Inducement," A
             Defense Not Assertable Against The Plaintiff Funds, Rather
             Than "Fraud In The Execution"......................................... 11

          C. Even If Maarv Was Alleging "Fraud In The Execution,"
             Partial Summary Judgment Would Still Be Appropriate
             Because Maarv Cannot Show That It Had No Reasonable
             Opportunity To Learn The Nature Of The Document
             Mr. Szamosszegi Signed................................................. 16

CONCLUSION ........................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*Agathos v. Starlite Motel*, 977 F.2d 1500 (3d Cir. 1992)....................................................11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........................................................7

*BAC Local Union 15 Pension Fund v. Lonnie Cromwell Masonry, Inc.*,
　　No. 02-00074, 2002 WL. 31761565 (W.D. Mo. Nov. 25, 2002) ........................16, 19

*Bennett v. Machined Metals Co.*, 591 F. Supp. 600 (E.D. Pa. 1984)................................8

*Bituminous Coal Operators' Association, Inc. v. Connors*,
　　867 F.2d 625 (D.C. Cir. 1989)..................................................................................11

*Bricklayers and Allied Craftworkers Local 2 v. C.G. Yantch, Inc.*,
　　316 F. Supp. 2d 130 (N.D.N.Y.2003)…………………………...............14, 15, 16,18, 19

*Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620 (3d Cir. 1984) ........................................14

*Carpenters Amended and Restated Health Benefit Fund v.*
　　*Ryan Construction Co.*, 767 F.2d 1170 (5th Cir. 1985).................................................8

*Central States, Southeast and Southwest Areas Pension Fund v.*
　　*Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir. 1989)..................................10, 14

*Chicago Area International Brotherhood of Teamsters Health and*
　　*Welfare Trust Fund v. Watermelon Depot, Inc.*, No. 94C5819,
　　1996 WL. 447254 (N.D. Ill. July 31, 1996)..........................................................18, 19

*Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287 (3d Cir. 1996) ...........................................12

*Down to Earth Landscaping v. New Jersey Building Laborers District Council*
　　*Local 595*, No. 06-578, 2006 WL. 1373169 (D. N.J. May 17, 2006)..........................16

*Electrical Workers Local 58 v. Gary's Electric Service Co.*,
　　227 F.3d 646 (6th Cir. 2000) ....................................................................................12

*Flynn v. Thibodeaux Masonry, Inc.*, 311 F. Supp. 2d 30 (D.D.C. 2004).....................10, 11

*La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v.*
*Alfred Miller General Masonry Contracting Co.*,
　　157 F.3d 404 (5th Cir. 1998) ....................................................................................11

*New York State Teamsters Conference Pension & Retirement Fund v.*
　　*United Parcel Service, Inc.*, 382 F.3d 272 (2d Cir. 2004) ...........................................10

i

DSMDB-2367397

*Paper Express, Ltd. v. Pfankuch Maschinen GmbH,*
   972 F.2d 753 (7th Cir. 1992) ....................................................................17

*Perkins v. District of Columbia*, 769 F. Supp. 11 (D.D.C. 1991)....................................6, 7

*Southern California Retail Clerks Union v. Bjorklund,*
   728 F.2d 1262 (9th Cir. 1984) ..................................................................15

*Southwest Administrators, Inc. v. Rozay's Transfer,*
   791 F.2d 769 (9th Cir. 1986) ...............................................................12, 16

*Teamsters & Employers Welfare Trust v. Forman Brothers Ready Mix,*
   139 F. Supp. 2d 976 (C.D. Ill. 2001) .........................................................12

*Trustees of Glaziers Local Pension, Welfare, and Apprentice Funds v.*
   *Walker & LaBerge Co.*, 619 F. Supp. 1402 (D. Md. 1985)...........................................8

## FEDERAL STATUTES AND RULES

Fed. R. Civ. P. 56(c) ......................................................................................6

Fed. R. Evid. 801 ..........................................................................................3

29 U.S.C. § 158(a)(3)....................................................................................14

29 U.S.C. § 1132(g)(2) ..................................................................................8

29 U.S.C. § 1145..........................................................................................7, 8

## MISCELLANEOUS

John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 9-22 (3d ed.
   1987) ..............................................................................................12

DSMDB-2367397

## INTRODUCTION

Attila Szamosszegi, the owner, president, and sole officer of Maarv Waterproofing, Inc. ("Maarv") admits that, in February 2004, he signed a Local 5 Independent Agreement forwarded to Maarv by the local Bricklayers union. That document clearly and unambiguously states that any signatory employer is agreeing to "all terms and conditions," including the fringe benefit contribution obligations, of the Local 5 collective bargaining agreement. Despite these facts, Maarv seeks to escape its failure to pay the contributions owed under that collective bargaining agreement based on an alleged false statement regarding the scope of the Local 5 Independent Agreement by a local union official. Specifically, Maarv contends that a local union official told a Maarv subcontractor, who told Maarv's office manager, who then told Mr. Szamosszegi, that signing the Local 5 Independent Agreement would only obligate Maarv to make union contributions for one specific project.

These allegations, even if proven, do not allow Maarv to circumvent its obligations to the ERISA funds that bring this lawsuit. Maarv does not contend that anyone from the Plaintiff funds ever made any misrepresentations at all. And it is well-established that union misrepresentations of the sort alleged by Maarv do not preclude this delinquent contributions action. As explained below, fraudulent statements made by a union to induce an employer to enter into a collective bargaining agreement are simply not assertable against fringe benefit funds, such as the Plaintiffs, pursuing collection of the delinquent contributions owed by employers and needed to fund the benefits of their participants. Even if Maarv can establish that it is alleging "fraud in the execution" by the union, Maarv still cannot prevail. Mr. Szamosszegi's testimony establishes that he had had ample opportunity to learn the nature and terms of the document he was signing, but never read the document, never asked anyone at the union about it, never showed it to an attorney, and overall, "wasn't really paying that much attention." In these circumstances, Maarv cannot show that any failure to learn the nature of the

Local 5 Independent Agreement was "excusable ignorance," as required to maintain the affirmative defense of fraud in the execution.   Accordingly, this Court should enter partial summary judgment in favor of the Plaintiffs on all damages owed under the 2002-2007 collective bargaining agreement.[1]

## FACTS[2]

For purposes of this motion for partial summary judgment only, the Plaintiffs Bricklayers and Trowel Trades International Pension Fund ("IPF") and International Masonry Institute ("IMI") (collectively, "Funds") accept the relevant facts alleged by Maarv surrounding the signing of the 2002 CBA.   Even under Maarv's version of the facts, however, partial summary judgment in favor of the Funds on the 2002 CBA should be granted.   The basic facts of this case are simple and straightforward, and can be summarized as follows:

Maarv is a New Jersey contractor, in business for approximately the past twenty years performing various services, including waterproofing, caulking, and restoration, in New Jersey and neighboring states.   SMF ¶ 13.   The company was founded and is solely owned by Attila Szamosszegi, who also serves as President, Chairman of the Board, and the company's sole

---

[1] The Amended Complaint seeks damages under both a November 1, 1999 through October 31, 2002 "Agreement Between Building Contractors Association of New Jersey, Other Signatory Employers, and Local Union Nos. 4 & 5 of the International Union of Bricklayers and Allied Craftworkers" (hereinafter, "1999 CBA"), and a November 1, 2002 through October 31, 2007 Agreement Between Building Contractors Association of New Jersey, Masonry Contractors of New Jersey, Building Contractors Association of Atlantic County, Other Signatory Employers, and Local Union Nos. 4, 5 &2 of the International Union of Bricklayers and Allied Craftworkers (hereinafter, "2002 CBA").   The present motion for partial summary judgment addresses only the 2002 CBA because although Mr. Szamosszegi's name and signature appear on the face of the signature page to the 1999 CBA, he has testified that the signature is not his, thereby creating an issue of fact as to this agreement.   Plaintiffs believe that resolution of the issues regarding the 2002 CBA will likely foster a settlement that will obviate the need for any trial in this case.

[2] This section provides a summary of the facts material to the Plaintiffs' motion for partial summary judgment on the 2002 CBA.   A full statement of the material facts not in dispute for purposes of this motion only, with citations, is set forth in Plaintiffs' Rule 56(b) Statement Of Material Facts As To Which There Is No Genuine Issue, filed in support of Plaintiffs' motion (hereinafter, "SMF").   All factual citations in this brief are to the numbered paragraphs of that SMF.

DSMDB-2358024

officer and director. SMF ¶¶ 18,20. At one time, Mr. Szamosszegi was a "card-carrying" member of the Bricklayers union. SMF ¶ 19. At various points in its history, Maarv has submitted reports and payments to the IPF and/or local Bricklayers funds. SMF ¶¶ 87-88. Maarv claims that, in these instances, it would make contributions for "union guys" working on a Maarv project, but would not make contributions for non-union employees performing the same work. SMF ¶ 89.

Maarv contends that in early 2004, Anne Paoella, the office manager at Maarv, received a phone call from Ivan Pallos of Pallos Construction Company, a subcontractor to Maarv doing caulking work on a parking garage project in Princeton, New Jersey ("the Princeton Parking Garage Project"). SMF ¶ 34. Mr. Pallos, a former employee of Maarv, purportedly told Ms. Paoella that Dominic Longo, a Field Representative with Bricklayers Local Union No. 5 New Jersey, had informed him that a union worker needed to be hired for the project, an agreement with the union needed to be signed, the local union would not accept a signature from Pallos but required one from Maarv instead, and an agreement was therefore going to be sent over. SMF ¶ 36. Ms. Paoella relayed this information to Mr. Szamosszegi.[3] SMF ¶ 36.

Maarv claims that as a result of this conversation, a document titled "International Union of Bricklayers and Allied Craftworkers Local #5 – New Jersey Independent" (hereinafter, "Local 5 Independent Agreement") was faxed to Maarv, filled out by Ms. Paoella, signed by Mr. Szamosszegi, and faxed back to the local union, where it was also signed by Mr. Longo and another local union official. SMF ¶ 37. Mr. Szamosszegi explains that, by signing the Local 5 Independent Agreement, he intended to enter into a "union paper" requiring the payment of union dues and union fringe benefit contributions for the Princeton Parking Garage Project, but that he never intended to enter into a broader agreement requiring contributions for work

---

[3] Plaintiffs have been informed that Ms. Paoella is now deceased. SMF ¶ 23.

DSMDB-2358024

performed on any other projects. SMF ¶ 71. After signing, Maarv proceeded to finish the Princeton Parking Garage Project. SMF ¶ 38. In connection with that project, Maarv paid dues and fringe benefit contributions to the local unions and the relevant Bricklayers funds on behalf of Pallos Construction's union employees.[4]  SMF ¶ 96.

Nothing in the Local 5 Independent Agreement signed by Mr. Szamosszegi references the Princeton Parking Garage or any specific project. SMF ¶ 70. Nor does Maarv have any other documents indicating that the Local 5 Independent Agreement was limited to one project. SMF ¶ 69. To the contrary, the very first sentence of the Local 5 Independent Agreement refers to, and reflects the employer's agreement to, the standard Local 5 collective bargaining agreement:

> The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No. 2 of Delaware-New Jersey, and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

SMF ¶ 58.

The Local 5 Independent Agreement also contains a provision setting forth the territorial jurisdiction in which the agreement applied, a provision stating that the employer recognizes the union as the exclusive bargaining agent for all employees within the bargaining unit "on all present and future sites within the jurisdiction of the Local Union," and a provision stating that the employer agrees to the payment of all fringe benefit contributions as specified in the collective bargaining agreement incorporated in the first sentence. SMF ¶¶ 62. Consistent with

---

[4] Pallos supposed reimbursed Maarv for these payments. SMF ¶ 96.

DSMDB-2358024

these provisions, the local union officials have testified that the Local 5 Independent Agreement was the document that the local union would have employers interested in becoming union contractors sign. SMF ¶¶ 59-60. By signing the Local 5 Independent Agreement, these officials testified, employers become bound to the 2002 CBA referenced in the first sentence. SMF ¶¶ 59-60. That 2002 CBA contained not only provisions requiring the payment of fringe benefit contributions to various Bricklayer-affiliated funds, but also a provision prohibiting any signatory employer from subcontracting of work to any company that did not agree to be bound by all terms and conditions of the 2002 CBA. SMF ¶¶ 74, 77. Maarv, though, signed the Local 5 Independent Agreement but failed to make contributions on any projects covered by the 2002 CBA other than contributions for certain union employees working for Maarv's subcontractor, Pallos Construction Company, on the Princeton Parking Garage Project. SMF ¶ 90. Accordingly, the Funds have brought the present lawsuit against Maarv for the delinquent contributions and related damages owed under that 2002 CBA, as determined by an audit. SMF ¶¶ 99-149. The contributions sought in this lawsuit are necessary to fund the pensions and other benefits of participants in the Funds. SMF ¶ 76.

Maarv concedes that the language of the Local 5 Independent Agreement incorporates the 2002 CBA (SMF ¶ 61), but contends that it should not be held bound to the 2002 CBA because Mr. Szamosszegi never intended to agree to anything other than a one project agreement requiring contributions for work performed on the Princeton Parking Garage. SMF ¶ 32. The only reason Mr. Szamosszegi signed the Local 5 Independent Agreement, Maarv maintains, was because he was relying on the fraudulent representation of the local union official, Dominic Longo (conveyed to him by the now deceased Ms. Paoella and later repeated by Mr. Pallos), that the agreement would cover only the Princeton project. SMF ¶¶ 36, 37.

5

Maarv does not claim that anyone at the Funds ever made any representations regarding the scope of the Local 5 Independent Agreement. SMF ¶ 54. No one at Maarv ever spoke with anyone at the Funds. SMF ¶¶ 53-55. Moreover, Mr. Szamosszegi states that, despite the apparent conflict between the language of the Local 5 Independent Agreement and his understanding of the scope of the agreement, he never attempted to speak with anyone at the union regarding the document he was about to sign or to confirm that it would cover just one project, explaining "I didn't feel like I need to." SMF ¶ 49. He never asked Ms. Paoella or Mr. Pallos why the union was insisting that Maarv sign the agreement rather than Pallos; consequently, this was never explained to him. SMF ¶ 41. He never had an attorney review the document he was about to sign. SMF ¶ 48. Mr. Szamosszegi did not even read the document before he signed it. SMF ¶ 45. Instead, he "only glanced through it" and "wasn't really paying that much attention since my sub is doing the job, not me." SMF ¶ 45. Mr. Szamosszegi similarly claims that he was not concerned about any wage or contribution rates pertaining to the Local 5 Independent Agreement because "as far as we knew it doesn't concern us because we subbed the job out." SMF ¶ 46. He also never asked the union for a copy of the 2002 CBA incorporated by the first sentence of the Local 5 Independent Agreement. SMF ¶ 68. Mr. Szamosszegi paid so little attention to the document he was signing that he cannot even recall noticing this language in the first sentence: "I can't recall. As I stated, it was one particular job so I wasn't really, you know, paying too much attention." SMF ¶ 67.

## ARGUMENT

### I.    Summary Judgment Standards

Summary judgment should be granted against Maarv for the damages owed under the 2002 CBA because there is no genuine issue as to any material fact and, as demonstrated below, the Fund is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Perkins v. District of*

6

*Columbia*, 769 F. Supp. 11, 13 (D.D.C. 1991). To withstand a motion for summary judgment,

the non-moving party must demonstrate that there exists a genuine dispute as to one or more

facts material to the outcome of the litigation. *Perkins*, 769 F. Supp. at 13. Facts are material to

the outcome of the case only if governing substantive law recognizes them as relevant. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As shown below, the undisputed

facts demonstrate that Maarv signed the Local 5 Independent Agreement binding it to the 2002

CBA and its contribution obligations, that Maarv failed to make the contributions required by

that agreement, and that none of the defenses asserted by Maarv are tenable or assertable against

the Funds. Accordingly, the Funds' motion for partial summary judgment on the 2002 CBA

should be granted.

## II.    Maarv Signed A Collective Bargaining Agreement Which Required It To Make Fringe Benefit Contributions, But Failed To Make Such Contributions In Violation Of The Agreement, ERISA, And The IPF's Collection Procedures

Maarv admits that it signed the Local 5 Independent Agreement at issue in this case. *See*

SMF ¶ 29. By its clear and unambiguous terms, that document binds any employer signing it to

the full terms and conditions of the 2002 CBA with Bricklayers Local Union Nos. 4 and 5 of

New Jersey and Local No. 2 of Delaware/New Jersey/Pennsylvania. *See* SMF ¶¶ 58-60, Local 5

Independent Agreement, attached as Exhibit A thereto. Under that 2002 CBA, ERISA, and the

applicable Collection Procedures which govern all participating employers in the Funds, Maarv

was required to file reports and make contributions to various funds for covered work, regardless

of whether such work was performed by members or non-members of the Bricklayers union, and

regardless of whether such work was performed by Maarv directly or through its subcontractors.

*See* SMF ¶¶ 58-64, 72-78; *see also* 29 U.S.C. § 1145. Despite these obligations, Maarv admits

that the only fringe benefit contributions it made under the 2002 CBA were for a few employees

sent over by the union to work on one project. *See* SMF ¶¶ 95-96.

DSMDB-2358024

### III.  An Audit Reveals That Maarv Owes The Funds $129,308.05 In Damages Under The 2002 CBA, Plus Attorney's Fees

The Funds are entitled to damages because Maarv has failed to make the fringe benefit contributions required by the 2002 CBA.  Section 515 of ERISA, 29 U.S.C. § 1145, obligates employers to make contributions required under a collective bargaining agreement "in accordance with the terms and conditions of such plan or such agreement. . ."  This duty is enforceable under ERISA section 502(g)(2), 29 U.S.C. § 1132(g)(2),[5] which mandates that a plan, if successful in proving that an employer has violated section 1145, "shall" receive an award for "interest" on delinquent contributions, an "additional computation of interest," and "costs and attorneys' fees."  Under both ERISA and the Collection Procedures of the Funds (adopted by the Trustees), the Plaintiffs are therefore entitled to the overdue contributions from Maarv, all interest accrued from the delinquent payments, an additional computation of interest on those delinquent contributions,[6] audit fees, and attorneys' fees and costs.[7]  *See* SMF ¶ 142; 29 U.S.C. § 1132(g)(2).

As set forth in the Declaration of Patrice Clarke of Calibre CPA Group, the auditing firm retained by the Funds to review the books and records of Maarv, and the Declaration of David F. Stupar, Executive Administrator of the IPF (both attached to Plaintiffs' SMF), Maarv's failure to

---

[5] ERISA section 502(g)(2) provides that in an action such as this, "the court shall award the plan" (A) the unpaid contributions; (B) interest on the unpaid contributions; (C) an amount equal to the greater of: (i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent * * * of the amount determined by the court under subparagraph (A); (D) reasonable attorneys' fees and costs of the action, to be paid by the defendant; and (E) such other legal or equitable relief as the court deems appropriate.  29 U.S.C. § 1132(g)(2).

[6] ERISA provides that interest on unpaid contributions shall be calculated "at the rate provided under the plan or, if none, the rate prescribed under section 6621 of Title 26."  29 U.S.C. § 1132(g)(2).  Pursuant to this provision, the Funds, by trustee resolution, have long adopted a rate of 15% per annum for any interest or additional interest owed by delinquent employers such as Maarv.  *See* SMF ¶ 10.

[7] *See, e.g., Trustees of Glaziers Local Pension, Welfare, and Apprentice Funds v. Walker & LaBerge Co.,* 619 F. Supp. 1402, 1406 (D. Md. 1985) (plans awarded interest, an additional computation of interest, and costs and attorneys' fees); *Carpenters Amended and Restated Health Benefit Fund v. Ryan Constr. Co.,* 767 F.2d 1170, 1176 (5th Cir. 1985) (same); *Bennett v. Machined Metals Co.,* 591 F. Supp. 600, 604-08 (E.D. Pa. 1984) (same).

8

DSMDB-2358024

make the required contributions for the months of February 2004 through December 2005 has resulted in a known contribution delinquency under the 2002 CBA of $87,828.80. *See* SMF ¶¶ 137. Maarv is also liable for interest in the amount of $18,662.95 and additional interest in an amount of $18,662.95, both as of August 9, 2006, audit fees of $3,803.35, and the $350.00 cost of filing this action, for a total amount of $129,308.05 in damages under the 2002 CBA, plus reasonable attorneys' fees and costs in an amount to be determined. *See* SMF ¶¶ 140-141.

**IV.    Maarv Cannot Avoid Liability For The Delinquent Contributions It Owes Under The 2002 CBA Based On An Alleged Fraudulent Oral Statement By A Local Union Official**

Maarv seeks to avoid liability for its failure to make contributions under the 2002 CBA on the basis of an alleged fraudulent oral statement made by a local union official, Dominic Longo, a Field Representative with New Jersey Local Union No. 5. Specifically, Maarv's President and owner, Attila Szamosszegi, claims that Mr. Longo, in presenting the Local 5 Independent Agreement for signing, told one of Maarv's subcontractors (but not Mr. Szamosszegi himself, who says he never spoke with any union official) that the agreement would cover only union members working on one project – a parking garage in Princeton, New Jersey. Mr. Szamosszegi claims that he would never have signed the agreement with the local union had he known it covered anything more than that one project and that it was only because of Mr. Longo's fraudulent statement that he did sign. For the reasons stated below, Maarv's fraud allegations against the local union, even if true, do not preclude the Plaintiff Funds from collecting the delinquent contributions and related amounts owed by Maarv.

DSMDB-2358024

A.    **Most Contract Defenses That An Employer Might Have Against A Union, Including Fraud In The Inducement, Are Not Assertable Against ERISA Funds Like The Plaintiffs**

In enacting Section 515 of ERISA, Congress was concerned about the effect of application of the traditional rule that third-party beneficiaries take contracts as they find them to employee benefit funds:

> Multi-employer pension and welfare plans would be in a bind if this familiar rule applied, so that flaws in the formation [of the contract] cut off third-party claims. Plans rely on documents to determine the income they can expect to receive, which governs their determination of levels of benefits. Multi-employer plans are defined-contribution in, defined-benefit out. Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize – perhaps because employers go broke, perhaps because they are deadbeats, perhaps because they have a defense to the formation of the contract. If some employers do not pay, others must make up the difference in higher contributions, or the workers will receive less than was promised. Costs of tracking down reneging employers and litigating also come out of money available to pay benefits. The more complex the litigation, the more the plan must spend. Litigation involving conversations between employers and local union officials – conversations to which plans are not privy – may be especially costly, and hold out especially great prospects of coming away empty-handed. How is a pension fund to overcome a jointly advanced claim that there were oral exceptions to the documents?

*Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) (internal citation omitted); *see also, e.g., New York State Teamsters Conference Pension & Retirement Fund v. United Parcel Service, Inc.*, 382 F.3d 272, 280 (2d Cir. 2004) (noting "the depletion of pension funds that would result if multiemployer plans were routinely forced to collect contributions via litigation"). To address these problems with application of the traditional contract rule, Congress drafted Section 515 so as to not only simplify and effectuate funds' collection of pension contributions from delinquent employers but, most importantly, insulate fund collection actions from the myriad of disputes that an employer might have with the union with whom it signed its collective bargaining agreement. *See, e.g., Flynn v. Thibodeaux Masonry, Inc.*, 311 F. Supp. 2d 30, 43 (D.D.C. 2004) ("Congress

10

intended to protect the Funds' financial stability by limiting the scope of issues litigable when they seek to recover employers' contributions").[8]

In accordance with the policies and concerns underlying ERISA, the federal courts have universally construed Section 515 to bar employers faced with collection actions by pension funds from raising defenses going to the formation of the employer's collective bargaining agreement with the union. As stated by the D.C. Circuit in *Bituminous Coal Operators' Association, Inc. v. Connors*, 867 F.2d 625, 634 (D.C. Cir. 1989):

> When the trustees of a pension plan created pursuant to a collective bargaining agreement sue an employer for contributions required by the plan, the employer may not defend on the ground of union misconduct in negotiating the agreement. *If it means nothing else, section 515 means that, at least when the Trustees are not implicated in the alleged misconduct, their suit cannot be thwarted by defenses not apparent from the face of the Agreement.* (emphasis added).

Courts have recognized only three possible defenses that an employer may raise in opposition to a delinquent contribution lawsuit brought against it: (1) the pension contributions themselves are illegal; (2) the collective bargaining agreement is void *ab initio*, as where there has been fraud in the execution, and not merely voidable, as in the case of fraud in the inducement; and (3) the employees have voted to decertify the union as their bargaining representative. *Thibodeaux*, 311 F. Supp. 2d at 43-44 (quoting *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992)).

**B.    This Case Involves Alleged "Fraud In The Inducement," A Defense Not Assertable Against The Plaintiff Funds, Rather Than "Fraud In The Execution"**

The deposition testimony of Maarv's owner and President, Attila Szamosszegi, establishes that this case involves allegations of "fraud in the inducement," one of the defenses not assertable against ERISA funds such as the Plaintiffs, rather than "fraud in the execution."

---

[8] Quoting *La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co.*, 157 F.3d 404, 408 (5th Cir. 1998).

DSMDB-2358024

The distinction between these two doctrines is as follows. Fraud in the inducement occurs when a false statement induces a party to assent to something he or she otherwise would not have. *See, e.g., Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986). As explained by one court, fraud in the inducement involves "allegations of oral representations on which the other party relied in entering into the agreement but which are contrary to the express terms of the agreement." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1300 (3d Cir. 1996). In contrast, fraud in the execution arises when a party signs a document radically different than the document that party thought it was signing and "with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms" (*Rozay's Transfer*, 791 F.2d at 774 (quoting Uniform Commercial Code § 3-305(2)(c))), or, stated slightly differently, with "excusable ignorance of the contents of the writing signed." *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992) (quoting *Rozay's Transfer*, 791 F.2d 769 at 774).[9] The classic example of fraud in the execution is when, after an employer has reviewed an agreement, the union surreptitiously substitutes a materially different agreement before execution. Because fraud in the inducement and fraud in the execution are affirmative defenses, Maarv bears the burden of proof on each. *See, e.g., Electrical Workers Local 58 v. Gary's Electric Service Co.*, 227 F.3d 646, 656 (6th Cir. 2000) (defends bears the burden of proving fraud in the execution); *Teamsters & Employers Welfare Trust v. Forman Brothers Ready Mix*, 139 F. Supp. 2d 976, 983 (C.D. Ill. 2001) (fraud in the inducement is not assertable by an employer against an ERISA fund and, in any event, employer failed to meet its burden).

This case does not involve allegations of fraud in the execution. Maarv has never suggested that the local union surreptitiously switched out the document that Mr. Szamosszegi

---

[9] *See also* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 9-22 (3d ed. 1987) (to prevail on defense of fraud in the execution, a party must show that he "signed an instrument that is radically different from that which [he] is led to believe he is signing").

DSMDB-2358024

was signing or that Mr. Szamosszegi actually intended to sign some document other than the Local 5 Independent Agreement. *See* SMF ¶¶ 29-55. Mr. Szamosszegi not only chose to sign the Local 5 Independent Agreement; prior to signing he had the agreement in front of him in his office, where no union officials were present, and where he could review the document at his leisure before deciding whether to execute it. *See* SMF ¶¶ 29-55. This is also not a case where the employer believed that it was signing something entirely different from a collective bargaining agreement with a union. To the contrary, Mr. Szamosszegi has testified that he knew that when he signed the Local 5 Independent Agreement he was signing a "union" agreement that required that fringe benefit contributions be paid to the union and that union wage rates be paid to employees. *See* SMF ¶ 71. The only issue is the scope of those union obligations – Mr. Szamosszegi claims that a local union official told a subcontractor of Maarv, who then told his office manager, who then told him, that the agreement covered only union guys working on the Princeton Parking Garage Project.[10]  SMF ¶ 40. But the language of the Local 5 Independent Agreement is far broader than that. It clearly and unambiguously states that any employer, by signing, is agreeing:

(i)      that he has read and approved the full 2002 CBA with Locals 4, 5, and 2;

(ii)     to become one of the parties to the full 2002 CBA and be bound to all terms and conditions of the full 2002 CBA and any successor agreements;

(iii)    to recognize the union as the exclusive bargaining agent for all employees within the bargaining unit on (not just the Princeton parking garage jobsite) but all present and future sites within the jurisdiction of the Local Union; and

(iv)    to pay all fringe benefit contributions as specified in the full 2002 CBA (without any limitation in terms of employees or projects).

SMF, ¶¶ 58-63, Local 5 Independent Agreement, attached as Exhibit A thereto.

---

[10] All this testimony regarding what the local union official purportedly said to Mr. Pallos, what Mr. Pallos purportedly said to Ms. Paoella, and what Ms. Paoella purportedly said to Mr. Szamosszegi is not only irrelevant as to the Funds, but also inadmissible hearsay. *See* Fed. R. Evid. 801

DSMDB-2358024

In light of this straightforward language on the face of the Local 5 Independent Agreement incorporating the 2002 CBA and all its terms and conditions, and setting forth broad contribution obligations for all employees on "all present and future sites," Mr. Szamosszegi cannot reasonably contend that the purported oral statements of the local union official, conveyed to him third hand, prevented him from knowing the nature of the document he was signing. Rather, what Maarv is really contending is that Mr. Szamosszegi was induced, by the local union's representations, into signing something that he otherwise would not have signed. Maarv argues that it should not be found liable to the Funds because the local union's alleged assurances indicated that the Local 5 Independent Agreement, despite its plain language, would not be enforced as written, but would instead be limited in scope to only union employees on just the Princeton parking garage project and that it was because of these assurances that Mr. Szamosszegi signed.[11] Oral representations of this sort, however, are precisely the type of oral representations regarding the scope of an agreement that constitute "fraud in the inducement," one of the defenses not assertable against fringe benefit funds like the Plaintiffs.

The decision in *Bricklayers and Allied Craftworkers Local 2 v. C.G. Yantch, Inc.*, 316 F. Supp. 2d 130 (N.D.N.Y. 2003), which involved facts virtually identical to the present case, is particularly instructive. In *Yantch*, the employer signed a one page "letter of intent" stating that "it will abide by, sign and become a party to the collective bargaining agreement being

---

[11] Even if Mr. Szamosszegi's testimony in this regard were accepted, it would be irrelevant as a matter of law. As emphasized in *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1154 (7th Cir. 1989), Section 515 of ERISA "prevents a court from giving force to oral understandings between union and employer that contradict the writings," including any oral representations that an employer would only be required to make contributions for those employees who were union members. Thus, in *Gerber* the court refused to give force to an alleged union representation that only a few union workers would be covered by the CBA when the contract language clearly covered all employees. In any event, any discrimination by an employer against non-union workers would violate federal labor law and thus be unenforceable. *See, e.g., Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 623 (3d Cir. 1984) (finding that agreements could not be interpreted as requiring contributions for only union members because Section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), prohibits such discrimination on the basis of union membership).

DSMDB-2358024

negotiated with, and to be entered into, between the Union and [ECA], to pay all wages and fringe benefits under said agreement to be dated May 1, 1997, and to abide by all other terms of that agreement." *Yantch*, 316 F. Supp. 2d at 138. The employer admitted that it signed the letter, but claims that it did so without reading it and based on the repeated assurances of a union steward that signing would only obligate the company to pay benefits for one plasterer for work performed on one particular project. *Id.*

The court in *Yantch* concluded that because this allegation really involved misrepresentations regarding "the consequences or scope" of the document the employer signed, the employer's defense was properly classified as one of fraud in the inducement, rather than fraud in the execution. *Id.* at 147-48. The court began by stating that "[s]o long as an employer knowingly signs an agreement that requires it to contribute to an employee benefit plan," it may not escape its contribution obligations "by raising defenses that call into question the union's ability to enforce the contract as a whole." *Id.* at 146 (internal quotations omitted). The court noted that there was no allegation that the union steward misrepresented that the document signed by the employer required the payment of fringe benefit contributions pursuant to a collective bargaining agreement and no evidence that the employer did not know that the document required some contributions. *Id.* at 148. While the employer may have been mistaken or misled as to the scope of the contribution obligation, this "does not change the fact that he knew of the obligation in general." *Id.* Protection of the employer, the court stressed, "should have come from actually reading the letter of intent, which was not ambiguous in any regard, and/or forwarding it to his attorney for advice on the legal consequences of signing it." *Id.* Regardless, because fraudulent inducement is not assertable against ERISA funds such as the plaintiffs, the employer's affirmative defense in this regard was dismissed. *Id.* Like the court in

DSMDB-2358024

*Yantch*, numerous other courts have found that allegations such as these raise the defense of fraud in the inducement which cannot be maintained against funds.[12]

> **C.    Even If Maarv Was Alleging "Fraud In The Execution," Partial Summary Judgment Would Still Be Appropriate Because Maarv Cannot Show That It Had No Reasonable Opportunity To Learn The Nature Of The Document Mr. Szamosszegi Signed**

Even if this Court were to conclude that what Maarv is alleging is fraud in the execution, the Funds would still be entitled to partial summary judgment because the undisputed facts reveal that Maarv cannot establish an essential element of this defense. As noted above, fraud in the execution requires not only proof that a party did not know what it was signing but also "excusable ignorance of the contents of the writing signed," meaning that the party had neither knowledge "nor reasonable opportunity" to learn the true nature of the document it was signing. *See, e.g., Rozay's Transfer*, 791 F.2d at 774. In the present case, even if Maarv could prove that Mr. Szamosszegi didn't know what he was signing, it cannot establish that his ignorance was "excusable" because Mr. Szamosszegi's deposition testimony establishes that he had ample opportunity to learn the nature of the Local 5 Independent Agreement and the obligations it imposed. Indeed, all he had to do was read the document he was signing.

This is not a case where the union presented an employer with a blank signature page for execution. Rather, the Local 5 Independent Agreement, as explained above, contains numerous

---

[12] *See also, e.g., Southern California Retail Clerks Union v. Bjorklund*, 728 F.2d 1262, 1263, 1266 (9th Cir. 1984) (dismissing allegations that signature on collective bargaining agreement was procured by false statements that individual would be eligible for a pension under the agreement and that contributions would only be required for two employees because fraud in the inducement are not assertable against trust funds); *Down to Earth Landscaping v. New Jersey Building Laborers District Council Local 595*, No. 06-578, 2006 WL 1373169, *3 n.4 (D. N.J. May 17, 2006) (concluding that where an employer alleged that it signed a one page, "short form agreement" that incorporated a full CBA because it was led to believe that the agreement covered just one project, this constituted a claim of fraud in the inducement), attached hereto as Exhibit A; *BAC Local Union 15 Pension Fund v. Lonnie Cromwell Masonry, Inc.*, No. 02-00074, 2002 WL 31761565, *3 (W.D. Mo. Nov. 25, 2002) (stating that employer's claim that would not have signed document absent false representation that agreement covered only six employees on one project was "the classic definition of fraud in the inducement"), attached hereto as Exhibit B.

DSMDB-2358024

substantive provisions clearly and unambiguously stating that any employer signing is agreeing to the 2002 CBA, agreeing to all terms and conditions of that collective bargaining agreement, including the obligation to make hourly fringe benefit contributions, and agreeing to recognize the union as the exclusive bargaining agent of all employees within the bargaining unit "on all present and future sites within the jurisdiction of the Local Union." *See* SMF ¶ 62, Exhibit A thereto; *see also supra* at 4.  By themselves, these provisions on the face of the Local 5 Independent Agreement should have alerted Mr. Szamosszegi to the fact that what he was agreeing to was a general collective bargaining agreement imposing obligations far beyond the obligation to make contributions for a couple union employees on the Princeton Parking Garage Project.  At an absolute minimum, the apparent inconsistency between these provisions and the purported oral representations of the local union official should have led Mr. Szamosszegi to follow-up with the union regarding this inconsistency, to request a copy of the full 2002 CBA referenced in the very first sentence of the Local 5 Independent Agreement, or to at least show the agreement to an attorney prior to signing it.  But Mr. Szamosszegi admits that he did none of these things.  He never even attempted to contact the union.  *See* SMF ¶ 47.  He never asked anyone for a copy of the full 2002 CBA.  *See* SMF ¶ 68.  He never showed the Local 5 Independent Agreement to an attorney.  *See* SMF ¶ 48.  Instead, he chose to simply rely on what an unidentified local union official supposedly told one of his subcontractors about the nature of the document.

In these circumstances, Maarv cannot establish that it had no reasonable opportunity to learn the nature of the Local 5 Independent Agreement such that its ignorance of this nature could be found "excusable."  While Mr. Szamosszegi asserts that he only "glanced" at the Local 5 Independent Agreement and never read it because "I didn't feel like I need to," to him, and he "wasn't really paying that much attention (*see* SMF ¶¶ 45, 49), this does not protect Maarv from

17

liability, as it is well-established that parties have a duty to read the documents they sign. *See, e.g., Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992) (party who agrees to terms in writing without understanding or investigating those terms does so at his own peril). For purposes of Maarv's fraud in the execution claim, all that matters is that Mr. Szamosszegi had the opportunity to read the Local 5 Independent Agreement and, had he done so, he would have learned that it incorporated the 2002 CBA and the contribution obligations contained therein.

Significantly, this is not a case where an employer claims it was pressured into signing by virtue of a union official standing over him awaiting the signature. Mr. Szamosszegi claims never to have even met with any union official regarding the Local 5 Independent Agreement. *See* SMF ¶¶ 33, 47, 51. Instead, Maarv contends that it was a representative of one of Maarv's subcontractors who supposedly met with the local union official, and that the Local 5 Independent Agreement was faxed to Maarv's office without Mr. Szamosszegi ever even speaking with any union official. *See* SMF ¶ 37. Mr. Szamosszegi thus had the document in his office, outside the presence of any union official, and was free to read or not read it whenever he wanted prior to signing. The fact that he chose only to "glance" at it was his choice, and does not enable Maarv to evade any part of its liability to the Funds. As stated in the *Yantch* case, fraud in the execution is simply unavailable as a defense where an employer chooses not to read the information right in front of it:

> Proving excusable ignorance requires a showing that the party satisfied its basic responsibility of reading what it signed. Here, Christopher Yantch claims not to have read the document at all. There is no evidence he was prevented from doing so, or that he had no time to confer with counsel as to the document's meaning and the consequences of signing it. Therefore, fraud in the execution, even if it was properly pled, is unavailable as a defense in this case.

18

DSMDB-2358024

*Yantch*, 316 F. Supp. 2d at 147; *see also, e.g., Chicago Area Int'l Brotherhood of Teamsters Health and Welfare Trust Fund v. Watermelon Depot, Inc.*, No. 94C5819, 1996 WL 447254, *7 (N.D. Ill. July 31, 1996) (an employer "who signs documents with his eyes closed, and who keeps them shut despite being given multiple opportunities to open them, cannot establish 'reasonable ignorance' of the terms of the agreement signed"), attached hereto as Exhibit C.  As in *Yantch*, numerous other federal courts have rejected fraud in the execution defenses asserted by employers, like Maarv, that needed only to read the document in front of them in order to learn the basic nature of the obligations they were assuming.  In the *Watermelon Depot* case, for example, the court concluded that an employer, which failed to take even the "minimal step" of reviewing (let alone reading) the documents it was signing, and failed to ever request a copy of the labor agreement referenced in the documents, could not establish "excusable ignorance" for purposes of fraud in the execution. *Watermelon Depot*, 1996 WL 447254, *6.  The court reached this conclusion notwithstanding evidence of fairly egregious conduct by the union, including evidence that the employer repeatedly requested to read the documents but was dissuaded from doing so by the union officials, that the employer was told by the union officials that the documents were mere formalities required to maintain insurance coverage, and the bodies of the documents were generally covered with a half sheet of folded paper at the time of signing.  *Id.*[13] Consistent with decisions such as this and *Yantch,* this Court should rule that Maarv cannot meet its burden of establishing fraud in the execution and therefore enter partial summary judgment in favor of the Funds.

---

[13] *See also, e.g., BAC Local Union 15 Pension Fund v. Lonnie Cromwell Masonry, Inc.*, No. 02-00074, 2002 WL 31761565, *4 (W.D. Mo. Nov. 25, 2002) (rejecting fraud in the execution defense where the employer had ample opportunity to learn the essential terms of the documents he signed by simply reading the documents which, contrary to the supposed representations of the union, expressly incorporated a CBA and did not contain any language limiting the applicability of the parties' agreement to just one project), attached hereto as Exhibit B.

DSMDB-2358024

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for partial summary judgment on the 2002 CBA should be granted and judgment entered in favor of the Plaintiff Funds on this contract in the amount of $129,308.05, plus reasonable attorney's fees and expenses in an amount to be determined.[14]

Respectfully submitted,

Dated:  December 14, 2007          By:  _____

Ira R. Mitzner, DC Bar No. 184564
Charles V. Mehler III, DC Bar No. 475909
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403
(202) 420-3674

*Counsel for Plaintiffs*

---

[14] If the Funds' motion for partial summary judgment is granted, counsel for the Plaintiffs will submit a statement of attorney' fees and expenses within 30 days of the Court's Order, or as directed by the Court.

DSMDB-2358024

**EXHIBIT A**

Westlaw.

Slip Copy                                                                                                          Page 1

Slip Copy, 2006 WL 1373169 (D.N.J.)
**(Cite as: Slip Copy)**

**C**
Down to Earth Landscaping v. New Jersey Bldg.
Laborers Dist. Council Local 595
D.N.J.,2006.
Only the Westlaw citation is currently
available.NOT FOR PUBLICATION
    United States District Court,D. New Jersey.
    DOWN TO EARTH LANDSCAPING, Plaintiff,
                              v.
    NEW JERSEY BUILDING LABORERS
    DISTRICT COUNCIL LOCAL 595, et al.,
                        Defendants.
            **Civil No. 06-578(SRC).**

                    May 17, 2006.

Brian Mitchell Cige, Somerville, NJ, for Plaintiff.
Vincent M. Giblin, Lawrence J. Finnell, Kroll,
Heinemann, Giblin, LLC, Iselin, NJ, for Defendants.

                     **OPINION**
CHESLER, District Judge.
**\*1** THIS MATTER comes before the Court on a
Motion to Compel Arbitration by Defendant New
Jersey Building Laborers District Council Local
595 [FN1] ("Local 595") (docket entry # 8). The
Court, having considered the papers submitted by
the parties, for the reasons set forth below, and for
good cause shown, GRANTS the Defendant's
Motion and STAYS these judicial proceedings
pending arbitration of Plaintiff's claims in this
matter.

> FN1. The Defendant, in their answer to the
> Plaintiff's Complaint, notes that they were
> improperly pleaded as New Jersey
> Building Laborers District Council Local
> 595. The proper name for this entity is
> Laborers Local 595. (Answer at 1.)

**I. BACKGROUND OF THE CASE**[FN2]

> FN2. Unless otherwise noted, the recitation
> of the facts in this case are drawn from the
> allegations contained in the Plaintiff's
> Complaint.

The Plaintiff, Down to Earth Landscaping Company
("DTE"), is in the business of providing
landscaping services. In October 2000, DTE was
hired to perform landscaping services at a medical
building in East Brunswick New Jersey. The job
required experienced heavy equipment operators,
and DTE contacted Local 595, a local labor union,
for experienced labor. In providing this labor, Local
595 requested that DTE execute a "Short Form
Agreement" which DTE signed on October 23,
2000.

The Short Form Agreement was a single page
document between an employer "desiring to employ
laborers" and the union "desirous of building,
developing and maintaining a harmonious working
relationship" with the employer. (Def.'s Notice of
Removal at Ex. D .) Under the terms of the Short
Form Agreement, the parties "agree to be bound by
the terms and conditions as set forth in the Building,
site and General Construction Agreement by and
between the Building Laborers Local Unions and
District Councils of New Jersey and various
Building, Site and General Construction
Contractors and Employers, which Agreement is
incorporated herein as if set forth in full."(*Id.*) This
additional Collective Bargaining Agreement,
incorporated by reference, contains a provision that
it is applicable to "all construction work that is
described in this Agreement or the Manual of
Jurisdiction of the Laborers' International Union of
North America, which is incorporated herein by
reference and any other work within the traditional
jurisdiction of the Union shall be performed in
accordance with the terms of this Agreement."(Def's
Notice of Removal at Exhibit F, Art. 2.20.) It also
provides that the parties agree to submit disputes to
the "New Jersey State Board of Mediation for
binding arbitration on an expedited basis."(*Id.*)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2

Slip Copy, 2006 WL 1373169 (D.N.J.)
**(Cite as: Slip Copy)**

After the completion of the East Brunswick project, DTE had no further dealings with, and hired no additional workers from, Local 595. In February 2005, DTE secured a commercial contract for landscaping services with Six Flags Great Adventure Amusement Park in Jackson New Jersey. In April 2005, DTE was contacted by Local 595, who sent them a copy of the executed Short Form Agreement and demanded that union labor be hired to work on the project, pursuant to its terms. DTE refused and subsequently completed this project, without the use of any union labor, in June 2005. On April 4, 2005, Local 595 requested the New Jersey Board of Mediation mediate this dispute between them and DTE over the use of non-union labor. On January 16, 2006, DTE filed suit in state court seeking to restrain further proceedings in the arbitration until a court could render a determination on whether the Short Form Agreement is a valid contractual agreement between DTE and Local 595 and whether the executed Short Form Agreement requires the dispute to be submitted to binding arbitration. On February 8, 2006, Local 595 removed the case to this Court pursuant to 28 U.S.C. § 1441(b) on the grounds that DTE's claims arise under the Labor Management Relations Act, 29 U.S.C. § 185, *et seq.* which gives this Court jurisdiction over the claim pursuant to 28 U.S.C. § 1331. On March 27, 2006, Local 595 filed the current Motion to Compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-10.

## II. DISCUSSION

**\*2** Motions to stay proceedings and to compel arbitration are reviewed under the summary judgment standard set forth in FED.R.CIV.P. 56(c). *See Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.,* 636 F.2d 51, 54 n. 9 (3d Cir.1980) ("Application of [the summary judgment] standard to [arbitration determinations] is appropriate inasmuch as the district court's order to arbitrate is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate."); *Bellevue Drug Co. V. Advance PCS,* 333 F.Supp.2d 318, 322 (E.D.Pa.2004) ( "[m]otions to compel arbitration

are reviewed, in the first instance, under the well-settled summary judgment standard set forth in FED.R.CIV.P. 56(c)"); *E-Time System, Inc. v. Voicestream Wireless Corp.,* 2002 WL 1917967 at *4 (E.D.Pa. Aug. 19, 2002) ("When confronted with a motion to stay proceedings pursuant to 9 U .S.C. § 3, the appropriate standard of review for the district court is that employed in evaluating motions for summary judgment under FED.R.CIV.P. 56(c)." ) (citing *Par-Knit,* 636 F.2d at 54 n. 9). Consistent with this standard, a party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."*Matsushita,* 475 U.S. at 586;*see also Anderson,* 477 U.S. at 247-48. The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate ' specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324;*Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) ("to raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1373169 (D.N.J.)
**(Cite as: Slip Copy)**

the 'mere scintilla' threshold"), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

**\*3** The Federal Arbitration Act (FAA) applies to all arbitration agreements involving interstate commerce, including the Short Form Agreement at issue in this case. *See Citizens Bank v. Alafabco, Inc.,* 539 U.S. 52, 55-56, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003). "The effect of the [FAA] is to create a body of federal substantive law of arbitrability, applicable to any agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. V. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). The FAA also " establishes a strong federal policy in favor of compelling arbitration over litigation." *Sandvik AB v. Advent International Corporation,* 220 F.3d 99, 104 (3d Cir.2000).

Under the FAA, "a court must decide whether an agreement to arbitrate exists before it may order arbitration." *Sandvik,* 220 F.3d at 107. There is an important distinction between contracts that are " asserted to be 'void' or non-existent ... and those that are merely 'voidable.' " *Id.* Where a party claims that a contract containing a broad arbitration agreement is 'void' by challenging the very existence of a contract that they claim they never agreed to, the issue of whether a contract existed is a matter for the Court to determine before ordering arbitration. *Sandvik,* 220 F.3d at 106-07 (citing *Three Valleys Municipal Water District v. E.F. Hutton Co., Inc.,* 925 F.2d 1136, 1140 (9th Cir.1991)). Where, however, a party challenges a contract with a broad arbitration clause as 'voidable, ' such as claiming that it was induced by " 'fraud, mistake, or duress, or where breach of a warranty or other promise justifies the aggrieved party in putting an end to the contract,' " issues of contractual validity are to be determined by the arbitrator. *Id.* at 107 (quoting Three Valleys Municipal Water Dist., 925 F.2d at 1140 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 7 cmt. b (1981))).

The crux of the Plaintiff's claim in the present case is that the Short Form Agreement between them and Local 595 is invalid because it "does not state exactly what the parties obligations were to one

another, the starting and ending date of their duties to one another, how often Plaintiff was required to employ union laborers and what the consideration was for Plaintiff to enter into such an agreement."[FN3] (Pl. Motion to Remand, p. 1) The Plaintiff does not contest that DTE signed the Short Form Agreement, nor do they contest that the agreements incorporated by reference to the Short Form Agreement contained an otherwise valid arbitration agreement. Their claim, instead, is that the Short Form Agreement and its terms (including the arbitration agreement) are not applicable to DTE's jobs beyond the East Brunswick project.

> FN3. While the Short Form Agreement is indeed short on specific terms and conditions, the documents it incorporates by reference are somewhat more detailed. For example, while the Short Form Agreement does not contain any termination date, the fifty eight page Collective Bargaining Agreement, which was incorporated into the Short Form Agreement by reference, states that it terminates on April 30, 2002. (Def. Notice of Removal, Ex. E at 56, ¶ 22.10.)
> The Collective Bargaining Agreement also contains detailed terms regarding termination and automatic renewal of the agreement and its terms. According to this document, unless the employer gives " written notice to the Laborers' International Union of North America, Eastern Region office, of such intention [to terminate the Agreement] ninety (90) days prior" to this termination date, the Collective Bargaining Agreement "continue[s] in full force and effect after the termination date ... from year-to-year." *(Id.)* In order to terminate the Collective Bargaining Agreement, "the Employer shall give written notice at least thirty (30) days prior to April 30th of each succeeding year and, if said thirty (30) days notice is given, the Agreement shall terminate on April 30th of any year following the giving of such notice." *(Id .)* It is not claimed that MDC provided any written notice to Local 595 to terminate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 4

Slip Copy, 2006 WL 1373169 (D.N.J.)
(Cite as: Slip Copy)

their agreement pursuant to these terms.
The Collective Bargaining Agreement also states that "the Employer agrees to be bound by the wage and benefit rate schedules of any new Agreement made by the Union and the Building Contractors Association of New Jersey."*(Id.)* This original Collective Bargaining Agreement was replaced by a new one that went into effect on May 1, 2002 and terminates at midnight on April 30, 2007. (Def. Notice of Removal, Ex. F at 61-62, ¶ 23.10.) The new Collective Bargaining Agreement contains nearly identical language regarding terms for an employer to terminate the agreement and the ongoing renewal of its terms. *(Id.)*

This is a challenge that the Short Form Agreement, and its terms, are voidable.[FN4]DTE does not contest that they entered into the Short Form Agreement in order to obtain union labor for their East Brunswick project. They claim that they agreed to be "bound by the terms and conditions of a Building, Site and General Construction Agreement by and between the Building Labor Local Unions and District Council of New Jersey and various building site and general construction contractors and employers, which Agreement was incorporated by reference, for that project," but they did not intend or agree that the terms of the Short Form Agreement should apply beyond that project. (Compl. at 2, ¶ 7) Such a "challenge based on fraud in the inducement of the whole contract (including the arbitration clause) is for the arbitrator."*Sandvik,* 220 F.3d at 105 (citing *Matterhorn, Inc. v. NCR Corp.,* 763 F.2d 866, 868 (7th Cir.1985) (citation omitted)).*See also Buckeye Check Cashing, Inc. v. Cardegna,* --- U.S. ----, ----, 126 S.Ct. 1204, 1209, 163 L.Ed.2d 1038 (2006) (where plaintiff is challenging the validity of the entire contract, and not the arbitration clause separately, " the issue of the contract's validity is considered by the arbitrator in the first instance"). The Plaintiff's challenge to the validity of the agreement that they signed with Local 595 must, therefore, be referred to arbitration. Accordingly, the Defendant's Motion to Compel Arbitration is **GRANTED.**

FN4. As the Third Circuit noted:
[T]he distinction between fraud in the inducement and fraud in the execution is that, 'the former induces a party to assent to something he otherwise would not have; the latter induces a party to believe the nature of his act is something entirely different than it actually is.'*[Southwest Admrs., Inc. v.] Rozay's Transfer,* 791 F.2d [769,] 774 [ (9th Cir.1986) ] (citing 12 WALTER H.E. JAEGER, WILLISTON ON CONTRACTS § 1488, at 332 (3d ed.1970)). The court went on to explain that, " 'fraud in the execution' arises when a party executes an agreement 'with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms.'...Fraud in the execution results in the agreement being void ab initio, whereas fraud in the inducement makes the transaction merely voidable."*Id.*      (quoting      U.C.C.      § 3-305(2)(c)) (other citations omitted).
*Sandvik,* 220 F.3d at 109-110 (quoting *Connors v. Fawn Mining Corp.,* 30 F.3d 483, 490 (3d Cir.1994). In the present case, DTE asserts that they were induced into agreeing to the terms of the Short Form Agreement for the limited purposes of securing union labor for their East Brunswick project, but would not have agreed to these terms to bind them for other jobs going forward. This is essentially a claim of fraud in the inducement, which is a challenge that the ensuing contract is voidable.

### III. CONCLUSION

*4 For the reasons stated above, and for good cause shown, the Court grants the Defendant's Motion to Compel Arbitration. An appropriate form of order will be filed herewith.

D.N.J.,2006.
Down to Earth Landscaping v. New Jersey Bldg. Laborers Dist. Council Local 595
Slip Copy, 2006 WL 1373169 (D.N.J.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1373169 (D.N.J.)
**(Cite as: Slip Copy)**


END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT B**

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2002 WL 31761565 (W.D.Mo.), 29 Employee Benefits Cas. 2243
**(Cite as: Not Reported in F.Supp.2d)**

**C**
BAC Local Union 15 Pension Fund v. Lonnie
Cromwell Masonry, Inc.
W.D.Mo.,2002.

United States District Court,W.D. Missouri,Western
Division.
BAC LOCAL UNION 15 PENSION FUND, et al.,
Plaintiffs,
v.
LONNIE CROMWELL MASONRY, INC.,
Defendant.
**No. 02-00074-CV-W-HFS.**

Nov. 25, 2002.

ORDER
SACHS, District J.
*1 Before the court is defendant Lonnie Crowell
Masonry, Inc.'s ("LCM") motions for leave to file a
third-party complaint, and for partial summary
judgment. The instant action was commenced by
the filing of a complaint on January 24, 2002 by
trustees Steve Mullen and Jeffrey Chaikin, trustees
of multiemployer employee benefit plans, BAC
Local Union 15 Pension Fund; BAC Local Union
15 Welfare Fund; Kansas City Bricklayer
Employees Vacation Plan; BAC Local Union 15
Apprenticeship and Training Fund (sometimes
referred to as "the Plaintiff Funds," or collectively
referred to as "plaintiffs"). The complaint alleges
violations of the Employment Retirement Income
Security Act of 1974 ("ERISA") specifically 29 U
.S.C. § 1132, ERISA section 502, and 29 U.S.C. §
1145, ERISA section 515, and plaintiffs seek,
among other things, payment of allegedly
delinquent employer contributions to employee
benefit plans.

*Background*

The Plaintiff Funds are separate entities established

pursuant to the Labor Management Relations Act,
as amended, Section 302, 29 U.S.C. § 186; and
each of the Plaintiff Funds are employee benefit
plans pursuant to 29 U.S.C. § 1002. On June 6,
1968, a collective bargaining agreement ("CBA")
was entered into between the Builders Association
of Missouri ("the Association"), and Local Union
No. 15 of the Bricklayers, Masons and Plasterers
International Union ("the Union"). The Plaintiff
Funds are located in Kansas City, Missouri.
Defendant Lonnie Crowell Masonry, Inc. ("LCM")
is a corporation with its principal place of business
in Dardanelle, Arkansas. Jurisdiction is proper over
the parties pursuant to 29 U.S .C. § 185(a).

In mid-2000, Lonnie Crowell, President of LCM ("
Crowell"), contracted with general contractor Elan
Construction to provide certain masonry materials
and labor for the construction of a Costco
Wholesale store in Kansas City, Missouri ("the
Kansas City Costco project"). According to Crowell
he hired non-union labor, and when they arrived to
work on the project, other unionized trades walked
off the job in protest. This activity halted
construction at the site. Plaintiffs dispute the
occurrence of a protest, and assert that the Union
did not engage in a protest regarding the union
membership of LCM or any other employer at the
site; therefore, there was not a halt to construction
at the site.

On September 8, 2000, after negotiations with the
Union, Crowell, signed an untitled memorandum
agreement ("the Memorandum") which stated that
Larry Sedlacek, representing LCM, met with Steve
McClanahan, representing the Union, in the
presence of Dale Nyberg and Wade Veronelly, who
represented Elan Construction. At that meeting it
was agreed, among other things, that LCM would
hire six (6) second year masons at $13.02 per hour
plus $7.80 per hour in contractor contributions. The
Memorandum was signed by Crowell and
McClanahan. According to Crowell, this
Memorandum was the brain-child of James

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 2002 WL 31761565 (W.D.Mo.), 29 Employee Benefits Cas. 2243
(Cite as: Not Reported in F.Supp.2d)

Woolery, an agent and representative of the Union, who approached him during the walkout at the construction site and proposed that LCM and the Union enter into an agreement encompassing only the Kansas City Costco project in order to appease the Union. Crowell asserts that Woolery assured him this would be a "one-job" agreement.

*2 Also, on September 8, 2000, Crowell, purportedly at the Union's urging, signed a Stipulation in which "the undersigned employer" agreed to be bound by the CBA in force between the Union and the Association. This Stipulation was signed by Crowell for LCM, McClanahan for the Union, and representatives of the Plaintiff Funds. According to Crowell, he signed the Stipulation in reliance on representations made by McClanahan and Woolery that the Stipulation was in furtherance of the Memorandum.

Crowell states, and plaintiffs do not dispute, that in conformity with the Memorandum, LCM paid the contributions of the six (6) second year masons sent by the Union for LCM's use on the Kansas City Costco project. However, the parties dispute whether those payments concluded LCM's obligation to the Union. LCM states that plaintiffs are now suing to recover contributions for every mason sent by LCM to work on construction projects within the geographical jurisdiction of the union [FN1] since September 8, 2000. This would include two other projects where LCM provided masonry work, a Costco store in Lenexa, Kansas and a high school in Stilwell, Kansas.

> FN1. Article II of the CBA states that the jurisdiction of the agreement extends to and includes the following counties of Kansas: Wyandotte, Atchison, Brown, Doniphan, Franklin, Johnson, Leavenworth and Miami. And, in Missouri, the counties of Cass, Clay, Henry, Jackson, Johnson, Lafayette, Platte, and Ray, and portions of Carroll and Bates counties.

The Complaint alleges that LCM has not complied with the Stipulation which incorporated the CBA provisions regarding mandatory employee contributions to be paid by an employer. Essentially, the complaint seeks an order directing an accounting of LCM's books and records to determine the total number of hours worked and paid to employees covered under the CBA; judgment against LCM for those contributions not paid by LCM; judgment against LCM for liquidated damages; and judgment against LCM for the accrued interest on unpaid fringe benefit contributions.

### Third-Party Complaint

LCM seeks leave to bring a third-party claim against the Union for fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation. LCM claims that Crowell signed the Memorandum in reliance on false misrepresentations by McClanahan and Woolery that they, as agents and representatives of the Union, possessed authority to bind the Union to a one-job agreement and a contribution rate of $7.80 per hour for only the six second year masons who worked on the Kansas City Costco project. LCM claims that McClanahan and Woolery had a duty to disclose their lack of authority, but instead, chose to conceal this fact. LCM further claims that the Union, through the acts of McClanahan and Woolery, then fraudulently abrogated the terms of the Memorandum by subsequently inducing Crowell to sign the Stipulation which incorporated the CBA, on the false pretense that the Stipulation was in furtherance of the Memorandum. Finally, LCM alleges that McClanahan failed to exercise reasonable care in communicating the scope of his actual authority, and he also alleges that the Union had a pecuniary interest in LCM's inducement to be bound by the CBA which would require union dues to be paid to the Union. As a result of this alleged fraud and negligence, LCM complains that it could be forced to suffer damages in the amount of $8.95 per hour [FN2] for all masons provided by LCM who worked on all projects in the jurisdictional areas defined in the CBA for the period of September 8, 2000 through the present.

> FN2. Plaintiffs do not allege a specific

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31761565 (W.D.Mo.), 29 Employee Benefits Cas. 2243
**(Cite as: Not Reported in F.Supp.2d)**

dollar amount. Rather, plaintiffs seek an accounting in order to determine the number of hours worked and/or paid to employees times the hourly amounts due under the CBA.

**\*3** Therefore, LCM seeks indemnification from the Union for any judgment entered against it on the claims asserted by plaintiffs; rescission of the Memorandum and Stipulation incorporating the CBA; punitive damages against the Union; and its costs and attorney fees incurred in defending against plaintiffs and in prosecuting the Union.

Federal Rule of Civil Procedure 14(a) provides that a defending party may implead a third party "who is or may be liable to him for all or part of the plaintiff's claim against him."Notwithstanding the purpose behind Rule 14(a),[FN3] LCM may not be entitled to the relief it seeks.

> FN3. The purpose of this rule is to promote judicial efficiency by eliminating the necessity for the defendant to bring a separate action against a third individual who may be secondarily or derivatively liable to the defendant for all or part of the plaintiff's original claim.*Southwest Administrators, Inc. v Rozay's Transfer,* 791 F.2d 769, 777 (9th Cir.1986).

Section 515 of ERISA, essentially provides that an employer who is obligated to make contributions to a multiemployer plan under the terms of, among other things, a CBA, shall, to the extent not inconsistent with law, make said contributions pursuant to the terms of the CBA. 29 U.S.C. § 1145 ; *Central States v Independent Fruit & Produce, Co.,* 919 F.2d 1343, 1347 (8th Cir.1990). In looking at prior cases which dealt with this section of ERISA, the Court of Appeals found it clear that Congress intended section 515 to simplify actions, to collect delinquent contributions, avoid costly litigation, and enhance the actuarial planning necessary to the administration of multiemployer pension plans. *Central States v Independent Fruit & Produce, Co.,* 919 F.2d at 1347-48;*citing, Central States, Southwest & Southwest Areas Pension Fund*

*v Gerber Truck Serv.,* 870 F.2d 1148, 1152 (7th Cir.1989). Section 515 places the pension fund in a better position, analogous to that of a holder in due course or a receiver of a failed bank-"entitled to enforce the writing without regard to understandings or defenses applicable to the original parties."*Central States v Independent Fruit & Produce Co.,* 919 F.2d at 1348.[FN4]"If it means nothing else, section 515 means that.....suit [by a trustee] cannot be thwarted by defenses not apparent from the face of the Agreement."*Central States v Independent Fruit & Produce, Co.,* at 1349 [FN5].

> FN4. Because a pension fund is not a party to the CBA, it would normally be a third-party beneficiary. As a third party beneficiary, however, the pension fund would be subject to "any contract defense which the promisor could assert against the promisee if the promisee were suing on the contract."It is these contract defenses-for example, fraud in the inducement, oral side agreements or course of performance-that are most likely to breed litigation. *Central States v Independent Fruit & Produce Co.,* 919 F.2d 1343, 1348 (8th Cir.1990).

> FN5. The courts of appeal have been unanimous in so holding. *See, eg., Berry v. Garza,* 919 F.2d 87, 89-90 (8th Cir.1990) (rejecting defense based on lack of majority status); *Benson v. Brower's Moving & Storage,* 907 F.2d 310, 314-15 (2nd Cir.1990) (rejecting defenses of abandonment of contract and lack of majority representation). The rule appears to be similar to that applied to written obligations to failed banks.

In circumstances similar to the facts at bar, a district court denied a defendant employer's motion for leave to file a third-party complaint against a union for rescission of the CBA or, alternatively, for indemnification and for fraud. *Southwest Administrators, Inc. v Rozay's Transfer,* 791 F.2d 769 (9th Cir.1986). The employer in *Rozay's* asserted the same defense as LCM at bar, fraud in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 4

Not Reported in F.Supp.2d, 2002 WL 31761565 (W.D.Mo.), 29 Employee Benefits Cas. 2243
(Cite as: Not Reported in F.Supp.2d)

the inducement. However, the court held that it would not be an abuse of discretion to deny an application for impleader where it would disadvantage the existing action. *Southwest Administrators, Inc. v Rozay's Transfer,* 791 F.2d at 777. Moreover, to grant such an application would be inconsistent with the purposes of ERISA in providing a streamlined and simplified procedure for employee benefit trust funds to collect delinquent contributions. *Id.*

Here, LCM asserts that Crowell was fraudulently induced into signing the Memorandum, purported to reflect an understanding between Crowell, McClanahan and Woolery that: (1) the agreement concerned only the Kansas City Costco project (a " one-job" agreement); (2) that LCM would be required to pay contributions in the amount of $7.80 per hour; and (3) that those contributions would be paid on behalf of only the six second year masons sent by the Union to work on that project. LCM also claims that Crowell was then fraudulently induced into signing the Stipulation incorporating the CBA on the misrepresentation that the Stipulation was in furtherance of the Memorandum. Indeed, LCM's claim that Crowell would not have signed either document if he had known the representations were false, is the classic definition of fraud in the inducement. *Southwest Administrators, Inc. v Rozay's Transfer,* 791 F.2d at 774;*See* 12 Williston on Contracts § 1488, at 332 (3d ed.1970). Nevertheless, such fraudulent inducement is not the type of defense that can be maintained against a trust fund's collection action. *Id.; see also, Central States, Southwest & Southwest Areas Pension Fund v Gerber Truck Serv.,* 870 F.2d 1148, 1150-51 (7th Cir.1989) (rejecting defense based on oral agreement between parties not to enforce the written terms of the CBA as to some employees); *Robbins v. Lynch,* 836 F.2d 330, 333-34 (7th Cir.1988) (rejecting as defense claim that union had agreed not to collect a payment called for by the agreement).

**\*4** Similarly unavailing is LCM's claim of fraud in the execution. According to LCM, it justifiably relied on McClanahan's false representations of authority, and it was not within the fair or reasonable reach of LCM to know that neither

representative had authority to bind the Union. Fraud in the execution arises when a party executes an agreement "with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms."*Southwest Administrators, Inc. v Rozay's Transfer,* 791 F.2d 769, 774 (9th Cir.1986). Contrary to LCM's contentions, it had ample opportunity to obtain knowledge of the essential terms of both the Memorandum and Stipulation, for the terms were clearly expressed in both documents. That part of the Memorandum indicating that LCM agreed to pay contributions in the amount of $7.80 on behalf of the six second year masons simply reflects the agreement between the parties as to those six employees. There is nothing in the Memorandum to indicate that this amount would be attributable to all other employees provided by LCM. And, there is a glaring absence of any language limiting the agreement to only the Kansas City Costco project. Likewise, the Stipulation notes that the employer's signature constitutes its agreement to be bound by the CBA, there is no mention of the purported agreement asserted by LCM, and there is no language indicating that it is in furtherance of the Memorandum. Thus, it begs the question as to how Crowell could have read these two documents and subsequently claim they embodied the terms now asserted. In an Affidavit, Crowell states that he is the President of LCM and that for eight years he has been in the business of bidding for contracts to perform masonry work on construction projects. He contends he then contracts with temporary staffing agencies to provide the necessary masonry labor and expertise. With such an extensive background in the construction business, it is highly unlikely that Crowell could claim ignorance of the substantive and procedural provisions of the industry, including those embodied in a CBA.

In sum, courts recognize only two defenses to a collection action: that the pension contributions are themselves illegal or that the CBA is void.*Central States v Independent Fruit & Produce, Co.,* 919 F.2d at 1349).[FN6] LCM has failed to establish either of those two defenses here, and the defenses of fraud raised would impermissibly complicate this action to collect delinquent contributions. Consequently, LCM's motion to file a third party

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5

Not Reported in F.Supp.2d, 2002 WL 31761565 (W.D.Mo.), 29 Employee Benefits Cas. 2243
**(Cite as: Not Reported in F.Supp.2d)**

claim against the Union is denied.

> FN6. Although certiorari was denied in *Rozay's Transfer,* the decision was subsequently disagreed with by the U.S. District Court of Maine. In *Capozza Tile Co., Inc. v. Joy,* 2002 WL 771126, the employer argued fraud in the execution in that the CBA which the Fund sued on was not the document signed by the president of the company. According to the president, he was given only a signature page and was told that it dealt only with pension benefits for four employees. The court found that although a fact-finder could disbelieve him, his statement created a genuine issue of material fact. *Capozza Tile Co., Inc. v. Joy,* 2002 WL 771126 (D.Me. September 30, 2002). I will follow the appellate law cited above.

*Summary Judgment as to Employer Status*

*Standard of Review*

Summary judgment is appropriate if the record " show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."*See*Fed.R.Civ.P. 56(c) ; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-50 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. The inquiry performed is the threshold inquiry of determining whether there is a need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.,* at 250.

**\*5** If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It is not sufficient for the nonmoving party to present

evidence that is conclusory or speculative, with no basis in fact. *Id.* In order for a motion for summary judgment to be defeated, the nonmoving party must resist the motion by making a sufficient showing on every element of its case on which it bears the burden of proof. *Smith v. Torchmark Corp.,* 82 F.Supp.2d 1006 (W.D.Mo.1999). In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.,*477 U.S. at 255.

Summary procedures are appropriate where the issues for resolution are primarily legal rather than factual. *Smith v. Torchmark Corp.,* 82 F.Supp.2d at 1008;*citing, Parmenter v Federal Deposit Insurance Corp.,* 925 F.2d 1088, 1092 (8th Cir.1991). Issues of fact must be material to a resolution of the dispute between the parties; where the only disputed issues of fact are immaterial to the resolution of the legal issues, summary judgment is appropriate. *Smith v. Torchmark,* 82 F.Supp.2d at 1008;*citing, Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992). In ruling on a motion for summary judgment, the Court does not decide material fact issues, rather it determines whether or not they exist. *Smith,* 82 F.Supp2d at 1008;*citing, Parmenter,* 925 F.2d at 1092.

*Analysis*

LCM contends that, pursuant to the Memorandum, it paid the agreed upon contributions for the six second year masons provided by the Union to work on the Kansas City Costco project [FN7]. LCM also contends that any other workers it provided to work on the other two jobs, i.e. the Lenexa Costco project and the Kansas Stilwell High School, were employed by temporary staffing agencies, Trendsetter and AMS Staffing. Thus, LCM seeks partial summary judgment on the issue as to whether it is obligated to pay contributions for the workers assigned to the last two projects. Conversely, plaintiffs seek recovery of contributions for every mason LCM provided to work on construction sites within the geographical jurisdiction of the Union since September 8, 2000. There appears to be no dispute that this basically

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31761565 (W.D.Mo.), 29 Employee Benefits Cas. 2243
(Cite as: Not Reported in F.Supp.2d)

includes the Kansas City Costco project, the Lenexa Costco project, and the Kansas Stilwell High School.

> FN7. It is noted that, in their opposing papers, plaintiffs do not dispute that LCM paid the agreed upon payments for the six second year masons provided to work on the Kansas City Costco project.

LCM asserts that "employee" is not defined in the CBA. Plaintiffs do not dispute this assertion, but note that the Amended Agreement and Declaration of Trust define "employee" as "any person who is employed by an employer as defined herein....." (Plaintiffs' Exhibit 2: Art. IV. Sec. 3). However, even if in agreement with this definition, the parties still disagree as to whether the persons provided by LCM to work on various construction projects can be construed as the "employees" of LCM. To determine whether the masons in question were employees of LCM under ERISA, we look to the common law of agency. *Alford v. U.S.,* 116 F.3d 334, 336 (8th Cir.1997); *citing, Nationwide Mutual Insurance Co. v Darden,* 503 U.S. 318 (1992). In *Nationwide,* the Supreme Court held that a common-law test, enumerating a number of factors, should be considered when construing the meaning of an "employee" under ERISA [FN8]. *Nationwide Mutual Insurance Co. v Darden,* 503 U.S. 318 (1992)."In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished."*Nationwide Mutual Insurance Co. v Darden,* 503 U.S. at 323-24;*quoting, Community for Creative Non-Violence v Reid,* 490 U.S. 730, 751-52 (1989)."Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the

provision of employee benefits; and the tax treatment of the hired party."*Id.*"[s]ince the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer,. ....all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." ' *Berger Transfer v. Central States,* 85 F.3d 1374, 1378 (8th Cir.1996); *quoting, Nationwide,* 503 U.S. at 324.

> FN8. The term "employee" as used in ERISA incorporates traditional agency law criteria for identifying master-servant relationships. Where a statute containing that term does not helpfully define it, this court presumes that Congress means an agency law definition unless it clearly indicates otherwise. *Nationwide Mutual Insurance Co. v Darden,* 503 U.S. at 318; *quoting, Community for Creative Non-Violence v Reid,* 490 U.S. 730, 739-40 (1989).

*6 In applying these factors to the present case, LCM through its motion papers and the affidavit of Crowell, defines itself as a construction subcontractor (one might consider this a form of broker-obtaining jobs and turning them over to others). It recites that it is a small operation comprised of Crowell and three office employees. In his affidavit Crowell avers that once he successfully bids on a construction project, he then contracts with temporary staffing agencies to provide the labor. Materials are ordered from suppliers near the construction site, and delivered by the suppliers directly to the site. According to Crowell, Trendsetter provided the labor for the Kansas City Costco project, and AMS Staffing provided the labor for the Lenexa Costco project. Pursuant to the contracts entered with Trendsetter and AMS Staffing, those agencies reserved the right of direction and control over all of the employees, and retained the right to hire, fire, discipline and reassign the employees. The contracts also indicate that the agencies assumed responsibility for the payment of salaries to the employees, and the payment of payroll taxes, and all federal, state or local taxes. Additionally, the agencies provided

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 7

Not Reported in F.Supp.2d, 2002 WL 31761565 (W.D.Mo.), 29 Employee Benefits Cas. 2243
**(Cite as: Not Reported in F.Supp.2d)**

workers' compensation insurance and employee benefits. And, the agencies assumed responsibility for compiling and filing compensation claims.

The affidavits of both Crowell and Sedlacek describe their relationship as one of long duration in which Sedlacek, although initially employed by Trendsetter and then AMS Staffing, worked as a foreman for LCM on the projects. Based on this enduring relationship, Crowell preferred Sedlacek to be the foreman on the jobs. Although Crowell sometimes visited the site, Sedlacek was responsible for the day-to-day operation, including how and when the job would be done. LCM only required that the job be completed in accordance with its agreement with the general contractor. According to Sedlacek, a number of masons traveled with him to sites around the country, and if additional labor was needed, he hired locally. Potential employees filled out applications which Sedlacek then sent to the agency for final approval. Sedlacek was solely responsible for the day-to-day operation, including start and end time, days off, and all other worker issues and problems. Sedlacek averred that he and the masons received their paychecks and W-2 forms from the agencies. The agencies also provided Sedlacek and the masons with the option of obtaining health insurance and participation in the 401(k) plan.

Finally, as to the necessary level of skill, Sedlacek averred that masonry techniques required time and experience to master, requiring an apprenticeship period of several years before becoming a qualified journeyman mason. Also, that the masons who worked on the projects at issue brought their personal tools. LCM only supplied large equipment such as concrete mixers and scaffolding.

In rebuttal, plaintiffs contend that there is evidence tending to show that LCM enjoyed an employer/employee relationship with the masons who worked on the projects, and where such a relationship was not apparent, the evidence shows that Sedlacek was employed by LCM and acted as its agent in securing the other masons (as he did in the negotiations regarding Costco in Kansas City). In support of this argument, plaintiffs submit the Trendsetter Agreement which refers to LCM as a

co-employer with Trendsetter. But the contract is entitled "Client Service Agreement", and LCM is defined in the agreement as "Client". Moreover, in exchange for all of the services provided by Trendsetter, LCM was only required to pay a fee [FN9], and furnish auto liability insurance and general liability insurance. Finally, under the Miscellaneous section of the agreement where both parties agree to report employee accidents to each other, Trendsetter expressly refers to the workers as "TRENDSETTER employees assigned to CLIENT". Arguably the reference to co-employers is insufficient to show that LCM was an employer. *Schwieger v. Farm Bureau Ins. Co. of NE,* 207 F.3d 480, 483 (8th Cir.2000); *quoting, Nationwide Mutual Insurance Co. v Darden,* 503 U.S. 318, 324 (1992) (there is "no shorthand formula or magic phrase that can be applied to find the answer," and therefore " '......all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." ')

> FN9. According to the agreements, LCM was required to pay Trendsetter an amount equal to the gross payroll of all employees listed with Trendsetter, as well as a service fee which was calculated by multiplying the gross payroll by the fee percentage rate of 20.50%. *see,* Attachment A, pg. 1, 8. LCM was required to pay AMS Staffing the sum of 21.50% for all labor provided for work completed. *see,* Attachment B, Art. 5.

*7 Plaintiffs next argue that even if the contracts themselves cannot be construed to define LCM as an employer, Sedlacek was employed by LCM, and hired other masons on behalf of LCM. The support for this argument is the affidavit of McClanahan who avers that Sedlacek represented himself as an employee and head foreman of LCM. According to McClanahan, Sedlacek also discussed issues relating to LCM joining the Union and signing the International Agreement so that it would have access to bricklayers throughout the country; however, McClanahan admits that such an agreement was never signed. McClanahan's affidavit in opposition to summary judgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 8

Not Reported in F.Supp.2d, 2002 WL 31761565 (W.D.Mo.), 29 Employee Benefits Cas. 2243
(Cite as: Not Reported in F.Supp.2d)

contains no specific facts showing that Sedlacek was employed by LCM, other than a "representation " was made. Sedlacek admitted in his affidavit that as a foreman, part of his duties included determining the size of the workforce needed to complete the work on time. As such, he worked with Crowell and negotiated the use of union masons on the Kansas City Costco project. In sum, plaintiffs argue that Sedlacek exercised authority over the workers "on behalf of the leasing agencies or LCM." In other words, plaintiffs argue that if Sedlacek was not employed by one, then he was employed by the other. However, it is not generally sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).[FN10]

> FN10. Assuming arguendo that Sedlacek is a key (or the key) to the puzzle presented his occasional work for competitors of defendant could be significant. *Berger Transfer*, supra, 85 F.3d at 1380.

Plaintiffs' production of the 1099 showing LCM as the payer of Alfredo Rodriguez seems inconclusive on whether LCM employed the masons. In its response to plaintiffs' request for production of documents, LCM provided the 1099 on one individual, Mr. Rodriguez, who performed masonry work on one of the projects at issue. When a problem arose with his social security number, AMS Staffing refused to pay him, therefore, LCM paid him.

Further, plaintiffs argue that, contrary to LCM's assertion, the masons who worked on the projects were not highly skilled. McClanahan averred that the projects did not require highly specialized bricklayer work, rather, all the work could be performed by bricklayers possessing second year apprentice skills. McClanahan further averred that it was the standard in the industry for bricklayers and masons to use their own personal tools. Even accepting plaintiffs' view, the issue of skill alone is not enough to find a genuine issue as to whether the workers were employed by LCM.

Alternatively, plaintiffs assert that there is a genuine issue of material fact as to whether LCM entered into a subcontract with an employer, which was prohibited by Art. XII of the CBA. Plaintiffs do not argue this point, but merely make mention of it as a final point in their opposing papers. *cf., Chicago Painters and Decorators Pension v Karr Brothers, Inc.,* 755 F.2d 1285, 1287 (7th Cir.1985) (even though the complaint was poorly drafted, the alleged violations under both section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 (1976), and section 502 of ERISA were present, thereby giving the opposing party notice of the substance of the allegations). It can be argued that a party to a contract would presumably try to comply with its terms. The basic contention in this case, however, somewhat weakens the presumption.

**\*8** The facts in this case are presented in somewhat superficial manner, and both sides rely on self-serving documentation and affidavits. As to the applicable law, in its reply brief (page 4) defendant asks the court to reject Eighth Circuit "joint employment" cases in favor of a Third Circuit case that it argues is more persuasive, in light of changes in rulings by the National Labor Relations Board. See *NLRB v. Browning-Ferris Ind.,* 691 F.2d 1117 (3rd Cir.1982). My duty is, however, to follow Eighth Circuit law, not some supposition that the Eighth Circuit may change prior rulings. Moreover, the agency issue which needs resolution is presumably federal common law, not necessarily influenced by Labor Act concepts. *Nationside Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323 n. 3 (1992).

This is one of those cases where, even if it may be surmised that the papers filed somewhat favor defendant, if taken at face value, caution suggests that the matter be resolved in court, after a full hearing, and after the pertinent witnesses have been examined in the courtroom. *Roberts v. Browning,* 610 F.2d 258, 536 (8th Cir.1979). In denying summary judgment, I assume that a hearing by the court should be confined to the issue of whether defendant is the employer or a co-employer or joint employer of the workmen on the Kansas projects-and that a hearing can be scheduled after a brief round of discovery.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31761565 (W.D.Mo.), 29 Employee Benefits Cas. 2243
**(Cite as: Not Reported in F.Supp.2d)**

Accordingly, it is hereby

ORDERED that LCM's motion seeking leave to file a third party complaint (ECF doc. 36) is DENIED. It is further

ORDERED that LCM's motion for summary judgment (ECF doc. 44) is DENIED.

It is further

ORDERED that the parties propose an agreed discovery schedule within 21 days of this ruling.

W.D.Mo.,2002.
BAC Local Union 15 Pension Fund v. Lonnie Cromwell Masonry, Inc.
Not Reported in F.Supp.2d, 2002 WL 31761565 (W.D.Mo.), 29 Employee Benefits Cas. 2243

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT C**

**Westlaw.**

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1996 WL 447254 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Chicago Area Intern. Broth. of Teamsters Health
and Welfare Trust Fund v. Watermelon Depot, Inc.
N.D.Ill.,1996.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
CHICAGO AREA INTERNATIONAL
BROTHERHOOD OF TEAMSTERS HEALTH
AND WELFARE TRUST FUND, Chicago Area
International Brotherhood of Teamsters Pension
Trust Fund, and Chicago Area International
Brotherhood of Teamsters Severance and
Retirement Trust Fund, Plaintiffs,
v.
WATERMELON DEPOT, INC., Defendant and
Third-Party Plaintiff,
v.
PRODUCE, FRESH AND FROZEN FRUITS &
VEGETABLES, FISH, BUTTER, EGGS,
CHEESE, POULTRY, FLORISTS, NURSERY,
SCAPE & ALLIED EMPLOYEES DRIVERS,
CHAUFFEURS, WAREHOUSEMEN &
HELPERS UNION, LOCAL 703,
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF
AMERICA, AFL-CIO, Third-Party Defendant.
**No. 94 C 5819.**

July 31, 1996.

*MEMORANDUM OPINION AND ORDER*
MAROVICH, District Judge.
**\*1** Plaintiffs Chicago Area International
Brotherhood of Teamsters Health and Welfare
Trust Fund, Chicago Area International
Brotherhood of Teamsters Pension Trust Fund, and
Chicago Area International Brotherhood of
Teamsters Severance and Retirement Trust Fund
(collectively "the Funds") are multi-employer
benefit trusts maintained and administered pursuant
to 29 U.S.C. § 186*et seq.,* and the Employee

Retirement Income Security Act ("ERISA"), 29
U.S.C. § 1001*et seq.* The Funds provide health
and retirement benefits to employees who perform
work covered by a collective bargaining agreement
entered into by employers with Third-Party
Defendant Local 703, International Brotherhood of
Teamsters, Chauffeurs, Warehousemen, and
Helpers of America, AFL-CIO ("Local 703").

The Funds filed this action against Defendant and
Third-Party Plaintiff Watermelon Depot, Inc. ("
Watermelon Depot") pursuant to ERISA Sections
502(a)(3) and 515, 29 U.S.C. §§ 1132(a)(3) and
1145, seeking delinquent contribution payments of
$134,600 for workers employed by Watermelon
Depot during the period from 1990 through 1994,
based upon a collective bargaining agreement to
which Watermelon Depot is purportedly a
signatory. Watermelon Depot, in turn, filed suit
against Local 703, claiming that Watermelon Depot
was fraudulently induced into joining the collective
bargaining agreement by agents of Local 703 and
seeking indemnification for any amount of
delinquent contributions Watermelon Depot may be
obligated to pay to the Funds.

Now before the Court is Watermelon Depot's
motion for summary judgment with respect to the
Funds' claim for contributions.[FN1] For the reasons
set forth below, this Court denies Watermelon
Depot's motion.

FN1. Initially, Watermelon Depot also
filed a motion for summary judgment with
respect to its claim against Local 703.
Local 703, in turn, filed a motion for
judgment on the pleadings against
Watermelon Depot-a motion that is, in
essence, a response to Watermelon Depot's
motion for summary judgment. Because
Watermelon Depot has withdrawn its
motion for summary judgment against
Local 703, the court declines to consider

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 2

Not Reported in F.Supp., 1996 WL 447254 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Local 703's motion for judgment on the pleadings, including Local 703's argument concerning the application of the National Labor Relations Act, 29 U.S.C. § 158(b)(3), at this time. Fairness and judicial efficiency dictate that, should Local 703 wish to pursue its motion, Watermelon Depot be given a full opportunity to contest Local 703's legal and factual contentions in light of this Court's present ruling. Thus, Local 703's motion is stricken; Local 703 may refile its motion at a later date, however.

### BACKGROUND

Watermelon Depot is a small company engaged in the business of selling watermelons wholesale to food chain stores between May 1 and September 1 of each year; the company is closed during the remainder of the year. Watermelon Depot is currently owned by Wayne Szabla ("Szabla"), a former employee, who inherited the company from Leslie Gordon in 1982. Szabla operated Watermelon Depot as a sole proprietorship from 1982 until 1989. In 1989 Watermelon Depot incorporated, Szabla being the company's sole shareholder and officer.

Significantly, Szabla has a long history in the wholesale produce business. From 1970, when he was in high school, to 1976, when he received his bachelor's degree in business administration, Szabla worked summers for R.H. Dietz and Gaglione ("Dietz"), a wholesale produce business that eventually became Watermelon Depot. In October 1976, Szabla left Dietz to work for Darling Motor Service ("Darling") as a truck driver. Shortly thereafter, Szabla became a member of Local 703 and contributions were made into the Funds by Darling on Szabla's behalf. In the latter part of 1978, Szabla left Darling and began to work for Watermelon Depot, then owned by Leslie Gordon.

While Gordon owned Watermelon Depot, the company did not have a labor agreement with Local 703. Yet, because Szabla wished to keep his union health and pension benefits-benefits which he first obtained while employed by Darling-, he elected (or

so he thought) to participate in the union's Special Workers Fund, for which Szabla paid his own contributions, rather than having his contributions deducted from his paycheck, as would have been the practice had Watermelon Depot had a collective bargaining agreement with Local 703. Szabla initiated his participation in the Special Workers fund through, and with the help of, union agents Vince Gregasone ("Gregasone") or Jim Bertino ("Bertino").

**\*2** After Szabla took over Watermelon Depot in 1982, and until 1994, when the present dispute first arose, Gregasone, Bertino, and another union representative, Leonard Joseph ("Joseph"), periodically would bring Szabla various forms purportedly requiring his signature.[FN2] As it turns out, one of these forms was a collective bargaining agreement.

> FN2. These three men are no longer connected to Local 703 and have not yet been located by any of the parties to this suit.

No overt pressure was ever exerted on Szabla to sign the forms presented to him by Gregasone, Bertino and/or Joseph. Yet, though he requested to read the forms on at least two or three occasions, he was each time "dissuaded" from doing so by Gregasone's, Bertino's and/or Joseph's representations that the forms were mere formalities, required merely to continue his insurance coverage, and that Szabla had nothing to worry about. The body of the forms presented to Szabla generally were covered with a half sheet of folded paper at the time of his signing, though certain key terms of the documents were still visible to Szabla.[FN3]

> FN3. For example, according to Szabla's deposition testimony he could see enough of the actual agreement binding Watermelon Depot to the agreement entered into between Local 703 and the Market Services Association to notice that the dates and the company name on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 3

Not Reported in F.Supp., 1996 WL 447254 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

first line of the agreement were not filled in, but he could not see the heading "AGREEMENT" immediately above.

Szabla never requested from the union full copies of the documents signed by him. According to Szabla, he did not feel the need to request such copies because of his belief-a belief purportedly created and nurtured by the union representatives-that the documents simply continued his insurance coverage.[FN4] From 1982 through 1994, Szabla continued to pay into the Funds on his own behalf through Watermelon Depot.

> FN4. Though Szabla claims not to have copies of any of the relevant documents other than the first form he signed in 1980-a form that made him a member of the Special Workers Fund-, he did sign a receipt acknowledging that he received from Local 703 (1) copies of every document to which he affixed his signature and (2) copies of any and all documents incorporated by reference into the documents he signed. Further, it is undisputed that, over the years, Szabla received several letters from the union and/or from the Funds by registered mail. Several of these letters referred to specific provisions in "our existing labor agreement" o r to particular terms in "our collective bargaining agreement." Some of these letters apparently prompted Szabla to question the union representative at the time. Yet, according to Szabla, he was consistently assured by the representative that the letters referred only to Szabla's insurance benefits, that he was on the mailing list as a special worker, and that he shouldn't worry. For this reason, and because nothing had gone wrong, Szabla generally disregarded the letters as unimportant or irrelevant.

In early 1991, Szabla received a request from an accounting firm to audit Szabla's books. Szabla declined the audit request on advice of counsel.

Nothing more happened with respect to the audit request until 1993, when Watermelon Depot was notified by the National Labor Relations Board that the company was bound by a settlement agreement between Local 703 and the Market Services Association. Watermelon Depot eventually was exempted from the settlement agreement by Order of the presiding judge; at which time Szabla decided to cease making personal contributions to the Funds and to purchase a private health insurance policy.

In April 1995, the Funds' auditors conducted a payroll audit of Watermelon Depot and concluded that, from 1990 to 1994, the company had failed to make $134,600 in contributions to the Funds on behalf of employees covered by the collective bargaining agreement allegedly signed by Szabla. The Funds seek to recover these unpaid contributions in the present action.[FN5]

> FN5. The Funds further seek interest, liquidated damages, attorneys' fees and other costs associated with the collection of the amounts determined to be due and owing pursuant to an audit of Watermelon Depot's books and records, in accordance with ERISA Section 502(g), 29 U.S.C. § 1132(g).

Watermelon Depot asserts that the collective bargaining agreement upon which the Funds' claim for contributions rests is void *ab initio* by virtue of the union's "fraud-in-the-execution" of the agreement. Specifically, Szabla maintains that he had no knowledge of the contents of the documents he signed and that he signed those documents believing them to be insurance continuation forms, not forms binding him to a collective bargaining agreement. Watermelon Depot thus contends that summary judgment in its favor its appropriate.

*DISCUSSION*

A. *Standards for Summary Judgment*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 4

Not Reported in F.Supp., 1996 WL 447254 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

**\*3** Summary Judgment is appropriate where the pleadings, answers to interrogatories, admissions, affidavits, and other materials show that there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Only genuine disputes over "material facts" can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Material Facts" are those that might affect the outcome of the suit under governing law. *Id.* A "genuine issue" exists if there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249. When considering a motion for summary judgment, the court must view the facts, and all the inferences drawn from those facts, in the light most favorable to the non-movant. *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991); *Roman v. U.S. Postal Service,* 821 F.2d 382, 385 (7th Cir.1987).

B. *Unavailability of Contractual or Equitable Defenses to the Funds' Action for Delinquent Contributions*

As a general rule, an employer obligated to make payments to pension and/or welfare trust funds pursuant to the terms of a signed collective bargaining agreement may not assert defenses pertaining to the agreement or to the union's conduct in an action by the funds to recover unpaid contributions. *See Robbins v. Lynch,* 836 F.2d 330 (7th Cir.1988); *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.,* 870 F.2d 1148 (7th Cir.1989); *Central States, Southeast and Southwest Areas Pension Fund v. Joe McClelland, Inc.,* 23 F.3d 1256 (7th Cir.1994). While pension and welfare funds technically are third-party beneficiaries of collective bargaining agreements between unions and employers, *Gerber Truck,* 870 F.2d at 1150, and while third-party beneficiaries generally must take contracts as they find them, *Id.,* collective bargaining agreements are not treated as typical third-party beneficiary contracts. *Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 467 (1960).[FN6] The reason for this "special" treatment is that the aggregate benefit to workers of protecting pension

and welfare funds from employers' assertions of traditional equitable and/or contractual defenses-thus assuring the existence of adequate trust funds-far outweighs the costs to employers of enforcing even fraudulently obtained collective bargaining contracts. *Gerber Truck,* 870 F.2d at 1150, 1153.

> FN6. In *Lewis,* an early and authoritative Supreme Court decision regarding the nature of pension and welfare trust funds as third-party beneficiaries of collective bargaining agreements, it was held that " parties to a collective bargaining agreement must express their meaning in unequivocal words before they can be said to have agreed that the union's breaches of its promises should give rise to defense against the duty assumed by an employer to contribute to a welfare fund...." *Lewis,* 361 U.S. at 470.

Pension and welfare trust funds rely on documents-and particularly on collective bargaining agreements-to calculate their anticipated income stream and, consequently, to determine the level of benefits that appropriately can be paid out to plan participants-a level that, once set, cannot be reduced regardless of whether the funds actually receive the full amount of expected contributions. *Id.* at 1150; *Robbins,* 836 F.2d at 333. Thus, if some employers could escape their contribution obligations through the assertion of various legal theories, or if funds could only assure that contributions were made through costly and time-consuming litigation, one of two undesirable circumstances would result: either (1) the funds would be financially unable to satisfy their financial obligations, or (2) the funds would be forced to lower benefits to participants and/or increase contribution levels for employers in order to protect against the possibility of unpaid contributions and/or expensive legal battles. *Id.* at 1152.[FN7]

> FN7. The only recourse open to funds for collecting delinquent contributions is to track down reneging employers and engage

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 447254 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

them in inefficient, cumbersome, time consuming and costly litigation. *Id.* at 1152. If employers are allowed various contract defenses to the obligations set forth in the collective bargaining agreements they have signed, simple collection actions can become long, costly and complex litigation the cost of which is borne by other employers and plan beneficiaries. *Id.* In the aggregate this problem could seriously cripple pension and welfare funds.

**\*4** The most efficient solution to this problem is to place the burden of care on the party who is in the best position to avoid problems in the formation of collective bargaining agreements in the first instance and who is most likely to incur costs by engaging in strategic behavior-the employer. *Id.* at 1153. Recognizing this fact and building on decisions such as *Lewis,* 361 U.S. at 467, Congress elected expressly to curtail employers' ability to evade their contribution promises by enacting Section 515 of ERISA ("Section 515"), 29 U.S.C. § 1145. *Joe McClelland,* 23 F.3d at 1256.

Section 515 provides:
Every employer who is obligated to make contributions to a multi-employer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. This section was added to ERISA to "simplify delinquency collection" by freeing pension and welfare funds from defenses that pertain to the conduct of the union. *Robbins,* 836 F.2d at 333 (quoting Senate Committee on Labor & Human Resources, S.1076-The Multi-employer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration, 96th Cong., 2d Sess. 43-44 (April 1980)).

The Seventh Circuit has interpreted Section 515 to preclude employers from pointing to defects in the formation of a collective bargaining agreement-defects "such as fraud in the inducement,

oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law"-in defending an action for delinquent contributions. *Gerber Truck,* 870 F.2d at 1152; *see also Agathos v. Starlite Motel,* 977 F.2d 1500, 1505 (3d Cir.1992) ; *Connors v. Fawn Mining Corp.,* 30 F.3d 483, 490 (3d Cir.1994); *Benson v. Browers Moving & Storage, Inc.,* 907 F.2d 310, 313 (2d Cir.1990), *cert. denied,*498 U.S. 982 (1990). An employer claiming such defects must still keep its promise to pay into the pension plans; although the employer can seek indemnification from the union.[FN8] *Id.*

FN8. In order to reserve the issue for appeal, Watermelon Depot raises the argument in its motion for summary judgment that, because there was never an NLRB election in which Local 703 was elected and certified as the collective bargaining representative of Watermelon Depot's employees, and because there was never a showing of authorization cards establishing Local 703 as the representative of the majority of Watermelon Depot's employees, the collective bargaining agreement between Local 703 and Watermelon Depot is invalid. This argument, premised on an alleged lack of majority support for the union, was specifically rejected by the Seventh Circuit as a valid defense by an employer to an action for delinquent contributions. *Gerber Truck Service, Inc.,* 870 F.2d at 1152. Indeed, Judge Easterbrook has stated that "... nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement." *Id.* at 1153.

C. *Watermelon Depot's Assertion of " Fraud-in-the-Execution" is Unavailing*

In its present motion for summary judgment, Watermelon Depot asserts that, despite the Seventh Circuit's strong bias against allowing any defenses to employers sued by multi-employer pension and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 6

Not Reported in F.Supp., 1996 WL 447254 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

welfare plans for delinquent payments based on a signed collective bargaining agreement, Watermelon Depot should prevail on its defense of fraud-in-the-execution.[FN9] While the Seventh Circuit has not yet firmly stated whether fraud-in-the-execution is a viable ERISA defense, *Illinois Conference of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking,* 71 F.3d 1361, 1365 n. 3 (7th Cir.1995), several other circuits have allowed fraud-in-the-execution as a defense in delinquent contribution cases. *Id.; Operating Engineers Pension Trust v. Gilliam,* 737 F.2d 1501, 1504 (9th Cir.1984); *Southwest Administrators, Inc. v. Rozay's Transfer,* 791 F.2d 769, 774 (9th Cir.1986), *cert. denied,* 479 U.S. 1065 (1987); *Connors,* 30 F.3d at 490; *Agathos,* 977 F.2d at 1505. This court need not determine whether the defense of fraud-in-the-execution is available to Watermelon Depot with respect to the Funds' claim, however, as, even if the defense were available, Watermelon Depot cannot establish the existence of fraud-in-the-execution.

> FN9. Although the Court is puzzled by (1) the Funds' statement in their Response to Defendant and Third-Party Plaintiff's Motion for Summary Judgment Against Plaintiffs that, "Plaintiffs admit that the allegation set forth in paragraph 3 of the Defendant's Motion for Summary Judgment against the Plaintiffs does, in fact, set forth certain facts which purportedly constitute a fraud in the execution, as are alleged in the attached Affidavit of Wayne Szabla....," and (2) the Funds' failure to file a proper Local Rule 12(N) statement, the Court assumes, based on the Funds' repeated statements in their briefs that fraud-in-the-execution is "not a good and valid defense against the Plaintiffs' claim" and that Szabla was an educated individual who knew (or should have known) the nature of the agreement he signed, that the Funds are not admitting the existence of fraud-in-the-execution by Local 703. Rather, the Court concludes that, while they admit the facts as set forth by Watermelon Depot, the Funds position

is that those facts are insufficient, as a matter of law, to establish fraud-in-the-execution and that the defense of fraud-in-the-execution is itself not a valid defense to the Funds' claim for delinquent contributions.

**\*5** The distinction between fraud-in-the-inducement and fraud-in-the-execution (also called "fraud in factum") is subtle: "the former induces a party to assent to something he otherwise would not have; the later induces a party to believe the nature of his act is something entirely different than it actually is. " *Rozay's Transfer,* 791 F.2d at 774; *see also Connors,* 30 F.3d at 490. " 'Fraud-in-the-execution ' arises when a party executes an agreement 'with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms.' " *Steve Gilbert Trucking,* 71 F.3d at 1366; *see also Connors,* 30 F.3d at 490; *Rozay's Transfer,* 791 F.2d at 774. A party claiming fraud-in-the-execution must show "excusable ignorance of the contents of the writing signed" and must prove that he "signed an instrument that is radically different from that which he [was] led to believe that he [was] signing." *A gathos,* 977 F.2d at 1505, 1506; *see also Rozay's Transfer,* 791 F.2d at 774.

"Fraud-in-the-execution results in the agreement being void *ab initio,* whereas fraud-in-the-inducement makes the transaction merely voidable." *Connors,* 30 F.3d at 490; *see also Rozay's Transfer,* 791 F.2d at 774. According to those courts permitting fraud-in-the-execution to be raised as a defense in ERISA collection actions, this distinction between fraud-in-the-execution and fraud-in-the-inducement is important because a collective bargaining agreement void *ab initio* (i.e. from the beginning) never legally existed and, consequently, a signatory employer cannot be said ever truly to have agreed to make fund contributions, whereas an agreement that is voidable merely permits a signatory employer to declare the agreement void-the employer remaining liable for any payments due prior to such a declaration.

Here, while Szabla may have signed the subject

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7

Not Reported in F.Supp., 1996 WL 447254 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

collective bargaining agreement believing it to be something "radically different" than what it was, he cannot legally establish that his actions were taken with "excusable ignorance of" or "lack of opportunity to obtain knowledge of" the nature of the documents that he signed.

Watermelon Depot cites two cases, *Connors v. Fawn Mining Corp.,* 30 F.3d at 483, and *Operating Engineers Pension Trust v. Gilliam,* 737 F.2d at 1501, in support of its position. Yet, these two cases are factually distinguishable from the present matter. In *Connors,* the president of the defendant-employer, under considerable time pressure, signed the lone signature page of a wage agreement that he believed to be substantively different from the agreement to which the signature page was later attached. As soon as the employer received the first indications that it had unwittingly obligated itself to make payments to pension and welfare trust funds, it contacted union officials in an effort to resolve the apparent misunderstanding. The Third Circuit court held:
**\*6** If an employer reviews a document reflecting the agreements reached in collective bargaining and the union surreptitiously substitutes a materially different contract document before both sides execute it, we think it clear that there has been a fraud-in-the-execution of the contract and that the agreement reflected in the executed document is void ab initio....

*Id.* at 493.

In *Gilliam,* the defendant-employer applied for union membership as an owner-operator in order to work on a union-controlled job. In response to this application, a union representative presented the employer with a number of purportedly "standard forms signed by owner-operators." The employer signed the documents without reading them, relying on the representative's assurances that he was merely applying to become a member of the union as an owner-operator; one of the forms he signed was a short-form collective bargaining agreement. The employer was not informed that he was signing a collective bargaining agreement, and he was given no copies of the short-form agreement or of the union's master labor agreement, although he was

given copies of the trust agreements. In holding that the employer was not obligated to make contributions to various pension and welfare funds, the court found that, "Under the circumstances, [the employer] reasonably and justifiably thought the documents involved only an application for union membership and his signing of the short-term agreement did not create a binding collective bargaining agreement." *Id.* at 1505.

Unlike the defendant-employers in *Connors* and *Gilliam,* Szabla had ample opportunity to examine the documents presented to him and to ascertain that he was signing a collective bargaining agreement. Initially, it is important to note that Szabla is an experienced businessman, business owner and union member with a degree in business administration. That some portion of the agreement he signed purportedly was covered by a half sheet of paper, and that union representatives assured him that the document was merely to continue his insurance coverage, does not excuse his failure to take the minimal step of examining the document and identifying it as a collective bargaining agreement. Indeed, many of the documents signed by Szabla expressly refer to a collective bargaining agreement. Further, according to his own deposition testimony, Szabla never felt any pressure to sign the forms given to him by Local 703.

Gregasone, Bertino and/or Joseph did not, like the union representatives in *Connors* and *Gilliam,* attach Szabla's signature to a document that he never intended to sign or withhold from him copies of the agreement to which he bound Watermelon Depot. In fact, Szabla signed a receipt stating that he had received copies of all documents signed by him, and he indisputably failed to request a copy of the agreement or to inquire as to the existence of an agreement, notwithstanding that the agreement was specifically mentioned in several of the documents he received and that he was aware of his ability to obtain a copy of the agreement from the union.[FN10]

> FN10. The general lack of action taken by Watermelon Depot, specifically Wayne Szabla, after being given several written

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 8

**Not Reported in F.Supp., 1996 WL 447254 (N.D.Ill.)**
**(Cite as: Not Reported in F.Supp.)**

notices implicating its membership in the collective bargaining agreement, might in some jurisdictions implicate his acquiescence to its terms. "A course of performance by one party accepted or acquiesced in without objection by the other may be evidence of an agreed modification or waiver of a written term." *Agathos,* 977 F.2d 1509; *see*Restatement (Second) of Contracts § 202(4) & cmt. g (1981). However, a finding that Watermelon Depot fully accepted its membership in the collective bargaining agreement through inaction might be unduly harsh, considering that the facts involved suggest there may have been fraud-in-the-inducement, but it is certainly enough to preclude the defense of fraud-in-the-execution.

**\*7** Szabla's conduct resembles that of the defendant in *Cement Masons Pension Fund, Local 502 v. Clements,* 1993 WL 326851 (N.D.Ill. Aug. 25, 1993), more than it does the conduct of the defendants in *Connors* or *Gilliam.* In *Clements,* the defendant signed a series of forms presented to him by a union representative without reading them in order to continue an ongoing job. One of these forms was a collective bargaining agreement. The defendant's only attempt to determine the contents of the forms was to ask union officials present what they meant. The court stated that "mere ignorance of the terms of an agreement will not relieve a party of its contractual obligations. A party who agrees to terms in writing without understanding or investigating those terms does so at its peril." *Id.* at *4; *see also Paper Exp., Ltd. v. Pfankuch Maschinen,* 972 F.2d 753, 757 (7th Cir.1992). The *Clements* court further explained that, "[I]t is not a valid defense that a union representative misrepresented the terms of a collective bargaining agreement." *Clements,* 1993 WL 326851 at *4. Such misrepresentations if true amount only to fraud-in-the-inducement, not fraud-in-the-execution. *Id.*

Szabla, like the defendant in *Clements,* signed forms without reading them and, according to his deposition testimony, asked union officials only a handful of times over more than a decade what it was that he was signing. Never did Szabla insist upon seeing, let alone take the time to read, the full text of the documents he was signing. Nor did Szabla ever request copies of the labor agreement that was referenced in several different certified letters sent to him. An employer, like Szabla, who signs documents with his eyes closed, and who keeps them shut despite being given multiple opportunities to open them, cannot establish " reasonable ignorance" of the terms of the agreement signed. Szabla unquestionably had a reasonable opportunity to obtain knowledge of the union documents' character and their essential terms. Thus, as a matter of law, Watermelon Depot cannot establish the defense of fraud-in-the-execution and, consequently, its motion for summary judgment is denied. Further, because Watermelon Depot offers no other legally cognizable defense/s to the Funds' action for delinquent contributions, summary judgment in favor of the Funds is proper.

*CONCLUSION*

For the foregoing reasons, Defendant Watermelon Depot's motion for summary judgment against Plaintiffs is denied. Summary judgment is granted in favor of Plaintiffs. Third-Party Defendant Local 703's motion for judgment on the pleadings is stricken.

Plaintiffs are directed to file within two weeks of the date on which this Order is entered a statement setting forth the specific amount of (1) delinquent contributions owed by Watermelon Depot to the Funds and (2) interest, liquidated damages, attorneys' fees and costs sought by the Funds. If it chooses, Watermelon Depot may file a response to the Funds' statement within two weeks of the date on which the Funds' statement is filed with this Court.

N.D.Ill.,1996.
Chicago Area Intern. Broth. of Teamsters Health and Welfare Trust Fund v. Watermelon Depot, Inc.
Not Reported in F.Supp., 1996 WL 447254 (N.D.Ill.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 9

Not Reported in F.Supp., 1996 WL 447254 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:07-CV-00501 (RJL) |
| | ) |
| MAARV WATERPROOFING, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ORDER

Upon consideration of the Plaintiffs' motion for partial summary judgment, memorandum of points and authorities, statement of material facts as to which there is no genuine issue, and supporting declarations and exhibits, any opposition thereto, and Plaintiffs' Reply, the Court finds that Plaintiffs' motion should be granted. **ACCORDINGLY**, it is hereby

**ORDERED**, that Plaintiffs' motion be, and it hereby is, **GRANTED**, and further

**ORDERED**, that judgment be and hereby is, entered in favor of Plaintiffs as to all damages owed by Defendant under the 2002 – 2007 collective bargaining agreement at issue I thisw case andPlaintiffs' motion be, and it

**ORDERED**, that Defendant Maarv Waterproofing, Inc. shall pay to the Plaintiffs the total amount of $129,308.05, as determined by the audit, which includes delinquent contributions for covered work performed by Maarv Waterproofing, Inc., pursuant to the 2002 – 2007 collective bargaining agreement, interest and additional interest thereon, audit costs, and filing fee, and further

**ORDERED**, that Plaintiffs shall file an application for attorney's fees incurred by the Plaintiffs in this matter within 30 days of the entry of this Order.

**SO ORDERED**, this _____ day of _____, 2008.

_____.

Richard J. Leon
United States District Judge

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 07-CV-0501 (RJL) |
| | ) |
| MAARV WATERPROOFING, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## LOCAL RULE 7(K) STATEMENT

Pursuant to Local Rule 7(k), the following persons are entitled to be served with orders, judgments and stipulations:

Ira R. Mitzner, Esq.
Charles V. Mehler III, Esq.
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, DC  20006
Telephone: (202) 420-2234
Facsimile    (202) 420-2201

Alexander Nemiroff, Esq.
Peter L. Frattarelli Esq.
Douglas Diaz, Esq.
Archer & Greiner
One Centennial Square
Haddonfield, NJ  08033
Telephone: (856) 795-2121
Facsimile    (856) 795-0574

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>MAARV WATERPROOFING, INC., )<br><br>Defendant. ) | Civil Action No. 1:07-CV-00501 (RJL) |

**PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**[1]

1.  The Bricklayers & Trowel Trades International Pension Fund ("IPF") and the International Masonry Institute ("IMI") (collectively, "Funds" or "Plaintiffs") are multiemployer employee benefit plans governed by ERISA. *See* Stupar Decl. ¶ 1.

2.  The Funds provide pension and other benefits to employees who work in the construction industry under contracts negotiated between Bricklayer local unions and employers. *Id.* ¶ 2.

---

[1] For purposes of their motion for partial summary judgment only, the Funds accept the relevant facts alleged by Maarv surrounding the signing of the relevant 1999-2007 collective bargaining agreement. The material facts not in dispute for purposes of this motion only are derived from the documentary evidence, including the February 4, 2004 International Union of Bricklayers and Allied Craftworkers Local #5 – New Jersey, Independent Agreement ("Local 5 Independent Agreement"), attached hereto as Exhibit A; the November 1, 2002 through October 31, 2007 Agreement Between Building Contractors Association of New Jersey, Masonry Contractors of New Jersey, Building Contractors Association of Atlantic County, Other Signatory Employers, and Local Union Nos. 4, 5 & 2 of the International Union of Bricklayers and Allied Craftworkers ("2002 CBA"), attached hereto as Exhibit B; the sworn Declaration of David F. Stupar ("Stupar Decl."), attached hereto as Exhibit C; the sworn Declaration of Patrice Clarke ("Clarke Decl."), attached hereto as Exhibit D; the October 24, 2007 sworn deposition testimony of Attila Szamosszegi ("Szamosszegi Dep."), attached hereto as Exhibit E; the October 22, 2007 sworn deposition testimony of Dominic Longo ("Longo Dep."), with relevant pages from the deposition transcript attached hereto as Exhibit F; and the October 23, 2007 sworn deposition testimony of Michael Robert Perrone ("Perrone Dep."), with relevant pages from the deposition transcript attached hereto as Exhibit G.

3. David F. Stupar is the Executive Director of the IPF and has served in that capacity since May 1993. *Id.* ¶ 1.

4. As Executive Director, Mr. Stupar supervises the collection of employer delinquencies. *Id.*

5. Pursuant to the contracts between Bricklayers local union and employers, the employers are obligated to make contributions to the Funds in order to fund the benefits provided to the participants and beneficiaries. *Id.* ¶ 2.

6. The Trustees of the Funds have a fiduciary duty under ERISA to collect delinquent employer contributions and the Trustees can be held personally liable for their failure to do so. 29 U.S.C. §§ 1104, 1109, 1132(g)(2), 1145; Stupar Decl. ¶ 2.

7. The Trustees of the Funds adopted the "Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers" ("CCU Procedures" or "Collection Procedures"), which govern the collection of employer contributions and reports. *See* Stupar Decl. ¶ 3, Ex. 1 thereto.

8. Pursuant to the Collection Procedures and a written assignment of claims, the IPF is authorized not only to collect the delinquent amounts due the IPF, but is also authorized to effect collections on behalf of the IMI. *Id.* ¶ 1, Ex. 1 thereto.

9. Under the Collection Procedures, contributions and reports are due on or before the 15th day of the month ("Due Date") following the month in which work is performed. *Id.* ¶ 4, Ex. 1 thereto.

10. Once contributions are delinquent, the Procedures authorize the assessment of interest at 15% *per annum* and an additional amount, the greater of 15% *per annum*, or 20% of the delinquent contributions, in the form of liquidated damages. *Id.* ¶ 4.

2365477.01

11. The Collection Procedures, the collective bargaining agreement that Maarv signed with the Bricklayers and Allied Craftworkers Local Union Nos. 4 and 5 of New Jersey and/or Local No. 2 of Delaware-New Jersey, and ERISA authorize the Funds to audit participating employers upon notice to such employers so as to ascertain whether the employer has accurately reported its employees and made contributions and other payments. *Id.* ¶ 5, Exs. 1 and 3 thereto. This right to audit includes the right to review all books and records of the company, including those that the company contends may not be covered by the collective bargaining agreement. *Id.* ¶ 5.

12. Under ERISA and the Collection Procedures, the Funds are entitled to recover from delinquent employers all overdue contributions, as well as interest accrued from the delinquent payments, additional interest or liquidated damages, audit fees, court costs, process server's costs, and all attorney's fees and costs. *Id.* ¶ 6, Ex. 1 thereto.

### Maarv Waterproofing, Inc.

13. Defendant Maarv Waterproofing, Inc. ("Maarv") is a New Jersey corporation that has been operating for approximately twenty years and which performs various services, including waterproofing, caulking, and restoration, in the State of New Jersey and other states, including Delaware and New York. *See* Szamosszegi Dep. at 28-36, 124.

14. The current address of Maarv is 68 Colfax Avenue, Clifton, New Jersey 07013. *See* Szamosszegi Dep. at 17.

15. Prior to its current address, Maarv operated at 317 Oak Street, Passaic, New Jersey, including in 2000. *See* Szamosszegi Dep. at 18, 40.

16. At times, Maarv has gone by the name "Maarv Caulking" and/or "Maarv Concrete Restoration." *See* Szamosszegi Dep. at 17, 103.

2365477.01

17. Maarv has employed members of the International Union of Bricklayers and Allied Craftworkers, and/or its local affiliates, on some projects. *See* Szamosszegi Dep. at 42, 84, 93, 100.

18. Attila Szamosszegi, is the owner, president, and chairman of the board of Maarv. *See* Szamosszegi Dep. at 21.

19. Mr. Szamosszegi was a "card-carrying" member of the Bricklayers union at one time. *See* Szamosszegi Dep. at 89.

20. There are no officers of Maarv other than Mr. Szamosszegi. *See* Szamosszegi Dep. at 22.

21. There are also no directors of Maarv and there are no board meetings at Maarv. *See* Szamosszegi Dep. at 23-24.

22. Maarv currently has approximately 12-13 employees. *See* Szamosszegi Dep. at 24. Some of the employees are office employees and some of the employees are field workers. *See* Szamosszegi Dep. at 24.

23. Anne Paoella was the office manager of Maarv for approximately 15 years until her death a little over a year ago. *See* Szamosszegi Dep. at 25-26.

24. Among other duties, Ms. Paoella was responsible for preparing the payroll sheets for Maarv's employees. *See* Szamosszegi Dep. at 139.

25. Among other information, those payroll sheets list the names, applicable wage rates, and hours of Maarv's employees. *See* Exhibits 23 and 24 to Szamosszegi Dep.; Clarke Decl. ¶ 11.

26. Maarv claims to currently subcontract out most or all of its waterproofing and caulking work. *See* Szamosszegi Dep. at 28-29, 115, 122. Maarv claims to also subcontract out concrete work. *See* Szamosszegi Dep. at 34.

27.  Maarv has hired union workers to do waterproofing and caulking work.  *See* Szamosszegi Dep. at 29.

28.  Maarv claims that it has met with local union officials in New Jersey regarding getting union workers to work on certain union projects of Maarv.  *See* Szamosszegi Dep. at 44.

### The Local 5 Independent Agreement Signed By Maarv In 2004

29.  On or about February 4, 2004, Attila Szamosszegi, the owner and president of Maarv, signed a document titled "International Union of Bricklayers and Allied Craftworkers Local #5 – New Jersey Independent" (hereinafter, "Local 5 Independent Agreement").  *See* Szamosszegi Dep. at 48-49, 54, Ex. 4 thereto; Local 5 Independent Agreement, attached hereto as Exhibit A; *see also* Longo Dep. at 76, Ex. 1 thereto.

30.  In addition to Mr. Szamosszegi, the Local 5 Independent Agreement was also signed on or about February 4, 2004 by Michael R. Perrone, the Business Manager for Bricklayers Local Union No. 5 New Jersey at that time, and Dominic Longo, a Field Representative with Bricklayers Local Union No. 5 New Jersey at that time.  *See* Exhibit A hereto; Perrone Dep. at 20, Ex. 1 thereto; Longo Dep. at 82, Ex. 1 thereto.

31.  Mr. Szamosszegi signed the Local 5 Independent Agreement, on behalf of Maarv, during the time that Maarv was working on a parking garage project in Princeton, New Jersey (hereinafter, "the Princeton Parking Garage Project").  *See* Szamosszegi Dep. at 37, 49.

32.  Maarv claims that it signed the Local 5 Independent Agreement for purposes of the Princeton Parking Garage Project only.  *See* Szamosszegi Dep. at 49, 55, 60.

33.  Mr. Szamosszegi claims never to have personally met with any local union official regarding the Princeton Parking Garage Project.  *See* Szamosszegi Dep. at 50.

34.  Maarv claims that the office manager at Maarv, Anne Paoella, received a phone call from a person named Ivan Pallos of Pallos Construction Company, a company that was

5

working as a subcontractor to Maarv doing caulking work on the Princeton Parking Garage Project. *See* Szamosszegi Dep. at 50-51.

35. Mr. Pallos was an employee of Maarv at one time, in 2002. *See* Szamosszegi Dep. at 119.

36. Maarv claims that Anne Paoella was told by Mr. Pallos that an official with the local Bricklayers union, supposedly Field Representative Dominic Longo, was going to send an agreement for the Princeton Parking Garage Project, that a union worker had to be hired on the project, and that the union would not accept a signature from Pallos Construction Company on the agreement but instead wanted Maarv to sign the agreement. *See* Szamosszegi Dep. at 51.

37. Maarv claims that as a result of this conversation, the Local 5 Independent Agreement was faxed to Maarv, filled out by Anne Paoella, signed by Mr. Szamosszegi, and faxed back to the union. *See* Szamosszegi Dep. at 51, 63.

38. Maarv then finished the Princeton Parking Garage Project. *See* Szamosszegi Dep. at 63.

39. Mr. Szamosszegi claims not to have had any other conversations with Anne Paoella about this matter. *See* Szamosszegi Dep. at 51.

40. Mr. Szamosszegi claims that he did speak with Mr. Pallos about this matter and that Mr. Pallos told him that he had spoken with someone from the local union and that a union worker needed to be hired and that Maarv needed to sign the Local 5 Independent Agreement. *See* Szamosszegi Dep. at 51-53. Mr. Szamosszegi claims that he was told by Mr. Pallos that the agreement just covered the Princeton Parking Garage Project. *See* Szamosszegi Dep. at 55.

41. Mr. Szamosszegi claims that neither Anne Paoella nor Mr. Pallos ever explained why the local union would not accept Pallos Construction Company's signature on the Local 5 Independent Agreement. *See* Szamosszegi Dep. at 52-53.

6

42. Mr. Szamosszegi never asked the union why it couldn't just have Pallos Construction Company sign an agreement with the union. *See* Szamosszegi Dep. at 66.

43. Maarv claims to have subcontracted out the whole Princeton Parking Garage project to Pallos Construction Company. *See* Szamosszegi Dep. at 52.

44. Mr. Szamosszegi claims that after receiving the Local 5 Independent Agreement, he never asked Mr. Pallos any questions about the agreement. *See* Szamosszegi Dep. at 53.

45. Mr. Szamosszegi never read through the Local 5 Independent Agreement before signing it, instead he probably only "glanced through it." *See* Szamosszegi Dep. at 54-55. Mr. Szamosszegi states that he "wasn't really paying that much attention since my sub is doing the job, not me . . ." *See* Szamosszegi Dep. at 55.

46. Maarv also claimed that he was not concerned about any wage rate and contributions rates pertaining to the Local 5 Independent Agreement because "as far as we knew it doesn't concern us because we subbed the job out." *See* Szamosszegi Dep. at 65; *see also id.* at 66.

47. Mr. Szamosszegi never called anyone at the union before signing the Local 5 Independent Agreement. *See* Szamosszegi Dep. at 54.

48. Mr. Szamosszegi never spoke with an attorney before signing the Local 5 Independent Agreement. *See* Szamosszegi Dep. at 61-62.

49. Mr. Szamosszegi claims never to have personally spoken with anyone at the union about the Local 5 Independent Agreement, because "I didn't feel like I need to." *See* Szamosszegi Dep. at 56.

50. When asked whether Anne Paoella ever spoke with anyone from the International Bricklayers Union about the Local 5 Independent Agreement, Mr. Szamosszegi testified as follows:

7

Q. Do you know whether Anne ever spoke with anyone from the International Bricklayers Union about this document?

A. "Why should she? Where would she get a phone number from?
Mr. Diaz: Do you know?

A. No. No.

Q. You don't know whether she did?

A. No. I don't know.

*See* Szamosszegi Dep. at 56-57.

51. Mr. Szamosszegi also never spoke with anyone at the International Bricklayers Union about the Local 5 Independent Agreement. *See* Szamosszegi Dep. at 57, 132.

52. Mr. Szamosszegi is also not aware of anyone from Pallos Construction Company ever speaking with anyone from the International Bricklayers Union. *See* Szamosszegi Dep. at 57.

53. Mr. Szamosszegi claims that Anne Paoella never spoke with anyone at the IPF regarding the Local 5 Independent Agreement until the auditor showed up to audit Maarv. *See* Szamosszegi Dep. at 57.

54. Mr. Szamosszegi never personally spoke with anyone at the IPF either. *See* Szamosszegi Dep. at 57, 132.

55. Mr. Szamosszegi is not aware of anyone from the IPF or the International Bricklayers Union ever telling him that the Local 5 Independent Agreement covered just one project. *See* Szamosszegi Dep. at 58.

### The Provisions Of The Local 5 Independent Agreement

56. The Local 5 Independent Agreement reflects the typed name of Maarv Waterproofing, Inc., along with the typed address, telephone and fax numbers, federal identification number, New Jersey Employment Compensation number, and workmen's compensation insurance carrier of Maarv. *See* Exhibit A hereto.

8

57.  Most of this information would not be in possession of the Bricklayers union but would have to come from Maarv.  *See* Longo Dep. at 95-96.

58.  The first sentence of the Local 5 Independent Agreement states as follows, right under the heading:  "The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No. 2 of Delaware-New Jersey, and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time."  *See* Exhibit A hereto.

59.  Consistent with this first sentence, Local Union No. 5 used the Local 5 Independent Agreement as the page that employers would sign in order to become bound to the November 1, 2002 through October 31, 2007 "Agreement Between Building Contractors Association of New Jersey, Masonry Contractors of New Jersey, Building Contractors Association of Atlantic County, Other Signatory Employers, and Local Union Nos. 4, 5, and 2 of the International Union of Bricklayers and Allied Craftworkers (hereinafter, "2002 CBA"), that

9

is attached as Exhibit B to the Plaintiffs' Amended Complaint in this matter.[2] *See* Perrone Dep. at 32-33, 38, Ex. 1 thereto; Longo Dep. at 88-90, 95-96, 98 Ex. 1 thereto.

60. Local Union No. 5 would have employers sign the Local 5 Independent Agreement in place of signing the signature page contained within the 2002 CBA. *See* Perrone Dep. at 32-33, 38, Ex. 1 thereto; Longo Dep. at 88-90, 95, Ex. 1 thereto. The Local 5 Independent Agreement is sometimes referred to by Mr. Longo as a "short version" of the 2002 CBA or a "cover sheet" for the 2002 CBA. *See* Longo Dep. at 81, 89-90, 95-96, 98 Ex. 1 thereto.

61. Maarv admits that the Local 5 Independent Agreement incorporates the collective bargaining agreement referenced in the first sentence. *See* Reply Brief of Defendant in Support of Its Motion for Leave to File a Third Party Complaint, at 7 ("Plaintiffs nonetheless attempt to manufacture an "interpretation" argument by claiming that the Court will need to determine if the Independent Agreement incorporates the collective bargaining agreement. *This, however, is not even in dispute* and is not the issue for the misrepresentation claim") (emphasis added).

62. The second paragraph of the Local 5 Independent Agreement states, in relevant part: "This Agreement and such successor Agreement shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers . . . The employer recognizes the Union pursuant to Section 9(a) of the National

---

[2] The Amended Complaint filed by the Plaintiffs in this matter seeks damages not only under the 2002 CBA, but also under a under a November 1, 1999 through October 31, 2002 "Agreement Between Building Contractors Association of New Jersey, Other Signatory Employers, and Local Union Nos. 4 & 5 of the International Union of Bricklayers and Allied Craftworkers" (hereinafter, "1999 CBA"). The Plaintiffs' motion for partial summary judgment only addresses the 2002 CBA because although Mr. Szamosszegi's name and signature appear on the face of the signature page to the 1999 CBA, he has testified that the signature is not his and that he never signed the document, thereby creating an issue of fact as to this agreement.

Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union." *See* Exhibit A hereto.

63.   The Local 5 Independent Agreement also contains the following contribution provision: "The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement." *See* Exhibit A hereto.

64.   The 2002 CBA to which Maarv is bound includes an "Evergreen Clause" providing for the continuance of the agreement, on a yearly basis, after the initial time period, absent timely notice of termination from one of the parties. *See* Stupar Decl. ¶ 9; Exhibit 3 thereto, at Article II.

65.   Maarv did not terminate any of its collective bargaining agreements with the Bricklayers Local Unions in New Jersey during the time period relevant to the Funds' current delinquency case against Maarv. *See* Stupar Decl. ¶ 10.

66.   When asked what the first sentence of the Local 5 Independent Agreement means – the provision stating that the employer has read and approves the 2002 CBA – Mr. Szamosszegi stated that it was "[a] lot of mumbo-jumbo." *See* Szamosszegi Dep. at 54-55.

67.   When asked whether he noticed, at the time he signed it, the language in the Local 5 Independent Agreement referring to the 2002 CBA, Mr. Szamosszegi testified as follows:

> A. I can't recall.  As I stated, it was one particular job so I wasn't really, you know, paying too much attention.

*See* Szamosszegi Dep. at 59.

11

68. When asked whether he ever asked the union for a copy of the 2002 CBA referenced in the first sentence of the Local 5 Independent Agreement that he admittedly signed, Mr. Szamosszegi testified: "I wasn't even aware of this agreement." *See* Szamosszegi Dep. at 60.

69. Mr. Szamosszegi is not aware of anyone ever receiving anything in writing from the union saying that the Local 5 Independent Agreement covered just the Princeton Parking Garage Project. *See* Szamosszegi Dep. at 59-60.

70. There is no reference in the Local 5 Independent Agreement to the Princeton Parking Garage Project, or any other specific projects, and no language within the Local 5 Independent Agreement suggesting that it was limited to just a certain project. *See* Exhibit A hereto.

71. Mr. Szamosszegi understood that by signing the Local 5 Independent Agreement, he was agreeing, on behalf of Maarv, to a union contract requiring the payment of union fringe benefit contributions and union wage rates:

> Q. So when you signed Plaintiff's Exhibit 4 [the Local 5 Independent Agreement] you thought that you were signing a collective bargaining agreement but just for that one project.
>
>   Mr. Diaz:  Objection to the form.
>
> A. Well, I am signing a union paper for that particular job, yeah.
>
> Q. What did you think that union paper required?
>
> A. Hire the union guy and pay his guys.
>
> Q. What about fringe benefits contribution?
>
> A. And the fringe benefits, whatever on that particular job for union guys.
>
> Q. Did it require you pay a particular wage rate to the employees?
>
> A. I am sure.

12

*See* Szamosszegi Dep. at 60; *see also* Szamosszegi Dep. at 129-130.

<div align="center">

**Maarv's Contribution Obligations
Under The 2002 CBA**

</div>

72.  Maarv is an "employer" within the meaning of ERISA.  *See* Stupar Decl. ¶ 11.

73.  As an "employer" within the meaning of ERISA, and pursuant to the 2002 CBA and the Collection Procedures, Maarv is required to file reports and make fringe benefit contributions to the Funds for each hour of covered work performed by its employees or subcontractors within the jurisdiction of the 2002 CBA.  *See* Exhibit B hereto, at Article XI, XIV; Stupar Decl. ¶ 11.

74.  The 2002 CBA contains provisions requiring the payment of fringe benefit contributions to various Bricklayer-affiliated funds, including the IPF and IMI, for covered work performed by Maarv's employees.  *See* Exhibit B hereto, at Articles XI, XIV; Stupar Decl. ¶ 12, Ex. 3 thereto.

75. "Covered work" under the 2002 CBA encompasses various masonry, cement, brick, stone, marble, waterproofing, caulking, plastering, and cleaning work specifically described in the agreement and related union documents.  *See* Exhibit B hereto, at Article III; Stupar Decl. ¶ 13, Ex. 3 thereto.

76.  The contributions required by the 2002 CBA are necessary to fund the benefits provided by the Funds to Maarv's employees.  *See* Stupar Decl. ¶ 14.

77.  The 2002 CBA also contains a provision prohibiting the employer from subcontracting any work covered by the 2002 CBA to any company except when such company agrees to be bound by the 2002 CBA and comply with all terms and conditions of the 2002 CBA.  *See* Exhibit B hereto, at Article XVII; Stupar Decl. ¶ 15, Ex. 3 thereto.

78.  The 2002 CBA encompasses and applies to all covered work performed in the State of New Jersey, though there is also a traveling contractors clause imposing obligations on

<div align="center">13</div>

signatory employers for certain work performed outside of New Jersey. *See* Exhibit B hereto, at Articles III, IX; Stupar Decl. ¶ 16, Exhibit 3 thereto.

### Maarv's Performance Of Covered Work Under The 2002 CBA

79.    Maarv has performed waterproofing, caulking, concrete, and other work covered by the 2002 CBA, though Maarv claims that it typically performs waterproofing and caulking work through subcontractors. *See* Clarke Decl. ¶¶ 12; *see also* Szamosszegi Dep. at 68-70, 73-74, 76-78, 122, 124-25.

80.    Maarv claims to have used some union subcontractors on projects in New Jersey. *See* Szamosszegi Dep. at 30-31, 73-74.

81.    Mr. Szamosszegi claims, however, that Maarv does not keep records of the subcontractors it has used because "I don't need to." *See* Szamosszegi Dep. at 75.

82.    Mr. Szamosszegi claims also that he does not know which employees worked on Maarv's projects and that Maarv does not have records reflecting that. *See* Szamosszegi Dep. at 75-76.

83.    Mr. Szamosszegi claims not to remember a number of the projects reflected in Maarv's records and/or the type of work that was performed on them. *See* Szamosszegi Dep. at 69, 71-72, 74-75. He says that Maarv does not have any other employees who would know about these projects either. *See* Szamosszegi Dep. at 75.

84.    Mr. Szamosszegi claims that Maarv does not have any documents which list the projects which Maarv has performed over the last seven years. *See* Szamosszegi Dep. at 136.

85.    Mr. Szamosszegi claims that Maarv does not have any list of the general contractors it has worked for. *See* Szamosszegi Dep. at 136.

86.    Pursuant to the 2002 CBA, Maarv has operated with the jurisdiction of Bricklayers Local Union Nos. 4, 5, and 2, performed covered work within the jurisdiction of

14

these local unions, including work on union projects, and employed members of these local unions. *See* Stupar Decl. ¶ 17.

## Maarv's Contribution History

87.    Maarv has made some contributions and filed some fringe benefit contribution reports with the IPF, going as far as back as 1987. *See* Stupar Decl. ¶ 18, Exs. ___ thereto. Mr. Szamosszegi claims that he does not know why Maarv would have filed reports or made contributions with the IPF at that time. *See* Szamosszegi Dep. at 88-90.

88.    Maarv has also filed reports and made contributions to the Local No. 4 New Jersey Benefit Funds for general work performed on major projects. *See* Szamosszegi Dep. at 94, 96-98. Some of the benefit contribution forms submitted to the Local No. 4 Benefit Funds were signed by Mr. Szamosszegi. *See* Szamosszegi Dep. at 97-100, Exs. 11, 13-17 thereto.

89.    Maarv has also sent dues payment checks to Bricklayers Local Union No. 5 New Jersey. *See* Szamosszegi Dep. at 102-104, Exhibit 18 thereto.

90.    Mr. Szamosszegi claims that Maarv would make fringe benefit contributions for any "union guys" working on a Maarv project, but would not make such contributions for any non-union workers doing the same waterproofing work. *See* Szamosszegi Dep. at 93, 97, 100.

91.    Mr. Szamosszegi claims that Maarv would file these reports and make these contributions whenever it hired a "union guy" regardless of whether Maarv had any agreement with the Bricklayers union. *See* Szamosszegi Dep. at 100-102. Mr. Szamosszegi believes that the local Bricklayers union would send union members to work on a Maarv project even if Maarv was not a party to any agreement with the union. *See* Szamosszegi Dep. at 102.

92.    Shop Steward Reports prepared for Maarv projects reflect the names of Maarv employees who were not members of the Bricklayers union, including Peter Cuomo, a former part-owner of Maarv. *See* Szamosszegi Dep. at 107-108, Ex. 19 thereto.

15

93. Maarv has made some contributions to the Funds for covered work it has performed under Bricklayers collective bargaining agreements. *See* Stupar Decl. ¶ 19; Szamosszegi Dep. at 96-100, Exs. 11-17 thereto.

94. In violation of the reporting and contribution obligations imposed by the 2002 CBA and to which Maarv is bound, Maarv has failed to fully report its employees performing covered work and has failed to make full and correct contributions on behalf of its employees performing covered work. *See* Stupar Decl. ¶ 20.

95. Maarv filed reports and made fringe benefit contributions on behalf of certain union members working on the Princeton Parking Garage Project. *See* Szamosszegi Dep. at 96-100, Exs. 11-17 thereto; Stupar Decl. ¶ 21, Exs. 18-25 thereto; *see also* Longo Dep. at 77-78 (shop steward reports submitted by the shop steward for the Princeton Parking Garage Project).

96. Maarv claims that, on the Princeton Parking Garage Project, it would pay the fringe benefit contributions and union dues owed for Pallos Construction Company employees working on that project and that Pallos Construction Company would then reimburse Maarv. *See* Szamosszegi Dep. at 83-84, 104-105, Exs. 7, 18 thereto.

97. Maarv claims that this was done because the union rejected a check from Pallos Construction Company because Maarv was the one that had signed the Local 5 Independent Agreement. *See* Szamosszegi Dep. at 84, 104-105.

98. Mr. Szamosszegi claims that he is not aware of anyone from Pallos Construction Company ever talking with the Bricklayers union about the check that was supposedly rejected by the union. *See* Szamosszegi Dep. at 84. Mr. Szamosszegi also never spoke with anyone at the union about this. *See* Szamosszegi Dep. at 84.

**The Audit**

99.    In September 2005, Calibre CPA Group PLLC ("Calibre"), 1850 K Street, NW, Suite 1050, Washington, DC 20006, was retained by Dickstein Shapiro Morin & Oshinsky LLP, counsel to the Funds, to conduct a payroll audit of Maarv for the Funds, as authorized by ERISA, the Collection Procedures, and the 2002 CBA, to determine whether any delinquencies were owed. *See* Stupar Decl. ¶ 22; Clarke Decl. ¶ 2.

100.    The auditor was instructed by counsel to calculate any amounts owed by Maarv Building to the IPF and/or the IMI, pursuant to the collective bargaining agreements to which Maarv is bound. *See* Stupar Decl. ¶ 23.

101.    Miranda Romero, who no longer is employed by Calibre, and Mustafa Dimbiloglu were the auditors at Calibre who traveled to the offices of Maarv to review the company's books and records and determine whether any delinquencies were owed. *See* Clarke Decl. ¶ 3.

102.    Patrice Clarke, an auditor and manager at Calibre, was responsible for reviewing and approving the report prepared by them. *See* Clarke Decl. ¶ 3.

103.    The audit was conducted beginning on January 10, 2006. *See* Clarke Decl. ¶ 2.

104.    Anne Paoella (now deceased), the office manager at Maarv at the time, was the auditor's contact at Maarv regarding the audit and all related matters and the only one the auditors dealt with at Maarv. *See* Clarke Decl. ¶ 4; Szamosszegi Dep. at 109.

105.    Mr. Szamosszegi did not deal with the auditors at all. *See* Szamosszegi Dep. at 109.

106.    Mr. Szamosszegi claims that Anne Paoella did not come to him with questions about the audit. *See* Szamosszegi Dep. at 110. He claims that: "She was the office

manager, so she pretty much decision as far as this is concerned, this particular." *Id.* He claims that he does not recall Anne Paoella ever mentioning to him that she was having trouble locating documents. *Id.*

107.    During the payroll compliance audit of Maarv, Calibre's contact at Maarv Waterproofing, Anne Paoella provided the auditors with Maarv's payroll records for 2003 through 2005. *See* Clarke Decl. ¶ 4.

108.    Although the auditors requested payroll records for 2002 from Maarv, Ms. Paoella informed the auditors that she was not able to locate the 2002 payroll records. *See* Clarke Decl. ¶ 4.

109.    Mr. Szamosszegi claims that Maarv does not maintain any payroll records other than the actual W2 forms of employees. *See* Szamosszegi Dep. at 135.

110.    The auditors also requested from Maarv the Employer's federal tax forms 941, 1099 and 1096 for 2002 through 2005. None of these tax forms were provided to the auditors. W2 tax forms were provided to the auditors, per request, for the years 2002 through 2004. Although Anne Paoella informed the auditors that she did have a portion of the 2005 W2s requested, they never were provided to the auditors. *See* Clarke Decl. ¶ 5.

111.    Despite repeated requests to Ms. Paoella by telephone and by three certified letters, the auditors never received all of the requested materials necessary to fully complete the audit. *See* Clarke Decl. ¶ 6.

112.    For up to five months after the field work on the audit was conducted, Ms. Paoella continued to inform the auditors that she would not be able to meet any of the extended deadlines given to her by the auditors to produce the requested records. *See* Clarke Decl. ¶ 6.

2365477.01

113.    The auditors found that Ms. Paoella was extremely obstinate and unhelpful from the day that the audit was begun. *See* Clarke Decl. ¶ 7.

114.    Despite repeated attempts, the auditors were unable to get in touch with the owners of the company regarding the resistance they were facing in obtaining the requested documents from Maarv or to see if they were aware of the situation. *See* Clarke Decl. ¶ 7.

115.    Ms. Paoella never told Mr. Szamosszegi that the auditors were still seeking documents after they left Maarv's office. *See* Szamosszegi Dep. at 111-112.

116.    Ms. Paoella never told Mr. Szamosszegi that there were additional documents that she was supposed to send the auditor. *See* Szamosszegi Dep. at 112.

117.    Ms. Paoella never told Mr. Szamosszegi that she refused to provide some documents to the auditors. *See* Szamosszegi Dep. at 112.

118.    Ms. Paoella never told Mr. Szamosszegi that the auditors were asking for documents that Maarv does not keep. *See* Szamosszegi Dep. at 112.

119.    Ms. Paoella never told Mr. Szamosszegi that she received certified letters from the auditors requesting documents. *See* Szamosszegi Dep. at 112.

120.    Ms. Paoella never told Mr. Szamosszegi that the auditors had set certain deadlines for Maarv to provide certain additional documents. *See* Szamosszegi Dep. at 112-113.

121.    Maarv has no policies regarding the preservation or destruction of its documents. *See* Szamosszegi Dep. at 127.

122.    Once a project is completed, Maarv throws out all records pertaining to that project. *See* Szamosszegi Dep. at 127.

123.    In order to determine the type of work performed by Maarv employees, the auditors requested that Anne Paoella indicate each employee's job classification on a copy of his or her W2 form. The notation written on many of the W2 forms by Ms. Paoella was "lab" or

19

laborer, and she informed the auditor that the individuals listed as laborers did waterproofing and caulking work. *See* Clarke Decl. ¶ 8.

124.     Mr. Szamosszegi is not aware of whether Ms. Paoella did this. *See* Szamosszegi Dep. at 114.

125.     When asked whether Ms. Paoella identified most of Maarv's employees as laborers, Mr. Szamosszegi testified "I am not aware what Anne did." *See* Szamosszegi Dep. at 120.

126.     Mr. Szamosszegi admits that Ms. Paoella never came to him with any questions about how to classify Maarv's employees for purposes of the audit. *See* Szamosszegi Dep. at 123.

127.     Although waterproofing and caulking are both listed as covered trades in the collective bargaining agreement, Anne Paoella was adamant that the laborers and caulkers employed by Maarv Waterproofing did not perform any work covered by the collective bargaining agreement signed with the Bricklayers Union. *See* Clarke Decl. ¶ 9.

128.     Because waterproofing and caulking are covered trades under the 2002 CBA, the auditors included the work performed by the individuals identified as laborers in the audit report and in calculating the delinquent contributions and other damages owed by Maarv. *See* Clarke Decl. ¶ 13.

129.     Ms. Paoella also stated that the only employees covered by the collective bargaining agreement were the two owners of the company. *See* Clarke Decl. ¶ 9.

130.     During the audit, Ms. Paoella told the auditors that Maarv did not use any subcontractors during 2002 through 2005. *See* Clarke Decl. ¶ 10.

131.     Mr. Szamosszegi is not aware of Ms. Paoella telling the auditors this. *See* Szamosszegi Dep. at 113.

132.    Mr. Szamosszegi admits that at least some of the Maarv employees listed in the audit report did waterproofing and caulking work.  *See* Szamosszegi Dep. at 119, 124.

133.    Mr. Szamosszegi admits that project managers at Maarv "oversee everything," including waterproofing and caulking work.  *See* Szamosszegi Dep. at 121.

134.    Calibre's review of the books and records made available by Maarv disclosed that from the period February 2004 through December 2005, Maarv failed to satisfy its obligations under the 2002 CBA[3] to report all employees performing covered work and make contributions for each hour of covered work performed by its employees.  *See* Clarke Decl. ¶ 14.

135.    A copy of the results of the audit performed by Calibre is attached to the Clarke Declaration as Exhibit 4.  *See* Clarke Decl. ¶ 15.

136.    Mr. Szamosszegi never had Maarv's accountant review the audit prepared by the auditors in this case.  *See* Szamosszegi Dep. at 125.

### The Damages Owed By Maarv

137.    The delinquencies Calibre calculated pursuant to its audit of Maarv totaled $414,822.44.  This amount included $87,828.80 in fringe benefit contributions owed to the Fund under the 2002 – 2007 collective bargaining agreement for the time period February 2004 through December 2005.  *See* Clarke Decl. ¶ 16.

138.    In accordance with the Collection Procedures of the Central Collections Unit of the Bricklayers and Allied Craftworkers ("Collection Procedures"), Calibre also assessed interest on the $87,828.80 in delinquent contributions at the rate of 15 percent per annum.  Based on Calibre's calculations, the interest due from Maarv Waterproofing on the aforementioned

---

[3] Although the auditor also determined the delinquent contributions and other damages owed by Maarv under the 1999 CBA, and those damages are sought in the Funds' Amended Complaint, those damages are not addressed in this Statement of Material Facts because the Funds are not moving for partial summary on the 1999 CBA.

delinquent contributions, calculated through August 9, 2006 is $18,662.95. *See* Clarke Decl. ¶ 17.

139. In accordance with the Collection Procedures, Calibre also assessed additional interest on the $87,828.80 in delinquent contributions amount at the rate of 15 percent per annum. Based on Calibre's calculations, the additional interest due from Maarv Waterproofing on the aforementioned delinquent contributions, calculated through August 9, 2006, is $18,662.95. *See* Clarke Decl. ¶ 18.

140. In sum, Maarv owes the Funds the following amounts in contributions, interest, and additional interest:

| | |
|---|---|
| Contributions: | $87,828.80 |
| Interest: | $18,662.95 |
| Additional Interest: | $18,662.95 |
| TOTAL | $125,154.70 |

*See* Clarke Decl. ¶ 19.

141. In addition to the amounts stated above, Calibre has billed the Funds, as of the date of this Statement of Material Facts, a total of $3,803.35 in audit fees for its work in calculating the amounts owed to the Funds by Maarv. *See* Clarke Decl. ¶ 20.

142. In addition to the amounts calculated by the auditor, and the fees charged by the auditor, the Funds have also incurred, as a result of Maarv's failure to comply with its contribution obligations, the $350.00 cost of filing this action, and attorney's fees in an amount to be determined. *See* Stupar Decl. ¶ 24.

143.    In the event that this Court enters partial summary judgment in favor of the Funds on the 2002 CBA, counsel for the Funds will submit a statement of the attorney's fees and costs incurred by the Funds in this matter. *See* Stupar Decl. ¶ 25.

### The Funds' Lawsuit Against Maarv

144.    On March 15, 2007, the Funds filed a Complaint in the United States District Court for the District of Columbia against Maarv for collection of any and all delinquent ERISA contributions and related amounts owed by Maarv (known and unknown), for an order directing Maarv to comply with its obligations to submit all required reports and make all contributions due and owing to the Funds, and such other relief as the Court deems appropriate. *See* Stupar Decl. ¶ 26.

145.    In their Complaint, the Funds sought $463,312.10 in delinquent contributions and related damages owed by Maarv, based on the audit, under the 1999 and 2002 CBAs. *See* Stupar Decl. ¶ 27. Of this amount, $129,308.05 represents damages due under the 2002 CBA.

146.    On October 18, 2007, the Funds filed an Amended Complaint to update the names of the Plaintiff Trustees and correct two exhibits. *See* Stupar Decl. ¶28.

147.    The Trustees of the Funds have brought this action against Maarv in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1). *See* Stupar Decl. ¶ 29.

148.    The Funds have been, and are, incurring attorney's fees as a direct result of Maarv's failure to make contributions in accordance with the terms and conditions of the 2002 CBA. *See* Stupar Decl. ¶ 30.

2365477.01

149.    By their lawsuit, the Trustees of the Funds seek to make the Funds whole by recouping all losses from Maarv.  *See* Stupar Decl. ¶ 31.

Dated:  December 14, 2007

Respectfully submitted,

By_____
Ira R. Mitzner, DC Bar No. 184564
Charles V. Mehler III, DC Bar No. 475909
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D.C.  20006
(202) 420-2234

*Attorneys for Plaintiffs*

24

Exhibit A

FEB-04-04 10:30A BAC Local 5 NJ                                    160' 241605

MAARV WATERPROOFING INC.  P-02

000665

NJ0424

# INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
## LOCAL #5 – NEW JERSEY
### INDEPENDENT

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed Independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement, or as they shall be set out from time to time in any such successor Agreements as may be negotiated. The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its representative on the Board of Trustees such Employer Trustees together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund Agreement and Declaration of Trust Instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its successor assigns, and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

MAARV WATERPROOFING INC.
Company Name

317 OAK STREET
Physical Street Address

PASSAIC, NEW JERSEY    07055
City                          State        Zip Code

(973) 470-0686         (973) 470-8716
Telephone Number        Fax Number

22-2527189
Federal Identification Number

608103-00-5
New Jersey Employment Compensation Number

ST. PAUL INSURANCE COMPANY
Workmen's Compensation Insurance Carrier

Please complete and remit to:
BAC Local #5, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-6568
(609) 324-1805 - Fax

Initial if you have received a full copy of this Collective Bargaining Agreement _____

ATTILA SZAMOSSZEGI          FEBRUARY 4, 2004
Officers Signature          Printed Name          Date

Michal R. Perrone          2/4/2004
Business Managers Signature          Printed Name          Date

Dominic Longo          2/4/04
Field Representatives Signature          Printed Name          Date

0455

Exhibit B

# Local NO. 5 – Central & South Jersey

# AGREEMENT BETWEEN

## BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY,

## MASONRY CONTRACTORS OF NEW JERSEY,

## BUILDING CONTRACTORS ASSOCIATION OF ATLANTIC COUNTY,

## OTHER SIGNATORY EMPLOYERS

-and-

## LOCAL UNION NOS. 4, 5 & 2 OF THE INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS

*November 1, 2002 through October 31, 2007*

0709

# Table of Contents

|  | ARTICLE NO. | PAGE NO. |
|---|---|---|
| Apprentices | VII | 21 |
| Bonding | XII | 34 |
| Duration/Termination/Amendment | II | 1 |
| Foremen | VIII | 23 |
| General Understanding | XXII | 50 |
| Grievance Procedure | XVI | 44 |
| Hiring Preference | V | 20 |
| Hours Work, Overtime, Shifts, Holidays | XIII | 34 |
| Jointly Trusteed Funds | XI | 25 |
| More Favorable Conditions | XXI | 50 |
| No-Strike/No-Lockout | XIX | 49 |
| Parties | I | 1 |
| Payment of Wages & Fringe Benefits | XIV | 37 |
| Preservation of Work | XVIII | 48 |
| Scope of Work | III | 2 |
| Separability and Savings Provision | XX | 49 |
| Stewards | VI | 21 |
| Subcontracting | XVII | 47 |
| Traveling Contractors | IX | 24 |
| Union Recognition, Union Security, Access | IV | 19 |
| Wages, BACPAC & Local Dues Checkoff | X | 24 |
| Working Conditions | XV | 38 |



0710

10/17/2007  14:56   6093248287                BAC LOCAL 5                          PAGE  28/30

# AGREEMENT BETWEEN
## BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY,
## MASONRY CONTRACTORS OF NEW JERSEY,
## BUILDING CONTRACTORS ASSOCIATION OF ATLANTIC COUNTY,
## OTHER SIGNATORY EMPLOYERS
### -and-
## LOCAL UNION NOS. 4, 5 & 2
## OF THE INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS

## ARTICLE I
## PARTIES

This Agreement is entered into this *first day of November 2002,* by and between the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey, the Building Contractors Association of Atlantic County (hereinafter referred to as the Association), for and on behalf of their members as set forth in Schedule "A" attached hereto and other contractors who are signatory hereto or who may become signatory hereto (hereinafter referred to as the Employer), and the INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL UNION NOS. 4, 5 & 2 (hereinafter referred to as the Union).

The Association agrees to furnish to the Union a list of all members of the Association denoting those members bound to the terms of this Agreement, the honorary members, independent members, and any other classes or groups of members.

## ARTICLE II
## DURATION - TERMINATION – AMENDMENT

This Agreement shall be effective commencing *November 1st, 2002* and shall continue in full force and effect up to and including *October 31, 2007,* and shall be automatically continued for each successive period of this Collective Bargaining Agreement unless

1

0711

written notice of decision to negotiate a new Agreement in whole or in part, is given in writing by either party to the other not later than sixty (60) days nor more than ninety (90) days prior to the expiration date or any anniversary date thereafter. If the parties fail to reach an agreement in such negotiations, the issues in dispute shall be submitted to the International Masonry Institute's Dispute Settlement Plan for such steps as are deemed appropriate in accordance with the procedures of the Plan. The parties may at any time mutually agree to change or amend any part of this Agreement and such changes or modifications shall not affect the continuing nature of this Agreement.

## ARTICLE III
## SCOPE OF WORK

A. This Agreement shall cover new construction, maintenance, repair and renovation in the State of New Jersey.

B. The Employers bound hereby recognize the Union's claim to all work falling within the jurisdiction of the Union, as defined in Branches of the Trade, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers which is incorporated herein by reference.

C. The installation of Brick and all other masonry units such as blocks, etc., with or without mortar, anywhere on the project shall be the work of Bricklayers & Allied Craftworkers of International Union, Local Nos. 4 & 5.

D. Temporary heat, applicable to all branches of the trade, to protect any Masonry work performed and shall include all masonry materials all year, especially in the winter months (November 15th through March 15th).

E. The trade and territorial jurisdiction for Local No. 4 shall cover new construction, maintenance, repair and renovation for the following trades and counties:

Bricklayers, Cement Masons, Plasterers, Pointer Caulkers, Cleaners, Fire Proofers, Stone Masons, Brick Pavers and Exterior Marble Masons shall be the trade jurisdiction for Bergen, Essex, Hudson, Morris, Passaic, Sussex, Union, Warren, part of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional map maintained by the International Union.

F. The trade and territorial jurisdiction for Local No. 5 shall cover new construction, maintenance, repair and renovation for the following trades and counties:

Bricklayers, Pointer Caulkers, Cleaners, Stone Masons, Brick Pavers and Exterior Marble Masons shall be the trade jurisdiction for, Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer, Monmouth, Ocean, Salem, and parts of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional map maintained by the International Union.

G. The trade and territorial jurisdiction for Local No. 2 shall cover new construction, maintenance, repair and renovation in the following trades and counties:

Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer, Monmouth, Ocean, Salem, and parts of Hunterdon, Middlesex and Somerset for all work falling within the jurisdiction of the Union, as defined in Branches of the Trades for Cement Masons, Plasterers & Fire Proofers, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers.

## Brick Masonry

A. Bricklaying masonry shall consist of, but not be limited to, the following work procedures and installation of the

0712

following materials: The laying of bricks made from any material in, under or upon any structure or form of work where bricks are used, whether in the ground, or over its surface, or beneath water, in commercial buildings, rolling mills, iron works, blasts or smelter furnaces, lime or brick kilns, in mines or fortifications and in all underground work, such as sewers, telegraphy, electric and telephone conduits; including the installation of substitutes for brick such as all carbon materials, Karbate, Impervite or mixtures, all acid resistant materials, all terra cotta and porcelain materials, except where the foregoing materials are manufactured to substitute for tile as provided for under the category of Section 8, C of the Codes of the International Union of Bricklayers and Allied Craftworkers. All cutting of joints, pointing, cleaning and cutting brick walls, fireproofing, block, arching terra cotta cutting and setting, the laying and cutting of all tile, plaster, mineral wool, cork, blocks and glass masonry or any substitutes for the above material, the laying of all pipe sewers or water mains and the filling of all joints on the same when such sewers or conduits are of any vitreous material, burnt clay or cement, or any substitute material used for the above purpose, the installation of all brackets and fasteners is the work of the mason exclusively, the cutting and rubbing and grinding of all kinds of bricks and the setting of all cut-stone trimmings on brick buildings, is bricklayer's work. The preparation and erection of plastic castables or any refractory materials is bricklayer's work.

B.  Cleaning, grouting, pointing and other work necessary to achieve and complete the work under the foregoing categories, all waterproofing and black mastic waterproofing, silicone and/or substitutes sandwiched between masonry units in the interior of the wall.

C.  All terra cotta called unit tile in sizes over 6" x 12" regardless of method of installation; all quarry tile over 9"x 9" x 1 1/4" in size, split brick or quarry tile or similar

material if bedded and jointed with one operation. The bedding, jointing and pointing of the above materials shall be the work of the craft installing same.

D.  All burnt clay extruded cellular products regardless of trade name or method of installation when used as a veneer on structures; all clay products known as terra cotta tile, unit tile, ceramic veneer and machine-made terra cotta and like materials in sizes larger than 6" x 12", regardless of the method of installation. Where the preponderance of material to be installed is of the above size and when material of lesser sizes is to be used in connection therewith, the bricklayers shall install all such materials. Brick paving comes under bricklayers' trade classifications. The parties acknowledge the Union's claim to screeding of sub base regardless of type of material used.

E.  Grouting of all Masonry Units, all Leveling Plates for steel columns, all machinery and Precast Panels shall apply to all branches of the trade.

F.  The Bricklayer shall perform the complete installation and related finish work of all AACMU. These operations include, but are not limited to; the cutting, fitting and applications of mortar and/or other cementitious materials used for the setting and bonding purposes as well as the actual laying of the AACMU block units into position. The routing, drilling, cutting and patching for all mechanical piping and openings. The preparation, assembly, unloading, selecting or staging of AACMU panels, hooking on, signaling, drilling, cutting, installation of support angles or strut supports, fitting, bedding, landing, setting, leveling, plumbing, aligning, fastening, anchoring (whether by bolt, clip, pin, or weld), insulation, caulking, grouting, patching, cleaning, waterproofing and installation of all AACMU units. This also includes all work operations related to the installation and applications of all coating, covering and veneer systems (both exterior and interior) on all AACMU

units. These work operations include, but are not limited to: preparations of walls, the mixing and applications of any and all finish coating materials by any method (i.e. trowel on, machine, spray on, etc.) or any other device deemed necessary to produce the desired finish surface.

## Stone Masonry

A. Stone Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying of all rip rap, rubble work with or without mortar, setting all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured from such foreign or domestic products as are specified and used in the interior or on the exterior of buildings by architects, and customarily called "stone" in the trade.) Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over 10 inches in height; the dressing of all jambs, corners and ringstones that are roughly dressed upon the beds, joints or reveals and the cutting of a draft upon same for plumbing purposes only, and the cleaning, cutting of joints and pointing of stone work.

B. This is to apply to all work in buildings, sewers, bridges, railroads, bulkheads, breakwaters, jetties, playgrounds, parks, landscaping and curbing or other public works and to all kinds of stone, particularly to the product of the locality where the work is being done. Stonemasons shall have the right to use all tools which they consider necessary in the performance of their work.

C. Cleaning, grouting, pointing and other necessary work to achieve and complete the work under the foregoing categories.

6

## Artificial Masonry

A. Artificial Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The cutting, setting and pointing of cement blocks and all artificial stone or marble, either interior or exterior, when set by the usual custom of the stone mason and marble setter. All cement that is used for backing up external walls, the building of party walls, columns, girders, beams, floors, stairs and arches and all material substituted for the clay or natural stone products, shall be handled by employees in the bargaining unit for which the highest rate of wages shall be demanded.

B. All artificial masonry, the cutting, setting and pointing of all concrete prefabricated slabs, regardless of dimension size, shall be the work of members of this organization, for which the regular wage scale in the jurisdiction where the work is performed shall be paid.

C. Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over ten inches in height, the dressing of all jambs, corners and ringstones, joints, or reveals and the cutting of a draft upon same for plumbing purposes only, and the cleaning, cutting of joints and pointing of stonework.

D. This is to apply to all work on buildings, sewers, bridges, railroads or other public works, and to all kinds of stone, particularly to the products of the locality where the work is being done and the same shall be considered stone masonry.

E. Bricklayers and stone masons shall have the right to use all tools which they consider necessary in the performance of their work.

F. All cement that is used for parging up external walls and

7

G. The building of party walls, columns, girders, beams, floors, stairs and arches. Gypstell products and cement of precast slabs on roofs or wherever used in building construction of alterations, and all material substituted for the clay or natural stone products. All wall ties and brackets used to anchor brick, block, stone or any type of masonry whether screwed or nailed is the work of the mason, as per the 1962 agreement between the B. & A.C. and Ironworkers herein incorporated by reference.

H. The laying out and supervising of work for or by the use of any or all of the above materials shall be done by the employees covered hereunder.

### Cement Masons Agreement

A. Cement masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying out, screeding and finishing of all cement, concrete, brown stone composition, mastic and gypsum materials, also for fireproofing, waterproofing, cement and composition base and vault lights.

B. The cutting of all cement and concrete for patching and finishing; the bush hammering of all concrete when cast in place; the operation of cement gun, the nozzle and the finishing of all material applied by the guns, and the operation of the cement floor finishing machines. The cement mason shall have the right to use all tools necessary to complete his work.

C. The operation of the Lazar Screed Machine shall be performed solely by the Cement Masons.

D. Concrete constructions, such as buildings, bridges,

---

elevators, smokestacks, curbs, gutters, sidewalks, street paving, alleys and roofs; laying out, setting joists, strips or screed rods for work hereinafter specified; laying and finishing of cement, wearing surfaces of basements, floor yards, driveways, areas and other surfaces where cement finish is to be laid; and where strips have to be set, or material ruled down, or surfaces finished; screening of concrete or fine stuff, asphalt or other preparations that are to be troweled, floated, darbied or bull floated; troweling, floating or finishing of concrete or fire retarding material or waterproofing compound or mixtures; construction of glass vaults or sidewalks, lights, where same is set in cement; excepting the carpenter work, but including pointing, facing and finishing of the surfaces after forms are removed; leveling of all fine materials for facing same; running of all cement base; cutting; patching and finishing of concrete fireproofing on walls, beams, girders and columns; cutting facing and finishing with cement of all concrete surfaces such as arches, beams, girders, walls, pile caps, piers and columns, whether done with trowel, float, gun and nozzle, bushhammer, rubbing or other process; applying cement mortar for damp-proofing, waterproofing for sanitary purposes where not over four (4) feet high whenever cementing with the floor is done in one operation; cutting of all concrete when cement finish is applied; setting of carpet pins and sockets in cement and composition brass or other metallic or wood strips when inserted in floor during the laying of same; rodding and spreading of all concrete and spreading and finishing of all top material; setting of all strips and stakes and grade; pointing, caulking and patching around all steel or metal window frames that touch concrete; handling of the vibrator machine. Washing and treating of all cement surfaces, handling of all machines, trowel machines, riding trowel machines, apparatus or equipment of any kind in connection with or to perform any of the above functions shall be the work of the cement finisher. Any signatory contractor who subcontracts sidewalks and curbs shall, in

9

8

block units, installing reinforcing rods and door blocks, and all grouting.

E. The pouring of all concrete shall require a mason.

F. When concrete bucket is used in conjunction with a crane, all safety precautions shall be exercised.

G. The aligning of all bolts and the setting of all plates shall be performed by the employees covered hereunder.

H. When flat concrete arches are poured with a crane, a hopper must be used in conjunction with a concrete bucket.

I. On all high rise buildings an exterior scaffold for the cement masons shall be erected complete with guard rails.

J. There shall be no cutting of cement masons crews before pull up is completed.

K. Overtime shall only be with the prior permission of the union and shall be equitably shared by the employees working on the job.

L. No cement worker working alone shall use a straight edge of more than six feet in length. Where a straight edge is longer than six feet, two men shall be used on a straight edge which is between six and eleven feet in length, one additional man shall be used for every additional four feet or fraction thereof of straight edge. On power straight edges or roller-type straight edges, two men shall be utilized up to fourteen feet and one additional man shall be used for each five feet or fraction thereof.

M. The casting and pouring of pre-cast slabs when done on the job site shall be the work of a cement mason.

N. Cement masons are to complete, joint and strike up their work, whether this work is done with cement or caulking compound on any other masonry material.

O. The cement masons shall supervise the placing or pouring of all concrete. In the event there is a journeyman already working at the job site who is recognized by the Local Union as a competent cement mason, he may be assigned to such work, otherwise a cement mason shall be hired.

P. When concrete floors are to be hand troweled, the Employer shall provide knee boards such as the type used by cement finishers to handle trowel concrete floors, such knee boards shall measure approximately 12" wide and 30" long or fraction thereof, and shall have handles.

Q. The following work shall be allotted to the cement masons only: The setting of all screeds and forms to determine the proper grade of concrete when held in place by stakes and/or spreaders shall be done by cement finishers. A screed is a strip of wood, metal, etc., used as a guide for leveling or grading a concrete floor, slab or sidewalk.

R. Any bulkhead that is one single board in height, and that has no key attached or which is not notched or fitted shall be set and braced or staked by cement finishers, providing same is used as a screed. The term bulkhead shall mean a form or screed erected for the purpose of separating pours of concrete.

S. The grinding, patching and curing of all floors, the snapping of wall ties, and patching of same and setting of expansion joints.

T. Steps, Landings, Platforms, etc. The setting of forms for steps, landings, platforms, coping, caps and curbs, except where underforms or centers are required, and the placing of all fine materials for facing same, shall be done by

good faith, inform the subcontractor that said work is within the jurisdiction of the Bricklayers & Allied Craftworkers, Local Union Nos. 4 & 2.

10

11

cement masons.

U.  Curing and dustproofing of all floors are to be done by cement masons. All epoxy, acid and latex work will be an additional $.50 per hour above scale.

V.  The cement mason shall have the right to use all tools necessary to complete his work. There shall be no restriction as to the use of machinery or tools.

W.  When troweling floors with machine, changing of blades, cleaning and maintaining machine to be done by mason.

X.  No concrete trucks, pumping machine or any other machines are to do any mixing inside any structure without proper ventilation.

Y.  Special Tools: The employer agrees to furnish the following tools for use by his employees: Respirators, goggles, boots, bull floats, brooms, brushes, power chisels, trowel machines, bushhammers, straight edges, rubber floats, rubbing stones, cover tools, special base tools and special edgers. Gloves furnished when using epoxies, acid, latex floor patching or any irritant.

Z.  All wages, waiting time and general working conditions that apply to bricklayers shall also apply to the cement mason.

## Plastering

A.  Level 5 Gypsum Board Finishing is the work of Plasterers.

Level 5 finishing as specified by the Association of the Wall and Ceiling Industries Construction International (AWCI), Ceiling and Interior Systems Construction Association (CISCSA), Gypsum Association (GA), and Painting and Decorating Contractors of America (PDCA), in their "Levels of

12

Gypsum Board Finish Recommended Specification."

Levels Description: All joints and interior angles shall have tape embedded in joint compound and three separate coats of joint compound applied over all joints, angles, fastener heads, and accessories. A thin skim board of joint compound, or a material manufactured especially for this purpose shall be applied to the entire surface. The surface shall be smooth and free of tool marks and ridges. Note: It is recommended that the prepared surface be coated with a primer/sealer prior to the application of finish paint. (See painting specification in this regard.)

The level of finish is recommended where gloss, semi-gloss, enamel or non-textured flat paints are specified or where severe lighting conditions occur.

This highest quality finish is the most effective method to provide a uniform surface and minimize the possibility of joint photographing and of fasteners showing through the final decoration. The work jurisdiction of the plasterer under level 5: Gypsum board finishing shall be that which has heretofore been performed under this Agreement and is further set forth in constitution of the International Union of Bricklayers and Allied Craftworkers of the United States and Canada. The parties agree to be bound by decisions rendered by the "Green Book" Decision of Record rendered by the Hearings Panel (March 1, 1978) under the plan for the settlement of jurisdictional disputes in the construction industry.

B.  All cement plastering, stone texture, stucco work, and pebble dask work, either exterior or interior, shall be done by plastering employees under this contract.

C.  All plastering, including plastering alterations and repairs, and all cement, caehstone, acoustic or any plastic substitute or artificial or imitative composition for plain surfaces or

13

for moldings, cornices, pilasters panels, capitals, columns, bases, keystones, brackets or centers when applied on any exterior or surface in the usual method of either plastering or stuck work shall be the work of plastering employees.

D. All ornaments including centers, brackets, trusses and keystone shall be placed in position and pointed by plastering employees who are on the job. Cast ornamentation shall be made in a Union shop. No employee shall work on any operation where the stickling of ornamentation has been sublet.

E. All moldings, covers, arrises, chamfers and bullnoses shall run in place wherever possible with a regular mold on proper running strips. When moldings or cornices are to be ornamented proper beds shall be run to secure same.

F. All capitals and bases shall be run on the job if practical to do so.

G. All templates to be used by the plasterer shall be placed in position by the plasterer.

H. All plastering shall consist of not less than three coats as scratch, brown and finish. Before the brown coat is applied, the scratch shall be hard and set. The brown coat shall be made true with a straight edge rod in all upright and ceiling angles: the walls and ceilings shall be properly darbied and floated to an even surface and the angles cut out. The finish coat shall be properly gauged and troweled to the required surface and all angles featheredged true. All interior or exterior plastering shall be left straight and true with rod and darby, rod and darby to be furnished by the contractor. The taping and pointing of sheetrock, composition-board, plaster-board, etc., shall be the work of the plasterer.

I. When Sprayo-Flake or similarly applied acoustics are used the applied acoustic will take the place of the finish coat

14

and will be applied by plastering employees.

J. The operation of all mechanical plastering or troweling machines, pertaining to plaster and all of its substitutes, shall be the work of the plasterer.

K. All safety precautions, goggles, shields, and masks, shall be supplied by the contractor for the health and welfare of the plastering employees operating these machines.

L. Plastering on concrete, fireproofing, brickwork or plaster boards shall be two coat work- brown and finish.

M. The finish coat may be omitted on cellar ceilings provided the brown coat is floated to an even surface. All EIF systems and all related work.

N. Finishing of walls and ceilings shall not be done until the screeds, cornices or covers with which they intersect are in place.

O. Employees shall not install metal corner beads, nor shall they work on any operation where corner beads have been used to form arrises on beams or arches or corners except door or window heads or other continuous openings not over twelve (12) feet in height.

P. On a scaffold area of one hundred and fifty (150) square feet or over, the mortar board shall be raised 30" from the scaffold on a properly constructed stand. On a scaffold area of less than 150 square feet, the mortar board shall be raised at least 12" from the scaffold on a properly constructed stand. No mortar board shall be raised on blocking, and no mortar board or gauging board shall be more than 46" square.

Q. Where beams are sixteen (16) inches or over in depth, the scaffold shall be dropped to a suitable height where the

15

plasterers may execute their work in a proper manner.

R. Any material applied on walls by the plasterers shall not be higher than 66" from the floor. Where only the walls have to be plastered, a scaffold 4 planks wide and 6' from the ceiling shall be erected on which the mortar board shall be placed and raised 12" above the scaffold. Positively no hopping planks to be permitted.

S. There shall be a foreman plasterer on all plastering jobs. Plastering foremen shall meet the requirements for foremen as specified herein, and shall be paid as specified herein.

T. Plastering foremen shall see that no gauging is made up later than thirty (30) minutes before 12 o'clock and thirty (30) minutes before quitting time.

U. Plastering work, when sublet, shall be given to a subcontractor who employs employees covered under this contract.

V. Plastering contractors shall furnish all the materials required for their work including all screed rods, cornice, rods, darbies and feather edges. No subcontractor shall contract for labor only.

W. Synthetic Plastering Systems: The styrofoam and any other materials which is part of the system that are installed by screws, glue, masonry materials, and including Mechanical System.

## Firebrick

The matters set forth in this section are applicable solely to firebrick work.

A. On all firebrick jobs, when working with regular firebrick and clay, the bricklayers will be permitted an additional

16

fifteen (15) minutes to wash up or twenty-five (25) minutes when working with a carbon, acid proofing, high temperature clay or any other material out of the ordinary such as colored cements, asphalts, tars, plastics, etc. Solvent for washing up and cleaning of tools will be provided for by the employer.
A bricklayer working with carbon or acid proofing materials shall be given a minimum of five (5) minutes wash-up prior to lunch time.

B. All scaffolding inside of furnace shall be solid nailed scaffold. Contractors to furnish safety equipment and have same on job site.

C. Provisions for adequate scaffolding shall be made so that the lead man does not have to climb over the wall to work on the opposite side of the wall. Adequate scaffolding shall mean standard metal tubular scaffolding or wooden scaffolding consisting of a platform of not less than 2" x 10" planks in width and scaffolding shall remain in place until all paving has been completed.

D. Clay shall be mixed at the furthermost location of the enclosure where refractory brick is being laid. The location to be selected as to both its physical separation from the work area and to its feasibility for performing the mixing function. In coke oven work a separate enclosure is required. All care shall be exercised to reduce dust.

D. When bricklayers are employed laying firebrick, the contractor shall pay for the sharpening of their tools required for the work, and all tools shall be sharpened to the satisfaction of the bricklayer. The contractor shall furnish all chisels over twelve (12) inches in length and all saws when required.

E. On all jobs where conditions are such that a safety man is required by the owner, he shall be mutually agreed upon by

17

bricklayer shall also apply to all branches of the trade.

K. In addition, all other assignments mutually agreed upon between the Employer and the Union on any other building products or systems related to the scope and type of work covered by this Agreement which may be developed in the future that are determined by these parties to fall within the work jurisdiction of this Agreement.

L. In the event of territorial jurisdiction or work assignment dispute with any other BAC Local Union, the matter shall be referred to the International Union for binding resolution.

## ARTICLE IV
## UNION RECOGNITION, UNION SECURITY, ACCESS

A. The Employer hereby recognizes and acknowledges that the Union is the exclusive representative of all its employees in the classifications of work falling within the jurisdiction of the Union, as defined in Article III of this Agreement, and in the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers, for the purpose of collective bargaining as provided for in the Labor Management Relations Act of 1947, as amended.

B. No later than eight (8) days following the effective date of this Agreement, all present employees must, as a condition of continued employment, be or become members of the Union; all employees hired after the effective date of this Agreement shall be or become and remain members of the Union no later than eight (8) days following the first day of their employment in accordance with the provisions of Section 8 of the National Labor Relations Act, as amended. Failure of any employee to comply with the provisions of this subsection shall, upon request of the Union, result in termination of such employee, provided that the Union has

---

the parties. For the safety of the bricklayers, said safety man must be a union bricklayer.

F. All hot work shall be paid at the rate of double time. Fringe benefits shall be based on hours paid.

One hundred degree (100) Fahrenheit or over shall constitute hot work. When bricklayers are employed on excessive hot work, the contractor shall provide proper counter fatigue aids which shall meet the standards prescribed by the State Medical Board, shall provide proper gloves and protective materials to safeguard bricklayers when they are handling hot work, shall supply wooden shoes or facsimile when working on heated surfaces and contractors shall be responsible for tools, shoes, and clothes of bricklayers which they burn in performance of their duties on said work. Bricklayers must spell each other on all hot work.

Contractor will also be responsible for clothes, tools and/or shoes that are destroyed or damaged on jobs due to exception conditions and materials.

G. When electrical grinding stones or carborundums are used, bricklayers shall leave that part of the job until the operation is completed. In an enclosed area, suction device to be used to remove dust while bricklayers grind. The employer and union shall arrange to spell bricklayers at ten minute intervals when they are actually performing grinding work.

H. On stoves and furnaces, or anywhere else where danger of gas exists, approved gas detecting devices will be required.

I. On all firebrick or acid proofing jobs, the employer shall furnish all bricklayers with gloves.

J. All general working conditions which apply to the

18

19

given the employee four (4) days notice that this obligation to make payment has not been met and that his delinquency renders him liable to termination under this section. The Employer shall not be obligated to dismiss an employee for non-membership in the Union: (a) if he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members; or (b) if he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

C. International Union Representatives and the Business Manager and/or other officers of the Union shall have access to the Employer's jobsites at reasonable times in compliance with any special rules and regulations adopted by the owner to ensure that the provisions of this Agreement are observed, provided however, that such representatives shall not unduly interfere with the job progress.

D. It is recognized and agreed by the parties to this Collective Bargaining Agreement that the Local Union is the authorized collective bargaining agent for all its members in connection with issues related to the wages, working conditions, and employee fringe benefit funds.

## ARTICLE V
## HIRING PREFERENCE

The employer agrees that when hiring any employee for any job in the territorial jurisdiction of the agreement he will employ a fair percentage in the territorial jurisdiction of Local No. 4, or Local No. 5 or Local No. 2 of New Jersey. The employer also agrees that when requesting manpower, they must call the Local Union Office by 4:30 p.m. of the previous day.

20

Any employee who is hired and reports on the job at starting time with his tools and starts work and is thereafter stopped for any reason other than inclement weather, shall be paid a full day's wages at his basic rate of pay.

## ARTICLE VI
## STEWARDS

A. The Employer shall hire a steward for each branch of the trade appointed by the business manager of the Union on all jobs. The steward shall be a working employee and shall, when appropriate, be granted reasonable time to conduct union business. The steward shall not be laid off without reasonable cause, without first consulting the business manager.

B. It is the steward's duty to look after the interests of both parties, to see that the number of men desired by the employer is promptly reported to the business agent, take up all grievances on the job, and try to have the same adjusted. In the event that he cannot, he must report that fact to the business agent. He shall conduct himself in a proper manner at all times when on the projects and shall not be discriminated against, discharged, or laid off for the performance of his duties as such. The steward's employment can only be terminated by the employer after a review of complaint against him between the employer and the business agent.

C. The first Bricklayers & Allied Craftworkers member shall notify the union at the start of each job.

## ARTICLE VII
## APPRENTICES

A. In order to train sufficient skilled mechanics for the

21

industry, the necessity for employment of apprentices and/or apprentice improvers is recognized and encouraged by the parties to this Agreement. Apprentices shall be given a minimum of 32 hours per week to perform the work of brick or block provided the work is available. The employer agrees to employ one apprentice for every five journeymen employed on a job site. It is agreed that the Employer shall abide by the National Apprenticeship Standards, developed for masonry craft training, incorporated herein by reference.

B. All apprentices will be required to attend and successfully complete a pre-job school which shall take place over a period of approximately 12 weeks at a place and at such times as designated by the State Joint Apprenticeship Committee.

C. After 12 weeks of pre-job training, apprentices shall be required to serve a probationary period of 30 days of employment at the trade during which period no fringe benefit contributions will be required. After satisfactory completion of this period, credit will be given for this time served as part of the three year apprenticeship term. During the probationary period, the termination or cancellation of the apprenticeship agreement may be made by the committee at the request of either party to the agreement. After the probationary period, the agreement may be canceled at the request of the apprentice or committee. The committee may cancel the agreement for good cause such as unexcused absences from the job and related training classes if required, lack of progress or interest, and unsafe practices common to the trade. Due notice shall be given to the apprentice with a reasonable opportunity for corrective action. Written notice shall be given to the apprentice and Bureau of Apprenticeship and Training of the final action taken.

22

D. Apprentices shall be paid not less than the following percentages of the journeyman's basic wage rate:

First six months or 500 hours:   50% of Journeyman's Basic Wage Rate
Second six months or 500 hours:  55% of Journeyman's Basic Wage Rate
Third six months or 500 hours:   65% of Journeyman's Basic Wage Rate
Fourth six months or 500 hours:  75% of Journeyman's Basic Wage Rate
Fifth six months or 500 hours:   85% of Journeyman's Basic Wage Rate
Sixth six months or 500 hours:   95% of Journeyman's Basic Wage Rate

During the first year of apprenticeship, after the probationary period, fringe benefit contributions shall be required for the Welfare Fund at 50%. No other fringe benefit contributions shall be required for this period. Deductions for check off dues and BACPAC should be made according to Schedule "B" attached hereto. Commencing with the second year of apprenticeship (third six-months), fringe benefit contributions and check off deductions shall be made according to Schedule "B" attached hereto.

B. Apprentices may be required to attend related training classes during period of apprenticeship as directed by the Joint Apprenticeship.

## ARTICLE VIII
## FOREMEN

There shall be a separate foreman on all jobs for each branch of the trade. The employer will determine when the foreman shall not work with tools. Foremen shall be paid the prevailing regular weekly pay (40 hours), between the initial date of employment and the termination date of employment, holidays and inclement weather days included, provided, however, that all foremen must report to work everyday within the work week unless otherwise directed by the Employer. All overtime worked by foremen shall be compensated for at proper overtime rates.

23

0722

10/17/2007  14:56    6093248287          BAC LOCAL 5                    PAGE  16/30

## ARTICLE IX
## TRAVELING CONTRACTORS

When the Employer has any work specified in Article III of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied Craftworkers, the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the jobsite area. Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Article X of this Agreement but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local Agreement. The Employer shall in all other matters be governed by the provisions established in the jobsite local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in Article III of this Agreement, the full terms and conditions of this Agreement shall apply.

## ARTICLE X
## WAGES, BACPAC, AND LOCAL DUES CHECKOFF

A.   The hourly wage rates for all employees performing work covered under this Agreement shall be as listed on Schedule "B" attached hereto.

B.   The Union shall have the option of allocating a portion of all of the increases in wage rates for the periods beginning November 1, 2002 and all subsequent increases thereafter, among the various benefit funds specified in Article XI.

C.   The Employer shall deduct from the wages of each employee who has signed a check-off authorization conforming to federal law and transmit monthly to the Union (or to any agency designated by said Union for the

24

collection of such money), the sum for each hour paid which the Union has specified, or specifies from time to time and so advises the Employer in writing, as the portion of each employee's Union dues to said Union, to its International Union, or to any other affiliate of the International Union, subject to check-off.  The sums transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the name of each person whose dues are being paid and the number of hours each employee has been paid. If the employee does not sign a dues check off authorization card, he shall report to the union hall to pay the weekly dues.

D.   The Employer agrees to deduct an amount from the pay of each employee, who is a union member and who executes a voluntary check-off authorization form for the Bricklayers and Allied Craftworkers Political Action Committee (BACPAC). Deductions shall be in the amount and at the intervals specified on the check-off authorization form. The Employer agrees to transmit BACPAC deductions to the Treasurer of BACPAC, and shall be accompanied by a list of the names of those employees for whom BACPAC deductions have been made and the amount deducted for each employee.

## ARTICLE XI
## JOINTLY TRUSTEED FUNDS

Section 1.
In addition to the wages and other payments herein provided for, the Employer agrees to pay specified contributions to the following designated funds.  In the event any of the trust funds to which contributions are required to be made, under this Agreement, is merged with or into another trust fund, the contributions shall be made to the successor fund.

A.   **Bricklayers and Trowel Trades International Pension Fund**

25

1. The contribution to the Bricklayers and Trowel Trades International Pension fund (IPF) shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the Bricklayers and Trowel Trades International Pension Fund, which was established under an Agreement and Declaration of Trust, dated 1 July 1972.

B. **Local Pension Fund**

1. The contribution to the Local Pension Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the territorial Local Pension Fund which was established under an Agreement and Declaration of Trust. All Local Pension Funds remitted on behalf of an employee shall be forwarded in whole to the employee's Home Local Pension Fund. The Home Local Funds shall credit any excess monies remitted for the Pension Fund to the employee's Annuity Fund.

C. **Local Annuity Fund**

1. The contribution to the Local Annuity Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the territorial Local Annuity Fund which was established under an Agreement and Declaration of Trust. All Local Annuity Funds remitted on behalf

26

of an employee shall be forwarded in whole to the employee's Home Local Annuity Fund. The Home Local Funds shall apply any excess monies remitted for the Annuity Fund to the employee's Pension Fund.

D. **Bricklayers and Allied Craftworkers' Statewide Welfare Fund**

1. The contribution to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund which was established under an Agreement and Declaration of Trust, dated May 1, 1988.

E. **Industry Advancement Fund**

The parties hereto do hereby establish an Industry Advancement Fund pursuant to the requirements of the Labor - Management Relations Act, the Internal Revenue Code and all applicable laws and the agreement of the parties for the purpose, in all lawful ways, of promoting the increase of commercial, institutional, public and industrial building construction throughout the State of New Jersey and the adjoining areas within the territorial jurisdiction of the unions by providing building owners, architects, engineers, builders, contractors, private and public funding institutions and agencies, government agencies and any others, directly or indirectly, with the building construction industry information, data and other information to communicate the advantages of sound, durable and economical construction that will provide a high degree of service, utilization and benefit to the public by the utilization of union affiliated contractors. The purpose of

27

be distributed equally between the BCANJ and the Masonry Contractors of New Jersey.

4. The BCANJ and the Masonry Contractors of New Jersey shall utilize said funds in a manner consistent with the terms of the trust including the lease or purchase of materials, supplies and equipment, the lease of premises or purchase of premises, the employment and retention of professional counsel, the engagement of administrative and other employees, and all other appropriate expenses and expenditures which comply with the purposes of the trust and law. However, in all circumstances, it is the intention hereto that the said Fund shall be used to promote the following industry wide activities for the benefit of the contractors utilizing members of the Bricklayers & Allied Craftworkers union including accident prevention, education, research, public relations, industry relations, labor relations, market development, standardization of contracts and specifications and all other such appropriate activities.

5. Although the Industry Advancement Fund is designated a "contribution" it is expressly understood and agreed that the said sum payable to said Industry Advancement Fund is not intended to be and is not a contribution to employees and no employee of Employer has any proprietary interest in said funds.

6. The Industry Advancement Fund shall pay the Bricklayers & Allied Craftworkers' Health and Welfare fund 2% of all amounts collected as reimbursement for expenses incurred in connection with the collection services rendered. In addition the Bricklayers & Allied Craftworkers' Health & Welfare Fund shall not be responsible for collection

the Fund shall be to foster and promote the continued utilization and expansion of union construction, particularly utilizing union members of the Bricklayers & Allied Craftworkers union, in prospective projects throughout the State of New Jersey.

In order to carry out this agreement, the parties hereto shall execute such agreements of trust and other documents necessary in accordance with law, which documents shall include the following terms which are agreed to and incorporated into this contract:

1. The Employer shall make contributions for each hour worked by each member of the Bricklayers & Allied Craftworkers union to the Industry Advancement Fund created hereby as listed on Schedule B attached hereto.

2. The Bricklayers & Allied Craftworkers' Health & Welfare Fund Office shall collect and distribute such funds.

3. Effective November 1, 2002, the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey agree to allocate $.02 of the Industry Advancement Fund contribution to the International Council of Employers of Bricklayers & Allied Craftworkers (I.C.E.). Said contribution shall be forward to I.C.E. by the Masonry Contractors of New Jersey. The remaining contribution shall be divided as follows:

BCANJ:                              50%
Masonry Contractors of New Jersey: 50%

In such case as the parties opt to discontinue the $.02 allocation to I.C.E., said $.02 contribution shall

28

of any delinquent amounts owed by any employer.

F. International Masonry Institute (IMI)

1. The masonry industry in the United States and Canada has great and definable needs in the fields of apprenticeship and training, advertising and promotion, research and development, and labor/management relations which must be met if the industry is to grow and prosper. The parties to this agreement believe that the International Masonry Institute is the most effective and efficient instrument for meeting these needs because it offers the greatest possibility of integrating activities in these program areas in an effective manner and coordinating them through a single regional/international system.

2. In order to properly finance IMI programs, the ultimate objective is to provide, through collective bargaining, contributions from the total hourly wage and benefits package, as listed on Schedule "B" attached hereto.

3. With IMI funding from New Jersey, IMI will be able to provide advertising and promotion, research and development, apprenticeship and training, and labor/management relations programs directed specifically to this area. With these principles in mind, the parties agree to contribute the amounts listed on Schedule "B".

The payments required above shall be made to the International Masonry Institute, which was established under an Agreement and Declaration of Trust, 14 March 1981, as the successor trust to the predecessor International Masonry Institute (established under an Agreement and Declaration of Trust, 22 July 1970) and/or to the predecessor

30

International Masonry Apprenticeship Trust (established under an Agreement and Declaration of Trust, 6 November 1974).

G. New Jersey State Apprentice Fund

1. The contribution to the New Jersey State Apprentice Fund shall be listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay. The Apprentice Fund contribution of $.15 shall be suspended for Local No. 2 and deferred to the Defense Fund established by the Union.

2. The payments required above shall be made to established New Jersey State Fund office which was established under an Agreement and Declaration of Trust.

Section 2.
In order to facilitate the establishment of the same wage and fringe benefit structure within Local No. 5, it is agreed that no other funds other than the Welfare, Pension, International Pension, Annuity, Apprentice, IMI, IAP, Labor Management, BACPAC and Defense Funds shall be contributed to as of November 1, 1999. During the term of this agreement, the parties agree to establish uniform wages and fringe benefits for Local No. 4, 5 & 2.

Section 3.
The Employer hereby agrees to be bound by and to the above stated Agreements and Declarations of Trust, as though he had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of these funds pursuant to said Agreements and Declarations of Trust.

Section 4.
The Employer hereby irrevocably designates as its representative on the above stated Boards of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees,

31

0726

10/17/2007  14:56    6093248287    BAC LOCAL 5    PAGE  12/30

together with their successors.

Section 5.

For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and all other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable to each fund designated in Section 1 of this Article.

Section 6.

Contributions shall be paid on behalf of all covered employees starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, journeymen, apprentices, helpers, trainees and probationary employees.

Section 7.

All contributions shall be made at such time and in such a manner as the Trustees require; and the Trustees shall have the authority to have an Independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the funds designated in Section 1 of this Article. Any Employer found, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, to have been substantially inaccurate in reporting shall be charged in full costs of such audit.

Section 8.

If the Employer fails to make any contribution specified in this Article, within twenty (20) days after the date required by the Trustees, the Union shall take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of payments due together with attorney's fees and such liquidated damages as may be assessed by the Trustees. In the event a job is stopped due to delinquent fringe benefit payments by the employer, craftworkers shall be compensated a day's wages for

each day the delinquency continues, not to exceed five days. The Employer's liability for payment under this article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided for or set forth elsewhere in this Agreement.

Section 9.

Management's appointments to the aforementioned Jointly Trusteed Funds are to be made equally by the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey. The Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey shall only have the right to the appointment of trustees if and when the existing Trust Funds of the predecessor local unions of the International Union of Bricklayers and Allied Craftworkers, Local Unions No. 4 and 5 are merged into statewide benefits funds. Neither the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey shall have the right or authority to appoint trustees to any trust fund of a predecessor local union unless and until a statewide merger of the Trust Funds occur, except if trustees are currently appointed by either the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey, that authority shall remain.

Section 10.

The Labor/Management Fund established under an Agreement and Declaration of Trust, shall be used to enhance the economic development and competitiveness of the unionized masonry industry, to assure the effective enforcement of prevailing wage laws and to provide for stable labor-management relations. The parties to this agreement shall appoint trustees to this fund in the same manner in which appointments are made to the Statewide Welfare Fund.

Section 11.

The parties agree to establish a Committee to explore the concept and funding mechanism for a Market Recovery Program.

32

10/17/2007  14:56    6093248287    BAC LOCAL 5    PAGE  11/30

## ARTICLE XII
## BONDING

Prior to commencing any work covered by this Agreement, the Employer shall obtain a bond in the amount of $25,000, (twenty-five thousand dollars) with a duly qualified bonding company in a form approved by the Union, to secure payment of wages, benefit contributions, and other sums due under this agreement.

## ARTICLE XIII
## HOURS WORK, OVERTIME, SHIFTS, AND HOLIDAYS

A.  The standard work day shall consist of eight (8) hours of work with starting and quitting times of either 7:00 a.m. to 3:30 p.m., or 8:00 a.m. to 4:30 p.m., unless otherwise mutually agreed to by the parties, with a 30-minute unpaid lunch hour occurring in the middle of the shift. The standard work week shall consist of five standard work days commencing on Monday and ending on Friday, inclusive. The normal starting and quitting times may be changed by mutual consent of the Employer and the Union.

B.  All time worked before and after the established eight (8) hour day, Monday through Friday, and all time worked on Saturday shall be paid at the rate of time and one-half. All hours worked on Sundays and holidays shall be paid at the double time rate. If a craftworker works through any portion of their lunch they shall be paid one hour.

If any of the following trades: Carpenters, Laborers, Ironworkers or Operating Engineers Locals, with whom the BCANJ negotiates, receive a more beneficial overtime rate, the Bricklayers will be paid the higher overtime rate.

C.  A make-up day may be worked on Saturday providing it is mutually agreed to by the union and the employer and provided that the following conditions are satisfied:

1.  A make-up day on Saturday can be utilized provided 24 or more hours are worked during the course of the calendar work week, Monday through Friday.

2.  It is not mandatory for an employee to work on a make-up day and it is at their choice and discretion. No negative actions or retribution shall be taken by the employer against any employee who chooses not to work a make-up day.

3.  The sole reason for the loss of hours during the calendar work week must be weather conditions to qualify for a make-up day.

4.  Any time worked before the established starting time or after the established quitting time on a make-up day shall be paid at the applicable overtime rate. Any hours worked on a Saturday make-up day that exceed 40 hours shall be paid at the applicable overtime rate.

5.  If employees are unable to work a make-up day, the local union shall be given the preference to supply the remainder of the employees needed for that day.

6.  There shall be no addition to the previously established crew size for the make-up day.

Any employer who violates the above provisions shall be prohibited from utilizing the make-up day for the duration of this Collective Bargaining Agreement. The employer has the right to file an appeal with the Joint Arbitration Board defined in Article XV of this Collective Bargaining Agreement. Said appeal shall be heard within five (5) days from the date filed. During the appeal process the employer shall be prohibited from utilizing the make-up day provision.

34

35

D. The parties to this Agreement recognize the desirability and in some cases absolute necessity of coordinating the shifts to be worked with the other trades involved on the project and the customer's work schedule. If shift work is necessary and it is mutually agreed to by the union and the employer, the following schedule shall prevail:

When a two shift schedule (including a day shift) is established, the first or day shift shall be established on an eight (8) hour basis. The second shift shall be established on an eight (8) hour basis and paid the base rate plus 15%.

When a three shift schedule is established, and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The day shift shall be established on an eight (8) hour basis, the second shift shall be established on a seven and one-half (7 ½) hour basis, and the third shift shall be established on a seven (7) hour basis. The first shift shall receive the base or regular hourly rate. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

When there is no day shift and a second shift or third shift is established and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The second shift shall be established on an eight (8) hour basis. The third shift shall be established on an eight (8) hour basis. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

The percentage premium, when added to the base rate, shall be termed the regular hourly rate. Shift hours for the second and third shifts shall be such as to conform to the day shift and in no case shall an employee work on more than one shift within a 24 hour period. When an irregular shift must be established, the percentage premium shall be

15% above the base rate.

All time worked before and after a regularly established shift shall be paid at the applicable overtime rate. When a portion of a regular established shift works into Saturday, Sunday or a Holiday, that time worked shall be paid at the established shift rate.

E. The Employer agrees to recognize the following holidays: New Year's Day, President's Day, Memorial Day, Fourth of July, Labor Day, Presidential Election Day, Veterans' Day, Thanksgiving Day, and Christmas Day. Holidays falling on a Sunday shall be observed the following Monday. The above holidays are subject to renegotiation based upon agreements established with other trades.

## ARTICLE XIV
## PAYMENT OF WAGES & FRINGE BENEFITS

All employees working under this Agreement shall be paid in cash or by check weekly on Thursday, or another day if mutually agreed between the business agent and the employer, before quitting time and within 72 hours after the closing of the pay for the week. When employees are unable to work on pay day due to inclement weather, the employee shall be paid before 12 noon in absence of reasonable cause for delay. An employee who has worked more than three days who is being laid off shall be given his final paycheck in full for all hours of employment one hour before layoff. When working overtime, the one hour notice of layoff does not apply. At the discretion of the Union, out of state contractors may be required to have payroll checks drawn on a local bank. Payroll checks will be delivered to the job site. In the event an employer issues a paycheck and there are insufficient funds in the employer's account, the employer, on the next working day, will bring either cash or cashiers checks to the jobsite to cover the paychecks and all penalties. Failure to do so will result in immediate withdrawal of all craftworkers from the job. Employees will be compensated by the employer for all lost time until the

36

0729

matter is resolved. If a second violation occurs, all payrolls shall be in either the form of cash or cashiers checks. Fringe benefits will be paid on a weekly basis, except that Association Members, may pay monthly. Monthly payments shall be due to the fund(s) on, or before the fifteenth day of the month immediately following the month during which the contributions were earned. Should an Association Member become delinquent, they may be required by the trustees of the benefits funds to remit weekly payments.

## ARTICLE XV
## WORKING CONDITIONS

A.  Overhead Protection: If any work is being performed overhead, all Employees must be protected on all outside scaffolds by two inch (2") planks, a covering shall be supplied over all stairwells, hatches, shafts, etc., no more than two (2) stories overhead and two (2) stories below in shafts.

B.  Hard hats are to be supplied by each employer. Failure to wear hard hats is cause for dismissal.

C.  Lines: All contractors must furnish the men with lines. The lines must not be raised more than one (1) course at a time. No bricklayer shall spread mortar before the line has been raised. However, a trig brick can be raised one (1) course before raising the line. Lines on a double unit wall shall be used on both sides of a wall eight inches (8") or over in thickness and on all units of masonry over four (4) feet in length.

D.  Portable Sanitation Units: Suitable portable sanitation units shall be erected on all jobs which shall be kept in sanitary condition. Portable sanitation units shall be built in accordance with State or Municipal health laws.

E.  Cutting Tools: Where employees are employed on cutting

38

masonry, the employer shall have all cutting tools sharpened.

F.  In order to protect the health and safety of employees against the effects of silicosis and other respiratory diseases, the dry cutting of masonry units by the means of hand-held, gas-powered, or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be prohibited on all masonry projects. The only exception to this provision will be when the Union and employer determine that the use of water is not feasible. When the Union and employer identify such tasks, the employer must ensure that the engineering and work practice controls are in place to control the dust: such as a vacuum, with high efficiency particulate air (HEPA) filter or another dust control system. It is agreed that in order to protect the health and safety of employees the dry cutting of masonry units by means of hand-held, gas powered or electrical portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be done in a designated area away from craftworkers if at all possible. It is the responsibility of the employee to adhere to the established restrictions for said designated areas.

Respirators should only be used as the primary method of protection if other engineering and work practice controls are not feasible. When the respirators are used, in accordance with the OSHA regulations, employers must provide workers with full-face respirators as part of a complete respiratory program that includes the proper selection of respiratory cartridges, and training and fit-testing to ensure that the worker is able to wear a respirator. It is the employee's responsibility to utilize proper protection.

Additionally, in the event the Union and the employer determine that dry-cutting or grinding is necessary, the contractor agrees to perform periodic air monitoring to

39

ensure that the silica exposure levels do not exceed OSHA permissible exposure limit. Failure to comply will result in work stoppage. The employee operating the machine shall be allowed ten (10) minutes to clean up at 12:00 noon and quitting time.

Employees engaged in wet cutting masonry products will be furnished elbow length gloves, an apron and goggles. No employee shall operate a wet saw unless provided with a wooden platform on which to stand and the saw is properly grounded.

G. Cutting and Mechanical Devices: Where air guns or other mechanical devices are used for the purpose of cutting chases, opening, etc., in brick work, such gun or device shall not exceed fifteen (15) lbs. weight. When such device exceeds fifteen (15) lbs, the employer may use a laborer to assist the bricklayer in handling the gun, but there shall always be one bricklayer on each gun in use. All cutting, when done by hammer and chisel, shall be done exclusively by the bricklayer. Where a bull and sledge hammer is used, there shall be a composite crew of bricklayers and laborers. (The bricklayer foreman shall have complete authority over all men employed in this phase of work.) All cutting out of brick work, pointing, washing down, caulking cement and lime waterproofing washing of brick, or slabs, used in floor arches shall be done by bricklayers, and where scaffolding is used in the above work wire rope shall be used.

H. Pointing: All pointing and joining of brick work shall be done by journeymen who built same, if possible.

I. Cement Block: Bricklayers and stone masons to set all cement blocks and all masonry units.

J. Cork Block: All cork block (Styrofoam Sheets), and substitutes thereof, shall be laid by bricklayers.

40

K. Caulking: All pointing and caulking of windows with cement or composition to be done by bricklayers, by either gun, trowel or any other method.

L. Stone Work: All renovation, cleaning, and pointing of stone to be done by this union.

M. The setting, aligning and erection of all precast slabs and the setting and leveling of all bearing plates for structural steel or machinery shall be done by the members of the above local union.

N. Composite crew on all precast panels. Setting of all other masonry panels shall be the work of BAC Members.

O. All brick or block panels shall be erected by union bricklayers.

P. Waterproofing: All transparent waterproofing applied to brick or stone work with brush or spray to be done by bricklayers.

Q. There are to be two men on all blocks weighing 40 lbs. or more.

R. Scaffolding: No block 6" or over in size shall be built more than six (6) courses in scaffold height. Where blocks of 100 lbs. or over are used, a pony scaffold is to be erected when the wall is three (3) feet high, for the easier laying of these blocks to the next scaffold height. When a BAC member works on a swing scaffold as part of a composite crew, they shall receive the same premium differential as the other trades performing work on the same swing scaffold.

S. Water: Water containers and sanitary drinking cups shall be provided on all jobs to be furnished by all contractors at all times.

41

T.  Shanty and Stoves:  Where there are not more than ten (10) men employed on a job, a shanty house shall be erected exclusively for the bricklayer, and it shall contain not less than eighty (80) square feet of floor space.  Where there are more than ten (10) men and not more than twenty (20) men, the shanty house shall contain not less than one hundred and fifty (150) square feet of floor space.  Where there are more than twenty (20) men and not more than thirty (30) men it shall contain not less than two hundred (200) square feet of floor space but where there are more than thirty (30) men employed the same proportion shall apply.  Where there is a shanty and no elevator floor unless elevator is shall not be above the ground floor in the building it provided except on alterations where it will be placed to suit the convenience of the contractor.

U.  Ample provision shall be made to protect all bricklayers levels on all outside scaffolds.

V.  It shall be deemed unsafe to run any brick work up more than 6 courses or 16" whichever is less without backing up in cavity walls or any masonry walls which does not utilize a brick header course.

W.  Contractors shall provide a two foot clear, planked working area beyond the building wall when bricklayers or stone masons are working off new footing on or below grade.

X.  There shall be a clothing allowance of fifty cents (.50) per hour minimum on all fire brick work paid by contractor.

Y.  There will be one coffee break in the morning not to exceed ten (10) minutes.

Z.  The employee shall be allowed five (5) minutes to clean up prior to quitting time.

AA.  All mortar tubs will be raised to at least sixteen inches, not to exceed thirty inches.

BB.  All rubber gloves and goggles to be furnished by the contractor for all washing down.

CC.  All work on high stacks, the contractor will pay a premium wage of 22% above the wage scale.

DD.  All scaffolds will be kept at least four (4) inches below the wall.

EE.  If an employee works past the full hour and must stop because of inclement weather conditions, he shall be paid for the full hour, but is not to leave the job until expiration of said hour.  No employee shall start work on the half hour.

FF.  If an employee reports to work and is not started but requested to stay on the job by the contractor, the employee shall be paid for all time prior to starting or until informed that no work shall be performed.

GG.  In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between starting time and 12 noon, men shall be paid until noon.  Employees must, however, remain on the job until noon.  In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between 12:30 p.m. and 3:30 or 4:30 p.m., employees shall be paid until 3:30 or 4:30 p.m. Employees must remain on the job until 3:30 or 4:30 p.m.

HH.  When a job does not start at the regular starting time, it will be the duty of the Foreman to notify the Shop Steward, personally, two hours after the designated start regarding the work conditions. It is clearly understood and agreed the employer will not send anyone to work on a job working during inclement weather unless all of the men working regularly

42

43

employed on that job who showed up for work at starting time are started first. Nothing herein contained shall be construed to deny the saw men, lay-out men and stewart regularly employed on the job from working at anytime at their respective job assignments if they are needed.

II. When masons work overtime at the direction of the employer or foreman, they shall receive at least one hour's pay at the applicable overtime rate. Fractions of an hour to be considered a full hour.

JJ. Employees who may be required to work overtime beyond 6:00 p.m. shall be permitted to take an unpaid one-half hour meal period on the job between 6:00 p.m. and 7:00 p.m. The employer may split a crew for the dinner period.

## ARTICLE XVI
## GRIEVANCE PROCEDURE

A. The parties to this Agreement shall establish a Joint Arbitration Board consisting of two representatives of the Building Contractors Association of New Jersey, two representatives of the Masonry Contractors of New Jersey and four representatives selected by the Local Union, to resolve disputes over the interpretation and application of this Agreement. The boards shall meet at least once a month, or on call, to settle complaints, abuses or grievances. It is further agreed that should occasion require any alterations or amendments to this Agreement, the party desiring such alterations or amendments shall submit same in writing to the Board. The Employer and union representatives at a session shall have an equal number of votes on all matters coming before the Joint Arbitration Board, regardless of the number of Employer or Union representatives present at a session.

B. It is specifically agreed that any controversy arising out of this Agreement involving the interpretation of its terms and

44

conditions, shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the union or to the attention of the Union by the Employer within five (5) days after the alleged violation is committed or discovered.

C. Grievances shall be handled in the following manner:

1. The grievance shall be referred to the jobsite union steward and to an employer representative for adjustment.

2. If the grievance cannot be settled pursuant to paragraph 1 of this Section, the grievance shall be referred on the following day to the Business Manager of the Union and the Employer.

3. If the grievance cannot be settled pursuant to paragraph 2 of this Section within three (3) working days excluding weekends and holidays, the grievance shall be submitted within 48 hours to the Joint Arbitration Board for consideration and settlement.

4. If the Joint Arbitration Board cannot reach a satisfactory settlement within five (5) working days, not including weekends and holidays, following a referral of the grievance to the Board, it shall immediately select an impartial arbitrator to review with the Board all evidence submitted relating to the dispute and then cast the deciding vote. If the Arbitration Board cannot agree on an impartial arbitrator, then the matter shall be submitted to the American Arbitration Association for a decision. All expenses of the impartial party shall be borne equally by the Employer and the Union. The decision reached by the Joint Arbitration Board

45

with the assistance of the impartial arbitrator shall be final and binding upon all parties.

D. When a settlement has been reached at any step of this Grievance Procedure, such a settlement shall be final and binding on all parties, provided, however, that in order to encourage the resolution of disputes and grievances at Steps 1 and 2 of Section C of this Article, the parties agree that such settlements shall not be precedent-setting.

E. The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties initiated by the written request of one party to the other, at the appropriate step of the Grievance Procedure. However, failure to process a grievance, or failure to respond within the time limits provided above, without a written request for an extension of time, shall be deemed a waiver of such grievance without prejudice and shall create no precedent in the processing of and/or resolution of like or similar grievances or disputes.

JURISDICTIONAL DISPUTES

A. In order to avoid jurisdictional disputes which have such a demoralizing effect upon the progress of the construction work, it is agreed that only B.A.C. Members will be employed on work which is recognized as coming under the jurisdiction of the International Union of Bricklayers and Allied Craftworkers as:

1. Granted by the A.F.L. - C.I.O.

2. Determined by a Joint Board consisting of four representatives from the Local Unions, two representatives from the Building Contractors Association of New Jersey and two representatives from the Mason Contractors of New Jersey.

46

3. As established by practice of Employers within the area designated herein whenever (1) or (2) above are not applicable;

4. It is the intent of the parties that wherever a job decision shall be deemed to be strongly indicative of the area practice, the Bricklayers & Allied Craftworkers Local Unions will advise all personnel affected to make future assignments accordingly.

5. It is further the intent of the parties hereto that wherever possible, and whenever the contractor can reasonably foresee a jurisdictional dispute, the contractor will call a pre-job conference with the Local concerned and the contractors agree that when no agreement is reached, at the request of the Union, the contractor will join in the submission of the matter to the Joint Board. In the meantime, the work shall proceed by the craft in possession of the work.

B. The Employer and the Unions agree to be governed by the terms and conditions of the Agreement, effective May 1, 1995, as amended, creating the Joint Board for the settlement of any jurisdictional dispute; and the decisions of the Joint Board will be followed in good faith.

ARTICLE XVII
SUBCONTRACTING

A. The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement and complies with all of the terms and conditions of this Agreement.

47

0734

B. All charges of violation of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.

### ARTICLE XVIII
### PRESERVATION OF WORK (Anti-Double Breasting)

A. In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

B. All charges of violations of Section A of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in Article XV of this Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in Article XV is empowered, at the request of the Union, to require an Employer to: (1) pay to affected employees covered by this Agreement, the equivalent of wages lost by such employees as result of the violations, and (2) pay into the affected joint trust funds established under this Agreement any delinquent

48.

contributions to such funds which have resulted from the violations, including such interest as may be prescribed by the trustees or by law. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other sections or articles of this Agreement.

C. If, as a result of violation of this Article, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with Section B above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

### ARTICLE XIX
### NO-STRIKE/NO-LOCKOUT

It is understood and mutually agreed that there shall be no strikes or lockouts over a dispute concerning this Agreement during its term until the grievance procedures described in Article XIV have been exhausted and then only in the event a party fails or refuses to abide by a final decision. This Article shall not apply in those cases where an Employer fails or refuses to make in whole or in part any payments required under this Agreement including all wages, local union fringe benefits or other contributions that have been established through bona fide collective bargaining.

### ARTICLE XX
### SEPARABILITY AND SAVINGS PROVISION

It is the intent of the parties hereto to abide by all applicable Federal and State statutes and rules and regulations made pursuant thereto. If any provision of this Agreement is held invalid by any court or governmental agency having jurisdiction, or if compliance with or enforcement of any provision of this Agreement is

49

restrained by such tribunal pending a final determination as to its validity, then such provision or provisions shall continue in effect only to the extent permitted and all other provisions of this Agreement shall remain in force and effect.

In the event that any provision of this Agreement is held invalid, or enforcement of or compliance with any provision is restrained, the Union and the Employer shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement, incorporating the substance of such provision to the extent allowable under the law, to be in effect during the period of invalidity or restraint.

## ARTICLE XXI
## MORE FAVORABLE CONDITIONS

The Union hereby agrees that if it affords any conditions of a more favorable means to any other employer with whom it has a collective bargaining agreement who performs the same or similar work, that said more favorable condition shall automatically be incorporated in this Agreement and be afforded all members of the Association covered hereunder.

## ARTICLE XXII
## GENERAL UNDERSTANDING

The Union agrees to cooperate with the Employer in meeting conditions peculiar to the job in which it may be engaged. It will at all times meet and confer with the Employer, and similarly, the Employer will at all times meet with the Union regarding any questions or misunderstandings that may arise under the performance of this Agreement.

This Agreement constitutes the entire agreement between the parties, and any local or area practices or working rules which may be in conflict with the provisions contained in this Agreement shall be subordinate to this Agreement.

50

Inasmuch as (1) the Union has requested recognition as the majority, Section 9(a), representative of the employees in the bargaining unit described herein and (2) has submitted or offered to show proof of its majority support by those Employees, and (3) the Employer is satisfied that the Union represents the majority of the bargaining unit Employees, the Employer recognizes the Union, pursuant to Section 9(a) of the National Labor Relations Act, as the exclusive collective bargaining agent for all employees within that bargaining unit, on all present and future job sites within that jurisdiction of the Union.

The Employer agrees that if it has not previously done so, at any time during this agreement it will, upon the Union's request for recognition as the Section 9(a) representative of the employees in the bargaining unit described herein, and upon the union's submission of proof of majority support by such employees, voluntarily recognize the Union as the exclusive representative as defined in Section 9 (a) of the National Labor Relations Act, of all the employees within the bargaining unit on all present and future jobsites within the jurisdiction of the Union. When the Union has requested recognition as majority representative, the Employer's recognition will be based on the Union's proof or offer to submit proof. The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board.

We, the undersigned Employer on behalf of the parent firm, all subsidiaries and corporate related firms, companies and/or corporations hereby become signatory to this Agreement and agree to abide by the full terms and conditions of this Agreement effective as of this date.

51

| ********WAGE RATES EFFECTIVE NOV 1, 2002 THROUGH OCTOBER 31, 2003******** | | | | | | | |
|---|---|---|---|---|---|---|---|
| FORMER LOCAL # | 6 | 7 | 8 | 15 | 26 | 33 | 35 |
| JOURNEYMAN: | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 |
| DEPUTY FOREMAN: | $31.95 | $31.95 | $31.95 | $31.95 | $31.95 | $31.95 | $31.95 |
| FOREMAN: | $34.55 | $34.55 | $34.55 | $34.55 | $34.55 | $34.55 | $34.55 |
| EMPLOYER CONTRIBUTIONS******** | | | | | | | |
| WELFARE FUND: | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 |
| LOCAL PENSION FUND: | $4.60 | $4.50 | ********** | ********** | $4.50 | $4.50 | ********** |
| ANNUITY FUND: | $3.00 | $3.00 | $7.50 | $3.00 | $3.00 | $3.00 | $7.50 |
| APPRENTICE FUND: | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 |
| INDUSTRY ADVANCEMENT: | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 |
| LABOR MANAGEMENT TRUST: | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| I.U. PENSION FUND: | $1.50 | $1.50 | $1.50 | $6.00 | $1.50 | $1.50 | $1.50 |
| I.M.I. | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 |
| **TOTAL PACKAGE** | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 |
| | ********DEDUCTIONS AFTER TAXES FROM GROSS WAGES******** | | | | | | |
| | JOURNEYMAN | | DEP FOREMAN | | FOREMAN | | |
| LOCAL DUES CHECKOFF: | $1.57 | | $1.66 | | $1.75 | | |
| INT'L DUES CHECKOFF: | $0.45 | | $0.45 | | $0.45 | | |
| DEFENSE FUND: | $0.05 | | $0.05 | | $0.05 | | |
| LOCAL BAC/PAC: | $0.05 | | $0.05 | | $0.05 | | |
| I.U BAC/PAC: | $0.01 | | $0.01 | | $0.01 | | |
| TOTAL DEDUCTIONS: | $2.13 | | $2.22 | | $2.31 | | |
| AFTER TAX DEDUCTIONS NOTE: | All former locals have the same deductions with the exception of one: | | | | | | |
| Former Local #7: | Has a BAC/PAC of $0.02, making their deductions $2.14 | | | | | | |
| I.U. Reporting Forms: | IU Pension, I.M.I., IU Dues Checkoff, & BAC/PAC are all to be remitted on IU Remittance | | | | | | |
| | All other benefits are to be remitted to the LOCAL FUND OFFICE where the job is preformed. | | | | | | |

53

IN WITNESS WHEREOF, we the authorized officers of the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey, the Building Contractors Association of Atlantic County and the Bricklayers & Allied Craftworkers, Local Unions No. 4, 5 & 2 have hereunto set our hands and seals this 31st day of October, 2002.

*Authorized Management Representatives*

Joseph Nobile, BCANJ

Neil Kocis, Jr., BCANJ

Michael Schmiebook, MC of NJ

Michael Pearson, BCAAC

*Authorized Union Representatives*

Gerald Della Balla, Local No. 4

Michael Perrone, Local No. 5

Thomas F. Rhoades, Local No. 2

52

*The undersigned employer agrees to be bound by all terms of the within agreement:*

_____
*Name of Firm*

_____
*Physical Street Address*

_____
*City*                              *State*                    *Zip Code*

_____
*Phone Number*                                      *Fax Number*

_____
*Employer's Federal Identification Number*

_____
*New Jersey Employment Compensation Number*

_____
*Workmen's Compensation Insurance Carrier*

_____
*Date*

## SIGNATURE OF PARTIES

_____
*Member of Firm Signature*          *Printed Name*              *Title*

_____
*Union Officer Signature*            *Printed Name*              *Title*

_____
*Field Representative Signature*      *Printed Name*

## PLEASE COMPLETE & REMIT TO:

*Bricklayers & Allied Craftworkers Local #5*
*3281 Route 206, Suite 3*
*Bordentown, New Jersey 08505*
*(609) 324-0500*
*Fax- (609) 324-1505*

54

0738

MAARV WATER PROOFING INC. P-02
16093241605
000665
NJ0424

## INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
### LOCAL #5 – NEW JERSEY
### INDEPENDENT

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed Independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement, or as they shall be set out from time to time in any such successor Agreements as may be negotiated. The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its representative on the Board of Trustees such Employer Trustees together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund Agreement and Declaration of Trust Instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its successor assigns, and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

MAARV WATERPROOFING INC.
Company Name

317 OAK STREET
Physical Street Address

PASSAIC, NEW JERSEY    07055
City                State        Zip Code

(973) 470-0686        (973) 470-8716
Telephone Number        Fax Number

Please complete and remit to:
BAC Local #5, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-0500
(609) 324-1805 - Fax

22-2527189
Federal Identification Number

608103-00-5
New Jersey Employment Compensation Number

ST. PAUL INSURANCE COMPANY
Workmen's Compensation Insurance Carrier

Initial if you have received a full copy of this Collective Bargaining Agreement _____

| Officers Signature | ATTILA SZAMOSSZEGI | FEBRUARY 4, 2004 |
|---|---|---|
| | Printed Name | Date |
| Business Managers Signature | Michael R. Perrone | 2/4/2004 |
| | Printed Name | Date |
| Field Representatives Signature | Dominic Longo | 2/4/04 |
| | Printed Name | Date |

0739

Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN FLYNN, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No. 1:07-CV-00501 (RJL) |
| | ) |
| MAARV WATERPROOFING, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF DAVID F. STUPAR IN SUPPORT
## OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, DAVID F. STUPAR, hereby declare as follows:

1.    I am the Executive Director of the Bricklayers & Trowel Trades International Pension Fund ("IPF") and have served in that capacity since May 1993. As Executive Director, I supervise the collection of employer delinquencies. I am also an authorized representative to effect collections on behalf of the International Masonry Institute ("IMI") pursuant to a written assignment of claims and as specified in the General Collection Procedures of the Central Collection Unit ("CCU") of the Bricklayers and Allied Craftworkers ("Collection Procedures" or "Procedures"), Exhibit 1 hereto. The IPF and IMI (Collectively "Funds") are multiemployer employee benefit plans governed by ERISA. I have personal knowledge of the facts stated herein based on my position and duties as Executive Director and my review of the documents in the Fund's possession and, if called to testify as a witness, I could and would competently testify as set forth below.

2.    The Funds provide pension and other benefits to employees who work in the construction industry under contracts negotiated between Bricklayer local unions and employers.

Pursuant to these contracts, the employers are obligated to make contributions to the Funds in order to fund the benefits provided to the beneficiaries. The Trustees of the Funds have a fiduciary duty under ERISA to collect delinquent employer contributions, and the Trustees can be held personally liable for their failure to do so. 29 U.S.C. §§ 1104, 1109, 1132(g)(2). The Fund are administered in the District of Columbia.

3. The Trustees adopted the CCU Collection Procedures, which govern the collection of employer contributions and reports.

4. Under these Procedures, contributions and reports are due on or before the 15th day of the month ("Due Date") following the month in which work is performed. Once contributions are delinquent, the Procedures authorize the assessment of interest at 15 percent per annum and an additional amount, the greater of 15 percent per annum or 20 percent of the delinquent contributions, in the form of an additional computation of interest or liquidated damages.

5. The Collection Procedures, the collective bargaining agreement that Maarv signed with the Bricklayers and Allied Craftworkers Local Union Nos. 4 and 5 of New Jersey and/or Local No. 2 of Delaware-New Jersey, and ERISA authorize the Funds to audit participating employers upon notice to such employers so as to ascertain whether the employer has accurately reported its employees and made contributions and other payments. Exhibit 1, and Exhibit 3, at article XI, hereto. This right to audit includes the right to review all books and records of the company, including those that the company contends may not be covered by the collective bargaining agreement. *See* Exhibit 1 attached hereto.

6. Under ERISA and the Collection Procedures, the Funds are entitled to recover from delinquent employers all overdue contributions, as well as interest accrued from the

2366899.01

delinquent payments, additional interest or liquidated damages, audit fees, court costs, process server's costs, and all attorney's fees and costs. *See* Exhibit 1 attached hereto.

7.    I am personally familiar with the account of Maarv Waterproofing, Inc. ("Maarv").

8.    My review of the IPF's records reveals that Maarv is a party to an Agreement between the Building Contractors Association of New Jersey, Masonry Contractors of New Jersey, Building Contractors Association of Atlantic County, Other Signatory Employers and Local Union Nos. 4, 5 & 2 of the International Union of Bricklayers and Allied Craftworkers, November 1, 2002 through October 31, 2007 (the "2002 CBA"). *See* Exhibit 3 attached hereto.

9.    The 2002 CBA to which Maarv is bound includes an "Evergreen Clause" providing for the continuance of the agreement, on a yearly basis, after the initial time period, absent timely notice of termination from one of the parties. *See* Exhibit 3 attached hereto, at Article II.

10.    Maarv did not terminate any of its collective bargaining agreements with the Bricklayers Local Unions in New Jersey during the time period relevant to the Funds' current delinquency case against Maarv.

11.    As an "employer" within the meaning of ERISA, and pursuant to the 2002 CBA and the Collection Procedures, Maarv is required to file reports and make fringe benefit contributions to the Funds for each hour of covered work performed by its employees or subcontractors within the jurisdiction of the 2002 CBA. *See* Exhibit 3 attached hereto, at Articles XI, XIV; Exhibit 1 attached hereto.

2366899.01

12. The 2002 CBA contains provisions requiring the payment of fringe benefit contributions to various Bricklayer-affiliated funds, including the IPF and IMI, for covered work performed by Maarv's employees. *See* Exhibit 3 attached hereto, at Articles XI, XIV.

13. "Covered work" under the 2002 CBA encompasses various masonry, cement, brick, stone, marble, waterproofing, caulking, plastering, and cleaning work specifically described in the agreement and related union documents. *See* Exhibit 3 attached hereto, at Article III.

14. The contributions required by the 2002 CBA are necessary to fund the benefits provided by the Funds to Maarv's employees.

15. The 2002 CBA also contains a provision prohibiting the employer from subcontracting any work covered by the 2002 CBA to any company except when such company agrees to be bound by the 2002 CBA and comply with all terms and conditions of the 2002 CBA. *See* Exhibit 3 attached hereto, at Article XVII.

16. The 2002 CBA encompasses and applies to all covered work performed in the State of New Jersey, though there is also a traveling contractors clause imposing obligations on signatory employers for certain work performed outside of New Jersey. *See* Exhibit 3 attached hereto, at Articles III, IX.

17. Pursuant to the 2002 CBA, Maarv has operated within the jurisdiction of Bricklayers Local Union Nos. 4, 5, and 2, performed covered work within the jurisdiction of these local unions, including work on union projects, and employed members of these local unions.

4

18.  Maarv has made some contributions and filed some fringe benefit contribution reports with the IPF, going as far as back as 1987 as documented by an Employer Report for March 1987 prepared by Maarv showing hours worked by Maarv employees and submitted to the Funds along with related fringe benefit contributions, see Exhibit 4 hereto; and by printouts generated from the Funds' database showing a summary of hours worked by Maarv employees as reported by Maarv during various years. *See* Exhibits 5 - 25 attached hereto.

19.  Maarv has made some contributions to the Funds for covered work it has performed under the 2002 CBA as shown by Fund printouts generated from the Funds' database, providing a summary of hours worked by Maarv employees as reported by Maarv. *See* Exhibits 18-25 attached hereto.

20.  In violation of the reporting and contribution obligations imposed by the 2002 CBA and to which Maarv is bound, Maarv has failed to fully report its employees performing covered work and has failed to make full and correct contributions on behalf of its employees performing covered work.

21.  Maarv filed reports and made fringe benefit contributions on behalf of certain union members working on the Princeton Parking Garage Project, as shown by printouts generated from the Funds' database showing a summary of hours worked by Maarv employees as reported by Maarv. *See* Exhibits 18-25 attached hereto.

22.  In September 2005, Calibre CPA Group PLLC ("Calibre"), 1850 K Street, NW, Suite 1050, Washington, DC 20006, was retained by Dickstein Shapiro LLP, counsel to the Funds, to conduct a payroll audit of Maarv for the Funds, as authorized by ERISA, the Collection Procedures, and the 2002 CBA, to determine whether any delinquencies were owed.

23. The auditor was instructed by counsel to calculate any amounts owed by Maarv to the IPF and/or the IMI, pursuant to the 2002 CBA to which Maarv is bound.

24. In addition to the delinquent amounts calculated by the auditor, and the fees charged by the auditor, the Funds have also incurred, as a result of Maarv's failure to comply with its contribution obligations, the $350.00 cost of filing this action, and attorney's fees in an amount to be determined.

25. In the event that this Court enters partial summary judgment in favor of the Funds on the 2002 CBA, counsel for the Funds will submit a statement of the attorney's fees and costs incurred by the Funds in this matter.

26. On March 15, 2007, the Funds filed a Complaint in the United States District Court for the District of Columbia against Maarv for collection of any and all delinquent ERISA contributions and related amounts owed by Maarv (known and unknown), for an order directing Maarv to comply with its obligations to submit all required reports and make all contributions due and owing to the Funds, and such other relief as the Court deems appropriate. The Funds incurred a $350.00 filing fee in bringing this action.

27. In their Complaint, the Funds sought $463,312.10 in delinquent contributions and related damages owed by Maarv, based on the audit, under a 1999 – 2002 collective bargaining agreement and the 2002 CBA. Of this amount, $129,308.05 represents damages due under the 2002 CBA.

28. On October 18, 2007, the Funds filed an Amended Complaint to update the names of the Plaintiff Trustees and correct two exhibits.

2366899.01

29. The Trustees of the Funds have brought this action against Maarv in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1).

30. The Funds have been, and are, incurring attorney's fees as a direct result of Maarv's failure to make contributions in accordance with the terms and conditions of the 2002 CBA.

31. By their lawsuit, the Trustees of the Funds seek to make the Funds whole by recouping all losses from Maarv.

I declare under penalty of perjury that the foregoing is true and correct.

Date: December 14, 2007

David F. Stupar
Executive Director

7

Exhibit 1

5/13/02

# GENERAL COLLECTION PROCEDURES OF
## THE CENTRAL COLLECTION UNIT OF
### THE BRICKLAYERS AND ALLIED CRAFTWORKERS

These General Collection Procedures govern the collection of delinquencies by the Central Collection Unit of the Bricklayers and Allied Craftworkers ("CCU") on behalf of the following participating entities:  Bricklayers and Allied Craftworkers International Union ("BAC"); Bricklayers and Trowel Trades International Pension Fund ("IPF"); Bricklayers and Allied Craftworkers International Health Fund ("IHF"); International Masonry Institute ("IMI"); Bricklayers and Allied Craftworkers Political Action Committee ("BACPAC"); and Local Officers and Employees Pension Fund ("LOEPF") (collectively "CCU Entities").  IHF and BAC SAVE are covered by Special Collection Procedures. Such Special Collection Procedures shall control when in conflict with these General Procedures.

I.      REPORTS AND PAYMENTS TO CCU ENTITIES

      A.      Due Date

            1.      Contributions and reports to the CCU Entities are due on or before the 15th day of the month following the month for which the contributions are being paid ("Due Date"), unless the collective bargaining agreement imposes a different Due Date.

            2.      Reports of participating employers must be filed each month even if no contributions are due for that month.  All participating employers, whether submitting contributions directly or through a local administrator or local union, must use the standard CCU report form.

            3.      Employer reports will be date-stamped on the day received in the CCU Office, or in the case of local administrators or local unions, on the day received by the local.  The stamped date will be the controlling date with regard to these Collection Procedures.

            4.      If any controlling date under these Collection Procedures falls on a weekend or legal holiday, the applicable date will be the next working day.

5. The IPF is authorized by other CCU Entities to act on their behalf in litigation. All references to "CCU Office" in these Collection Procedures may also refer to "IPF Office," as applicable.

B. Notice Of Delinquency

1. If the CCU Office has not received payment by the last day of the month of the Due Date, the CCU Office will send a Reminder Notice to the employer. If payment has not been received 30 days after the Reminder Notice, a Notice of Delinquency will be sent to the employer.

2. The Notice of Delinquency will advise the employer that required contributions were not received by the Due Date and warn that if the contributions are not received within 15 days (60 days following the Due Date), the employer will be considered delinquent ("Delinquent Date") and will be assessed interest at 15% per annum (retroactive to the Due Date) and may be required to pay Liquidated Damages of 20% of the delinquent amount. The Notice of Delinquency will require the employer to notify the CCU Office within five (5) days of the date of notice if the employer believes that the Notice of Delinquency was sent in error.

C. Notice Of Referral To Counsel

1. If the CCU Office has not received payment within 15 days of the Notice of Delinquency, the CCU Office will send to the employer a Notice of Referral to Counsel.

2. The Notice of Referral to Counsel will advise the employer that payments were not received by the Delinquent Date and that payments for contributions and interest are due and owing. Unless all sums owed are received by the CCU Office within 10 days following the Notice of Referral to Counsel, liquidated damages up to 20% of the delinquent contributions or statutory interest may be imposed and the matter automatically will be referred to counsel. The Notice of Referral to Counsel also will state that counsel will be instructed to seek all sums recoverable, including contributions, interest, liquidated damages or statutory interest, and all attorneys' fees.

1449336 v1; V2BC01!.DOC

DSMDB-1449336v01

II.    COUNSEL

A.    Procedures

1.    If CCU has not received the contributions and applicable interest within 10 days of the Notice of Referral to Counsel, the matter automatically will be referred to counsel no later than 15 days from the due date.

2.    Within 10 days of referral, counsel will send a letter to the employer advising that if payment of contributions, interest and other damages is not received within 10 days, suit will be instituted.

3.    Suit thereafter will be instituted.

B.    CCU Policy Following Referral To Counsel

1.    Following the referral of a matter to counsel, the CCU Office will have no authority to deal with an employer except to discuss computations.

2.    Counsel shall file suit for all moneys recoverable, including damages that may be recoverable under Section 502(g)(2) of ERISA and also may seek remedies under applicable state law against individual corporate officers and/or shareholders.

3.    The CCU is authorized to seek legal redress prior to the time that the above procedures are exhausted if, in his sole discretion, the Director concludes that the interests of affected participants require immediate action. If an employer fails to make payment when due, suit may be filed to collect all delinquent contributions, interest and other damages regardless of other exhaustion requirements in these Collection Procedures.

III.    AUDITS

Audits will be conducted to insure full compliance with employer obligations under collective bargaining agreements. Every employer can expect to be audited at some time. If a delinquency is discovered as the result of an audit, the employer will be assessed the cost of the audit.

3

A.     Detection Of Delinquent Employers Subject To Audit

     1.    At least once every year, the Executive Directors of the IPF and IHF will send information to participants reflecting contributions received from participating employers. The participants will be encouraged to report missing hours to the CCU.

     2.    The CCU will take steps to insure that delinquencies of participating employers are recovered.

B.     Audits Performed By Third Parties

     1.    The CCU will rely upon audits performed by third parties when CCU determines that they conform to auditing procedures contained in the CCU's Guidelines.

     2.    The CCU periodically will monitor the audits of third parties in order to confirm their reliability.

C.     Audits Performed On Employers Contributing Directly To The CCU

     1.    The CCU will coordinate with third parties who perform audits on employers contributing directly to CCU and will insure that such audits conform to CCU guidelines.

     2.    As to employers contributing directly to the CCU who are not subject to audits by third parties, CCU will perform two types of payroll audits on directly contributing employers in order to insure compliance.

        a.    <u>Random Audits</u> -- Audits may be conducted on any participating employer at any time, on a random basis, at the direction of the Director.

        b.    <u>Problem Audits</u> -- When the Director receives information from a local union, covered member or other source indicating that an employer may be delinquent, the Director may order that an audit be conducted.

D.     Notification Of Audit Delinquency

     1.    The CCU Office will send a Notice of Delinquency to audited employers found to be delinquent stating the amount of additional contributions owing as a result of the audit.

     2.    Any unsatisfied audit deficiency will be treated according to the CCU's Collection Procedures following the intervention of counsel.

<div align="center">4</div>

E.    Form of Audits

     1.    All audits will be carried out under procedures formulated by the Director.

     2.    All employer books and records set forth in the audit procedures will be made available to the CCU auditor.

IV.    BONDS

The Director may, in his sole discretion, require an employer to post a cash or surety bond in an amount and under terms necessary to protect the interests of the applicable CCU Entity.

5

DSMDB-1449336v01

Exhibit 2

FEB-04-04 10:30A BAC Local 5 NJ                          260° 241605          P.02

*MAARV WATER PROOFING INC.*

000665

NJ0424

# INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
## LOCAL #5 – NEW JERSEY
### INDEPENDENT

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 3 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed Independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement, or as they shall be set out from time to time in any such successor Agreements as may be negotiated. The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its representative on the Board of Trustees such Employer Trustees together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund. Agreement and Declaration of Trust Instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its' successor assigns, and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

MAARV WATERPROOFING INC.
Company Name

317 OAK STREET
Physical Street Address

PASSAIC, NEW JERSEY   07055
City                         State          Zip Code

(973) 470-0686         (973) 470-8716
Telephone Number         Fax Number

22-2527189
Federal Identification Number

608103-00-5
New Jersey Employment Compensation Number

ST. PAUL INSURANCE COMPANY
Workman's Compensation Insurance Carrier

Please complete and remit to:
BAC Local 55, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-0565
(609) 324-1865 - Fax

Initial if you have received a full copy of this Collective Bargaining Agreement _____

| Officers Signature | Printed Name | Date |
|---|---|---|
| _[signature]_  | ATTILA SZAMOSSZEGI | FEBRUARY 4, 2004 |
| _[signature]_  | Michael R. Perrone | 2/4/2004 |
| Business Managers Signature | Printed Name | Date |
| _[signature]_  | Dominic Longo | 2/4/04 |
| Field Representatives Signature | Printed Name | Date |

0455

Exhibit 3

# Local NO. 5 - Central & South Jersey

# AGREEMENT BETWEEN

## BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY,

## MASONRY CONTRACTORS OF NEW JERSEY,

## BUILDING CONTRACTORS ASSOCIATION OF ATLANTIC COUNTY,

## OTHER SIGNATORY EMPLOYERS

-and-

## LOCAL UNION NOS. 4, 5 & 2 OF THE INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS

*November 1, 2002 through October 31, 2007*



0709

# Table of Contents

|  | ARTICLE NO. | PAGE NO. |
|---|---|---|
| Apprentices | VII | 21 |
| Bonding | XII | 34 |
| Duration/Termination/Amendment | II | 1 |
| Foremen | VIII | 23 |
| General Understanding | XXII | 50 |
| Grievance Procedure | XVI | 44 |
| Hiring Preference | V | 20 |
| Hours Work, Overtime, Shifts, Holidays | XIII | 34 |
| Jointly Trusteed Funds | XI | 25 |
| More Favorable Conditions | XXI | 50 |
| No-Strike/No-Lockout | XIX | 49 |
| Parties | I | 1 |
| Payment of Wages & Fringe Benefits | XIV | 37 |
| Preservation of Work | XVIII | 48 |
| Scope of Work | III | 2 |
| Separability and Savings Provision | XX | 49 |
| Stewards | VI | 21 |
| Subcontracting | XVII | 47 |
| Traveling Contractors | IX | 24 |
| Union Recognition, Union Security, Access | IV | 19 |
| Wages, BACPAC & Local Dues Checkoff | X | 24 |
| Working Conditions | XV | 38 |



0710

# AGREEMENT BETWEEN
## BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY,
## MASONRY CONTRACTORS OF NEW JERSEY,
## BUILDING CONTRACTORS ASSOCIATION OF ATLANTIC COUNTY,
## OTHER SIGNATORY EMPLOYERS
-and-
## LOCAL UNION NOS. 4, 5 & 2
## OF THE INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS

## ARTICLE I
## PARTIES

This Agreement is entered into this *first day of November 2002*, by and between the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey, the Building Contractors Association of Atlantic County (hereinafter referred to as the Association), for and on behalf of their members as set forth in Schedule "A" attached hereto and other contractors who are signatory hereto or who may become signatory hereto (hereinafter referred to as the Employer), and the INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL UNION NOS. 4, 5 & 2 (hereinafter referred to as the Union).

The Association agrees to furnish to the Union a list of all members of the Association denoting those members bound to the terms of this Agreement, the honorary members, independent members, and any other classes or groups of members.

## ARTICLE II
## DURATION - TERMINATION – AMENDMENT

This Agreement shall be effective commencing *November 1st, 2002* and shall continue in full force and effect up to and including *October 31, 2007*, and shall be automatically continued for each successive period of this Collective Bargaining Agreement unless

1

0711

written notice of decision to negotiate a new Agreement in whole or in part, is given in writing by either party to the other not later than sixty (60) days nor more than ninety (90) days prior to the expiration date or any anniversary date thereafter. If the parties fail to reach an agreement in such negotiations, the issues in dispute shall be submitted to the International Masonry Institute's Dispute Settlement Plan for such steps as are deemed appropriate in accordance with the procedures of the Plan. The parties may at any time mutually agree to change or amend any part of this Agreement and such changes or modifications shall not affect the continuing nature of this Agreement.

# ARTICLE III
## SCOPE OF WORK

A. This Agreement shall cover new construction, maintenance, repair and renovation in the State of New Jersey.

B. The Employers bound hereby recognize the Union's claim to all work falling within the jurisdiction of the Union, as defined in Branches of the Trade, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers which is incorporated herein by reference.

C. The installation of Brick and all other masonry units such as blocks, etc., with or without mortar, anywhere on the project shall be the work of Bricklayers & Allied Craftworkers of International Union, Local Nos. 4 & 5.

D. Temporary heat, applicable to all branches of the trade, to protect any Masonry work performed and shall include all masonry materials all year, especially in the winter months (November 15th through March 15th).

E. The trade and territorial jurisdiction for Local No. 4 shall cover new construction, maintenance, repair and renovation for the following trades and counties:

Bricklayers, Cement Masons, Plasterers, Pointer Caulkers, Cleaners, Fire Proofers, Stone Masons, Brick Pavers and Exterior Marble Masons shall be the trade jurisdiction for Bergen, Essex, Hudson, Morris, Passaic, Sussex, Union, Warren, part of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional map maintained by the International Union.

F. The trade and territorial jurisdiction for Local No. 5 shall cover new construction, maintenance, repair and renovation for the following trades and counties:

Bricklayers, Pointer Caulkers, Cleaners, Stone Masons, Brick Pavers and Exterior Marble Masons shall be the trade jurisdiction for, Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer, Monmouth, Ocean, Salem, and parts of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional map maintained by the International Union.

G. The trade and territorial jurisdiction for Local No. 2 shall cover new construction, maintenance, repair and renovation in the following trades and counties:

Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer, Monmouth, Ocean, Salem, and parts of Hunterdon, Middlesex and Somerset for all work falling within the jurisdiction of the Union, as defined in Branches of the Trades for Cement Masons, Plasterers & Fire Proofers, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers.

## Brick Masonry

A. Bricklaying masonry shall consist of, but not be limited to, the following work procedures and installation of the

following materials: The laying of bricks made from any material in, under or upon any structure or form of work where bricks are used, whether in the ground, or over the surface, or beneath water, in commercial buildings, rolling mills, iron works, blasts or smelter furnaces, lime or brick kilns, in mines or fortifications and in all underground work, such as sewers, telegraphy, electric and telephone conduits; including the installation of substitutes for brick such as all carbon materials, Karbate, Impervite or mixtures, all acid resistant materials, all terra cotta and porcelain materials, except where the foregoing materials are manufactured to substitute for tile as provided for under the category of Section 8, C of the Codes of the International Union of Bricklayers and Allied Craftworkers. All cutting of joints, pointing, cleaning and cutting brick walls, fireproofing, block, arching terra cotta cutting and setting, the laying and cutting of all tile, plaster, mineral wool, cork, blocks and glass masonry or any substitutes for the above material, the laying of all pipe sewers or water mains and the filling of all joints on the same when such sewers or conduits are of any vitreous material, burnt clay or cement, or any substitute material used for the above purpose, the installation of all brackets and fasteners is the work of the mason exclusively, the cutting and rubbing and grinding of all kinds of bricks and the setting of all cut-stone trimmings on brick buildings, is bricklayer's work. The preparation and erection of plastic castables or any refractory materials is bricklayer's work.

B.  Cleaning, grouting, pointing and other work necessary to achieve and complete the work under the foregoing categories, all waterproofing and black mastic waterproofing, silicone and/or substitutes sandwiched between masonry units in the interior of the wall.

C.  All terra cotta called unit tile in sizes over 6" x 12" regardless of method of installation; all quarry tile over 9"x 9" x 1 1/4" in size, split brick or quarry tile or similar

material if bedded and jointed with one operation. The bedding, jointing and pointing of the above materials shall be the work of the craft installing same.

D.  All burnt clay extruded cellular products regardless of trade name or method of installation when used as a veneer on structures; all clay products known as terra cotta tile, unit tile, ceramic veneer and machine-made terra cotta and like materials in sizes larger than 6" x 12", regardless of the method of installation. Where the preponderance of material to be installed is of the above size and when material of lesser sizes is to be used in connection therewith, the bricklayers shall install all such materials. Brick paving comes under bricklayers' trade classifications. The parties acknowledge the Union's claim to screeding of sub base regardless of type of material used.

E.  Grouting of all Masonry Units, all Leveling Plates for steel columns, all machinery and Precast Panels shall apply to all branches of the trade.

F.  The Bricklayer shall perform the complete installation and related finish work of all AACMU. These operations include, but are not limited to; the cutting, fitting and applications of mortar and/or other cementitious materials used for the setting and bonding purposes as well as the actual laying of the AACMU block units into position. The routing, drilling, cutting and patching for all mechanical piping and openings. The preparation, assembly, unloading, selecting or staging of AACMU panels, hooking on, signaling, drilling, cutting, installation of support angles or strut supports, fitting, bedding, landing, setting, leveling, plumbing, aligning, fastening, anchoring (whether by bolt, clip, pin, or weld), insulation, caulking, grouting, patching, cleaning, waterproofing and installation of all AACMU units. This also includes all work operations related to the installation and applications of all coating, covering and veneer systems (both exterior and interior) on all AACMU

## Artificial Masonry

A.  Artificial Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The cutting, setting and pointing of cement blocks and all artificial stone or marble, either interior or exterior, when set by the usual custom of the stone mason and marble setter. All cement that is used for backing up external walls, the building of party walls, columns, girders, beams, floors, stairs and arches and all material substituted for the clay or natural stone products, shall be handled by employees in the bargaining unit for which the highest rate of wages shall be demanded.

B.  All artificial masonry, the cutting, setting and pointing of all concrete prefabricated slabs, regardless of dimension size, shall be the work of members of this organization, for which the regular wage scale in the jurisdiction where the work is performed shall be paid.

C.  Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over ten inches in height, the dressing of all jambs, corners and ringstones, joints, or reveals and the cutting of a draft upon same for plumbing purposes only, and the cleaning, cutting of joints and pointing of stonework.

D.  This is to apply to all work on buildings, sewers, bridges, railroads or other public works, and to all kinds of stone, particularly to the products of the locality where the work is being done and the same shall be considered stone masonry.

E.  Bricklayers and stone masons shall have the right to use all tools which they consider necessary in the performance of their work.

F.  All cement that is used for parging up external walls and

7

units. These work operations include, but are not limited to: preparations of walls, the mixing and applications of any and all finish coating materials by any method (i.e. trowel on, machine, spray on, etc.) or any other device deemed necessary to produce the desired finish surface.

## Stone Masonry

A.  Stone Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying of all rip rap, rubble work with or without mortar, setting all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured from such foreign or domestic products as are specified and used in the interior or on the exterior of buildings by architects, and customarily called "stone" in the trade.) Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over 10 inches in height; the dressing of all jambs, corners and ringstones that are roughly dressed upon the beds, joints or reveals and the cutting of a draft upon same for plumbing purposes only; and the cleaning, cutting of joints and pointing of stone work.

B.  This is to apply to all work in buildings, sewers, bridges, railroads, bulkheads, breakwaters, jetties, playgrounds, parks, landscaping and curbing or other public works and to all kinds of stone, particularly to the product of the locality where the work is being done. Stonemasons shall have the right to use all tools which they consider necessary in the performance of their work.

C.  Cleaning, grouting, pointing and other necessary work to achieve and complete the work under the foregoing categories.

6

elevators, smokestacks, curbs, gutters, sidewalks, street paving, alleys and roofs; laying out, setting joists, strips or screed rods for work hereinafter specified; laying and finishing of cement, wearing surfaces of basements, floor yards, driveways, areas and other surfaces where cement finish is to be laid, and where strips have to be set, or material ruled down, or surfaces finished; screening of concrete or fine stuff, asphalt or other preparations that are to be troweled, floated, darbied or bull floated; troweling, floating or finishing of concrete or fire retarding material or waterproofing compound or mixtures; construction of glass vaults or sidewalks, lights, where same is set in cement; excepting the carpenter work, but including pointing, facing and finishing of the surfaces after forms are removed; leveling of all fine materials for facing same; running of all cement base; cutting; patching and finishing of concrete fireproofing on walls, beams, girders and columns; cutting facing and finishing with cement of all concrete surfaces such as arches, beams, girders, walls, pile caps, piers and columns, whether done with trowel, float, gun and nozzle, bushhammer, rubbing or other process; applying cement mortar for damp-proofing, waterproofing for sanitary purposes where not over four (4) feet high whenever cementing with the floor is done in one operation; cutting of all concrete when cement finish is applied; setting of carpet pins and sockets in cement and composition brass or other metallic or wood strips when inserted in floor during the laying of same; rodding and spreading of all concrete and spreading and finishing of all top material; setting of all strips and stakes and grade; pointing, caulking and patching around all steel or metal window frames that touch concrete; handling of the vibrator machine. Washing and treating of all cement surfaces, handling of all machines, trowel machines, riding trowel machines, apparatus or equipment of any kind in connection with or to perform any of the above functions shall be the work of the cement finisher. Any signatory contractor who subcontracts sidewalks and curbs shall, in

9

block units, installing reinforcing rods and door blocks, and all grouting.

G. The building of party walls, columns, girders, beams, floors, stairs and arches. Gypsteel products and cement of precast slabs on roofs or wherever used in building construction of alterations, and all material substituted for the clay or natural stone products. All wall ties and brackets used to anchor brick, block, stone or any type of masonry whether screwed or nailed is the work of the mason, as per the 1962 agreement between the B. & A.C. and Ironworkers herein incorporated by reference.

H. The laying out and supervising of work for or by the use of any or all of the above materials shall be done by the employees covered hereunder.

## Cement Masons Agreement

A. Cement masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying out, screeding and finishing of all cement, concrete, brown stone composition, mastic and gypsum materials, also for fireproofing, waterproofing, cement and composition base and vault lights.

B. The cutting of all cement and concrete for patching and finishing; the bush hammering of all concrete when cast in place; the operation of cement gun, the nozzle and the finishing of all material applied by the guns, and the operation of the cement floor finishing machines. The cement mason shall have the right to use all tools necessary to complete his work.

8

C. The operation of the Lazar Screed Machine shall be performed solely by the Cement Masons.

D. Concrete constructions, such as buildings, bridges,

N.    Cement masons are to complete, joint and strike up their work, whether this work is done with cement or caulking compound on any other masonry material.

O.    The cement masons shall supervise the placing or pouring of all concrete. In the event there is a journeyman already working at the job site who is recognized by the Local Union as a competent cement mason, he may be assigned to such work, otherwise a cement mason shall be hired.

P.    When concrete floors are to be hand troweled, the Employer shall provide knee boards such as the type used by cement finishers to handle trowel concrete floors, such knee boards shall measure approximately 12" wide and 30" long or fraction thereof, and shall have handles.

Q.    The following work shall be allotted to the cement masons only: The setting of all screeds and forms to determine the proper grade of concrete when held in place by stakes and/or spreaders shall be done by cement finishers. A screed is a strip of wood, metal, etc., used as a guide for leveling or grading a concrete floor, slab or sidewalk.

R.    Any bulkhead that is one single board in height, and that has no key attached or which is not notched or fitted shall be set and braced or staked by cement finishers, providing same is used as a screed. The term bulkhead shall mean a form or screed erected for the purpose of separating pours of concrete.

S.    The grinding, patching and curing of all floors, the snapping of wall ties, and patching of same and setting of expansion joints.

T.    Steps, Landings, Platforms, etc. The setting of forms for steps, landings, platforms, coping, caps and curbs, except where underforms or centers are required, and the placing of all fine materials for facing same, shall be done by

11

good faith, inform the subcontractor that said work is within the jurisdiction of the Bricklayers & Allied Craftworkers, Local Union Nos. 4 & 2.

E.    The pouring of all concrete shall require a mason.

F.    When concrete bucket is used in conjunction with a crane, all safety precautions shall be exercised.

G.    The aligning of all bolts and the setting of all plates shall be performed by the employees covered hereunder.

H.    When flat concrete arches are poured with a crane, a hopper must be used in conjunction with a concrete bucket.

I.    On all high rise buildings an exterior scaffold for the cement masons shall be erected complete with guard rails.

J.    There shall be no cutting of cement masons crews before pull up is completed.

K.    Overtime shall only be with the prior permission of the union and shall be equitably shared by the employees working on the job.

L.    No cement worker working alone shall use a straight edge of more than six feet in length. Where a straight edge is longer than six feet, two men shall be used on a straight edge which is between six and eleven feet in length, one additional man shall be used for every additional four feet or fraction thereof of straight edge. On power straight edges or roller-type straight edges, two men shall be utilized up to fourteen feet and one additional man shall be used for each five feet or fraction thereof.

M.    The casting and pouring of pre-cast slabs when done on the job site shall be the work of a cement mason.

10

0716

cement masons.

U.  Curing and dustproofing of all floors are to be done by cement masons. All epoxy, acid and latex work will be an additional $.50 per hour above scale.

V.  The cement mason shall have the right to use all tools necessary to complete his work. There shall be no restriction as to the use of machinery or tools.

W.  When troweling floors with machine, changing of blades, cleaning and maintaining machine to be done by mason.

X.  No concrete trucks, pumping machine or any other machines are to do any mixing inside any structure without proper ventilation.

Y.  Special Tools: The employer agrees to furnish the following tools for use by his employees: Respirators, goggles, boots, bull floats, brooms, brushes, power chisels, trowel machines, bushhammers, straight edges, rubber floats, rubbing stones, cover tools, special base tools and special edgers. Gloves furnished when using epoxies, acid, latex floor patching or any irritant.

Z.  All wages, waiting time and general working conditions that apply to bricklayers shall also apply to the cement mason.

## Plastering

A.  Level 5 Gypsum Board Finishing is the work of Plasterers.

Level 5 finishing as specified by the Association of the Wall and Ceiling Industries International (AWCI), Ceiling and Interior Systems Construction Association (CISCSA), Gypsum Association (GA), and Painting and Decorating Contractors of America (PDCA), in their "Levels of

12

Gypsum Board Finish Recommended Specification."

Levels Description: All joints and interior angles shall have tape embedded in joint compound and three separate coats of joint compound applied over all joints, angles, fastener heads, and accessories. A thin skim board of joint compound, or a material manufactured especially for this purpose shall be applied to the entire surface. The surface shall be smooth and free of tool marks and ridges. Note: It is recommended that the prepared surface be coated with a primer/sealer prior to the application of finish paint. (See painting specification in this regard.)

The level of finish is recommended where gloss, semi-gloss, enamel or non-textured flat paints are specified or where severe lighting conditions occur.

This highest quality finish is the most effective method to provide a uniform surface and minimize the possibility of joint photographing and of fasteners showing through the final decoration. The work jurisdiction of the plasterer under level 5: Gypsum board finishing shall be that which has heretofore been performed under this Agreement and is further set forth in constitution of the International Union of Bricklayers and Allied Craftworkers of the United States and Canada. The parties agree to be bound by decisions rendered by the "Green Book" Decision of Record rendered by the Hearings Panel (March 1, 1978) under the plan for the settlement of jurisdictional disputes in the construction industry.

B.  All cement plastering, stone texture, stucco work, and pebble dask work, either exterior or interior, shall be done by plastering employees under this contract.

C.  All plastering, including plastering alterations and repairs, and all cement, cashstone, acoustic or any plastic substitute or artificial or imitative composition for plain surfaces or

13

for moldings, cornices, pilasters panels, capitals, columns, bases, keystones, brackets or centers when applied on any exterior or surface in the usual method of either plastering or stuck work shall be the work of plastering employees.

D. All ornaments including centers, brackets, trusses and keystone shall be placed in position and pointed by plastering employees who are on the job. Cast ornamentation shall be made in a Union shop. No employee shall work on any operation where the stickling of ornamentation has been sublet.

E. All moldings, covers, arrises, chamfers and bullnoses shall run in place wherever possible with a regular mold on proper running strips. When moldings or cornices are to be ornamented proper beds shall be run to secure same.

F. All capitals and bases shall be run on the job if practical to do so.

G. All templates to be used by the plasterer shall be placed in position by the plasterer.

H. All plastering shall consist of not less than three coats as scratch, brown and finish. Before the brown coat is applied, the scratch shall be hard and set. The brown coat shall be made true with a straight edge rod in all upright and ceiling angles: the walls and ceilings shall be properly darbied and floated to an even surface and the angles cut out. The finish coat shall be properly gauged and troweled to the required surface and all angles featheredged true. All interior or exterior plastering shall be left straight and true with rod and darby; rod and darby to be furnished by the contractor. The taping and pointing of sheetrock, compo-board, plaster-board, etc., shall be the work of the plasterer.

I. When Sprayo-Flake or similarly applied acoustics are used the applied acoustic will take the place of the finish coat

14

and will be applied by plastering employees.

J. The operation of all mechanical plastering or troweling machines, pertaining to plaster and all of its substitutes, shall be the work of the plasterer.

K. All safety precautions, goggles, shields, and masks, shall be supplied by the contractor for the health and welfare of the plastering employees operating these machines.

L. Plastering on concrete, fireproofing, brickwork or plaster boards shall be two coat work- brown and finish.

M. The finish coat may be omitted on cellar ceilings provided the brown coat is floated to an even surface. All EIF systems and all related work.

N. Finishing of walls and ceilings shall not be done until the screeds, cornices or covers with which they intersect are in place.

O. Employees shall not install metal corner beads, nor shall they work on any operation where corner beads have been used to form arrises on beams or arches or corners except door or window heads or other continuous openings not over twelve (12) feet in height.

P. On a scaffold area of one hundred and fifty (150) square feet or over, the mortar board shall be raised 30" from the scaffold on a properly constructed stand. On a scaffold area of less than 150 square feet, the mortar board shall be raised at least 12" from the scaffold on a properly constructed stand. No mortar board shall be raised on blocking, and no mortar board or gauging board shall be more than 4'6" square.

Q. Where beams are sixteen (16) inches or over in depth, the scaffold shall be dropped to a suitable height where the

15

plasterers may execute their work in a proper manner.

R. Any material applied on walls by the plasterers shall not be higher than 6'6" from the floor. Where only the walls have to be plastered, a scaffold 4 planks wide and 6' from the ceiling shall be erected on which the mortar board shall be placed and raised 12" above the scaffold. Positively no hopping planks to be permitted.

S. There shall be a foreman plasterer on all plastering jobs. Plastering foremen shall meet the requirements for foremen as specified herein, and shall be paid as specified herein.

T. Plastering foremen shall see that no gauging is made up later than thirty (30) minutes before 12 o'clock and thirty (30) minutes before quitting time.

U. Plastering work, when sublet, shall be given to a subcontractor who employs employees covered under this contract.

V. Plastering contractors shall furnish all the materials required for their work including all screed rods, cornice, rods, darbies and feather edges. No subcontractor shall contract for labor only.

W. Synthetic Plastering Systems: The styrofoam and any other materials which is part of the system that are installed by screws, glue, masonry materials, and including Mechanical System.

## Firebrick

The matters set forth in this section are applicable solely to firebrick work.

A. On all firebrick jobs, when working with regular firebrick and clay, the bricklayers will be permitted an additional

16

fifteen (15) minutes to wash up or twenty-five (25) minutes when working with a carbon, acid proofing, high temperature clay or any other material out of the ordinary such as colored cements, asphalts, tars, plastics, etc. Solvent for washing up and cleaning of tools will be provided for by the employer.
A bricklayer working with carbon or acid proofing materials shall be given a minimum of five (5) minutes wash-up prior to lunch time.

B. All scaffolding inside of furnace shall be solid nailed scaffold. Contractors to furnish safety equipment and have same on job site.

Provisions for adequate scaffolding shall be made so that the lead man does not have to climb over the wall to work on the opposite side of the wall. Adequate scaffolding shall mean standard metal tubular scaffolding or wooden scaffolding consisting of a platform of not less than 2" x 10" planks in width and scaffolding shall remain in place until all paving has been completed.

C. Clay shall be mixed at the furthermost location of the enclosure where refractory brick is being laid. The location to be selected as to both its physical separation from the work area and to its feasibility for performing the mixing function. In coke oven work a separate enclosure is required. All care shall be exercised to reduce dust.

D. When bricklayers are employed laying firebrick, the contractor shall pay for the sharpening of their tools required for the work, and all tools shall be sharpened to the satisfaction of the bricklayer. The contractor shall furnish all chisels over twelve (12) inches in length and all saws when required.

E. On all jobs where conditions are such that a safety man is required by the owner, he shall be mutually agreed upon by

17

0719

the parties. For the safety of the bricklayers, said safety man must be a union bricklayer.

F. All hot work shall be paid at the rate of double time. Fringe benefits shall be based on hours paid.

One hundred degree (100) Fahrenheit or over shall constitute hot work. When bricklayers are employed on excessive hot work, the contractor shall provide proper counter fatigue aids which shall meet the standards prescribed by the State Medical Board, shall provide proper gloves and protective materials to safeguard bricklayers when they are handling hot work, shall supply wooden shoes or facsimile when working on heated surfaces and contractors shall be responsible for tools, shoes, and clothes of bricklayers which they burn in performance of their duties on said work. Bricklayers must spell each other on all hot work.

G. Contractor will also be responsible for clothes, tools and/or shoes that are destroyed or damaged on jobs due to exception conditions and materials.

When electrical grinding stones or carborundums are used, bricklayers shall leave that part of the job until the operation is completed. In an enclosed area, suction device to be used to remove dust while bricklayers grind. The employer and union shall arrange to spell bricklayers at ten minute intervals when they are actually performing grinding work.

H. On stoves and furnaces, or anywhere else where danger of gas exists, approved gas detecting devices will be required.

I. On all firebrick or acid proofing jobs, the employer shall furnish all bricklayers with gloves.

J. All general working conditions which apply to the

18

bricklayer shall also apply to all branches of the trade.

K. In addition, all other assignments mutually agreed upon between the Employer and the Union on any other building products or systems related to the scope and type of work covered by this Agreement which may be developed in the future that are determined by these parties to fall within the work jurisdiction of this Agreement.

L. In the event of territorial jurisdiction or work assignment dispute with any other BAC Local Union, the matter shall be referred to the International Union for binding resolution.

## ARTICLE IV
## UNION RECOGNITION, UNION SECURITY, ACCESS

A. The Employer hereby recognizes and acknowledges that the Union is the exclusive representative of all its employees in the classifications of work falling within the jurisdiction of the Union, as defined in Article III of this Agreement, and in the Constitution, Rules of Order and Codes of the International.Union of Bricklayers and Allied Craftworkers, for the purpose of collective bargaining as provided for in the Labor Management Relations Act of 1947, as amended.

B. No later than eight (8) days following the effective date of this Agreement, all present employees must, as a condition of continued employment, be or become members of the Union; all employees hired after the effective date of this Agreement shall be or become and remain members of the Union no later than eight (8) days following the first day of their employment in accordance with the provisions of Section 8 of the National Labor Relations Act, as amended. Failure of any employee to comply with the provisions of this subsection shall, upon request of the Union, result in termination of such employee, provided that the Union has

19

given the employee four (4) days notice that his obligation to make payment has not been met and that his delinquency renders him liable to termination under this section. The Employer shall not be obligated to dismiss an employee for non-membership in the Union: (a) if he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members; or (b) if he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

C.  International Union Representatives and the Business Manager and/or other officers of the Union shall have access to the Employer's jobsites at reasonable times in compliance with any special rules and regulations adopted by the owner to ensure that the provisions of this Agreement are observed, provided however, that such representatives shall not unduly interfere with the job progress.

D.  It is recognized and agreed by the parties to this Collective Bargaining Agreement that the Local Union is the authorized collective bargaining agent for all its members in connection with issues related to the wages, working conditions, and employee fringe benefit funds.

## ARTICLE V
## HIRING PREFERENCE

The employer agrees that when hiring any employee for any job in the territorial jurisdiction of the agreement he will employ a fair percentage in the territorial jurisdiction of Local No. 4, or Local No. 5 or Local No. 2 of New Jersey. The employer also agrees that when requesting manpower, they must call the Local Union Office by 4:30 p.m. of the previous day.

20

Any employee who is hired and reports on the job at starting time with his tools and is not started and any employee who reports to and starts work and is thereafter stopped for any reason other than inclement weather, shall be paid a full day's wages at his basic rate of pay.

## ARTICLE VI
## STEWARDS

A.  The Employer shall hire a steward for each branch of the trade appointed by the business manager of the Union on all jobs. The steward shall be a working employee and shall, when appropriate, be granted reasonable time to conduct union business. The steward shall not be laid off without reasonable cause, without first consulting the business manager.

B.  It is the steward's duty to look after the interests of both parties, to see that the number of men desired by the employer is promptly reported to the business agent, take up all grievances on the job, and try to have the same adjusted. In the event that he cannot, he must report that fact to the business agent. He shall conduct himself in a proper manner at all times when on the projects and shall not be discriminated against, discharged, or laid off for the performance of his duties as such. The steward's employment can only be terminated by the employer after a review of complaint against him between the employer and the business agent.

C.  The first Bricklayers & Allied Craftworkers member shall notify the union at the start of each job.

## ARTICLE VII
## APPRENTICES

A.  In order to train sufficient skilled mechanics for the

21

industry, the necessity for employment of apprentices and/or apprentice improvers is recognized and encouraged by the parties to this Agreement. Apprentices shall be given a minimum of 32 hours per week to perform the work of brick or block provided the work is available. The employer agrees to employ one apprentice for every five journeymen employed on a job site. It is agreed that the Employer shall abide by the National Apprenticeship Standards, developed for masonry craft training, incorporated herein by reference.

B.  All apprentices will be required to attend and successfully complete a pre-job school which shall take place over a period of approximately 12 weeks at a place and at such times as designated by the State Joint Apprenticeship Committee.

C.  After 12 weeks of pre-job training, apprentices shall be required to serve a probationary period of 30 days of employment at the trade during which period no fringe benefit contributions will be required. After satisfactory completion of this period, credit will be given for this time served as part of the three year apprenticeship term. During the probationary period, the termination or cancellation of the apprenticeship agreement may be made by the committee at the request of either party to the agreement. After the probationary period, the agreement may be canceled at the request of the apprentice or committee. The committee may cancel the agreement for good cause such as unexcused absences from the job and related training classes if required, lack of progress or interest, and unsafe practices common to the trade. Due notice shall be given to the apprentice with a reasonable opportunity for corrective action. Written notice shall be given to the apprentice and Bureau of Apprenticeship and Training of the final action taken.

D.  Apprentices shall be paid not less than the following percentages of the journeyman's basic wage rate:

First six months or 500 hours:    50% of Journeyman's Basic Wage Rate
Second six months or 500 hours:   55% of Journeyman's Basic Wage Rate
Third six months or 500 hours:    65% of Journeyman's Basic Wage Rate
Fourth six months or 500 hours:   75% of Journeyman's Basic Wage Rate
Fifth six months or 500 hours:    85% of Journeyman's Basic Wage Rate
Sixth six months or 500 hours:    95% of Journeyman's Basic Wage Rate

During the first year of apprenticeship, after the probationary period, fringe benefit contributions shall be required for the Welfare Fund at 50%. No other fringe benefit contributions shall be required for this period. Deductions for check off dues and BACPAC should be made according to Schedule "B" attached hereto. Commencing with the second year of apprenticeship (third six-months), fringe benefit contributions and check off deductions shall be made according to Schedule "B" attached hereto.

E.  Apprentices may be required to attend related training classes during period of apprenticeship as directed by the Joint Apprenticeship.

## ARTICLE VIII
## FOREMEN

There shall be a separate foreman on all jobs for each branch of the trade. The employer will determine when the foreman shall not work with tools. Foremen shall be paid the prevailing regular weekly pay (40 hours), between the initial date of employment and the termination date of employment, holidays and inclement weather days included, provided, however, that all foremen must report to work everyday within the work week unless otherwise directed by the Employer. All overtime worked by foremen shall be compensated for at proper overtime rates.

22

23

10/17/2007  14:56    6093248287    BAC LOCAL 5    PAGE  16/30

collection of such money), the sum for each hour paid which the Union has specified, or specifies from time to time and so advises the Employer in writing, as the portion of each employee's Union dues to said Union, to its International Union, or to any other affiliate of the International Union, subject to check-off. The sums transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the name of each person whose dues are being paid and the number of hours each employee has been paid. If the employee does not sign a dues check-off authorization card, he shall report to the union hall to pay the weekly dues.

D.  The Employer agrees to deduct an amount from the pay of each employee, who is a union member and who executes a voluntary check-off authorization form for the Bricklayers and Allied Craftworkers Political Action Committee (BACPAC). Deductions shall be in the amount and at the intervals specified on the check-off authorization form. The Employer agrees to transmit BACPAC deductions to the Treasurer of BACPAC, and shall be accompanied by a list of the names of those employees for whom BACPAC deductions have been made and the amount deducted for each employee.

## ARTICLE XI
## JOINTLY TRUSTEED FUNDS

Section 1.
In addition to the wages and other payments herein provided for, the Employer agrees to pay specified contributions to the following designated funds. In the event any of the trust funds to which contributions are required to be made, under this Agreement, is merged with or into another trust fund, the contributions shall be made to the successor fund.

A.  **Bricklayers and Trowel Trades International Pension Fund**

25

## ARTICLE IX
## TRAVELING CONTRACTORS

When the Employer has any work specified in Article III of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied Craftworkers, the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the jobsite area. Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Article X of this Agreement but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local Agreement. The Employer shall in all other matters be governed by the provisions established in the jobsite local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in Article III of this Agreement, the full terms and conditions of this Agreement shall apply.

## ARTICLE X
## WAGES, BACPAC, AND LOCAL DUES CHECKOFF

A.  The hourly wage rates for all employees performing work covered under this Agreement shall be as listed on Schedule "B" attached hereto.

B.  The Union shall have the option of allocating a portion of all of the increases in wage rates for the periods beginning November 1, 2002 and all subsequent increases thereafter, among the various benefit funds specified in Article XI.

C.  The Employer shall deduct from the wages of each employee who has signed a check-off authorization conforming to federal law and transmit monthly to the Union (or to any agency designated by said Union for the

24

i. The contribution to the Bricklayers and Trowel Trades International Pension fund (TPF) shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the Bricklayers and Trowel Trades International Pension Fund, which was established under an Agreement and Declaration of Trust, dated 1 July 1972.

B. Local Pension Fund

1. The contribution to the Local Pension Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the territorial Local Pension Fund which was established under an Agreement and Declaration of Trust. All Local Pension Funds remitted on behalf of an employee shall be forwarded in whole to the employee's Home Local Pension Fund. The Home Local Funds shall credit any excess monies remitted for the Pension Fund to the employee's Annuity Fund.

C. Local Annuity Fund

1. The contribution to the Local Annuity Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the territorial Local Annuity Fund which was established under an Agreement and Declaration of Trust. All Local Annuity Funds remitted on behalf

26

of an employee shall be forwarded in whole to the employee's Home Local Annuity Fund. The Home Local Funds shall apply any excess monies remitted for the Annuity Fund to the employee's Pension Fund.

D. Bricklayers and Allied Craftworkers' Statewide Welfare Fund

1. The contribution to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund which was established under an Agreement and Declaration of Trust, dated May 1, 1988.

E. Industry Advancement Fund

The parties hereto do hereby establish an Industry Advancement Fund pursuant to the requirements of the Labor - Management Relations Act, the Internal Revenue Code and all applicable laws and the agreement of the parties for the purpose, in all lawful ways, of promoting the increase of commercial, institutional, public and industrial building construction throughout the State of New Jersey and the adjoining areas within the territorial jurisdiction of the unions by providing building owners, architects, engineers, builders, contractors, private and public funding institutions and agencies, government agencies and any others, directly or indirectly, with the building construction industry information, data and other information to communicate the advantages of sound, durable and economical construction that will provide a high degree of service, utilization and benefit to the public by the utilization of union affiliated contractors. The purpose of

27

10/17/2007  14:56   6093248287          BAC LOCAL 5                    PAGE  14/30

the Fund shall be to foster and promote the continued utilization and expansion of union construction, particularly utilizing union members of the Bricklayers & Allied Craftworkers union, in prospective projects throughout the State of New Jersey.

In order to carry out this agreement, the parties hereto shall execute such agreements of trust and other documents necessary in accordance with law, which documents shall include the following terms which are agreed to and incorporated into this contract:

1. The Employer shall make contributions for each hour worked by each member of the Bricklayers & Allied Craftworkers union to the Industry Advancement Fund created hereby as listed on Schedule B attached hereto.

2. The Bricklayers & Allied Craftworkers' Health & Welfare Fund Office shall collect and distribute such funds.

3. Effective November 1, 2002, the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey agree to allocate $.02 of the Industry Advancement Fund contribution to the International Council of Employers of Bricklayers & Allied Craftworkers (I.C.E.). Said contribution shall be forward to I.C.E. by the Masonry Contractors of New Jersey. The remaining contribution shall be divided as follows:

BCANJ:                                        50%
Masonry Contractors of New Jersey: 50%

In such case as the parties opt to discontinue the $.02 allocation to I.C.E., said $.02 contribution shall

28

be distributed equally between the BCANJ and the Masonry Contractors of New Jersey.

4. The BCANJ and the Masonry Contractors of New Jersey shall utilize said funds in a manner consistent with the terms of the trust including the lease or purchase of materials, supplies and equipment, the lease of premises or purchase of premises, the employment and retention of professional counsel, the engagement of administrative and other employees, and all other appropriate expenses and expenditures which comply with the purposes of the trust and law. However, in all circumstances, it is the intention hereto that the said Fund shall be used to promote the following industry wide activities for the benefit of the contractors utilizing members of the Bricklayers & Allied Craftworkers union including accident prevention, education, research, public relations, industry relations, labor relations, market development, standardization of contracts and specifications and all other such appropriate activities.

5. Although the Industry Advancement Fund is designated a "contribution" it is expressly understood and agreed that the said sum payable to said Industry Advancement Fund is not intended to be and is not a contribution to employees and no employee of Employer has any proprietary interest in said funds.

6. The Industry Advancement Fund shall pay the Bricklayers & Allied Craftworkers' Health and Welfare fund 2% of all amounts collected as reimbursement for expenses incurred in connection with the collection services rendered. In addition the Bricklayers & Allied Craftworkers' Health & Welfare Fund shall not be responsible for collection

29

of any delinquent amounts owed by any employer.

F. International Masonry Institute (IMI)

1. The masonry industry in the United States and Canada has great and definable needs in the fields of apprenticeship and training, advertising and promotion, research and development, and labor/management relations which must be met if the industry is to grow and prosper. The parties to this agreement believe that the International Masonry Institute is the most effective and efficient instrument for meeting these needs because it offers the greatest possibility of integrating activities in these program areas in an effective manner and coordinating them through a single regional/international system.

2. In order to properly finance IMI programs, the ultimate objective is to provide, through collective bargaining, contributions from the total hourly wage and benefits package, as listed on Schedule "B" attached hereto.

3. With IMI funding from New Jersey, IMI will be able to provide advertising and promotion, research and development, apprenticeship and training, and labor/management relations programs directed specifically to this area. With these principles in mind, the parties agree to contribute the amounts listed on Schedule "B".

The payments required above shall be made to the International Masonry Institute, which was established under an Agreement and Declaration of Trust, 14 March 1981, as the successor trust to the predecessor International Masonry Institute (established under an Agreement and Declaration of Trust, 22 July 1970) and/or to the predecessor

30

International Masonry Apprenticeship Trust (established under an Agreement and Declaration of Trust, 6 November 1974).

G. New Jersey State Apprentice Fund

1. The contribution to the New Jersey State Apprentice Fund shall be listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay. The Apprentice Fund contribution of $.15 shall be suspended for Local No. 2 and deferred to the Defense Fund established by the Union.

2. The payments required above shall be made to established New Jersey State Fund office which was established under an Agreement and Declaration of Trust.

Section 2.
In order to facilitate the establishment of the same wage and fringe benefit structure within Local No. 5, it is agreed that no other funds other than the Welfare, Pension, International Pension, Annuity, Apprentice, IMI, IAP, Labor Management, BACPAC and Defense Funds shall be contributed to as of November 1, 1999. During the term of this agreement, the parties agree to establish uniform wages and fringe benefits for Local No. 4, 5 & 2.

Section 3.
The Employer hereby agrees to be bound by and to the above stated Agreements and Declarations of Trust, as though he had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of these funds pursuant to said Agreements and Declarations of Trust.

Section 4.
The Employer hereby irrevocably designates as its representative on the above stated Boards of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees,

31

together with their successors.

### Section 5.

For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and all other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable to each fund designated in Section 1 of this Article.

### Section 6.

Contributions shall be paid on behalf of all covered employees starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, journeymen, apprentices, helpers, trainees and probationary employees.

### Section 7.

All contributions shall be made at such time and in such a manner as the Trustees require; and the Trustees shall have the authority to have an Independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the funds designated in Section 1 of this Article. Any Employer found, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, to have been substantially inaccurate in reporting shall be charged in full costs of such audit.

### Section 8.

If the Employer fails to make any contribution specified in this Article, within twenty (20) days after the date required by the Trustees, the Union shall take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of payments due together with attorney's fees and such liquidated damages as may be assessed by the Trustees. In the event a job is stopped due to delinquent fringe benefit payments by the employer, craftworkers shall be compensated a day's wages for

each day the delinquency continues, not to exceed five days. The Employer's liability for payment under this article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided for or set forth elsewhere in this Agreement.

### Section 9.

Management's appointments to the aforementioned Jointly Trusteed Funds are to be made equally by the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey. The Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey shall only have the right to the appointment of trustees if and when the existing Trust Funds of the predecessor local unions of the International Union of Bricklayers and Allied Craftworkers, Local Unions No. 4 and 5 are merged into statewide benefits funds. Neither the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey shall have the right or authority to appoint trustees to any trust fund of a predecessor local union unless and until a statewide merger of the Trust Funds occur, except if trustees are currently appointed by either the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey, that authority shall remain.

### Section 10.

The Labor/Management Fund established under an Agreement and Declaration of Trust, shall be used to enhance the economic development and competitiveness of the unionized masonry industry, to assure the effective enforcement of prevailing wage laws and to provide for stable labor-management relations. The parties to this agreement shall appoint trustees to this fund in the same manner in which appointments are made to the Statewide Welfare Fund.

### Section 11.

The parties agree to establish a Committee to explore the concept and funding mechanism for a Market Recovery Program.

32

10/17/2007  14:56   6093248287          BAC LOCAL 5                    PAGE  11/30

## ARTICLE XII
### BONDING

Prior to commencing any work covered by this Agreement, the Employer shall obtain a bond in the amount of $25,000, (twenty-five thousand dollars) with a duly qualified bonding company in a form approved by the Union, to secure payment of wages, benefit contributions, and other sums due under this agreement.

## ARTICLE XIII
### HOURS WORK, OVERTIME, SHIFTS, AND HOLIDAYS

A.  The standard work day shall consist of eight (8) hours of work with starting and quitting times of either 7:00 a.m. to 3:30 p.m., or 8:00 a.m. to 4:30 p.m., unless otherwise mutually agreed to by the parties, with a 30-minute unpaid lunch hour occurring in the middle of the shift. The standard work week shall consist of five standard work days commencing on Monday and ending on Friday, inclusive. The normal starting and quitting times may be changed by mutual consent of the Employer and the Union.

B.  All time worked before and after the established eight (8) hour day, Monday through Friday, and all time worked on Saturday shall be paid at the rate of time and one-half. All hours worked on Sundays and holidays shall be paid at the double time rate. If a craftworker works through any portion of their lunch they shall be paid one hour.

    If any of the following trades: Carpenters, Laborers, Ironworkers or Operating Engineers Locals, with whom the BCANJ negotiates, receive a more beneficial overtime rate, the Bricklayers will be paid the higher overtime rate.

C.  A make-up day may be worked on Saturday providing it is mutually agreed to by the union and the employer and provided that the following conditions are satisfied:

1.  A make-up day on Saturday can be utilized provided 24 or more hours are worked during the course of the calendar work week, Monday through Friday.

2.  It is not mandatory for an employee to work on a make-up day and it is at their choice and discretion. No negative actions or retribution shall be taken by the employer against any employee who chooses not to work a make-up day.

3.  The sole reason for the loss of hours during the calendar work week must be weather conditions to qualify for a make-up day.

4.  Any time worked before the established starting time or after the established quitting time on a make-up day shall be paid at the applicable overtime rate. Any hours worked on a Saturday make-up day that exceed 40 hours shall be paid at the applicable overtime rate.

5.  If employees are unable to work a make-up day, the local union shall be given the preference to supply the remainder of the employees needed for that day.

6.  There shall be no addition to the previously established crew size for the make-up day.

    Any employer who violates the above provisions shall be prohibited from utilizing the make-up day for the duration of this Collective Bargaining Agreement. The employer has the right to file an appeal with the Joint Arbitration Board defined in Article XV of this Collective Bargaining Agreement. Said appeal shall be heard within five (5) days from the date filed. During the appeal process the employer shall be prohibited from utilizing the make-up day provision.

34

35

D. The parties to this Agreement recognize the desirability and in some cases absolute necessity of coordinating the shifts to be worked with the other trades involved on the project and the customer's work schedule. If shift work is necessary and it is mutually agreed to by the union and the employer, the following schedule shall prevail:

When a two shift schedule (including a day shift) is established, the first or day shift shall be established on an eight (8) hour basis. The second shift shall be established on an eight (8) hour basis and paid the base rate plus 15%.

When a three shift schedule is established, and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The day shift shall be established on an eight (8) hour basis, the second shift shall be established on a seven and one-half (7 ½) hour basis, and the third shift shall be established on a seven (7) hour basis. The first shift shall receive the base or regular hourly rate. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

When there is no day shift and a second shift or third shift is established and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The second shift shall be established on an eight (8) hour basis. The third shift shall be established on an eight (8) hour basis. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

The percentage premium, when added to the base rate, shall be termed the regular hourly rate. Shift hours for the second and third shifts shall be such as to conform to the day shift and in no case shall an employee work on more than one shift within a 24 hour period. When an irregular shift must be established, the percentage premium shall be

15% above the base rate.

All time worked before and after a regularly established shift shall be paid at the applicable overtime rate. When a portion of a regular established shift works into Saturday, Sunday or a Holiday, that time worked shall be paid at the established shift rate.

E. The Employer agrees to recognize the following holidays: New Year's Day, President's Day, Memorial Day, Fourth of July, Labor Day, Presidential Election Day, Veterans' Day, Thanksgiving Day, and Christmas Day. Holidays falling on a Sunday shall be observed the following Monday. The above holidays are subject to renegotiation based upon agreements established with other trades.

## ARTICLE XIV
## PAYMENT OF WAGES & FRINGE BENEFITS

All employees working under this Agreement shall be paid in cash or by check weekly on Thursday, or another day if mutually agreed and within 72 hours after the closing of the pay for the week. When employees are unable to work on pay day due to inclement weather, the employee shall be paid before 12 noon in absence of reasonable cause for delay. An employee who has worked more than three days who is being laid off shall be given his final paycheck in full for all hours of employment one hour before layoff. When working overtime, the one hour notice of layoff does not apply. At the discretion of the Union, out of state contractors may be required to have payroll checks drawn on a local bank. Payroll checks will be delivered to the job site. In the event an employer issues a paycheck and there are insufficient funds in the employer's account, the employer, on the next working day, will bring either cash or cashiers checks to the jobsite to cover the paychecks and all penalties. Failure to do so will result in immediate withdrawal of all craftworkers from the job. Employees will be compensated by the employer for all lost time until the

36

10/17/2007  14:56  6093248287                BAC LOCAL 5                    PAGE  09/30

masonry, the employer shall have all cutting tools sharpened.

F. In order to protect the health and safety of employees against the effects of silicosis and other respiratory diseases, the dry cutting of masonry units by the means of hand-held, gas-powered, or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be prohibited on all masonry projects. The only exception to this provision will be when the Union and employer determine that the use of water is not feasible. When the Union and employer identify such tasks, the employer must ensure that the engineering and work practice controls are in place to control the dust: such as a vacuum, with high efficiency particulate air (HEPA) filter or another dust control system. It is agreed that in order to protect the health and safety of employees the dry cutting of masonry units by means of hand-held, gas powered or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be done in a designated area away from craftworkers if at all possible. It is the responsibility of the employee to adhere to the established restrictions for said designated areas.

Respirators should only be used as the primary method of protection if other engineering and work practice controls are not feasible. When the respirators are used, in accordance with the OSHA regulations, employers must provide workers with full-face respirators as part of a complete respiratory program that includes the proper selection of respiratory cartridges, and training and fit-testing to ensure that the worker is able to wear a respirator. It is the employee's responsibility to utilize proper protection.

Additionally, in the event the Union and the employer determine that dry-cutting or grinding is necessary, the contractor agrees to perform periodic air monitoring to

39

matter is resolved. If a second violation occurs, all payrolls shall be in either the form of cash or cashiers checks. Fringe benefits will be paid on a weekly basis, except that Association Members may pay monthly. Monthly payments shall be due to the fund(s) on, or before the fifteenth day of the month immediately following the month during which the contributions were earned. Should an Association Member become delinquent, they may be required by the trustees of the benefits funds to remit weekly payments.

ARTICLE XV
WORKING CONDITIONS

A. Overhead Protection: If any work is being performed overhead, all Employees must be protected on all outside scaffolds by two inch (2") planks, a covering shall be supplied over all stairwells, hatches, shafts, etc., no more than two (2) stories overhead and two (2) stories below in shafts.

B. Hard hats are to be supplied by each employer. Failure to wear hard hats is cause for dismissal.

C. Lines: All contractors must furnish the men with lines. The lines must not be raised more than one (1) course at a time. No bricklayer shall spread mortar before the line has been raised. However, a trig brick can be raised one (1) course before raising the line. Lines on a double unit wall shall be used on both sides of a wall eight inches (8") or over in thickness and on all units of masonry over four (4) feet in length.

D. Portable Sanitation Units: Suitable portable sanitation units shall be erected on all jobs which shall be kept in sanitary condition. Portable sanitation units shall be built in accordance with State or Municipal health laws.

E. Cutting Tools: Where employees are employed on cutting

38

10/17/2007  14:56    6093248287              BAC LOCAL 5                    PAGE  08/30

ensure that the silica exposure levels do not exceed OSHA permissible exposure limit. Failure to comply will result in work stoppage. The employee operating the machine shall be allowed ten (10) minutes to clean up at 12:00 noon and quitting time.

Employees engaged in wet cutting masonry products will be furnished elbow length gloves, an apron and goggles. No employee shall operate a wet saw unless provided with a wooden platform on which to stand and the saw is properly grounded.

G.   Cutting and Mechanical Devices:   Where air guns or other mechanical devices are used for the purpose of cutting chases, opening, etc., in brick work, such gun or device shall not exceed fifteen (15) lbs. weight. When such device exceeds fifteen (15) lbs., the employer may use a laborer to assist the bricklayer in handling the gun, but there shall always be one bricklayer on each gun in use. All cutting, when done by hammer and chisel, shall be done exclusively by the bricklayer. Where a bull and sledge hammer is used, there shall be a composite crew of bricklayers and laborers. (The bricklayer foreman shall have complete authority over all men employed in this phase of work.) All cutting out of brick work, pointing, washing down, caulking cement and lime waterproofing washing of brick, or slabs, used in floor arches shall be done by bricklayers, and where scaffolding is used in the above work wire rope shall be used.

H.   Pointing:   All pointing and joining of brick work shall be done by journeymen who built same, if possible.

I.   Cement Block:   Bricklayers and stone masons to set all cement blocks and all masonry units.

J.   Cork Block:   All cork block (Styrofoam Sheets), and substitutes thereof, shall be laid by bricklayers.

K.   Caulking:   All pointing and caulking of windows with cement or composition to be done by bricklayers, by either gun, trowel or any other method.

L.   Stone Work:   All renovation, cleaning, and pointing of stone to be done by this union.

M.   The setting, aligning and erection of all precast slabs and the setting and leveling of all bearing plates for structural steel or machinery shall be done by the members of the above local union.

N.   Composite crew on all precast panels. Setting of all other masonry panels shall be the work of BAC Members.

O.   All brick or block panels shall be erected by union bricklayers.

P.   Waterproofing:   All transparent waterproofing applied to brick or stone work with brush or spray to be done by bricklayers.

Q.   There are to be two men on all blocks weighing 40 lbs. or more.

R.   Scaffolding:   No block 6" or over in size shall be built more than six (6) courses in scaffold height.   Where blocks of 100 lbs. or over are used, a pony scaffold is to be erected when the wall is three (3) feet high, for the easier laying of these blocks to the next scaffold height. When a BAC member works on a swing scaffold as part of a composite crew, they shall receive the same premium differential as the other trades performing work on the same swing scaffold.

S.   Water:   Water containers and sanitary drinking cups shall be provided on all jobs to be furnished by all contractors at all times.

40

41

0731

AA. All mortar tubs will be raised to at least sixteen inches, not to exceed thirty inches.

BB. All rubber gloves and goggles to be furnished by the contractor for all washing down.

CC. All work on high stacks, the contractor will pay a premium wage of 22½% above the wage scale.

DD. All scaffolds will be kept at least four (4) inches below the wall.

EE. If an employee works past the full hour and must stop because of inclement weather conditions, he shall be paid for the full hour, but is not to leave the job until expiration of said hour. No employee shall start work on the half hour.

FF. If an employee reports to work and is not started but requested to stay on the job by the contractor, the employee shall be paid for all time prior to starting or until informed that no work shall be performed.

GG. In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between starting time and 12 noon, men shall be paid until noon. Employees must, however, remain on the job until noon. In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between 12:30 p.m. and 3:30 or 4:30 p.m., employees shall be paid until 3:30 or 4:30 p.m. Employees must remain on the job until 3:30 or 4:30 p.m.

HH. When a job does not start at the regular starting time, it will be the duty of the Foreman to notify the Shop Steward, personally, two hours after the designated start regarding the work conditions. It is clearly understood and agreed the employer will not send anyone to work on a job working during inclement weather unless all of the men regularly

41

T. Shanty and Stoves: Where there are not more than ten (10) men employed on a job, a shanty house shall be erected exclusively for the bricklayer, and it shall contain not less than eighty (80) square feet of floor space. Where there are more than ten (10) men and not more than twenty (20) men, the shanty house shall contain not less than one hundred and fifty (150) square feet of floor space. Where there are more than twenty (20) men and not more than thirty (30) men it shall contain not less than two hundred (200) square feet of floor space but where there are more than thirty (30) men employed the same proportion shall apply. Where there is a shanty and no elevator located in the building it shall not be above the ground floor unless elevator is provided except on alterations where it will be placed to suit the convenience of the contractor.

U. Ample provision shall be made to protect all bricklayers levels on all outside scaffolds.

V. It shall be deemed unsafe to run any brick work up more than 6 courses or 16" whichever is less without backing up in cavity walls or any masonry walls which does not utilize a brick header course.

W. Contractors shall provide a two foot clear, planked working area beyond the building wall when bricklayers or stone masons are working off new footing on or below grade.

X. There shall be a clothing allowance of fifty cents (.50) per hour minimum on all fire brick work paid by contractor.

Y. There will be one coffee break in the morning not to exceed ten (10) minutes.

Z. The employee shall be allowed five (5) minutes to clean up prior to quitting time.

42

employed on that job who showed up for work at starting time are started first. Nothing herein contained shall be construed to deny the saw men, lay-out men and stewards regularly employed on the job from working at anytime at their respective job assignments if they are needed.

II. When masons work overtime at the direction of the employer or foreman, they shall receive at least one hour's pay at the applicable overtime rate. Fractions of an hour to be considered a full hour.

JJ. Employees who may be required to work overtime beyond 6:00 p.m. shall be permitted to take an unpaid one-half hour meal period on the job between 6:00 p.m. and 7:00 p.m. The employer may split a crew for the dinner period.

## ARTICLE XVI
## GRIEVANCE PROCEDURE

A. The parties to this Agreement shall establish a Joint Arbitration Board consisting of two representatives of the Building Contractors Association of New Jersey, two representatives of the Masonry Contractors Association of New Jersey and four representatives selected by the Local Union, to resolve disputes over the interpretation and application of this Agreement. The boards shall meet at least once a month, or on call, to settle complaints, abuses or grievances. It is further agreed that should occasion require any alterations or amendments to this Agreement, the party desiring such alterations or amendments shall submit same in writing to the Board. The Employer and union representatives at a session shall have an equal number of votes on all matters coming before the Joint Arbitration Board, regardless of the number of Employer or Union representatives present at a session.

B. It is specifically agreed that any controversy arising out of this Agreement involving the interpretation of its terms and

44

conditions, shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the union or to the attention of the Union by the Employer within five (5) days after the alleged violation is committed or discovered.

C. Grievances shall be handled in the following manner:

1. The grievance shall be referred to the jobsite union steward and to an employer representative for adjustment.

2. If the grievance cannot be settled pursuant to paragraph 1 of this Section, the grievance shall be referred on the following day to the Business Manager of the Union and the Employer.

3. If the grievance cannot be settled pursuant to paragraph 2 of this Section within three (3) working days excluding weekends and holidays, the grievance shall be submitted within 48 hours to the Joint Arbitration Board for consideration and settlement.

4. If the Joint Arbitration Board cannot reach a satisfactory settlement within five (5) working days, not including weekends and holidays, following a referral of the grievance to the Board, it shall immediately select an impartial arbitrator to review with the Board all evidence submitted relating to the dispute and then cast the deciding vote. If the Arbitration Board cannot agree on an impartial arbitrator, then the matter shall be submitted to the American Arbitration Association for a decision. All expenses of the Impartial party shall be borne equally by the Employer and the Union. The decision reached by the Joint Arbitration Board

45

0733

3.  As established by practice of Employers within the area designated herein whenever (1) or (2) above are not applicable;

4.  It is the intent of the parties that wherever a job decision shall be deemed to be strongly indicative of the area practice, the Bricklayers & Allied Craftworkers Local Unions will advise all personnel affected to make future assignments accordingly.

5.  It is further the intent of the parties hereto that wherever possible, and whenever the contractor can reasonably foresee a jurisdictional dispute, the contractor will call a pre-job conference with the Local concerned and the contractors agree that when no agreement is reached, at the request of the Union, the contractor will join in the submission of the matter to the Joint Board. In the meantime, the work shall proceed by the craft in possession of the work.

B.  The Employer and the Unions agree to be governed by the terms and conditions of the Agreement, effective May 1, 1995, as amended, creating the Joint Board for the settlement of any jurisdictional dispute; and the decisions of the Joint Board will be followed in good faith.

## ARTICLE XVII
## SUBCONTRACTING

A.  The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement and complies with all of the terms and conditions of this Agreement.

47

---

with the assistance of the impartial arbitrator shall be final and binding upon all parties.

D.  When a settlement has been reached at any step of this Grievance Procedure, such a settlement shall be final and binding on all parties, provided, however, that in order to encourage the resolution of disputes and grievances at Steps 1 and 2 of Section C of this Article, the parties agree that such settlements shall not be precedent-setting.

E.  The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties initiated by the written request of one party to the other, at the appropriate step of the Grievance Procedure. However, failure to process a grievance, or failure to respond within the time limits provided above, without a written request for an extension of time, shall be deemed a waiver of such grievance without prejudice and shall create no precedent in the processing of and/or resolution of like or similar grievances or disputes.

## JURISDICTIONAL DISPUTES

A.  In order to avoid jurisdictional disputes which have such a demoralizing effect upon the progress of the construction work, it is agreed that only B.A.C. Members will be employed on work which is recognized as coming under the jurisdiction of the International Union of Bricklayers and Allied Craftworkers as:

1.  Granted by the A.F.L. - C.I.O.

2.  Determined by a Joint Board consisting of four representatives from the Local Unions, two representatives from the Building Contractors Association of New Jersey and two representatives from the Mason Contractors of New Jersey.

46

0734

10/17/2007  14:56    6093248287    BAC LOCAL 5    PAGE  04/30

B.  All charges of violation of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.

### ARTICLE XVIII
### PRESERVATION OF WORK (Anti-Double Breasting)

A.  In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

B.  All charges of violations of Section A of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in Article XV of this Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in Article XV is empowered, at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as result of the violations, and (2) pay into the affected joint trust funds established under this Agreement any delinquent

48.

contributions to such funds which have resulted from the violations, including such interest as may be prescribed by the trustees or by law.  Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other sections or articles of this Agreement.

C.  If, as a result of violation of this Article, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with Section B above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

### ARTICLE XIX
### NO-STRIKE/NO-LOCKOUT

It is understood and mutually agreed that there shall be no strikes or lockouts over a dispute concerning this Agreement during its term until the grievance procedures described in Article XIV have been exhausted and then only in the event a party fails or refuses to abide by a final decision.  This Article shall not apply in those cases where an Employer fails or refuses to make in whole or in part any payments required under this Agreement including all wages, local union fringe benefits or other contributions that have been established through bona fide collective bargaining.

### ARTICLE XX
### SEPARABILITY AND SAVINGS PROVISION

It is the intent of the parties hereto to abide by all applicable Federal and State statutes and rules and regulations made pursuant thereto.  If any provision of this Agreement is held invalid by any court or governmental agency having jurisdiction, or if compliance with or enforcement of any provision of this Agreement is

49

restrained by such tribunal pending a final determination as to its validity, then such provision or provisions shall continue in effect only to the extent permitted and all other provisions of this Agreement shall remain in force and effect.

In the event that any provision of this Agreement is held invalid, or enforcement of or compliance with any provision is restrained, the Union and the Employer shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement, incorporating the substance of such provision to the extent allowable under the law, to be in effect during the period of invalidity or restraint.

## ARTICLE XXI
## MORE FAVORABLE CONDITIONS

The Union hereby agrees that if it affords any conditions of a more favorable means to any other employer with whom it has a collective bargaining agreement who performs the same or similar work, that said more favorable condition shall automatically be incorporated in this Agreement and be afforded all members of the Association covered hereunder.

## ARTICLE XXII
## GENERAL UNDERSTANDING

The Union agrees to cooperate with the Employer in meeting conditions peculiar to the job in which it may be engaged. It will at all times meet and confer with the Employer, and similarly, the Employer will at all times meet with the Union regarding any questions or misunderstandings that may arise under the performance of this Agreement.

This Agreement constitutes the entire agreement between the parties, and any local or area practices or working rules which may be in conflict with the provisions contained in this Agreement shall be subordinate to this Agreement.

50

Inasmuch as (1) the Union has requested recognition as the majority, Section 9(a), representative of the employees in the bargaining unit described herein and (2) has submitted or offered to show proof of its majority support by those Employees, and (3) the Employer is satisfied that the Union represents the majority of the bargaining unit Employees, the Employer recognizes the Union, pursuant to Section 9(a) of the National Labor Relations Act, as the exclusive collective bargaining agent for all employees within that bargaining unit, on all present and future job sites within that jurisdiction of the Union.

The Employer agrees that if it has not previously done so, at any time during this agreement it will, upon the Union's request for recognition as the Section 9(a) representative of the employees in the bargaining unit described herein, and upon the union's submission of proof of majority support by such employees, voluntarily recognize the Union as the exclusive representative as defined in Section 9 (a) of the National Labor Relations Act, of all the employees within the bargaining unit on all present and future jobsites within the jurisdiction of the Union. When the Union has requested recognition as majority representative, the Employer's recognition will be based on the Union's proof or offer to submit proof. The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board.

We, the undersigned Employer on behalf of the parent firm, all subsidiaries and corporate related firms, companies and/or corporations hereby become signatory to this Agreement and agree to abide by the full terms and conditions of this Agreement effective as of this date.

51

| ********************WAGE RATES EFFECTIVE NOV 1, 2002 THROUGH OCTOBER 31, 2003******************** | | | | | | | |
|---|---|---|---|---|---|---|---|
| FORMER LOCAL # | 6 | 7 | 8 | 15 | 26 | 33 | 35 |
| JOURNEYMAN: | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 |
| DEPUTY FOREMAN: | $31.95 | $31.95 | $31.95 | $31.95 | $31.95 | $31.95 | $31.95 |
| FOREMAN: | $34.55 | $34.55 | $34.66 | $34.55 | $34.55 | $34.66 | $34.55 |
| EMPLOYER CONTRIBUTIONS************ | | | | | | | |
| WELFARE FUND: | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 |
| LOCAL PENSION FUND: | $4.60 | $4.50 | *********** | *********** | $4.50 | $4.50 | *********** |
| ANNUITY FUND: | $3.00 | $3.00 | $7.50 | $3.00 | $3.00 | $3.00 | $7.50 |
| APPRENTICE FUND: | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 |
| INDUSTRY ADVANCEMENT: | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 |
| LABOR MANAGEMENT TRUST: | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| I.U. PENSION FUND: | $1.50 | $1.50 | $1.50 | $6.00 | $1.50 | $1.50 | $1.50 |
| I.M.I. | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 |
| **TOTAL PACKAGE** | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 |
| | ***********DEDUCTIONS AFTER TAXES FROM GROSS WAGES*********** | | | | | | |
| | JOURNEYMAN | | DEP FOREMAN | | FOREMAN | | |
| LOCAL DUES CHECKOFF: | $1.57 | | $1.68 | | $1.75 | | |
| INT'L DUES CHECKOFF: | $0.45 | | $0.45 | | $0.45 | | |
| DEFENSE FUND: | $0.05 | | $0.05 | | $0.05 | | |
| LOCAL BAC/PAC: | $0.05 | | $0.05 | | $0.05 | | |
| I.U BAC/PAC: | $0.01 | | $0.01 | | $0.01 | | |
| TOTAL DEDUCTIONS: | $2.13 | | $2.22 | | $2.31 | | |
| AFTER TAX DEDUCTIONS NOTE: | All former locals have the same deductions with the exception of one: | | | | | | |
| Former Local #7: | Has a BAC/PAC of $0.02, making their deductions $2.14 | | | | | | |
| I.U. Reporting Forms: | IU Pension, I.M.I., IU Dues Checkoff, & BAC/PAC are all to be remitted on IU Remittance | | | | | | |
| | All other benefits are to be remitted to the LOCAL FUND OFFICE where the job is preformed. | | | | | | |

53

**IN WITNESS WHEREOF,** we the authorized officers of the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey, the Building Contractors Association of Atlantic County and the Bricklayers & Allied Craftworkers, Local Unions No. 4, 5 & 2 have hereunto set our hands and seals this 31st day of October, 2002.

*Authorized Management Representatives*

Joseph Nicoli, BCANJ

Jack Kocis, Jr., BCANJ

Michael Schmerbeck, MC of NJ

Michael Pfeiffer, BCA/AC

*Authorized Union Representatives*

Gerald Della Salla, Local No. 4

Michael Perrone, Local No. 5

Thomas F. Rhoades, Local No. 2

52

0737

The undersigned employer agrees to be bound by all terms of the within agreement:

_____

*Name of Firm*

_____

*Physical Street Address*

_____

*City*                              *State*                    *Zip Code*

_____

*Phone Number*                              *Fax Number*

_____

*Employer's Federal Identification Number*

_____

*New Jersey Employment Compensation Number*

_____

*Workmen's Compensation Insurance Carrier*

_____

*Date*

## SIGNATURE OF PARTIES

_____

*Member of Firm Signature*          *Printed Name*              *Title*

_____

*Union Officer Signature*          *Printed Name*              *Title*

_____

*Field Representative Signature*    *Printed Name*

## *PLEASE COMPLETE & REMIT TO:*

**Bricklayers & Allied Craftworkers Local #5**
**3281 Route 206, Suite 3**
**Bordentown, New Jersey 08505**
**(609) 324-0500**
**Fax- (609) 324-1505**

54

0738

MAARV WATER PROOFING INC. P-02

1609324160S

000665

NJ0424

## INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
### LOCAL #5 – NEW JERSEY
#### INDEPENDENT

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement. The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its representative on the Board of Trustees such Employer Trustees together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund Agreement and Declaration of Trust instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its successor assigns and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

MAARV WATERPROOFING INC.
Company Name

317 OAK STREET
Physical Street Address

PASSAIC, NEW JERSEY    07055
City                State        Zip Code

(973) 470-0686      (973) 470-8716
Telephone Number      Fax Number

22-2527189
Federal Identification Number

608103-00-5
New Jersey Employment Compensation Number

ST. PAUL INSURANCE COMPANY
Workmen's Compensation Insurance Carrier

**Please complete and remit to:**
BAC Local #5, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-0500
(609) 324-1805 - Fax

Initial if you have received a full copy of this Collective Bargaining Agreement _____

| Signature | Printed Name | Date |
|---|---|---|
| _[signature]_ Officers Signature | ATTILA SZAMOSSZEGI | FEBRUARY 4, 2004 |
| _[signature]_ Business Managers Signature | Michael R. Perrone | 2/4/2004 |
| _[signature]_ Field Representatives Signature | Dominic Longo | 2/4/04 |

0739

Exhibit 4

Bricklayers
& Trowel Trades
International Pension Fund

ROOM 411, 815 FIFTEENTH STREET, NORTHWEST  ·  WASHINGTON, D.C. 20005
TELEPHONE (202) 638-1996                    3/87

**EMPLOYER REPORT FOR** W/E 3/6/87

**DUE NO LATER THAN** 4/15/87

281885

| ACCOUNT NO. | BAC LOCAL |
|---|---|
| 22-617451 | #37 NJ |

**IMPORTANT**

1. Make check payable to the Bricklayers International Pension Fund and mail with the WHITE copy of this report to the above address.
2. Mail the YELLOW copy of this report to the BAC Local having job site jurisdiction.
3. Retain the PINK copy for your records.

See the reverse side of this form for complete instructions.

MAARV

MAARV CONTRACTORS, INC.
P. O. BOX 2250
LODI, N.J. 07644

| EMPLOYEE | | SOCIAL SECURITY NUMBER | NUMBER OF PAID HOURS | HIRED OR TERMINATED | |
|---|---|---|---|---|---|
| LAST NAME | INITIALS | | | H or T | DATE |
| CUOMO | P | 140 44 4630 | 14 | | |
| MAYFIELD | G | 152 60 7790 | 17 | | |
| SKAMOSSKESI | A | 135 50 2265 | 14 | | |

| | | |
|---|---|---|
| TOTAL NUMBER OF EMPLOYEES THIS MONTH | 3 | |
| IF NONE, CHECK HERE | ☐ | |
| IF LAST REPORT, CHECK HERE | ☐ | |

TOTAL HOURS THIS PAGE    45
TOTAL HOURS THIS REPORT    45

PROCESSED
APR 24 1987
BY  PC

CURRENT INTERNATIONAL PENSION AMOUNT DUE AT  .85¢  PER HOUR $  38.25
                                          CONTRIBUTION RATE

OTHER CHARGES DUE — CODES _____  AMOUNT $ _____
                    (SEE OTHER SIDE FOR EXPLANATION OF CODES)

AMOUNT REMITTED TO INTERNATIONAL PENSION FUND (ADDRESS ABOVE) $  38.25

I hereby certify that this is a true report of all paid hours during the report month, in accordance with the obligations assumed by this firm under the current applicable Collective Bargaining Agreement and the provisions of the applicable trust agreement. I further certify that this report does not include contributions in behalf of any self-employed individuals.

Ms. VIVIANNE VEKONY, SECTY. BRICKLAYERS LOCAL #37 NJ (201) 366-7420  4/13/87
Member or Officer of Firm                    Telephone Number                    Date          P-3

0747

Exhibit 5

**Screen:** Member/Employer Service History [MAYFIELD, GREGORY ], SSN = [152607790]
**Criteria:** Hours Report for 1986 by Month
**Sort:** date, employer, local, covered group
**User** CWELLER

| Work Month | Employer | Local | Cvg | Agent | Total Hours |
|---|---|---|---|---|---|
| November | 281885 - MAARV WATERPROOFING IN | 33-NJ | 1 | 00106 | 35.00 |
| December | 281885 - MAARV WATERPROOFING IN | 33-NJ | 1 | 00106 | 64.00 |

**Total Hours:** 99.00

0266

Exhibit 6

Screen    Member/Employer Service History [MAYFIELD, GREGORY ], SSN = [152607790]
Criteria: Hours Report for 1987 by Month
Sort:     date, employer, local, covered group
User      CWELLER

| Work Month | Employer | Local | Cvg | Agent | Total Hours |
|---|---|---|---|---|---|
| March | 281885 - MAARV WATERPROOFING IN | 37-NJ | 1 | 00105 | 17.00 |
| July | 281885 - MAARV WATERPROOFING IN | 33-NJ | 1 | 00106 | 35.00 |

Total Hours:    52.00

0267

Exhibit 7

Screen:   Search Employer/Contractor
Criteria:  (Emp_Name Like 'maarv%')
Sort:
User:      JMARKS

| Account | Employer Name | Local | Cvg | Fund | RA Number | Status | Status Dt | Last Rpt Dt | Acct. Bal. |
|---|---|---|---|---|---|---|---|---|---|
| 801122 | MAARV WATERPROOF | 13-NJ | 1 | USA | 00105 | EI | 11/7/2005 | 7/31/1987 | |
| 281885 | MAARV WATERPROOFING IN | 33-NJ | 1 | USA | 00106 | ER | 7/31/1987 | 11/30/2001 | |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | USA | 00105 | ER | 11/30/2001 | 8/31/1994 | |
| 281885 | MAARV WATERPROOFING IN | 38-NJ | 1 | USA | 00105 | ER | 8/31/1994 | 3/29/1987 | |
| 281885 | MAARV WATERPROOFING IN | 37-NJ | 1 | USA | 00105 | ER | 3/31/1987 | 12/31/1996 | |
| 281885 | MAARV WATERPROOFING IN | 13-NJ | 1 | USA | 00106 | ER | 12/31/1996 | 2/29/2004 | |
| 281885 | MAARV WATERPROOFING IN | 5-NJ | 1 | USA | 00106 | EI | 2/28/2004 | 2/29/2004 | |
| 281885 | MAARV WATERPROOFING IN | 5-NJ | 10 | USA | 00106 | EI | 2/28/2004 | 2/29/2004 | -$15.84 |
| 284036 | MAARV WATERPROOFING INC | 37-NJ | 1 | USA | 00105 | ER | 3/31/1989 | 3/31/1989 | |

ss_frmEmployer_QBE.rpt

1

10/19/2006   12:08:19PM

0404

Exhibit 8

| Account | Employer_Name | Local | CVG | SSN | UnionID | Mbr_Stat_Code | Mbr_Stat_CodeDate | Employee_Name | Work_Date | EntryDt | Hours | IPF |
|---------|---------------|-------|-----|-----|---------|----------------|--------------------|---------------|-----------|---------|-------|-----|
| 801122 | MAARV WATERPROOF | 13-NJ | 1 | 135502265 | 311076 | MN | 10/1/1995 | SZAMOSSZEGI, ATTILA | 5/1/1988 | 8/15/1988 | 28 | 1.35 |
| 801122 | MAARV WATERPROOF | 13-NJ | 1 | 135502265 | 311076 | MN | 10/1/1995 | SZAMOSSZEGI, ATTILA | 5/1/1988 | 8/3/1988 | 21 | 1.35 |
| 801122 | MAARV WATERPROOF | 13-NJ | 1 | 148444630 | 321017 | AC | 12/1/1990 | CUOMO, PETER | 5/1/1988 | 8/15/1988 | 28 | 1.35 |
| 801122 | MAARV WATERPROOF | 13-NJ | 1 | 148444630 | 321017 | AC | 12/1/1990 | CUOMO, PETER | 5/1/1988 | 8/3/1988 | 21 | 1.35 |

MAARV   IPF Account No. 801122

0743

Exhibit 9

| Account | Employer_Name | Local | CVG | SSN | UnionID | Mbr_Stat Code | Mbr_Stat CodeDate | Employee_Name | Work_Date | EntryDt | Hours | IPF | Ann | IMI | IUDues |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 284036 | MAARV WATERPROOFING INC | 37-NJ | 1 | 036626319 | | EA | 10/31/2006 | MURPHY, JOSEPH | 3/1/1989 | 4/25/1989 | 7 | 0.85 | | | |
| 284036 | MAARV WATERPROOFING INC | 37-NJ | 1 | 135502265 | 311076 | MN | 10/1/1995 | SZAMOSSZEGI, ATTILA | 3/1/1989 | 4/26/1989 | 7 | 0.85 | | | |
| 284036 | MAARV WATERPROOFING INC | 37-NJ | 1 | 138492275 | | EA | 10/31/2006 | MAYNARD, GREG | 3/1/1989 | 4/25/1989 | 7 | 0.85 | | | |
| 284036 | MAARV WATERPROOFING INC | 37-NJ | 1 | 147666981 | 334989 | MN | 4/1/1992 | SCHNEIDER, KEVIN J. | 3/1/1989 | 4/25/1989 | 7 | 0.85 | | | |
| 284036 | MAARV WATERPROOFING INC | 37-NJ | 1 | 147681232 | 334988 | MN | 5/1/1990 | MURPHY, JAMES | 3/1/1989 | 4/25/1989 | 7 | 0.85 | | | |
| 284036 | MAARV WATERPROOFING INC | 37-NJ | 1 | 148444630 | 321017 | AC | 12/1/1990 | CUOMO, PETER | 10/1/1988 | 11/29/1988 | 100 | 0.85 | | | |
| 284036 | MAARV WATERPROOFING INC | 37-NJ | 1 | 148444630 | 321017 | AC | 12/1/1990 | CUOMO, PETER | 3/1/1989 | 4/25/1989 | 7 | 0.85 | | | |
| 284036 | MAARV WATERPROOFING INC | 37-NJ | 1 | 152628957 | | EA | 10/31/2006 | GILMORE, KEVIN | 3/1/1989 | 4/25/1989 | 7 | 0.85 | | | |
| 284036 | MAARV WATERPROOFING INC | 37-NJ | 1 | 907558427 | | EA | 10/31/2006 | MAHONY, PATRICK | 3/1/1989 | 4/25/1989 | 7 | 0.85 | | | |

MAARV    IPF Account # 284036

Exhibit 10

EMPLOYER NAME
MARRY WATERPROOFING INC

ER ID    LOCAL    MONTH    RATE    HOURS
284036  0037-NJ  03/89   0.85     7.00

G7

HOURS FROM 01/89 TO 12/89
SSN/SIN: 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
LOCAL 0044-NJ.

EST.PAST SERV.CR:        TOT.FUT.SERV.CR:        TOT.HOURS:
0.0                      0.0                      7.00
ESTIMATED MONTHLY BENEFITS: ESTIMATE NOT AVAILABLE - WILL
                            BE PROVIDED AT A LATER DATE

SZAHOSSZIGI     ATTILA

PAGE 1 OF 1

0292

Exhibit 11

EMPLOYER NAME
MARY WATERPROOFING INC

*** G R I D   F12 ***

| ER ID | LOCAL | MONTH | RATE | HOURS |
|-------|-------|-------|------|-------|
| 281885 | 0004-NJ | 05/00 | 1.50 | 80.00 |

HOURS FROM 01/00 TO 12/00

EST.PAST SERV.CR1: 0.0 TOT.FUT.SERV.CR1: 0.0 TOT.HRS: 80.00
SINCE YOUR MEM.DATE: 07/01/87 SINCE YOUR PART.DATE: 03/01/87

SSN/SIN: 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
LOCAL: 0004-NJ -
CUOMO PETER
58 MAPLE AVE
LK STOCKHOLM
NJ 07460

OUR RECS.REFL.:
BENEFICIARY SINCE:

PAGE   1 OF 1    AS YOUR DESIG.

0264

Exhibit 12

```
EMPLOYER NAME          ER ID
MARV WATERPROOFING INC   281885  LOCAL: 0004-NJ
MARV WATERPROOFING INC   281885  0004-NJ

            * * *  G R I D   L 0 8  * * *

            MONTH  RATE   HOURS
            06/00  1.50   192.00
            07/00  1.50    64.00

                                    HOURS FROM 01/00 TO 12/00

EST.PAST.SERV.CR: 0.0  TOT.FUT.SERV.CR: 0.1  TOT.HRS: 256.00    SSN/SIN: 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
SINCE YOUR MEM.DATE: 02/01/87  SINCE YOUR PART.DATE: 06/01/87    LOCAL: 0004-NJ
                                                                 GILPIN
OUR RECS.REFL.: GILPIN                                           P.O. BOX 374
BENEFICIARY SINCE: 07/05/91                                      CALIFON
                                                                 NJ 07830
                     WILMER       JAMES
                     PAGE 1 OF 1 AS YOUR DESIG.                               M
```

0265

Exhibit 13

```
* * *  G R I D   I 0 5  * * *

EMPLOYER NAME              ER ID    LOCAL     MONTH RATE    HOURS
SOUTH SHORE CONTRACTING INC 279693  0004-NJ   12/99 1.50    80.00
MAARV WATERPROOFING INC     281885  0004-NJ   05/00 1.50    80.00
MAARV WATERPROOFING INC     281885  0004-NJ   06/00 1.50    192.00
MAARV WATERPROOFING INC     281885  0004-NJ   07/00 1.50    64.00

                                                            HOURS FROM 01/00 TO 12/00

EST.PAST SERV.CR: 0.0 TOT.FUT.SERV.CR: 0.2 TOT.HRS:    416.00    SSN/SIN: 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
SINCE YOUR MEM.DATE: 08/01/84 SINCE YOUR PART.DATE: 02/01/85     LOCAL: 0004-NJ
                                                                STANZIALE JR JOHN
                                                                9 TANGLEWOOD ROAD
OUR RECS.REFL.: STANZIALE         DIANA,       M AS YOUR DESIG.  MIDDLETOWN
BENEFICIARY SINCE: 01/15/95       PAGE  1 OF 1                   NJ 07748
```

0287

Exhibit 14

EMPLOYER NAME
CHANEE CONSTR CO INC

ER.ID     LOCAL     MONTH RATE     HOURS
285127    0004-NJ   12/00  1.50    22.00

*** G R I D   C } }   ***

HOURS FROM 01/00 TO 12/00

EST.PAST SERV.CR: 0.0  TOT.FUT.SERV.CR: 0.0  TOT.HRS: 651.50
SINCE YOUR MEM.DATE: 07/01/86  SINCE YOUR PART.DATE: 07/01/86
OUR RECS.REFL: MILLS
BENEFICIARY SINCE: 05/08/00

SSN/SIN: 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
LOCAL: 0004-NJ -
MILLS
15 AUSTIN ST
WILLIAM
RIDGEFIELD PARK
NJ 07660

CLAIRE
PAGE   2 OF 2   AS YOUR DESIG.

0268

Exhibit 15



# Bricklayers & Trowel Trades International Pension Fund

Suite 750, 1776 Eye Street, Northwest Washington, D.C. 20006-3700
Phone: 202/638-1996; 888/880-8222
Fax: 202/347-7339
http://www.ipfihf.org

MILLS          WILLIAM
15 AUSTIN ST

RIDGEFILED PARK
NJ 07660

STATEMENT OF HOURS AS
REPORTED BY EMPLOYER
FROM 01/01
TO 12/01

44386

| EMPLOYER NAME | ACCOUNT NUMBER | LOCAL | REPORT DATE | IPF RATE | REPORTED HOURS |
|---|---|---|---|---|---|
| CREAMER FLETCHER J & SON | 281974 | 0004-NJ | 09/01 | 1.50 | 72.50 |
| FORSA CONSTRUCTION LLC | 292097 | 0004-NJ | 09/01 | 1.50 | 44.00 |
| A-TECH CONCRETE COMPANY INC | 293552 | 0004-NJ | 09/01 | 1.50 | 9.00 |
| NIGO CONSTRUCTION CORP | 274788 | 0004-NJ | 09/01 | 1.50 | 9.00 |
| NIGO CONSTRUCTION CORP | 274788 | 0004-NJ | 10/01 | 1.50 | 9.00 |
| MAARV WATERPROOFING INC | 281885 | 0004-NJ | 10/01 | 1.50 | 48.00 |
| SIMPSON AND BROWN INC | 285747 | 0004-NJ | 10/01 | 1.50 | 12.00 |
| PANETTA G AND SONS CONSTR I | 286629 | 0004-NJ | 10/01 | 1.50 | 27.00 |
| LACONTI CONCRETE & MASONRY | 294067 | 0004-NJ | 10/01 | 1.50 | 49.50 |
| MAARV WATERPROOFING INC | 281885 | 0004-NJ | 11/01 | 1.50 | 98.00 |
| A G CONSTRUCTION CORP | 292189 | 0004-NJ | 11/01 | 1.50 | 9.00 |
| SANOCO CONCRETE AND MASONRY | 297401 | 0004-NJ | 11/01 | 1.50 | 17.75 |

HOURS NOT RECEIVED AT TIME OF PRINTING OF THIS REPORT WILL BE SHOWN ON YOUR NEXT STATEMENT. HOURS FOR EARLIER YEARS THAT WERE REPORTED LATE OR ORIGINALLY UNDER A FALSE SOC. SEC. NO. ARE NOW CREDITED TO THE PROPER YEAR. ANY MISSING HOURS SHOULD BE VERIFIED WITH A COPY OF THIS STATEMENT AND CHECK STUBS.

**ELIGIBILITY SUMMARY - U.S.**

YOU RECEIVE 1.0 YEAR OF FUTURE SERVICE CREDIT FOR EACH YEAR OF 1,500 HOURS SINCE YOUR PARTICIPATION DATE. YOU MAY RECEIVE PAST SERVICE FOR EACH YEAR BEFORE YOUR PARTICIPATION DATE IN WHICH YOU WORKED OVER 750 HOURS FOR SIGNATORY EMPLOYERS IN PARTICIPATING LOCALS. HOWEVER, PAST SERVICE CREDITS ARE ONLY ESTIMATIONS, WITH ACTUAL ELIGIBILITY DETERMINED WHEN YOU RETIRE BASED ON PLAN RULES.

GENERALLY, TO BE ELIGIBLE FOR A PENSION AT NORMAL RETIREMENT AGE, YOU MUST EARN AT LEAST 10.0 SERVICE CREDITS INCLUDING 1.0 YEAR OF FUTURE SERVICE CREDIT, OR TEN YEARS OF VESTING SERVICE, WITHOUT A BREAK IN SERVICE. IF YOU WORK ANY HOURS AFTER JANUARY 1, 1999, YOU WILL BE ELIGIBLE WITH FIVE EARNED PENSION CREDITS AND ONE YEAR OF FUTURE SERVICE, OR FIVE YEARS OF VESTING SERVICE WITHOUT A BREAK IN SERVICE. ONCE YOU ARE VESTED, YOUR CREDITS CANNOT BE CANCELED BY A BREAK IN SERVICE. SEE THE SUMMARY PLAN DESCRIPTION FOR MORE INFORMATION ON ELIGIBILITY AND PENSION CREDITS.

# U. S. A.

ESTIMATED YEARS OF PAST SERVICE CREDIT  0.0   TOTAL YEARS OF FUTURE SERVICE  1.5  TOTAL  1,771.75  LOCAL  0004-NJ-

SINCE YOUR 07/01/86 MEMBER DATE    SINCE YOUR 07/01/86 PARTICIPATION DATE    SOCIAL SECURITY NO. 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

OUR RECORDS REFLECT MILLS    CLAIRE    AS YOUR DESIGNATED BENEFICIARY SINCE 05/08/00



Exhibit 16

**Screen:**   Employer Report History [MAARV WATERPROOFING IN - 281885, 4-NJ, 1]
**Criteria:**   (EmpRel_ID=41187) And (EntryDate Between `01/01/2001` And `01/30/2002`)
**Sort:**
**User:**   FKANDRIK

**Current Account Balance:**

| Report Date | Rpt # | --Calculated Hours--<br>Employer | System | --Cal. Contributions--<br>Employer | System | Total Rate | Rnd Flg | Rpt Stat | Entry Date | Amt Paid |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/01/2001 | 63356 | 48.00 | 48.00 | $126.24 | $126.24 | $2.63 | N | CL | 01/27/2002 | $126.24 |
| 11/01/2001 | 25630 | 98.00 | 98.00 | $258.72 | $258.72 | $2.64 | N | CL | 01/27/2002 | $258.72 |

0751

Exhibit 17

| | | | | | Remit/Adjust | Reciept | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

**Screen**  Employer Cash History - [MAARV WATERPROOFING IN - 281885, 4-NJ, 1]
**Criteria:**  (EntityID=41187) And (EntryDate Between `01/01/2002` And `12/31/2002`)
**Sort:**
**User**  FKANDRIK

| Batch # | Transfer # | Adj / Reason Code | Entry Date | Remit/Adjust Amount | Reciept Date | FiscalDate | Period | Adj? |
|---|---|---|---|---|---|---|---|---|
| 062773EN | 020231E | ER - Employer Report | 01/28/2002 | $384.96 | 10/04/2006 | 1/28/2002 | 01/2002 | |
| | 020231E | ER - Employer Report | 01/28/2002 | $384.96- | | 1/28/2002 | 01/2002 | |
| 250224R | 020231E | ER - Employer Report | 01/28/2002 | $258.72 | 01/27/2002 | 1/28/2002 | 01/2002 | |
| 250224R | 020231E | ER - Employer Report | 01/28/2002 | $126.24 | 01/27/2002 | 1/28/2002 | 01/2002 | |

0752

Exhibit 18

REQUEST?

RESEARCH EMPLOYER ACCOUNTS ABSTRACT - BALANCE

| EMPLYR | LOCAL | CG | NAME | S | FRST RPT | LAST RPT | BALANCE |
|--------|-------|-----|------|---|----------|----------|---------|
| 281885 | 0005-NJ | 1 | MAARV WATERPROOFING IN | I | 02/29/04 | 02/29/04 | $0.00 |
| 281885 | 0005-NJ | 10 | MAARV WATERPROOFING IN | I | 02/29/04 | 02/29/04 | $15.84- |

NO MORE DATA THIS EMPLOYER ID. PLEASE TYPE END THEN ENTER NEW REQUEST

Exhibit 19

Maarv Waterproofing
Employer # 281885
Hours List
Period 01/01/2002 - 12/31/2005.

| Account | Employer Name | Local | SSN | OVG | Employee Name | Work Date | Hours | EmMJD |
|---------|---------------|-------|-----|-----|---------------|-----------|-------|-------|
| 281885 | MAARV WATERPROOFING IN | 5-NJ | 057541731 1 | | RIVERA, EFRAIN | 02/01/04 | 72.0000 | 07/29/04 |
| 281885 | MAARV WATERPROOFING IN | 5-NJ | 143648537 10 | | MCMULLAN, ROBERT D | 02/01/04 | 72.0000 | 07/29/04 |
| 281885 | MAARV WATERPROOFING IN | 5-NJ | 145681003 10 | | PRUITT, PATRICK L | 02/01/04 | 72.0000 | 07/29/04 |

No other data available.

0315

Exhibit 20

| Account | Employer_Name | Local | SSN | CVG | Employee_Name | Work_Date |
|---------|---------------|-------|-----|-----|---------------|-----------|
| 281885 | MAARV WATERPROOFING IN | 5-NJ | 57541731 | 1 | RIVERA, EFRAIN | 2/1/2004 |
| 281885 | MAARV WATERPROOFING IN | 5-NJ | 143648537 | 10 | MCMULLAN, ROBERT D | 2/1/2004 |
| 281885 | MAARV WATERPROOFING IN | 5-NJ | 145681003 | 10 | PRUITT, PATRICK L | 2/1/2004 |

Exhibit 21

| Account | Local | SSN | CVG | Employee_Name | Work_Date | Hours |
|---------|-------|-----|-----|---------------|-----------|-------|
| 281885 | 5-NJ | 57541731 | 1 | RIVERA, EFRAIN | 2/1/2004 | 72 |
| 281885 | 5-NJ | 143648537 | 10 | MCMULLAN, ROBER | 2/1/2004 | 72 |
| 281885 | 5-NJ | 145681003 | 10 | PRUITT, PATRICK L | 2/1/2004 | 72 |

0553

Exhibit 22

| Account | Employer_Name | Local | CVG | SSN | UnionID | MBR_Stat_Code | Mbr_Stat_CodeDate | Employee_Name | Work_Date | EntryDt | Hours | IPF | Ann | IMI | IUDues |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 281885 | MAARV WATERPROOFING IN | 33-NJ | 1 | 135502265 | 311076 | MN | 10/1/1995 | SZAMOSSZEGI, ATTILA | 11/1/1986 | 2/28/1987 | 28 | 0.1 | | | |
| 281885 | MAARV WATERPROOFING IN | 33-NJ | 1 | 135502265 | 311076 | MN | 10/1/1995 | SZAMOSSZEGI, ATTILA | 11/1/1986 | 4/30/1987 | 7 | 0.1 | | | |
| 281885 | MAARV WATERPROOFING IN | 33-NJ | 1 | 152607790 | 311066 | MN | 7/1/1989 | MAYFIELD, GREGORY | 11/1/1986 | 4/30/1987 | 7 | 0.1 | | | |
| 281885 | MAARV WATERPROOFING IN | 33-NJ | 1 | 152607790 | 311066 | MN | 7/1/1989 | MAYFIELD, GREGORY | 11/1/1986 | 2/28/1987 | 28 | 0.1 | | | |
| 281885 | MAARV WATERPROOFING IN | 33-NJ | 1 | 135502265 | 311076 | MN | 10/1/1995 | SZAMOSSZEGI, ATTILA | 12/1/1986 | 2/28/1987 | 64 | 0.1 | | | |
| 281885 | MAARV WATERPROOFING IN | 33-NJ | 1 | 152607790 | 311066 | MN | 7/1/1989 | MAYFIELD, GREGORY | 12/1/1986 | 2/28/1987 | 64 | 0.1 | | | |
| 281885 | MAARV WATERPROOFING IN | 37-NJ | 1 | 135502265 | 311076 | MN | 10/1/1995 | SZAMOSSZEGI, ATTILA | 3/1/1987 | 4/30/1987 | 14 | 0.85 | | | |
| 281885 | MAARV WATERPROOFING IN | 37-NJ | 1 | 148444630 | 321017 | AC | 12/1/1990 | CUOMO, PETER | 3/1/1987 | 4/30/1987 | 14 | 0.85 | | | |
| 281885 | MAARV WATERPROOFING IN | 33-NJ | 1 | 152607790 | 311066 | MN | 7/1/1989 | MAYFIELD, GREGORY | 3/1/1987 | 4/30/1987 | 17 | 0.85 | | | |
| 281885 | MAARV WATERPROOFING IN | 33-NJ | 1 | 135502265 | 311076 | MN | 10/1/1995 | SZAMOSSZEGI, ATTILA | 7/1/1987 | 9/30/1987 | 35 | 0.1 | | | |
| 281885 | MAARV WATERPROOFING IN | 33-NJ | 1 | 152607790 | 311066 | MN | 7/1/1989 | MAYFIELD, GREGORY | 7/1/1987 | 9/30/1987 | 35 | 0.1 | | | |
| 281885 | MAARV WATERPROOFING IN | 38-NJ | 1 | 147669409 | 319091 | AC | 5/1/1987 | WOODS, GERALD P | 8/1/1994 | 8/29/1994 | 115 | 1 | | | |
| 281885 | MAARV WATERPROOFING IN | 13-NJ | 1 | 154667964 | 283498 | AC | 9/1/1981 | TILLYER, MICHAEL | 12/1/1996 | 2/21/1997 | 128 | 1.5 | | | |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 147724325 | 297801 | AC | 8/1/1984 | STANZIALE JR, JOHN | 5/1/2000 | 7/21/2000 | 80 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 148444630 | 321017 | AC | 12/1/1990 | CUOMO, PETER | 5/1/2000 | 7/21/2000 | 80 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 152484912 | 428252 | AC | 5/1/2000 | MILLS, WILLIAM J | 5/1/2000 | 7/21/2000 | 72 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 135589458 | 317545 | MN | 9/1/2005 | GILPIN, JAMES M | 6/1/2000 | 7/21/2000 | 72 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 135589458 | 317545 | MN | 9/1/2005 | GILPIN, JAMES M | 6/1/2000 | 8/10/2000 | 120 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 147724325 | 297801 | AC | 8/1/1984 | STANZIALE JR, JOHN | 6/1/2000 | 7/21/2000 | 72 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 147724325 | 297801 | AC | 8/1/1984 | STANZIALE JR, JOHN | 6/1/2000 | 8/10/2000 | 120 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 152484912 | 428252 | AC | 5/1/2000 | MILLS, WILLIAM J | 6/1/2000 | 7/21/2000 | 56 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 152484912 | 428252 | AC | 5/1/2000 | MILLS, WILLIAM J | 6/1/2000 | 8/10/2000 | 104 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 135589458 | 317545 | MN | 9/1/2005 | GILPIN, JAMES M | 7/1/2000 | 10/17/2000 | 64 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 147724325 | 297801 | AC | 8/1/1984 | STANZIALE JR, JOHN | 7/1/2000 | 10/17/2000 | 64 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 152484912 | 428252 | AC | 5/1/2000 | MILLS, WILLIAM J | 7/1/2000 | 10/17/2000 | 61 | 1.5 | | 0.7 | 0.41 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 152484912 | 428252 | AC | 5/1/2000 | MILLS, WILLIAM J | 10/1/2001 | 1/27/2002 | 48 | 1.5 | | 0.7 | 0.43 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 152484912 | 428252 | AC | 5/1/2000 | MILLS, WILLIAM J | 11/1/2001 | 1/27/2002 | 98 | 1.5 | | 0.7 | 0.44 |
| 281885 | MAARV WATERPROOFING IN | 4-NJ | 1 | 057541731 | 453314 | AC | 7/1/2002 | RIVERA, EFRAIN | 2/1/2004 | 7/29/2004 | 72 | | | 0.75 | 0.47 |
| 281885 | MAARV WATERPROOFING IN | 5-NJ | 10 | 143648537 | 425019 | MN | 4/1/2005 | MCMULLAN, ROBERT D | 2/1/2004 | 7/29/2004 | 72 | | | | 0.36 |
| 281885 | MAARV WATERPROOFING IN | 5-NJ | 10 | 145681003 | 425021 | AC | 12/1/1999 | PRUITT, PATRICK L | 2/1/2004 | 7/29/2004 | 72 | | | | 0.36 |

MAARV    IPF Account No. 281885

Exhibit 23

**Screen** Employer Cash History - [MAARV WATERPROOFING IN - 281885, 5-NJ, 1]
**Criteria:**
**Sort:**
**User** FKANDRIK

| Batch # | Transfer # | Adj / Reason Code | Entry Date | Remit/Adjust Amount | Reciept Date | FiscalDate | Period | Adj? |
|---------|-----------|-------------------|-----------|---------------------|--------------|-----------|--------|------|
| 258384R | 042021M | ER - Employer Report | 07/29/2004 | $195.84 | 07/29/2004 | 7/29/2004 | 07/2004 | |

Exhibit 24

| Screen: | Employer Report History [MAARV WATERPROOFING IN - 281885, 5-NJ, 1] |
|---------|---|
| Criteria: | |
| Sort: | |
| User: | FKANDRIK |

**Current Account Balance:** $0.00

| Report Date | Rpt. # | |--Calculated Hours--| Employer | System | |--Cal. Contributions--| Employer | System | Total Rate | Rnd Flg | Rpt Stat | Entry Date | Amt Paid |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/01/2004 | 292818 | 72.00 | 72.00 | $195.84 | $195.84 | $2.72 | N | CL | 07/29/2004 | $195.84 |

0754

Exhibit 25



# Bricklayers & Trowel Trades International Pension Fund

Suite 750, 1776 Eye Street, Northwest Washington, D.C. 20006-3700
Phone: 202/638-1996; 888/880-8222
Fax: 202/347-7339
http://www.ipfibf.org

RIVERA          EFRAIN
1325 N OLDEN AVE

TRENTON
NJ 08638

STATEMENT OF HOURS AS
REPORTED BY EMPLOYER
FROM 01/04
TO 12/04

17661

| EMPLOYER NAME | ACCOUNT NUMBER | LOCAL | REPORT DATE | IPF RATE | REPORTED HOURS |
|---|---|---|---|---|---|
| DECONIE MASONRY & GENERAL C | 281558 | 0006-NJ | 08/03 | 1.50 | 24.00 |
| DECONIE MASONRY & GENERAL C | 281558 | 0006-NJ | 09/03 | 1.50 | 16.00 |
| MROCZEK CONSTRUCTION INC | 298831 | 0005-NJ | 01/04 | 1.50 | 235.00 |
| MAARV WATERPROOFING IN | 281885 | 0005-NJ | 02/04 | 1.50 | 72.00 |
| AMERICAN MASONRY CORP | 296817 | 0005-NJ | 03/04 | 1.50 | 37.50 |
| AMERICAN MASONRY CORP | 296817 | 0005-NJ | 04/04 | 1.50 | 16.00 |
| MROCZEK CONSTRUCTION INC | 298831 | 0005-NJ | 05/04 | 1.50 | 235.00 |
| FALCON CONSTR CO OF MATTAWA | 297393 | 0005-NJ | 06/04 | 1.50 | 55.00 |
| FALCON CONSTR CO OF MATTAWA | 297393 | 0005-NJ | 07/04 | 1.50 | 157.50 |
| FALCON CONSTR CO OF MATTAWA | 297393 | 0005-NJ | 08/04 | 1.50 | 141.00 |
| FALCON CONSTR CO OF MATTAWA | 297393 | 0005-NJ | 09/04 | 1.50 | 119.00 |
| FALCON CONSTR CO OF MATTAWA | 297393 | 0005-NJ | 10/04 | 1.50 | 125.00 |
| FABCON INC | 238980 | 0005-NJ | 11/04 | 1.50 | 6.50 |

HOURS NOT RECEIVED AT TIME OF PRINTING OF THIS REPORT WILL BE SHOWN ON YOUR NEXT STATEMENT. HOURS FOR EARLIER YEARS THAT WERE REPORTED LATE OR ORIGINALLY UNDER A FALSE SOC. SEC. NO. ARE NOW CREDITED TO THE PROPER YEAR. ANY MISSING HOURS SHOULD BE VERIFIED WITH A COPY OF THIS STATEMENT AND CHECK STUBS.

ELIGIBILITY SUMMARY - U.S.

YOU RECEIVE 1.0 YEAR OF FUTURE SERVICE CREDIT FOR EACH YEAR OF 1,500 HOURS SINCE YOUR PARTICIPATION DATE. YOU MAY RECEIVE PAST SERVICE FOR EACH YEAR BEFORE YOUR PARTICIPATION DATE IN WHICH YOU WORKED OVER 750 HOURS FOR SIGNATORY EMPLOYERS IN PARTICIPATING LOCALS. HOWEVER, PAST SERVICE CREDITS ARE ONLY ESTIMATIONS, WITH ACTUAL ELIGIBILITY DETERMINED WHEN YOU RETIRE BASED ON PLAN RULES.

# U. S. A.

GENERALLY, TO BE ELIGIBLE FOR A PENSION AT NORMAL RETIREMENT AGE, YOU MUST EARN AT LEAST 10.0 SERVICE CREDITS INCLUDING 1.0 YEAR OF FUTURE SERVICE CREDIT, OR TEN YEARS OF VESTING SERVICE, WITHOUT A BREAK IN SERVICE. IF YOU WORK ANY HOURS AFTER JANUARY 1, 1999, YOU WILL BE ELIGIBLE WITH FIVE EARNED PENSION CREDITS AND ONE YEAR OF FUTURE SERVICE, OR FIVE YEARS OF VESTING SERVICE WITHOUT A BREAK IN SERVICE. ONCE YOU ARE VESTED, YOUR CREDITS CANNOT BE CANCELED BY A BREAK IN SERVICE. SEE THE SUMMARY PLAN DESCRIPTION FOR MORE INFORMATION ON ELIGIBILITY AND PENSION CREDITS.

ESTIMATED YEARS OF PAST SERVICE CREDIT 0.0    TOTAL YEARS OF FUTURE SERVICE 1.7 TOTAL 1,239.50 LOCAL 0005-NJ-

SINCE YOUR 07/01/02 MEMBER DATE    SINCE YOUR 08/01/02 PARTICIPATION DATE    SOCIAL SECURITY NO. 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

OUR RECORDS REFLECT _____ AS YOUR DESIGNATED BENEFICIARY SINCE _____

 05/13/05          PAGE 1 OF 1          0284          IPF-05 (11/99)

Exhibit D

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  Case No. 07-CV-0501 (RJL) |
| | ) |
| MAARV WATERPROOFING, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF PATRICE CLARKE

Pursuant to 28 U.S.C. § 1746, I, Patrice Clarke, hereby declare as follows:

1. I am an auditor who holds the position of manager with the certified public accounting firm Calibre CPA Group PLLC ("Calibre"), 1850 K Street, N.W., Suite 1050, Washington DC 20006. My firm is regularly retained by employee benefit plans to conduct payroll compliance audits. Those audits ensure that employers that have signed collective bargaining agreements with labor unions are making the fringe benefit contributions to employee benefit plans that are required by those agreements. When a review of the employer's books and records reveals that the employer has failed to meet its contractual contribution obligations, my firm calculates the delinquent contributions and other amounts owed by the employer under the relevant collective bargaining agreement. I have been an auditor since 2000 and, pursuant to my position at Calibre I have been performing, reviewing, and/or supervising payroll compliance audits since 2002. I have personal knowledge of the facts stated herein and, if called to testify as a witness, I could and would competently testify as set forth below.

2. In September 2005, my firm was retained by Dickstein Shapiro LLP, counsel to the Bricklayers & Trowel Trades International Pension Fund ("IPF") and the International Masonry Institute ("IMI") ("collectively Funds"), to conduct a payroll audit of Maarv

2364214.01

Waterproofing, Inc. ("Maarv") for the Funds, as authorized by ERISA, the Collection Procedures, and the 2002 – 2007 collective bargaining agreement to which Maarv is or was bound, to determine whether any delinquencies were owed. The audit was conducted beginning on January 10, 2006.

3. Miranda Romero, who no longer is employed by Calibre, and Mustafa Dimbiloglu were the auditors at Calibre who traveled to the offices of Maarv Waterproofing to review the company's books and records and determine whether any delinquencies were owed. I am one of their supervisors and was responsible for reviewing and approving the report prepared by them. Accordingly, I have personal knowledge of both the review of the books and records of Maarv Waterproofing and the conclusions reached as a result of that review.

4. During this payroll compliance audit, Anne Paoella (who I am told is now deceased), the office manager at Maarv at the time, was the auditors' contact at Maarv regarding the audit and all related matters and the only one the auditors dealt with at Maarv. Ms. Paoella provided the auditors with Maarv Waterproofing's payroll records for 2003 through 2005. However, although the auditors requested payroll records for 2002, Ms. Paoella informed the auditors that she was not able to locate the 2002 payroll records.

5. The auditors also requested the Employer's federal tax forms 941, 1099 and 1096 for 2002 through 2005. None of these tax forms were provided to the auditors. W2 tax forms were provided to the auditors, per request, for the years 2002 through 2004. However, although Anne Paoella informed the auditors that she did have a portion of the 2005 W2s requested, they never were provided to the auditors.

6. Despite repeated requests to Ms. Paoella by telephone and by 3 certified letters, the auditors never received all of the requested materials necessary to fully complete the audit. For up to five months after the field work on the audit was conducted, Ms. Paoella continued to

inform the auditors that she would not be able to meet any of the extended deadlines given to her by my firm to produce the requested records.

7. My firm found that Ms. Paoella was extremely obstinate and unhelpful from the day that the audit was begun. Despite repeated attempts, the auditors were unable to get in touch with the owners of the company regarding the resistance they were facing in obtaining the requested documents from Maarv or to see if they were aware of the situation.

8. In order to determine the type of work performed by Maarv Waterproofing employees, the auditors requested that Anne Paoella indicate each employee's job classification on a copy of his or her W2 form. The notation written on many of the W2 forms by Ms. Paoella was "lab" or laborer, and she informed the auditor that the individuals listed as laborers did waterproofing and caulking work.

9. Although waterproofing and caulking are both listed as covered trades in the collective bargaining agreement, Anne Paoella was adamant that the laborers and caulkers employed by Maarv Waterproofing did not perform any work covered by the collective bargaining agreement signed with the Bricklayers Union. Ms. Paella also stated that the only employees covered by the collective bargaining agreement were the two owners of the company.

10. During the audit, Ms. Paoella told the auditors that Maarv did not use any subcontractors during 2002 through 2005.

11. Ms. Paoella provided the auditors with payroll sheets. Among other information, those payroll sheets list the names, applicable wage rates, and hours of Maarv employees.

12. The information my firm gathered through the audit revealed that Maarv has performed waterproofing, caulking, concrete, and other work covered by the 2002 CBA, though Maarv claims that it typically performs waterproofing and caulking work through subcontractors.

13. Because waterproofing and caulking are covered trades under the 2002 – 2007 collective bargaining agreement, the work performed by the individuals identified as laborers by

3

Ms. Paella was included in the audit report and in calculating the delinquent contributions and other damages owed by Maarv.

14. My firm's review of the books and records of Maarv Waterproofing disclosed, among other matters, that from the period February 2004 through December 2005, Maarv Waterproofing failed to satisfy its obligations under the 2002 – 2007 collective bargaining agreement it had signed to report all employees performing covered work and make contributions for each hour of covered work performed by its employees.

15. A copy of the results of the audit performed by my firm is attached hereto as Exhibit 1.

16. The delinquencies my firm calculated pursuant to this audit totaled $414,822.44. This amount includes $87,828.80 in delinquent fringe benefit contributions owed to the Fund under the 2002 – 2007 collective bargaining agreement for the time period February 2004 through December 2005. *See* Exhibit 1 attached hereto.

17. In accordance with the Collection Procedures of the Central Collections Unit of the Bricklayers and Allied Craftworkers ("Collection Procedures"), my firm also assessed interest on the $87,828.80 in delinquent contributions at the rate of 15 percent per annum. Based on our calculations, the interest due from Maarv Waterproofing on the aforementioned delinquent contributions, calculated through August 9, 2006 is $18,662.95. *See* Exhibit 1 attached hereto.

18. In accordance with the Collection Procedures, my firm also assessed additional interest on the delinquent contributions amount at the rate of 15 percent per annum. Based on our calculations, the additional interest due from Maarv Waterproofing on the aforementioned $87,828.80 in delinquent contributions, calculated through August 9, 2006 is $18,662.95. *See* Exhibit 1 attached hereto.

2364214.01

19.   In sum, my firm has determined that Maarv Waterproofing owes the Funds the following amounts in contributions, interest, and additional interest under the 2002 – 2007 collective bargaining agreement to which Maarv is bound:

| | |
|---|---|
| Contributions: | $87,828.80 |
| Interest: | $18,662.95 |
| Additional Interest: | $18,662.95 |
| **TOTAL** | **$125,154.70** |

*See* Exhibit 1 attached hereto.

20.   In addition to the amounts stated above, my firm has charged the Funds, as of the date of this Declaration, a total of $3,803.35 in audit fees for our work in calculating the amounts owed to the Funds by Maarv.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  December 14, 2007

*Patrice Clarke*
_____
Patrice Clarke

2364214.01

Exhibit 1

**INTERNATIONAL TROWEL TRADES FRINGE BENEFIT FUNDS**
**COMPLIANCE AUDIT SUMMARY**
**GRAND TOTAL**

| | | | |
|---|---|---|---|
| Employer | Maarv Waterproofing | Date Audit Completed | 8/1/06 |
| Account No. | 281885    0004-NJ    0005-NJ | Auditor | Miranda Romero & Mustafa Dimbiloglu |
| Time Period Audited | January 2002 through December 2005 | Interest Calc. Through | 8/9/2006 |

| Funds | Contributions | Liq. Damages | Interest |
|---|---|---|---|
| International Pension Fund | $146,636.23 | $29,327.27 | $60,053.75 |
| International Health Fund | $0.00 | $0.00 | $0.00 |
| International Masonry Institute | $71,789.66 | $14,357.93 | $28,667.76 |
| Subtotal | $218,425.89 | $43,685.20 | $88,721.51 |
| International Union Dues Checkoff | $45,671.33 | $0.00 | $18,318.51 |
| Totals | $264,097.22 | $43,685.20 | $107,040.02 |

| | |
|---|---|
| Total Contributions and Dues Checkoff | $264,097.22 |
| Total Liquidated Damages @ 20% | $43,685.20 |
| Total Interest @ 15% per annum | $107,040.02 |
| Total Delinquency | $414,822.44 |
| Total Audit Fees | $3,103.35 |
| Total Due International Funds | $417,925.79 |

*→ Additional interest computed*
*$ 88,721.51.*

*New Total 10/19/06.    462,962.10 ✓*
*A.*

**0186**

## INTERNATIONAL TROWEL TRADES FRINGE BENEFIT FUNDS
### Interest and Liquidated Damages Schedule

Employer: Manrv Waterproofing
Account Number: 281885
BAC Local/State: 0004-NJ/0005-NJ
CVG: 1

| MO | DUE | REC | DAYS | HOURS | International Pension Fund | | | | International Health Fund | | | | International Masonry Institute | | | | International Dues CVG | | | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | RATE | DEL | INT | LD | RATE | DEL | INT | LD | RATE | DEL | INT | LD | RATE | DEL | INT | |
| Apr02 | 2/15/2002 | X | 1,656 | 2920.00 | 1.50 | $3,930.15 | $1,642.33 | $786.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,834.07 | $1,233.10 | $566.81 | 0.44 | $1,152.85 | $775.10 | $13,720.46 |
| May02 | 3/15/2002 | X | 1,628 | 2920.00 | 1.50 | $3,930.15 | $1,597.15 | $786.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,834.07 | $1,212.00 | $566.81 | 0.44 | $1,152.85 | $761.83 | $13,646.87 |
| Jun02 | 4/15/2002 | X | 1,599 | 2920.00 | 1.50 | $3,930.15 | $1,624.18 | $786.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,834.07 | $1,200.10 | $566.81 | 0.44 | $1,152.85 | $759.56 | $13,640.02 |
| Jul02 | 5/15/2002 | X | 1,577 | 2920.00 | 1.50 | $3,930.15 | $2,498.61 | $786.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,834.07 | $1,166.00 | $566.81 | 0.44 | $1,152.85 | $751.05 | $13,440.58 |
| Aug02 | 6/15/2002 | X | 1,547 | 2920.00 | 1.50 | $3,930.15 | $2,523.30 | $1810.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,890.07 | $1,175.54 | $378.01 | 0.44 | $1,185.05 | $742.02 | $13,717.22 |
| Sep02 | 7/15/2002 | X | 1,516 | 2920.00 | 1.50 | $3,930.15 | $2,400.38 | $786.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,834.07 | $1,120.04 | $566.81 | 0.44 | $1,152.85 | $704.03 | $13,294.66 |
| Oct02 | 8/15/2002 | X | 1,486 | 2920.00 | 1.50 | $3,930.15 | $2,350.01 | $786.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,834.07 | $1,096.68 | $566.81 | 0.44 | $1,152.85 | $689.94 | $13,205.94 |
| Nov02 | 9/15/2002 | X | 1,455 | 2920.00 | 1.50 | $3,930.15 | $2,305.13 | $786.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,834.07 | $1,066.02 | $566.81 | 0.44 | $1,152.85 | $697.24 | $13,491.82 |
| Dec02 | 10/15/2002 | X | 1,424 | 2920.00 | 1.50 | $3,930.15 | $2,270.10 | $786.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,890.07 | $1,073.17 | $378.01 | 0.44 | $1,152.85 | $660.44 | $13,478.71 |
| Jan03 | 11/15/2002 | X | 1,394 | 2920.00 | 1.50 | $3,930.15 | $2,231.49 | $786.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,890.07 | $1,000.00 | $378.01 | 0.44 | $1,152.85 | $659.54 | $13,029.66 |
| Feb03 | 12/15/2002 | X | 1,263 | 2920.00 | 1.50 | $3,930.15 | $3,201.42 | $786.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,834.07 | $1,027.13 | $566.81 | 0.44 | $1,152.85 | $645.70 | $11,244.43 |
| Mar03 | 1/15/2003 | X | 1,333 | 2700.00 | 1.50 | $4,050.15 | $2,118.71 | $810.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,890.07 | $1,025.40 | $378.01 | 0.44 | $1,242.05 | $650.41 | $12,304.83 |
| Apr03 | 2/15/2003 | X | 1,302 | 2700.00 | 1.50 | $3,930.15 | $2,102.90 | $810.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,890.07 | $1,005.35 | $378.01 | 0.44 | $1,152.85 | $664.89 | $12,309.88 |
| May03 | 2/15/2003 | X | 1,271 | 2200.75 | 1.50 | $3,452.63 | $1,803.41 | $690.53 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,611.23 | $841.59 | $322.21 | 0.46 | $1,058.81 | $555.01 | $11,311.94 |
| Jun03 | 3/15/2003 | X | 1,243 | 2320.00 | 1.50 | $3,489.00 | $1,782.26 | $697.80 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,628.20 | $831.72 | $325.64 | 0.46 | $1,059.96 | $546.55 | $10,971.14 |
| Jul03 | 4/15/2003 | X | 1,212 | 2399.53 | 1.50 | $3,599.38 | $1,788.31 | $718.08 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,673.51 | $834.54 | $335.10 | 0.46 | $1,100.05 | $548.42 | $10,591.39 |
| Aug03 | 5/15/2003 | X | 1,181 | 2381.47 | 1.50 | $3,571.71 | $1,821.14 | $714.15 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,700.15 | $855.00 | $335.03 | 0.46 | $1,156.67 | $577.65 | $11,040.91 |
| Sep03 | 6/15/2003 | X | 1,151 | 2343.50 | 1.50 | $3,545.25 | $1,823.44 | $709.05 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,654.45 | $855.00 | $330.89 | 0.46 | $1,147.91 | $731.83 | $14,038.84 |
| Oct03 | 7/15/2003 | X | 1,121 | 2404.50 | 1.50 | $3,606.75 | $1,661.58 | $721.31 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,683.15 | $775.41 | $336.63 | 0.46 | $1,106.07 | $731.83 | $14,063.86 |
| Nov03 | 8/15/2003 | X | 1,090 | 2453.00 | 1.50 | $3,679.50 | $1,644.22 | $735.90 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,717.10 | $769.17 | $343.43 | 0.46 | $1,128.38 | $505.46 | $14,305.34 |
| Dec03 | 9/15/2003 | X | 1,059 | 3380.00 | 1.50 | $3,170.00 | $1,684.25 | $774.00 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $1,856.00 | $785.90 | $361.20 | 0.46 | $1,186.80 | $515.51 | $10,484.74 |
| Jan04 | 10/15/2003 | X | 1,029 | 1654.00 | 1.50 | $2,481.00 | $506.20 | $774.00 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $489.61 | $231.56 | $231.56 | 0.46 | $760.94 | $221.75 | $16,987.20 |
| Feb04 | 11/15/2003 | X | 998 | 2700.00 | 1.50 | $4,055.15 | $810.23 | $810.03 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $991.10 | $776.17 | $361.49 | 0.46 | $1,343.81 | $510.01 | $11,330.28 |
| Mar04 | 12/15/2003 | X | 968 | 1272.00 | 1.50 | $1,909.50 | $331.90 | $381.90 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $890.11 | $354.69 | $178.21 | 0.46 | $585.04 | $210.01 | $15,019.45 |
| Apr04 | 1/15/2004 | X | 937 | 780.00 | 1.50 | $1,183.50 | $455.73 | $236.70 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $552.30 | $215.68 | $110.46 | 0.48 | $378.72 | $143.84 | $13,271.93 |
| May04 | 2/15/2004 | X | 906 | 825.00 | 1.50 | $1,239.00 | $247.80 | | 0.00 | $0.00 | $0.00 | $0.00 | 0.75 | $619.50 | $123.90 | | 0.47 | $388.22 | $144.51 | $3,426.84 |
| Jun04 | 3/15/2004 | X | 877 | 414.50 | 1.50 | $631.75 | $124.09 | $247.80 | 0.00 | $0.00 | $0.00 | $0.00 | 0.75 | $320.66 | $112.05 | $62.11 | 0.47 | $194.72 | $70.21 | $1,703.54 |
| | | X | 846 | 379.00 | 1.50 | $567.00 | $301.44 | $113.40 | 0.00 | $0.00 | $0.00 | $0.00 | 0.75 | $310.68 | $61.10 | $62.70 | 0.47 | $178.14 | $70.05 | $1,757.11 |
| | | X | 816 | 869.00 | 1.50 | $1,303.50 | $437.12 | $174.40 | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $651.75 | $131.51 | $130.35 | 0.47 | $408.43 | $59.35 | $3,434.37 |
| | | X | 785 | 869.00 | 1.50 | $1,429.50 | $285.90 | | 0.00 | $0.00 | $0.00 | $0.00 | 0.70 | $714.75 | $142.95 | | 0.47 | $447.91 | $148.50 | $3,837.21 |
| Jun04 | 7/15/2004 | X | 751 | 1444.00 | 1.50 | $2,166.00 | $433.20 | | 0.00 | $0.00 | $0.00 | $0.00 | 0.75 | $1,083.00 | $216.60 | | 0.47 | $678.68 | $210.58 | $5,796.15 |

**INTERNATIONAL TROWEL TRADES FRINGE BENEFIT FUNDS**
**Interest and Liquidated Damages Schedule**

Employer: Masry Waterproofing
Account Number: 281885
B.A.C. Local/State: 0004-NJ/0005-NJ
CVG: 1

Interest calculated through: 8/9/2006

| MO | DUE | REC | DAYS | HOURS | International Pension Fund | | | | International Health Fund | | | | International Masonry Institute | | | | International Dues CVG | | | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | RATE | DEL | INT | LD | RATE | DEL | INT | LD | RATE | DEL | INT | LD | RATE | DEL | INT | |
| Aug-04 | 8/15/2004 | X | 724 | 3051.90 | 1.50 | $3,077.23 | $915.59 | $615.45 | 0.75 | $1,518.63 | $457.80 | $307.73 | 0.47 | $964.41 | $286.89 | 0.47 | $964.41 | $286.89 | $8,163.55 |
| Sep-04 | 9/15/2004 | X | 693 | 2938.20 | 1.50 | $2,850.75 | $811.88 | $570.15 | 0.75 | $1,425.38 | $405.94 | $285.08 | 0.47 | $893.24 | $254.59 | | | | $7,496.81 |
| Oct-04 | 10/15/2004 | X | 663 | 2936.40 | 1.50 | $4,101.50 | $1,133.31 | $820.43 | 0.75 | $2,050.85 | $566.69 | $410.18 | 0.47 | $1,284.02 | $355.11 | | | | $10,731.40 |
| Nov-04 | 11/15/2004 | X | 632 | 3529.80 | 1.50 | $5,292.90 | $1,374.71 | $1,058.58 | 0.75 | $2,646.45 | $687.36 | $529.29 | 0.47 | $1,658.45 | $430.77 | | | | $13,678.49 |
| Dec-04 | 12/15/2004 | X | 602 | 2877.00 | 1.50 | $4,316.23 | $1,067.83 | $863.33 | 0.75 | $2,350.00 | $569.51 | $460.40 | 0.47 | $1,433.73 | $335.95 | | | | $11,273.94 |
| Jan-05 | 1/15/2005 | X | 571 | 2925.00 | 1.50 | $4,387.50 | $1,029.56 | $877.50 | 0.75 | $2,340.00 | $549.10 | $448.00 | 0.47 | $1,462.50 | $343.19 | | | | $11,457.35 |
| Feb-05 | 2/15/2005 | X | 540 | 2212.50 | 1.50 | $3,318.75 | $403.62 | $530.75 | 0.75 | $970.00 | $213.28 | $194.00 | 0.50 | $600.25 | $134.54 | | | | $4,706.17 |
| Mar-05 | 3/15/2005 | X | 512 | 1106.50 | 1.50 | $1,659.75 | $349.21 | $331.95 | 0.75 | $885.50 | $186.26 | $177.04 | 0.50 | $553.25 | $116.41 | | | | $4,239.09 |
| Apr-05 | 4/15/2005 | X | 481 | 983.75 | 1.50 | $1,475.63 | $291.69 | $295.13 | 0.75 | $787.00 | $155.57 | $157.40 | 0.50 | $491.88 | $97.24 | | | | $3,731.54 |
| May-05 | 5/15/2005 | X | 451 | 1748.50 | 1.50 | $2,622.75 | $486.11 | $524.55 | 0.75 | $1,398.80 | $259.26 | $279.76 | 0.50 | $874.25 | $162.04 | | | | $8,607.92 |
| Jun-05 | 6/15/2005 | X | 420 | 1013.00 | 1.50 | $1,522.50 | $262.79 | $304.50 | 0.75 | $812.00 | $140.16 | $162.40 | 0.50 | $507.50 | $87.60 | | | | $3,799.43 |
| Jul-05 | 7/15/2005 | X | 390 | 784.25 | 1.50 | $1,176.38 | $188.32 | $235.28 | 0.75 | $627.20 | $100.44 | $125.44 | 0.50 | $392.06 | $62.84 | | | | $2,908.16 |
| Aug-05 | 8/15/2005 | X | 359 | 851.00 | 1.50 | $1,276.50 | $188.33 | $255.30 | 0.75 | $680.80 | $100.45 | $136.16 | 0.50 | $425.50 | $62.78 | | | | $3,135.82 |
| Sep-05 | 9/15/2005 | X | 328 | 1139.22 | 1.50 | $1,708.83 | $230.35 | $341.77 | 0.75 | $911.38 | $122.86 | $182.28 | 0.50 | $569.61 | $76.79 | | | | $4,143.86 |
| Oct-05 | 10/15/2005 | X | 298 | 2904.75 | 1.50 | $4,357.13 | $533.60 | $871.43 | 0.75 | $2,323.80 | $284.59 | $464.76 | 0.50 | $1,452.38 | $177.87 | | | | $10,465.56 |
| Nov-05 | 11/15/2005 | X | 267 | 3205.00 | 1.50 | $3,457.50 | $379.38 | $691.50 | 0.75 | $1,844.00 | $202.34 | $368.80 | 0.50 | $1,152.50 | $126.46 | | | | $8,222.48 |
| Dec-05 | 12/15/2005 | X | 237 | 3098.00 | 1.50 | $3,147.00 | $306.51 | $629.40 | 0.75 | $1,783.20 | $173.69 | $356.66 | 0.50 | $1,090.96 | $106.65 | | | | $7,550.74 |
| Jan-06 | 1/15/2006 | X | 206 | 1949.50 | 1.50 | $2,924.25 | $247.76 | $584.85 | 0.75 | $1,651.08 | $140.59 | $331.42 | 0.52 | $1,013.74 | $81.63 | | | | $6,983.02 |
| | | | | | | $146,636.43 | $60,053.73 | $29,327.27 | | $0.00 | $0.00 | $0.00 | | $71,789.68 | $28,667.76 | $14,357.92 | | $45,671.33 | $18,318.51 | $414,822.44 |

International Dues Check-off ..................... $216,423.89
International Dues Check-off Interest ............. $38,721.51
............................................... $43,685.20

International Dues Check-off ..................... $45,671.33
International Dues Check-off Interest ............. $18,318.51

Total ............................................ $414,822.44

# INTERNATIONAL TROWEL TRADES FRINGE BENEFIT FUNDS
## Summary of Unreported Hours

ACCOUNT NUMBER: 281885
LOCAL UNION/STATE: 0084-NJ/0084-NJ
CVG: 01

YEAR: 2002

COMPLIANCE AUDIT PERIOD: January 2003 through December 2005
EMPLOYER NAME: Marri Waterproofing
EMPLOYER ADDRESS: 68 Colfax Avenue, Clifton, NJ 07013
CONTACT & PH#: Ms. Ann Padilla (973) 470 - 0686

CALCULATION OF HOURS PAID

PRIMARY EXPLANATION OF FINDINGS:
A. Failed to report employee performing covered work

AUDITOR: Miranda Romero & Mustafa Dinobioglu

| EMPLOYEE NAME | S/S NUMBER | HIRE | ELIGIBLE | TERM | NOTE | Approx Wage Rate | Approx W-2 Wages | Approx Hours YTD | Amortized hours per month |
|---|---|---|---|---|---|---|---|---|---|
| Campos, Francisco | 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 | not available | N/A | N/A | A | $ 12.00 | $ 11,010.00 | 917.50 | 76.50 |
| Conway, Willie | 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 | not available | N/A | N/A | A | $ 11.50 | $ 9,401.25 | 817.50 | 68.20 |
| Evans, Peter R. | 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 | not available | N/A | N/A | A | $ 13.50 | $ 10,327.95 | 765.03 | 63.80 |
| Geza, Budai | 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 | not available | N/A | N/A | A | $ 11.25 | $ 28,676.50 | 2,549.02 | 212.50 |
| Gilmore, Kevin P | 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 | not available | N/A | N/A | A | $ 15.00 | $ 4,395.00 | 293.00 | 24.50 |
| Gilmore, Shawn J | 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 | not available | N/A | N/A | A | $ 18.50 | $ 40,098.16 | 2,329.63 | 194.20 |
| Holland, Sherman | 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 | not available | N/A | N/A | A | $ 19.37 | $ 51,003.44 | 2,633.12 | 219.50 |
| Karczag, Gyula | 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 | not available | N/A | N/A | A | $ 13.50 | $ 34,021.61 | 2,520.12 | 210.10 |
| Kaszony Sr, Balint | 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 | not available | N/A | N/A | A | $ 15.59 | $ 4,435.70 | 284.52 | 23.80 |
| Klimaszewski, Andrzej | 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 | not available | N/A | N/A | A | $ 10.00 | $ 24,922.25 | 2,492.23 | 207.70 |
| Krupinski, Kazimierz | 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 | not available | N/A | N/A | A | $ 15.00 | $ 17,195.50 | 1,109.39 | 92.50 |
| Krupinski, Lech | 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 | not available | N/A | N/A | A | $ 14.50 | $ 24,057.25 | 1,659.79 | 138.30 |
| Krysik, Chester | 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 | not available | N/A | N/A | A | $ 13.50 | $ 44,980.51 | 3,331.89 | 277.70 |
| Mata, Gerardo G | 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 | not available | N/A | N/A | A | $ 12.50 | $ 20,103.50 | 1,608.28 | 134.10 |
| Palitos, Ivan | 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 | not available | N/A | N/A | A | $ 13.50 | $ 10,000.00 | 740.74 | 61.80 |
| Simon, Ervin | 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 | not available | N/A | N/A | A | $ 14.00 | $ 25,380.00 | 1,812.86 | 151.10 |
| Straub, Ian | 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 | not available | N/A | N/A | A | $ 13.50 | $ 19,501.00 | 1,444.52 | 120.40 |
| Zaretsky, Bruce | 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 | not available | N/A | N/A | A | $ 17.31 | $ 4,846.80 | 280.00 | 23.40 |

The auditors were not given any payroll records for the Year 2002, only W-2s were made available. As a result, the W-2 wages were divided by the approximate wage rates noted on payroll records from subsequent years in the audit period. This information was used to calculate the approximate number of hours paid during 2002. In order to more accurately calculated contributions due, interest, and damages, the approximate number of hours paid will be amortized over the entire year. The amortized hours are noted in the adjacent schedule and will be noted in each month of the Unreported Hours Schedules to follow.

# INTERNATIONAL TROWEL TRADES FRINGE BENEFIT FUNDS
## Summary of Unreported Hours

ACCOUNT NUMBER: 281885
BAC LOCAL UNION/STATE: 0004-NJ/0005-NJ
CVG: 01

YEAR: 2003

COMPLIANCE AUDIT PERIOD: January 2003 through December 2005
EMPLOYER NAME: Maxry Waterproofing
EMPLOYER ADDRESS: 68 Colfax Avenue
Clifton, NJ 07013
CONTACT & FBH: Ms. Ann Padilla    (973) 470-0686

SCHEDULE OF UNREPORTED HOURS    (HOURS HAVE BEEN AMORTIZED)

PRIMARY EXPLANATION OF FINDINGS:
A. Failed to report employee performing covered work

AUDITOR: Miranda Romero & Mustafa Dimiliugiu

| EMPLOYEE NAME | SSN NUMBER | HIRE | ELIGIBLE | TERM | NOTE | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Campos, Francisco | 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 | not available | N/A | not available | | 76.50 | 76.50 | 76.50 | 76.50 | 76.50 | 76.50 | 76.50 | 76.50 | 76.50 | 76.50 | 76.50 | 76.50 | 918.00 |
| Caraway, Willie | 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 | not available | N/A | not available | | 68.60 | 68.60 | 68.60 | 68.60 | 68.60 | 68.60 | 68.60 | 68.60 | 68.60 | 68.60 | 68.60 | 68.60 | 823.20 |
| Evans, Peter R. | 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 | not available | N/A | not available | | 63.80 | 63.80 | 63.80 | 63.80 | 63.80 | 63.80 | 63.80 | 63.80 | 63.80 | 63.80 | 63.80 | 63.80 | 765.60 |
| Gizo, Budal | 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 | not available | N/A | not available | | 212.50 | 212.50 | 212.50 | 212.50 | 212.50 | 212.50 | 212.50 | 212.50 | 212.50 | 212.50 | 212.50 | 212.50 | 2,550.00 |
| Glinton, Kevin P. | 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 | not available | N/A | not available | | 24.50 | 24.50 | 24.50 | 24.50 | 24.50 | 24.50 | 24.50 | 24.50 | 24.50 | 24.50 | 24.50 | 24.50 | 294.00 |
| Glinton, Shawn | 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 | not available | N/A | not available | | 194.20 | 194.20 | 194.20 | 194.20 | 194.20 | 194.20 | 194.20 | 194.20 | 194.20 | 194.20 | 194.20 | 194.20 | 2,330.40 |
| Holland, Sherman | 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 | not available | N/A | not available | | 219.50 | 219.50 | 219.50 | 219.50 | 219.50 | 219.50 | 219.50 | 219.50 | 219.50 | 219.50 | 219.50 | 219.50 | 2,634.00 |
| Kerzog, Ozula | 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 | not available | N/A | not available | | 210.10 | 210.10 | 210.10 | 210.10 | 210.10 | 210.10 | 210.10 | 210.10 | 210.10 | 210.10 | 210.10 | 210.10 | 2,521.20 |
| Kianow, St. Batist | 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 | not available | N/A | not available | | 23.80 | 23.80 | 23.80 | 23.80 | 23.80 | 23.80 | 23.80 | 23.80 | 23.80 | 23.80 | 23.80 | 23.80 | 285.60 |
| Kieszzowski, Andrzej | 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 | not available | N/A | not available | | 207.70 | 207.70 | 207.70 | 207.70 | 207.70 | 207.70 | 207.70 | 207.70 | 207.70 | 207.70 | 207.70 | 207.70 | 2,492.40 |
| Kupinski, Kazimierz | 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 | not available | N/A | not available | A | 92.50 | 92.50 | 92.50 | 92.50 | 92.50 | 92.50 | 92.50 | 92.50 | 92.50 | 92.50 | 92.50 | 92.50 | 1,110.00 |
| Kupinski, Leon | 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 | not available | N/A | not available | A | 138.30 | 138.30 | 138.30 | 138.30 | 138.30 | 138.30 | 138.30 | 138.30 | 138.30 | 138.30 | 138.30 | 138.30 | 1,659.60 |
| Kopnia, Chester | 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 | not available | N/A | not available | A | 277.70 | 277.70 | 277.70 | 277.70 | 277.70 | 277.70 | 277.70 | 277.70 | 277.70 | 277.70 | 277.70 | 277.70 | 3,332.40 |
| Maza, Emesto O. | 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 | not available | N/A | not available | A | 134.10 | 134.10 | 134.10 | 134.10 | 134.10 | 134.10 | 134.10 | 134.10 | 134.10 | 134.10 | 134.10 | 134.10 | 1,609.20 |
| Pallai, Ivan | 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 | not available | N/A | not available | A | 61.80 | 61.80 | 61.80 | 61.80 | 61.80 | 61.80 | 61.80 | 61.80 | 61.80 | 61.80 | 61.80 | 61.80 | 741.60 |
| Simon, Ervin | 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 | not available | N/A | not available | A | 151.10 | 151.10 | 151.10 | 151.10 | 151.10 | 151.10 | 151.10 | 151.10 | 151.10 | 151.10 | 151.10 | 151.10 | 1,813.20 |
| Straub, Ben | 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 | not available | N/A | not available | A | 120.40 | 120.40 | 120.40 | 120.40 | 120.40 | 120.40 | 120.40 | 120.40 | 120.40 | 120.40 | 120.40 | 120.40 | 1,444.80 |
| Zantsky, Bruce | 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 | not available | N/A | not available | F | 23.40 | 23.40 | 23.40 | 23.40 | 23.40 | 23.40 | 23.40 | 23.40 | 23.40 | 23.40 | 23.40 | 23.40 | 280.80 |
| Cortina, Peter | 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 | not available | N/A | not available | F | 160.00 | 160.00 | 160.00 | 160.00 | 160.00 | 160.00 | 160.00 | 160.00 | 160.00 | 160.00 | 160.00 | 160.00 | 2,080.00 |
| Starwomzegl, Attila | 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 | not available | N/A | not available | F | 160.00 | 160.00 | 200.00 | 200.00 | 200.00 | 160.00 | 160.00 | 200.00 | 160.00 | 160.00 | 200.00 | 160.00 | 2,080.00 |

**TOTAL UNREPORTED HOURS** | | | | | | 2,620.10 | 2,620.10 | 2,700.10 | 2,620.10 | 2,700.10 | 2,620.10 | 2,620.10 | 2,700.10 | 2,620.10 | 2,620.10 | 2,700.10 | 2,620.10 | 31,761.20

| Rate used | Funds | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $1.50 | International Pension Fund | $3,930.15 | $3,930.15 | $3,930.15 | $3,930.15 | $3,930.15 | $3,930.15 | $3,930.15 | $3,930.15 | $3,930.15 | $3,930.15 | $3,930.15 | $3,930.15 | $47,161.80 |
| $0.70 | International Maternity Institute | $1,834.07 | $1,834.07 | $1,890.07 | $1,834.07 | $1,890.07 | $1,834.07 | $1,834.07 | $1,890.07 | $1,834.07 | $1,834.07 | $1,890.07 | $1,834.07 | $22,232.84 |
| $0.44 | International Dues Check-Off | $1,152.84 | $1,152.84 | $1,188.04 | $1,152.84 | $1,188.04 | $1,152.84 | $1,152.84 | $1,188.04 | $1,152.84 | $1,152.84 | $1,203.25 | $1,152.84 | $14,001.30 |
| $2.64 | Totals | $6,917.06 | $6,917.06 | $7,128.26 | $6,917.06 | $7,128.26 | $6,917.06 | $6,917.06 | $7,128.26 | $6,917.06 | $6,917.06 | $7,182.27 | $6,969.47 | $83,935.94 |

0190

# INTERNATIONAL TROWEL TRADES FRINGE BENEFIT FUNDS
## Summary of Unreported Hours

**ACCOUNT NUMBER:** 281885
**BAC LOCAL UNION/STATE:** 0004-NJ0005-NJ
**CVG:** 01

**YEAR:** 2003

**COMPLIANCE AUDIT PERIOD:** January 2003 through December 2005
**EMPLOYER NAME:** Mary Waterproofing
**EMPLOYER ADDRESS:** 68 Cella Avenue, Clifton, NJ 07013
**CONTACT & PH#:** Ms. Ann Pistella (973) 470-6686

**PRIMARY EXPLANATION OF FINDINGS:**
A. Failed to report employee performing covered work

### SCHEDULE OF UNREPORTED HOURS

**AUDITOR:** Miranda Romero & Murada Dinbilegu

| EMPLOYEE NAME | SS NUMBER | HIRE | ELIGIBLE | TERM | NOTE | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Campos, Francisco | 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 | not available | N/A | not available | A | 122.00 | 159.50 | 164.00 | 137.00 | 229.00 | 154.50 | 163.50 | 100.00 | 77.00 | 164.00 | 80.00 | | 1,547.50 |
| Carvey, Willie | 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 | not available | N/A | not available | A | 22.00 | | | | 233.00 | 139.00 | 80.00 | 37.00 | | | | | 248.00 |
| Clarke, Samuel | 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 | not available | N/A | not available | A | | | | | | 24.00 | 18.50 | 114.50 | | | | | 242.00 |
| Dias, Marcin | 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 | not available | N/A | not available | A | | 145.00 | 165.00 | 170.50 | | 16.00 | 149.00 | 72.00 | 17.50 | 180.00 | 83.00 | | 317.95 |
| Garcia, Barla | 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 | not available | N/A | not available | A | 152.00 | 138.00 | 155.00 | 66.00 | 183.50 | 129.50 | 137.50 | 40.50 | 63.50 | | 15.00 | 47.00 | 1,342.00 |
| Glinski, Kevin P | 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 | not available | N/A | not available | A | 113.50 | 144.50 | 304.00 | 124.00 | 117.00 | | | | | | | | 833.00 |
| Glinowo, Shawn J | 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 | not available | N/A | not available | A | | | | 17.50 | | 65.00 | | | | | | | 341.50 |
| Gonatez, Rodolfo | 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 | not available | N/A | not available | A | | | 39.00 | | | 114.00 | | 137.00 | 141.50 | 111.50 | 90.00 | | 1,376.58 |
| Hollenc, Shenman | 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 | not available | N/A | not available | A | 123.50 | 164.50 | 88.18 | 144.50 | 138.00 | 120.00 | 80.00 | | | 46.00 | 27.00 | 131.50 | 273.00 |
| Karczag, Gyula | 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 | not available | N/A | not available | A | | | | | | 155.50 | 70.50 | 133.50 | 127.00 | 138.00 | 104.00 | 83.50 | 2,055.95 |
| Kasanov Sr, Balint | 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 | not available | N/A | not available | A | 143.50 | 148.50 | 174.00 | 370.50 | 199.50 | 140.00 | 159.50 | 140.00 | 327.00 | 160.00 | | | 2,045.00 |
| Klimaszewski, Andrzej | 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 | not available | N/A | not available | A | | 148.50 | 174.50 | 189.00 | 263.00 | 147.50 | 191.50 | 167.00 | | | | | 438.50 |
| Klimaszewski, Lukasz | 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 | not available | N/A | not available | A | 138.00 | 139.00 | 138.00 | 138.00 | 86.00 | 40.00 | 67.00 | 24.00 | 76.00 | | | | 1,132.00 |
| Krupinski, Kazimierz | 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 | not available | N/A | not available | A | 111.00 | 97.00 | 23.00 | 203.50 | 78.50 | 40.00 | 99.00 | 173.50 | 154.50 | 13.50 | | | 786.50 |
| Krupinski, Lech | 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 | not available | N/A | not available | A | 143.50 | 162.00 | 196.50 | 234.50 | 181.00 | 99.50 | 219.00 | 167.50 | 264.00 | 160.50 | | | 2,411.50 |
| Krynta, Chester | 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 | not available | N/A | not available | A | 148.50 | 155.50 | 118.50 | 164.50 | 240.00 | 142.00 | 101.50 | 125.50 | 73.50 | | 13.50 | | 1,359.50 |
| Kuhn, Elmer | 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 | not available | N/A | not available | A | 135.50 | 152.00 | 169.00 | 181.00 | 80.00 | 80.00 | 146.00 | 148.00 | | | | | 498.00 |
| Meta, Grendo G | 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 | not available | N/A | not available | A | | | | | | 161.00 | 130.00 | 62.00 | | | 114.50 | | 174.50 |
| Mott, Thomas | 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 | not available | N/A | not available | A | | | | | | | | 63.00 | 65.00 | | | | 2,106.50 |
| Santana, Antonio | 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 | not available | N/A | not available | A | 147.00 | 155.00 | 167.00 | 134.50 | 219.50 | 142.00 | 181.00 | 148.00 | 68.00 | 386.50 | 143.50 | | 1,007.25 |
| Simon, Ervin | 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 | not available | N/A | not available | A | 100.75 | 107.00 | 65.00 | 109.50 | 177.00 | 144.50 | 50.50 | 138.00 | 90.00 | | | | 2,000.00 |
| Straub, Jan | 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 | not available | N/A | not available | A | 80.00 | 138.00 | 160.00 | 160.00 | 200.00 | 160.00 | 160.00 | 200.00 | 160.00 | 200.00 | 160.00 | 160.00 | 463.00 |
| Zarztby, Bruce | 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 | not available | N/A | not available | F | 200.00 | 160.00 | 160.00 | 160.00 | 200.00 | 160.00 | 160.00 | 200.00 | 160.00 | 200.00 | 160.00 | 160.00 | 2,080.00 |
| Starnesszasz, Attila | 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 | not available | N/A | not available | F | 200.00 | 160.00 | 160.00 | 160.00 | 200.00 | 160.00 | 160.00 | 200.00 | 160.00 | 200.00 | 160.00 | 160.00 | 2,080.00 |
| **TOTAL UNREPORTED HOURS** | | | | | | 2,301.75 | 2,226.00 | 2,393.58 | 2,514.50 | 3,563.50 | 2,404.50 | 2,453.00 | 2,580.00 | 1,654.00 | 2,703.50 | 1,275.00 | 789.00 | 26,756.83 |

| Fund | Rate as of 11/1/2003 | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| International Pension Fund | $1.50 | $3,452.63 | $3,489.00 | $3,590.38 | $3,771.75 | $5,045.25 | $3,606.75 | $3,679.50 | $3,870.00 | $2,481.00 | $4,055.25 | $1,909.50 | $1,183.50 | $40,134.51 |
| International Masonry Institute | $0.70 | $1,611.23 | $1,558.20 | $1,675.51 | $1,760.15 | $2,354.45 | $1,683.15 | $1,717.10 | $1,806.00 | $1,157.80 | $1,892.45 | $891.10 | $555.30 | $18,752.44 |
| Int'l Health Fund | $0.48 | $1,038.81 | $1,066.96 | $1,107.61 | $1,159.67 | $1,613.57 | $1,106.07 | $1,186.80 | $1,243.61 | $793.04 | $1,321.68 | $578.72 | $378.72 | $13,249.16 |
| Int'l Dues Check-Off | F | $200.00 | $160.00 | $160.00 | $160.00 | $200.00 | $160.00 | $160.00 | $200.00 | $160.00 | $200.00 | $160.00 | $160.00 | $2,080.00 |
| Totals | | $2.66 | $2.68 | $0.48 | $6,112.67 | $6,187.16 | $6,746.94 | $6,356.91 | $6,359.97 | $6,524.98 | $6,862.80 | $4,399.64 | $7,191.31 | $3,411.64 | $7,114.52 | $71,113.11 |

**ACCOUNT NUMBER:** 281885
**BAC LOCAL UNION/STATE:** 0094-NJ/0005-NJ
**CVG:** 01

**YEAR:** 2004

**COMPLIANCE AUDIT PERIOD:** January 2003 through December 2005
**EMPLOYER NAME:** Maxry Waterproofing
**EMPLOYER ADDRESS:** 68 Colfax Avenue / Clifton, NJ 07011
**CONTACT & PH#:** (973) 401-0666

# INTERNATIONAL TROWEL TRADES FRINGE BENEFIT FUNDS
## Summary of Unreported Hours

### SCHEDULE OF UNREPORTED HOURS

**PRIMARY EXPLANATION OF FINDINGS:**
A. Failed to report employees performing covered work

**AUDITOR:** Miranda Romero & Nuanrh Dimbisgalu

| EMPLOYEE NAME | S.S NUMBER | HIRE | ELIGIBLE | TERM | NOTE | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adams, Maurice | 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 | not available | N/A | A | | | | | | | | | | | | | 30.50 | 30.50 |
| Besek, Andrzej | 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 | not available | N/A | A | | | | | | | | | | | 232.00 | | | 232.00 |
| Campos, Francisco | 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 | not available | N/A | A | | | | | | | | | 167.50 | | | | | 167.50 |
| Cadena, Michael F | 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 | not available | N/A | A | | 56.00 | 24.00 | 64.50 | 16.00 | 155.50 | 176.50 | 107.50 | 166.50 | 147.00 | 160.50 | 168.00 | | 1,378.50 |
| Cruz, Luis | 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 | not available | N/A | A | | | | | | | | | | 159.50 | 193.50 | 193.50 | | 746.00 |
| Greta, Bohai | 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 | not available | N/A | A | | 23.00 | | | 14.00 | 44.00 | 35.50 | 76.50 | 96.00 | 193.50 | 24.50 | 137.00 | | 660.00 |
| Holland, Sherman | 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 | not available | N/A | A | | | 8.00 | 7.00 | | | | | 220.50 | 190.00 | | | 180.50 | 672.00 |
| Kardan, Olvin | 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 | not available | N/A | A | | | | | | | | 40.50 | 214.00 | 172.50 | | 145.50 | | 840.50 |
| Kata, Stan | 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 | not available | N/A | A | | | | | | | 86.50 | 187.00 | 238.00 | 46.50 | 9.00 | | | 661.50 |
| Kaszowy S. Balint | 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 | not available | N/A | A | | 65.00 | 92.00 | 156.00 | 190.00 | 111.00 | 22.50 | 22.50 | 21.50 | 56.00 | 175.50 | 244.50 | | 254.50 |
| Klimaszewski, Andrzej | 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 | not available | N/A | A | | 24.00 | 30.50 | 67.00 | 160.00 | 181.50 | 201.50 | 204.00 | 203.00 | 179.00 | 21.50 | 144.50 | | 1,586.50 |
| Kopinski, Kazimierz | 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 | not available | N/A | A | | 20.00 | | 147.00 | 181.50 | 191.00 | 179.50 | 132.50 | 164.00 | 144.50 | 98.50 | 243.50 | | 1,378.50 |
| Kropinski, Kazimierz | 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 | not available | N/A | A | | 104.00 | | | | 62.00 | 126.00 | 137.00 | 290.00 | 239.00 | 152.50 | 1,352.50 | | 1,228.00 |
| McNair, William | 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 | not available | N/A | A | | 112.00 | | | 30.00 | 77.00 | 118.50 | 79.50 | 155.50 | 268.00 | 200.00 | 175.00 | | 1,228.00 |
| Meza, Oresdo G | 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 | not available | N/A | A | | 12.00 | | | | | | | | 69.50 | 56.00 | 123.50 | | 123.50 |
| Omen, Ismet | 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 | not available | N/A | A | | | | | | | 173.50 | 174.00 | 205.00 | 179.00 | 232.50 | 937.00 | | 937.00 |
| Reetz, Derren | 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 | not available | N/A | A | | | | | | 121.50 | 132.50 | | 76.50 | 171.50 | 224.50 | 472.50 | | 472.50 |
| Reetz, David | 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 | not available | N/A | A | | | | 7.50 | | | 135.00 | 206.50 | 91.50 | 198.50 | 194.50 | 1,070.00 | | 1,070.00 |
| Simon, Ervin | 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 | not available | N/A | A | | 41.00 | | 27.00 | 28.50 | | | | 88.50 | | | 96.00 | | 96.00 |
| Shriram, Bednarczyk | 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 | not available | N/A | A | | | | | | 39.50 | 244.00 | 223.00 | 219.50 | 210.00 | 198.50 | 260.50 | | 1,493.50 |
| Swift, Timothy | 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 | not available | N/A | A | | | | | | | | | 99.00 | 90.50 | | | | 193.50 |
| Stamszezep, Man | 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 | not available | N/A | A | | | | | | | | | 60.00 | | 38.00 | 118.50 | | 193.50 |
| Vila, Hugo | 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 | not available | N/A | F | | | | | | | | 137.00 | 183.50 | | 24.00 | 38.00 | | 180.50 |
| Cueno, Peter | 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 | not available | N/A | F | | 200.00 | 160.00 | 160.00 | 200.00 | 160.00 | 200.00 | 160.00 | 160.00 | 222.50 | 172.50 | 160.00 | | 990.50 |
| Stamszezaji, Attila | 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 | not available | N/A | A | | 200.00 | 160.00 | 160.00 | 200.00 | 160.00 | 160.00 | 160.00 | 160.00 | 200.00 | 200.00 | 200.00 | | 2,120.00 |
| **TOTAL UNREPORTED HOURS** | | | | | | 826.00 | 414.50 | 578.00 | 869.00 | 933.00 | 1,444.00 | 2,051.00 | 1,900.50 | 2,774.50 | 3,123.60 | 2,877.50 | 2,927.00 | 21,142.10 |

| Rate as of 11/1/2004 | 11/1/2004 | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fund | | | | | | | | | | | | | | |
| International Pension Fund | $1.59 | $1,230.00 | $657.75 | $887.00 | $1,303.50 | $1,429.50 | $2,166.00 | $3,077.25 | $2,830.75 | $4,161.75 | $5,292.90 | $4,316.25 | $4,387.00 | $31,713.13 |
| International Masonry Institute | $0.75 | $619.50 | $310.88 | $433.50 | $651.75 | $714.75 | $1,625.00 | $1,538.63 | $1,425.38 | $2,080.88 | $2,342.70 | $2,150.63 | $2,195.25 | $20,764.72 |
| International Dues Check-Off | $0.47 | $388.22 | $194.82 | $271.66 | $408.43 | $447.91 | $678.68 | $964.21 | $893.24 | $1,304.02 | $1,658.44 | $1,438.75 | $1,462.50 | $10,110.88 |
| **Totals** | $2.72 | $2,246.72 | $1,127.45 | $1,592.16 | $2,363.68 | $2,592.16 | $3,927.68 | $5,580.09 | $5,169.37 | $7,546.65 | $9,597.79 | $8,057.00 | $57,970.72 |

ACCOUNT NUMBER: 281895
BAC LOCAL UNION/STATE: 0004-N/0005-NJ
CVG: 01
YEAR: 2005

COMPLIANCE AUDIT PERIOD: January 2003 through December 2005
EMPLOYER NAME: Marv Waterproofing
EMPLOYER ADDRESS: 68 Colfax Avenue, Clifton, NJ 07013
CONTACT & PH#: Ms. Ann Padella (973) 473-0686

# INTERNATIONAL TROWEL TRADES FRINGE BENEFIT FUNDS
## Summary of Unreported Hours

### SCHEDULE OF UNREPORTED HOURS

PRIMARY EXPLANATION OF FINDINGS:
A: Failed to report employee performing covered work

AUDITOR: Miranda Romero & Mariah Dimblugu

| EMPLOYEE NAME | SS NUMBER | HIRE | ELIGIBLE | TERM | NOTE | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aguilar, Bartholome | 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 | not available | N/A | not available | A | | | | | | | | | 43.50 | 177.50 | 67.00 | | 220.00 |
| Bonilla, Adam | 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 | not available | N/A | not available | A | | | | | | | | | 29.50 | 137.50 | 88.00 | | 230.00 |
| Bonilla, Anthony | 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 | not available | N/A | not available | A | | | | | | | | | | 37.50 | 99.50 | 104.00 | 392.00 |
| Campos, Francisco | 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 | not available | N/A | not available | A | | 56.00 | | 5.00 | | 48.00 | | | | | | | 52.00 |
| Cruz, Luis | 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 | not available | N/A | not available | A | 78.00 | | | | | | | | 199.00 | | | | 392.50 |
| Dutu, Madum | 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 | not available | N/A | not available | A | | | | | | | | | 141.50 | | 52.00 | | 393.50 |
| Feneu, Leon-Marra | 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 | not available | N/A | not available | A | | | | | | | 0.00 | 37.00 | 193.50 | | 112.00 | | 435.50 |
| Fordel, Leon | 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 | not available | N/A | not available | A | | | | | | 13.30 | 74.00 | 43.50 | 142.50 | | 128.00 | | 475.50 |
| Greu, Budu | 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 | not available | N/A | not available | A | | 22.00 | 8.00 | 23.00 | 38.75 | 37.50 | | | 52.00 | | | | 52.00 |
| Holland, Sherman | 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 | not available | N/A | not available | A | | 18.50 | 6.75 | 132.00 | 54.00 | 22.50 | | 4.00 | 60.00 | 49.50 | 32.00 | 19.50 | 335.25 |
| Keresstur, Oyin | 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 | not available | N/A | not available | A | 64.50 | 3.50 | | | 21.00 | 49.50 | | | 52.00 | | | | 333.25 |
| Kassovy, Belin | 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 | not available | N/A | not available | A | | | 173.50 | 21.00 | 11.00 | | | | 81.50 | | | |
| Klimazewski, Audrey | 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 | not available | N/A | not available | A | 91.00 | 144.00 | 136.00 | 109.50 | 184.72 | 289.00 | 231.50 | 145.50 | 1,478.22 | | | |
| Kugionis, Kazmierz | 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 | not available | N/A | not available | A | 80.50 | 103.50 | 111.00 | 57.00 | 129.50 | 221.50 | 95.50 | 1,473.12 | | | | |
| Kugionis, Lech | 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 | not available | N/A | not available | A | 81.50 | 38.50 | 32.00 | 67.00 | 5.00 | 200.00 | 187.50 | 980.00 | | | | |
| Meza, Ed | 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 | not available | N/A | not available | A | 72.00 | 13.50 | 79.50 | 22.00 | 35.50 | 138.00 | 140.00 | 151.50 | 835.50 | | | |
| Meza, Gerardo O | 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 | not available | N/A | not available | A | 56.00 | 42.00 | 14.00 | 14.00 | 13.50 | | 80.00 | 261.00 | | | | |
| Osman, Imre | 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 | not available | N/A | not available | A | 72.50 | 42.00 | 128.50 | 53.00 | 13.30 | 194.50 | 119.50 | 948.00 | | | | |
| Ramsey, Darren | 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 | not available | N/A | not available | A | 54.50 | 51.00 | 14.50 | | | 18.50 | | 68.00 | 80.00 | 189.00 | | |
| Rosella, Marco | not available | N/A | not available | A | 48.50 | 22.50 | 85.00 | 233.00 | 9.00 | | 22.00 | 166.50 | 144.00 | 1,175.25 | | | |
| Rosella, Steven | not available | N/A | not available | A | | | | | | | 81.00 | | 3.00 | 84.00 | | |
| Simon, Ervin | 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 | not available | N/A | not available | A | | | | | | | | | | 80.00 | | 80.00 |
| Simon, Lazlo | not available | N/A | not available | A | 118.50 | 155.00 | 138.50 | 206.00 | 48.00 | 176.00 | 37.50 | 79.50 | 263.50 | 177.00 | 163.50 | 171.00 | 1,735.00 |
| Stanoszegaj, Matt | 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 | not available | N/A | not available | A | 42.50 | 57.50 | 80.00 | 46.00 | 17.00 | 53.50 | 93.50 | 88.75 | 44.50 | 39.00 | 31.50 | 640.25 |
| Stanoszegaj, Paul | 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 | not available | N/A | not available | A | | 37.50 | 84.00 | 26.50 | 98.00 | | | | 117.00 | | | |
| Vila, Nago | 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 | not available | N/A | not available | A | | 160.00 | 200.00 | 160.00 | 79.50 | 186.00 | | | 186.00 | | | |
| Gurnu, Peter | 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 | not available | N/A | not available | A | 160.00 | 160.00 | 160.00 | 160.00 | 200.00 | 160.00 | 200.00 | 200.00 | 2,080.00 | | | |
| Stanoszegaj, Attila | 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 | not available | N/A | not available | F | | | | | | | | | | | 200.00 | 2,080.00 |

### TOTAL UNREPORTED HOURS

| | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1,312.50 | 1,106.50 | 983.75 | 1,748.50 | 1,015.00 | 784.12 | 851.00 | 1,139.22 | 2,904.75 | 2,505.00 | 2,098.00 | 1,949.50 | 18,097.84 |

| Fund | Rate as of 1/1/2004 | Rate as of 1/1/2005 | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| International Pension Fund | $1.90 | $1.90 | $1,818.75 | $1,659.75 | $1,475.63 | $2,622.75 | $1,522.50 | $1,176.18 | $1,276.50 | $1,708.83 | $4,357.13 | $3,457.50 | $3,147.00 | $2,924.25 | $27,144.77 |
| International Masonry Institute | $0.80 | $0.80 | $506.25 | $555.25 | $491.88 | $874.25 | $507.50 | $460.80 | $911.38 | $3,202.80 | $1,444.00 | $1,783.30 | $1,857.08 | $14,580.66 |
| International Dues Check-Off | $0.50 | $0.52 | $595.00 | $3,098.20 | $2,754.51 | $4,895.80 | $2,842.00 | $2,195.54 | $3,382.80 | $3,189.82 | $6,424.00 | $5,021.26 | $1,013.74 | $9,129.88 |
| Totals | $2.80 | $2.87 | | | | | | | | | | | $5,593.07 | $50,057.31 |

0193

CENSUS INFORMATION
FOR THE
INTERNATIONAL TROWEL TRADES FRINGE BENEFIT FUNDS

Employer: Maarv Waterproofing
Employer #: 281885

| EMPLOYEE NAME | S/S NUMBER | HIRE DATE | TERM DATE | CURRENT ADDRESS | JOB CLASS | BIRTH DATE | SEX |
|---|---|---|---|---|---|---|---|
| Adams, Maurice T | 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 | *** | *** | 150 Farnham Avenue, Garfield, NJ 07026 | Cleaner - Waterproofer | N/A | M |
| Alexis, Herbert | 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 | *** | *** | 91 Sackman Street, Brooklyn, NY 11233 | Cleaner - Waterproofer | N/A | M |
| Bednarczyk, Stanistan | 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 | *** | *** | 11 Jackson Street, Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Bezak, Andrzcej | 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 | *** | *** | 11 Jackson Street, Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Bonilla, Alex | 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 | *** | *** | 43 1/2 Lowe Street, South Norwalk, CT 06854 | Cleaner - Waterproofer | N/A | M |
| Campos, Francisco | 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 | *** | *** | 94 Sherman Street, Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Caraway, Willie | 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 | *** | *** | 322 Anderson Street Apt #C, Hackensack, NJ 07601 | Cleaner - Waterproofer | N/A | M |
| Clarke, Samuel | 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 | *** | *** | 393 East 26th Street, Paterson, NJ 07522 | Cleaner - Waterproofer | N/A | M |
| Codon, Michael P | 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 | *** | *** | 1244 Washington Street, Peekskill, NY 10566 | Cleaner - Waterproofer | N/A | M |
| Colontonia, Michael | 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 | *** | *** | 1192 Balsam Street, Shrub Oak, NY 10588 | Cleaner - Waterproofer | N/A | M |
| Cruz, Luis | 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 | *** | *** | 203 Highland Avenue, Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Cuomo, Peter (*2000) | 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 | *** | *** | 58 Maple Avenue, Lake Stockholm, NJ 07460 | Project Manager (J) | N/A | M |
| Duru, Mazlum | 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 | *** | *** | 878 Main Street, Paterson, NJ 07503 | Cleaner - Waterproofer | N/A | M |
| Ember, Zoltan | 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 | *** | *** | 156 French Hill Road, Wayne, NJ 07470 | Cleaner - Waterproofer | N/A | M |
| Evans, Peter R | 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 | *** | *** | No Address Stated on W-2 | Supervisor - Cleaner - Waterproofer | N/A | M |
| Galinas, Jerry | 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 | *** | *** | 316 Hudson Avenue, Washington Township, NJ 07676 | Cleaner - Waterproofer | N/A | M |
| Geza, Budai | 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 | *** | *** | 99 Hellerhill Road, Blairstown, NJ 07825 | Cleaner - Waterproofer | N/A | M |
| Gilmore, Kevin P | 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 | *** | *** | 12 6th Street, Old Bridge, New Jersey 08857 | Cleaner - Waterproofer | N/A | M |
| Gilmore, Shawn J | 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 | *** | *** | 44 Dartmouth Way, North Brunswick, NJ 08902 | Supervisor - Cleaner - Waterproofer | N/A | M |
| Gonzalez, Raul | 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 | *** | *** | 1417 Hobart Avenue, Bronx, NY 10461 | Cleaner - Waterproofer | N/A | M |
| Gonzalez, Rodolfo | 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 | *** | *** | 71 Marilyn Place, Clifton, NJ 07011 | Cleaner - Waterproofer | N/A | M |
| Herrera, Juan | 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 | *** | *** | 418 Paulison Avenue, Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Holland, Sherman | 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 | *** | *** | 379 W Pleasant View Ave., Apt 421, Hackensack, NJ 07601 | Foreman Cleaner - Waterproofer | N/A | M |
| Ingram, Lopez | 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 | *** | *** | 51 Park Avenue, Yonkers, NY 10501 | Cleaner - Waterproofer | N/A | M |
| Karczag, Gyula | 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 | *** | *** | 60 Mitchell Roada, Hackettstown, NJ 07840 | Caulker | N/A | M |
| Kasa, Sean | 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 | *** | *** | 38 Summit Road, Hamburg, NJ 07419 | Cleaner - Waterproofer | N/A | M |
| Kaszony Sr, Balint | 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 | *** | *** | 249C Reichelt Avanue, New Mitford, NJ 07646 | Cleaner - Waterproofer | N/A | M |
| Keesler, Robert | 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 | *** | *** | 394 Main Street, Cold Spring, NY 10516 | Cleaner - Waterproofer | N/A | M |
| Klimaszewski, Andrezej | 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 | *** | *** | 38 Gaston Avenue Apt #1, Garfield, NJ 07026 | Cleaner - Waterproofer | N/A | M |
| Klimaszewski, Leszek | 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 | *** | *** | 11 Jackson Street, Apt #6 Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Krupinski, Kazimierz | 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 | *** | *** | 11 Jackson Street, Apt #2 Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Krupinski, Lech | 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 | *** | *** | 11 Jackson Street, Apt #2 Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Krystak, Chester | 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 | *** | *** | 143 Maple Avenue, Wallington, NJ 07057 | Cleaner - Waterproofer | N/A | M |
| MacDonald, Phillip K | 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 | *** | *** | 71 VanCortlandt Avenue, Ossining, NY 10562 | Foreman Cleaner - Waterproofer | N/A | M |
| McNair, William | 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 | *** | *** | 490 Tremont Avenue, Fl#1, Apt#14, Orange, NJ 07050 | Cleaner - Waterproofer | N/A | M |
| Meza, Gerado G | 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 | *** | *** | 106 Grant Street, Second Floor, Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Mott, Thomas | 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 | *** | *** | 42 Shirley Blvd, Old Bridge, NJ 08857 | Cleaner - Waterproofer | N/A | M |
| Nofs, William | 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 | *** | *** | 387 Madison Street Apt 5, Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Osmani, Imet | 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 | *** | *** | 43 Shore Road, Wayne, NJ 07470 | Cleaner - Waterproofer | N/A | M |
| Pallos, Ivan | 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 | *** | *** | 34-10 Netcong Heights, Netcong, NJ 07857 | Caulker | N/A | M |
| Perez, Darrel | 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 | *** | *** | 109 South A Avenue, Mt Vernon, NY 10550 | Cleaner - Waterproofer | N/A | M |
| Ramsey, Darren | 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 | *** | *** | 280 Gregory Avenue, Apt #C6, Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Reyes, David | 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 | *** | *** | 230 Abbot Avenue, Elmsford, NY 10523 | Cleaner - Waterproofer | N/A | M |
| Rodriguez, David | 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 | *** | *** | 865 Clifton Ave, Newark, NJ 07104 | Cleaner - Waterproofer | N/A | M |
| Santana, Antonio | 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 | *** | *** | 40 Vineyard Apt #2, Passaic, NJ 07855 | Cleaner - Waterproofer | N/A | M |
| Simon, Ervin | 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 | *** | *** | 119 Mechanic Street, Boonton, NJ 07005 | Cleaner - Waterproofer | N/A | M |
| St. George, Russell | 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 | *** | *** | W-2 Is Missing | Cleaner - Waterproofer | N/A | M |
| Straub, Ian | 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 | *** | *** | 17 East Gate Drive, Glenwild, New Jersey 07418 | Cleaner - Waterproofer | N/A | M |
| Swain, Timothy | 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 | *** | *** | 280 Gregory Avenue, Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Szamosszegi, Attila (*1989) | 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 | *** | *** | 156 French Hill Road, Wayne, NJ 07470 | President (J) | N/A | M |
| Szamosszegi, Matt | 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 | *** | *** | 156 French Hill Road, Wayne, NJ 07470 | Cleaner - Waterproofer | N/A | M |
| Tenorio, Fernando | 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 | *** | *** | 106 Grant Street, Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Vila, Hugo | 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 | *** | *** | 563 Central Avenue, Jersey City, NJ | Cleaner - Waterproofer | N/A | M |
| Young, Kirk | 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 | *** | *** | 254 Chestnut Street, Passaic, NJ 07055 | Cleaner - Waterproofer | N/A | M |
| Zaretsky, Bruce | 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 | *** | *** | 517 74th Street, Brooklyn, NY 11209 | Project Manager (J) | N/A | M |
| Zhizhan, Saul | 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 | *** | *** | 79A Dale Avenue Apt #1, Ossining, NY 10562 | Cleaner - Waterproofer | N/A | M |

*** - Hire/Term dates were not made available to the Auditor.

(*year) - Owners and the years they were ~~supposed have been reported from.~~ Last Reported to BAC.

0194

Exhibit E

Attila Szamosszegi                                          October 24, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ CASE NO.: 1:07CV00501(RJL)

JOHN FLYNN, JAMES BOLAND,
GERALD O'MALLEY, KEN LAMBERT,
GERARD SCARANO, H.J. BRAMLETT,
EUGENE GEORGE, PAUL SONGER,
WILLIAM McCONNELL, MATTHEW
AQUILINE, GREGORY R. HESS,
MICHAEL SCHMERBECK, VINCENT
DELAZZERO, and BENJAMIN CAPP,
as Trustees of, and on behalf
of, the
BRICKLAYERS & TROWEL TRADES
INTERNATIONAL PENSION FUND,
    620 F Street, N.W.
    Washington, DC 20004
    202-783-3788,

JIM ALLEN, MATTHEW AQUILINE,
LON BEST, JAMES BOLAND, TED
CHAMP, RAYMOND CHAPMAN,
VINCENT DELAZZERO, BRUCE
DEXTER, JOHN FLYNN, EUGENE
GEORGE, GREGORY HESS, FRED
KINATEDER, DAN KWIATKOWSKI,
KEN LAMBERT, SANTO LANZAFAME,
DICK LAUBER, WILLIAM McCONNELL,
EDWARD NAVARRO, GERALD O'MALLEY,
JOHN PHILLIPS, CHARLES RASO,
MARK ROSE, KEVIN RYAN, GERARD
SCARANO, MICHAEL SCHMERBECK,
PAUL SONGER, JOSEPH SPERANZA,
and FRED VAUTOUR
as trustees of, and on behalf
of, the
INTERNATIONAL MASONRY INSTITUTE
    620 F Street, N.W.
    Washington, D.C. 20004
    202-783-3788

ORIGINAL

ORAL DEPOSITION OF

ATTILA SZAMOSSZEGI

*   *   *   *   *
OCTOBER 24, 2007
*   *   *   *   *

(Caption Continued)

MASTROIANNI & FORMAROLI, INC.
Certified Court Reporting and Video Conferencing
251 South White Horse Pike - Suite 200
Audubon, New Jersey 08106
856-546-1100

Attila Szamosszegi                                    October 24, 2007

**Page 2**

```
 1    and
 2    INTERNATIONAL UNION OF BRICKLAYERS
      AND ALLIED CRAFTWORKERS,
 3      620 F Street, N.W.
        Washington, D.C. 20004
 4    202-783-3788,
 5
        PLAINTIFFS,
 6
      vs.
 7
 8    MAARV WATERPROOFING, INC.
        68 Colfax Drive
 9    Clifton, New Jersey 07013
10
        DEFENDANT.
11
12
13
14       Transcript in the above matter taken at the law
15    offices of Archer & Greiner, 100 Centennial Square,
16    Haddonfield, New Jersey, commencing at 9:00 A.M.
17
18
19
20
21
22
23
24
25    0
```

**Page 3**

```
 1    A P P E A R A N C E S :
 2
 3    DICKSTEIN SHAPIRO, LLP
      BY:  CHARLES V. MEHLER, III, ESQUIRE
 4    1825 EYE STREET, N.W.
      WASHINGTON, D.C. 20006
 5    202-420-2200
      ATTORNEYS FOR THE PLAINTIFFS
 6
 7
      ARCHER & GREINER, P.C.
 8    BY:  DOUGLAS DIAZ, ESQUIRE
      ONE CENTENNIAL SQUARE
 9    HADDONFIELD, NEW JERSEY 08033-0968
      856-795-2121
10    ATTORNEYS FOR THE DEFENDANT
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1        W I T N E S S   I N D E X
 2
 3    Examination of Mr. Szamosszegi
 4
      By Mr. Mehler:  Page: 7
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1            EXHIBITS
 2
 3    P-1 - Notice of Deposition
        Page 13
      P-2 - B.A.C. Local #4 Signature Page Document
 4      Page 38
      P-3 - Agreement Between BCANJ & Local Union
 5      Nos. 4 & 5, 11/1/99 through 10/31/02
        Page 46
 6    P-4 - International Union of Bricklayers & Allied
        Craftworkers Local 5 document, Bates #739
 7      Page 48
      P-5 - Local No. 5-Central & South Jersey Agreement
 8      Bates Nos. 709-738
        Page 59
 9    P-6 - Fax Transmittal Form from Longo to Maarv
        With attachments
10      Page 64
      P-7 - Check #2969 from Pallos to Maarv, 4/15/04
11      Page 83
      P-8 - Memo to Ivan from Anne, 2/13/04
12      Page 84
      P-9 - Pallos Construction Document - Att. Local 5
13      Page 85
      P-10 - IPF Employer Report - Bates No. 747
14      Page 87
      P-11 - NJ B.A.C. Local #4 Benefit Funds form
15      Bates No. 758
        Page 91
16    P-12 - NJ B.A.C. Local #4 Benefit Funds form
        Bates No. 757
17      Page 95
      P-13 - NJ B.A.C. Local #4 Benefit Funds form
18      Bates No. 761
        Page 97
19    P-14 - NJ B.A.C. Local #4 Benefit Funds form
        Bates No. 765
20      Page 98
      P-15 - NJ B.A.C. Local #4 Benefit Funds form
21      Bates No. 768
        Page 99
22    P-16 - NJ B.A.C. Local #4 Benefit Funds form
        Bates No. 770
23      Page 99
      P-17- NJ B.A.C. Local #4 Benefit Funds form
24      Bates No. 776
        Page 100
25
```

Attila Szamosszegi                                      October 24, 2007

|  | Page 6 |
|---|---|

EXHIBITS, continued

P-18 - Letter from Szamosszegi to Longo, 4/15/04
    Page 102
P-19 - Bergen County Area Weekly Shop Steward
    Report - 5/19/2000
    Page 106
P-20 - Letter fro Odell to Murphy, 8/10/06 with
    Attachments, Bates Nos. 180-194
    Page 118
P-21 - Defendant's Responses to Plaintiffs'
    Interrogatories
    Page 127
P-22 - Verification
    Page 128
P-23 - Payroll Sheets for Maarv
    Bates Nos. 620-708
    Page 139
P-24 - Payroll Sheet for Maarv
    Bates No. 372
    Page 139
P-25 - Payroll Sheet for Maarv
    Bates No. 618
    Page 139
P-26 - Document entitled Identification of
    Employees - Bates Nos. 543-546
    Page 140

(Exhibits attached to transcript)

|  | Page 8 |
|---|---|

1  Trades International Pension Fund and Bricklayers and
2  Allied Craftworkers, the international union.
3      Have you ever had your deposition taken before?
4   A. Regarding?
5   Q. Regarding anything. Ever sat down in a
6  conference room like this?
7   A. Yeah.
8   Q. How many times?
9   A. I think once.
10  Q. Do you remember what that case was about?
11  A. Contract dispute.
12  Q. With another business?
13  A. Yes.
14  Q. Not with a union?
15  A. No.
16  Q. Do you remember what the other business's name
17 was, what that was?
18  A. Not offhand.  They are out of Canada.
19  Q. Where was this lawsuit?
20  A. In New York.
21  Q. In New York?
22  A. Yeah.
23  Q. Do you remember --
24  A. No.  In New Jersey.
25  Q. New Jersey?

|  | Page 7 |
|---|---|

1  (ATTILA SZAMOSSZEGI, having been duly sworn, was
2  examined and testified as follows:)
3      MR. DIAZ:  Just the right to review and sign
4  on behalf of the witness.
5      MR. MEHLER:  Before we get started I have
6  exhibits organized, a set for me and a set for the
7  witness.  I don't have a third set for you Attila.  I
8  have a full set of our Bates-stamped documents and I
9  will be referring to them by the Bates stamp, if you
10  want to flip to it.
11     MR. DIAZ:  I appreciate it.
12 (EXAMINATION OF MR. SZAMOSSZEGI BY MR. MEHLER:)
13  Q. How are you doing today?
14  A. Very well.
15  Q. I apologize in advance if I mispronounce your
16 name at some point during this, but I will do my best.
17  A. It's okay.  You can just call me Attila.
18  Q. I will do that.
19     I know you just stated your name but state it
20 again for the record.
21  A. My name is Attila Szamosszegi.
22  Q. What is your current home address?
23  A. 156 French Hill Road, Wayne, New Jersey.
24  Q. My name is Charles Mehler.  I represent the
25  plaintiffs in this lawsuit, The Bricklayers and Trowel

|  | Page 9 |
|---|---|

1   A. New Jersey.
2   Q. About how many years ago was that?
3   A. Five.
4   Q. Well, although you have had your deposition taken
5  before, let me go through the basics of what we will do
6  here today.
7      I will ask you a series of questions.  If at any
8  point you don't understand a question I ask, just tell
9  me and I will do my best to rephrase it so you do
10  understand it.  If you don't tell me you don't
11  understand, I will assume you understood the question.
12     If at any point you need a break, just let me
13 know and we will take a break whenever we need to.  You
14 are under oath, you understand, and your testimony here
15 is the same as if you were in a courtroom before a judge
16 or jury.
17     Are you taking any medication today which would
18 affect your ability to testify truthfully?
19  A. No.
20  Q. Are you suffering from any illnesses?
21  A. No.  Besides high blood pressure, no.
22  Q. Nothing other than that?
23  A. Not really.  Not that I know of.
24  Q. Other than the deposition, the prior deposition
25  which you mentioned have you ever given testimony under

Attila Szamosszegi                                          October 24, 2007

|  | Page 10 |
|---|---|

1  oath before in a courtroom?
2     A. No.
3     Q. Or any other manner?
4     A. No.
5     Q. There is a question I ask of all witnesses.
6        Have you ever been convicted of any crimes?
7     A. No.
8     Q. Have you ever been held in contempt by any judge
9  or a court?
10    A. No.
11    Q. As we go through this, me asking you questions,
12 try to wait for me to finish my question because it
13 makes it hard for the court reporter to take it down if
14 we are both talking at the same time. And also try to
15 answer audibly since she can't take down nods of the
16 head or gestures, that type of thing.
17       Other than that one lawsuit you mentioned where
18 your deposition was taken before, have you been involved
19 in any other lawsuits?
20    A. No.
21    Q. Where were you born?
22    A. In Hungary.
23    Q. When did you come to this country?
24    A. July 7th, 1970.
25    Q. Are you currently married?

|  | Page 11 |
|---|---|

1     A. I am divorced.
2     Q. What is your educational background? Did you
3  graduate high school?
4     A. Yeah. I graduated high school.
5     Q. In Hungary?
6     A. Yes.
7     Q. Any college?
8     A. I took a couple of semesters over here. I took
9  one semester, a few courses.
10    Q. Can you tell me what did you do to prepare for
11 your deposition here today?
12       MR. DIAZ: Just an instruction to the
13 witness not to reveal any conversations we have had.
14 You can reveal the fact that we have met.
15    Q. Who did you talk with other than your attorney,
16 what documents did you review, anything else you did to
17 get ready for today?
18    A. Just talk to my attorney.
19    Q. You didn't talk to anybody else at the company?
20    A. No.
21    Q. Did you speak with Peter Cuomo in preparation for
22 today?
23    A. No. Peter Cuomo is not around.
24    Q. Is not around?
25    A. No. He lives in Texas.

|  | Page 12 |
|---|---|

1     Q. He is no longer part of the company?
2     A. No longer party of the company.
3     Q. Did you speak with your accountant to prepare for
4  today?
5     A. No.
6     Q. Is your accountant still Roy Bushover?
7     A. Bushover, yes. That is correct.
8     Q. Did you review any documents to prepare for
9  today?
10    A. Did I review?
11    Q. Did you take a look at any documents?
12    A. Whatever my attorney presented to me to look at.
13    Q. Do you understand that you are here today not
14 just as an individual but also as the witness for the
15 defendant, Maarv Waterproofing, Inc.?
16    A. Yeah.
17    Q. You are here to testify on behalf of the company?
18    A. Yeah.
19    Q. I assume you didn't do anything special or
20 anything different to prepare for your testimony on
21 behalf of the company versus your testimony here just as
22 an individual?
23       MR. DIAZ: Objection to the form. You can
24 go ahead and answer.
25    Q. You can answer.

|  | Page 13 |
|---|---|

1     A. What?
2     Q. Did you do anything else to prepare?
3     A. No.
4     Q. Let me show you --
5        MR. MEHLER: Let me have this marked as
6  Plaintiffs 1.
7        (P-1 marked for identification.)
8     Q. Take a look at this document. Any time I hand
9  you a document if you need a minute to look through it
10 or so, just feel free.
11    A. Okay.
12    Q. Have you seen this document before?
13    A. No. You just handed it to me.
14    Q. But you never saw it before today?
15    A. No.
16    Q. Can you tell me are you prepared to testify to
17 each of the topics listed on behalf of the company?
18    A. Yes, I am.
19    Q. Where are you currently employed?
20    A. Maarv Waterproofing.
21    Q. That's Maarv Waterproofing, Inc.?
22    A. Yes.
23    Q. What's your title there?
24    A. I am the president.
25    Q. Are you the owner?

Pages 10 to 13

Attila Szamosszegi                                          October 24, 2007

Page 14

1   A. Yes.
2   Q. Are there any co-owners?
3   A. No.
4   Q. Describe to me what your duties are as president,
5   what do you do?
6   A. Estimating.
7   Q. Anything else?
8   A. Oversee jobs.
9   Q. Are you responsible for getting jobs for the
10  company?
11  A. Yeah. That's estimating, yes.
12  Q. Do you do any field work any more?
13  A. No.
14  Q. How long have you been president?
15  A. Since the inception of the corporation.
16  Q. When was that?
17  A. I don't know. 20 years ago. I don't know
18  exactly.
19  Q. Did you have any companies before Maarv?
20  A. That's it.
21  Q. What did you do before you started this company?
22  A. I was working in construction.
23  Q. What company were you working for?
24  A. Jobin Associates.
25  Q. Anybody else?

Page 15

1   A. A&J Caulking.
2   Q. You said Maarv -- and when I say Maarv I am
3   referring to the defendant Maarv Waterproofing, Inc.
4   throughout this deposition. The company was formed
5   about 20 years ago you estimate roughly?
6   A. Yeah.
7   Q. And you formed it?
8   A. Yes.
9   Q. Was anybody else an owner of the company at the
10  time it started?
11  A. No.
12  Q. Why did you decide to start this business?
13  A. Why anybody decide to do a business.
14  Q. What type of work did the company do when you
15  first started?
16  A. Waterproofing.
17  Q. Does it do anything other than waterproofing?
18  A. No. When it started, no.
19  Q. When you say waterproofing, is that distinct from
20  caulking?
21  A. It's pretty much hand in hand since caulking is a
22  type of waterproofing.
23  Q. Where does the name Maarv come from?
24  A. That's an abbreviation of four names, Mike,
25  Attila, Richard and Vinnie.

Page 16

1   Q. Who are those other individuals?
2   A. Those other individuals was one was my uncle, the
3   head of a corporation called Marv, M-A-R-V, and when I
4   start my company I just -- they gave me the company and
5   after I while I just -- after a year or so I decided to
6   form my own corporation and we added one more A to it
7   for no particular reason.
8   Q. You say they gave you the company?
9   A. No.
10  Q. What did you say?
11  A. They have a company and I work for the company.
12  Q. Okay. In the United States?
13  A. In the United States.
14  Q. Okay. You worked for the company and then how --
15  A. Then I decided to go on my own and I just
16  inserted one more A and formed a new corporation as
17  M-A-A-R-V Waterproofing.
18  Q. But none of these other people were involved in
19  your company?
20  A. No.
21  Q. And Maarv, your company, has been operating for
22  all those 20 years since you started?
23  A. That is correct.
24  Q. Have you ever operated your company under any
25  name other than Maarv Waterproofing, Inc.?

Page 17

1   A. It always was Maarv, Maarv Caulking, Maarv
2   Waterproofing. Maarv Waterproofing is basically the
3   company Maarv.
4   Q. You said sometimes you refer to it as Maarv
5   Caulking?
6   A. I think in the very beginning it was. I really
7   don't recall it, but I see Maarv Caulking. They send me
8   a letter it says Maarv Caulking so I assume there was a
9   Maarv Caulking, as well.
10  Q. And the company has always been a corporation?
11  A. Always been a corporation.
12  Q. In what state is the company incorporated?
13  A. New Jersey.
14  Q. Did you file the incorporation papers?
15  A. Well, it's incorporated.
16  Q. But I mean who did it?
17  A. I assume the attorney.
18  Q. Your attorney did it. Okay.
19     Do you have copies of the incorporation papers?
20  A. I don't know. I could look. I don't know.
21  Q. You haven't looked for them yet?
22  A. No.
23  Q. What is the current address of Maarv?
24  A. 68 Colfax Avenue, Clifton, New Jersey 07013.
25  Q. Are there any other companies that operate out of

Pages 14 to 17

Attila Szamosszegi                                     October 24, 2007

## Page 18

1  that same address?
2      A. No.
3      Q. How long has Maarv been at that address?
4      A. Three years.
5      Q. During that three years have any other companies
6  operated out of that address?
7      A. Yeah. Child care.
8      Q. Child care?
9      A. Yeah.
10     Q. Nothing else?
11     A. Nothing else.
12     Q. So for the last three years Maarv has been at
13  that Clifton, New Jersey address. Where did Maarv
14  operate before then?
15     A. I think it's 317 Oak Street, Passaic, New Jersey.
16  I don't know the ZIP.
17     Q. How long was Maarv at that address?
18     A. 17 years.
19     Q. Since its formation?
20     A. Pretty much almost. Yeah.
21     Q. Was there a different address when the company
22  first formed?
23     A. Yes.
24     Q. What was that address? I know this is bringing
25  you way back.

## Page 19

1      A. Well, I don't believe -- it's in Hackensack.
2      Q. Hackensack. Okay.
3         During the time that Maarv was at this Passaic
4  location, did any other companies operate out of that
5  address?
6      A. No.
7      Q. Now you told me you are currently the sole owner
8  of Maarv?
9      A. That is correct.
10     Q. Have there been any other owners of the company
11  in the past?
12     A. Part owners.
13     Q. Who were they?
14     A. Peter Cuomo.
15     Q. Is he the only one?
16     A. Uh-huh. Yes.
17     Q. When was he a part owner?
18     A. When was he?
19     Q. Yes.
20     A. What do you mean?
21     Q. What years, when did he start being a part owner,
22  when did he finish being a part owner?
23     A. I guess he started -- I don't recall when I gave
24  him a partnership.
25         MR. DIAZ: I don't know if he gave the

## Page 20

1  instruction to you, don't guess. I don't want you
2  guessing.
3      A. Then I don't know.
4      Q. Do you know approximately; was it 20 years ago,
5  10 years ago?
6      A. I don't want to guess. I don't know. It could
7  be ten or 20. I really don't want to have myself with
8  something I am not fully aware of.
9      Q. Was it in the last year that he left?
10     A. Oh, when he left. No. He left -- Peter was not
11  part of the company in the last four years.
12     Q. When he was a part owner what percentage of the
13  company did he own?
14     A. First he owned ten percent, then the last seven
15  or eight years I brought him up to 30 percent.
16     Q. What was the reason that you brought him on as a
17  partial owner?
18     A. What was the reason?
19     Q. Yes.
20         MR. DIAZ: Objection to the form. Objection
21  to brought him on.
22     Q. What was the reason?
23     A. I liked the personality.
24     Q. Did he work for you before he became a part
25  owner?

## Page 21

1      A. No. He pretty much, he just -- I really don't
2  know, you know. I don't recall.
3      Q. When he became a part owner did he invest money
4  into the company?
5      A. No.
6      Q. What was the reason for him leaving the company?
7      A. Medical health.
8      Q. Did you buy him out at that point?
9      A. Yes.
10     Q. Did he hold a position with the company when he
11  was there?
12     A. Yeah. He was a foreman.
13     Q. Was he an officer, was he vice-president or
14  anything of that sort?
15     A. I don't recall.
16     Q. Have you personally held any positions with Maarv
17  other than president?
18     A. What do you mean?
19     Q. Any other titles.
20     A. Chairman of the board.
21     Q. I assume you earn a salary from Maarv?
22     A. Yes. That is correct.
23     Q. Have you ever personally loaned money to the
24  company?
25     A. I really don't recall how we started. It could

Pages 18 to 21

Attila Szamosszegi                                           October 24, 2007

## Page 22

1  be possible in the early stage of the corporation.
2      Q. It would have been early if you did?
3      A. Yeah.
4      Q. Do you know if there is any documents reflecting
5  that?
6      A. I don't know.
7      Q. Have you ever borrowed money from the company?
8      A. No.
9      Q. You are the current president. Who are the other
10  officers of the company currently?
11          MR. DIAZ: Objection to the form. It's
12  based on assumption.
13      Q. Are there other officers of the company
14  currently?
15      A. No.
16      Q. You are the only officer?
17      A. I'm the only officer.
18      Q. So there is no vice-president?
19      A. No.
20      Q. There is no treasurer?
21      A. No treasurer.
22      Q. No secretary?
23      A. No secretary. I am all of them.
24      Q. You are all of them?
25      A. Yeah.

## Page 23

1      Q. Have you had any other officers in the past?
2      A. I don't recall beside Peter.
3      Q. Peter you told me was a foreman?
4      A. But he was a partner.
5      Q. He was a partner?
6      A. Yeah.
7      Q. But you didn't recall whether he was an officer
8  in the past, whether he was vice-president or anything
9  of that sort? I believe that was your testimony.
10      A. Yeah. I don't think he, you know -- I don't
11  recall, no.
12      Q. Do you know whether there are documents
13  reflecting who the officers of the company are?
14          MR. DIAZ: Objection to the form. Again,
15  it's based on assumption.
16      A. I don't know.
17      Q. You don't know?
18      A. I don't recall. No.
19      Q. Are there any directors of Maarv?
20      A. What do you mean directors? What is director?
21      Q. You mentioned earlier you were the chairman of
22  the board?
23      A. Okay.
24      Q. Is there directors of that board?
25      A. No.

## Page 24

1      Q. I assume there is no board meetings?
2      A. Yeah. There is not.
3      Q. Do you serve as an officer of any other
4  companies?
5      A. No.
6      Q. Have you in the past?
7      A. No.
8      Q. How many employees does Maarv currently have?
9      A. 12, 13.
10      Q. Are some of them office employees and some of
11  them are field guys?
12      A. That is correct.
13      Q. Who are the office employees?
14      A. By names?
15      Q. By name.
16      A. We got two secretaries.
17      Q. What are their names?
18      A. Rosa and Mary.
19      Q. Do you know their last names?
20      A. Rosa Rodriguez and I don't know Mary's last name
21  because she just started with us not long ago.
22      Q. Who else is an office employee?
23      A. My son, Matt.
24      Q. Who else?
25      A. Right now that's it.

## Page 25

1      Q. What is Matt, your son Matt's position?
2      A. He is a project manager.
3      Q. So the only office employees you think you have
4  right now are the two secretaries and your son Matt who
5  is a project manager?
6      A. Yes. Out of 11, yes, 13, whatever.
7      Q. Have you had other office employees in the past?
8      A. I am sure I have, I just can't recall.
9      Q. You can't recall if you have or you can't recall
10  the name of the ones you have had?
11      A. I can't recall the names, you know. I had some
12  estimators and other sort of help. Warehouse workers.
13      Q. Did you have an office employee by the name of
14  Anne Paoella?
15      A. Yes.
16      Q. What was her position?
17      A. She was office manager.
18      Q. I understand she passed away?
19      A. Yes. That is correct.
20      Q. When did that occur?
21      A. I think a little over a year ago.
22      Q. And have you hired a new office manager since
23  then?
24      A. No. Yeah. We hired Mary but she is not the
25  office manager.

info@mfreporting.com              Mastroianni & Formaroli, Inc.              856-546-1100
                              Professionals Serving Professionals

Attila Szamosszegi                                      October 24, 2007

| Page 26 | Page 28 |
|---|---|

**Page 26**

1    Q. How long did Anne work for the company?
2    A. 15 years, somewhere around there.
3    Q. Long time?
4    A. Yeah. Long time. I don't know for sure, yeah,
5    exactly.
6    Q. We have gone through the office employees. What
7    field employees does the company currently have?
8         MR. DIAZ: You mean titles?
9         MR. MEHLER: No. By name if you have them.
10   A. I got people coming in, you know, in and out of
11   my office, some of them work for a week or so. I can
12   recall some of it but that's about it.
13   Q. Do you have some who pretty much work for your
14   company full time, yours is the only company they work
15   for?
16   A. Yes.
17   Q. Can you give me some of their names?
18   A. I can give you the first name.
19   Q. Okay. I'll take that.
20   A. Okay. Who is there? There is Imet, Frank, Dan.
21   There is a few more.
22   Q. In addition to these people you have guys who
23   will work for you for a little while and go off and work
24   for somebody else and they may work for you again? Is
25   that how it works?

**Page 27**

1    A. When we hire people and sometimes they don't like
2    what they do so they quit.
3    Q. Does it depend on the amount of work you have?
4    Sometimes you will hire more people and let them go when
5    a project finishes and bring them back when the work
6    increases again?
7    A. Well, yes and no.
8    Q. Yes and no?
9    A. Yeah. I mean, we got a big turnover. Normally
10   once they leave us they don't come back.
11   Q. The field employees you have, do they have a
12   title?
13   A. Project manager. If that's what you're referring
14   to.
15   Q. Just the guys who are doing the work, what would
16   you say their position is, are they laborers?
17   A. Laborers. 90 percent laborers.
18   Q. 90 percent laborers?
19   A. Yes.
20   Q. What do the laborers do?
21   A. Sweep, make concrete, you know, move dirt if we
22   have.
23   Q. Do they do the waterproofing/caulking work?
24   A. No.
25   Q. Who does that work?

**Page 28**

1    A. The waterproofer and caulker. Most of the time
2    we sub it out.
3    Q. Most of the time you sub out the waterproofing
4    and caulking?
5    A. That is correct.
6    Q. Has that always been the case for your company?
7    A. Yeah. That's been the trend in the last ten
8    years or so.
9    Q. What percentage of your work would you say you
10   sub out currently?
11   A. A good portion of it.
12   Q. More than 50 percent?
13   A. I really don't know, you know.
14   Q. More than ten percent?
15   A. I just don't know, you know. If I said ten
16   percent, 50 percent I would be lying because I don't
17   know.
18   Q. But there is a percentage of work that you have
19   your guys do and then there is a percentage of your work
20   that you sub out?
21   A. We do labor work.
22   Q. Is there any waterproofing/caulking work that you
23   currently have your guys do rather than subbing it out?
24   A. No. No.
25   Q. So a hundred percent of the

**Page 29**

1    waterproofing/caulking work is subbed out currently?
2    A. Yeah. That is correct.
3    Q. Was that the case when you first started this
4    company?
5    A. I don't know. I can't recall.
6    Q. Has there ever been a time during the history of
7    the company when you have had your guys do the
8    waterproofing/caulking work?
9    A. It's possible. I don't know.
10   Q. You don't know?
11   A. No.
12   Q. Have you ever employed somebody as a waterproofer
13   or a caulker?
14   A. I think we had a union job we hired some people.
15   Q. You think on a union job you hired some people to
16   do some work that is caulking?
17   A. Yes, that is correct.
18   Q. Other than that you can't recall where you have
19   hired somebody who was a waterproofer or a caulker?
20   A. I might have. I mean, I just can't really recall
21   one way or the other.
22   Q. Well, you testified that currently you sub out a
23   hundred percent of the waterproofing/caulking work. How
24   long has that been the case?
25   A. I testified before probably ten years.

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                        Professionals Serving Professionals

Attila Szamosszegi                                    October 24, 2007

| Page 30 |
|---|

1    Q.  About ten years?
2    A.  That's right.
3    Q.  Is there a reason why you sub out that work
4  rather than just hiring guys to do it?
5    A.  Less headache.
6    Q.  Why is it less headache?
7    A.  Because it's less headache.
8    Q.  Why is that?
9    A.  Because financially it makes more sense and less
10  headaches.
11    Q.  You wouldn't make more money by doing it
12  yourself?
13    A.  I like to sub it out.
14    Q.  So you sub out that work and the work that your
15  guys do is more the laborer type duties you described to
16  me previously?
17    A.  That is correct.
18        MR. DIAZ:  Just asked and answered.  We have
19  gone through this for several minutes.
20    Q.  You can still answer.
21        MR. DIAZ:  Tell him again.
22    A.  Yeah.  Yeah.
23    Q.  What types of projects does Maarv typically work
24  on?
25    A.  There is no typical.

| Page 31 |
|---|

1    Q.  Do you work on residential homes?
2    A.  Sometimes, yes.
3    Q.  Work on office buildings?
4    A.  Sometimes, yes.
5    Q.  Work on new construction?
6    A.  We do restoration mostly.
7    Q.  Restoration mostly.
8        Do you know about what percentage of your
9  business would be restoration?
10    A.  I don't want to guess about it, so no.
11    Q.  More than ten percent?
12    A.  I said I don't want to guess.
13    Q.  You don't know if it's five percent or you don't
14  know if it's a hundred percent?
15    A.  I don't want to guess it, you know.
16    Q.  Where does Maarv typically do its work?
17        MR. DIAZ:  Objection to the form.  Go ahead.
18  I am just objecting to the form of the question.  The
19  typically.
20    A.  Meaning what?
21    Q.  In what states?
22    A.  New Jersey.
23    Q.  Any other states?
24    A.  Delaware.
25    Q.  Anywhere else?

| Page 32 |
|---|

1    A.  That's about it.
2    Q.  Do you do any work in New York?
3    A.  Sometimes.
4    Q.  Any other states?
5    A.  No.
6    Q.  Any particular areas within New Jersey?  Do you
7  work in every county in New Jersey or just certain
8  counties?
9    A.  Wherever is the job, I mean.
10    Q.  You will take jobs anywhere in the state?
11    A.  If the job is, you know, there, yes.
12    Q.  Do you find that the majority of your work ends
13  up being in certain counties?
14    A.  No.
15    Q.  How does Maarv typically go about getting its
16  work?
17        MR. DIAZ:  Objection to the form.  Go ahead.
18    A.  Bid on the job.
19    Q.  How do you learn about the jobs to bid on?
20    A.  One way this is called a CDN Data News.
21    Q.  Any other ways?
22    A.  I don't know.  That's mainly where we see jobs.
23    Q.  Does Maarv typically work under a general
24  contractor?
25        MR. DIAZ:  Objection to the form.  Go ahead.

| Page 33 |
|---|

1    A.  Yes and no.
2    Q.  What do you mean by yes and no?
3    A.  Depends on the jobs.
4    Q.  Some jobs there is no general contractor?
5    A.  That is correct.
6    Q.  Would you say most jobs do have a general
7  contractor?
8    A.  Possible.
9    Q.  Are there certain general contractors you have
10  worked under more than once?
11    A.  Probably.
12    Q.  You don't know for sure?
13    A.  I don't keep record of it.
14    Q.  You don't keep record.
15        Are there some general contractors that will
16  refer work to your company?
17    A.  Excuse me?
18    Q.  Are there some general contractors that will
19  refer work to your company?
20    A.  What do you mean refer?
21    Q.  They will recommend you for work?
22    A.  You mean they call back and give us the other
23  job?
24    Q.  They will call you and say, We have this
25  waterproofing work, can you guys do it?

Pages 30 to 33

Attila Szamosszegi                                    October 24, 2007

| Page 34 | Page 36 |
|---|---|

**Page 34**

1  A. Yeah.
2  Q. That will happen?
3  A. Yeah. It will happen.
4  Q. Does Maarv sometimes serve as a general
5  contractor?
6  A. Sometimes.
7  Q. For things other than waterproofing/caulking?
8  A. Yeah. We do some landscaping when it calls for.
9  Q. Landscaping?
10  A. Yeah. If it's part of the waterproofing, then
11  sometimes it becomes landscaping.
12  Q. And you will hire somebody else to do that?
13  A. The waterproofing, yes.
14  Q. What about the landscaping?
15  A. It's labor, so that we do.
16  Q. Is there any other types of work you guys will
17  handle?
18  A. Excuse me?
19  Q. Is there any other type of work you will handle?
20  A. Yeah. Labor.
21  Q. Laboring, the waterproofing/caulking you will sub
22  out and the landscaping you will do yourself.
23  A. Yes.
24  Q. Any other types of work the company will do?
25  A. Concrete we sub out.

**Page 35**

1  Q. You always sub that out?
2  A. Almost.
3  Q. Almost?
4  A. Yeah. Sub out. We sub out because we like to do
5  labor. That's what we do.
6  Q. Well, you sometimes do the concrete work
7  yourself?
8  A. If it's a little sidewalk, you know, sometimes we
9  will do it, yeah.
10  Q. Any other types of work the company does?
11  A. Restoration.
12  Q. What do you mean by restoration?
13  A. Just what it says, restoration. Restoring stuff.
14  Restoring waterproofing, landscaping.
15  Q. I assume Maarv doesn't share office space with
16  any other company?
17  A. You just asked that before.
18  Q. I asked if there were any other companies
19  operating out of that same address?
20  A. I would share then if someone operates out of it.
21  Q. Do you share equipment with anybody else?
22  A. No.
23  Q. Do you share employees with anybody else?
24  A. No.
25  Q. Do you personally and currently own any other

**Page 36**

1  companies?
2  A. No.
3  Q. Have you in the past?
4  A. No.
5  Q. Do you have investments in any other companies?
6  A. No.
7  Q. What about Maarv the company, does Maarv the
8  company own any other businesses?
9  A. No.
10  Q. Has it in the past?
11  A. No.
12  Q. Is Maarv, the company, an investor in any other
13  business?
14  A. No.
15  Q. Do you know if any of your employees, whether
16  office employees or field employees, own any other
17  companies?
18  A. I don't know.
19  Q. Do any of your family members own any other
20  companies?
21  A. No.
22  Q. Has Maarv ever signed any collective bargaining
23  agreements with The Bricklayers and Allied Craftworkers
24  Union?
25  A. Any bargaining agreement?

**Page 37**

1  MR. DIAZ: Objection to the form. Objection
2  to bargaining agreement. You can answer.
3  Q. Let's start with just agreement then.
4  MR. DIAZ: Same objection to the form. It's
5  a legal term. That's my objection.
6  A. I sent in a form, one form regarding the
7  Princeton job was signed by Maarv, by me.
8  Q. The Princeton job?
9  A. Right.
10  Q. Are you aware of any other agreements you have
11  signed with the Bricklayers Union?
12  A. No.
13  Q. What about with any other unions?
14  A. No. I don't know.
15  Q. You don't know?
16  A. No. I don't...
17  Q. You don't recall any others?
18  A. No.
19  Q. Would anybody at Maarv be authorized to sign an
20  agreement on behalf of the company other than you?
21  A. No.
22  Q. And has that always been the case?
23  A. Always been the case.
24  Q. What about when Peter Cuomo was a part owner,
25  could he sign agreements on behalf of the company?

Pages 34 to 37

Attila Szamosszegi                                          October 24, 2007

Page 38

1   A. No.
2       MR. MEHLER: I'm going to show you a
3   document. Douglas, it's Bates No. 159. We will mark
4   this Plaintiffs No. 2.
5       (P-2 marked for identification.)
6   Q. Take a look at this document and after you have
7   read over it let me know when you are ready.
8       Do you recognize this document?
9   A. Do I recognize it?
10  Q. Have you ever seen it before?
11  A. I saw it recently by --
12      MR. DIAZ: Just a representation that I
13  showed the document to him.
14  Q. In connection with the lawsuit you saw it?
15  A. Yeah.
16  Q. You never saw it before then?
17  A. No.
18  Q. Is that your signature on the document?
19  A. No. That's not.
20  Q. Do you have any idea who signed that?
21  A. No.
22  Q. Do you recognize the handwriting?
23  A. No. I don't.
24  Q. Do you see higher up on the document it has an
25  employer's Federal ID number, a New Jersey Employment ID

Page 39

1   number and an insurance carrier for worker's comp?
2   A. That is correct.
3   Q. Do you know who filled in that information?
4   A. I have no idea.
5   Q. Do you know if that information is correct for
6   Maarv?
7   A. No. Because -- no, I don't.
8   Q. You don't know?
9   A. No.
10  Q. You don't know who the insurance carrier is for
11  worker's comp?
12  A. Well, this thing I seen a date going back to
13  2000, so, no.
14  Q. Do you know who you the current insurance carrier
15  is for worker's comp?
16  A. No.
17  Q. Is there somebody in your office that handles
18  that?
19  A. Absolutely.
20  Q. Who is that?
21  A. Who is handling right now?
22  Q. Yes.
23  A. Mary.
24  Q. So you don't get involved in that aspect of it?
25  A. No.

Page 40

1   Q. Is that the current -- up higher it lists 317 Oak
2   Street, Passaic, New Jersey; is that the current office
3   at the time of this document?
4   A. Back in 2000?
5   Q. Yes.
6   A. Yes.
7   Q. But you don't know who filled that information in
8   on this document?
9   A. No.
10  Q. Do you have any reason to believe the union would
11  have filled in this information?
12  A. I don't believe it.
13  Q. Do you know whether the brick -- at the top it
14  says B.A.C. Local No. 4, New Jersey. Are you familiar
15  with that union?
16  A. Yes.
17  Q. Do you know whether they would have all this
18  information for Maarv back in 2000?
19      MR. DIAZ: Objection to the form.
20  A. I don't know.
21  Q. You don't know if they would or not?
22  A. How would I know?
23  Q. Did you ever speak with a person named John Capo?
24  A. Yeah.
25  Q. Who is John Capo?

Page 41

1   A. Last time I talked to him he was in charge of the
2   apprenticeship program.
3   Q. When was that you last spoke with him?
4   A. I really don't know. Long time ago.
5   Q. Long time ago?
6   A. Long time ago. I don't know exactly.
7   Q. Have you spoken with him more than once?
8   A. No. I think that was the conversation we had.
9   Q. Do you remember ever speaking with him in
10  relation to an agreement with Local 4 of New Jersey?
11  A. What kind of agreement?
12  Q. Any kind of agreement.
13  A. No. No. I don't recall.
14  Q. You don't recall.
15      Do you remember ever speaking with him about this
16  document in front of you?
17  A. No.
18  Q. Do you remember ever meeting with him about a
19  project in Fort Lee?
20  A. That's when I met him. That's when I am
21  referring to when I talked to him.
22  Q. What was the purpose of that conversation you had
23  with him?
24  A. I think if I recall it right, it's a little
25  fuzzy, getting some union guys from him.

Pages 38 to 41

Attila Szamosszegi                                                    October 24, 2007

---

Page 42

1    Q. Getting some union guys?
2    A. Right.
3    Q. For the project in Fort Lee?
4    A. Absolutely.
5    Q. Do you remember was this meeting with him in a
6 diner?
7    A. Yes, indeed, it was a diner.
8    Q. Do you remember was John Capo's father there, as
9 well?
10    A. I don't recall.
11    Q. Do you remember if there was anybody else there?
12    A. I don't recall. I know John was there. I
13 remember him.
14    Q. Who set up that meeting? Basically how did it
15 come about?
16    A. I don't know whether it was initiated by us or by
17 them. I really don't recall.
18    Q. Do you remember calling him at some point and
19 saying, Hey, I need some union guys on this project?
20    A. I don't recall calling, but obviously we needed
21 some kind of union workers on the job because there were
22 guys on the job already.
23    Q. Why did you need union guys on that job?
24    A. Because it was a union job.
25    Q. It was a union job so all the subs had to have

---

Page 43

1 union guys on it?
2    A. Well, most of them.
3    Q. Had the company worked on union jobs before that,
4 before 2000?
5        MR. DIAZ: Objection to the form. He didn't
6 say it was in 2000.
7    A. I really don't recall.
8    Q. Was the Fort Lee project -- this document I gave
9 you is dated by the two signatures 5/10/2000, is that
10 around the time the Fort Lee project was going on?
11    A. I really don't know. I don't recall.
12    Q. Was your meeting with John Capo around that time?
13    A. I don't recall.
14    Q. Was your meeting with him more recently, was it
15 in the last couple of years?
16    A. Not the last couple of years. Definitely not.
17    Q. So it was a number of years ago but you don't
18 know exactly when?
19    A. Yeah. That's correct.
20    Q. I know it's been a long time, but explain to me
21 the best you can what you remember being said at that
22 meeting with John Capo?
23    A. I really don't recall the conversation.
24    Q. What was the topics that were discussed?
25    A. I don't know.

---

Page 44

1    Q. I think you mentioned that getting union guys out
2 to this job in Fort Lee was one of the things discussed?
3    A. I'm just assuming that's why I had a meeting with
4 him, otherwise there is no reason why I would have a
5 meeting with him.
6    Q. Did John or Local 4 end up providing union guys
7 for that job?
8    A. I believe they have. That's why, you know, we
9 call them because we needed a mason and since they were
10 the mason local.
11    Q. Did you have guys other than the guys sent over
12 by the union working on that job?
13    A. I don't really recall.
14    Q. Did you have laborers working on that job?
15    A. I don't recall who was working, you know, who was
16 on the job and who wasn't.
17    Q. But you believe the union sent over some masons
18 to do some work?
19    A. It's a possibility. I don't know for -- I don't
20 know the facts. I just don't remember.
21    Q. The union might have sent some masons over?
22    A. Might have.
23    Q. But no one from the company ever signed an
24 agreement with Local 4 of New Jersey?
25    A. Not that I recall.

---

Page 45

1    Q. Do you remember John Capo ever telling you that
2 the union would need you to sign an agreement before
3 they could send union guys over?
4    A. I don't recall the conversation.
5    Q. Have you had occasions in the past where unions
6 have sent guys to work on one of the projects you were
7 working on?
8    A. For me? It's possible.
9    Q. You don't recall specifically?
10    A. I don't recall specifics, no.
11    Q. Did you ever talk with a person named Gerald
12 Della Salla?
13    A. Who is he?
14    Q. He is a union official.
15    A. No.
16    Q. His signature is on this document I provided you.
17    A. No.
18    Q. You don't know that name?
19    A. No. I don't recall talking to him. I don't
20 know. The name doesn't do anything.
21    Q. What about an individual named Pete Caputo?
22    A. Who is he?
23    Q. Another union person.
24    A. Not that I recall.
25    Q. You don't recognize that name either?

info@mfreporting.com              Mastroianni & Formaroli, Inc.              856-546-1100
                                   Professionals Serving Professionals

Attila Szamosszegi                                     October 24, 2007

| | |
|---|---|
| Page 46 | Page 48 |

**Page 46**

1    A. No.
2    Q. And you don't recall ever receiving anything in
3   writing from either of those people, Gerald Della Salla
4   or Pete Caputo?
5    A. No. Because -- no.
6    Q. Let me show you another document.
7        MR. MEHLER: It's Bates No. 100 through 132.
8   Mark this as Plaintiff's Exhibit No. 3.
9        (P-3 marked for identification.)
10    Q. Take a look at that document.
11    A. And this is -- what agreement is this?
12    Q. It's a collective bargaining agreement with Local
13   Union 4 and 5 of the B.A.C.
14    A. And the question is?
15    Q. First question is: Have you ever seen this
16   before?
17    A. No.
18    Q. Did Maarv ever agree to this agreement as far as
19   you know?
20    A. No.
21    Q. If John Capo had said we can only send union guys
22   over if you agree to this agreement, would you have done
23   so?
24        MR. DIAZ: Objection to the form.
25    A. Done what?

**Page 47**

1    Q. Would you have signed this agreement?
2    A. Maybe for the job, you know, if that's what you
3   require, you know.
4    Q. You would have signed it for that specific job?
5    A. For that specific job.
6    Q. But you wouldn't have signed it generally?
7    A. No.
8    Q. Why is that?
9    A. Why should I?
10    Q. I assume you didn't have an interest in being a
11   union company?
12    A. No. I was just fine as I was.
13    Q. So if John had said the only way we can send
14   union guys is by you signing this agreement you would
15   have said no?
16        MR. DIAZ: Asked and answered. He already
17   answered the question.
18    A. No. Because I would sign for one job, for the
19   job only, not for whatever.
20    Q. In relation to that Fort Lee project, do you
21   recall signing any agreement with a union for that job
22   specifically?
23    A. I don't recall.
24    Q. You don't recall signing any agreements regarding
25   that job with a union?

**Page 48**

1    A. That is correct.
2        MR. DIAZ: You don't have to look at it any
3   more.
4        THE WITNESS: I am just curious myself what
5   is in it.
6   (BY MR. MEHLER:)
7    Q. Did Maarv to the best of your memory ever sign
8   any collective bargaining agreement with Bricklayers
9   Local 5 New Jersey?
10        MR. DIAZ: Objection to the form. Objection
11   to agreement, but go ahead.
12    A. No. Not that I know of.
13    Q. Was there anybody else in the company that would
14   know?
15    A. No. I would be the one.
16    Q. Did Maarv ever sign any agreement with
17   Bricklayers Local 2 Delaware-New Jersey?
18        MR. DIAZ: Objection to the form. Go ahead.
19    A. No.
20    Q. Let me show you another exhibit.
21        MR. MEHLER: Douglas, this is Bates No. 739.
22        Please mark this as Plaintiff's Exhibit 4.
23        (P-4 marked for identification.)
24    Q. Take a look at this document and let me know when
25   you are ready.

**Page 49**

1    A. Yes. You have a question?
2    Q. Have you seen this document before?
3    A. Yeah. It came to the attention through my
4   attorney when we were talking about this case.
5    Q. Had you seen it before, before this lawsuit?
6    A. Obviously I have because I got my signatures on
7   it.
8    Q. That is your signature?
9    A. Yeah. That is my signature.
10    Q. Do you remember when you first saw this document?
11    A. Since I know I signed only one paper it had to be
12   done at Princeton job.
13    Q. You signed this in relation to the Princeton job?
14    A. I am pretty sure that's what it was.
15    Q. By the Princeton job, you mean the Princeton
16   Parking Garage job?
17    A. That is correct.
18    Q. Do you remember signing this document?
19    A. Not really, but I remember something that was
20   said to they are going to make something up, my
21   secretary explained something, the union was going to
22   send an agreement for the job. You need to sign it so I
23   said okay. So I signed the paper.
24    Q. Do you remember meeting with anybody from
25   Bricklayers Local 5 in relation to that Princeton

Pages 46 to 49

|  | Page 50 |
|---|---|

1   project?
2      A.  No.  I never met anybody.
3      Q.  You never met with a Dominic Longo?
4      A.  No.
5      Q.  Do you know Dominic Longo?
6      A.  No, I don't.
7      Q.  Do you recognize that name?
8      A.  Well, recently just.
9      Q.  Just from the lawsuit?
10     A.  Yeah.
11     Q.  How did it come about that you signed this
12  agreement?
13     A.  How did it come about?
14     Q.  Yes.
15     A.  What I recall is my secretary told me one day she
16  talked to a person called Ivan Pallos, he was from
17  Pallos Construction Company.
18     Q.  Your secretary spoke with somebody from Pallos
19  Construction?
20     A.  Right.  Pallos Construction was doing the work on
21  the Princeton Parking Garage.
22     Q.  What work were they doing?
23     A.  Caulking.
24     Q.  Were they doing it as your subcontractor?
25     A.  Yes.

|  | Page 51 |
|---|---|

1      Q.  So your secretary -- which secretary was this?
2      A.  Anne.
3      Q.  Was she the office manager at that time, as well?
4      A.  Yes.
5      Q.  So she got a call from somebody at Pallos
6   Construction?
7      A.  And they said, Look, they are going to send up an
8   agreement for this particular job and we have to hire a
9   union guy and they wouldn't accept his signatures.
10     Q.  Wouldn't accept Pallos?
11     A.  Pallos.  They want Maarv to sign the paper,
12  agreement for that job.  So it was faxed up to us and
13  Anne filled it out and I signed it.
14     Q.  Was that the only discussion you had with Anne
15  about this?
16     A.  I think so.
17     Q.  Did you ever talk with anybody at Pallos yourself
18  about this?
19     A.  I talked to Ivan.
20     Q.  That was the head of the company?
21     A.  Yeah.
22     Q.  What did he tell you?
23     A.  He said he talked to gentleman from the union and
24  they came out, they have a check regarding that he needs
25  to hire a union guy.

|  | Page 52 |
|---|---|

1      Q.  Because it was a union job?
2      A.  I guess union was slow.
3      Q.  What do you mean the union was slow?
4      A.  The jobs are slow so a lot of union members
5   sitting in the union hall so they come around and they
6   ask you to take one of their guys.
7      Q.  Did you or Pallos feel obligated to take on a
8   union guy?
9      A.  I don't know what Pallos felt.
10     Q.  What about you?
11     A.  Well, I subbed it out to him the whole job so I
12  couldn't care less one way or the other what he does.
13  It's his job.
14     Q.  Did this person from Pallos ever say whether it
15  was Dominic Longo he had talked with?
16     A.  Yeah.  He implied they had a talk and they ask
17  him to tell Maarv to sign the paper for this particular
18  job, you know, sign the page or whatever you call it.
19     Q.  Did he give the -- did he mention the name
20  Dominic Longo to you?
21     A.  I don't recall whether he mentioned it or not,
22  you know.
23     Q.  Did he ever explain to you why the union wouldn't
24  accept Pallos Construction as the signature on this?
25     A.  No.  He just said they want Maarv to sign it.

|  | Page 53 |
|---|---|

1      Q.  And Anne never explained that to you either?
2      A.  Explained what?
3      Q.  Why the union wouldn't accept Pallos Construction
4   on this page?
5      A.  Not that I recall.  No.
6      Q.  Did you ask Pallos -- after you received this
7   page marked as Plaintiff's Exhibit 4, did you ask the
8   person at Pallos Construction any questions about what
9   was on this page?
10     A.  What was on this page?
11     Q.  Yes.
12     A.  No.  We just talked about general, what is this.
13  He says, Look, we need to sign it for this job because
14  we have a union guy, he had to hire a union guy and in
15  order for me to do that we have to sign this page.
16     Q.  Had he already hired a union guy?
17     A.  No.  After that -- I don't know.  I really don't
18  know.  That's a good question.  I don't know.
19     Q.  Did you ever discuss with the person from Pallos
20  Construction what Plaintiff's Exhibit 4 meant?
21     A.  He said that's the agreement with the union for
22  that particular job.
23     Q.  And he specifically said for that particular job?
24     A.  Yes.  Yes.
25     Q.  Did you read over this document before you signed

Attila Szamosszegi
October 24, 2007

**Page 54**

1  it?
2    A. I just glanced through it, you know. No, I did
3  not.
4    Q. Did you ever call anybody at the union about this
5  page before signing it?
6    A. No.
7    Q. If you look at the first paragraph.
8    A. Okay.
9    Q. I know it's small writing. It says, The
10  undersigned employer has read and hereby approves the
11  signed collective bargaining agreement between the
12  Building Contractors Association of New Jersey and the
13  Masonry Contractors Association of New Jersey dated
14  November 1st, 2002, and Bricklayers and Allied
15  Craftworkers Locals No. 4, No. 5 of New Jersey and Local
16  No. 2 of Delaware-New Jersey and any successor
17  collective bargaining agreement subsequently negotiated
18  between said parties and herewith accepts and becomes
19  one of the parties thereto and agrees to be bound by all
20  the terms and conditions of the effective collective
21  bargaining agreement and such successor agreements as
22  may be negotiated from time to time.
23    What did that paragraph mean to you?
24    MR. DIAZ: Objection to the form. You are
25  assuming he even read it.

**Page 55**

1    A. A lot of mumbo-jumbo. I don't even know what is
2  the collective bargaining. What am I agreeing to? This
3  is one page over here. What I see it now it doesn't get
4  into any specifics.
5    Q. Did you read this page before you signed it?
6    A. Probably I glanced through it but it wasn't -- I
7  didn't think since I was told it's for this particular
8  job I wasn't really paying that much attention since my
9  sub is doing the job, not me, so one small job, I said
10  okay sign.
11    Q. You were told by Pallos Construction that it was
12  for one job?
13    A. Excuse me?
14    Q. You were told by Pallos Construction that this
15  just covered one job?
16    A. I think it was yeah, Pallos, and also I believe,
17  as I said, Anne talked to them.
18    Q. Anne talked to Pallos?
19    A. And probably Anne talked to the union guys.
20    Q. Do you know whether she talked to the union guys?
21    A. Do I know?
22    Q. Yes.
23    A. What?
24    Q. Do you know whether Anne talked to the union guys
25  or are you speculating?

**Page 56**

1    A. No. She mentioned something this is the one job.
2  That's why I signed it. Ivan called and the union
3  called this is one job, fill out and send back to them.
4    Q. Anne specifically told you she spoke with the
5  union?
6    A. Yeah. Otherwise I wouldn't have signed it. I
7  had no gain by it. What do I have to gain by it?
8    Q. Who did she say she spoke with at the union?
9    A. I don't know. She said union official. She
10  didn't get into specifics.
11    Q. She was told both by a union official and by
12  Pallos Construction that this was for one job?
13    A. Right. That is correct.
14    Q. Did you personally speak with anybody at the
15  union about this?
16    A. No, I haven't. I didn't feel like I need to.
17    Q. Pallos Construction also told you that they had
18  spoken with the union who told them it was for one job?
19    A. Right. That is correct.
20    Q. And I believe you testified previously that the
21  person Pallos said they spoke with was Dominic Longo?
22    A. If that's what the job came in, I don't know. I
23  didn't testify because I don't know.
24    Q. Do you know whether Anne ever spoke with anyone
25  from the International Bricklayers Union about this

**Page 57**

1  document?
2    A. Why should she? Where would she get a phone
3  number from?
4    MR. DIAZ: Do you know?
5    Q. I am just wondering if you know if she did?
6    A. No. No.
7    Q. You don't know whether she did?
8    A. No. I don't know.
9    Q. And you never spoke with anybody from the
10  international union?
11    A. Nope.
12    Q. And you are not aware of Pallos ever speaking
13  with anybody from the international union?
14    A. Not that I am aware of.
15    Q. Do you know whether Anne ever spoke with anyone
16  from the Bricklayers and Trowel Trades International
17  Pension Fund regarding this document?
18    A. Not until they show up at our office.
19    Q. For the audit?
20    A. Yeah.
21    Q. You personally never spoke with anybody from the
22  IPF?
23    A. No.
24    Q. Are you aware of Pallos ever speaking with
25  anybody from the IPF?

Pages 54 to 57

Page 58

1    A. I don't know. I can't speak on his behalf.
2    Q. But you are not aware of anyone from the IPF,
3  which is the International Pension Fund, ever telling
4  you that this document covered just one project?
5    A. Come again? I am sorry.
6    Q. You are not aware of anyone from the IPF, which
7  is the International Pension Fund, ever telling you or
8  Anne or Pallos Construction that this document covered
9  just one project?
10    A. Why would they know we even exist?
11    Q. I want to make sure you are not aware of any
12  evidence of that?
13    A. How would they know we even exist?
14    Q. You are not aware of anyone from the
15  international union ever talking to them and saying this
16  was for one project?
17    A. We don't deal with the international. We dealt
18  with the local union.
19    Q. So your answer would be no, you are not aware of
20  any evidence; is that correct?
21    A. Yes.
22    Q. Let me show you another document.
23        MR. MEHLER: Douglas, it's 709 to 738.
24        Mark that as Plaintiff's Exhibit 5, please.
25        (P-5 marked for identification.)

Page 59

1    Q. Take a look at that. Let me know when you are
2  ready.
3    A. This is? What am I looking at?
4    Q. This is a collective bargaining agreement with
5  Locals 4, 5 and 2 of the Bricklayers.
6    A. Okay. Do I need to read it through?
7    Q. No. I won't ask you about the specific terms.
8  Just read through and let me know if you are familiar
9  with it.
10    A. No. I am not.
11    Q. Have you seen it before?
12    A. No.
13    Q. Did you understand that by signing Plaintiff's
14  Exhibit 4 you were agreeing to Plaintiff's Exhibit 5?
15    A. No. It was for one job. One particular job,
16  Princeton.
17    Q. When you signed Plaintiff's Exhibit 4 did you
18  notice that language regarding this collective
19  bargaining agreement with Locals 4, 5 and 2 in the first
20  paragraph?
21    A. I can't recall. As I stated, it was one
22  particular job so I wasn't really, you know, paying too
23  much attention.
24    Q. Do you know if anyone ever got anything in
25  writing from the union saying that Plaintiff's Exhibit 4

Page 60

1  just covered that one particular job?
2    A. I don't know.
3    Q. You are not aware of any documents?
4    A. No. I am not aware of.
5    Q. Did you ever ask the union for a copy of the
6  agreement referenced in the first paragraph of
7  Plaintiff's Exhibit 4?
8    A. I wasn't even aware of this agreement.
9    Q. So when you signed Plaintiff's Exhibit 4 you
10  thought you were signing a collective bargaining
11  agreement but just for that one project?
12        MR. DIAZ: Objection to the form.
13    A. Well, I am signing a union paper for that
14  particular job, yeah.
15    Q. What did you think that union paper required?
16    A. Hire the union guy and pay his guys.
17    Q. What about fringe benefits contribution?
18    A. And the fringe benefits, whatever on that
19  particular job for union guys.
20    Q. Did it require you pay a particular wage rate to
21  the employees?
22    A. I am sure.
23    Q. Did you understand the agreement as allowing you
24  to hire nonunion guys for that job, as well?
25        MR. DIAZ: Objection to the form. What

Page 61

1  agreement are we referring to?
2        MR. MEHLER: Plaintiff's Exhibit 4.
3        MR. DIAZ: Okay. Objection to the
4  agreement, but go ahead.
5    A. What was the question again?
6    Q. By signing Plaintiff's Exhibit 4 did you
7  understand it as requiring you to hire only union guys
8  or you could also hire nonunion guys?
9    A. Also nonunion.
10    Q. And if nonunion guys were hired, did you believe
11  that dues needed to be paid for them?
12    A. No.
13    Q. Did you believe that fringe benefit contribution
14  needed to be paid for them?
15    A. No.
16    Q. Did you believe that a certain wage rate had to
17  be paid to them?
18    A. No. As far as I was concerned this was for union
19  guys only. That's why we had to hire the union guy. As
20  far as I know it informs us and the union guy gets so
21  much money and benefits, I guess. And that's it.
22    Q. Did you have anybody else in your office review
23  Plaintiff's Exhibit 4 before you signed it?
24    A. Anne. Anne.
25    Q. Did you have your attorney review it?

Pages 58 to 61

Attila Szamosszegi                                            October 24, 2007

Page 62

1  A. I have no attorney.
2  Q. Had you signed any collective bargaining
3  agreements prior to that?
4  A. No.
5  Q. Just so I am clear on your testimony, you
6  understood Plaintiff's Exhibit 4 as requiring your sub,
7  Pallos, to hire union guys?
8  A. Well, he was doing the job so, you know, he is...
9  Q. After you signed Plaintiff's Exhibit 4 it was
10 faxed back to the union?
11 A. I suppose. I really don't know.
12 Q. Would you have given it to Anne for that purpose?
13 A. I would have given it to Anne.
14 Q. After this lawsuit was filed did you talk to Anne
15 about this situation with Local 4 and 5 in New Jersey?
16     MR. DIAZ: Just objection. If you can maybe
17 give a time reference. I don't know offhand when the
18 lawsuit was filed.
19     MR. MEHLER: I don't remember exactly
20 either.
21 Q. Since the time the lawsuit was filed up until
22 Anne's death, did you ever speak with her about the
23 allegations in this lawsuit?
24     MR. DIAZ: I forget when Anne died. That's
25 why I was looking for a time frame.

Page 63

1     MR. MEHLER: I can get you that.
2     MR. DIAZ: I thought it was filed in the
3  beginning of '07.
4     MR. MEHLER: It was filed in '07.
5  (BY MR. MEHLER:)
6  Q. I think Anne had already passed away by 2007?
7  A. Yes.
8  Q. That answers my question.
9     So, you signed Plaintiff's Exhibit 4 and it was
10 faxed back to the union presumably by Anne. What
11 happened after that?
12 A. I finished the job.
13 Q. Did Pallos hire a union guy?
14 A. I suppose, yeah.
15 Q. Do you know who that union guy was?
16 A. Not offhand.
17 Q. That union guy was paid by Pallos, not by Maarv?
18 A. Yeah. That is correct.
19 Q. You didn't see Plaintiff's Exhibit 4 as requiring
20 Maarv to hire union people?
21 A. No. Because we subbed the job out.
22 Q. And you didn't see it as requiring Maarv to file
23 reports of their employees with the union?
24 A. That is correct.
25 Q. And you didn't see it as requiring Maarv to pay

Page 64

1  dues for any of its employees?
2  A. Absolutely.
3  Q. And you didn't see it as requiring Maarv to make
4  fringe benefit contribution for any of its employees?
5  A. True, too.
6  Q. All those questions whether in relation to the
7  Princeton job or any other job?
8  A. Yeah.
9  Q. Did you ever speak with a person named Mike
10 Perrone who else goes by Chuck Perrone?
11 A. Who is he?
12 Q. He is a union official with Local 5.
13 A. No.
14 Q. You don't recognize the name?
15 A. No.
16     MR. MEHLER: I am going to mark an exhibit.
17 This is one of your documents. M-71 through M-75.
18     Mark that as Plaintiff's Exhibit 6.
19     (P-6 marked for identification.)
20 Q. Take a look at that and let me know when you are
21 ready.
22 A. Okay.
23 Q. Have you seen this document before?
24 A. Just came about recently.
25 Q. In connection with the lawsuit?

Page 65

1  A. Yeah.
2  Q. You don't remember seeing it around the time -- I
3  am trying to see if it has a date on here. There is a
4  fax date of 4/04 at the top?
5  A. Uh-huh.
6  Q. You don't remember seeing it around that time?
7  A. No. No.
8  Q. You don't remember receiving this from Anne at
9  some point?
10 A. No.
11 Q. Do you remember the circumstances of Anne handing
12 you Plaintiff's Exhibit 4 to sign?
13 A. Somewhat, yeah. Because she mentioned to me, you
14 know, I said regarding union and she said, Look, as I
15 said, we received this thing for that particular job, we
16 need to send it back. That was the extent of it.
17 Q. Did she just give you the one sheet that is
18 marked Plaintiff's Exhibit 4 to sign?
19 A. That's all she gave me.
20 Q. She didn't give you Plaintiff's Exhibit 6, this
21 fax with the attachments?
22 A. No. Why would I -- as far as we knew it doesn't
23 concern us because we subbed the job out.
24 Q. So the rates --
25 A. I see her signature, I mean her handwriting over

Pages 62 to 65

Attila Szamosszegi                                    October 24, 2007

| Page 66 | Page 68 |
|---|---|
| 1  here. | 1  Q. What work did Maarv do on that project? |
| 2  Q. Where is her handwriting? | 2  A. What did we do? Mostly we removed old dirt. |
| 3  A. This one. | 3  They were building planters. |
| 4  Q. Where it says Princeton P/G and Building A | 4  Q. Was there waterproofing work on that? |
| 5  Project in the middle? | 5  A. Was there waterproofing? Yeah. It was |
| 6  A. Right. | 6  hot-applied waterproofing. |
| 7  Q. That is Anne's handwriting? | 7  Q. Did Maarv sub out that work? |
| 8  A. Right. | 8  A. Yes. |
| 9  Q. And the information in the middle of this | 9  Q. Entirely? |
| 10  regarding wage rates and contributions, you weren't | 10  A. Yes. |
| 11  concerned about that because in your view it was Pallos | 11  Q. Do you remember who they subbed it out to? |
| 12  that had to comply with that? | 12  A. I don't recall. |
| 13  A. That is correct. | 13  Q. Another project from 2002, Gayle & Wentworth at |
| 14  Q. If you go to the second page of this, do you | 14  50 Dey Street in Jersey City. Do you recall that |
| 15  agree that that appears to be a blank version of | 15  project? |
| 16  Plaintiff's Exhibit 4 without any signatures or | 16  A. Yes. Something, yeah. We had to remove wooden |
| 17  information filled in? | 17  floors from the old buildings. |
| 18  A. Yeah. Looks to be, yeah. | 18  Q. Was there waterproofing and caulking work on |
| 19  Q. Did you ever ask the union why it was that they | 19  that? |
| 20  couldn't just have Pallos sign an agreement? | 20  A. No. |
| 21  A. No. | 21  Q. It was just removal of the floor, you said? |
| 22  Q. If you look at the last page of Plaintiff's | 22  A. Yeah. This is old American Can Company and they |
| 23  Exhibit 6, do you know what that document is? | 23  had wood floors, it was very old. We were hired to |
| 24  A. All I know is what I could see over there, what I | 24  remove them. |
| 25  could read, Benefit Funds Report. That's what it is. | 25  Q. Did you do that work yourself or did you contract |

| Page 67 | Page 69 |
|---|---|
| 1  It says it right up there so I guess that's it. | 1  that? |
| 2  Q. In your view was that something else that was | 2  A. No. We did that ourself. |
| 3  something Pallos had to deal with and not you? | 3  Q. Another project from 2002, the Montclair Art |
| 4  A. Yeah. I mean, nobody worked for my organization | 4  Museum? |
| 5  over there. | 5  A. I don't recall that, no. |
| 6  Q. What do you mean nobody worked for your | 6  Q. You don't recall that one? |
| 7  organization over there? | 7  A. No. |
| 8  A. On the job. | 8  Q. Is there anybody at Maarv that would recall that |
| 9  Q. It was all Pallos' employees? | 9  one? |
| 10  A. It was all Pallos. | 10  A. I don't think so. |
| 11  Q. Do you know if this fax with the attachments was | 11  Q. Another one from 2002, the Hospital For Special |
| 12  forwarded by you over to Pallos Construction? | 12  Surgery? |
| 13  A. I don't know. | 13  A. What was the first project? |
| 14  Q. Would Anne have handled that? | 14  Q. First project was Bel Air Building Parking |
| 15  A. Yeah. | 15  Garage? |
| 16  Q. I would like to ask you about some projects that | 16  A. That's the same thing. |
| 17  I believe Maarv has done over the years. Tell me about | 17  Q. That's the same thing? |
| 18  them to the best of your ability. | 18  A. Yeah. |
| 19  A Bel Air building parking garage in New York | 19  Q. So that's the same project where the |
| 20  back in 2002? | 20  waterproofing was subbed out by Maarv? |
| 21  A. What about it? | 21  A. Right. |
| 22  Q. Do you remember that project? | 22  Q. Another one from 2002, River Tower Associates? |
| 23  A. Yes. Somewhat. | 23  A. I don't know. I don't recall. |
| 24  Q. It was in New York City? | 24  Q. You don't recall that one. |
| 25  A. Yeah. | 25  About how many projects does Maarv do in a year |

Attila Szamosszegi                                    October 24, 2007

| Page 70 | Page 72 |
|---|---|

**Page 70**

1  typically?
2     A. It all depends.
3     Q. More than 50?
4     A. No. I don't think so.
5     Q. More than ten?
6     A. I really don't know, you know, the exact numbers.
7     Q. Project from 2003, Queens Parking Garage in New
8  York?
9     A. Yeah. Expansion joints we did.
10    Q. Excuse me?
11    A. Expansion joints.
12    Q. Was there waterproofing on that job?
13    A. No. Expansion joints.
14    Q. What was the work on the expansion joints you
15  did?
16    A. Removed, replace.
17    Q. Did you have your guys do it or did you sub it
18  out?
19    A. No. We did that.
20    Q. You did that?
21    A. Yeah.
22    Q. Another one from 2003, the Stonehenge Parking
23  Garage in North Bergen?
24    A. Waterproof, hot applied.
25    Q. Did you sub out that?

**Page 72**

1     Q. What about the MONY at Lake Success, New York?
2     A. A what?
3     Q. MONY at Lake Success?
4     A. I don't remember that.
5     Q. You don't recall that one?
6     A. No.
7     Q. 2004, the Gayle & Wentworth Seamans; do you
8  recall that project?
9     A. I know we did some work for Gayle but I don't
10  know which one is which. No, not in particular.
11    Q. What about the Englewood Hospital in 2004?
12    A. Englewood Hospital, 2004. I think we did some
13  trench. I am not sure but I think it was trench.
14    Q. Trench work?
15    A. Yeah.
16    Q. Not waterproofing?
17    A. No.
18    Q. Did you have your own guys do that work?
19    A. I think we subbed it out.
20    Q. Do you remember to who?
21    A. No.
22    Q. 2004, another reference to Hospital For Special
23  Surgery?
24    A. It's all the same.
25    Q. All the same?

**Page 71**

1     A. Yes.
2     Q. Entirely?
3     A. Yes.
4     Q. The Parking Authority of New Brunswick in 2003?
5     A. Steel work.
6     Q. Just steel work?
7     A. Uh-huh.
8     Q. No waterproofing?
9     A. No.
10    Q. Did you do that work yourself?
11    A. No. We subbed it out.
12    Q. Do you remember to who?
13    A. No. No.
14    Q. Do you remember who you subbed it out to in
15  Stonehenge Parking Garage?
16    A. It was some roofing company.
17    Q. In 2003 I have another reference to the Hospital
18  For Special Surgery, was that another project or was
19  that the same one?
20    A. It's the same.
21    Q. Did you do a project for the Township of
22  Parsippany in 2003?
23    A. I don't know.
24    Q. You don't recall that one?
25    A. No, I don't recall.

**Page 73**

1     A. I don't know who gave them the list, but...
2     Q. I can tell you this is a list that the auditor
3  came up with from looking at your records.
4     A. Okay. Obviously my office supplied it.
5     Q. A project for the Troast Group, that's the
6  Princeton Parking Garage project?
7     A. Yes.
8     Q. That's the project where you did sub out all the
9  waterproofing to Pallos; is that right?
10    A. All the caulking/waterproofing, yeah.
11    Q. What about a Bristol Parking Garage in 2004?
12    A. Bristol.
13    Q. For the Glenwood Management Corp.?
14    A. It was subbed out.
15    Q. Was that waterproofing?
16    A. Concrete.
17    Q. Concrete. And you subbed it all out?
18    A. Yeah.
19    Q. Who did you sub it out to?
20    A. The gentleman over here in Hackensack, he is a
21  big union outfit.
22    Q. You don't remember the name?
23    A. Not offhand, but I know they are located in
24  Hackensack.
25    Q. Do you remember why you used a union

Pages 70 to 73

Attila Szamosszegi                                      October 24, 2007

Page 74

1  subcontractor in that project?
2    A.  Because his price was the lowest.
3    Q.  It wasn't because it was union?
4    A.  No.  He was the lowest sub bid.
5    Q.  What about a Lowes Theatre in 2004?
6    A.  I don't recall.
7    Q.  You don't recall that one?
8    A.  No.
9    Q.  What about Phoenix Medical Construction in 2004?
10   A.  That was a railing job, it was subbed out.
11   Q.  Not waterproofing?
12   A.  No.
13   Q.  Valley National Bank in 2004?
14   A.  Valley National Bank.  Epoxy injection.
15   Q.  Did you do that work yourself?
16   A.  Yeah.
17   Q.  The Wilmington Parking Authority in 2004, do you
18 recall that project?
19   A.  Yeah.  It was subbed out.
20   Q.  What kind of work was it?
21   A.  Waterproofing.
22   Q.  Who did you sub it out to?
23   A.  Some outfit out there.
24   Q.  You don't remember?
25   A.  I don't recall the name.

Page 75

1    Q.  Would the company have records reflecting who you
2  subbed out the various projects to?
3    A.  We don't keep record of them.
4    Q.  You don't keep record of them?
5    A.  I don't need to.
6    Q.  What about the North Shore Long Island Jewish
7  Medical Center Parking Garage?
8    A.  What did we do there?  I don't know.  I don't
9  recall that.  Asphalt maybe, possible asphalt.  I don't
10 know.  I am not so sure.
11   Q.  What about Riverview Towers in 2004?
12   A.  Riverview Towers, doesn't ring a bell.
13   Q.  Would Peter Cuomo know about any of these
14 projects?
15   A.  He would know some, but not all of them.
16   Q.  But you haven't checked with him?
17   A.  No.  I don't think it was necessary.
18   Q.  Was your son involved in the business back in
19 2002 to 2005?
20   A.  I don't think so.
21   Q.  Would you have employees that would know about
22 some of these projects?
23   A.  No.  I am the one who knows, you know, about the
24 jobs.
25   Q.  What about the guys that actually worked on the

Page 76

1  projects?
2    A.  I don't know who worked on the projects.
3    Q.  You don't have records reflecting that?
4    A.  No.
5    Q.  Some 2005 projects.  Toms River, New Jersey
6  Parking Garage?
7    A.  We subbed it out, waterproofing.
8    Q.  Do you remember who you subbed it to?
9    A.  Yeah.  It was subbed out to AGP, I think.
10   Q.  Is that a union sub?
11   A.  I don't know.  I think he is, but I am not sure.
12   Q.  A project Arena Construction Company, the St.
13 George Ferry?
14   A.  Epoxy injection.
15   Q.  Did you sub that out?
16   A.  No.  We did that.
17   Q.  How about the University of Medicine & Dentistry
18 in 2005?
19   A.  Landscaping.
20   Q.  Just landscaping?
21   A.  Yeah.
22   Q.  You did it yourself?
23   A.  Yeah.
24   Q.  Wilmington Parking Authority?  Same as the prior
25 one?

Page 77

1    A.  Yeah.
2    Q.  And the Long Island Jewish Medical Center Parking
3  Garage is the same one we already mentioned?
4    A.  Yeah.  Same.
5    Q.  Okay.  How about the Riverdale Parking Garage,
6  Skyview Apartments?
7    A.  Landscaping, hot-applied waterproofing.
8    Q.  Who did the waterproofing?
9    A.  The outfit out of Canada.
10   Q.  Do you remember the name?
11   A.  What's the name of them?  I could look it up.
12   Q.  Do you have a record of that?
13   A.  I think, yeah, I do because they did the job for
14 us -- what's the name of the guy?  Multi Seal.
15   Q.  How does Maarv go about getting these
16 subcontractors, do they --
17   A.  They pick up the Blue Book and get subs.
18   Q.  Do you get bids from various subs?
19   A.  Yeah.
20   Q.  Are there some subs you work with repeatedly?
21   A.  Some.
22   Q.  How many bids do you typically get on a job?
23   A.  Depends, you know.  All depends.  If the sub
24 gives you a price and I think it's a fair price I will
25 give him a job.

Pages 74 to 77

Attila Szamosszegi                                           October 24, 2007

| Page 78 | Page 80 |
|---|---|
| 1  Q.  But if you don't think it's a price, a good price | 1  Q.  No waterproofing? |
| 2  you may get some other bids? | 2  A.  No. |
| 3    A.  I don't necessarily shop around. | 3  Q.  Who did the work on that? |
| 4  Q.  Hartsdale Parking Garage? | 4  A.  Us. |
| 5    A.  That's painting. | 5  Q.  I know I have gone through a lot of projects |
| 6  Q.  Just painting? | 6  here, but sitting here right now can you think of |
| 7    A.  Yeah. | 7  additional projects during 2002 to 2005 that the company |
| 8  Q.  And you did that yourself? | 8  did? |
| 9    A.  Yeah. | 9    A.  No.  Not offhand.  No.  I don't recall. |
| 10  Q.  W&M Properties Parking Garage repairs? | 10  Q.  Do you think I probably listed them all or do you |
| 11    A.  I don't recall that.  What year? | 11  think there is probably others? |
| 12  Q.  2005.  These are all 2005. | 12    A.  I don't know.  You listed a good many of them.  I |
| 13    A.  Some are so small, maybe a day's work. | 13  wasn't aware that we did that much work. |
| 14  Q.  Is there a typical duration of your projects? | 14  Q.  Do you know a company by the name of South Shore |
| 15    A.  No.  No. | 15  Contracting? |
| 16  Q.  Are some just a couple days? | 16    A.  South Shore, yeah. |
| 17    A.  Some just a couple of hours. | 17  Q.  What do you know about them? |
| 18  Q.  And the bigger projects, how long do they -- | 18    A.  They are caulking and waterproofing. |
| 19    A.  All depends. | 19  Q.  Have you used them as a sub? |
| 20  Q.  Could it be months? | 20    A.  I don't recall.  Might have helped each other, |
| 21    A.  It could be weeks. | 21  but I don't really recall. |
| 22  Q.  City of Summit Parking Garage? | 22  Q.  Have you ever hired any of their employees? |
| 23    A.  Yeah.  That's waterproofing, we subbed it out. | 23    A.  I don't recall. |
| 24  Q.  Who did you sub it to? | 24  Q.  Do you have records that would reflect that? |
| 25    A.  AJP, same. | 25    A.  I don't know. |

| Page 79 | Page 81 |
|---|---|
| 1  Q.  AJP? | 1  Q.  Would anybody else at Maarv know that? |
| 2    A.  Yeah. | 2    A.  I don't think so. |
| 3  Q.  Are they union, do you know? | 3  Q.  Do you know who the head of South Shore |
| 4    A.  I believe they are union.  I never asked but I | 4  Contracting is? |
| 5  think he mentioned something he is a union outfit. | 5    A.  Glen Russo. |
| 6  Q.  Any union subcontractors you used was it because | 6  Q.  Excuse me? |
| 7  they were union? | 7    A.  Glen Russo.  Glen DelRusso. |
| 8    A.  No.  Because of the pricing. | 8  Q.  Did South Shore Contracting work on any of the |
| 9  Q.  You didn't feel you had any obligation to use | 9  same projects as Maarv? |
| 10  union subcontractors? | 10    A.  I really don't recall. |
| 11    A.  No.  Absolutely not. | 11  Q.  Do you know a company by the name of Sealant |
| 12  Q.  A project in 2005 for the Parking Authority of | 12  Technologies Services? |
| 13  New Brunswick? | 13    A.  I heard of them. |
| 14    A.  That's replace the doors. | 14  Q.  Have you ever subbed any work to them? |
| 15  Q.  No waterproofing? | 15    A.  I don't think so. |
| 16    A.  No.  Subbed out. | 16  Q.  Do you know what type of work they do? |
| 17  Q.  SJP Properties, two parking garages in | 17    A.  I think they do caulking. |
| 18  Bridgewater? | 18  Q.  Have you ever hired any of their employees? |
| 19    A.  SJG Properties.  Expansion joints. | 19    A.  No. |
| 20  Q.  No waterproofing? | 20  Q.  Do you know a company called Water Control in |
| 21    A.  No. | 21  Huntington Valley, Pennsylvania? |
| 22  Q.  Did you do that work yourself? | 22    A.  No. |
| 23    A.  Uh-huh. | 23  Q.  Do you know a company named Grandview |
| 24  Q.  Merck & Company, concrete pad repairs? | 24  Waterproofing in Hackensack? |
| 25    A.  Epoxy coating. | 25    A.  Yeah. |

Pages 78 to 81

Attila Szamosszegi                                    October 24, 2007

|  | Page 82 |
|---|---|
| 1 | Q. What do you know about them? |
| 2 | A. I know they are doing caulking and waterproofing. |
| 3 | Q. Did you ever sub to them? |
| 4 | A. No. |
| 5 | Q. Ever hire any of their employees? |
| 6 | A. Not that I know of. |
| 7 | Q. What about Bryant Caulking and Waterproofing in |
| 8 | Pine Hill, New Jersey? |
| 9 | A. I don't know them. |
| 10 | Q. What about Roman, Inc. in West Berlin, New |
| 11 | Jersey? |
| 12 | A. No. |
| 13 | Q. What about Garden State Caulking, Inc. in |
| 14 | Belleville, New Jersey? |
| 15 | A. Yeah, I heard of them. |
| 16 | Q. Are they a waterproofing company? |
| 17 | A. The name say caulking so I know they do caulking. |
| 18 | Q. Did you ever sub to them? |
| 19 | A. No. |
| 20 | Q. Did you ever hire any of their employees? |
| 21 | A. Not knowingly. |
| 22 | MR. MEHLER: Again, let me know whenever you |
| 23 | need a break. |
| 24 | THE WITNESS: Just go. Just go right on |
| 25 | through. |

|  | Page 83 |
|---|---|
| 1 | MR. MEHLER: That's what I like to hear. |
| 2 | M-70, Douglas. |
| 3 | MR. DIAZ: If you are okay let us know, too. |
| 4 | You are the most important person in the room. |
| 5 | MR. MEHLER: Of course. You are working the |
| 6 | hardest definitely. |
| 7 | Please mark this as Plaintiff's Exhibit 7. |
| 8 | (P-7 marked for identification.) |
| 9 | (BY MR. MEHLER:) |
| 10 | Q. Take a look at that document, please. |
| 11 | A. Okay. |
| 12 | Q. Do you recognize that document? |
| 13 | A. This is a check, yes. |
| 14 | Q. Do you know what that check was for? |
| 15 | A. It says reimbursement for union dues. |
| 16 | Q. Do you remember what employee that was |
| 17 | reimbursing for union dues? |
| 18 | A. Since it come from Pallos I suppose this is for |
| 19 | the Princeton Parking Garage. |
| 20 | Q. So, Maarv was paying the union dues for at least |
| 21 | one union employee and Pallos would reimburse Maarv? |
| 22 | A. Yeah. Pallos sent his check and they rejected |
| 23 | his check, so he asked us to pay and he is going to |
| 24 | reimburse us. |
| 25 | Q. The union rejected it? |

|  | Page 84 |
|---|---|
| 1 | A. Yeah. |
| 2 | Q. Because Pallos wasn't the one that had signed the |
| 3 | document they had sent? |
| 4 | A. Right. That is correct. |
| 5 | Q. Do you know if anyone from Pallos talked to the |
| 6 | union about that check that was rejected? |
| 7 | A. I don't know. |
| 8 | Q. You never talked to the union about it? |
| 9 | A. No. |
| 10 | MR. MEHLER: M-76. Plaintiff's Exhibit No. |
| 11 | 8. |
| 12 | (P-8 marked for identification.) |
| 13 | Q. Take a look at this document. |
| 14 | A. Okay. |
| 15 | Q. Have you seen this before? |
| 16 | A. No. I don't think I have. |
| 17 | Q. It says, Memo to Ivan at the top. Do you know |
| 18 | who Ivan is? |
| 19 | A. Ivan Pallos. |
| 20 | Q. And it says from Anne. Is that the Anne from |
| 21 | your company, you believe? |
| 22 | A. Yes. |
| 23 | Q. And it references Union Man at Princeton Project. |
| 24 | So your understanding is that that was the individual |
| 25 | sent over by the union to that project? |

|  | Page 85 |
|---|---|
| 1 | MR. DIAZ: Objection to the form as Attila |
| 2 | -- I am assuming Attila didn't prepare that document and |
| 3 | draft it but go ahead. |
| 4 | Q. Go ahead. |
| 5 | A. What was the question? |
| 6 | Q. Is it your understanding that Union Man at |
| 7 | Princeton Project refers to the union guy? |
| 8 | A. I don't think because I never see this. |
| 9 | Q. Do you know if the union sent over more than one |
| 10 | person to that project? |
| 11 | A. I don't know. |
| 12 | Q. Whoever they sent over would have been working |
| 13 | for Pallos, not for you? |
| 14 | A. That is correct. |
| 15 | Q. It gives a name of Efrain Rivera. Are you |
| 16 | familiar with that name? |
| 17 | A. No. |
| 18 | Q. You don't know who that is? |
| 19 | A. No. |
| 20 | MR. MEHLER: M-79. Please mark this as |
| 21 | Plaintiff's Exhibit 9. |
| 22 | (P-9 marked for identification.) |
| 23 | Q. Have you seen that document before? |
| 24 | A. No. |
| 25 | Q. Do you recognize the handwriting? |

Pages 82 to 85

Attila Szamosszegi                                      October 24, 2007

| Page 86 |
|---|
| 1    A. I think it's Ivan's. |
| 2    Q. Do you remember Anne ever discussing this |
| 3  document with you? |
| 4        MR. DIAZ: Objection to form. Go ahead. |
| 5    A. No. |
| 6        MR. DIAZ: Just because he said he didn't |
| 7  see it before, but go ahead. |
| 8    A. No. |
| 9    Q. You had mentioned, we had discussed South Shore |
| 10  Contractors before? |
| 11    A. Uh-huh. |
| 12    Q. Do you know if they, anybody at South Shore |
| 13  Contractors has any facts relating to this lawsuit? |
| 14        MR. DIAZ: Any facts? |
| 15    A. Any facts. What do you mean facts? |
| 16    Q. Do they know anything about what is alleged in |
| 17  this lawsuit? |
| 18    A. I don't know. |
| 19    Q. You don't know? |
| 20    A. No. |
| 21    Q. You are not aware of them knowing? |
| 22    A. No. |
| 23    Q. What about Garden State Caulking? |
| 24    A. No. |
| 25        MR. MEHLER: Bates No. 747. Please mark |

| Page 87 |
|---|
| 1  this as Plaintiff's Exhibit 10. |
| 2        (P-10 marked for identification.) |
| 3    Q. Do you recognize that document? |
| 4    A. What is it? |
| 5    Q. Tell me if you recognize it first. |
| 6    A. No.  I don't recognize it. |
| 7    Q. You have never seen this document before? |
| 8    A. No. |
| 9    Q. You didn't prepare this document? |
| 10    A. Not that I recall.  This goes back to '87. |
| 11    Q. Do you know if somebody at Maarv prepared this |
| 12  document? |
| 13    A. No. |
| 14    Q. You don't know? |
| 15    A. I don't know. |
| 16    Q. Do you know if this document was submitted by |
| 17  Maarv to the Bricklayers and Trowel Trades International |
| 18  Pension Fund? |
| 19    A. I don't know. |
| 20    Q. It gives an address of Maarv of Lodi, New Jersey. |
| 21  Was that Maarv's address at one point? |
| 22    A. Not that I recall. |
| 23    Q. Not that you recall? |
| 24    A. No. |
| 25    Q. You don't recognize that address? |

| Page 88 |
|---|
| 1    A. No. |
| 2    Q. And it looks like Waterproofing, Inc. is crossed |
| 3  out and above it just says Maarv.  Do you see that? |
| 4    A. Yeah. |
| 5    Q. Do you have any idea why that would be? |
| 6    A. I don't recognize the paper, period, whether it |
| 7  is crossed out or not. |
| 8    Q. This document is from 1987 if you look in the |
| 9  upper right-hand corner.  Was Maarv bound to any |
| 10  agreement with the Bricklayers Union at that time? |
| 11    A. Not that I know. |
| 12    Q. So you don't know why Maarv would file any |
| 13  reports with the IPF at that time? |
| 14    A. No. |
| 15    Q. It lists three last names here, one is Cuomo.  Is |
| 16  that the same way you spelled Peter Cuomo? |
| 17    A. Yeah. |
| 18    Q. Another one is Mayfield.  Do you have any idea |
| 19  who that is? |
| 20    A. I don't recall. |
| 21    Q. You don't recall any employee by the name |
| 22  Mayfield from Maarv? |
| 23    A. No. |
| 24    Q. At any point? |
| 25    A. No. |

| Page 89 |
|---|
| 1    Q. I think the next one is your name? |
| 2    A. It looks like it, yeah.  Not the correct |
| 3  spelling, but... |
| 4        MR. DIAZ: Close. |
| 5    A. Close. |
| 6    Q. Not the correct spelling? |
| 7    A. Absolutely not. |
| 8    Q. So you definitely did not put that information |
| 9  in. |
| 10        Do you know what is being reflected on this |
| 11  document when it says number of paid hours? |
| 12    A. No.  I really don't know what it refers, the |
| 13  whole subject. |
| 14    Q. Do you know if contributions were made on your |
| 15  behalf to the IPF during 1987? |
| 16    A. Could have been. |
| 17    Q. Why would they have been? |
| 18    A. At one time I was a union card member, |
| 19  card-carrying union member. |
| 20    Q. When was that? |
| 21    A. I don't know.  Seventies. |
| 22    Q. And into the eighties? |
| 23    A. Could be. |
| 24    Q. Well, during that time when you were a union |
| 25  member was Maarv, the company, bound to any agreements |

Pages 86 to 89

Attila Szamosszegi                                    October 24, 2007

Page 90

1 with the Bricklayers Union?
2 A. No.
3 Q. So why would contributions have been made on your
4 behalf if the company wasn't bound --
5 MR. DIAZ: Objection to the form.
6 Q. -- to an agreement?
7 MR. DIAZ: Same objection. You are assuming
8 contributions were made and he said he doesn't recognize
9 or is not familiar with the document.
10 Q. You can answer the question.
11 MR. DIAZ: Go ahead, you can answer.
12 A. What was the question?
13 Q. Do you know why contributions would be made on
14 your behalf?
15 A. I have no idea. I don't know. I don't recall.
16 Q. Is it your understanding that contributions could
17 be made even if the company was not bound to an
18 agreement? You don't know?
19 A. No. I don't know.
20 Q. Do you know if during 1987 Maarv had more than
21 three employees?
22 A. I don't recall.
23 Q. You don't recall if it had more than three?
24 MR. DIAZ: He just said -- I am objecting
25 because he answers the question and you ask it again. I

Page 91

1 am trying to move this along a little bit.
2 A. No. I don't. I don't.
3 Q. Are you aware of any reports being filed by Maarv
4 with the IPF during the 1980's?
5 A. I don't recall.
6 MR. MEHLER: Bates No. 758. Please mark
7 that as P-11.
8 (P-11 marked for identification.)
9 Q. Tell me if you recognize that document. Do you
10 recognize that document?
11 A. I guess it's the Benefit Fund.
12 Q. Is that your signature on it?
13 A. I'm not so sure.
14 Q. You are not sure?
15 A. I'm not sure. No.
16 Q. Do you remember signing benefit forms like this?
17 A. I don't recall.
18 Q. You don't recall if you have ever signed any?
19 A. Not offhand, no.
20 Q. Not often but you recall sometimes you signed
21 them?
22 A. I said not offhand.
23 Q. Not offhand. I am sorry.
24 Do you know who prepared this document?
25 A. No idea.

Page 92

1 Q. Do you know if this document was submitted to the
2 Local 4 Benefit Funds?
3 A. No. I don't.
4 Q. You don't?
5 A. I don't.
6 Q. Do you know if Maarv received this document to
7 fill out from the Local 4 Benefit Funds?
8 A. No. I don't know.
9 Q. Did Maarv file reports with the Local 4 Benefit
10 Funds at any point?
11 A. I really don't know. I mean, I don't recall.
12 Q. This document is for the period beginning May
13 15th, 2000 and ending May 26th, 2000?
14 A. Yeah.
15 Q. Was Maarv bound to any agreement with the
16 Bricklayers Union at that time?
17 A. No.
18 Q. Do you know why Maarv would have submitted
19 anything to the Benefit Funds at that time?
20 A. We had to hire some union guys, they are paid the
21 benefits.
22 Q. Do you recognize the three names on this?
23 A. No.
24 Q. It has Peter Cuomo crossed out. Do you know why
25 he is crossed out?

Page 93

1 A. No idea.
2 Q. And you don't know if the other three individuals
3 are union guys or not union guys?
4 A. Well, I don't recall the names so I assume, you
5 know, if I am paying the benefits over here they
6 probably were union guys.
7 Q. You would have only paid benefits for union guys?
8 A. Absolutely.
9 Q. If you had nonunion guys doing waterproofing work
10 you wouldn't have paid benefits for them?
11 A. No.
12 Q. If you could refer back to that.
13 A. Okay.
14 Q. Near the top it says Job and Location, The
15 Palisades, Fort Lee, New Jersey?
16 A. Uh-huh.
17 Q. Is that the same project that you discussed with
18 John Capo?
19 A. Yeah. I assume so.
20 Q. Did you have more than one project in Fort Lee?
21 A. No.
22 Q. Do you remember who the general contractor was on
23 that project?
24 A. No. Someone down from South Jersey, some outfit.
25 Q. I may have asked you this, but did you sub out

Pages 90 to 93

Attila Szamosszegi                                        October 24, 2007

Page 94

1   the work on the Fort Lee project?
2      A.  Obviously not, if I am paying the guys over here,
3   the union benefits.
4      Q.  In May of 2000 did Maarv have more than three
5   employees?
6      A.  May of 2000, I really don't know.  I am sorry.  I
7   don't mean to be...
8      Q.  Did you have office employees at that time?
9      A.  2000?  Yeah, I should have because we are over at
10  Oak Street.  Anne was.
11     Q.  You at least had Anne?
12     A.  Yes.
13     Q.  And you were an employee of the company?
14     A.  Yeah.
15     Q.  And you don't have any idea who filled in the
16  information on this?
17     A.  No.
18     Q.  Did you ever speak with anybody at the Local 4
19  Benefit Funds about these forms?
20     A.  No.
21     Q.  Do you know whether there is a copy of this
22  document anywhere in Maarv's offices?
23     A.  I wouldn't know.
24     Q.  Have you looked for it?
25     A.  Have I looked for it?

Page 95

1      Q.  Yes.
2      A.  There was no reason to look for it.
3      Q.  It was part of the document request in this
4   litigation.
5      A.  What?
6      Q.  Request for contribution forms.
7      A.  Then obviously there is none.
8      Q.  You looked for whatever -- whatever we requested
9   presumably you looked for?
10     A.  Anne looked for it, whomever.
11     Q.  Anne didn't look for it because the
12  lawsuit wasn't filed.
13     A.  Because it came to the other.
14     Q.  You mean when the auditor was there?
15     A.  Yeah.  She looked for whatever was there.
16     Q.  Maarv's accountant wouldn't be the one to
17  maintain documents like this?
18     A.  No.  Absolutely not.
19         MR. MEHLER:  757.  Please mark this as
20  Plaintiff's Exhibits 12.
21         (P-12 marked for identification.)
22     A.  And this is?
23     Q.  Have you ever seen this document before?
24     A.  No.
25     Q.  You don't know who filled out this document?

Page 96

1      A.  Obviously not us.
2      Q.  Obviously not you?
3      A.  Not us.  Here is ours, typed out, this is
4   handwritten.
5      Q.  You are referring to Plaintiff's Exhibit 11?
6      A.  Yes.
7      Q.  But Plaintiff's Exhibit 11, you don't know who
8   filled that out either?
9      A.  Obviously we put this in there.
10     Q.  You put the address of Maarv in and the
11  information at the top.  Do you know if you put in the
12  employee names?
13     A.  The employee names, I guess we paid it so we had
14  to fill it out, yeah.
15     Q.  Because Plaintiff's Exhibit 11 you believe
16  reflects amounts that you paid to the Benefit Funds?
17     A.  I guess looking on the statement, yes.  So this
18  is?
19     Q.  We can move on from 12 if you don't recognize it.
20  That's fine.
21         MR. MEHLER:  Let's go to 761.  Mark that as
22  Plaintiff's Exhibit 13.
23         (P-13 marked for identification.)
24     Q.  Do you recognize that document?
25     A.  Yeah.  This is the third time I am seeing it.

Page 97

1   It's all the same.
2      Q.  Do you remember seeing it before this lawsuit?
3      A.  No.
4      Q.  Is that your signature on it?
5      A.  That's my signature, yes.
6      Q.  What does this document reflect?
7      A.  It reflects the same as the other one.  The
8   people paid union benefit funds.
9      Q.  I believe those are the same three people listed
10  previously?
11     A.  Yeah.  I believe so.
12     Q.  And you testified that you don't know whether
13  those guys are union guys, you presume they are?
14     A.  I presume they are because I don't recall their
15  names so I don't think they work for me.
16     Q.  And you believe that the total on the bottom of
17  this says $350, you believe Maarv paid that to the Local
18  4 Benefit Funds?
19     A.  I would have known.  At least I would see the
20  check.
21     Q.  And you believe that Maarv was reporting these
22  three guys because they were union guys?
23     A.  Yes.  Most likely, yes.
24     Q.  Working directly for Maarv?
25     A.  I guess, yeah.  If we haven't subbed the job out

Attila Szamosszegi                                    October 24, 2007

|                                                                 Page 98 |
| --- |

1    they worked for us, yes.
2        Q. Again, it references The Palisades, Fort Lee,
3    that same project we were speaking about?
4        A. Yeah.
5            MR. MEHLER: 765. Please mark this as
6    Plaintiff's Exhibit 14.
7            (P-14 marked for identification.)
8        Q. Do you recognize this document?
9        A. Same document.
10       Q. Same thing?
11       A. Same thing.
12       Q. And is your signature again on it?
13       A. Yeah. That's my signature.
14       Q. And it's the same three individuals listed?
15       A. Absolutely.
16       Q. For the same project, correct?
17       A. Yeah. That's correct.
18       Q. Do you know whether Maarv paid the $602 at the
19   bottom?
20       A. I don't know.
21       Q. Do you remember if Maarv would typically send in
22   a check along with this Benefit Funds form?
23       A. I don't know.
24       Q. You don't know?
25       A. No.

|                                                                 Page 99 |
| --- |

1        Q. Would Anne have been the one to handle that?
2        A. Definitely.
3            MR. MEHLER: 768. Please mark this as
4    Plaintiff's Exhibit 15.
5            (P-15 marked for identification.)
6        Q. Do you recognize this document?
7        A. How can I not?
8        Q. Is that your signature?
9        A. Yeah.
10       Q. And it's the same three individuals listed again?
11       A. Yeah.
12       Q. For the same project in Fort Lee?
13       A. That is correct.
14       Q. Do you know whether Maarv paid the 330.75
15   referenced at the bottom of this document?
16       A. The answer is the same. I don't know.
17           MR. MEHLER: 770, Plaintiff's Exhibit 16.
18           (P-16 marked for identification.)
19       Q. Do you recognize this document?
20       A. Of course.
21       Q. Your signature again?
22       A. Yes.
23       Q. Now it just lists one of the individuals, William
24   Mills?
25       A. That is correct.

|                                                                Page 100 |
| --- |

1        Q. This one, I assume it's the same project. It
2    says Palisades, 100 Old Palisades Avenue, Fort Lee, New
3    Jersey. Is that the same project?
4        A. Yeah.
5        Q. And the total of 673.44. Do you know if Maarv
6    paid that?
7        A. I don't know.
8            MR. MEHLER: 776, mark this as Plaintiff's
9    Exhibit 17.
10           (P-17 marked for identification.)
11       Q. Your signature again?
12       A. Yes.
13       Q. Do you know whether Maarv paid the 181.30
14   referenced on the bottom of that?
15       A. I don't know.
16       Q. Now, with all these benefit forms we have just
17   gone through you have testified that it's your
18   understanding they were submitted because these were
19   union guys?
20       A. That is correct.
21       Q. Tell me why did you feel that you had to file
22   these forms for the union guys if you didn't have an
23   agreement with The Bricklayers.
24       A. If we took union guys on the job, like such
25   individual, a union foreman explained to us, look, this

|                                                                Page 101 |
| --- |

1    is how much he has to get, my guys, and we just obeyed
2    what was agreed upon.
3        Q. Your understanding was whenever you hired a union
4    guy you had to submit those forms and pay the
5    contribution in dues?
6        A. To the union guys, yeah.
7        Q. Regardless of whether you had an agreement with
8    The Bricklayers?
9        A. Well, we had a verbal agreement for that
10   particular job for those individuals.
11       Q. Who was your verbal agreement with?
12       A. I am sure it was Capo. If I talked to Capo. Or
13   even the union guys when they come out they say, Look,
14   here is the form what you have to pay.
15       Q. Do you remember a specific verbal agreement with
16   Capo?
17       A. No. I don't.
18       Q. Is it your understanding that you would have to
19   submit those forms and pay the dues and contributions
20   regardless of whether you had any agreement with the
21   union?
22       A. Yeah. If I hired a union guy, yes.
23       Q. So tell me, what is your understanding, how would
24   it be different if you actually signed an agreement with
25   the union, how would your obligations be different?

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                              Professionals Serving Professionals

Attila Szamosszegi                                                    October 24, 2007

| Page 102 |
|---|

1    A. I don't know. I don't want to speculate on it.
2    Q. Is it your understanding that the union would
3  send guys to a project to work for you even if you
4  didn't have an agreement with them?
5    A. Absolutely.
6    Q. How do you know they would do that?
7    A. Because they just did over there.
8    Q. Although you said you may have had a verbal
9  agreement with Capo?
10    A. I may said. I don't want to speculate on it,
11  but...
12    MR. MEHLER: 222. Plaintiff's Exhibit 18.
13    (P-18 marked for identification.)
14    Q. Tell me if you recognize that document.
15    A. Yes. It's a contribution, check of dues or
16  whatever it is.
17    Q. Being submitted by Maarv to B.A.C. Local 5?
18    A. Yes.
19    Q. That's your signature on it?
20    A. Absolutely.
21    Q. Did you prepare this document?
22    A. No.
23    Q. Who did?
24    A. Most likely Anne.
25    Q. Do you know why this letter was used rather than

| Page 103 |
|---|

1  a form from the union for these contributions?
2    A. I have no idea.
3    Q. Do you know if this document was actually sent to
4  B.A.C. Local 5?
5    A. I just believe the stamp over here, otherwise I
6  wouldn't know.
7    Q. At the top it says Maarv Concrete Restoration on
8  kind of the letterhead. Is that a name Maarv went by at
9  some point?
10    A. It's Maarv Waterproofing, you know. Concrete
11  Restoration.
12    Q. It's the same company?
13    A. Yeah. It's the same company.
14    Q. Was there ever a legal change of the name of
15  Maarv?
16    A. I don't think so. I don't think so.
17    Q. Do you know does your letterhead currently say
18  Maarv Concrete Restoration or does it say Maarv
19  Waterproofing?
20    A. You know, that's a good question. I don't know.
21    Q. This letter is dated April 15th, 2004. Was Maarv
22  bound to an agreement with The Bricklayers Union at that
23  time?
24    A. Not that I know of.
25    Q. Well, you testified previously that your

| Page 104 |
|---|

1  understanding of the Princeton Project that the document
2  you signed was just for that project.
3    A. That is correct.
4    Q. Were these dues and fringe benefits being
5  submitted pursuant to that agreement?
6    A. Yeah. This happened after my sub's check was
7  rejected, as you showed me. So we had to, you know,
8  send in a check. So obviously probably we referred him
9  back to why we did not fill out this form because
10  probably our sub filled it out and sent it in and they
11  sent the check back, you know, stating probably this has
12  to be Maarv, but didn't send a thing so we just send the
13  check out with a note.
14    Q. So you believe that these three employees listed
15  were guys working for Pallos Construction, your sub?
16    A. Definitely they were.
17    Q. And the union wouldn't accept contributions or a
18  report from Pallos so you had to do it?
19    A. Yes.
20    Q. And I think this amount matches up to the amount
21  that Pallos reimbursed you for on that check we looked
22  at earlier?
23    A. That is correct. That is correct.
24    Q. Do you remember how many reports or letters Maarv
25  submitted to the union in relation to that Princeton

| Page 105 |
|---|

1  Project?
2    A. No. I don't recall.
3    Q. Was it more than one?
4    A. I don't know.
5    Q. If you look at the last paragraph it says, Please
6  be advised in error the first check neglected to pay for
7  Check Off Dues for Efrain Rivera. Does that suggest to
8  you there was at least one other check sent in?
9    A. It suggests nothing to me.
10    Q. What do you think the reference to the first
11  check is?
12    A. No idea.
13    Q. Did Pallos reimburse you for all the
14  contributions and dues you paid for their employees?
15    A. For whose employees?
16    Q. Maarv made the contribution and dues payments for
17  the union employees of Pallos?
18    A. Okay.
19    Q. Did Pallos reimburse Maarv for all those
20  payments?
21    A. I think this was the only payments, you know.
22    Q. You think this was the only one?
23    A. Yeah, I think so.
24    Q. You are not aware of any payments that Maarv made
25  that Pallos didn't reimburse them for?

Pages 102 to 105

Attila Szamosszegi                                    October 24, 2007

| Page 106 | Page 108 |
|---|---|

**Page 106**

1  A. I don't know.
2  Q. You don't know?
3  A. I don't recall anything else.
4  Q. Would you be aware if Pallos still owed you money
5  that they hadn't paid?
6  A. Probably.
7  Q. Do you know whether there is a copy of this
8  document anywhere in Maarv's offices?
9  A. No. This is it.
10  Q. Did you search for documents related to -- like
11  this?
12  A. Yeah. Anne put everything together, whatever is
13  required over there when they came in and audited us.
14      MR. MEHLER: 755, Plaintiff's Exhibit 19.
15      (P-19 marked for identification.)
16  Q. Do you recognize this document?
17  A. Yeah. By just looking at it, yeah.
18  Q. What is it?
19  A. Let me read it. It's the Benefit Funds.
20  Q. You see up in the upper right-hand corner it says
21  Weekly Shop Steward Report?
22  A. Okay.
23  Q. Do you know what a Shop Steward Report is?
24  A. Yeah. That's a union representative.
25  Q. Something the union representative submits to the

**Page 107**

1  union?
2  A. Yes.
3  Q. And is it a union representative who is working
4  on the job?
5  A. Yes.
6  Q. Who decides on who the shop steward is; is it the
7  employer?
8  A. The union.
9  Q. The union?
10  A. The union.
11  Q. And it reflects at the bottom William Mills is
12  the shop steward?
13  A. Okay. Then he is the stop steward.
14  Q. I think you testified previously you don't
15  recognize that name?
16  A. No.
17  Q. Do you know what information is supposed to be
18  included on a Shop Steward Report?
19  A. No. Besides what I am looking at over here?
20  Q. Do you know what employees are supposed to be
21  listed on a Shop Steward Report?
22  A. I guess who is on the job.
23      MR. DIAZ: Note the instruction not to
24  guess. Either you know or you do not.
25  A. I don't know.

**Page 108**

1  Q. Do you know why Peter Cuomo would be listed on
2  this Shop Steward Report?
3  A. Probably he worked on the job.
4  Q. Was he a member of the union?
5  A. No.
6  Q. Did you see any Shop Steward Reports at the time
7  the Fort Lee project was going on?
8  A. No, I haven't.
9  Q. Is that something as the employer you would
10  typically see?
11      MR. DIAZ: Objection to the form. Go ahead.
12  A. I don't know because I don't have too many union
13  jobs so, you know.
14  Q. Have there been union jobs where you have
15  received copies of the Shop Steward Reports?
16  A. I don't know.
17  Q. Have you personally received benefit statements
18  from any Bricklayer Funds?
19  A. No.
20  Q. But contributions have been made on your behalf
21  in the past I think you testified to previously?
22  A. I don't recall seeing anything.
23  Q. Now, you are aware that a few years back the
24  plaintiffs in this lawsuit hired an auditor to look at
25  your books and records?

**Page 109**

1  A. Yeah.
2  Q. When did you become aware of that?
3  A. When they called.
4  Q. Did they call and speak with you?
5  A. No. They spoke to Anne.
6  Q. Do you remember who contacted her specifically?
7  A. No.
8  Q. Was Anne the one at Maarv that dealt with the
9  auditor?
10  A. Absolutely, yeah.
11  Q. Did you deal with the auditor at all?
12  A. No.
13  Q. Did you meet the auditor?
14  A. I might see them over there, but, you know.
15  Q. Did you speak with the auditor on the phone?
16  A. No.
17  Q. It was Anne dealing with it?
18  A. Yeah.
19  Q. Did Anne keep you updated on what was going on
20  with the audit?
21  A. Some, but you know she mentioned they were
22  looking for three persons who worked for us supposedly.
23  That's why they coming down to look for those three
24  particular persons.
25  Q. What did you tell her when she said that to you?

Pages 106 to 109

Attila Szamosszegi                                    October 24, 2007

| Page 110 | Page 112 |
|---|---|

**Page 110**

1    A. I said those persons never worked for us.
2    Q. But you still allowed the auditor in?
3    A. Yes. Stupid me, yes.
4    Q. Why did you allow the auditor in?
5    A. Because they were looking for three persons who
6  never worked for me. It's as simple as that.
7    Q. Did you feel like you were obligated to let them
8  in?
9    A. Feel like I'm obligated? As far as I could see I
10  did nothing wrong.
11    Q. Did you think you had the right to tell them, no,
12  you can't come in?
13    A. At that time I thought I was doing the right
14  thing. Little did I know.
15    Q. As the audit was going on, did Anne come to you
16  with questions about what was happening?
17    A. Not really, not that I recall.
18    Q. Did she come to you saying, Hey, they need these
19  documents, can I give them to them?
20    A. She was the office manager, so she made pretty
21  much decision as far as this is concerned, this
22  particular.
23    Q. Did she ever mention to you that she was having
24  trouble locating any documents?
25    A. Not that I recall. I know they took a lot of

**Page 112**

1  seeking documents after they left your office?
2    A. No.
3    Q. Did Anne ever tell you that there were additional
4  documents she was supposed to send to the auditor?
5    A. No.
6    Q. Did she ever tell you that she refused to provide
7  some documents?
8    A. She was the kindest person. She always did her
9  obligation to the best of her knowledge.
10    Q. Did Anne keep any personal files at the office?
11    A. A diary?
12    Q. Just, I mean files of documents, stuff she worked
13  on that wasn't part of the official company files?
14      MR. DIAZ: Objection to the form. Go ahead.
15    A. Why should she?
16    Q. You are not aware she did?
17    A. That's her office base, not her home.
18    Q. Did Anne ever tell you that the auditor was
19  asking for documents that Maarv just doesn't keep?
20    A. No. She never mentioned anything.
21    Q. Did Anne ever tell you that she received
22  certified letters from the auditor requesting documents?
23    A. No. She never mentioned it.
24    Q. Did she ever tell you that the auditors had
25  certain deadlines for Anne to provide certain documents?

| Page 111 | Page 113 |
|---|---|

**Page 111**

1  things out of our office.
2    Q. Did she ever tell you about any problems going on
3  with the audit?
4    A. Yeah. They couldn't find the three persons they
5  were looking for and they were getting frustrated.
6    Q. Did she tell you anything else?
7    A. No. That was the main subject, you know.
8  Because they were getting very testy because they
9  couldn't find the three persons that supposedly worked
10  for us and frustrated them.
11    Q. What did she tell you when the audit was
12  finished?
13    A. What was she supposed to tell? I don't know.
14    Q. Did she tell you that the auditor was satisfied
15  with what they found?
16    A. She just said, Look, they were very frustrated.
17  And I was very frustrated because they came in the
18  pretense of looking for three persons and when they
19  didn't find it they got into everything else.
20    Q. Anne told you that they were looking for three
21  persons?
22    A. No. The auditor, they send a letter. Once she
23  showed me, why is the audit going to take place, it
24  mentioned three persons.
25    Q. Did Anne ever tell you that the auditor was still

**Page 113**

1    A. No. Because they came out so they took
2  everything. I believe they were there two and a half
3  days.
4    Q. I am referring to after they left.
5    A. I think they got everything in two and a half
6  days, you know, as far as I know. She never mentioned
7  anything else.
8    Q. Are you aware that Anne told the auditors that
9  Maarv didn't use any subcontractors during 2002 through
10  2005?
11      MR. DIAZ: Just note an objection to the
12  form. The objection is you are assuming Anne made those
13  comments.
14    Q. You can answer.
15    A. I don't know.
16    Q. Maarv did, in fact, use subcontractors during
17  that time period?
18    A. Yes. Yes, we did.
19    Q. Are you aware that Anne informed the auditor that
20  Peter Cuomo was vice-president/secretary of the company?
21      MR. DIAZ: Objection to the form. Go ahead.
22    A. No.
23    Q. Was that accurate, that he was vice-president,
24  secretary?
25    A. I don't know. I never even thought about making

Pages 110 to 113

Attila Szamosszegi                                    October 24, 2007

## Page 114

1  anybody vice-president or secretary, no. I really don't
2  know.
3      Q. He was not vice-president or secretary?
4      A. I don't recall.
5      Q. Are you aware that Anne looked at the W-2's for
6  the company and marked next to each employee's name what
7  job they did, such as whether they were a laborer?
8          MR. DIAZ: Objection to the form. Go ahead.
9      A. No. I am not aware.
10     Q. Are you aware that Anne told the auditor that
11 laborers at Maarv do waterproofing and caulking work?
12         MR. DIAZ: Objection to the form.
13     A. I am thinking she knows who is doing what, she's
14 the office manager. She doesn't even know what caulking
15 is.
16     Q. To the extent she said that she was mistaken?
17     A. If she said it, I don't know. I am not
18 stipulating about it.
19     Q. Well, the laborers, I think you testified
20 previously laborers at Maarv don't do waterproofing and
21 caulking?
22     A. No. The caulkers do the waterproofing and
23 laborers do laboring work.
24         MR. DIAZ: Chuck, we can go through if you
25 want to go up to 1. I don't know how much more you

## Page 115

1  have.
2          MR. MEHLER: I probably will be able to
3  finish by then.
4          MR. DIAZ: I have to leave at 1. If you
5  want to take a break at 1.
6          MR. MEHLER: I have gotten through quicker
7  than I thought. I might be able to finish by then or
8  not much longer.
9          MR. DIAZ: If we go through 1 and then break
10 at 1. Is that okay?
11         (Discussion off the record.)
12 (BY MR. MEHLER:)
13     Q. I think you just testified a minute ago, and
14 correct me if I am wrong, if I am misstating that the
15 laborers do the labor work and the caulkers do the
16 caulking work; is that right?
17     A. Uh-huh.
18     Q. But doesn't Maarv subcontract out all their
19 caulking work now?
20     A. Yeah. Right.
21         MR. DIAZ: Can you give me one minute?
22         MR. MEHLER: Sure.
23         (Brief recess taken.)
24 (BY MR. MEHLER:)
25     Q. Do you know whether caulking and waterproofing

## Page 116

1  work are within the work jurisdiction of the Bricklayers
2  Union?
3      A. I don't know. I assume so, you know, the
4  caulking probably is.
5      Q. At some point did you become aware of the
6  conclusions the auditors had reached?
7      A. The conclusion of what?
8      Q. The amounts that the auditor claimed were owed.
9      A. Well, we got a letter, yeah, you know.
10     Q. What was your reaction when you saw that?
11     A. I believe it was a joke, bad one for that matter.
12     Q. What did you do when you received that letter?
13     A. You do not want to know.
14     Q. Was it a letter from the auditor or from the
15 attorney for the IPF?
16     A. I think an auditor. I am not so sure who sent
17 it, no.
18     Q. Did you call anybody when you received it?
19     A. Yeah. Our attorney.
20     Q. Your attorney?
21     A. Yeah.
22     Q. Anybody else?
23     A. I was looking for attorney. Who else I am going
24 to call, God? No.
25     Q. Did you talk with Anne about it?

## Page 117

1      A. Anne?
2      Q. Yes.
3      A. Yeah. Yeah.
4      Q. What was her reaction?
5      A. She was shocked. Killed her.
6      Q. But you didn't talk to anybody at the union about
7  it directly?
8      A. No.
9      Q. And you didn't talk to anybody at the IPF about
10 it?
11     A. No.
12     Q. Did you ever see the auditor's report that they
13 prepared?
14     A. I had seen something, whether it came from that
15 or from you guys. I don't know.
16     Q. Did you review the report that the auditor
17 prepared?
18     A. Yeah. Because it was -- they listed everybody,
19 whoever walked in front of my office, as a union person.
20     Q. Do you believe that Maarv owes anything in
21 contribution or dues?
22     A. No.
23     Q. Did you discuss the auditor's report with anybody
24 other than your attorney?
25     A. Such as? Who?

Pages 114 to 117

Attila Szamosszegi                                    October 24, 2007

| Page 118 |
|---|
| 1    Q. Anne or Peter or anybody? |
| 2    A. Anne is aware because she opens the mail. |
| 3       MR. MEHLER: Douglas, documents 180 through |
| 4  194. Plaintiff's Exhibit 20. |
| 5       (P-20 marked for identification.) |
| 6       MR. DIAZ: Up to what Bates No.? |
| 7       MR. MEHLER: Up to 194. |
| 8       MR. DIAZ: Okay. |
| 9    A. Yes, what is the question? |
| 10   Q. Have you seen this before? |
| 11   A. I don't think I have seen it. No. |
| 12   Q. I can represent to you that this is the auditor's |
| 13  report. |
| 14   A. Okay. |
| 15   Q. Do you know if anybody at Maarv ever received a |
| 16  copy of this other than after this lawsuit was filed? |
| 17   A. I don't know. Like I said, I don't think I have |
| 18  seen this one. |
| 19   Q. Okay. If you can turn to Page 189. |
| 20   A. Okay. Yes. |
| 21   Q. The top of that says International Trowel Trades |
| 22  Fringe Benefit Funds Summary of Unreported Hours and |
| 23  this page is for 2002. You see it's right there. 2002. |
| 24  You see a list of employees listed? |
| 25   A. Uh-huh. |

| Page 120 |
|---|
| 1  company? |
| 2    A. Absolutely not. |
| 3    Q. Nobody else in there you recognize as doing |
| 4  waterproofing/caulking work in 2002? |
| 5    A. No. |
| 6    Q. Do you believe most of them were laborers? |
| 7    A. Yeah. Welders, laborers, painters. |
| 8    Q. I am sorry, what was the first word? |
| 9    A. Welder. |
| 10   Q. Are you aware that Anne identified them to the |
| 11  auditor as laborers? |
| 12      MR. DIAZ: Objection to the form. Go ahead. |
| 13   A. I am not aware what Anne did. |
| 14   Q. Are you aware whether any of those employees are |
| 15  union members? |
| 16   A. None of them are union members. |
| 17   Q. Let's go to the next page, 190. It lists a lot |
| 18  of the same employees but it also lists you and Peter |
| 19  Cuomo at the bottom. |
| 20   A. Yeah. |
| 21   Q. What type of work did you and Peter Cuomo do in |
| 22  2002? |
| 23   A. I did estimating. |
| 24   Q. Did either of you do work in the field? |
| 25   A. Peter Cuomo. |

| Page 119 |
|---|
| 1    Q. Are some of those Maarv employees? |
| 2    A. They were, yeah. |
| 3    Q. Which ones? We can go through them one by one if |
| 4  you like. |
| 5       Francisco Campos, is that a Maarv employee? |
| 6    A. Yeah. Most of them are, yeah. |
| 7    Q. What type of work did each of them do? |
| 8    A. I don't recall. I don't recall some of the |
| 9  names. I may recall the face but that's about it. I |
| 10  don't know specifically what they did. |
| 11   Q. Did any of them do waterproofing and caulking |
| 12  work? |
| 13   A. Yeah, probably Ivan Pallos. |
| 14   Q. Ivan Pallos was a Maarv employee? |
| 15   A. Back then. |
| 16   Q. Back in 2002? |
| 17   A. Yeah. In that particular job I guess. |
| 18   Q. He subsequently went out and started his own |
| 19  company? |
| 20   A. Yes. He just worked I think -- I believe this is |
| 21  the only time he worked for us. |
| 22   Q. You don't have any involvement in that other |
| 23  company? |
| 24   A. No, I don't. |
| 25   Q. And he no longer has any involvement in your |

| Page 121 |
|---|
| 1    Q. What type of work did he do? |
| 2    A. He is a project manager. |
| 3    Q. He didn't do any waterproofing or caulking? |
| 4    A. No. He is a project manager. |
| 5    Q. Would his responsibilities include overseeing |
| 6  waterproofing and caulking work? |
| 7    A. His job is to oversee everything. |
| 8    Q. Whether it was done by Maarv employees or whether |
| 9  it was being done by Maarv subcontractors? |
| 10   A. That is correct. |
| 11   Q. Turn to the next page. This lists some |
| 12  additional employees. |
| 13      Is there anybody on there that you believe did |
| 14  waterproofing/caulking work in 2003? |
| 15   A. No. |
| 16   Q. Nobody? |
| 17   A. Nobody. |
| 18   Q. Next page, 2004, anybody on there you believe did |
| 19  waterproofing or caulking work in 2004? |
| 20   A. Not that I recall, no. |
| 21   Q. Do you recognize most of these names? |
| 22   A. A majority, yeah. These are people that come and |
| 23  go. They work, I don't know, we got a high turnover as |
| 24  you can see, you know. |
| 25   Q. Would you know the people who did waterproofing |

Pages 118 to 121

Attila Szamosszegi                                October 24, 2007

Page 122

1  and caulking work for you?
2      A.  We subbed it out.  We sub out our waterproofing.
3      Q.  But in some instances you did it yourself?
4      A.  Way back in the eighties, yes.  We sub out our
5  waterproofing and caulking.
6      Q.  And all these employees we have covered thus far
7  during these years were employees of Maarv's not
8  employees of subs?
9      A.  No.  They are on my payroll obviously.
10     Q.  Next page, 2005.
11     A.  Okay.
12     Q.  Page 193.
13     A.  Yes.
14     Q.  Any of them do waterproofing or caulking work?
15     A.  We subbed out our work.
16     Q.  Next page, 194.
17     A.  That was a joke over here.
18     Q.  That's what I wanted to ask you about?
19     A.  They came and took upon themselves.  I seen this
20  page somehow.
21     Q.  What does that mean to you -- I am sorry.  What
22  does it mean when it says cleaner-waterproofer?
23     A.  I have no idea.  Everybody is waterproofing or
24  cleaner.  So I don't get it.
25     Q.  It wasn't your understanding that was anybody's

Page 123

1  position at Maarv, cleaner, waterproofer?
2      A.  No.  I just don't know where they got cleaners
3  waterproofer.  Everybody.  That's why when I said it was
4  a joke because they categorized people the way they
5  wanted to categorize.
6      Q.  You don't know where that information came from?
7      A.  Absolutely not.  Not from us.
8      Q.  And Anne never came to you and asked, Hey, they
9  want to know the classification of these employees, what
10  should I tell them?
11     A.  No.
12     Q.  Would you have relied on Anne to provide that
13  information?
14     A.  Well, I was only aware if there was a question.
15     Q.  But if you had known that was a question would
16  you expect Anne to just answer that or would you expect
17  Anne to come to you and figure it out?
18     A.  I don't want to stipulate on it because I really
19  don't know what would be my answer.
20     Q.  Would Anne know that information?
21     A.  Would she know?
22     Q.  Yes.
23     A.  I don't think so.
24     Q.  If you look about halfway down the page it does
25  have a person there, Karczag is the last name, who is

Page 124

1  listed as a caulker.
2      A.  Let me just see.  Yeah.
3      Q.  Is that accurate for that person?
4      A.  No.
5      Q.  That person was not a caulker?
6      A.  No.  This other one, Pallos, Ivan, yeah, he was a
7  caulker.
8      Q.  He was a caulker.  But he is listed -- why would
9  he be listed as a caulker if you subcontracted out all
10  your calking work?
11     A.  Because back when he worked in 2002 probably he
12  was doing the caulking.
13     Q.  Did you have employees that did cleaning work,
14  what you would call cleaning work?
15     A.  What is cleaning?  Housecleaning?
16     Q.  How about cleaning in preparation for restoration
17  or cement restoration?
18     A.  Cleaning what?  What is cleaning?  That's pretty
19  objective, cleaning.
20     Q.  When you subcontracted out your caulking and
21  waterproofing work, would your laborers do anything to
22  get the site or the project ready for that waterproofing
23  work?
24     A.  Absolutely not.
25     Q.  What about your company did do some cement

Page 125

1  restoration work?
2      A.  Yes.
3      Q.  Did your laborers do that work or was that work
4  subbed out?
5      A.  Most of it was subbed out.  A lot of work subbed
6  out.
7      Q.  Some of it you did in-house?
8      A.  Yes.
9      Q.  Was there cleaning work associated with that in
10  preparation for the restoration?
11     A.  No.  There is no cleaning work whatsoever.
12  That's why I am kind of shocked.  Cleaner and
13  waterproofer.
14     Q.  Did you ever have your accountant review the
15  auditor's findings?
16     A.  No.
17     Q.  Are all of Maarv's documents kept at the office?
18     A.  Yes.
19     Q.  You don't keep any at home?
20     A.  No.
21     Q.  Are there any documents that are kept at your
22  accountant's office that you don't have at the Maarv
23  office?
24     A.  No.
25     Q.  Does anybody at the company use E-Mail?

Pages 122 to 125

Attila Szamosszegi                                October 24, 2007

| Page 126 | Page 128 |
|---|---|

**Page 126**

1    A. Anybody at the company use E-Mail?
2    Q. Yes.
3    A. Recently, yes.
4    Q. How recently?
5    A. Couple of years or so. Because when Anne was
6    alive she was illiterate. She couldn't use the computer
7    so we did not have a computer.
8    Q. Is it just the last couple of years you have had
9    a computer in the office, as well?
10   A. Yeah. Yeah.
11   Q. Did you search the E-Mail or the computer for any
12   documents relating to this case?
13   A. In this case?
14   Q. Yes.
15   A. What would I find?
16   Q. I don't know what you would find.
17   A. E-Mail from whom?
18   Q. You didn't search?
19   A. No. Who am I supposed to get E-Mail from, what I
20   am searching for?
21   Q. Do you personally use E-Mail?
22   A. Do I personally use E-Mail? No.
23   Q. Do you use the computer at all?
24   A. I use the computer, yes.
25   Q. For your business? Do you just use the computer

**Page 127**

1    at Maarv or do you have a computer at home you use to do
2    business stuff?
3    A. I don't use the computer for Maarv, period.
4    Q. You just use the computer at home?
5    A. No. We got computers but that's just for
6    accounting purpose.
7    Q. So you don't use a computer at Maarv?
8    A. No. Not for business purposes, no.
9    Q. Does Maarv have any policies regarding we need to
10   keep these documents, let's not destroy them for five
11   years or anything of that sort, any sort of document
12   retention policies?
13   A. No. We don't have any policies. We never had
14   any problems.
15   Q. What do you do with the documents regarding a
16   project once that project is over? Do you keep them or
17   do you throw them out?
18   A. We throw them out.
19      MR. MEHLER: I would like to mark Defendants
20   Responses to Plaintiffs' Discovery as Plaintiff's
21   Exhibit 21.
22      (P-21 marked for identification.)
23      MR. MEHLER: And the verification as 22.
24      (P-22 marked for identification.)
25   Q. I assume you have seen these before?

**Page 128**

1    A. Yeah. I seen this, some, yeah.
2    Q. If you look at Plaintiff's Exhibit 22, the
3    verification, you understand by signing 22 you were
4    agreeing that the answers in 21 were true to the best of
5    your knowledge and belief?
6    A. I guess.
7       MR. DIAZ: Can I look at 21 for a second?
8    Just give me a second. Thanks.
9    Q. If you look on the front page --
10   A. Yeah.
11   Q. -- Question 1, State the beginning and ending
12   date of each and every period of your membership in
13   BCANJ. And the answer is, Maarv is not a member in the
14   Building Contractors' Association of New Jersey.
15   A. Yes.
16   Q. Has Maarv never been a member of that
17   association?
18   A. Not that I know of.
19   Q. Look at Question 12. Identify all facts
20   supporting your contention that contributions previously
21   identified by plaintiffs as those made by Maarv in
22   connection with the Princeton Parking Garage project
23   were not made on behalf of Maarv employees. And the
24   answer is, The workers listed were never employed by
25   Maarv. These are employees of South Shore Contractors.

**Page 129**

1    South Shore has the contract with the union, not Maarv.
2    A. Yeah.
3    Q. Is that correct?
4    A. Some of those people were supposed to work for
5    South Shore, I believe. The union identified.
6    Q. Maybe I am confused. I thought you had testified
7    previously that the workers on the Princeton project,
8    the union people were Pallos Construction?
9    A. Yeah. Pallos Construction. That's what I mean.
10   Q. Are they employees of Pallos or are they
11   employees of South Shore?
12   A. I believe South Shore guys were supposed to work
13   for Ivan.
14   Q. So --
15   A. They were supposed to work, but my understanding
16   they wind up not working for him at all on the job.
17   Q. Do you think they ended up not working for him?
18   A. Yeah. That's my understanding.
19   Q. And your understanding is South Shore has the
20   contract with the union?
21   A. I know South Shore is a union contractor. That's
22   why you want to reach out for him.
23   Q. You say South Shore has the contract with the
24   union, not Maarv. Didn't you testify previously that
25   Maarv did have an agreement for this one project?

Pages 126 to 129

Attila Szamosszegi                              October 24, 2007

| Page 130 | Page 132 |
|---|---|

**Page 130**

1    A. For this project, yes. Yes. That is correct.
2    Q. Next question, 13. Identify all facts supporting
3  your contention that managers and the president of Maarv
4  should not have been included in the audit. The answer
5  is, Maarv never had a collective bargaining agreement
6  with the union and the managers and the president
7  perform supervisory functions.
8        Again, when you say Maarv never had a collective
9  bargaining agreement with the union, Maarv did have an
10  agreement for the Princeton project alone?
11    A. Not a collective bargaining. I mean, we had an
12  agreement we are going to use a union guy on it.
13    Q. What's the distinction you are making there
14  between a collective bargaining agreement and agreement
15  you had?
16        MR. DIAZ: Objection to the form of the
17  question, but go ahead.
18    A. Collective bargaining, I got to know through this
19  litigation, you know, what the collective bargaining is,
20  when I sign a contract with them. Because they sent out
21  a book like this, as soon as the litigation started I
22  receive a book from the union.
23    Q. You did receive a book from the union?
24    A. After the litigation started, yes.
25    Q. When was that?

**Page 131**

1        MR. MEHLER: Was that in connection with the
2  lawsuit or is he referring to --
3        MR. DIAZ: He is talking about in connection
4  with the lawsuit. I showed him documents.
5        MR. MEHLER: Okay.
6        THE WITNESS: What they refer to supposedly.
7  (BY MR. MEHLER:)
8    Q. Stuff that came through your attorney, not stuff
9  that was sent directly to you by the union?
10    A. Sent direct from the union to me. That was the
11  book supposedly bargaining whatever it is. A book about
12  this thick.
13    Q. When did you receive that, after the lawsuit was
14  filed?
15    A. After the lawsuit was filed.
16    Q. Do you remember who sent that to you?
17    A. The union. I don't know.
18    Q. You don't remember who at the union?
19    A. No. It was a book like this thick.
20    Q. Did you speak with anybody other than your
21  attorney about that?
22    A. No. To whom?
23    Q. You didn't call the union about it?
24    A. Why should I?
25    Q. If you look in the document request responses,

**Page 132**

1  which is further in, you will see a new document will
2  start. Okay. No. 6. It's a long question, at the end
3  it says, Documents produced should include, without
4  limitation, all fringe benefit report forms, copies of
5  all checks, all other documents related to payments of
6  fringe benefit funds; and the response is, None other
7  than what has been produced by plaintiffs.
8        So, Maarv does not have copies of any fringe
9  benefit forms in its records?
10    A. Fringe benefits?
11    Q. Any forms submitted?
12    A. To the union?
13    Q. To the union or the funds.
14    A. No. Whatever we have.
15    Q. I think I asked you this previously but let me
16  make sure.
17        Have you personally ever spoken with anybody at
18  the International Pension Fund?
19    A. No.
20    Q. Have you ever spoken with anybody at the
21  International Union?
22    A. No.
23    Q. Have your employees ever taken any action to
24  withdraw recognition of or decertify a union?
25    A. Excuse me?

**Page 133**

1    Q. Have your employees ever taken any action against
2  a union?
3        MR. DIAZ: Objection to the form as to what
4  action, what do you mean by any action? That's the
5  objection.
6    Q. You can answer.
7        MR. DIAZ: Do you understand the question?
8        THE WITNESS: No.
9    A. They wouldn't be union members so how can I take
10  action against them?
11    Q. You are not aware of your employees ever doing
12  anything, ever filing anything with the National Labor
13  Board or with a union saying we don't want this union to
14  represent us?
15        MR. DIAZ: Same objection.
16    A. No.
17    Q. Does Maarv maintain payroll records?
18    A. Payroll records, of course.
19    Q. Do you have payroll records for 2002?
20    A. I don't know.
21    Q. Do you have them for 2006?
22    A. Yes. We have 2006.
23    Q. Do you have them for 2007?
24    A. Of course.
25    Q. Is there a reason they haven't been produced in

Pages 130 to 133

Attila Szamosszegi                           October 24, 2007

### Page 134

1  this lawsuit?
2  A. What?
3  Q. Is there a reason they haven't been produced?
4  A. What do you mean produced?
5  Q. Haven't been provided to us in this lawsuit. We
6  asked for them.
7  A. Who is us?
8  Q. The plaintiffs.
9  A. Well, when they came in they got everything they
10  asked for.
11  Q. They only covered the years 2002 through 2005.
12  They were not there after -- they were not there to get
13  2006 or 2007.
14  A. So who asked for them after that?
15  Q. We have asked for them in this lawsuit.
16  A. In what form?
17  Q. In what form?
18  A. Yeah.
19  Q. We have asked for them in discovery requests.
20      MR. DIAZ: I have given you 2006.
21      MR. MEHLER: I don't think you gave me
22  payroll records.
23      MR. DIAZ: We gave you W-2's.
24      MR. MEHLER: You gave me W-2's.
25      THE WITNESS: That's payroll records.

### Page 135

1  (BY MR. MEHLER:)
2  Q. Do you maintain payroll records other than W-2's?
3  A. No.
4  Q. Those are the only payroll records you maintain,
5  the actual W-2's?
6  A. Yeah.
7  Q. That's where the confusion is.
8  A. Okay.
9  Q. Do you maintain any sort of cash disbursement
10  records showing what monies are going out of the
11  company?
12  A. Cash disbursements?
13  Q. Yes. Anything showing where the money of the
14  company, where it's being paid out to?
15  A. I guess the accountants would know, somebody. I
16  assume we have something, we have to have.
17  Q. In connection with this lawsuit did you gather
18  from your accountant the financial records for the
19  company?
20  A. What do you mean financial records?
21  Q. We asked for cash disbursement records. So if
22  your accountant has them you had an obligation to get
23  them to us.
24  A. If he didn't get them to us obviously he doesn't
25  have it.

### Page 136

1  Q. You believe you asked the accountant for whatever
2  records we requested?
3  A. Yeah.
4  Q. Do you have any documents which list by street
5  address all the projects you have done over the last
6  seven years?
7  A. No. I don't have that.
8  Q. Do you have them for the more recent years?
9  A. Last year or so.
10  Q. Last year or so?
11  A. Whatever we still working on, yeah.
12  Q. Your listings of the projects for 2007?
13  A. When we are working on, yeah.
14  Q. Do you have a listing of the general contractors
15  you have worked for?
16  A. No.
17  Q. What about the subs you have used?
18  A. Well, the tax, we got 1099's. That's what the
19  subs got.
20  Q. Do you have your 1099 forms?
21  A. I suppose we have some.
22  Q. They have not been produced to us in this
23  lawsuit.
24  A. Okay.
25  Q. So to the extent you have them you have an

### Page 137

1  obligation to provide those from 2002 to 2007.
2  A. I don't know if I got them back to 2002, but
3  whatever I got I will forward it to you.
4  Q. Let me go through the records I have indication
5  of us not getting and you can tell me whether you think
6  you have them or don't have them.
7      Federal 941 quarterly payroll tax returns.
8  A. Let me make -- whatever I provide you I have
9  that, whatever I provide you. Whatever I don't provide,
10  couldn't provide probably because we didn't have it.
11      MR. DIAZ: I will represent I gave him the
12  list that you are referring to now and instructed him to
13  get documents they had responsive to that list.
14  Q. I guess my question is: Was that list
15  communicated to the accountant who presumably has some
16  of these documents?
17  A. Yeah. They gave me all the W-2's and everything
18  else for the first eight questions.
19  Q. You remember seeing this list?
20  A. Yes. Yes.
21  Q. And you forwarded it or discussed that list with
22  your accountant?
23  A. Yes. Yes.
24  Q. And he forwarded what info he had?
25  A. Yes. And he forwarded it to you.

Pages 134 to 137

Attila Szamosszegi                                October 24, 2007

## Page 138

1    Q. And you checked your own files to see if you had
2  any of that stuff?
3    A. Yeah.
4    Q. Because you realize that some of this covers
5  years that were not covered by the audits. The auditor
6  never have requested them.
7    A. Whatever you requested, whatever we gave you is
8  what you requested that we have.
9    Q. Does Maarv do any government work?
10   A. Yes. They do.
11   Q. Is it a large portion of your business?
12   A. No.
13   Q. Has it been a large portion in the past?
14   A. No.
15       MR. MEHLER: I am just about done. Let's
16  take like ten minutes. Let me see what else I have and
17  then we can finish up.
18       MR. DIAZ: Sure.
19       (Brief recess taken.)
20  (BY MR. MEHLER:)
21   Q. I would like to show you a stack of documents
22  Bates numbers 620 through 708.
23       MR. MEHLER: Let's have these marked as
24  Plaintiff's Exhibit 23.
25       (P-23 marked for identification.)

## Page 139

1    Q. Tell me if you recognize those documents
2  generally.
3    A. Yes. Paychecks breakdown.
4    Q. Are those like payroll sheets?
5    A. Payroll sheets, yeah.
6    Q. From your company?
7    A. Yeah.
8    Q. Who would have prepared them in the company?
9    A. Anne.
10   Q. Anne?
11   A. Yeah.
12       MR. MEHLER: I would like to show you two
13  similar documents. First one Bates No. 372, next one
14  Bates No. 618. Let's have these marked, as well, P-24
15  and P-25.
16       (P-24 and P-25 marked for identification.)
17   Q. I just wanted to confirm these are also payroll
18  sheets from your company?
19   A. Yeah.
20   Q. What about 618?
21   A. Yeah.
22   Q. These are all things Anne would have prepared?
23   A. Yes.
24   Q. Who does it since Anne passed away, Mary?
25   A. We don't keep this any more, you know.

## Page 140

1    Q. How do you keep track of payroll now?
2    A. We got just one sheet, foreman and project
3  manager drops it off and make the check out and that's
4  it.
5    Q. That's all I have on those.
6        MR. MEHLER: Next document Bates numbered
7  543 through 546. Mark that as P-26.
8        (P-26 marked for identification.)
9    Q. Tell me if you recognize that document.
10   A. What is this? What purpose?
11   Q. Well, it's something prepared by the auditor.
12   A. Okay.
13   Q. You see the Classification/Duties column?
14   A. Whose column?
15   Q. The last column says Clarification/Duties?
16   A. Yes.
17   Q. And it lists various people as
18  waterproofer/laborer?
19   A. This is something we looked in a small version of
20  it, right, basically.
21   Q. You don't know where the auditor would have
22  gotten that information?
23   A. Absolutely not.
24   Q. That information is not accurate?
25   A. No, not by any stretch of the imagination. Like

## Page 141

1  I said, they have all these waterproofers.
2        MR. MEHLER: I don't think I have anything
3  further.
4        MR. DIAZ: Neither do I.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Pages 138 to 141

Attila Szamosszegi                                              October 24, 2007



Page 142

```
1          C E R T I F I C A T E
2
3      I, RUTHANN WALKER, a Notary Public and Certified
4  Court Reporter of the State of New Jersey, do hereby
5  certify that, prior to the commencement of the
6  examination, ATTILA SZAMOSSCEGI was duly sworn by me to
7  testify the truth, the whole truth, and nothing but the
8  truth.
9      I DO FURTHER CERTIFY that the foregoing is a true and
10 accurate transcript of the testimony as taken
11 stenographically by and before me at the time, place,
12 and on the date hereinbefore set forth, to the best of
13 my ability.
14     I DO FURTHER CERTIFY that I am neither a relative nor
15 employee nor attorney nor counsel of any of the parties
16 to this action, and that I am neither a relative nor
17 employee of such attorney or counsel, and that I am not
18 financially interested in the action.
19
20
21     _____
       RUTHANN WALKER, C.C.R.
22     Notary Public, State of New Jersey
       My Commission Expires August 28, 2010
23     Certificate No. 2002488
       Date:  November 1, 2007
24
25
```

Page 142

1          <u>C E R T I F I C A T E</u>

2

3

4

5          I, RUTHANN WALKER, a Notary Public and

6     Certified Court Reporter of the State of New

7     Jersey and Commissioner of Deeds of the

8     Commonwealth of Pennsylvania, do hereby certify

9     that the foregoing is a true and accurate

10    transcript of the testimony as taken

11    stenographically by and before me at the time,

12    place and on the date hereinbefore set forth.

13          I do further certify that I am neither a

14    relative nor employee nor attorney nor counsel of

15    any of the parties to this action, and that I am

16    neither a relative nor employee of such attorney

17    or counsel and that I am not financially

18    interested in this action.

19

20

21

22    _____
      RUTHANN WALKER, C.C.R.
23    Notary Public, State of New Jersey
      My Commission Expires August 28, 2010
24    Certificate No. XI 00415

25

Exhibit 1

MAARV WATERPROOFING INC. P-02

16003241505

000665

NJ0424

## INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
## LOCAL #5 – NEW JERSEY
### INDEPENDENT

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed Independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement, or as they shall be set out from time to time in any such successor Agreements as may be negotiated. The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its representative on the Board of Trustees such Employer Trustees together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund Agreement and Declaration of Trust Instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its' successor assigns, and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

MAARV WATERPROOFING INC.
Company Name

317 OAK STREET
Physical Street Address

PASSAIC, NEW JERSEY    07055
City                    State        Zip Code

(973) 470-0686        (973) 470-8716
Telephone Number        Fax Number

22-2527189
Federal Identification Number

608103-00-5
New Jersey Employment Compensation Number

ST. PAUL INSURANCE COMPANY
Workmen's Compensation Insurance Carrier

Please complete and remit to:
BAC Local #5, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-0500
(609) 324-1505 - Fax

Initial if you have received a full copy of this Collective Bargaining Agreement _____

_____    ATTILA SZAMOSSZEGI        FEBRUARY 4, 2004
Officers Signature            Printed Name                Date

_____    Michael R. Perrone          2/4/2004
Business Managers Signature    Printed Name              Date

Dominic Longo            Dominic Longo              2/4/04
Field Representatives Signature    Printed Name            Date

EXHIBIT
P-4
RW 10/24/07

0739

Exhibit 2

# N.J. B.A.C. LOCAL #4 BENEFIT FUNDS

Phone: (973) 631-9594
Fax: (973) 631-9531

**143 Washington Street
Morristown, New Jersey 07960**

| EFFECTIVE |
| JAN 1, 2000 |

Name Of Employer  MAARV WATERPROOFING INC.                    Tel. (973) 470-0686
Address Of Employer  317 OAK STREET, PASSAIC, NEW JERSEY      Zip  07055
Job & Location  THE PALISADES, FORT LEE, NEW JERSEY
Payroll Week: Beginning  May 15, 2000  and Ending  5/26/2000  IRS Ident #  22-2527189
By forwarding payment, Employer acknowledges obligations to pay fringe benefits under collective bargaining agreement covering the listed employees and accepts the Trust Agreement governing said funds. Fund is filing all its data with IRS.

**650**

CR 3517
R 1

Signature of Owner or Principal Officer Only

Hourly Wage:     Journeyman  $28.02          Foreman  $33.71          Deputy  $32.71

All time worked before or after the established 8 hour day Monday-Friday and on Saturday shall be paid at Time & One-Half
Any time worked thru Lunch shall be paid One (1) hour.
All hours worked on Sundays and Holidays shall be paid at Double Time rate.

| Name of Employee (List Alphabetically) | Social Security Number | Total Hours Paid* |
|---|---|---|
| PETER CUOMO | 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 | 80 |
| WILLIAM J. MILLS | 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 | 72 |
| JOHN STANZIALE, JR. | 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 | 80 |
| Jim Gilpin | 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 | 80 |
| | | |
| | | |
| | | |
| | | |
| | | |

EXHIBIT
P-11
10/24/07 RW
FRM# 800-631-6989

☐ Please Send Additional Forms                    *Total Hours    232

**Fringe Benefit
Contributions**          **$13.51 Per Hour**                    Per Hour-Paid

| | Per Hour-Paid | Amount |
|---|---|---|
| Local Pension Fund | $3.15 | $ 730.80 |
| I.U. Pension Funds | 1.50 | $ 348.00 |
| Health Fund Contribution | 4.25 | $ 986.00 |
| Annuity Fund Contribution | 3.45 | $ 800.40 |
| N.J. Apprentice Tr. & Edu. Fund | .15 | $ 34.80 |
| Industry Advancement Program (IAP) | .20 | $ 46.40 |
| International Masonry Institute (IMI) | .70 | $ 162.40 |
| Labor Management Fund | .05 | $ 11.60 |
| Local #4 B.A.C. P.A.C. (deduct after taxes) | .05 | $ 11.60 |
| I.U. B.A.C. P.A.C. (deduct after taxes) | .01 | $ 2.32 |
| **Total Fringe Benefit Check:** (Payable to: N.J. Loc. 4 Benefit Funds) | **TOTAL** | $3,134.32 |

**Check off -** (deduct after taxes)

| | | Amount |
|---|---|---|
| Journeyman | $1.75 per hour paid | $ 406.00 |
| Foreman | $1.98 per hour paid | $ -0- |
| Deputy | $1.94 per hour paid | $ -0- |
| **Total Check Off Check:** (Payable to: "B.A.C. Local 4") | **TOTAL** | $ 406.00 |

RECEIVED
JUN 5 2000

***MAIL BOTH CHECKS TO BENEFIT OFFICE ABOVE***

Oct-18-07  12:57am  From-NJ BAC HEALTH FUND  9738087312  T-996  P.021/023  F-469

Exhibit 3

# N.J. B.A.C. LOCAL #4 BENEFIT FUNDS

**Phone:** (973) 631-9594
**Fax:** (973) 631-9531

**143 Washington Street**
**Morristown, New Jersey 07960**

| EFFECTIVE |
|---|
| JAN 1, 2000 |

Name Of Employer _Maan Waterproofing_     Tel. _____

Address Of Employer _____     Zip _____

Job & Location _The Palisades, Fort Lee_

Payroll Week: Beginning _5/15_    and Ending _5/26/00_   IRS Ident # _____

By forwarding payment, Employer acknowledges obligations to pay fringe benefits under collective bargaining agreement covering the listed employees and accepts the Trust Agreement governing said funds. Fund is filing all its data with IRS.

_CR 3545_
_R. 2_

650

_____
Signature of Owner or Principal Officer Only

Hourly Wage:      Journeyman  $28.02      Foreman  $33.71      Deputy  $32.71

All time worked before or after the established 8 hour day Monday-Friday and on Saturday shall be paid at Time & One-Half.
Any time worked thru Lunch shall be paid One (1) hour.
All hours worked on Sundays and Holidays shall be paid at Double Time rate.

| Name of Employee (List Alphabetically) | Social Security Number | Total Hours Paid* |
|---|---|---|
| Peter Cuorto | 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 | − 80 |
| Jim Gilpin | 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 | + 80 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Please Send Additional Forms                    *Total Hours

EXHIBIT
P-12
10/24/07  RW

**Fringe Benefit Contributions**          **$13.51 Per Hour**          Per Hour Paid

| | | |
|---|---|---|
| Local Pension Fund | 3.15 | $_____ |
| I.U. Pension Funds | 1.50 | $_____ |
| Health Fund Contribution | 4.25 | $_____ |
| Annuity Fund Contribution | 3.45 | $_____ |
| N.J. Apprentice Tr. & Edu. Fund | .15 | $_____ |
| Industry Advancement Program (IAP) | .20 | $_____ |
| International Masonry Institute (IMI) | .70 | $_____ |
| Labor Management Fund | .05 | $_____ |
| Local #4 B.A.C. P.A.C. (deduct after taxes) | .05 | $_____ |
| I.U. B.A.C. P.A.C. (deduct after taxes) | .01 | $_____ |
| Total Fringe Benefit Check: (Payable to: N.J. Loc. 4 Benefit Funds) | TOTAL | $_____ |

RECEIVED
JUN 15 2000

**Check off -** (deduct after taxes)

| | | |
|---|---|---|
| Journeyman | $1.75 per hour paid | $_____ |
| Foreman | $1.98 per hour paid | $_____ |
| Deputy | $1.94 per hour paid | $_____ |
| Total Check Off Check: (Payable to: "B.A.C. Local 4") | TOTAL | $_____ |

Oct-18-07  12:57am   From-NJ BAC HEALTH FUND   9738087312   T-996  P.020/023  F-469

Exhibit 4

# N.J. B.A.C. LOCAL #4 BENEFIT FUNDS

**ne: (973) 631-9594**
**(973) 631-9531**

**143 Washington Street**
**Morristown, New Jersey 07960**

| EFFECTIVE |
| JAN 1, 2000 |

e Of Employer __MAARV WATERPROOFING, INC.__     Tel. (973) 470-0686
ess Of Employer __317 OAK STREET, PASSAIC, NEW JERSEY__     Zip __07055__
Location: __THE PALISADES, FORT LEE, NEW JERSEY__     2000
Week: Beginning __May 29, 2000__     and Ending __June 9th__, IRS Ident # __22-2527189__

cting payment, Employer acknowledges obligations to pay fringe benefits under collective bargaining agreement covering
ed employees and accepts the Trust Agreement governing said funds. Fund is filing all its data with IRS.

650

Signature of Owner or Principal Officer Only

3553
R.1

**Hourly Wage:**     Journeyman $28.02     Foreman $33.71     Deputy $32.71

me worked before or after the established 8 hour day Monday-Friday and on Saturday shall be paid at Time & One-Hal
me worked thru Lunch shall be paid One (1) hour.
urs worked on Sundays and Holidays shall be paid at Double Time rate.

| Name of Employee (List Alphabetically) | Social Security Number | Total Hours Paid* |
|---|---|---|
| JAMES GILPIN | 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 | 72 |
| WILLIAM J. MILLS | 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 | 56 |
| JOHN STANZIALE, JR. | 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 | 72 |
| | | |
| | | |
| | | |
| | | |
| | | |

EXHIBIT
P-13
10/24/07 PW

ease Send Additional Forms     *Total Hours     200

e Benefit     **$13.51 Per Hour**     Per Hour Paid
ibutions

| | Per Hour Paid | |
|---|---|---|
| Local Pension Fund | $3.15 | $ 630.00 |
| I.U. Pension Funds | 1.50 | $ 300.00 |
| Health Fund Contribution | 4.25 | $ 850.00 |
| Annuity Fund Contribution | 3.45 | $ 690.00 |
| N.J. Apprentice Tr. & Edu. Fund | .15 | $ 30.00 |
| Industry Advancement Program (IAP) | .20 | $ 40.00 |
| International Masonry Institute (IMI) | .70 | $ 140.00 |
| Labor Management Fund | .05 | $ 10.00 |
| Local #4 B.A.C. P.A.C. (deduct after taxes) | .05 | $ 10.00 |
| I.U. B.A.C. P.A.C. (deduct after taxes) | .01 | $ 2.00 |
| Fringe Benefit Check: (Payable to: N.J. Loc. 4 Benefit Funds) | **TOTAL** | $ 2,702.00 |

RECEIVED
JUN 1 9 2000

eck off - (deduct after taxes)
ourneyman     $1.75 per hour paid     $ 350.00
oreman     $1.98 per hour paid     $ -0-
eputy     $1.94 per hour paid     $ -0-
tal Check Off Check: (Payable to: "B.A.C. Local 4")     **TOTAL**     $ 350.00

*****MAIL BOTH CHECKS TO BENEFIT FUNDS

Exhibit 5

# N.J. B.A.C. LOCAL #4 BENEFIT FUNDS

Phone: (973) 631-9594
Fax: (973) 631-9531

**143 Washington Street
Morristown, New Jersey 07960**

| EFFECTIVE |
| JAN 1, 2000 |

Name Of Employer  MAARV WATERPROOFING INC.                    Tel. (973)  470-0686
Address Of Employer  317 OAK STREET, PASSAIC, NEW JERSEY      Zip  07055
Job & Location  THE PALISADES, FORT LEE, NEW JERSEY
Payroll Week: Beginning  6/12/2000  and Ending  6/30/2000  IRS Ident #  22-2527189

By forwarding payment, Employer acknowledges obligations to pay fringe benefits under collective bargaining agreement covering the listed employees and accepts the Trust Agreement governing said funds. Fund is filing all its data with IRS.

CR 3606
R.1

_____
Signature of Owner or Principal Officer Only

650

Hourly Wage:        Journeyman  $28.02        Foreman  $33.71        Deputy  $32.71

All time worked before or after the established 8 hour day Monday-Friday and on Saturday shall be paid at Time & One-Half.
Any time worked thru Lunch shall be paid One (1) hour.
All hours worked on Sundays and Holidays shall be paid at Double Time rate.

| Name of Employee (List Alphabetically) | Social Security Number | Total Hours Paid* |
|---|---|---|
| JAMES GILPIN | 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 | 120 |
| WILLIAM J. MILLS | 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 | 104 |
| JOHN STANZIALE, JR. | 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 | 120 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

EXHIBIT
P-14
10/24/07 PW

☐ Please Send Additional Forms          *Total Hours          344

**Fringe Benefit Contributions**          **$13.51 Per Hour**          Per Hour Paid

| | Per Hour Paid | |
|---|---|---|
| Local Pension Fund | $3.15 | $ 1,083.60 |
| I.U. Pension Funds | 1.50 | $ 516.00 |
| Health Fund Contribution | 4.25 | $ 1,462.00 |
| Annuity Fund Contribution | 3.45 | $ 1,186.80 |
| N.J. Apprentice Tr. & Edu. Fund | .15 | $ 51.60 |
| Industry Advancement Program (IAP) | .20 | $ 68.80 |
| International Masonry Institute (IMI) | .70 | $ 240.80 |
| Labor Management Fund | .05 | $ 17.20 |
| Local #4 B.A.C. P.A.C. (deduct after taxes) | .05 | $ 17.20 |
| I.U. B.A.C. P.A.C. (deduct after taxes) | .01 | $ 3.44 |

RECEIVED
JUL 7 2000

Total Fringe Benefit Check: (Payable to: N.J. Loc. 4 Benefit Funds)        TOTAL  $ 4,647.44

**Check off -** (deduct after taxes)

| Journeyman | $1.75 per hour paid | $ 602.00 |
| Foreman | $1.98 per hour paid | $ |
| Deputy | $1.94 per hour paid | $ |

Total Check Off Check: (Payable to: "B.A.C. Local 4")        TOTAL  $ 602.00

***MAIL BOTH CHECKS TO BENEFIT OFFICE ABOVE***

Exhibit 6

# N.J. B.A.C. LOCAL #4 BENEFIT FUNDS

Phone: (973) 631-9594
Fax: (973) 631-9531

**143 Washington Street**
**Morristown, New Jersey 07960**

| EFFECTIVE |
|---|
| **JAN 1, 2000** |

Name Of Employer __MAARV WATERPROOFING INC.__    Tel. __(973) 470-0686__

Address Of Employer __317 OAK STREET, PASSAIC, NEW JERSEY__    Zip __07055__

Job & Location __THE PALISADES - FORT LEE, NEW JERSEY__

Payroll Week: Beginning __7/3/2000__ and Ending __7/14/2000__ IRS Ident # __22-2527189__

In forwarding payment, Employer acknowledges obligations to pay fringe benefits under collective bargaining agreement covering
the listed employees and accepts the Trust Agreement governing said funds. Fund is filing all its data with IRS.

_____
Signature of Owner or Principal Officer Only

Hourly Wage:    Journeyman  $28.02    Foreman  $33.71    Deputy  $32.71

All time worked before or after the established 8 hour day Monday-Friday and on Saturday shall be paid at Time & One-Half.
Any time worked thru Lunch shall be paid One (1) hour.
All hours worked on Sundays and Holidays shall be paid at Double Time rate.

| Name of Employee (List Alphabetically) | Social Security Number | Total Hours Paid* |
|---|---|---|
| WILLIAM MILLS | 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 | 61 |
| JAMES GILPIN | 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 | 64 |
| JOHN STANZIALE, JR. | 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 | 64 |
| | | |
| | | |
| NOTE: PLEASE BE ADVISED THAT NO | | |
| ONE WORKED AT JOBSITE ON | | |
| 7/3 and 7/4 - CLOSED FOR | | |
| THE HOLIDAY. | | |

| EXHIBIT |
|---|
| P-15 |
| 10/24/07 |

☐ Please Send Additional Forms    *Total Hours    189

**Fringe Benefit Contributions**    **$13.51 Per Hour**

| | Per Hour Paid | |
|---|---|---|
| Local Pension Fund | $3.15 | $ 595.35 |
| I.U. Pension Funds | 1.50 | $ 283.50 |
| Health Fund Contribution | 4.25 | $ 803.25 |
| Annuity Fund Contribution | 3.45 | $ 652.05 |
| N.J. Apprentice Tr. & Edu. Fund | .15 | $ 28.35 |
| Industry Advancement Program (IAP) | .20 | $ 37.80 |
| International Masonry Institute (IMI) | .70 | $ 132.30 |
| Labor Management Fund | .05 | $ 9.45 |
| Local #4 B.A.C. P.A.C. (deduct after taxes) | .05 | $ 9.45 |
| I.U. B.A.C. P.A.C. (deduct after taxes) | .01 | $ 1.89 |
| Total Fringe Benefit Check: (Payable to: N.J. Loc. 4 Benefit Funds) | **TOTAL** | $ 2,553.39 |

**Check off -  (deduct after taxes)**

| | | |
|---|---|---|
| Journeyman | $1.75 per hour paid | $ 330.75 |
| Foreman | $1.98 per hour paid | $ -0- |
| Deputy | $1.94 per hour paid | $ -0- |
| Total Check Off Check: (Payable to: "B.A.C. Local 4") | **TOTAL** | $ 330.75 |

**\*\*\*MAIL BOTH CHECKS TO BENEFIT OFFICE ABOVE\*\*\***

Exhibit 7

# N.J. B.A.C. LOCAL #4 BENEFIT FUNDS

Phone: (973) 631-9594
Fax:    (973) 631-9531

143 Washington Street
Morristown, New Jersey 07960

**EFFECTIVE
NOV. 1, 2001**

Name Of Employer  MAARV WATERPROOFING INC.                    Tel. (973)  470-0686
Address Of Employer 317 OAK STREET, PASSAIC, NEW JERSEY        Zip     07055
Job & Location  PALISADES, 100 OLD PALISADES AVE., FORT LEE, NEW JERSEY
Payroll Week: Beginning _____ and Ending  10/30/0   IRS Ident # __22-2527189__

By forwarding payment. Employer acknowledges obligations to pay fringe benefits under collective bargaining agreement covering the listed employees and accepts the Trust Agreement governing said funds. Fund is filing all its data with IRS.

ATTILA SZAMSZEGI, PRESIDENT
Signature of Owner or Ranking Officer Only

Hourly Wage:           Journeyman: ~~$29.33~~ $28.77    Foreman: $34.91          Deputy:  $33.91

All time worked before or after the established 8 hour day Monday-Friday and on Saturday shall be paid at Time & One-Half.
Any time worked thru Lunch shall be paid One (1) hour.
All hours worked on Sundays and Holidays shall be paid at Double Time rate.

| Name of Employee (List Alphabetically) | Social Security Number | Total Hours Paid* |
|---|---|---|
| WILLIAM J. MILLS | 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 | 48 Hours |
|  | OCTOBER, 2001 |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**EXHIBIT
P-16
10/24/07  (pw)**

□ Please Send Additional Forms                      Total Hours | 48 Hours |

Fringe Benefit          $14.03
Contributions           ~~$19.88~~ Per Hour

| | Per Hour Paid | |
|---|---|---|
| Local Pension Fund |  | $_____ |
| I.U. Pension Funds | ~~3.30~~ $3.20 | $_____ |
| Health Fund Contribution | 1.50 | $_____ |
| Annuity Fund Contribution | ~~XXXX~~ 4.50 | $_____ |
| N.J. Apprentice Tr. & Edu. Fund | ~~XXXX~~ 3.60 | $_____ |
| Industry Advancement Program (IAP) | .15 | $_____ |
| International Masonry Institute (IMI) | ~~.30~~ .25 | $_____ |
| Labor Management Fund | .70 | $_____ |
| Local #4 B.A.C. P.A.C. (deduct after taxes) | .05 | $_____ |
| I.U. B.A.C. P.A.C. (deduct after taxes) | .07 | $_____ |
| Total Fringe Benefit Check: (Payable to: N.J. Loc. 4 Benefit Funds) | .01 | $_____ |
|  | **TOTAL** | **$ 673.44** |

Check off - (deduct after taxes)
Journeyman      $1.85 per hour paid
Foreman         $2.08 per hour paid                     $ 88.80
Deputy          $2.04 per hour paid
Total Check Off Check: (Payable to: "B.A.C. Local 4")         **TOTAL**    $_____

***MAIL BOTH CHECKS ~~TO~~***

0770

Exhibit 8

# N.J. B.A.C. LOCAL #4 BENEFIT FUNDS

Phone: (973) 631-9594
Fax: (973) 631-9531

143 Washington Street
Morristown, New Jersey 07960

**EFFECTIVE**
**NOV. 1, 2001**

Name Of Employer ____MAARV WATERPROOFING INC.____ Tel. (973)    470-0686
Address Of Employer 317 OAK STREET, PASSAIC, NEW JERSEY        Zip    07055
Job & Location  PALISADES, 100 OLD PALISADES AVE., FORT LEE, NEW JERSEY
Payroll Week: Beginning_____ and Ending  11/30/01  IRS Ident #  22-2527189
By forwarding payment. Employer acknowledges obligations to pay fringe benefits under collective bargaining agreement covering the listed employees and accepts the Trust Agreement governing said funds. Fund is filing all its data with IRS.

ATTILA SZAMSZIEGI      Signature of Owner or Principal Officer Only

Hourly Wage:      Journeyman:  $29.22      Foreman:  $34.91      Deputy:  $33.9

All time worked before or after the established 8 hour day Monday-Friday and on Saturday shall be paid at Time & One-Hal
Any time worked thru Lunch shall be paid One (1) hour.
All hours worked on Sundays and Holidays shall be paid at Double Time rate.

| Name of Employee (List Alphabetically) | Social Security Number | Total Hours Paid* |
|---|---|---|
| WILLIAM J. MILLS | 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 | 98 Hours |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

EXHIBIT
P-17
10/24/07 RW

☐ Please Send Additional Forms      *Total Hours      98 Hours

**Fringe Benefit Contributions**      **$14.83 Per Hour**      Per Hour Paid

| | Per Hour Paid | |
|---|---|---|
| Local Pension Fund | $3.30 | $_____ |
| I.U. Pension Funds | 1.50 | $_____ |
| Health Fund Contribution | 5.00 | $_____ |
| Annuity Fund Contribution | 3.75 | $_____ |
| N.J. Apprentice Tr. & Edu. Fund | .15 | $_____ |
| Industry Advancement Program (IAP) | .30 | $_____ |
| International Masonry Institute (IMI) | .70 | $_____ |
| Labor Management Fund | .05 | $_____ |
| Local #4 B.A.C. P.A.C. (deduct after taxes) | .07 | $_____ |
| I.U. B.A.C. P.A.C. (deduct after taxes) | .01 | $_____ |

Total Fringe Benefit Check; (Payable to: N.J. Loc. 4 Benefit Funds)      TOTAL  $ 1,453.34

**Check off** - (deduct after taxes)

| | | |
|---|---|---|
| Journeyman | $1.85 per hour paid | $   181.30 |
| Foreman | $2.08 per hour paid | $_____ |
| Deputy | $2.04 per hour paid | $_____ |

Total Check Off Check; (Payable to: "B.A.C. Local 4")      TOTAL  $_____

***MAIL BOTH CHECKS TO BENEFIT OFFICE ABOVE***

F-469  T-996  P.004/023  973808731Z      From-NJ BAC HEALTH FUND    12:51am    Oct-18-07

Exhibit 9

Oct-18-07    12:57am    From-NJ BAC HEALTH FUND                    9738087312        T-996    P.022/023    F-469

MAIL TO: NJ BAC, LOCAL NO. "
BENEFIT FUNDS OFFICE
143 WASHINGTON STREET
MORRISTOWN, N.J. 07960
(973) 631-9594 • FAX: (973) 631-9531

**BERGEN COUNTY AREA**

**WEEKLY SHOP STEWARD REPORT**

JOB LOCATION (Street, Town) _Foot Lee River Rd_

EMPLOYER NAME _Marri Concrete_    PAYROLL WEEK END _5/9_    20 _00_

NAME OF GC _A J D_    ADDRESS _____    FOREMAN'S NAME _____

| EMPLOYEE NAME (Please Print) | SOCIAL SECURITY NO. | LOCAL NO. *See Instructions Below | NUMBER HOURS PAID | | | | | | | O.T. | | Makeup | TOTAL HOURS PAID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | SUN | MON | TUE | WED | THU | FRI | SAT | SAT | SAT | | |
| William J Mills | 152/98/4910 | 4/35 | | 8 | 8 | 8 | 8 | 8 | | | | | 32 ✓ |
| Peter Cubano | 757/46/1635 | 4/ | | 8 | 8 | 8 | 0 | 8 | | | | | 40 ✓ |
| Edward Pine | | | | | | | | | | | | | |
| John Stawziale | 147/73/4325 | 4/ | | 8 | 8 | 8 | 8 | 8 | | | | | 46 ✓ |
| Jim Gil Pin | 135/58/9458 | 4/ | | 8 | 8 | 8 | 8 | 8 | | | | | 40 ✗ |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

LIST APPRENTICES ONLY BELOW

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

**EXHIBIT**
P-19
10/24/07 Cw
PENGAD 800-631-6989

% _____    TOTAL HOURS _____

*MEMBER LOCAL NUMBER IS REQUIRED. NEW JERSEY MEMBERS USE LOCAL 4 OR 5 WITH FUND #. EXAMPLE: 4 or 5/33. OUT-OF-STATE MEMBERS USE LOCAL/STATE, EXAMPLE: 1/N.Y.

_William Mill_
SIGNATURE OF SHOP STEWARD (REQUIRED)
_William Mills_
(PRINT SHOP STEWARD NAME

White copy - Fund Office
Yellow copy - Steward

0755

Exhibit 10

0790

| Employee Names: | Rate | Hours | Gross | SS | Fed.WH | Medic. | State | SUI | FIO | Loans | Net |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Attila Szamosszegi | S-4 | WKS | 5600 | | | | | | | | |
| Peter Cuomo | M-4 | WKS | 3265 | 202 | 453 | 47 | | | | | 299 |
| Anne M. Paolella | S-1 | WKS | 1330 | 82 | 162 | 19 | 81 | 30 | 246 | | 200 |
| Shawn Gilmore | S-1 | 20 | 1450 | 70 | 128 | 16 | 92 | 22 | 57 | 90 | 899 |
| Sherman Holland | S-1 | 33 | 1145 | 60 | 101 | 14 | | | | | 574 |
| Rosa I. Rodriguez | S-1 | | 980 | | | | | | | | |
| Gyula Karczag | M-0 | | | | | | | | | | |
| Lech Krupinski | S-1 | 3.7 | 536 | 33 | 35 | 7 | 48 | 4.96 | | | 448 |
| Kasmierz Krupinski | M-1 | 53 | 821 | 50 | 47 | 11 | 83 | 7.60 | 41.50 | | 633 |
| Ervin Simon | M-4 | 60 | 950 | 46 | 3 | 10 | 89 | 8.75 | | | 773 |
| Chester Krystiak | M-4 | | 1208 | 198 | 74 | 15 | | | | | |
| Andrzej Klimaszewski | S-0 | | 665 | 41 | 74 | 9 | | | | | |
| Gerardo G. Meza | M-2 | | 887 | 48 | 96 | 10 | 998 | | | | 524 |
| Budai Geza | S-1 | 79 | 894 | 55 | 89 | 12 | 773 | 617 | | | 603 |
| Ian Straub | S-2 | 29 | 362 | 224 | 3 | 5 | 328 | 327 | | | 323 |
| Elek Ludasi | S-1 | | 492 | 74 | 11 | 482 | | 335 | | | 640 |
| Willie Caraway | M-7 | | 253 | 569 | | 1133 | | 234 | | | 229 |
| Francisco Campos | M-2 | 40 | 480 | 297 | 367 | | 178 | | | | |
| Ivan Pallos | S-1 | | | | | | | | | | |
| Kirk Young | S-9 | | | | | | | | | | |
| Bruce Zaretsky | M-1 | | 1731 | 1020 | 182 | 25 | 3067 | 2601 | | | 1370 |
| Balint Kaszonyi | S-0 | 44 | 693 | 430 | 77 | 1066 | 1047 | 642 | | | 746 |
| | S-1 | 37 | 555 | 344 | 8 | 86 | 775 | 513 | 200 | | 461 |

TOTAL:

Exhibit 11

0372

EXHIBIT
P-24
PENGAD 800-631-6989

Period Ending:  2/7/2003

E-FTS # 0 5 6 9 2 4 8 P

E-FTS # 0 5 6 9 2 0 6 S

| Employee Names: | Rate | Hours | Gross | SS | Fed.W/H | Medic. | State | SUI | F/O | Loans | Net |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Attila Szamoszegi S-4 | 5600 | | 5600 | 347 | 1279 | 81.20 | 224 | 57.82 | | | PTS 1000 | 2616 |
| Peter Cuomo M-4 | 3265 | | 3265 | 202 | 453 | 34.47 | 130 | 30 | 181 | | PTS 1000 | 2619 |
| Anne M. Paciella S-1 | 330 | | 330 | 82 | 162 | 19.29 | 22 | 1230 | 313 | | | 2019 |
| Shawn Gilmore S-1 | 1850 | 96 | 1716 | 110 | 281 | 25 | 3092 | 1043 | 72 | | PTS 90 | 1014 |
| Sherman Holland S-1 | 1937 | 90 | 1902 | 117 | 318 | 27.59 | 3345 | 1760 | | | PTS 315 | 1311 |
| Rosa I. Rodriguez S-1 | 1050 | | | | | | | | | | | 912 |
| Gyula Karczag M-0 | | | | | | | | | | | | |
| Lech Krupinski S-1 | 1450 | 93 | 1058 | 65 | 113 | 15.35 | 1651 | 979 | | | | 830 |
| Kasmierz Krupinski M-1 | 1550 | 93 | 1131 | 70 | 92 | 1641 | 1803 | 1049 | | | | 824 |
| Ervin Simon M-4 | 1250 | 93 | 1162 | 72 | 108 | 1680 | 1834 | 1025 | | 100 | | 1001 |
| Chester Krystak M-4 | 1350 | 93 | 1255 | 78 | 57 | 1820 | 1810 | 11 | 25 | 1000 | | 1048 |
| Andrzej Klimaszewski S-0 | 1075 | 93 | 999 | 61 | 122 | 1455 | 1649 | 925 | | 259 | | 775 |
| Gerardo G. Meza M-4 | 1250 | 93 | 1162 | 72 | 45 | 1686 | 1634 | 1025 | | | | 1001 |
| Budai Geza S-1 | 1125 | 85 | 958 | 59 | 98 | 1387 | 1452 | 825 | | 300 | | 461 |
| Ian Straub S-2 | 1250 | 84½ | 1056 | 6544 | 96 | 1532 | 1575 | 912 | | | | 853 |
| Elek Ludas S-1 | 1250 | 82 | 1025 | 6355 | 110 | 1486 | 1522 | 943 | | | | 911 |
| Willie Caraway M-7 | | | | | | | | | | | | |
| Francisco Campos M-2 | 1283½ | 1002 | | 6213 | 56 | 1453 | 1469 | 929 | | | | 695 |
| Balint Kesztyü S-0 | 1559 | 93 | 1449 | 8990 | 226 | 2102 | 2116 | 341 | | 150 | | 1297 |
| Kevin Gilmore S-1 | 1578½ | 1177 | | 7301 | 131 | 1702 | 1842 | 1084 | | 200 | | 925 |
| Attila Szamoszegi S-4 | 5600 | | | | | | | | | | | |
| | | | 27,310.73 | | | | | | | | | |

Exhibit F

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No. 07-cv-0501 (RJL)

---

JOHN FLYNN, JAMES BOLAND, GERALD
O'MALLEY, KEN LAMBERT, GERARD SCARANO,
H.J. BRAMLETT, EUGENE GEORGE, PAUL
SONGER, WILLIAM McCONNELL, MATTHEW
AQUILINE, GREGORY R. HESS, MICHAEL
SCHMERBECK, VINCENT DELAZZERO, and
BENJAMIN CAPP,
as Trustees of and on behalf of the
BRICKLAYERS & TROWEL TRADES
INTERNATIONAL PENSION FUND,
    620 F Street, N.W.          ORAL DEPOSITION OF
    Washington, DC 20004       DOMINIC LONGO
    (202) 783-3788,
JIM ALLEN, MATTHEW AQUILINE, LON BEST,
JAMES BOLAND, TED CHAMP, RAYMOND
CHAPMAN, VINCENT DELAZZERO, BRUCE
DEXTER, JOHN FLYNN, EUGENE GEORGE,
GREGORY HESS, FRED KINATEDER, DAN
KWIATKOWSKI, KEN LAMBERT, SANTO
LANZAFAME, DICK LAUBER, WILLIAM
McCONNELL, EDWARD NAVARRO, GERALD
O'MALLEY, JOHN PHILLIPS, CHARLES
RASO, MARK ROSE, KEVIN RYAN, GERARD
SCARANO, MICHAEL SCHMERBECK, PAUL
SONGER, JOSEPH SPERANZA, and FRED
VAUTOUR,
as Trustees of and on behalf of the
INTERNATIONAL MASONRY INSTITUTE,
    620 F Street, N.W.
    Washington, DC 2004
    (202) 783-3788

---

(CAPTION CONTINUED)

\*   \*   \*   \*   \*
Monday, October 22, 2007
\*   \*   \*   \*   \*

MASTROIANNI & FORMAROLI, INC.
Certified Court Reporters and Videoconferencing
251 South White Horse Pike, Suite 200
Audubon, New Jersey 08106
856-546-110

Dominic Longo                                      October 22, 2007

## Page 70

1    sign the contract. The simple fact of the matter is,
2    you know, that for me to fax it to him, he had to
3    give me his fax number. Probably gave me his card
4    with his fax number on it and said send me the
5    contract, you know, because I wouldn't -- you know,
6    obviously, that appears to be -- you know, I think I
7    did call his office and I think there was a female
8    that responded, okay, and I probably told her, look,
9    I'm faxing the cover sheet over for the contract.
10       Q.    Okay. Do you remember the name of the
11   female?
12       A.    No. No. No. No.
13       Q.    What was the conversation that you had
14   with the female?
15       A.    Probably the simple fact that I am
16   faxing over a contract, just so she was aware that it
17   was coming.
18       Q.    Did you mention to her that the contract
19   was for this --
20       A.    No.
21       Q.    Let me ask the question first. Did you
22   mention this was in reference to the Princeton
23   parking garage project?
24       A.    Might have.
25       Q.    Did she say anything in response?

## Page 71

1    A.    I don't remember any of the
2    conversation. I generally put, when I am making a
3    fax like that, I generally put the job site that I
4    was on so you know, so you are familiar exactly where
5    we are talking about. Not that that has anything to
6    do with a one-job agreement, but it helps as a point
7    of destination.
8    Q.    When you had this conversation with the
9    person on the project was there anyone else present
10   at the time?
11       A.    Well, the workers were there, but they
12   were occupied at the time. I believe, I believe I
13   was just talking just the two of us.
14       Q.    Okay. Was there anyone else with you
15   from the local?
16       A.    No, I don't believe so.
17       Q.    You mentioned you either gave him the
18   contract right there and then or you faxed it to him?
19       A.    Yeah, either way. You know, I thought I
20   handed him the contract, but, you know what, it's
21   very possible that I could have faxed him the
22   contract over.
23       Q.    Okay.
24       A.    I still think I gave -- I think I gave
25   him the contract on the job, but I'm not, I'm not --

## Page 72

1    you know, you want me to swear on my children, no, I
2    can't. But generally, that's the way it would go
3    down.
4    Q.    Okay. Are you familiar with a company
5    called Pallos Construction?
6    A.    No, I'm not.
7    Q.    Do you know who Ivan Pallos is?
8    A.    No.
9    Q.    The person you spoke to, did they have
10   any clothing on or anything else that indicated the
11   company they worked for?
12       A.    I can't remember.
13       Q.    Was there anything that said Maarv
14   Waterproofing on anything they wore?
15       A.    Can't remember.
16       Q.    Did you know that Pallos Construction
17   was the sub on that job for Maarv Waterproofing?
18       A.    I have no knowledge of anything like
19   that.
20       Q.    Okay.
21       A.    I was never, never informed of any, you
22   know, anything that Maarv was doing, doing the act,
23   performing the work.
24       Q.    Okay. You didn't know?
25       A.    No. No. I wasn't -- you know, I dealt

## Page 73

1    with Maarv and the employees that I talked to --
2    well, the employees on the job, as far as I know, and
3    I am not -- and I can't swear to this, but I probably
4    asked one of the employees who he was working for,
5    and I believe he said Maarv.
6    Q.    Was this the person in the sports
7    jacket?
8    A.    No. I think I asked -- you know, I
9    would usually -- I would go up to somebody if I saw
10   him and say, well, who are you working for, and I do
11   remember that he was -- I don't think it was much of
12   a conversation. Or I might have said are you working
13   for Maarv.
14       Q.    Okay.
15       A.    Okay. You know...
16       Q.    Weren't they employees that didn't speak
17   English, you thought maybe they were Russian?
18       A.    Yeah, but if you say are you working for
19   Maarv, they -- Maarv is Maarv, whether it's English
20   or Russian. You know, they usually -- you know.
21       Q.    Okay. The person you spoke to, did he
22   give you his business card or did he have a business
23   card, do you know?
24       A.    Can't remember.
25       Q.    Did he introduce himself as Attila?

Pages 70 to 73

Dominic Longo                                October 22, 2007

| Page 74 |
|---|

1    A.   I believe so, yes.
2    Q.   Did you eventually provide someone by
3  the name of the Efrain Rivera to the job?
4    A.   Yes, I did.
5    Q.   And he was a shop steward at the time?
6    A.   Yes, he was.
7    Q.   Is it possible Mr. Rivera was the same
8  shop steward that called you initially?
9    A.   No.
10    Q.   Why not?
11    A.   Because I wouldn't, I wouldn't --
12  because the shop steward that called me stayed with
13  Speranza.
14    Q.   Okay. After you had this conversation
15  with the person at the job, you said the next thing
16  you did was you spoke to someone that you believe was
17  at Maarv Waterproofing and it was a female that
18  answered the phone?
19    A.   I believe. Only to the fact that I was
20  just notifying them that I was faxing something --
21  you know what, I believe. Okay. Now, for some
22  reason, I seem to remember a female voice. I
23  probably just notified them that I am faxing over a
24  copy of the contract, you know, but I cannot be --
25  it's very, it's very -- like my mind is not really,

| Page 75 |
|---|

1  you know...
2    Q.   That's all right. It's whatever you
3  remember.
4       Do you remember a company by the name
5  of the Nassau Developers on the Princeton garage
6  project? Does that sound familiar at all?
7    A.   I don't -- a lot of things in that area
8  are called Nassau because that's Princeton. I am not
9  real familiar with the development company.
10    Q.   Okay.
11    A.   Okay. Usually development companies
12  themselves are not -- don't have a whole lot of
13  control over the workforce, so that's why I was
14  dealing with Troust at the time.
15    Q.   And you said Troust was the company --
16  what was their relationship to this job in Princeton?
17    A.   I believe, I believe they were project
18  manager/general contractors.
19    Q.   All right. After you have the phone
20  call with the person who was the female did you then
21  fax over the contract?
22    A.   Can I physically remember if I did that,
23  no, I can't physically remember if I did that.
24    Q.   Okay.
25    A.   Okay?

| Page 76 |
|---|

1    Q.   Did you ever get a signed contract from
2  Maarv Waterproofing?
3    A.   Yes.
4    Q.   I take it at some point you put Mr.
5  Rivera on the job?
6    A.   Yes. I might have put Mr. Rivera on the
7  job even prior to the contract being signed.
8    Q.   Okay.
9    A.   Okay. You know, one of these deals,
10  well, I will send you a man and then you send me the
11  contract back. It's a possibility.
12    Q.   After you put Mr. Rivera on the job did
13  you have any conversations with Mr. Rivera regarding
14  that specific job in Princeton?
15    A.   Most likely.
16    Q.   Do you remember what the conversations
17  were, what they entailed?
18    A.   How is everything going, probably.
19  That's about it.
20    Q.   Did he discuss anything with you
21  regarding Maarv Waterproofing or some other company
22  called Pallos Construction?
23    A.   I don't believe, no.
24    Q.   Was this job -- well, Princeton was in
25  your territory?

| Page 77 |
|---|

1    A.   Yes.
2    Q.   Okay.
3       MR. MEHLER:  If you need a break, let
4  us know.
5       THE WITNESS:  I'm fine.
6    Q.   Do you know if Mr. Rivera submitted any
7  health and welfare or pension contribution reports
8  with respect to the Princeton garage job?
9    A.   Yes, I believe he did. I looked for
10  those. I don't think I could find them. You know,
11  again, you are going back to shop steward reports
12  going back three and a half years. Usually I don't
13  keep them that long.
14    Q.   Is that the responsibility of the shop
15  steward, to submit those reports?
16    A.   Yes.
17       MR. MEHLER:  Just to clarify what
18  reports you are talking about, you referenced them as
19  pension and welfare reports and he referenced them as
20  shop steward reports.
21       MR. DIAZ:  Okay.
22    Q.   What reports did he submit for the
23  Princeton garage project?
24    A.   Shop steward report.
25    Q.   And what are those?

info@mfreporting.com           Mastroianni & Formaroli, Inc.           856-546-1100
                              Professionals Serving Professionals

Dominic Longo                                                    October 22, 2007

Page 78

1     A.    Report of hours.  It's a simple form
2  where you put the name of the member, Social Security
3  and the amount of hours worked by the day and date,
4  strictly for tracking.
5     Q.    And where does that go to?  Where does
6  that report get submitted?
7     A.    It gets submitted to Local 5, and from
8  there it's submitted to the pension and welfare
9  boards.
10    Q.    Does Mr. Rivera still do work through
11  the local?
12    A.    Yes, he does.
13    Q.    Do you know what job he is presently on?
14    A.    No, I don't.
15    Q.    Okay.  Do you know his address?
16    A.    Not offhand.  The office will have it.
17    Q.    Okay.
18    A.    Usually, the list I deal with is
19  strictly phone number lists.
20    Q.    All right.  After you had Mr. Rivera go
21  to the job in Princeton did you have any
22  communications with Maarv Waterproofing again?
23    A.    I don't think so.
24    Q.    Okay.  The lawsuit is the first time
25  they came up again, to you at least?

Page 79

1     A.    I might have made -- I think I made a
2  follow-up phone call on benefits.
3     Q.    Do you know when that was?
4     A.    No.  You know, relatively maybe a month
5  or two after it, you know, a simple phone call which
6  I make all the time saying, you know, you are
7  delinquent X amount of benefits.
8     Q.    Did you make that phone call, or you
9  said you think you made it?
10    A.    I made that phone call.
11    Q.    Okay.  And who did you speak to?
12    A.    I cannot remember at this time.
13    Q.    Was it a man or a woman?
14    A.    I believe it was a woman, I believe.
15    Q.    Can you tell me what you said in the
16  phone call and what the other person said in
17  response?
18    A.    Basically, I said, you know, benefits
19  for the job, and basically I believe they said okay.
20  Again, it was just -- you know, when you have a
21  dispute, you tend to remember things a little more
22  than just like if things go along like they are
23  supposed to go along.
24    Q.    Okay.  You said this was a couple months
25  after the contract was signed?

Page 80

1     A.    I would think so.
2     Q.    Yes.
3     A.    Most likely they came up delinquent on
4  the sheet and then, you know...
5     Q.    What sheet?
6     A.    We have a delinquency sheet.
7     Q.    And you said they were delinquent in
8  respect to benefits.  Is that the benefits on the
9  Princeton job?
10    A.    Yes, which they paid.
11    Q.    So you received payment after the phone
12  call?
13    A.    Yes.
14    Q.    Did you have any other communications
15  with Maarv Waterproofing after that?
16    A.    No.
17          MR. DIAZ:  Let's mark a few documents
18  here.  Longo-1.
19          (Exhibit No. Longo-1, Cover sheet for
20  agreement with Local No. 5, was marked for
21  identification.)
22    Q.    We have given you what we have marked as
23  Longo-1, Mr. Longo.
24    A.    Yes.
25    Q.    Take a moment and look at that and tell

Page 81

1  me if you are familiar with that document.
2     A.    Yes, I am.
3     Q.    Can you tell me what this document is?
4     A.    It's the cover sheet for an agreement
5  with Local No. 5, and I believe it also covered Local
6  2 and Local 4.
7     Q.    What do you mean when you say it's a
8  cover sheet?
9     A.    It's the short version of the contract.
10    Q.    It's a short version of a contract.
11    A.    Uh-huh.
12    Q.    Of which contract?
13    A.    Of the local agreement for Local No. 5.
14    Q.    Do you know whose handwriting that is up
15  on the top?  It says Maarv Waterproofing, Inc. and
16  then there's some numbers and letters.
17    A.    You mean up here?
18    Q.    Yes.
19    A.    No.
20          MR. MEHLER:  For the record, you are
21  referring to the upper-right-hand corner of the
22  document.
23    A.    Right here, you mean?
24    Q.    Right here in the upper-right-hand
25  corner, see it says Maarv Waterproofing, Inc.?

Pages 78 to 81

Dominic Longo                                            October 22, 2007

Page 82

1    A.    Yes.
2    Q.    And the numbers next to that, do you
3  know whose handwriting that is?
4    A.    No.
5    Q.    Is your signature on this document?
6    A.    Yes.
7    Q.    Okay.
8        MR. DIAZ:  We can mark this as Longo-2.
9        (Exhibit No. Longo-2, Contract, was
10  marked for identification.)
11    Q.    All right.  Mr. Longo, I have given you
12  what we have marked as Longo-2.  I am just going to
13  represent this is the contract that was attached to
14  the first amended complaint, I think, as Exhibit B.
15    A.    This is just a copy of the contract.
16    Q.    Okay.
17    A.    Am I correct?
18    Q.    I don't know.  I'm sorry, this was the
19  contract that was submitted to the first amended
20  complaint as Exhibit B from the International.  Have
21  you seen this document before?
22    A.    I'm not sure.  I have to look at it.
23    Q.    Okay.  Take your time.
24    A.    This appears to be just a standard
25  working agreement.

Page 83

1    Q.    Okay.  Is this the contract
2  referenced --
3        MR. MEHLER:  You want to take a look at
4  that?
5        MR. DIAZ:  Sorry.
6    Q.    Take a moment.
7        MR. MEHLER:  Yes, it's what was
8  attached as Exhibit B.
9    Q.    Is Longo-2, the contract that we marked
10  as Longo-2, is that the contract that is referenced
11  in Longo-1?
12    A.    Yes.
13    Q.    Longo-2, it notes it's an agreement
14  between Building Contractors Association of New
15  Jersey, Masonry Contractors of New Jersey and
16  Building Contractors Association of Atlantic County.
17  And the Atlantic County part is not in the signature
18  page document or Longo-1.
19        MR. MEHLER:  Just a standing objection.
20  I assume you are going to ask him questions about
21  these two documents.
22        MR. DIAZ:  All right.
23        MR. MEHLER:  Objection on the grounds
24  that these documents speak for themselves.
25        MR. DIAZ:  Okay.  That's fine.

Page 84

1    Q.    My question is, at least what I am
2  seeing is, is the contract, which is Longo-2, do you
3  see where it says Building Contractors Association of
4  Atlantic County?
5    A.    Yeah.
6    Q.    And if you look on Longo-1 and the first
7  paragraph, I am not seeing Building Contractors
8  Association of Atlantic County referenced there, so I
9  am trying to understand which contract Longo-1 is
10  referring to.
11    A.    Building Contractors Association and
12  other signatory employers.  I don't know.  And
13  Local 4, 5 and 2.  I don't know what to tell you.
14    Q.    Okay.  You don't --
15    A.    Other than you mean with the Atlantic
16  County?
17    Q.    Yes, that's the contract that I have, at
18  least that was attached to the first amended
19  complaint, and I'm trying to see -- if you are
20  telling me this is -- Longo-2 is what is referenced
21  in Longo-1, I am trying to understand why the
22  reference to Atlantic County is not in Longo-1, if
23  you know.
24    A.    No, I don't know.
25    Q.    Did you ever give what has been marked

Page 85

1  as Longo-2 to Maarv Waterproofing?
2    A.    I gave Maarv the latest up-to-date
3  agreement I had at the time.
4    Q.    Which would have been what?
5    A.    I'm not sure.  I knew, you know, there
6  was -- I don't know.  I don't -- I wasn't involved in
7  the negotiations or the writing up of the book one
8  way or the other, so.  It's something you might have
9  to discuss with Tolson maybe.
10        MR. MEHLER:  I believe he is just
11  asking you what you gave the individual you believe
12  was Attila.
13    A.    I'm not, I'm not positive.
14    Q.    Are you --
15    A.    You know, you are asking me whether,
16  whether...
17    Q.    Did you even give him a contract?
18    A.    Yeah.
19    Q.    Are you sure?
20    A.    Yes.  How you do you think -- no
21  disrespect, how do you think he got it?
22    Q.    I don't know.  Well, let's try this way.
23        MR. DIAZ:  We can mark this as Longo-3.
24        Exhibit No. Longo-3, Copy of the fax
25  sent to Maarv Waterproofing, was marked for

Pages 82 to 85

Dominic Longo                                    October 22, 2007

Page 86

1  identification.)
2      Q.    I've given you what we have marked as
3  Longo-3.
4      A.    Uh-huh.
5      Q.    Do you recognize that document?
6      A.    Yes, I do.
7      Q.    Can you tell me what that is?
8      A.    It appears to be the copy of the fax
9  that I sent Maarv Waterproofing.
10     Q.    Okay. And on the first page, is that
11 your handwriting?
12     A.    Some of it is and some of it is not.
13     Q.    Which is your handwriting?
14     A.    Review and sign, Dominic Longo, phone
15 number. Princeton PG and Building A project is not,
16 is not my handwriting.
17     Q.    Okay. How about the information on the
18 top where it's got the name, R Waterproofing, cc
19 Attila from --
20     A.    That's mine.
21     Q.    Number of pages, including cover, five.
22 It's checked for review and please reply. Is that
23 your handwriting as well?
24     A.    Yeah.
25     Q.    Okay. I asked if you sent him the

Page 87

1  contract because the fax shows five pages, and the
2  first page --
3      A.    I wouldn't fax him the contract.
4      Q.    You wouldn't fax him the contract.
5      A.    No.
6      Q.    Why not?
7      A.    Documentation is too long for a general
8  fax. I believe I asked Attila if he wanted a copy of
9  the contract and he said no.
10     Q.    He said no. So now you remember that
11 you specifically asked Attila if he wanted the
12 contact?
13     A.    I said I believe.
14     Q.    You believe.
15     A.    Okay. Now, again, now the thing is with
16 this over here, that if I sent him -- correct me if I
17 am wrong here. If I sent him a fax, okay, and then
18 he filled in different, you know, filled in
19 information here, and I think there's no problem in
20 seeing that there's two different types of
21 handwriting.
22     Q.    You are saying that the Princeton PG and
23 Building A project is not your handwriting; is that
24 correct?
25     A.    Absolutely not.

Page 88

1      Q.    Okay. But you never faxed him a
2  Collective Bargaining Agreement?
3      A.    No, that's correct. I didn't fax him
4  any, you know...
5      Q.    You are saying that you think you
6  offered him the Collective Bargaining --
7      A.    I think. Now, the fact that -- okay.
8  You know, I think the documentations in the cover
9  letter, I think, is quite, quite sufficient to -- the
10 other thing here is just a working agreement.
11          MR. MEHLER: Just to clarify, when you
12 say collective bargaining, you are talking about
13 Longo-2 or something of that sort.
14     Q.    My question before, do you remember
15 sending Longo-2 to Mr. Attila?
16     A.    No, I did not fax him.
17     Q.    Okay. Did you give Attila Longo-2?
18     A.    I am not sure. Okay. In all honesty, I
19 can't remember if I gave him a book or not.
20     Q.    And if you did give him a Collective
21 Bargaining Agreement do you know which one it was?
22     A.    Can I see both of them and I will tell
23 you which one?
24     Q.    Well, Longo-2 is the contract. Longo-1
25 is the, what you referred to before as the cover

Page 89

1  letter.
2      A.    Well, it's a short, short version. It's
3  basically -- it's the contract minus the working
4  rules and regulations, I believe.
5          MR. DIAZ: We can do Longo-4.
6      A.    Now, on Longo-3 here -- is this Longo-3.
7          MR. MEHLER: Longo-3.
8      A.    On Longo-3, again, I would like to
9  reiterate that that is not my handwriting in the
10 middle.
11     Q.    Okay.
12     A.    Clearly.
13          (Exhibit No. Longo-4, handwritten
14 document on I. Pallos Construction letterhead,
15 Attention Local #5, numbered M-79, was marked for
16 identification.)
17     Q.    I have given you Longo-4, but before we
18 get to Longo-4, let's go back to Longo-2 for a
19 second. If you can look at the contract again. Look
20 at the last page on Longo-2.
21     A.    Right.
22     Q.    Bates No. 738.
23     A.    Yes.
24     Q.    Is that the signature page for this
25 contract which is Longo-2?

Pages 86 to 89

Dominic Longo                                    October 22, 2007

Page 90

1    A.    That's strictly the signature page.
2    Okay.  The other one is more of a cover sheet.  The
3    cover sheet actually has the terms of the contract on
4    there.
5    Q.    If you have Maarv --
6    A.    I believe there is a lot more, you know,
7    information over here.
8    Q.    Okay.  If you gave Maarv Waterproofing
9    the contract, Longo-2, why didn't you give them the
10   signature page that is part of that contract?
11   A.    I don't know.
12   Q.    If you look at Longo-4, which is the
13   document I just gave you --
14   A.    Yes.
15   Q.    -- do you recognize that document?
16   A.    Not particularly.
17   Q.    What do you mean not particularly?  That
18   leads me to think you might have some recollection of
19   it.
20   A.    No, I do not recall this document.
21   Q.    Okay.
22   A.    You know, I seem to recall, you know,
23   this bottom part here, but I do not recall anything
24   it has to do with the top version.  Okay.
25   Q.    What's the bottom part you said you seem

Page 91

1    to recall?
2    A.    Yeah, I seem to remember like there was
3    a notation of when they sent fringe benefits in,
4    okay, for the members here, okay, but, no, I don't
5    remember anything with Pallos Construction on it.
6    Okay.
7    Q.    Does seeing this document refresh your
8    memory at all as to Pallos Construction in any way?
9    A.    Which document is that?
10   Q.    The one I just showed you?
11   A.    No.
12   Q.    And you said you don't remember a person
13   named Ivan Pallos?
14   A.    No.
15   Q.    Would it surprise you if Mr. Pallos
16   testified that he spoke to you and he remembers
17   speaking to you on the project of Princeton, the
18   Princeton garage project, that he was the person that
19   you actually spoke to and he had people with him that
20   might have had trouble speaking English?
21   A.    Would it surprise me?
22   Q.    Yes.
23   A.    Yes, it would surprise me.  Is it
24   possible, yes, it's possible.
25   Q.    On the document I just gave you,

Page 92

1    Longo-4, there's a couple names I noted there.  It
2    looks like to me P. Pruitt.
3    A.    No.
4    Q.    Do you know who that person is?
5    A.    No
6    Q.    And an R. McMullen, do you know who that
7    person is?
8    A.    No.  I believe they are Local 4 book
9    men, but I'm not positive.  I'm not familiar with
10   either one of them.
11   Q.    What is a -- what are book men?
12   A.    They have union books out of Local 4.
13   Q.    Do you know of any companies they worked
14   for or work for?
15   A.    I am not familiar with the men at all.
16   Q.    Okay.
17        MR. DIAZ:  We can mark that Longo-5.
18        (Exhibit No. Longo-5, April 15, 2004
19   letter from Maarv Concrete to B.A.C., Bates stamped
20   0222, was marked for identification.)
21   Q.    I am going to show you what we marked as
22   Longo-5.  Take your time and look it over, and my
23   question is just going to be if you recognize that
24   document.
25   A.    I believe I recommended -- I recognize

Page 93

1    this document only because I seem to remember that
2    there was this thing with -- there was an error in
3    the first check.
4    Q.    Okay.
5    A.    Now, can I positively, absolutely
6    confirm that I remember this document, no, I cannot.
7    Q.    Okay.  That's fine.  Do you
8    recognize the -- let me start with the handwriting in
9    the middle of the document where there's several
10   numbers there.  Do you recognize that handwriting?
11   A.    No.
12   Q.    All right.  How about the handwriting on
13   the bottom left of the document where there seems to
14   be dates and hours?
15   A.    No.
16   Q.    And then there is handwriting on the
17   bottom right, more numbers.  Starts with 222.  Do you
18   recognize that?
19   A.    No.
20   Q.    Do you know -- did you receive this
21   document?
22   A.    I cannot recall.
23   Q.    Did you have any discussions with anyone
24   regarding this document?
25   A.    I don't believe so.

Dominic Longo                                      October 22, 2007

Page 94

1    Q.    Do you know of a company named Garden
2  State Caulking, Inc.?
3    A.    The name is familiar.
4    Q.    Okay.  I am going to ask you if you are
5  familiar with any contributions they have paid or
6  haven't paid?
7    A.    No.
8    Q.    Are you aware of any disputes with that
9  company at all?
10    A.    No.  Again, caulk companies come in and
11  out.  They are very hard to keep track of.
12    Q.    Give me a second.  I think I am wrapping
13  up here.  Longo-1 --
14    A.    Yes.
15    Q.    -- which is, I am calling it a signature
16  page, have you had any other contractors sign the
17  same type of --
18    A.    Yes.
19    Q.    -- agreement or page?  You have?
20    A.    Yes.
21    Q.    Do you know who those contractors are?
22    A.    Not off the top of my head.
23    Q.    Okay.
24          MR. DIAZ:  I think that's all I have.
25          MR. MEHLER:  I probably have a couple.

Page 95

1  Why don't we take a five or ten minute-break.
2          (Recess.)
3  (Examination of MR. LONGO by MR. MEHLER:)
4    Q.    I just want to clarify a couple
5  things --
6    A.    Okay.
7    Q.    -- that you testified to.  Mr. Longo --
8  let me make sure I get this straight.  Your memory is
9  Longo-1, which is this exhibit --
10    A.    Yes.
11    Q.    -- is what you provided to Maarv,
12  whether via fax or handing it to them?
13    A.    That is absolutely correct.
14    Q.    And that's what came back to the office
15  signed?
16    A.    Yes.
17    Q.    Now, this document has various pieces of
18  information about, purportedly about the company.  It
19  has an address, telephone number, a federal
20  identification number, a New Jersey employer
21  compensation number, a worker's compensation
22  insurance carrier number.  Would the union or you
23  have had that information or would that have had to
24  come from the company?
25    A.    That would have to come from the

Page 96

1  company.
2    Q.    Now, was it your understanding that by
3  having Maarv or somebody from Maarv sign this page,
4  they were agreeing to the Collective Bargaining
5  Agreement which has been identified as Longo-2?
6    A.    Correct.
7    Q.    And is it common that you or the local
8  would have an employer sign a document like Longo-1
9  rather than the signature page attached to Longo-2?
10    A.    That is correct.
11    Q.    Did you ever tell anyone at Maarv that
12  by signing Longo-1, they were agreeing to a
13  Collective Bargaining Agreement just for that one
14  project?
15    A.    Absolutely not.
16          MR. MEHLER:  I don't think I have
17  anything further.
18  (Examination of MR. LONGO by MR. DIAZ:)
19    Q.    Why would it be common for you to use
20  the signature page, which has been marked as Longo-1,
21  instead of the actual signature page of the contract?
22    A.    Actually, we have a book that has all
23  the contracts in them.  We have probably hundreds of
24  contracts, and it's much easier for us to store it
25  like this than like that.

Page 97

1    Q.    What would be the problem with taking
2  off the last page of the contract that is marked as
3  Longo-2, which is one page, and faxing that page to
4  Maarv Waterproofing?
5    A.    As far as I am concerned, I am not
6  really sure, but I would think that the documentation
7  on this page over here would be a lot more
8  satisfactory than the last page over there.
9    Q.    Okay.  But why didn't you just send the
10  actual signature page of the actual contract to Maarv
11  Waterproofing?
12          MR. MEHLER:  Objection.  Asked and
13  answered.  You can answer.
14    A.    It's not standard procedure.
15    Q.    Who sets the standard -- who sets the
16  procedure?
17    A.    Procedure was set before I got there.
18    Q.    Okay.  So you are telling me the
19  procedure of Local 5 is not to send the signature
20  page to the actual contract, but the procedure
21  instead is to use --
22    A.    The procedure is --
23    Q.    Let me finish the question.
24    A.    Okay.
25    Q.    But the procedure instead is to use

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                        Professionals Serving Professionals

Dominic Longo                                October 22, 2007

Page 98

1    another document, which is in the form of Longo-1?
2    That's the procedure?
3        A.   I cannot speak for everybody else.
4        Q.   Do you know whether or not that is the
5    procedure or not?
6        A.   I cannot speak for anybody else.
7    Usually, usually that suffices for everybody. That
8    is what we usually do. We offer the people the book
9    if they would like to see it, which is only a matter
10   of working agreements, but usually this is the
11   documentation that is signed and mailed or faxed back
12   to us.
13       Q.   You are referring to Longo-1?
14       A.   Yes.
15       Q.   That is for all contracts?
16       A.   I'm sure it's not for all contracts. I
17   am going to say for a good number of them.
18       Q.   On Longo-1, Longo-1 specifically
19   mentions a specific contract in the first paragraph.
20   Do you see that?
21            MR. MEHLER: Objection on the grounds
22   it speaks for itself.
23       Q.   Do you see that it mentions a specific
24   contract?
25            MR. MEHLER: You can answer.

Page 99

1        A.   You mean at the very top of the page?
2        Q.   No. No. No. The first three lines.
3        A.   I hereby approve the Collective
4    Bargaining Agreement between the Building Contract
5    Association, New Jersey...
6            Now, what was your question again,
7    please?
8        Q.   My question is do you use that exact
9    language for every contract that you enter into with
10   contractors?
11       A.   At --
12            MR. MEHLER: Objection to the extent
13   that's not limited by time period.
14       A.   At the time, I believe this was the
15   standard agreement we were using at the time.
16       Q.   Was there any training or was there any
17   direction at the local, Local 5, where someone said
18   do not use the signature page to the contract which
19   was marked as Longo-2?
20       A.   I don't know.
21       Q.   And you said in Longo-1, which you have
22   before you, your understanding was that this
23   signature in Longo-1 referred to the contract which
24   we marked as Longo-2, and that was your
25   understanding. My question is why was that your

Page 100

1    understanding?
2        A.   Can you explain yourself a little more,
3    please?
4        Q.   Sure. Mr. Mehler asked you whether or
5    not your understanding was that the signature page
6    document, which you are holding in your hand, he
7    asked you was it your understanding that this
8    document referred to Longo-2, which is this contract
9    I am pointing to right now.
10           MR. MEHLER: Objection in the sense my
11   specific question to him was whether it was his
12   understanding that by signing Longo-1, which is this
13   document, Maarv was agreeing to the agreement that
14   has been marked as Longo-2.
15           MR. DIAZ: Okay. Correct.
16       Q.   And you answered yes, that it was your
17   understanding?
18       A.   Yes.
19       Q.   My question is why was that your
20   understanding?
21       A.   That was my understanding from
22   conversations with business agents that had more
23   experience than me and, at the time, business
24   manager, Chuck Perrone.
25       Q.   In 2004, I guess February 2004, how long

Page 101

1    had you been signing up employers, so to speak, or
2    contractors to Collective Bargaining Agreements, how
3    much experience had you had doing that?
4        A.   I guess five months.
5        Q.   And in that five months, approximately
6    how many contractors did you sign up to agreements?
7        A.   I have no idea.
8        Q.   Any idea we're talking about like 50
9    or --
10       A.   No.
11       Q.   -- like a handful, five or 10, for
12   example?
13       A.   I am not familiar with that.
14           MR. DIAZ: That is all I have.
15           MR. MEHLER: I have nothing further.
16           (Deposition concluded at 12:25 p.m.)
17
18
19
20
21
22
23
24
25

Pages 98 to 101

Exhibit 1

FEB-04-04 10:30A BAC Local 5 NJ          16093241605          P-02

MAARV WATERPROOFING INC

000665

NJ0424

## INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
### LOCAL #5 – NEW JERSEY
### INDEPENDENT

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed Independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement, or as they shall be set out from time to time in any such successor Agreements as may be negotiated. The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its representative on the Board of Trustees such Employer Trustees together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund, Agreement and Declaration of Trust instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its successor assigns, and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

MAARV WATERPROOFING INC.
Company Name

317 OAK STREET
Physical Street Address

PASSAIC, NEW JERSEY   07055
City                State        Zip Code

(973) 470-0686      (973) 470-8716
Telephone Number     Fax Number

22-2527189
Federal Identification Number

608103-00-5
New Jersey Employment Compensation Number

ST. PAUL INSURANCE COMPANY
Workmen's Compensation Insurance Carrier

Please complete and remit to:
BAC Local #5, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-0500
(609) 324-1805 - Fax

Initial if you have received a full copy of this Collective Bargaining Agreement _____

_____  ATTILA SZAMOSSZEGI      FEBRUARY 4, 2004
Officers Signature         Printed Name              Date

_____  Michael R. Perrone        2/4/2004
Business Managers Signature  Printed Name            Date

_____  Dominic Longo             2/4/04
Field Representatives Signature  Printed Name        Date

EXHIBIT # Longo-1
DATE 10-22-07
MASTROIANNI & FORMAROLI, INC. plp
CERTIFIED SHORTHAND REPORTERS

0105

Exhibit G

Michael Robert Perrone                                    October 23, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 07-CV-0501(RJL)

JOHN FLYNN, JAMES BOLAND,           ORAL DEPOSITION OF
GERALD O'MALLEY, KEN
LAMBERT, GERARD SCARANO,        MICHAEL ROBERT PERRONE
H.J. BRAMLETT, EUGENE
GEORGE, PAUL SONGER, WILLIAM
MC CONNELL, MATTHEW
AQUILINE, GREGORY R. HESS,
MICHAEL SCHMERBECK, VINCENT
DELAZZERO, and BENJAMIN
CAPP, as Trustees of, and on
behalf of the BRICKLAYERS &
TROWEL TRADES INTERNATIONAL
PENSION FUND, 620 F Street,
NW, Washington, DC 20004
(202)783-3788, JIM ALLEN,
MATTHEW AQUALINE, LON BEST,
JAMES BOLAND, TED CHAMP,
RAYMOND CHAPMAN, VINCENT
DELAZZERO, BRUCE DEXTER,
JOHN FLYNN, EUGENE GEORGE,
GREGORY HESS, FRED
KINATEDER, DAN KWIATKOWSKI,
KEN LAMBERT, SANTO
LANZAFAME, DICK LAUBER,
WILLIAM MC CONNELL, EDWARD
NAVARRO, GERALD O'MALLEY,
JOHN PHILLIPS, CHARLES RASO,
MARK ROSE, KEVIN RYAN,
GERARD SCARANO, MICHAEL
SCHMERBECK, PAUL SONGER,
JOSEPH SPERANZA, and FRED
VAUTOUR as Trustees of, and

*      *      *      *
Tuesday, October 23, 2007
*      *      *      *

MASTROIANNI & FORMAROLI, INC.
Certified Court Reporting and Videoconferencing
251 South White Horse Pike, Suite 200
Audubon, New Jersey 08106
(856) 546-1100

Michael Robert Perrone                                                October 23, 2007

| Page 18 |
|---|

1    A. I never heard of Maarv Waterproofing until it
2  came to my attention when all this was brought about
3  through Chuck, our international.
4    Q. The first you heard of Maarv Waterproofing was
5  through this lawsuit?
6    A. Yes, with all this kind of information.
7    Q. Okay.
8    A. At the time of the signing of this agreement, I
9  was business manager, and I was no longer in the field.
10    Q. Okay. You're referring to, I'll call it the 2004
11  agreement?
12    A. Yes.
13    Q. Okay. So you've never had any interaction with
14  Maarv Waterproofing at all?
15    A. Not to my recollection.
16    Q. Do you have any knowledge regarding any union
17  work or union-related work that Maarv Waterproofing has
18  done?
19    A. No, not prior to this.
20    Q. Prior to the lawsuit -- not prior to the lawsuit?
21  I'm just clarifying. You said "this".
22    A. All I'm saying is -- I should clarify. I have no
23  knowledge or recognition of Maarv Waterproofing until I
24  got a call from Chuck.
25    Q. Do you know a person by the name of Attila who is

| Page 19 |
|---|

1  the head of Maarv Waterproofing?
2    A. I've never heard the name until all this started.
3    Q. Okay. Are you familiar or are you aware of a
4  company called Palos Construction?
5    A. No.
6    Q. Okay. Do you know who F. Ron Rivera is?
7    A. No.
8      MR. DIAZ: Let's mark this. Even though
9  this was marked before, you can mark this -- do you want
10  to keep this as Longo-1 or use another name? This is
11  the signature page.
12      MR. MEHLER: You can use Longo-1. That's
13  fine. That's the signature page.
14      (Exhibit No. Long-1, Signature Page dated
15  February 4, 2004, was marked for identification.)
16  BY MR. DIAZ:
17    Q. Mr. Perrone, I've given you Longo-1, which should
18  be the same as the other document you're referring to.
19    A. Right.
20    Q. If you take a look at that, are you familiar with
21  that document Longo-1?
22    A. Yes, it's been re-familiarized with me, if I'm
23  using the right words, when I got the call about all
24  this coming about.
25    Q. Okay.

| Page 20 |
|---|

1    A. But I -- as manager, I sign hundreds of these
2  things, because you got 15 different field reps, and
3  they're organizing daily.
4    Q. Okay. It appears to be your signature, or one of
5  the signatures on Longo-1 appears to be that of you.
6    A. Yes.
7    Q. Is that correct?
8    A. Yes.
9    Q. That is your signature?
10    A. Yes.
11    Q. Okay. Do you have any knowledge regarding the
12  circumstances surrounding your signing of this document?
13    A. As principal officer, I have to sign all
14  agreements.
15    Q. Okay. Do you have any specific recollection --
16    A. At that time, I was the principal officer.
17    Q. Okay. In 2004, you were business manager?
18    A. Yes.
19    Q. Okay. Do you have any recollections of signing
20  this agreement, Longo-1?
21    A. Not any -- for special reason, no.
22    Q. Do you know how you came to sign the document
23  that's in front of you? For example, who presented it
24  to you?
25    A. Yes, Dominic Longo presented it to me, because

| Page 21 |
|---|

1  his name is on there, and I specifically put the field
2  rep's name and signature on this document because we
3  never had that before. When there was questions that
4  would arise, we would not know who signed the contract.
5      Then when I took over as manager, I added that
6  line, and this way, just like the questions arise, if
7  there's a question about the contract, I look to see who
8  the field rep was and what's going on with the person.
9    Q. I'm trying to see if you have a specific
10  recollection when you signed this agreement.
11    A. Not at all.
12    Q. Do you remember Mr. Longo coming in your office
13  and saying can you sign this?
14    A. Nope, no.
15    Q. Okay.
16    A. Nothing out of the norm.
17    Q. Do you remember Mr. Longo ever discussing this
18  agreement with you?
19    A. No.
20    Q. Okay.
21    A. Not to my recollection.
22    Q. Since this lawsuit has been filed -- let me
23  strike that.
24      Has Mr. Longo ever had any discussions with you
25  regarding Maarv Waterproofing?

info@mfreporting.com                Mastroianni & Formaroli, Inc.                856-546-1100
Professionals Serving Professionals

Michael Robert Perrone                                      October 23, 2007

| Page 30 |
|---|

1    Q.  Yeah, they do actually.
2    A.  But there's a window where if an employer wishes
3    not to be part of the bargaining agreement, he or she
4    has to notify in writing within a specific period of
5    time, and then there's certain stipulations and things
6    like that.
7    Q.  Let me backtrack.  Are you aware of any
8    decertification petitions on behalf of employees --
9    A.  Employees?
10   Q.  -- or workers.
11   A.  From my union?
12   Q.  Yeah.
13   A.  No.
14   Q.  Okay.
15   A.  In other words, they would not basically say I
16   quit.  What they would, you know, basically not pay
17   their dues, and they would be dropped for nonpayment of
18   dues.
19   Q.  Okay.
20   A.  I've never had somebody -- not to my
21   recollection.  I've never had a written letter saying I
22   no longer want to be part of this union.  I've never had
23   that from a member.
24   Q.  Okay.  Are you aware of any companies that are or
25   were unionized that recognized, for example, Local 5

| Page 31 |
|---|

1    where in that specific company, the employees of that
2    company sought to dessert Local 5 as their bargaining
3    rep?
4    A.  Not to my recollection, no.
5    Q.  Okay.  I take it if you're not familiar with
6    Maarv Waterproofing, at least not until this litigation,
7    you would not be familiar with any employees of Maarv
8    Waterproofing?
9    A.  No, not personally.
10   Q.  I think I just have a few documents, and then I'm
11   done.  I'm just going to start by showing you this.  I'm
12   showing you a signature page agreement, and it looks
13   like there's a date of May of 2000.  Have you ever seen
14   this document before?
15   A.  I've seen this document, which was presented to
16   me by Chuck, asking me basically the same thing, did I
17   ever see this document before.  Not until he showed it
18   to me, I've never seen it.
19   MR. DIAZ:  Okay.  Let's mark this as
20   Perrone-3.
21   (Exhibit No. Perrone-3, Signature Page, BAC
22   Local No. 4 New Jersey, 5/10/00, was marked for
23   identification.)
24   BY MR. DIAZ:
25   Q.  All right.  We've marked as Perrone-3, it's Bates

| Page 32 |
|---|

1    numbered 0159, and it's a signature page.  It says "BAC
2    Local #4 New Jersey" on the top.  And I think, Mr.
3    Perrone, you testified that before this litigation
4    you've never seen what we've marked as Perrone-3?
5    A.  No.
6    Q.  Has Local 5 ever used any documents similar to
7    the one you see before you at Perrone-3?
8    A.  No, these are the only documents that we've ever
9    used.  I guess you're referring to Longo-1.
10   Q.  Longo-1, right.
11   A.  Okay.
12   Q.  A company named Garden State Caulking, Inc., did
13   you ever hear of that company?
14   A.  No.
15   Q.  All right.  I think I'm zero for 3 on that one in
16   prior deps.  All right.  That's all I have.
17   MR. MEHLER:  I just have a couple
18   questions.  Just a couple follow-up.
19   (EXAMINATION OF MR. PERRONE BY MR. MEHLER:)
20   Q.  Looking at Longo-1 and the last page of
21   Perrone-2, is it your understanding that Local 5, if
22   they had an employer sign Longo-1, they would not have
23   them sign the last page of this other -- of Perrone-2?
24   A.  No, no.  We added this, this language here for
25   people that, you know, didn't get books -- I mean the

| Page 33 |
|---|

1    contract books and stuff.
2    Q.  You would use this in place of this signature
3    page?
4    A.  Yes.
5    Q.  Okay.
6    A.  That was the norm.
7    Q.  And this signature page that's Page 54 to
8    Perrone-2, I believe you testified previously that at
9    one point at least, field reps would use this signature
10   page?
11   A.  Yes, I guess it would be kind of an exceptional
12   situation.  If they didn't have any of these and they
13   had a contract book and an employer would just turn
14   around and say, look, just let me sign the agreement.  I
15   want to get going.  I've got to get going.  Just send me
16   the rate sheets.
17   Q.  What about prior to when Longo-1 was created, was
18   there a time when Longo-1 had not been created yet?
19   MR. DIAZ:  Objection to the form as to what
20   time.
21   Q.  Or has Local 5 always used Longo-1, as far as you
22   know?
23   A.  To my recollection, always used Longo-1.
24   Q.  I have nothing further.
25   (CONTINUED EXAMINATION OF MR. PERRONE BY MR. DIAZ:)

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
Professionals Serving Professionals

Michael Robert Perrone                                        October 23, 2007

Page 38

1  the Masonry Contractors Association of New Jersey, but
2  it doesn't -- it doesn't reference this group called
3  Building Contractors Association of Atlantic County.
4  That's not in the first paragraph here of Longo-1.  Do
5  you know why that is?
6      A.  No.
7      Q.  All right.  That's all I have.
8  (CONTINUED EXAMINATION OF MR. PERRONE BY MR. MEHLER:)
9      Q.  One last question.  When an employer signs
10  Longo-1, your understanding is what they're agreeing to
11  is the agreement that's been marked as Perrone-2?
12      A.  Yes.
13      Q.  Okay.  I have nothing further.
14  (CONTINUED EXAMINATION OF MR. PERRONE BY MR. DIAZ:)
15      Q.  Do you tell that to the employer?
16      A.  I as business manager would not be dealing with
17  those employers, the field reps.
18      Q.  When you were a field rep, would you tell the
19  employer?
20      A.  Sure.
21      Q.  When would you tell them that?
22      A.  If they asked.
23      Q.  If they asked, you tell them?
24      A.  Yes.
25      Q.  Thank you.  That's all I have.

Page 39

1      MR MEHLER:  That's it.  Thank you.
2      (Testimony concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 40

1          C E R T I F I C A T E
2
3      I, NORA M. GALLAGHER, a Certified Court Reporter of
4  the State of New Jersey, do hereby certify that prior to
5  the commencement of the examination, MICHAEL ROBERT
6  PERRONE was duly sworn by me to testify the truth, the
7  whole truth, and nothing but the truth.
8      I DO FURTHER CERTIFY that the foregoing is a true and
9  accurate transcript of the testimony as taken
10  stenographically by and before me at the time, place,
11  and on the date hereinbefore set forth, to the best of
12  my ability.
13      I DO FURTHER CERTIFY that I am neither a relative nor
14  employee nor attorney nor counsel of any of the parties
15  to this action, and that I am neither a relative nor
16  employee of such attorney or counsel, and that I am not
17  financially interested in the action.
18
19
20      _____
        NORA M. GALLAGHER,
21      A Certified Court Reporter of the
        State of New Jersey
22      Certificate No. XI00091100
23
24
25

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                              Professionals Serving Professionals

Exhibit 1

FEB-04-04 10:30A BAC Local 5 NJ                    16093241605                    P.02

MAARV WATER PROOFING INC.

000665

NJ0424

### INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
### LOCAL #5 — NEW JERSEY
### INDEPENDENT

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed Independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement, or as they shall be set out from time to time in any such successor Agreements as may be negotiated. The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its representative on the Board of Trustees such Employer Trustees together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund Agreement and Declaration of Trust instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its successor assigns, and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

MAARV WATERPROOFING INC.
_____
Company Name

317 OAK STREET
_____
Physical Street Address

PASSAIC, NEW JERSEY   07055
_____
City                State        Zip Code

(973) 470-0686      (973) 470-8716
_____
Telephone Number     Fax Number

22-2527189
_____
Federal Identification Number

608103-00-5
_____
New Jersey Employment Compensation Number

ST. PAUL INSURANCE COMPANY
_____
Workmen's Compensation Insurance Carrier

Please complete and remit to:
BAC Local #5, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-6500
(609) 324-1805 - Fax

EXHIBIT
Longo-1
10/23/07 NS
PENGAD 800-631-6989

Initial if you have received a full copy of this Collective Bargaining Agreement _____

_____    ATTILA SZAMOSSZEGI        FEBRUARY 4, 2004
Officers Signature            Printed Name                Date

_____    Michael R. Perrone          2/4/2004
Business Managers Signature   Printed Name                Date

_____    Dominic Longo               2/4/04
Field Representatives Signature  Printed Name                Date

Longo 1