**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| JOHN FLYNN,  et al. | |
| Plaintiffs, | CASE NUMBER:  1:07CV00501 |
| v. | JUDGE:  Richard J. Leon |
| MAARV WATERPROOFING, INC., | |
| Defendant. | |

---

**BRIEF OF DEFENDANT IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

On the Brief:

Alexander Nemiroff, Bar No. 454408
Peter L. Frattarelli, admitted *pro hac vice*
Douglas Diaz, admitted *pro hac vice*
Archer & Greiner, P.C.
One Centennial Square
Haddonfield, New Jersey 08033
(856) 795-2121

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ii

I.          INTRODUCTION ............................................................................................1

II.         FACTS ..............................................................................................................2

    A.     Maarv Waterproofing, Inc.....................................................................2

    B.     Local 5 Sends Maarv an Illegible Signature Page in Fine Print That
Maarv's President Cannot Read and Which Local 5 States is a One Job
Agreement. ...........................................................................................2

    C.     The Title of the 2002 CBA Differs From the Title of the CBA Referenced
in the Local 5 Independent Agreement...................................................4

    D.     The Local 5 Independent Agreement Pertains Only to the Territory of
Local 2 and to the Trades of Cement Masons, Plasters and Fire Proofers. ...........4

    E.     The Audit Erroneously Lists Workers Not Covered By the 2002 CBA.................5

III.        ARGUMENT .....................................................................................................5

    A.     Standard of Review...............................................................................5

    B.     Maarv Never Signed the 2002 CBA But Rather a Signature Page That,
According to Plaintiffs, Has Language That Refers to a CBA Different
From That of the 2002 CBA...................................................................6

    C.     Maarv Alleges Fraud in the Execution Because It Claims That The Union
Misrepresented That the Signature Page Maarv's President Could Not
Read Was a One-Job Agreement and Never Provided Maarv With the
Actual CBA. ........................................................................................7

    D.     There is Sufficient Evidence To Conclude That Maarv Did Not Have a
Reasonable Opportunity to Learn of the Nature of the Document It Did
Sign. ..................................................................................................13

    E.     The Audit Incorrectly Determined that Maarv Owed Contributions to the
Funds. ................................................................................................15

IV.        CONCLUSION ...............................................................................................15

# TABLE OF AUTHORITIES

## FEDERAL CASES

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986) ...............................................5, 6

<u>Bricklayers and Allied Craftworkers Local 2 v. C.G. Yantch, Inc.</u>, 316 F. Supp.
    2d 130 (N.D.N.Y. 2003) ....................................................................................... 11, 12

<u>Capozza Tile Co., Inc. v. Joy</u>, 223 F. Supp. 2d 307 (D. Maine 2002) ...............................9

<u>Flynn v. Thibodeaux Masonry, Inc.</u>, 311 F. Supp. 2d 30 (D.D.C. 2004)...........................7

<u>Hetchkop v. Woodlawn at Grassmere, Inc.</u>, 116 F.3d 28 (2d Cir. 1997).........................12

<u>Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel, Inc.</u>, 976 F. Supp. 683
    (E.D. Mich. 1997)........................................................................................ 9, 10, 12

<u>Operating Engineers Pension Trust v. Gilliam</u>, 737 F.2d 1501 (9th Cir. 1984).................9

<u>Southwest Administrators, Inc.. v. Rozay's Transfer</u>, 791 F.2d 769
    (9th Cir. 1986) ........................................................................................... 8, 12, 13

## FEDERAL STATUTES

Fed.R.Civ.P. 56(c).............................................................................................................5

Fed.R.Evid. 803(3) ............................................................................................................8

Fed. R.Evid. 807................................................................................................................9

## MISCELLANEOUS

12 S. Williston, <u>A Treatise on the Law of Contracts</u> § 1488, at 332 (3d ed. 1970)...........8

Restatement (Second) of Contracts § 163 comment a (1981) ...................................... 8, 12

## I.    INTRODUCTION

Pursuant to its admitted "hide the ball" practice, a local union affiliated with the Plaintiffs here sent to Maarv Waterproofing, Inc. ("Maarv") a one page document it calls a "Local 5 Independent Agreement" which it drafted in fine print and sent by facsimile in order to prevent Maarv's owner from being able to read it. And, in fact, Maarv's owner was unable to read this document.  Also consistent with its practice, the local union never provided Maarv with the actual and legible collective bargaining agreement ("CBA") to which Plaintiffs claim Maarv is bound by signing the "Local 5 Independent Agreement."  The union instead misrepresented that the one page illegible document it did send was actually a one project agreement only that Maarv needed to sign in order to continue with a certain "union job" on which it was working.   An official from the local union made this misrepresentation not only to a subcontractor to Maarv, but also directly to Maarv itself.

Plaintiffs now contend they are due various fringe benefit contributions they claim Maarv committed to making on all jobs it performed by signing the illegible Local 5 Independent Agreement. However, it is well established that such contributions are not required where the underlying agreement was procured by fraud in the execution, which is what Maarv alleges here. Such fraud occurs where there is a misrepresentation as to the character or essential terms of a proposed contract that induces conduct by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the contract.  There is more than sufficient evidence here establishing a fraud in the execution defense and, indeed, there is case law on almost identical facts where a party signed a signature page represented as a one project agreement and the court held that the fraud in the execution defense applied.  The facts here are even stronger for a fraud in the execution defense because Maarv's owner could not read the one page blurry document in fine print that the union sent to him. Maarv has also otherwise presented

sufficient facts showing excusable ignorance of the terms of the CBA under which Plaintiffs seek to recover alleged delinquent contributions. Accordingly, Plaintiffs' motion for partial summary judgment should be denied.

## II.     FACTS

### A.     Maarv Waterproofing, Inc.

Maarv Waterproofing, Inc. ("Maarv") is a company located in Northern New Jersey that is owned and operated by its president Attila Szamosszegi. Maarv employees do not perform waterproofing or caulking services themselves but are instead general laborers who perform sweeping services, transport dirt, and conduct some landscaping. Maarv utilizes subcontractors to perform waterproofing, caulking, or concrete work. The majority of work performed by Maarv is done in Northern New Jersey.(See Defendant's Statement of Genuine Issues in Opposition to Plaintiffs' Statement of Material Facts ("Defendant's Genuine Issues"), at ¶ ¶ 13, 14).

### B.     Local 5 Sends Maarv an Illegible Signature Page in Fine Print That Maarv's President Cannot Read and Which Local 5 States is a One Job Agreement.

In or about February of 2004, Maarv was working as a general contractor on a garage project in Princeton, New Jersey ("Princeton Parking Garage Project"). A subcontractor for Maarv, Pallos Construction Company, was performing the actual work for Maarv. A Local Union No. 5 ("Local 5" or "Union") official, Dominick Longo, approached the owner of Pallos Construction Company, Mr. Pallos, on the job site.  Mr. Longo told Mr. Pallos that the Princeton Parking Garage Project was a "union job" and that he had to use some union men and that Maarv therefore had to sign a form or contract that was a contract for just that one job. Mr. Longo himself admitted that "I probably said you need to sign a union contract **on this job**." (Defendant's Genuine Issues, at ¶¶ 31, 32, 36, and 37).

Mr. Pallos told Mr. Szamosszegi and Maarv's then Office Manager, Ann Paoella, of the statements made by Mr. Longo, to wit, that because the Princeton Parking Garage Project was a union job, Maarv had to sign a contract to continue with the job and that it was a contract for just that one job. Mr. Longo never mentioned anything about a CBA or presented Mr. Pallos with a CBA or offered him any copies of a CBA. Local 5's practice is specifically not to offer or provide copies of CBAs. (Defendant's Genuine Issues, at ¶¶ 31, 32, 36, and 37).

Following his conversation with Mr. Pallos, Mr. Longo telephoned Maarv's office directly and spoke with a female who was in fact Ms. Paoella. Mr. Longo told Ms. Paoella that he was faxing her an agreement that was just an agreement for the Princeton Parking Garage Project. (Defendant's Genuine Issues, at ¶ ¶ 32, 50). Mr. Longo did fax to Maarv a document titled at the top: "International Union of Bricklayers and Allied Craftworkers Local #5-New Jersey Independent"(hereinafter, "Local 5 Independent Agreement" or "Signature Page"). This document was in fine print. (Defendant's Genuine Issues, at ¶¶ 32, 45). Ms. Paoella presented this one page document to Mr. Szamosszegi but he was unable to read it because it was in fine print that was made even less legible because it was sent via facsimile and was blurry to Mr. Szamosszegi. Ms. Paoella also told Mr. Szamosszegi that the union had called her and said that this document was just a one job agreement for the Princeton Parking Garage Project and that Maarv needed to sign it because that project was a union job. Relying on the union's representation, Mr. Szamosszegi signed the document. Mr. Longo never provided Maarv with a CBA and never offered Maarv a copy of a CBA, and Mr. Szamosszegi has never executed a CBA and has no experience in negotiating such agreements. (Defendant's Genuine Issues, at ¶ ¶ 37, 45, and 50).

**C.    The Title of the 2002 CBA Differs From the Title of the CBA Referenced in the Local 5 Independent Agreement.**

The language of the CBA to which Plaintiffs seek to bind Maarv ("2002 CBA") is not consistent with the first sentence of the Local 5 Independent Agreement as that language has been deciphered by Plaintiffs. According to Plaintiffs, the first sentence of the Local 5 Independent Agreement seeks to bind an employer to a CBA between

> "the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey"

whereas the 2002 CBA contains a different title with an additional and different party altogether, namely:

> "Agreement Between Building Contractors Association of New Jersey, Masonry Contractors of New Jersey, *Building Contractors Association of Atlantic County*, *Other Signatory Employers*, and Local Union Nos. 4, 5, and 2 of the International Union of Bricklayers and Allied Craftworkers."

The italicized language noted above does not appear in the Local 5 Independent Agreement. Moreover, the 2002 CBA has its own signature page which was never signed by Maarv. Mr. Longo also testified that he was "sure" that the Local 5 Independent Agreement signature page was not for all contracts. (Defendant's Genuine Issues, at ¶ ¶ 59, 60).

**D.    The Local 5 Independent Agreement Pertains Only to the Territory of Local 2 and to the Trades of Cement Masons, Plasters and Fire Proofers.**

Plaintiffs state that the agreement Mr. Szamosszegi signed provides that it "shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers...." (Plaintiffs' SMF, at ¶ 62). According to the 2002 CBA, the territorial jurisdiction of Local No. 2 consists primarily of counties in Southern New Jersey, where Maarv rarely if ever performed any work. Moreover, the territorial jurisdiction of Local

4

No. 2 also states that it covers the trades of "Cement Masons, Plasterers & Fire Proofers." Maarv did not employ any workers in these trades. In fact, Maarv did not employ anyone covering any of the trades listed in the 2002 CBA. (Defendant's Genuine Issues, at ¶ 62).

E.    **The Audit Erroneously Lists Workers Not Covered By the 2002 CBA.**

On or about January 10, 2006, Plaintiffs hired an accounting group to conduct an audit of Maarv. As noted above, based on the Plaintiffs' statement, the Local 5 Independent Agreement covers the territory of Local 2 which consists primarily of counties in Southern New Jersey where Maarv rarely if ever performed any work. Moreover, the territorial jurisdiction of Local No. 2 also states that it covers the trades of "Cement Masons, Plasterers & Fire Proofers." The audit did not find that any of Maarv's workers were in these categories. Rather, the audit labeled the vast majority of Maarv's workers as "Cleaners-Waterproofers." This, however, is incorrect as Maarv does not employ any such persons. (Defendant's Genuine Issues, at ¶ ¶ 62, 126, 127, and 128).

III.    **ARGUMENT**

A.    **Standard of Review.**

Summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In this regard, credibility assessments, choices between conflicting versions of the events, and weighing of the evidence are matters for the jury, not for the court on a motion for summary judgment. <u>Id.</u> at 255. Moreover, in determining whether or not there are genuine

5

issues for trial, the court must resolve all ambiguities and draw all reasonable inferences in favor

of the non-movant. Id.

> **B.    Maarv Never Signed the 2002 CBA But Rather a Signature Page That, According to Plaintiffs, Has Language That Refers to a CBA Different From That of the 2002 CBA.**

To prove their case, Plaintiffs must as an initial matter show that Maarv signed the 2002

CBA to which they claim Maarv is bound. However, Maarv was never even presented with the

2002 CBA, let alone signed it.  In fact, while the 2002 CBA has its own specific signature page,

Maarv was never presented with that 2002 CBA signature page and never signed it. Rather,

Local 5 presented Maarv with a different signature page altogether that it calls the "Local 5

Independent Agreement." Maarv's president could not read this one page document because it

was in fine print that was made even more undecipherable because it was sent to Maarv via

facsimile. Plaintiffs, however, have represented to the Court that the Local 5 Independent

Agreement provides that Maarv was agreeing to a specific CBA titled as follows:

> the Building Contractors Association of New Jersey and the
> Masonry Contractors Association of New Jersey dated November
> 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4,
> No. 5 of New Jersey and Local No.2 of Delaware-New Jersey.

Based on this reading by Plaintiffs, Maarv did not and indeed could not have agreed to the 2002

CBA because the title of the 2002 CBA is not the same title of the CBA Plaintiffs state is

referenced in the Local 5 Independent Agreement. Rather, the 2002 CBA is titled as follows:

> Agreement Between Building Contractors Association of New
> Jersey, Masonry Contractors of New Jersey, *Building Contractors
> Association of Atlantic County*, *Other Signatory Employers*, and
> Local Union Nos. 4, 5, and 2 of the International Union of
> Bricklayers and Allied Craftworkers.

(See Defendant's Genuine Issues, at ¶ ¶ 59, 60).

As shown above, the 2002 CBA differs from that referenced in the Local 5 Independent Agreement because it includes a different and new party altogether, namely, a "Building Contractors Association of Atlantic County," as well as "other signatory employers." This "Building Contractors Association of Atlantic County" is not referenced in the CBA referred to in the Local 5 Independent Agreement and Plaintiffs have never produced a CBA as described in that Local 5 Independent Agreement.[1] Simply put, the CBA to which Plaintiffs claim Maarv is bound is not the CBA referenced in the Signature Page Maarv signed based on Plaintiffs own reading of the language of that Signature Page. For this reason alone, Plaintiffs motion for partial summary judgment should be denied as they have failed to show that Plaintiffs signed or otherwise agreed to the 2002 CBA.

### C. Maarv Alleges Fraud in the Execution Because It Claims That The Union Misrepresented That the Signature Page Maarv's President Could Not Read Was a One-Job Agreement and Never Provided Maarv With the Actual CBA.

Contrary to Plaintiffs' argument, Maarv is claiming fraud in the execution, and not fraud in the inducement. Courts have recognized that in response to a delinquent contribution suit under the Employment Retirement Income Security Act ("ERISA"), an employer may raise the defense that the collective bargaining agreement is *void ab initio* based on fraud in the execution. See Flynn v. Thibodeaux Masonry, Inc. 311 F. Supp. 2d 30, 43-44 (D.D.C. 2004). Fraud in the execution arises when "a misrepresentation as to the character or essential terms of a proposed

---

[1] Plaintiffs have recognized this fundamental problem with their case as demonstrated by their actions of now producing two CBAs in an effort to "match up" as best they can a CBA with what they contend is the CBA referenced in the Local 5 Independent Agreement. In their original complaint, Plaintiffs attached as Ex. B a CBA titled "State of New Jersey Residential and Light Commercial Agreement between The Masonry Contractors of New Jersey[,] The Building Contractors Association of New Jersey and International Union of Bricklayers and Allied Craftworkers Local Unions No. 4, 5 of New Jersey and Local No. 1 Delaware/NJ." (Defendant's Genuine Issues, at ¶ 146). Plaintiffs then apparently found another CBA they deemed a closer fit to what they claim is referenced in the Local 5 Independent Agreement and replaced Exhibit B to their complaint with this new CBA. However, and as noted above, this new CBA Plaintiffs have found is not the same as what Plaintiffs contend is referenced in the Local 5 Independent Agreement because it includes an entirely different party, namely, a Building Contractors Association of Atlantic County.

7

contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract." Restatement (Second) of Contracts § 163 comment a (1981)(emphasis added); Southwest Administrators, Inc.. v. Rozay's Transfer, 791 F.2d 769 (9th Cir. 1986). Such a fraud causes a party "to believe that the act which he does is something other than it actually is." 12 S. Williston, A Treatise on the Law of Contracts § 1488, at 332 (3d ed. 1970). The critical fact for a fraud in the execution defense is a showing of "excusable ignorance of the contents of the writing signed." Rozay's Transfer, 791 F.2d at 774. This is what separates fraud in the execution from fraud in the inducement. With the latter, a party is made aware of the actual terms of the document at issue but is fraudulently told, for example, that those terms will not be enforced. Rozay's Transfer, 791 F.2d at 774-75 (noting that fraud in the execution did not apply because "there simply was no confusion as to the actual contents of the agreement.  Instead the misrepresentation concerned whether the express provisions of the agreement would in fact be enforced-an example of fraud in the inducement").

Here, Maarv sets forth a fraud in the execution defense because it contends that the Union misrepresented to both Maarv and its subcontractor that the Signature Page it sent to Maarv was a one-project agreement and, significantly, that Maarv's owner was not even able to read this document because it was illegible.[2] The Fraud in the execution defense also applies because the

---

[2] Contrary to Plaintiffs representation on page 9 of Plaintiffs' Brief, the Union did not just speak to Maarv's subcontractor regarding the Local 5 Independent Agreement. Rather, as admitted by Mr. Longo, he also telephoned Maarv's office directly and spoke to a female who happened to be Maarv's office manager, Ms. Paoella. Mr. Longo admitted that he might have in fact told this person that he was sending her an agreement that was just in reference to the Princeton Parking Garage Project.  Mr. Longo also admitted that he told what he thought was Mr. Szamosszegi, but who was really Mr. Pallos, that the agreement was just a "contract on this job."(Defendant's Genuine Issues, at ¶ 32).  Mr. Pallos has testified that he, in turn, told Mr. Szamosszegi of this representation. (Id. at ¶ 36). Based on the testimony of Mr. Longo and Mr. Pallos, there is no hearsay issue as Plaintiffs allege in footnote 10 of their Brief. Moreover, there is no hearsay issue as to what the now deceased Ms. Paoella told Mr. Szamosszegi because it shows Ms. Szamosszegi's state of mind in executing the Local 5 Independent Agreement and is thus a hearsay exception under Fed.R.Evid. 803(3).  Also considering that Mr. Longo has admitted to speaking with a

Union never provided Maarv with the actual CBA and, indeed, the Union testified that its practice was not to provide employers with a copy of the CBA. The Union in essence played a game of "hide the ball" by failing to provide Maarv with the actual and legible CBA and instead faxing to Maarv an illegible document in order to prevent Maarv from reading what the Union did decide to provide.

Courts have found fraud in the execution in situations such as this where a union representative presents an employer with a signature page only, and not the actual CBA itself, and misrepresents the essential terms of the document. See, e.g., Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel, Inc., 976 F. Supp. 683 (E.D. Mich. 1997)(finding fraud in the execution where union presented employer only with a signature page that it misrepresented as a one project agreement); Capozza Tile Co., Inc. v. Joy, 223 F. Supp.2d 307 (D. Maine 2002)(finding sufficient evidence of fraud in the execution where employer was presented only with a signature page and told that it was only for pension benefits for four employees); Operating Engineers Pension Trust v. Gilliam, 737 F.2d 1501 (9th Cir. 1984)(finding that employer's signing of a short-form collective bargaining agreement did not bind employer where he was told he was only signing standard forms for owner-operator membership and did not recognize that he entered into a collective bargaining agreement).

The decision in Nyeholt Steel involved facts almost identical to those here. There, a union official presented the employer with a short form agreement that, similar to what the Plaintiffs contend the Signature Page here states, provided that the employer will be bound by a collective bargaining agreement, including its terms pertaining to the payment of fringe benefits. Nyeholt Steel, 976 F. Supp. at 685-86. However, the union official told the employer that the

---

female at Maarv's office which would have been Ms. Paoella and that he has admitted to perhaps telling her that he was sending an agreement for the Princeton Parking Garage Project, Ms. Paoella's statements to Mr. Szamosszegi should also be covered under the residual hearsay exception of Fed. R.Evid. 807.

agreement was only a one-job agreement. Id.  Finding in favor of the employer on its fraud in the execution defense, the court reasoned that the union misrepresented what the actual nature of the document was through its characterization of it as a one job agreement. Id. at 690, n.12. The court further reasoned that any reasonable juror could find excusable ignorance on behalf of the employer because it was never provided with a copy of the actual CBA and had never negotiated or executed a CBA before and needed to sign what the union presented to him in order to avoid a strike. Id. at 690.

Here, Maarv was also told that the Signature Page was just a one project agreement--a "contract on this job" according to Mr. Longo.  Moreover, the facts are even stronger here than in Nyeholt Steel for a fraud in the execution defense because Mr. Szamosszegi could not even read the Signature Page as it was illegible to him. In addition, Mr. Szamosszegi has never negotiated or executed a CBA before and was pressured to sign the Signature Page because the Union said it was necessary to do so to in order to continue with the Princeton Parking Garage Project.

Notwithstanding the several cases cited above where courts have recognized a fraud in the execution defense on facts similar to those presented here, Plaintiffs nonetheless make several meritless arguments contending that this is not a fraud in the execution case. First, Plaintiffs claim that such a defense does not apply because Mr. Szamosszegi had a document with "straightforward language" that he could have reviewed. *Mr. Szamosszegi, however, could not even read this document*. Indeed, the document was in fine print and was blurry to Mr. Szamosszegi because it was sent by facsimile.  In addition, and according to Plaintiffs, this document only provides for the payments of contributions "as specified in the full 2002 CBA," which CBA was not provided to Maarv. Based on just the fact that the Union never provided

Maarv with the actual CBA but merely a one page document Mr. Szamosszegi could not even read, Plaintiffs' attempt to categorize this as a fraud in the inducement case is without any merit.

Moreover, even if Mr. Szamosszegi could have read this document with its fine print and blurry words, the fraud in the execution defense would still apply. In this regard, and contrary to Plaintiffs additional contention as to why the defense is not applicable, this is not a case where Maarv claims that the Union made "assurances" that "despite its plan language," the Local 5 Independent Agreement "would not be enforced as written." (Plaintiffs' Brief, at 14). To the contrary, Maarv contends that the Union told it that the Signature Page was something that it was not, namely, a one job agreement. Thus, the cases cited by Plaintiffs regarding oral assurances are inapposite.[3] For example, the Northern District of New York opinion that Plaintiffs principally rely upon involved a union official expressly telling an employer what the *consequences* were of it signing an agreement. Bricklayers and Allied Craftworkers Local 2 v. C.G. Yantch, Inc., 316 F. Supp. 2d 130(N.D.N.Y. 2003). There, the union official expressly assured an employer "that signing [a letter of intent] *would only obligate* the company" to pay benefits for one worker for a specific project. Id. at 138.(emphasis added). In rejecting the employer's defense, the court noted that such assurances do not establish a fraud in the execution defense.

Here, by contrast, Maarv is not claiming that Mr. Longo told it what the consequences were of signing a document or that its provisions would not be enforced. Rather, Maarv alleges that Mr. Longo told it that the Signature Page was something else entirely, namely, a one-job

---

[3] So too, therefore, is Plaintiffs reliance on the principle that a court cannot give force to "oral understandings" that contradict a clear writing since Maarv is not alleging any oral understanding, such that the terms of an agreement would not be enforced as written. (Plaintiffs' Brief, at 14, n. 11). This principle is also inapplicable because based on Plaintiffs representation of what the Local 5 Independent Agreement does state and which Mr. Szamosszegi was unable to read, this agreement does not provide that fringe benefit contributions were due for *all* projects but just "as specified in the full 2002 CBA," which was never provided to Maarv.

agreement---a document that was "a contract on this job."[4] Further distinguishing <u>Yantch</u> and the other cases cited by Plaintiffs is that in those cases there was no issue as to whether the document could have been read. Indeed, in <u>Yantch</u>, the court specifically noted that the letter of intent the employer signed was not ambiguous and there was no evidence that it could not have been read. <u>Yantch</u>, 316 F. Supp. 2d, at 147-48.  Here, by contrast, the Union drafted and sent the Local 5 Independent Agreement in such a fashion so that Mr. Szamosszegi was not able to read it even if he wanted to do so. It might as well have sent Mr. Szamosszegi a blank signature page.

Plaintiffs also argue that the fraud in the execution defense does not apply because Maarv knew the document it signed was a collective bargaining agreement. As an initial matter, this is factually false. Mr. Szamosszegi testified that he only knew he was signing some "union paper", not a collective bargaining agreement. (Defendant's Genuine Issues, at ¶ 71). Plaintiffs' statement is also incorrect as a matter of law as it ignores that fraud in the execution applies where there is a "misrepresentation as to the character *or essential terms* of a proposed contract" where the party  "neither knows nor has reasonable opportunity to know of the character *or essential terms.*" Restatement (Second) of Contracts § 163 comment a (1981)(emphasis added); <u>Rozay's Transfer</u>, 791 F.2d at 774. Indeed, based on the very definition of fraud in the execution, "even if the party knew the basic nature of the document, the defense is applicable if the party did not know and had no reasonable opportunity to know [the] material[]…terms…." <u>Hetchkop v. Woodlawn at Grassmere, Inc.</u>, 116 F.3d 28, 33-34 (2d Cir. 1997) (finding that district court had applied an "unduly narrow view of the law" when rejecting fraud in execution defense simply because employer knew agreement was a collective bargaining agreement). Here, Maarv

---

[4] As noted by the court in <u>Nyeholt Steel</u>, stating that a contract is a one project agreement when it is not constitutes a misrepresentation as to the nature of the document so that a fraud in the execution defense applies. <u>Nyeholt Steel</u> , 976 F. Supp. at 690, n. 12. As noted below, it is also a misrepresentation as to its "essential terms" which also makes the defense applicable.

did not know the terms of the CBA since it was never provided to him and he could not even learn the terms of the document that was provided since it was illegible to him.  For all these reasons, and as further noted below, there are more than sufficient facts showing "excusable ignorance of the contents of the writing signed" which results in a fraud in the execution defense. See Rozay's Transfer, 791 F.2d at 774.

> **D.    There is Sufficient Evidence To Conclude That Maarv Did Not Have a Reasonable Opportunity to Learn of the Nature of the Document It Did Sign.**

Plaintiffs additionally assume the role of trier of fact by arguing that even if a fraud in the execution defense is applicable, which it is as shown above, Plaintiffs must still prevail because they believe Maarv has failed to show "excusable ignorance of the contents of the writing signed."  Plaintiffs primarily argue in this regard that there is no excusable ignorance because all Mr. Szamosszegi had to do was read the document he was signing with its clear and unambiguous terms.  Of course, and as noted above, this argument fails because Mr. Szamosszegi could not read this document as it was in fine print made even less legible because the Union sent it by facsimile. As Mr. Szamosszegi has testified, while he did not concern himself with the document because he was relying on the representation of the Union that it was just a one job agreement, he did glance through it. When glancing through it, however, the document was difficult for Mr. Szamosszegi to read because it was in fine print and blurry and Mr. Szamosszegi could not in fact read it. Accordingly, the cases cited by Plaintiffs regarding a duty to read documents are inapplicable because there was no evidence in those cases that a party could not read the document as an initial matter. [5]

---

[5] When questioning Mr. Szamosszegi, Plaintiffs' counsel recognized that the Local 5 Independent Agreement was in "small writing" and then represented to Mr. Szamosszegi what he believed the "small writing" stated and then questioned him about that representation of the "small writing." Plaintiffs' counsel, however, never asked Mr. Szamosszegi if was even able to decipher the "small writing." (Defendant's Genuine Issues, Ex. B, at 54:7-25).  As noted above, he was not.

Also without merit is Plaintiffs' argument that Mr. Szamosszegi should have followed-up with the Union based on the "inconsistency" between what Plaintiffs claim the Local 5 Independent Agreement states and Mr. Longo's representation of the agreement. Even if Mr. Szamosszegi could have read this document, there is no such inconsistency based on what Plaintiffs contend the Local 5 Independent Agreement stated. This is so because according to Plaintiffs, this document does not state that Union fringe benefit contributions were due on all projects performed by Maarv, but only generally states that such contributions were due "as specified in the full 2002 CBA." This CBA was never provided to Maarv based on the Union's practice of not providing copies of CBAs. Moreover, and as noted above, the actual CBA Plaintiffs contend is referenced in the Local 5 Independent Agreement has never even been produced.

In sum, there is more than sufficient evidence here to establish excusable ignorance of the writing signed. This evidence consists of the following: (1) Mr. Szamosszegi could not read the illegible document sent to him that was in fine print and blurry; (2) based on Plaintiffs' representation, the Local 5 Independent Agreement does not state that contributions are required on all projects but just as specified in the CBA; (3) the Union never provided Mr. Szamosszegi with the actual CBA based on its practice of not doing so; (4) the Union told Maarv that the illegible document it sent was just a one job agreement so Mr. Szamosszegi had no reason to pry further and instead relied on this representation by the Union; (5) Mr. Szamosszegi has no experience in negotiating or signing CBAs and his experience was that he just needed to pay contributions to a union for a specific job when the job at hand was a union job; and (6) Maarv was pressured to sign this document quickly because the Union told it that it needed to do so in order to continue with the Princeton Parking Garage Project. (Defendant's Genuine Issues, at ¶ ¶

2, 36, 37, 45, and 50; Plaintiffs' SMF, at ¶ 63). Accordingly, there is sufficient evidence to establish excusable ignorance of the document signed for fraud in the execution to apply.

   **E.    The Audit Incorrectly Determined that Maarv Owed Contributions to the Funds.**

   Maarv also disputes the findings of the audit prepared on behalf of the Funds for the reasons stated in sections D and E of the Facts section above.  The Signature Page Maarv signed covered the territory of Local 2 according to what Plaintiffs have represented this Signature Page states. The territorial jurisdiction of Local No. 2 consists primarily of counties in Southern New Jersey where Maarv rarely if ever performed any work. Moreover, the territorial jurisdiction of Local No. 2 also states that it covers the trades of "Cement Masons, Plasterers & Fire Proofers." Maarv did not employ any workers in these trades. In fact, Maarv did not employ anyone covering any of the trades listed in the 2002 CBA. Thus, even if Maarv was bound to the 2002 CBA, it did not perform any work covered by that agreement.

**IV.    CONCLUSION**

   Based on the foregoing, Plaintiffs' motion for partial summary judgment should be denied.

                                   Respectfully submitted,

                                   ARCHER & GREINER

                                   BY:    /s/ Alexander Nemiroff
                                          ALEXANDER NEMIROFF
                                          Bar No. 454408
                                          PETER L. FRATTARELLI
                                          DOUGLAS DIAZ
                                          One Centennial Square
                                          Haddonfield, New Jersey 08033
                                          (856) 795-2121
                                          Attorneys for Defendant

3019874v1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

JOHN FLYNN,  et al.

                Plaintiffs,

     v.

MAARV WATERPROOFING, INC.,

                Defendant.

CASE NUMBER:  1:07CV00501

JUDGE:  Richard J. Leon

---

**DEFENDANT'S STATEMENT OF GENUINE ISSUES IN OPPOSITION TO
PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

Defendant Maarv Waterproofing, Inc. ("Maarv"), files this Statement of Genuine Issues in Opposition to Plaintiffs' Statement of Material Facts .[1]

1.      Admitted only that the IPF and IMI are multiemployer employee benefit plans. Denied as a conclusion of law that the IPF and IMI are governed by ERISA.

2.      Admitted only that the Funds provide pension and other benefits to employees who work in the construction industry. Denied that this is done under contracts "negotiated between Bricklayer local unions and employers." By way of further response, the Bricklayer local unions do not negotiate contracts but rather have a practice of not providing the applicable contracts to employers and of instead merely providing signature pages to employers. (See Deposition Transcript of Michael Perrone ("Perrone Dep."), attached as Exhibit A hereto, at 15:16-16:2; 25:18-24).  The Bricklayer local unions also have a practice of not telling employers that the signature pages will bind them to a collective bargaining agreement ("CBA") unless the employer specifically asks about the signature page. (Id. at 38:9-24).

3.      Admitted.

4.      Admitted.

---

[1] Maarv's Statement of Genuine Issues corresponds to the numbered paragraphs in Plaintiffs' Statement of Material Facts.

5.      Denied as stated because Plaintiffs do not make reference to any specific contracts to which they are referring in this paragraph.  By way of further response, it is specifically denied that Maarv was obligated to make contributions to the Funds for the reasons more fully stated below and in the Brief of Defendant's in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Maarv's Opposition Brief").

6.      Denied as a conclusion of law.

7.      The Collection Procedures document described in this paragraph is a document that speaks for itself and Maarv therefore denies Plaintiffs characterization of the same.

8.       The Collection Procedures is a document that speaks for itself and Maarv therefore denies Plaintiffs characterization of the same.

9.      The Collection Procedures is a document that speaks for itself and Maarv therefore denies Plaintiffs characterization of the same. By way of further response, the Collection Procedures require that contributions and reports are due on or before the 15th day of the month "following the month for which the contributions are being paid", not following the month in which "work is performed" as alleged by Plaintiffs. (See Declaration of David Stupar, Ex. C to Plaintiffs' Statement of Material Facts ("Plaintiffs' SMF"), at Ex. 1 (Collection Procedures), at 1(A)(1)).

10.      The Collection Procedures is a document that speaks for itself and Maarv therefore denies Plaintiffs characterization of the same.

11.      Denied that Maarv signed a CBA with the Bricklayers and Allied Craftworkers Local Union Nos. 4 and 5 of New Jersey and/or Local No. 2 of Delaware-New Jersey. Maarv was never even provided with a copy of a CBA, let alone signed a CBA. (See Deposition of Attila Szamosszegi ("Szamosszegi Dep"), attached as Exhibit B hereto, at 46:10-20; 59:1-12). The Collection Procedures is a document that speaks for itself and Maarv therefore denies Plaintiffs characterization of the same.  The remaining statements in this paragraph regarding ERISA are denied as conclusions of law.

12.      Denied as conclusions of law.

13.     Denied that Maarv performs waterproofing, caulking, and restoration. Maarv employs primarily laborers who perform sweeping services, move dirt, and do some landscaping. Maarv does not perform waterproofing or caulking itself but rather utilizes subcontractors to perform this work as well as concrete work. (Szamosszegi Dep., Ex. B, at 27:15-28:5; 29:22-25; 34). Admitted that Maarv is a New Jersey corporation that has been operating for approximately twenty years and which has performed services in New Jersey, Delaware, and New York. By way of further response, the majority of work performed by Maarv is performed in northern New Jersey where Maarv is located. (See Certification of Attila Szamosszegi ("Szamosszegi Cert."), attached as Exhibit C hereto, at ¶ 2).

14.     Admitted. By way of further response, Maarv is located in Passaic County, New Jersey. (Szamosszegi Cert., Ex. C, at ¶ 2).

15.     Admitted.

16.     Admitted.

17.     Denied as stated. Mr. Szamosszegi testified that Maarv was required to use "union guys" on projects that were "union job[s]." (Szamosszegi Dep., Ex. B, at 42:18-43:2).

18.     Admitted that Attila Szamosszegi is the owner and president of Maarv. Denied that he is chairman of the board as there is no board of directors. (Szamosszegi Cert., Ex. C, at ¶ 1).

19.     Admitted

20.     Admitted.

21.     Admitted that there are no "directors" of Maarv. Denied as stated that there are no board meetings at Maarv as there is no board. (Szamosszegi Cert., Ex. C, at ¶ 1).

22.     Admitted.

23.     Admitted.

24.     Admitted.

3

25.    The "payroll sheets" are documents that speaks for themselves and Maarv therefore denies Plaintiffs characterization of the same.

26.    Admitted. By way of further response, Maarv has historically subcontracted waterproofing, caulking, and concrete work and does not perform this work itself. (Szamosszegi Cert., Ex. C, at ¶ 3).

27.    Denied. Mr. Szamosszegi testified that he "just can't really recall one way or the other" if Maarv employed someone to perform waterproofing or caulking work. (Szamosszegi Dep., Ex. B. at 29:18-21).

28.    Denied as stated. Mr. Szamosszegi only met with John Capo of the Bricklayers Union Local 4 in relation to a project on which Maarv was told he was required to use union labor because the project was a "union job."(Szamosszegi Dep., Ex. B, at 40:23- 43:2).

29.    Admitted only that Mr. Szamosszegi signed what Plaintiffs refer to as the "Local 5 Independent Agreement" probably around February 4, 2004. By way of further response, Mr. Szamosszegi was not able to read this Local 5 Independent Agreement because it was in fine print that was made even less legible because it was sent to Maarv via facsimile. (Szamosszegi Cert., Ex. C, at ¶ 5).

30.    Admitted.

31.    Admitted. By way of further response, a company by the name of Pallos Construction Company was performing work on the Princeton Parking Garage Project as the subcontractor for Maarv. (Szamosszegi Dep., Ex. B, at 50:20-25).

32.    Admitted. By way of further response, Union official Dominick Longo similarly testified when describing the conversation he had with Maarv: "you know, I probably said you need to sign a union contract *on this job*." (Deposition of Dominick Longo ("Longo Dep."), attached as Exhibit D hereto, at 68:8-18)(emphasis added). Longo also testified that before he faxed the Local 5 Independent Agreement to Maarv, he called Maarv's office and spoke to a female to specifically advise her that he was faxing an agreement that he mentioned was only in reference to the Princeton Parking Garage Project. (Id. at 69:22-71:7). Longo testified:

Q.      Did you mention this [the contract] was in reference to the

Princeton parking garage project?

A.      Might have.

(Id. at 70:21-24). The only female working for Maarv at the time that answered the telephone

was Ann Paoella, the then office manager for Maarv. (Szamosszegi Cert., Ex. C, at ¶ 6).

33.     Admitted.

34.     Admitted. By way of further response, union official Dominick Longo also told

Ann Paoella that he was sending her an agreement that was just in reference to the Princeton

Parking Garage Project. (Longo Dep., Ex. D, at 69:22-71:7); Szamosszegi Dep., Ex. B, at 56:4-

13).

35.     Admitted.

36.     Admitted. By way of further response, union official Dominick Longo told

Maarv's subcontractor, Ivan Pallos, that Maarv needed to sign a form or contract that was for the

Princeton Parking Garage Project only in order to continue with that project. Mr. Pallos, in turn,

told both Maarv's office manager, Ann Paoella, and Mr. Szamosszegi of the statements made by

Mr. Longo. (See Certification of Ivan Pallos, attached as Exhibit E hereto); Szamosszegi Dep.,

Ex. B, at 52:14-18).  In addition to the representation he made to Mr. Pallos, Mr. Longo also told

Ms. Paoella that he was sending her an agreement that he said was just for the Princeton Parking

Garage Project. (Longo Dep., Ex. D, at 69:22-71:7; Szamosszegi Dep., Ex. B, at 56:4-13).

37.     Admitted except for the phrase "as a result of this conversation" which phrase is

denied as stated. By way of further response, Mr. Longo told both Mr. Pallos and Ms. Paoella

that Maarv needed to sign a contract that was just for the Princeton Parking Garage Project. Both

Mr. Pallos and Ms. Paoella communicated this representation to Mr. Szamosszegi and based on

the union's representations, Mr. Szamoszegi signed the one page Local 5 Independent

Agreement the Union had provided and which was not even legible to Mr. Szamosszegi.

(Szamosszegi Cert., Ex. C, at ¶ 5; Pallos Cert., Ex. E; Longo Dep., Ex. D, at 68:8-18; 70:6-71:7;

Szamosszegi Dep., Ex. B, at 52:14-18; 56:4-13). Mr. Longo also never provided Maarv with the

5

actual CBA and never offered Mr. Szamosszegi or Mr. Pallos a copy. (Szamosszegi Dep., Ex. B, at 46:10-20; 59:1-12; Szamosszegi Cert., Ex. C, at ¶ 7; Pallos Cert., Ex. E). This is consistent with the union's practice of not providing employers with the CBAs unless an employer specifically asks for a copy. (Perrone Dep., Ex. A, at 15:16-16:2; 25:18-24). Mr. Szamosszegi also has never executed a CBA and has no experience negotiating such agreements. (Szamosszegi Cert., Ex. C, at ¶ 7).

38.    Admitted.

39.    Denied as stated. By way of further response, after Ms. Paoella told Mr. Szamosszegi that she had received a document from the Union who told her that the document it was faxing was an agreement for the Princeton Parking Garage Project only, Mr. Szamosszegi does not think he had any other conversations with Ms. Paoella. (Szamosszegi Dep., Ex. B, at 51:14-16; 56:4-13).

40.    Admitted. By way of further response, Mr. Pallos told Mr. Szamosszegi that the union stated that the agreement Maarv needed to sign was for just the Princeton Parking Garage Project. (Pallos Cert., Ex. E; Szamosszegi Dep., Ex. B, at 52:14-18; 53:6-15).

41.    Admitted.

42.    Admitted.

43.    Admitted.

44.    Denied.  By way of further response, Mr. Szamosszegi asked Mr. Pallos what the document from the union was and Mr. Pallos told Mr. Szamosszegi that the union stated that it was an agreement Maarv needed to sign just for the Princeton Parking Garage Project. (Szamosszegi Dep., Ex. B, at 52:14-18; 53:6-24; Pallos Cert., Ex. E).

45.    Denied as stated. Mr. Szamosszegi glanced through the Local 5 Independent Agreement but when doing so, he was unable to read it due to the fact that this document sent by facsimile was in fine print and blurry to Mr. Szamosszegi and otherwise illegible to him. (Szamosszegi Cert., Ex. C, at ¶ 5; Local 5 Independent Agreement or Signature Page, attached as Exhibit F hereto).  Mr. Szamosszegi did not concern himself with the illegible nature of the

document because he was relying on the representation from the union that it was only for the Princeton Parking Garage Project. (Szamosszegi Dep., Ex. B, at 55:5-10).

46.    Denied as stated. By way of further response, Mr. Szamosszegi was never given any information regarding wage and contribution rates and was not otherwise concerned with such information because such payments would be paid by Maarv's subcontractor. (Szamosszegi Dep, Ex. B, at 65:17-23; 83:14-24).

47.    Admitted.  By way of further response, Mr. Szamosszegi never called anyone at the union before signing the Local 5 Independent Agreement because he was relying on the union's representation that this agreement he could not read was only a one project agreement for the Princeton Parking Garage Project. (Szamosszegi Dep., Ex. B, at 55:5-10; 55:24-56:13; Szamosszegi Cert., Ex. C, at ¶ 5).

48.    Admitted. By way of further response, Mr. Szamosszegi never spoke with an attorney before signing the Local 5 Independent Agreement because he was relying on the union's representation that this agreement he could not read was only a one project agreement for the Princeton Parking Garage Project. (Id.).

49.    Admitted.  By way of further response, Mr. Szamosszegi did not feel that he needed to personally speak with anyone from the union about the Local 5 Independent Agreement he could not read because he was relying on the union's prior representation that this agreement was only a one project agreement for the Princeton Parking Garage Project. (Id.).

50.    Denied as stated. Mr. Szamosszegi does not know if Ann Paoella spoke with anyone from the "International Bricklayers Union" but does know that a "union official" did call and speak with her. Mr. Szamosszegi testified:

> Q.    Do you know whether Anne talked to the union guys or are you speculating?
>
> A.    No. She mentioned something this is the one job.  That's why I signed it.  Ivan [Pallos] called *and the union called* this is one job, fill out and send back to them.
>
> Q.    Anne specifically told you she spoke with the union?

A.     Yeah.  Otherwise I wouldn't have signed it….

Q.     She was told both by a union official and by Pallos
Construction that this was for one job?

A.     Right.  That is correct.

(Szamosszegi Dep., Ex. B, at 55:24-56:13).  Moreover, union official Dominick Longo testified that he did call Maarv's office and speak to a female to advise that he was faxing an agreement and that he might have told her that this agreement was for the Princeton Parking Garage Project. (Longo Dep., Ex. D, at 69:22-71:7).

51.     Admitted.  By way of further response, Mr. Szamosszegi did not speak with anyone from the International Bricklayers Union about the Local 5 Independent Agreement because he was relying on the union's prior representation that this agreement he could not read was only a one project agreement for the Princeton Parking Garage Project. (Szamosszegi Dep., Ex. B, at 55:5-10; 55:24-56:13; Szamosszegi Cert., Ex. C, at ¶ 5).

52.     Admitted. By way of further response, Mr. Szamosszegi is aware of a union official speaking to Ivan Pallos as noted above in paragraph 36.

53.     Admitted.

54.     Admitted.

55.     Admitted.  By way of further answer, the local union represented that the agreement it had sent to Maarv was only a one project agreement for the Princeton Parking Garage Project, as noted in paragraph 36 above.

56.     Admitted that the Local 5 Independent Agreement reflects the name of Maarv Waterproofing, Inc., along with the address and telephone and fax numbers, federal identification number, New Jersey Employment Compensation number, and workermen's compensation insurance carrier of Maarv.  Maarv does not know if this information was typed and denies the same.

57.    Denied. The union could have obtained the information set forth on the Local 5 Independent Agreement from sources other than Maarv such as Requests for Proposals or Dodge Reports which list information pertaining to contract bidding relating to construction projects. (Szamosszegi Cert., Ex. C, at ¶ 8).

58.    Denied. The Local 5 Independent Agreement is in fine print and was blurry and otherwise illegible to Mr. Szamosszegi, preventing him from being able to read it. (Szamosszegi Cert., Ex. C, at ¶ 5; Local 5 Independent Agreement, Ex. F).

59.    Denied. The language of the 2002 CBA Plaintiffs claim Maarv is bound to is not "consistent" with the first sentence of the Local 5 Independent Agreement as that language has been deciphered by Plaintiffs in paragraph 58 of their SMF.  According to Plaintiffs, the first sentence of the Local 5 Independent Agreement seeks to bind an employer to a CBA between:

> "the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey"

whereas the 2002 CBA Plaintiffs seek to bind Maarv to contains a different title with an additional and different party altogether, not consistent with the title of the CBA referenced in the Local 5 Independent Agreement, to wit:

> "Agreement Between Building Contractors Association of New Jersey, Masonry Contractors of New Jersey, *Building Contractors Association of Atlantic County*, *Other Signatory Employers*, and Local Union Nos. 4, 5, and 2 of the International Union of Bricklayers and Allied Craftworkers."

(See Plaintiffs' SMF, at ¶ 58, and 2002 CBA, attached hereto as Ex. G)(emphasis added).

Moreover, the 2002 CBA has its own specific signature page which was never signed by Maarv. (2002 CBA, Ex. G, at 54).

60.    Denied. Mr. Longo testified that he was "sure" that the Local 5 Independent Agreement signature page was not for all contracts. (Longo Dep., Ex. D, at 98:13-16). Moreover, the Local 5 Independent Agreement signature page could not have been for the 2002 CBA

because, based on Plaintiffs' own reading, the 2002 CBA has a different title than that of the CBA referred to in the Local 5 Independent Agreement. (Plaintiffs' SMF, at ¶ 58, and 2002 CBA, Ex. G).

61.    Denied. Maarv's president, Mr. Szamosszegi could not even read the Local 5 Independent Agreement because it was illegible to him. (Szamosszegi Cert., Ex. C, at ¶ 5).

62.    Admitted only that this is what Plaintiffs have admitted that the Local 5 Independent Agreement states regarding territorial jurisdiction but Mr. Szamosszegi could not even read the Local 5 Independent Agreement because it was illegible to him. (Szamosszegi Cert., Ex. C, at ¶ 5). By way of further answer, Plaintiffs state that the agreement Mr. Szamosszegi signed provides that it "shall be applicable within the territorial jurisdiction assigned to *Local No. 2* by the International Union of Bricklayers and Allied Craftworkers…." (Plaintiffs' SMF, at ¶62).  According to the 2002 CBA, the territorial jurisdiction of Local No. 2 consists primarily of counties in Southern New Jersey where Maarv rarely if ever performed any work. (2002 CBA, Ex. G, at Art. III, section G (bates page 0712); Szamosszegi Cert., Ex. C, at ¶ 2) . Moreover, the territorial jurisdiction of Local No. 2 also states that it covers the trades of "Cement Masons, Plasterers & Fire Proofers." (2002 CBA, Ex. G, at Art. III, section G (bates page 0712)). Maarv did not employ any workers in these trades. In fact, Maarv did not employ anyone covering any of the trades listed in the 2002 CBA. . (Szamosszegi Cert., Ex. C, at ¶ 4).

63.    Admitted only that this is what Plaintiffs claim the Local 5 Independent Agreement states. By way of further response, Mr. Szamosszegi could not read the Local 5 Independent Agreement because it was illegible to him. (Szamosszegi Cert., Ex. C, at ¶ 5).

64.    The 2002 CBA is a document that speaks for itself and was never provided to Maarv. (Szamosszegi Dep., Ex. B,  at 46:10-20; 59:1-12).

65.    Denied as stated. Maarv did not sign any CBAs with the Union.( Szamosszegi Dep., Ex. B,  at 46:10-20; 59:1-12).

66.    Denied. Plaintiffs' counsel represented to Mr. Szamosszegi what he believed the "small writing" stated in the Local 5 Independent Agreement and in response, Mr. Szamosszegi said it was a lot of "mumbo-jumbo." (Szamosszegi Dep., Ex. B,  at 54:9-55:4). Mr. Szamosszegi

was not able to read the Local 5 Independent Agreement because it was illegible to him. (Szamosszegi Cert., Ex. C, at ¶ 5).

67.    Denied as stated. The language of the Local 5 Independent Agreement as quoted by Plaintiffs does not refer to the 2002 CBA. By way of further response, Mr. Szamosszegi was not able to read the Local 5 Independent Agreement because it was illegible to him. (Szamosszegi Cert., Ex. C, at ¶ 5).

68.    Admitted. By way of further response, the Union never provided Maarv with a CBA and instead provided a one page signature form by facsimile that was in fine print and illegible to Mr. Szamosszegi. (Szamosszegi Cert., Ex. C, at ¶ 5; Local 5 Independent Agreement, Ex. G).

69.    Admitted.

70.    Denied as the Local 5 Independent Agreement is a document that speaks for itself and which was illegible to Mr. Szamosszegi. (Szamosszegi Cert., Ex. C, at ¶ 5).

71.    Denied. By signing the Local 5 Independent Agreement, Mr. Szamosszegi understood that based on the representation of the Union, he was signing a "union paper" for one particular job and he would pay whatever he had to for the union workers for that one particular job. (Szamosszegi Dep, Ex. B, at 60:9-61:-21).

72.    Denied as a conclusion of law.

73.    Denied. Maarv denies that it is bound to the 2002 CBA for the reasons already stated above and the 2002 CBA is otherwise a document that speaks for itself. By way of further response, according to Plaintiffs, the Local 5 Independent Agreement Maarv signed provides that it "shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers…." (Plaintiffs' SMF, at ¶ 58). According to the 2002 CBA, the territorial jurisdiction of Local No. 2 consists primarily of counties in Southern New Jersey where Maarv rarely if ever performed any work.  Moreover, the territorial jurisdiction of Local No. 2 also states that it covers the trades of "Cement Masons, Plasterers & Fire Proofers." Maarv did not employ any workers in these trades. In fact, Maarv

did not employ workers covering any of the trades listed in the 2002 CBA. (See 2002 CBA, Ex. G, at Art. III, section G (bates page 0712); Szamosszegi Cert., Ex. C, at ¶¶ 2, 4).

74.  Denied. See response to paragraph 73 that is incorporated herein.

75.  Denied. See response to paragraph 73 that is incorporated herein.

76.  Denied. Maarv denies that it is bound to the 2002 CBA for the reasons already stated above and the 2002 CBA is otherwise a document that speaks for itself.

77.  The 2002 CBA is a document that speaks for itself. By of further response, the 2002 CBA provides that alleged violations of the subcontracting provision are to be handled through the grievance process set forth in the 2002 CBA. (2002 CBA, Ex. G, at Art. XVII).

78.  The 2002 CBA is a document that speaks for itself. By way of further response, see response to paragraph 73 that is incorporated herein.

79.  Denied. See response to paragraph 73 that is incorporated herein.

80.  Denied. Mr. Szamosszegi testified that he used a union subcontractor once on a project in New Jersey because the subcontractor was the lowest bid. (Szamosszegi Dep., Ex. B, at 73:19-74:4).

81.  Admitted. By way of further response, Maarv has provided certain records regarding subcontractors to Plaintiffs. (Szamosszegi Cert., Ex. C, at ¶ 9).

82.  Admitted. By way of further response, Maarv has provided the names of employees who have worked for him and does not and has not employed workers in the trades covered by the 2002 CBA. (Szamosszegi Cert., Ex. C, at ¶¶ 4, 9, 11, and 13).

83.  Admitted only that Mr. Szamosszegi does not recall some projects on which Maarv has performed work and/or the type of work performed on a certain project and that he does not believe his current employees would be familiar with such projects. By way of further response, Mr. Szamosszegi does know that he has not employed workers in the trades covered by

the 2002 CBA and that Maarv does not perform the type of work covered by the 2002 CBA. (Szamosszegi Cert., Ex. C, ¶ ¶ 4, 9, 11, and 13).

84.     Denied as stated. Mr. Szamosszegi testified that he does not have documents that list by street address all the projects he has done over the last seven years. (Szamosszegi Dep., Ex. B, at 136:4-7). By way of further response, Mr. Szamosszegi does know that he has not employed workers in the trades covered by the 2002 CBA and that Maarv does not perform the type of work covered by the 2002 CBA. (Szamosszegi Cert., Ex. C, at ¶ ¶ 4, 9, 11, and 13).

85.     Admitted.

86.     Denied. See response to paragraph 73 above which is incorporated herein.

87.     Denied. (Szamosszegi Dep., Ex. B, at 87:3-19).

88.     Denied as stated. By way of further response, Mr. Szamosszegi testified that he only signed some Local No. 4 Benefit Funds forms for a project in Fort Lee, New Jersey and that he did not know if contributions were made. (Szamosszegi Dep., Ex. B, at 98:8-99:16).

89.     Admitted. By way of further response, Maarv made such payments on behalf of Pallos Construction. (Szamosszegi Dep., Ex. B, at 104:6-23).

90.     Denied as stated. Maarv would pay union benefits if it was told by a union foreman it had to hire union workers for a specific project and pay benefits and would not make any benefits if the workers were non-union. (Szamosszegi Dep., Ex. B, at 92:18-93:11; 100:21-101:2 ).

91.     Denied as stated that Maarv "would file these reports and make these contributions whenever it hired a union guy regardless of whether Maarv had any agreement with the Bricklayers union." By way of further response, Maarv may have submitted forms to Local No. 4 on the Fort Lee, New Jersey project because of a verbal agreement with Local No. 4 that it had to pay union benefits for that particular job. (Szamosszegi Dep., Ex. B, at 100:21-101:10). The remaining statement in this paragraph is admitted.

92.     Admitted only that Peter Cuomo was a former part-owner and employee of Maarv and was not a member of the union.  The remaining statements are denied as the "Shop Steward Report" is an unauthenticated document that was apparently completed by a William Mills, not Maarv.

93.     Denied. Maarv has not performed any "covered work" under any Bricklayers CBAs. (Szamosszegi Cert., Ex. C, at ¶¶ 4, 9, 11, and 13).

94.     Denied. Maarv denies that it is bound to the 2002 CBA for the reasons already stated above. See also response to paragraph 73 that is incorporated herein.

95.     Denied as stated. Based on the representations by the Union, Maarv paid fringe benefit contributions and union dues for certain union members selected by the Union to work on the Princeton Parking Garage Project. (Szamosszegi Dep., Ex. B, at 83:10-24).

96.     Admitted.

97.     Admitted.

98.     Admitted.

99.     Denied that Maarv is bound to the 2002 CBA for the reasons already stated above, and denied as a conclusion of law that the audit was authorized by ERISA.  The remaining statements are admitted.

100.    Denied that Maarv is bound to the 2002 CBA for the reasons already stated above.

101.    Admitted upon information and belief.

102.    Denied. The audit report was submitted by an Ellen K. Odell and Patricia Clarke's name is not on the report. (See August 10, 2006 letter from Ellen Odell).

103.    Admitted upon information and belief.

104.    Denied that Ann Paoella was the auditor's contact at Maarv regarding the audit on "all related matters" as Mr. Szamosszegi was also available to the auditors and they had seen Mr. Szamosszegi in the office. (Szamosszegi Cert., Ex. C, ¶ 10). The remaining statements are admitted.

105.    Admitted. By way of further response, the auditors did see Mr. Szamosszegi in the office and he was available to them but they never sought any information from him. (Szamosszegi Cert., Ex. C, at ¶ 10).

106.    Admitted. By way of further response, Mr. Szamosszegi did not recall if Ms. Paoella posed questions to him about the audit. (Szamosszegi Dep., Ex. B, at 110:15-17).

107.    Admitted. By way of further response, Ms. Paoella provided the auditors with whatever documents they requested and which she was able to locate. (Szamosszegi Cert., Ex. C, at ¶ 10).

108.    Denied. Ms. Paoella would have provided the 2002 payroll records. (Szamosszegi Cert., Ex. C, at ¶ 10).

109.    Admitted.

110.    Denied. Ms. Paoella would have provided the auditors with whatever documents they requested and which she was able to locate. (Szamosszegi Cert., Ex. C, at ¶ 10).

111.    Denied. Maarv provided the auditors with all the information they needed to complete the audit. (Szamosszegi Cert., Ex. C, at ¶ 10).

112.    Denied. (Szamosszegi Cert., Ex. C, at ¶ 10).

113.    Denied. ((Szamosszegi Dep., Ex. B, at 112:6-9).

114.    Denied. (Szamosszegi Cert., Ex. C, at ¶ 10).

115.    Admitted. By way of further response, the auditors never told Mr. Szamosszegi they were still looking for documents. (Szamosszegi Cert., Ex. C, at ¶ 10).

116.    Denied as stated. By way of further response, Ms. Paoella would have provided the auditors with whatever documents they requested and which she was able to locate. (Szamosszegi Cert., Ex. C, at ¶ 10).

117.    Denied. (Szamosszegi Dep., Ex. B, at112:6-9).

118.    Admitted.

119.    Denied as stated.  It is admitted that Ms. Paoella never made such a statement to Mr. Szamosszegi  but denied that Maarv received any certified letters from the auditors requesting documents. (Szamosszegi Cert., Ex. C, at ¶ 10).

120.    Admitted. By way of further response, the auditors spent two and a half days at Maarv's offices and obtained everything they needed. (Szamosszegi Dep., Ex. B, at 112:24-113:7).

121.     Admitted.

122.    Admitted.

123.    Admitted only that Ms. Paoella would have written "laborers" next to Maarv employees since Maarv's employees are primarily laborers. (Szamosszegi Cert., Ex. C, at ¶ 11). The remaining statements are denied as Ms. Paoella was an office manager who would not have known what work laborers performed. (Szamosszegi Dep., Ex. B, at 114:10-23; 123:20-23).

124.    Denied as stated as Ms. Paoella would not have been able to make such statements since she would not have known what work laborers performed. (Szamosszegi Dep., Ex. B, at 114:10-23; 123:20-23).

125.    Admitted. By way of further response, Maarv employs primarily laborers who perform sweeping services, move dirt, and do some landscaping. Maarv does not perform waterproofing or caulking itself but rather utilizes subcontractors to perform this work as well as concrete work. (Szamosszegi Dep., Ex. B, at 27:15-28:5; 29:22-25; 34).

126.     Admitted. By way of further response, Maarv did not tell the auditors that it employed "cleaners" which is how the auditors listed virtually all of Maarv's employees so that they could attempt to "fit them" under the 2002 CBA. (Szamosszegi Cert., Ex. C, at ¶ 11).

127.     Denied that "waterproofing and caulking" are listed as covered trades under the 2002 CBA or that Maarv employed "caulkers." (2002 CBA; Szamosszegi Dep., Ex. B, at 27:15-28:5; 2002 CBA, Ex. G). Admitted that Ms. Paoella would have been adamant that Maarv employees did not perform covered work under the 2002 CBA because they did not. (Szamosszegi Cert., Ex. C, at ¶ 12).

128.     Denied. See response to paragraph 127 above which is incorporated herein. By way of further response, for virtually all of Maarv's employees, the auditors made up a job classification of "cleaner-waterproofer" which did not exist in an effort to "fit them" under the 2002 CBA. (Szamosszegi Cert., Ex. C, ¶11).

129.     Denied that Ms. Paoella would have stated this. (Szamosszegi Cert., Ex. C, at ¶ 13).

130.     Denied that Ms. Paoella would have stated this. (Szamosszegi Cert., Ex. C, at 14).

131.     Admitted, but it is denied that Ms. Paoella would have stated this. (Szamosszegi Cert., Ex. C, at ¶ 14).

132.     Denied. Mr. Szamosszegi testified that only Ivan Pallos performed waterproofing and caulking work in 2002. (Szamosszegi Dep., Ex. B, at 119:11-17; 124:5-12).

133.     Admitted.

134.     Denied. See responses to paragraphs 79, 127 and 128 above which are incorporated herein.

135.     Admitted. By way of further response, Maarv disputes the audit findings for the reasons stated above.

136.     Admitted.

137.    Admitted only that these were the audit findings.  Denied that they are correct or that they were done in accordance with the Collection Procedures or that Maarv is bound to the 2002 CBA. See responses to paragraphs 79, 127 and 128 above which are incorporated herein, and Declaration of David Stupar, Ex. C to Plaintiffs' SMF", at Ex. 1, Collection Procedures.

138.    Admitted that this is the amount of interest assessed. Denied that it is correct or that it was done in accordance with the Collection Procedures or that Maarv is bound to the 2002 CBA. See responses to paragraphs 79, 127 and 128 above which are incorporated herein and Declaration of David Stupar, Ex. C to Plaintiffs' SMF", at Ex. 1, Collection Procedures.

139.    Admitted that this is the amount of additional interest assessed. Denied that it is correct or that it was done in accordance with the Collection Procedures or that Maarv is bound to the 2002 CBA. See responses to paragraphs 79, 127 and 128 above which are incorporated herein and Declaration of David Stupar, Ex. C to Plaintiffs' SMF", at Ex. 1, Collection Procedures.

140.    Denied. See responses to paragraphs 79, 127 and 128 above which are incorporated herein.

141.    Admitted upon information and belief.

142.    Admitted upon information and belief.

143.    Denied that the Funds are entitled to partial summary judgment or any attorneys fees.

144.    Admitted that such a complaint was filed.  Maarv denies it owes any money to the Funds.

145.    Admitted that this is what the Funds sought. Maarv denies it owes any money to the Funds.

146.    Admitted. By way of further response, the Funds changed the CBA to which they initially said Maarv was bound in their original complaint. (See Original Complaint, attached as Ex. I hereto, at Ex. B to Original Complaint).

18

147.    Denied as a conclusion of law.

148.    Denied that Maarv is bound to the 2002 CBA or otherwise owes the Funds any
money.

149.    Denied that Maarv is bound to the 2002 CBA or otherwise owes the Funds any
money

       Respectfully submitted,

       ARCHER & GREINER


BY:   /s/ Alexander Nemiroff    
       ALEXANDER NEMIROFF
       Bar No. 454408
       PETER L. FRATTARELLI
       DOUGLAS DIAZ
       One Centennial Square
       Haddonfield, New Jersey 08033
       (856) 795-2121
       Attorneys for Defendant


3030454v1

# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 07-CV-0501(RJL)

| | |
|---|---|
| JOHN FLYNN, JAMES BOLAND, GERALD O'MALLEY, KEN LAMBERT, GERARD SCARANO, H.J. BRAMLETT, EUGENE GEORGE, PAUL SONGER, WILLIAM MC CONNELL, MATTHEW AQUILINE, GREGORY R. HESS, MICHAEL SCHMERBECK, VINCENT DELAZZERO, and BENJAMIN CAPP, as Trustees of, and on behalf of the BRICKLAYERS & TROWEL TRADES INTERNATIONAL PENSION FUND, 620 F Street, NW, Washington, DC 20004 (202)783-3788, JIM ALLEN, MATTHEW AQUALINE, LON BEST, JAMES BOLAND, TED CHAMP, RAYMOND CHAPMAN, VINCENT DELAZZERO, BRUCE DEXTER, JOHN FLYNN, EUGENE GEORGE, GREGORY HESS, FRED KINATEDER, DAN KWIATKOWSKI, KEN LAMBERT, SANTO LANZAFAME, DICK LAUBER, WILLIAM MC CONNELL, EDWARD NAVARRO, GERALD O'MALLEY, JOHN PHILLIPS, CHARLES RASO, MARK ROSE, KEVIN RYAN, GERARD SCARANO, MICHAEL SCHMERBECK, PAUL SONGER, JOSEPH SPERANZA, and FRED VAUTOUR as Trustees of, and | ORAL DEPOSITION OF<br><br>MICHAEL ROBERT PERRONE |

\*     \*     \*     \*
Tuesday, October 23, 2007
\*     \*     \*     \*


MASTROIANNI & FORMAROLI, INC.
Certified Court Reporting and Videoconferencing
251 South White Horse Pike, Suite 200
Audubon, New Jersey 08106
(856) 546-1100

Michael Robert Perrone                                      October 23, 2007

**Page 14**

1  situation?
2    A.  I would survey the situation, try to get them to
3  sign.  I would, you know, come to the conclusion whether
4  it's a prevailing wage job or a private funded job, I
5  would decide what my course of action would be, if any
6  at all --
7    Q.  Okay.
8    A.  -- to achieve the results that we would want.
9    Q.  Has there ever been communication, I'll just deal
10  with you, ever been communication from you when you were
11  a field rep when you'd come across a union job where you
12  tell the sub on the job that he has to do this union or
13  he has to use union men because it's a union job?
14    A.  Uh-huh, yeah.
15    Q.  Have you ever communicated something, sum and
16  substance to that extent?
17    A.  Yeah, to a degree.  A new contractor may come on
18  the job and say, you know, well, I wasn't told that this
19  was all union or what have you, and, you know, I would
20  inform him that, yes, this is a union job.  You should
21  have known or you should have been told, and, you know,
22  at that point, I would proceed just like I would with
23  any other contractor.
24    Q.  Okay.  Let me turn to the actual contracts,
25  collective bargaining agreements.  In your experience or

**Page 15**

1  what you did when you were field rep, what actual
2  document or documents would you give to a contractor in
3  an effort to sign them up?
4    A.  Well, what I did was, well, I would have to go
5  back to my previous business manager, Joe DiRienzo.  His
6  policy was that we never signed one job agreements, and
7  we never worked what we call split gangs.
8    Q.  Okay.
9    A.  And I continued that.  I followed that to the
10  letter, and when I took over, that was my program too.
11    Q.  What is split gangs?  What do you mean by that?
12    A.  Split gangs means that the union guys would work
13  with nonunion people.
14    Q.  Okay.
15    A.  Never works out, never.
16    Q.  And what if any documents would you present to
17  the contractor at hand to get that person to sign, sign
18  an agreement?
19    A.  What I would do is I would talk to the employer
20  and just tell him that these are our wage sheets.  These
21  are our rate sheets as far as fringe benefits.  I would
22  give him a copy of the contract, if he so choosed (sic),
23  if he asked for it.
24       If he did not ask for it, I would, you know, give
25  them a copy of the signature page, and, you know, if

**Page 16**

1  he -- if he wanted a copy of the agreement, you know,
2  certainly it was there.
3    Q.  Okay.
4    A.  And you know, actually, the signature page which
5  I have in my hand is the person in question, and sign
6  it, go to work, pay the fringe benefits.  That's it.
7    Q.  The signature page or pages that you use when you
8  were field rep, were they the signature pages to the --
9  to the relevant contract?  What I mean by that, were
10  they the actual signature page from the actual contract?
11    A.  To my knowledge, yes.
12    Q.  Have you ever seen contracts where the signature
13  page is the last page of the contract, you can kind of
14  like tear it out, for example?
15    A.  Yes, yes.
16    Q.  Is that what you would use or did use?
17    A.  That's what we would use of Local 5.
18    Q.  Okay.  Were other locals -- do they do it
19  differently?
20    A.  I can only speak for Local 5.  Prior to the
21  restructuring, you know, that was the reason for the
22  restructuring.  People were using, you know, different
23  managers were using different methods to achieve the
24  same goal, but the reason for the restructuring was that
25  everybody does the same thing now.

**Page 17**

1    Q.  Okay.  Was there ever any training given on what
2  documents to use to sign up contractors or how you would
3  do that?
4    A.  What -- well, what we started doing and then I
5  got into it further when I became the business manager
6  was that any new field reps went to leadership classes
7  sponsored by our international union.  They were made
8  aware of RICO laws, things like that, but the actual
9  training was on the job.
10    Q.  Okay.
11    A.  If any of the field reps had any questions, they
12  knew that they would call me.
13    Q.  When you were a field rep, did you maintain the
14  collective bargaining agreement somewhere or the
15  signature pages?
16    A.  Yeah.  Well, usually we worked, you know, we had
17  our pertinent documents that had to be signed at a
18  moment's notice.  We carried them in our cars and in our
19  trunks.
20    Q.  Okay.  So you, if you were on the -- on a site,
21  and you wanted to sign someone up and they're agreeable,
22  you'd have a signature page ready to go in your car?
23    A.  Yes.
24    Q.  Let me -- Maarv Waterproofing, are you familiar
25  with that company?

**Pages 14 to 17**

Michael Robert Perrone                                    October 23, 2007

**Page 22**

```
 1      A.  Not since this all started with Chuck, and you
 2   know.
 3      Q.  Let me start then that time period.  Since this
 4   lawsuit started, has Mr. Longo had any discussions with
 5   you regarding this lawsuit or Maarv Waterproofing?
 6      A.  Well, the only thing I asked him, you know, I
 7   called him in just like I would call anybody else in and
 8   said, what's going on here?  All of a sudden, we're
 9   being asked questions.
10      Q.  Okay.
11      A.  And --
12      Q.  You've had a recent discussion with Mr. Longo
13   regarding this lawsuit?
14      A.  Yes, and the only answer to that question was I
15   don't know any more about it than you do, and that's
16   what brought Chuck in, and we just got whatever we had.
17      Q.  Okay.  Approximately when did you have this
18   conversation you're referring to with Mr. Longo?
19      A.  God, a couple weeks back.
20      Q.  Okay.  This is not a test at all, but can you
21   tell me what you remember of that conversation, what you
22   said to him, what he said to you?
23      A.  Well, the actual, what brought all this on was
24   that I had talked to Chuck, and he had asked me, you
25   know, about Maarv Waterproofing, and there was a
```

**Page 23**

```
 1   question of fringe benefits paid, and was there an
 2   agreement signed and all that, and, you know, when we --
 3   when I saw the name of the contractor and got this out,
 4   you know, I talked to Dominic.
 5      Q.  Okay.
 6      A.  And I says, I don't know any more about this than
 7   you.  What's going on?  And he said I got the same call
 8   you did.
 9      Q.  Did Mr. Longo in the conversation you're
10   describing, did Mr. Longo relate to you the
11   circumstances in which he said he signed Maarv
12   Waterproofing to a contract?
13      A.  Yeah, it didn't seem like anything out of the
14   norm.  Went on the job, came in contact with a -- with
15   an employer that had people on the job, and, you know,
16   got them to sign the agreement.  It didn't seem like
17   anything out of the norm.
18      Q.  All right.  I'm trying to understand now
19   everything that Mr. Longo told you in this conversation.
20          He told you that he went on the job site and came
21   into contact with the employer and signed him to a
22   contract?
23      A.  As I know it, yes.
24      Q.  Did he tell you anything else?
25      A.  No, nothing.
```

**Page 24**

```
 1      Q.  Did he tell you whether or not he gave the
 2   contract, the actual collective bargaining agreement to
 3   the employer?
 4      A.  No.
 5      Q.  He didn't tell you that one way or the other?
 6      A.  No, but it's standard if an employer asks for the
 7   complete full agreement, we have thousands of them.
 8      Q.  Did Mr. Longo tell you how he gave a contract to
 9   Maarv Waterproofing?
10      A.  No.
11      Q.  For example, mail or fax?
12      A.  No.
13      Q.  Other than Mr. Longo, have you had conversations
14   with anyone else regarding this case other than Mr.
15   Mehler as well?
16      A.  The only other person now since the restructuring
17   is my supervisor mRichard E. Tolson.
18      Q.  What discussions -- can you describe the
19   discussions you had with Mr. Tolson?
20      A.  He asked me exactly what, do you know anything
21   about Maarv Waterproofing, and I said it doesn't ring a
22   bell to me.
23      Q.  Okay.
24      A.  And that was it.  And then the call came from
25   Chuck and everything, and I ended up here.
```

**Page 25**

```
 1      Q.  Anything else communicated between you and Mr.
 2   Tolson?
 3      A.  No.
 4      Q.  Did Mr. Longo tell you -- strike that.  Did Mr.
 5   Longo tell you that he actually met with the owner or
 6   principal of Maarv Waterproofing?
 7      A.  That, I don't -- I can't say.  All I know is that
 8   he said he met on the job with Maarv Waterproofing.
 9   Now, who he met with, I don't know, but apparently
10   whomever had the authority to sign this agreement.  So
11   what their title is, I don't know.
12      Q.  The document I put in front of you, this one
13   right here, which we've marked Longo-1, have you ever
14   used a document -- strike that.
15          Have you ever used -- well, in 2004, you weren't
16   still a field rep in 2004, you were a business manager?
17      A.  Yes.
18      Q.  When you were a field rep, did you ever use a
19   document that is reflected in Longo-1?
20      A.  Could you repeat that, please?
21      Q.  Sure.  When you were a field rep --
22      A.  Yes.
23      Q.  -- you mentioned you used signature pages.
24      A.  Right, right.
25      Q.  Did you ever use the document such as the one
```

**Pages 22 to 25**

## Page 38

1 the Masonry Contractors Association of New Jersey, but
2 it doesn't -- it doesn't reference this group called
3 Building Contractors Association of Atlantic County.
4 That's not in the first paragraph here of Longo-1. Do
5 you know why that is?
6    A. No.
7    Q. All right. That's all I have.
8 (CONTINUED EXAMINATION OF MR. PERRONE BY MR. MEHLER:)
9    Q. One last question. When an employer signs
10 Longo-1, your understanding is what they're agreeing to
11 is the agreement that's been marked as Perrone-2?
12    A. Yes.
13    Q. Okay. I have nothing further.
14 (CONTINUED EXAMINATION OF MR. PERRONE BY MR. DIAZ:)
15    Q. Do you tell that to the employer?
16    A. I as business manager would not be dealing with
17 those employers, the field reps.
18    Q. When you were a field rep, would you tell the
19 employer?
20    A. Sure.
21    Q. When would you tell them that?
22    A. If they asked.
23    Q. If they asked, you tell them?
24    A. Yes.
25    Q. Thank you. That's all I have.

## Page 39

1    MR MEHLER: That's it. Thank you.
2    (Testimony concluded.)

## Page 40

1       C E R T I F I C A T E
2
3    I, NORA M. GALLAGHER, a Certified Court Reporter of
4 the State of New Jersey, do hereby certify that prior to
5 the commencement of the examination, MICHAEL ROBERT
6 PERRONE was duly sworn by me to testify the truth, the
7 whole truth, and nothing but the truth.
8    I DO FURTHER CERTIFY that the foregoing is a true and
9 accurate transcript of the testimony as taken
10 stenographically by and before me at the time, place,
11 and on the date hereinbefore set forth, to the best of
12 my ability.
13    I DO FURTHER CERTIFY that I am neither a relative nor
14 employee nor attorney nor counsel of any of the parties
15 to this action, and that I am neither a relative nor
16 employee of such attorney or counsel, and that I am not
17 financially interested in the action.
18
19
20    _____
       NORA M. GALLAGHER,
21    A Certified Court Reporter of the
       State of New Jersey
22    Certificate No. XI00091100
23
24
25

# EXHIBIT B

Attila Szamosszegi                                          October 24, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____  CASE NO.: 1:07CV00501(RJL)

JOHN FLYNN, JAMES BOLAND,
GERALD O'MALLEY, KEN LAMBERT,
GERARD SCARANO, H.J. BRAMLETT,
EUGENE GEORGE, PAUL SONGER,
WILLIAM McCONNELL, MATTHEW
AQUILINE, GREGORY R. HESS,
MICHAEL SCHMERBECK, VINCENT
DELAZZERO, and BENJAMIN CAPP,
as Trustees of, and on behalf         ORAL DEPOSITION OF
of, the
BRICKLAYERS & TROWEL TRADES
INTERNATIONAL PENSION FUND,           ATTILA SZAMOSSZEGI
     620 F Street, N.W.
     Washington, DC 20004
     202-783-3788,
                                       *   *   *   *   *
                                      OCTOBER 24, 2007
JIM ALLEN, MATTHEW AQUILINE,           *   *   *   *   *
LON BEST, JAMES BOLAND, TED
CHAMP, RAYMOND CHAPMAN,
VINCENT DELAZZERO, BRUCE
DEXTER, JOHN FLYNN, EUGENE
GEORGE, GREGORY HESS, FRED
KINATEDER, DAN KWIATKOWSKI,
KEN LAMBERT, SANTO LANZAFAME,
DICK LAUBER, WILLIAM McCONNELL,
EDWARD NAVARRO, GERALD O'MALLEY,
JOHN PHILLIPS, CHARLES RASO,
MARK ROSE, KEVIN RYAN, GERARD
SCARANO, MICHAEL SCHMERBECK,
PAUL SONGER, JOSEPH SPERANZA,
and FRED VAUTOUR
as trustees of, and on behalf
of, the
INTERNATIONAL MASONRY INSTITUTE
     620 F Street, N.W.
     Washington, D.C. 20004
     202-783-3788
_____

(Caption Continued)

MASTROIANNI & FORMAROLI, INC.
Certified Court Reporting and Video Conferencing
251 South White Horse Pike - Suite 200
Audubon, New Jersey 08106
856-546-1100

Attila Szamosszegi                                          October 24, 2007

## Page 26

1    Q.  How long did Anne work for the company?
2    A.  15 years, somewhere around there.
3    Q.  Long time?
4    A.  Yeah.  Long time.  I don't know for sure, yeah,
5  exactly.
6    Q.  We have gone through the office employees.  What
7  field employees does the company currently have?
8        MR. DIAZ:  You mean titles?
9        MR. MEHLER:  No.  By name if you have them.
10   A.  I got people coming in, you know, in and out of
11 my office, some of them work for a week or so.  I can
12 recall some of it but that's about it.
13   Q.  Do you have some who pretty much work for your
14 company full time, yours is the only company they work
15 for?
16   A.  Yes.
17   Q.  Can you give me some of their names?
18   A.  I can give you the first name.
19   Q.  Okay.  I'll take that.
20   A.  Okay.  Who is there?  There is Imet, Frank, Dan.
21 There is a few more.
22   Q.  In addition to these people you have guys who
23 will work for you for a little while and go off and work
24 for somebody else and they may work for you again?  Is
25 that how it works?

## Page 27

1    A.  When we hire people and sometimes they don't like
2  what they do so they quit.
3    Q.  Does it depend on the amount of work you have?
4  Sometimes you will hire more people and let them go when
5  a project finishes and bring them back on when the work
6  increases again?
7    A.  Well, yes and no.
8    Q.  Yes and no?
9    A.  Yeah.  I mean, we got a big turnover.  Normally
10 once they leave us they don't come back.
11   Q.  The field employees you have, do they have a
12 title?
13   A.  Project manager.  If that's what you're referring
14 to.
15   Q.  Just the guys who are doing the work, what would
16 you say their position is, are they laborers?
17   A.  Laborers.  90 percent laborers.
18   Q.  90 percent laborers?
19   A.  Yes.
20   Q.  What do the laborers do?
21   A.  Sweep, make concrete, you know, move dirt if we
22 have.
23   Q.  Do they do the waterproofing/caulking work?
24   A.  No.
25   Q.  Who does that work?

## Page 28

1    A.  The waterproofer and caulker.  Most of the time
2  we sub it out.
3    Q.  Most of the time you sub out the waterproofing
4  and caulking?
5    A.  That is correct.
6    Q.  Has that always been the case for your company?
7    A.  Yeah.  That's been the trend in the last ten
8  years or so.
9    Q.  What percentage of your work would you say you
10 sub out currently?
11   A.  A good portion of it.
12   Q.  More than 50 percent?
13   A.  I really don't know, you know.
14   Q.  More than ten percent?
15   A.  I just don't know, you know.  If I said ten
16 percent, 50 percent I would be lying because I don't
17 know.
18   Q.  But there is a percentage of work that you have
19 your guys do and then there is a percentage of your work
20 that you sub out?
21   A.  We do labor work.
22   Q.  Is there any waterproofing/caulking work that you
23 currently have your guys do rather than subbing it out?
24   A.  No.  No.
25   Q.  So a hundred percent of the

## Page 29

1  waterproofing/caulking work is subbed out currently?
2    A.  Yeah.  That is correct.
3    Q.  Was that the case when you first started this
4  company?
5    A.  I don't know.  I can't recall.
6    Q.  Has there ever been a time during the history of
7  the company when you have had your guys do the
8  waterproofing/caulking work?
9    A.  It's possible.  I don't know.
10   Q.  You don't know?
11   A.  No.
12   Q.  Have you ever employed somebody as a waterproofer
13 or a caulker?
14   A.  I think we had a union job we hired some people.
15   Q.  You think on a union job you hired some people to
16 do some work that is caulking?
17   A.  Yes, that is correct.
18   Q.  Other than that you can't recall where you have
19 hired somebody who was a waterproofer or a caulker?
20   A.  I might have.  I mean, I just can't really recall
21 one way or the other.
22   Q.  Well, you testified that currently you sub out a
23 hundred percent of the waterproofing/caulking work.  How
24 long has that been the case?
25   A.  I testified before probably ten years.

Pages 26 to 29

Attila Szamosszegi                                    October 24, 2007

## Page 34

1  A. Yeah.
2  Q. That will happen?
3  A. Yeah. It will happen.
4  Q. Does Maarv sometimes serve as a general
5  contractor?
6  A. Sometimes.
7  Q. For things other than waterproofing/caulking?
8  A. Yeah. We do some landscaping when it calls for.
9  Q. Landscaping?
10  A. Yeah. If it's part of the waterproofing, then
11  it becomes landscaping.
12  Q. And you will hire somebody else to do that?
13  A. The waterproofing, yes.
14  Q. What about the landscaping?
15  A. It's labor, so that we do.
16  Q. Is there any other types of work you guys will
17  handle?
18  A. Excuse me?
19  Q. Is there any other type of work you will handle?
20  A. Yeah. Labor.
21  Q. Laboring, the waterproofing/caulking you will sub
22  out and the landscaping you will do yourself.
23  A. Yes.
24  Q. Any other types of work the company will do?
25  A. Concrete we sub out.

## Page 35

1  Q. You always sub that out?
2  A. Almost.
3  Q. Almost?
4  A. Yeah. Sub out. We sub out because we like to do
5  labor. That's what we do.
6  Q. Well, you sometimes do the concrete work
7  yourself?
8  A. If it's a little sidewalk, you know, sometimes we
9  will do it, yeah.
10  Q. Any other types of work the company does?
11  A. Restoration.
12  Q. What do you mean by restoration?
13  A. Just what it says, restoration. Restoring stuff.
14  Restoring waterproofing, landscaping.
15  Q. I assume Maarv doesn't share office space with
16  any other company?
17  A. You just asked that before.
18  Q. I asked if there were any other companies
19  operating out of that same address?
20  A. I would share then if someone operates out of it.
21  Q. Do you share equipment with anybody else?
22  A. No.
23  Q. Do you share employees with anybody else?
24  A. No.
25  Q. Do you personally and currently own any other

## Page 36

1  companies?
2  A. No.
3  Q. Have you in the past?
4  A. No.
5  Q. Do you have investments in any other companies?
6  A. No.
7  Q. What about Maarv the company, does Maarv the
8  company own any other businesses?
9  A. No.
10  Q. Has it in the past?
11  A. No.
12  Q. Is Maarv, the company, an investor in any other
13  business?
14  A. No.
15  Q. Do you know if any of your employees, whether
16  office employees or field employees, own any other
17  companies?
18  A. I don't know.
19  Q. Do any of your family members own any other
20  companies?
21  A. No.
22  Q. Has Maarv ever signed any collective bargaining
23  agreements with The Bricklayers and Allied Craftworkers
24  Union?
25  A. Any bargaining agreement?

## Page 37

1     MR. DIAZ: Objection to the form. Objection
2  to bargaining agreement. You can answer.
3  Q. Let's start with just agreement then.
4     MR. DIAZ: Same objection to the form. It's
5  a legal term. That's my objection.
6  A. I sent in a form, one form regarding the
7  Princeton job was signed by Maarv, by me.
8  Q. The Princeton job?
9  A. Right.
10  Q. Are you aware of any other agreements you have
11  signed with the Bricklayers Union?
12  A. No.
13  Q. What about with any other unions?
14  A. No. I don't know.
15  Q. You don't know?
16  A. No. I don't...
17  Q. You don't recall any others?
18  A. No.
19  Q. Would anybody at Maarv be authorized to sign an
20  agreement on behalf of the company other than you?
21  A. No.
22  Q. And has that always been the case?
23  A. Always been the case.
24  Q. What about when Peter Cuomo was a part owner,
25  could he sign agreements on behalf of the company?

Attila Szamosszegi                                        October 24, 2007

**Page 38**

1    A.  No.
2        MR. MEHLER:  I'm going to show you a
3    document.  Douglas, it's Bates No. 159.  We will mark
4    this Plaintiffs No. 2.
5        (P-2 marked for identification.)
6    Q.  Take a look at this document and after you have
7    read over it let me know when you are ready.
8        Do you recognize this document?
9    A.  Do I recognize it?
10   Q.  Have you ever seen it before?
11   A.  I saw it recently by --
12        MR. DIAZ:  Just a representation that I
13   showed the document to him.
14   Q.  In connection with the lawsuit you saw it?
15   A.  Yeah.
16   Q.  You never saw it before then?
17   A.  No.
18   Q.  Is that your signature on the document?
19   A.  No.  That's not.
20   Q.  Do you have any idea who signed that?
21   A.  No.
22   Q.  Do you recognize the handwriting?
23   A.  No.  I don't.
24   Q.  Do you see higher up on the document it has an
25   employer's Federal ID number, a New Jersey Employment ID

**Page 39**

1    number and an insurance carrier for worker's comp?
2    A.  That is correct.
3    Q.  Do you know who filled in that information?
4    A.  I have no idea.
5    Q.  Do you know if that information is correct for
6    Maarv?
7    A.  No.  Because -- no, I don't.
8    Q.  You don't know?
9    A.  No.
10   Q.  You don't know who the insurance carrier is for
11   worker's comp?
12   A.  Well, this thing I seen a date going back to
13   2000, so, no.
14   Q.  Do you know who you the current insurance carrier
15   is for worker's comp?
16   A.  No.
17   Q.  Is there somebody in your office that handles
18   that?
19   A.  Absolutely.
20   Q.  Who is that?
21   A.  Who is handling right now?
22   Q.  Yes.
23   A.  Mary.
24   Q.  So you don't get involved in that aspect of it?
25   A.  No.

**Page 40**

1    Q.  Is that the current -- up higher it lists 317 Oak
2    Street, Passaic, New Jersey; is that the current office
3    at the time of this document?
4    A.  Back in 2000?
5    Q.  Yes.
6    A.  Yes.
7    Q.  But you don't know who filled that information in
8    on this document?
9    A.  No.
10   Q.  Do you have any reason to believe the union would
11   have filled in this information?
12   A.  I don't believe it.
13   Q.  Do you know whether the brick -- at the top it
14   says B.A.C. Local No. 4, New Jersey.  Are you familiar
15   with that union?
16   A.  Yes.
17   Q.  Do you know whether they would have all this
18   information for Maarv back in 2000?
19        MR. DIAZ:  Objection to the form.
20   A.  I don't know.
21   Q.  You don't know if they would or not?
22   A.  How would I know?
23   Q.  Did you ever speak with a person named John Capo?
24   A.  Yeah.
25   Q.  Who is John Capo?

**Page 41**

1    A.  Last time I talked to him he was in charge of the
2    apprenticeship program.
3    Q.  When was that that you last spoke with him?
4    A.  I really don't know.  Long time ago.
5    Q.  Long time ago?
6    A.  Long time ago.  I don't know exactly.
7    Q.  Have you spoken with him more than once?
8    A.  No.  I think that was the conversation we had.
9    Q.  Do you remember ever speaking with him in
10   relation to an agreement with Local 4 of New Jersey?
11   A.  What kind of agreement?
12   Q.  Any kind of agreement.
13   A.  No.  No.  I don't recall.
14   Q.  You don't recall.
15        Do you remember ever speaking with him about this
16   document in front of you?
17   A.  No.
18   Q.  Do you remember ever meeting with him about a
19   project in Fort Lee?
20   A.  That's when I met him.  That's when I am
21   referring to when I talked to him.
22   Q.  What was the purpose of that conversation you had
23   with him?
24   A.  I think if I recall it right, it's a little
25   fuzzy, getting some union guys from him.

Pages 38 to 41

Attila Szamosszegi                                                    October 24, 2007

## Page 42

1    Q. Getting some union guys?
2    A. Right.
3    Q. For the project in Fort Lee?
4    A. Absolutely.
5    Q. Do you remember was this meeting with him in a
6    diner?
7    A. Yes, indeed, it was a diner.
8    Q. Do you remember was John Capo's father there, as
9    well?
10   A. I don't recall.
11   Q. Do you remember if there was anybody else there?
12   A. I don't recall. I know John was there. I
13   remember him.
14   Q. Who set up that meeting? Basically how did it
15   come about?
16   A. I don't know whether it was initiated by us or by
17   them. I really don't recall.
18   Q. Do you remember calling him at some point and
19   saying, Hey, I need some union guys on this project?
20   A. I don't recall calling, but obviously we needed
21   some kind of union workers on the job because there were
22   guys on the job already.
23   Q. Why did you need union guys on that job?
24   A. Because it was a union job.
25   Q. It was a union job so all the subs had to have

## Page 43

1    union guys on it?
2    A. Well, most of them.
3    Q. Had the company worked on union jobs before that,
4    before 2000?
5        MR. DIAZ: Objection to the form. He didn't
6    say it was in 2000.
7    A. I really don't recall.
8    Q. Was the Fort Lee project -- this document I gave
9    you is dated by the two signatures 5/10/2000, is that
10   around the time the Fort Lee project was going on?
11   A. I really don't know. I don't recall.
12   Q. Was your meeting with John Capo around that time?
13   A. I don't recall.
14   Q. Was your meeting with him more recently, was it
15   in the last couple of years?
16   A. Not the last couple of years. Definitely not.
17   Q. So it was a number of years ago but you don't
18   know exactly when?
19   A. Yeah. That's correct.
20   Q. I know it's been a long time, but explain to me
21   the best you can what you remember being said at that
22   meeting with John Capo?
23   A. I really don't recall the conversation.
24   Q. What was the topics that were discussed?
25   A. I don't know.

## Page 44

1    Q. I think you mentioned that getting union guys out
2    to this job in Fort Lee was one of the things discussed?
3    A. I'm just assuming that's why I had a meeting with
4    him, otherwise there is no reason why I would have a
5    meeting with him.
6    Q. Did John or Local 4 end up providing union guys
7    for that job?
8    A. I believe they have. That's why, you know, we
9    call them because we needed a mason and since they were
10   the mason local.
11   Q. Did you have guys other than the guys sent over
12   by the union working on that job?
13   A. I don't really recall.
14   Q. Did you have laborers working on that job?
15   A. I don't recall who was working, you know, who was
16   on the job and who wasn't.
17   Q. But you believe the union sent over some masons
18   to do some work?
19   A. It's a possibility. I don't know for -- I don't
20   know the facts. I just don't remember.
21   Q. The union might have sent some masons over?
22   A. Might have.
23   Q. But no one from the company ever signed an
24   agreement with Local 4 of New Jersey?
25   A. Not that I recall.

## Page 45

1    Q. Do you remember John Capo ever telling you that
2    the union would need you to sign an agreement before
3    they could send union guys over?
4    A. I don't recall the conversation.
5    Q. Have you had occasions in the past where unions
6    have sent guys to work on one of the projects you were
7    working on?
8    A. For me? It's possible.
9    Q. You don't recall specifically?
10   A. I don't recall specifics, no.
11   Q. Did you ever talk with a person named Gerald
12   Della Salla?
13   A. Who is he?
14   Q. He is a union official.
15   A. No.
16   Q. His signature is on this document I provided you.
17   A. No.
18   Q. You don't know that name?
19   A. No. I don't recall talking to him. I don't
20   know. The name doesn't do anything.
21   Q. What about an individual named Pete Caputo?
22   A. Who is he?
23   Q. Another union person.
24   A. Not that I recall.
25   Q. You don't recognize that name either?

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                          Professionals Serving Professionals

Attila Szamosszegi                                          October 24, 2007

## Page 46

1    A. No.
2    Q. And you don't recall ever receiving anything in
3 writing from either of those people, Gerald Della Salla
4 or Pete Caputo?
5    A. No. Because -- no.
6    Q. Let me show you another document.
7       MR. MEHLER: It's Bates No. 100 through 132.
8 Mark this as Plaintiff's Exhibit No. 3.
9       (P-3 marked for identification.)
10   Q. Take a look at that document.
11   A. And this is -- what agreement is this?
12   Q. It's a collective bargaining agreement with Local
13 Union 4 and 5 of the B.A.C.
14   A. And the question is?
15   Q. First question is: Have you ever seen this
16 before?
17   A. No.
18   Q. Did Maarv ever agree to this agreement as far as
19 you know?
20   A. No.
21   Q. If John Capo had said we can only send union guys
22 over if you agree to this agreement, would you have done
23 so?
24       MR. DIAZ: Objection to the form.
25   A. Done what?

## Page 47

1    Q. Would you have signed this agreement?
2    A. Maybe for the job, you know, if that's what you
3 require, you know.
4    Q. You would have signed it for that specific job?
5    A. For that specific job.
6    Q. But you wouldn't have signed it generally?
7    A. No.
8    Q. Why is that?
9    A. Why should I?
10   Q. I assume you didn't have an interest in being a
11 union company?
12   A. No. I was just fine as I was.
13   Q. So if John had said the only way we can send
14 union guys is by you signing this agreement you would
15 have said no?
16       MR. DIAZ: Asked and answered. He already
17 answered the question.
18   A. No. Because I would sign for one job, for the
19 job only, not for whatever.
20   Q. In relation to that Fort Lee project, do you
21 recall signing any agreement with a union for that job
22 specifically?
23   A. I don't recall.
24   Q. You don't recall signing any agreements regarding
25 that job with a union?

## Page 48

1    A. That is correct.
2       MR. DIAZ: You don't have to look at it any
3 more.
4       THE WITNESS: I am just curious myself what
5 is in it.
6 (BY MR. MEHLER:)
7    Q. Did Maarv to the best of your memory ever sign
8 any collective bargaining agreement with Bricklayers
9 Local 5 New Jersey?
10       MR. DIAZ: Objection to the form. Objection
11 to agreement, but go ahead.
12   A. No. Not that I know of.
13   Q. Was there anybody else in the company that would
14 know?
15   A. No. I would be the one.
16   Q. Did Maarv ever sign any agreement with
17 Bricklayers Local 2 Delaware-New Jersey?
18       MR. DIAZ: Objection to the form. Go ahead.
19   A. No.
20   Q. Let me show you another exhibit.
21       MR. MEHLER: Douglas, this is Bates No. 739.
22       Please mark this as Plaintiff's Exhibit 4.
23       (P-4 marked for identification.)
24   Q. Take a look at this document and let me know when
25 you are ready.

## Page 49

1    A. Yes. You have a question?
2    Q. Have you seen this document before?
3    A. Yeah. It came to the attention through my
4 attorney when we were talking about this case.
5    Q. Had you seen it before, before this lawsuit?
6    A. Obviously I have because I got my signatures on
7 it.
8    Q. That is your signature?
9    A. Yeah. That is my signature.
10   Q. Do you remember when you first saw this document?
11   A. Since I know I signed only one paper it had to be
12 done at Princeton job.
13   Q. You signed this in relation to the Princeton job?
14   A. I am pretty sure that's what it was.
15   Q. By the Princeton job, you mean the Princeton
16 Parking Garage job?
17   A. That is correct.
18   Q. Do you remember signing this document?
19   A. Not really, but I remember something that was
20 said to they are going to make something up, my
21 secretary explained something, the union was going to
22 send an agreement for the job. You need to sign it so I
23 said okay. So I signed the paper.
24   Q. Do you remember meeting with anybody from
25 Bricklayers Local 5 in relation to that Princeton

Pages 46 to 49

Attila Szamosszegi                                October 24, 2007

Page 50

1  project?
2     A.  No.  I never met anybody.
3     Q.  You never met with a Dominic Longo?
4     A.  No.
5     Q.  Do you know Dominic Longo?
6     A.  No, I don't.
7     Q.  Do you recognize that name?
8     A.  Well, recently just.
9     Q.  Just from the lawsuit?
10    A.  Yeah.
11    Q.  How did it come about that you signed this
12  agreement?
13    A.  How did it come about?
14    Q.  Yes.
15    A.  What I recall is my secretary told me one day she
16  talked to a person called Ivan Pallos, he was from
17  Pallos Construction Company.
18    Q.  Your secretary spoke with somebody from Pallos
19  Construction?
20    A.  Right.  Pallos Construction was doing the work on
21  the Princeton Parking Garage.
22    Q.  What work were they doing?
23    A.  Caulking.
24    Q.  Were they doing it as your subcontractor?
25    A.  Yes.

Page 51

1     Q.  So your secretary -- which secretary was this?
2     A.  Anne.
3     Q.  Was she the office manager at that time, as well?
4     A.  Yes.
5     Q.  So she got a call from somebody at Pallos
6  Construction?
7     A.  And they said, Look, they are going to send up an
8  agreement for this particular job and we have to hire a
9  union guy and they wouldn't accept his signatures.
10    Q.  Wouldn't accept Pallos?
11    A.  Pallos.  They want Maarv to sign the paper,
12  agreement for that job.  So it was faxed up to us and
13  Anne filled it out and I signed it.
14    Q.  Was that the only discussion you had with Anne
15  about this?
16    A.  I think so.
17    Q.  Did you ever talk with anybody at Pallos yourself
18  about this?
19    A.  I talked to Ivan.
20    Q.  That was the head of the company?
21    A.  Yeah.
22    Q.  What did he tell you?
23    A.  He said he talked to gentleman from the union and
24  they came out, they have a check regarding that he needs
25  to hire a union guy.

Page 52

1     Q.  Because it was a union job?
2     A.  I guess union was slow.
3     Q.  What do you mean the union was slow?
4     A.  The jobs are slow so a lot of union members
5  sitting in the union hall so they come around and they
6  ask you to take one of their guys.
7     Q.  Did you or Pallos feel obligated to take on a
8  union guy?
9     A.  I don't know what Pallos felt.
10    Q.  What about you?
11    A.  Well, I subbed it out to him the whole job so I
12  couldn't care less one way or the other what he does.
13  It's his job.
14    Q.  Did this person from Pallos ever say whether it
15  was Dominic Longo he had talked with?
16    A.  Yeah.  He implied they had a talk and they ask
17  him to tell Maarv to sign the paper for this particular
18  job, you know, sign the page or whatever you call it.
19    Q.  Did he give the -- did he mention the name
20  Dominic Longo to you?
21    A.  I don't recall whether he mentioned it or not,
22  you know.
23    Q.  Did he ever explain to you why the union wouldn't
24  accept Pallos Construction as the signature on this?
25    A.  No.  He just said they want Maarv to sign it.

Page 53

1     Q.  And Anne never explained that to you either?
2     A.  Explained what?
3     Q.  Why the union wouldn't accept Pallos Construction
4  on this page?
5     A.  Not that I recall.  No.
6     Q.  Did you ask Pallos -- after you received this
7  page marked as Plaintiff's Exhibit 4, did you ask the
8  person at Pallos Construction any questions about what
9  was on this page?
10    A.  What was on this page?
11    Q.  Yes.
12    A.  No.  We just talked about general, what is this.
13  He says, Look, we need to sign it for this job because
14  we have a union guy, he had to hire a union guy and in
15  order for me to do that we have to sign this page.
16    Q.  Had he already hired a union guy?
17    A.  No.  After that -- I don't know.  I really don't
18  know.  That's a good question.  I don't know.
19    Q.  Did you ever discuss with the person from Pallos
20  Construction what Plaintiff's Exhibit 4 meant?
21    A.  He said that's the agreement with the union for
22  that particular job.
23    Q.  And he specifically said for that particular job?
24    A.  Yes.  Yes.
25    Q.  Did you read over this document before you signed

Pages 50 to 53

Attila Szamosszegi

October 24, 2007

## Page 54

1   it?

2   A.   I just glanced through it, you know.  No, I did

3   not.

4   Q.   Did you ever call anybody at the union about this

5   page before signing it?

6   A.   No.

7   Q.   If you look at the first paragraph.

8   A.   Okay.

9   Q.   I know it's small writing.  It says, The

10  undersigned employer has read and hereby approves the

11  signed collective bargaining agreement between the

12  Building Contractors Association of New Jersey and the

13  Masonry Contractors Association of New Jersey dated

14  November 1st, 2002, and Bricklayers and Allied

15  Craftworkers Locals No. 4, No. 5 of New Jersey and Local

16  No. 2 of Delaware-New Jersey and any successor

17  collective bargaining agreement subsequently negotiated

18  between said parties and herewith accepts and becomes

19  one of the parties thereto and agrees to be bound by all

20  the terms and conditions of the effective collective

21  bargaining agreement and such successor agreements as

22  may be negotiated from time to time.

23       What did that paragraph mean to you?

24       MR. DIAZ:  Objection to the form.  You are

25  assuming he even read it.

## Page 55

1   A.   A lot of mumbo-jumbo.  I don't even know what is

2   the collective bargaining.  What am I agreeing to?  This

3   is one page over here.  What I see it now it doesn't get

4   into any specifics.

5   Q.   Did you read this page before you signed it?

6   A.   Probably I glanced through it but it wasn't -- I

7   didn't think since I was told it's for this particular

8   job I wasn't really paying that much attention since my

9   sub is doing the job, not me, so one small job, I said

10  okay sign.

11  Q.   You were told by Pallos Construction that it was

12  for one job?

13  A.   Excuse me?

14  Q.   You were told by Pallos Construction that this

15  just covered one job?

16  A.   I think it was yeah, Pallos, and also I believe,

17  as I said, Anne talked to them.

18  Q.   Anne talked to Pallos?

19  A.   And probably Anne talked to the union guys.

20  Q.   Do you know whether she talked to the union guys?

21  A.   Do I know?

22  Q.   Yes.

23  A.   What?

24  Q.   Do you know whether Anne talked to the union guys

25  or are you speculating?

## Page 56

1   A.   No.  She mentioned something this is the one job.

2   That's why I signed it.  Ivan called and the union

3   called this is one job, fill out and send back to them.

4   Q.   Anne specifically told you she spoke with the

5   union?

6   A.   Yeah.  Otherwise I wouldn't have signed it.  I

7   had no gain by it.  What do I have to gain by it?

8   Q.   Who did she say she spoke with at the union?

9   A.   I don't know.  She said union official.  She

10  didn't get into specifics.

11  Q.   She was told both by a union official and by

12  Pallos Construction that this was for one job?

13  A.   Right.  That is correct.

14  Q.   Did you personally speak with anybody at the

15  union about this?

16  A.   No, I haven't.  I didn't feel like I need to.

17  Q.   Pallos Construction also told you that they had

18  spoken with the union who told them it was for one job?

19  A.   Right.  That is correct.

20  Q.   And I believe you testified previously that the

21  person Pallos said they spoke with was Dominic Longo?

22  A.   If that's what the job came in, I don't know.  I

23  didn't testify because I don't know.

24  Q.   Do you know whether Anne ever spoke with anyone

25  from the International Bricklayers Union about this

## Page 57

1   document?

2   A.   Why should she?  Where would she get a phone

3   number from?

4        MR. DIAZ:  Do you know?

5   Q.   I am just wondering if you know if she did?

6   A.   No.  No.

7   Q.   You don't know whether she did?

8   A.   No.  I don't know.

9   Q.   And you never spoke with anybody from the

10  international union?

11  A.   Nope.

12  Q.   And you are not aware of Pallos ever speaking

13  with anybody from the international union?

14  A.   Not that I am aware of.

15  Q.   Do you know whether Anne ever spoke with anyone

16  from the Bricklayers and Trowel Trades International

17  Pension Fund regarding this document?

18  A.   Not until they show up at our office.

19  Q.   For the audit?

20  A.   Yeah.

21  Q.   You personally never spoke with anybody from the

22  IPF?

23  A.   No.

24  Q.   Are you aware of Pallos ever speaking with

25  anybody from the IPF?

Pages 54 to 57

Attila Szamosszegi

October 24, 2007

Page 58

1    A. I don't know. I can't speak on his behalf.
2    Q. But you are not aware of anyone from the IPF,
3    which is the International Pension Fund, ever telling
4    you that this document covered just one project?
5    A. Come again? I am sorry.
6    Q. You are not aware of anyone from the IPF, which
7    is the International Pension Fund, ever telling you or
8    Anne or Pallos Construction that this document covered
9    just one project?
10    A. Why would they know we even exist?
11    Q. I want to make sure you are not aware of any
12    evidence of that?
13    A. How would they know we even exist?
14    Q. You are not aware of anyone from the
15    international union ever talking to them and saying this
16    was for one project?
17    A. We don't deal with the international. We dealt
18    with the local union.
19    Q. So your answer would be no, you are not aware of
20    any evidence; is that correct?
21    A. Yes.
22    Q. Let me show you another document.
23        MR. MEHLER: Douglas, it's 709 to 738.
24        Mark that as Plaintiff's Exhibit 5, please.
25        (P-5 marked for identification.)

Page 59

1    Q. Take a look at that. Let me know when you are
2    ready.
3    A. This is? What am I looking at?
4    Q. This is a collective bargaining agreement with
5    Locals 4, 5 and 2 of the Bricklayers.
6    A. Okay. Do I need to read it through?
7    Q. No. I won't ask you about the specific terms.
8    Just read through and let me know if you are familiar
9    with it.
10    A. No. I am not.
11    Q. Have you seen it before?
12    A. No.
13    Q. Did you understand that by signing Plaintiff's
14    Exhibit 4 you were agreeing to Plaintiff's Exhibit 5?
15    A. No. It was for one job. One particular job,
16    Princeton.
17    Q. When you signed Plaintiff's Exhibit 4 did you
18    notice that language regarding this collective
19    bargaining agreement with Locals 4, 5 and 2 in the first
20    paragraph?
21    A. I can't recall. As I stated, it was one
22    particular job so I wasn't really, you know, paying too
23    much attention.
24    Q. Do you know if anyone ever got anything in
25    writing from the union saying that Plaintiff's Exhibit 4

Page 60

1    just covered that one particular job?
2    A. I don't know.
3    Q. You are not aware of any documents?
4    A. No. I am not aware of.
5    Q. Did you ever ask the union for a copy of the
6    agreement referenced in the first paragraph of
7    Plaintiff's Exhibit 4?
8    A. I wasn't even aware of this agreement.
9    Q. So when you signed Plaintiff's Exhibit 4 you
10    thought you were signing a collective bargaining
11    agreement but just for that one project?
12        MR. DIAZ: Objection to the form.
13    A. Well, I am signing a union paper for that
14    particular job, yeah.
15    Q. What did you think that union paper required?
16    A. Hire the union guy and pay his guys.
17    Q. What about fringe benefits contribution?
18    A. And the fringe benefits, whatever on that
19    particular job for union guys.
20    Q. Did it require you pay a particular wage rate to
21    the employees?
22    A. I am sure.
23    Q. Did you understand the agreement as allowing you
24    to hire nonunion guys for that job, as well?
25        MR. DIAZ: Objection to the form. What

Page 61

1    agreement are we referring to?
2        MR. MEHLER: Plaintiff's Exhibit 4.
3        MR. DIAZ: Okay. Objection to the
4    agreement, but go ahead.
5    A. What was the question again?
6    Q. By signing Plaintiff's Exhibit 4 did you
7    understand it as requiring you to hire only union guys
8    or you could also hire nonunion guys?
9    A. Also nonunion.
10    Q. And if nonunion guys were hired, did you believe
11    that dues needed to be paid for them?
12    A. No.
13    Q. Did you believe that fringe benefit contribution
14    needed to be paid for them?
15    A. No.
16    Q. Did you believe that a certain wage rate had to
17    be paid to them?
18    A. No. As far as I was concerned this was for union
19    guys only. That's why we had to hire the union guy. As
20    far as I know it informs us and the union guy gets so
21    much money and benefits, I guess. And that's it.
22    Q. Did you have anybody else in your office review
23    Plaintiff's Exhibit 4 before you signed it?
24    A. Anne. Anne.
25    Q. Did you have your attorney review it?

Pages 58 to 61

Attila Szamosszegi                                    October 24, 2007

---

Page 62

1    A. I have no attorney.
2    Q. Had you signed any collective bargaining
3  agreements prior to that?
4    A. No.
5    Q. Just so I am clear on your testimony, you
6  understood Plaintiff's Exhibit 4 as requiring your sub,
7  Pallos, to hire union guys?
8    A. Well, he was doing the job so, you know, he is...
9    Q. After you signed Plaintiff's Exhibit 4 it was
10  faxed back to the union?
11    A. I suppose. I really don't know.
12    Q. Would you have given it to Anne for that purpose?
13    A. I would have given it to Anne.
14    Q. After this lawsuit was filed did you talk to Anne
15  about this situation with Local 4 and 5 in New Jersey?
16        MR. DIAZ: Just objection. If you can maybe
17  give a time reference. I don't know offhand when the
18  lawsuit was filed.
19        MR. MEHLER: I don't remember exactly
20  either.
21    Q. Since the time the lawsuit was filed up until
22  Anne's death, did you ever speak with her about the
23  allegations in this lawsuit?
24        MR. DIAZ: I forget when Anne died. That's
25  why I was looking for a time frame.

---

Page 63

1        MR. MEHLER: I can get you that.
2        MR. DIAZ: I thought it was filed in the
3  beginning of '07.
4        MR. MEHLER: It was filed in '07.
5  (BY MR. MEHLER:)
6    Q. I think Anne had already passed away by 2007?
7    A. Yes.
8    Q. That answers my question.
9    So, you signed Plaintiff's Exhibit 4 and it was
10  faxed back to the union presumably by Anne. What
11  happened after that?
12    A. I finished the job.
13    Q. Did Pallos hire a union guy?
14    A. I suppose, yeah.
15    Q. Do you know who that union guy was?
16    A. Not offhand.
17    Q. That union guy was paid by Pallos, not by Maarv?
18    A. Yeah. That is correct.
19    Q. You didn't see Plaintiff's Exhibit 4 as requiring
20  Maarv to hire union people?
21    A. No. Because we subbed the job out.
22    Q. And you didn't see it as requiring Maarv to file
23  reports of their employees with the union?
24    A. That is correct.
25    Q. And you didn't see it as requiring Maarv to pay

---

Page 64

1  dues for any of its employees?
2    A. Absolutely.
3    Q. And you didn't see it as requiring Maarv to make
4  fringe benefit contribution for any of its employees?
5    A. True, too.
6    Q. All those questions whether in relation to the
7  Princeton job or any other job?
8    A. Yeah.
9    Q. Did you ever speak with a person named Mike
10  Perrone who else goes by Chuck Perrone?
11    A. Who is he?
12    Q. He is a union official with Local 5.
13    A. No.
14    Q. You don't recognize the name?
15    A. No.
16        MR. MEHLER: I am going to mark an exhibit.
17  This is one of your documents. M-71 through M-75.
18        Mark that as Plaintiff's Exhibit 6.
19        (P-6 marked for identification.)
20    Q. Take a look at that and let me know when you are
21  ready.
22    A. Okay.
23    Q. Have you seen this document before?
24    A. Just came about recently.
25    Q. In connection with the lawsuit?

---

Page 65

1    A. Yeah.
2    Q. You don't remember seeing it around the time -- I
3  am trying to see if it has a date on here. There is a
4  fax date of 4/04 at the top?
5    A. Uh-huh.
6    Q. You don't remember seeing it around that time?
7    A. No. No.
8    Q. You don't remember receiving this from Anne at
9  some point?
10    A. No.
11    Q. Do you remember the circumstances of Anne handing
12  you Plaintiff's Exhibit 4 to sign?
13    A. Somewhat, yeah. Because she mentioned to me, you
14  know, I said regarding union and she said, Look, as I
15  said, we received this thing for that particular job, we
16  need to send it back. That was the extent of it.
17    Q. Did she just give you the one sheet that is
18  marked Plaintiff's Exhibit 4 to sign?
19    A. That's all she gave me.
20    Q. She didn't give you Plaintiff's Exhibit 6, this
21  fax with the attachments?
22    A. No. Why would I -- as far as we knew it doesn't
23  concern us because we subbed the job out.
24    Q. So the rates --
25    A. I see her signature, I mean her handwriting over

---

Pages 62 to 65

Attila Szamosszegi                                          October 24, 2007

---

Page 70

1  typically?
2      A. It all depends.
3      Q. More than 50?
4      A. No. I don't think so.
5      Q. More than ten?
6      A. I really don't know, you know, the exact numbers.
7      Q. Project from 2003, Queens Parking Garage in New
8  York?
9      A. Yeah. Expansion joints we did.
10     Q. Excuse me?
11     A. Expansion joints.
12     Q. Was there waterproofing on that job?
13     A. No. Expansion joints.
14     Q. What was the work on the expansion joints you
15  did?
16     A. Removed, replace.
17     Q. Did you have your guys do it or did you sub it
18  out?
19     A. No. We did that.
20     Q. You did that?
21     A. Yeah.
22     Q. Another one from 2003, the Stonehenge Parking
23  Garage in North Bergen?
24     A. Waterproof, hot applied.
25     Q. Did you sub out that?

---

Page 72

1      Q. What about the MONY at Lake Success, New York?
2      A. A what?
3      Q. MONY at Lake Success?
4      A. I don't remember that.
5      Q. You don't recall that one?
6      A. No.
7      Q. 2004, the Gayle & Wentworth Seamans; do you
8  recall that project?
9      A. I know we did some work for Gayle but I don't
10  know which one is which. No, not in particular.
11     Q. What about the Englewood Hospital in 2004?
12     A. Englewood Hospital, 2004. I think we did some
13  trench. I am not sure but I think it was trench.
14     Q. Trench work?
15     A. Yeah.
16     Q. Not waterproofing?
17     A. No.
18     Q. Did you have your own guys do that work?
19     A. I think we subbed it out.
20     Q. Do you remember to who?
21     A. No.
22     Q. 2004, another reference to Hospital For Special
23  Surgery?
24     A. It's all the same.
25     Q. All the same?

---

Page 71

1      A. Yes.
2      Q. Entirely?
3      A. Yes.
4      Q. The Parking Authority of New Brunswick in 2003?
5      A. Steel work.
6      Q. Just steel work?
7      A. Uh-huh.
8      Q. No waterproofing?
9      A. No.
10     Q. Did you do that work yourself?
11     A. No. We subbed it out.
12     Q. Do you remember to who?
13     A. No. No.
14     Q. Do you remember who you subbed it out to in
15  Stonehenge Parking Garage?
16     A. It was some roofing company.
17     Q. In 2003 I have another reference to the Hospital
18  For Special Surgery, was that another project or was
19  that the same one?
20     A. It's the same.
21     Q. Did you do a project for the Township of
22  Parsippany in 2003?
23     A. I don't know.
24     Q. You don't recall that one?
25     A. No, I don't recall.

---

Page 73

1      A. I don't know who gave them the list, but...
2      Q. I can tell you this is a list that the auditor
3  came up with from looking at your records.
4      A. Okay. Obviously my office supplied it.
5      Q. A project for the Troast Group, that's the
6  Princeton Parking Garage project?
7      A. Yes.
8      Q. That's the project where you did sub out all the
9  waterproofing to Pallos; is that right?
10     A. All the caulking/waterproofing, yeah.
11     Q. What about a Bristol Parking Garage in 2004?
12     A. Bristol.
13     Q. For the Glenwood Management Corp.?
14     A. It was subbed out.
15     Q. Was that waterproofing?
16     A. Concrete.
17     Q. Concrete. And you subbed it all out?
18     A. Yeah.
19     Q. Who did you sub it out to?
20     A. The gentleman over here in Hackensack, he is a
21  big union outfit.
22     Q. You don't remember the name?
23     A. Not offhand, but I know they are located in
24  Hackensack.
25     Q. Do you remember why you used a union

---

Pages 70 to 73

Attila Szamosszegi                                    October 24, 2007

## Page 74

1  subcontractor in that project?
2    A. Because his price was the lowest.
3    Q. It wasn't because he was union?
4    A. No.  He was the lowest sub bid.
5    Q. What about a Lowes Theatre in 2004?
6    A. I don't recall.
7    Q. You don't recall that one?
8    A. No.
9    Q. What about Phoenix Medical Construction in 2004?
10   A. That was a railing job, it was subbed out.
11   Q. Not waterproofing?
12   A. No.
13   Q. Valley National Bank in 2004?
14   A. Valley National Bank.  Epoxy injection.
15   Q. Did you do that work yourself?
16   A. Yeah.
17   Q. The Wilmington Parking Authority in 2004, do you
18  recall that project?
19   A. Yeah.  It was subbed out.
20   Q. What kind of work was it?
21   A. Waterproofing.
22   Q. Who did you sub it out to?
23   A. Some outfit out there.
24   Q. You don't remember?
25   A. I don't recall the name.

## Page 75

1    Q. Would the company have records reflecting who you
2   subbed out the various projects to?
3    A. We don't keep record of them.
4    Q. You don't keep record of them?
5    A. I don't need to.
6    Q. What about the North Shore Long Island Jewish
7   Medical Center Parking Garage?
8    A. What did we do there?  I don't know.  I don't
9   recall that.  Asphalt maybe, possible asphalt.  I don't
10  know.  I am not so sure.
11   Q. What about Riverview Towers in 2004?
12   A. Riverview Towers, doesn't ring a bell.
13   Q. Would Peter Cuomo know about any of these
14  projects?
15   A. He would know some, but not all of them.
16   Q. But you haven't checked with him?
17   A. No.  I don't think it was necessary.
18   Q. Was your son involved in the business back in
19  2002 to 2005?
20   A. I don't think so.
21   Q. Would you have employees that would know about
22  some of these projects?
23   A. No.  I am the one who knows, you know, about the
24  jobs.
25   Q. What about the guys that actually worked on the

## Page 76

1   projects?
2    A. I don't know who worked on the projects.
3    Q. You don't have records reflecting that?
4    A. No.
5    Q. Some 2005 projects.  Toms River, New Jersey
6   Parking Garage?
7    A. We subbed it out, waterproofing.
8    Q. Do you remember who you subbed it to?
9    A. Yeah.  It was subbed out to AGP, I think.
10   Q. Is that a union sub?
11   A. I don't know.  I think he is, but I am not sure.
12   Q. A project Arena Construction Company, the St.
13  George Ferry?
14   A. Epoxy injection.
15   Q. Did you sub that out?
16   A. No.  We did that.
17   Q. How about the University of Medicine & Dentistry
18  in 2005?
19   A. Landscaping.
20   Q. Just landscaping?
21   A. Yeah.
22   Q. You did it yourself?
23   A. Yeah.
24   Q. Wilmington Parking Authority?  Same as the prior
25  one?

## Page 77

1    A. Yeah.
2    Q. And the Long Island Jewish Medical Center Parking
3   Garage is the same one we already mentioned?
4    A. Yeah.  Same.
5    Q. Okay.  How about the Riverdale Parking Garage,
6   Skyview Apartments?
7    A. Landscaping, hot-applied waterproofing.
8    Q. Who did the waterproofing?
9    A. The outfit out of Canada.
10   Q. Do you remember the name?
11   A. What's the name of them?  I could look it up.
12   Q. Do you have a record of that?
13   A. I think, yeah, I do because they did the job for
14  us -- what's the name of the guy?  Multi Seal.
15   Q. How does Maarv go about getting these
16  subcontractors, do they --
17   A. They pick up the Blue Book and get subs.
18   Q. Do you get bids from various subs?
19   A. Yeah.
20   Q. Are there some subs you work with repeatedly?
21   A. Some.
22   Q. How many bids do you typically get on a job?
23   A. Depends, you know.  All depends.  If the sub
24  gives you a price and I think it's a fair price I will
25  give him a job.

Pages 74 to 77

Attila Szamosszegi                                          October 24, 2007

## Page 82

1    Q. What do you know about them?
2    A. I know they are doing caulking and waterproofing.
3    Q. Did you ever sub to them?
4    A. No.
5    Q. Ever hire any of their employees?
6    A. Not that I know of.
7    Q. What about Bryant Caulking and Waterproofing in
8  Pine Hill, New Jersey?
9    A. I don't know them.
10   Q. What about Roman, Inc. in West Berlin, New
11  Jersey?
12   A. No.
13   Q. What about Garden State Caulking, Inc. in
14  Belleville, New Jersey?
15   A. Yeah, I heard of them.
16   Q. Are they a waterproofing company?
17   A. The name say caulking so I know they do caulking.
18   Q. Did you ever sub to them?
19   A. No.
20   Q. Did you ever hire any of their employees?
21   A. Not knowingly.
22       MR. MEHLER: Again, let me know whenever you
23  need a break.
24       THE WITNESS: Just go. Just go right on
25  through.

## Page 83

1        MR. MEHLER: That's what I like to hear.
2    M-70, Douglas.
3        MR. DIAZ: If you are okay let us know, too.
4    You are the most important person in the room.
5        MR. MEHLER: Of course. You are working the
6    hardest definitely.
7        Please mark this as Plaintiff's Exhibit 7.
8        (P-7 marked for identification.)
9    (BY MR. MEHLER:)
10   Q. Take a look at that document, please.
11   A. Okay.
12   Q. Do you recognize that document?
13   A. This is a check, yes.
14   Q. Do you know what that check was for?
15   A. It says reimbursement for union dues.
16   Q. Do you remember what employee that was
17  reimbursing for union dues?
18   A. Since it come from Pallos I suppose this is for
19  the Princeton Parking Garage.
20   Q. So, Maarv was paying the union dues for at least
21  one union employee and Pallos would reimburse Maarv?
22   A. Yeah. Pallos sent his check and they rejected
23  his check, so he asked us to pay and he is going to
24  reimburse us.
25   Q. The union rejected it?

## Page 84

1    A. Yeah.
2    Q. Because Pallos wasn't the one that had signed the
3  document they had sent?
4    A. Right. That is correct.
5    Q. Do you know if anyone from Pallos talked to the
6  union about that check that was rejected?
7    A. I don't know.
8    Q. You never talked to the union about it?
9    A. No.
10       MR. MEHLER: M-76. Plaintiff's Exhibit No.
11  8.
12       (P-8 marked for identification.)
13   Q. Take a look at this document.
14   A. Okay.
15   Q. Have you seen this before?
16   A. No. I don't think I have.
17   Q. It says, Memo to Ivan at the top. Do you know
18  who Ivan is?
19   A. Ivan Pallos.
20   Q. And it says from Anne. Is that the Anne from
21  your company, you believe?
22   A. Yes.
23   Q. And it references Union Man at Princeton Project.
24  So your understanding is that that was the individual
25  sent over by the union to that project?

## Page 85

1        MR. DIAZ: Objection to the form as Attila
2    -- I am assuming Attila didn't prepare that document and
3    draft it but go ahead.
4    Q. Go ahead.
5    A. What was the question?
6    Q. Is it your understanding that Union Man at
7    Princeton Project refers to the union guy?
8    A. I don't think because I never see this.
9    Q. Do you know if the union sent over more than one
10  person to that project?
11   A. I don't know.
12   Q. Whoever they sent over would have been working
13  for Pallos, not for you?
14   A. That is correct.
15   Q. It gives a name of Efrain Rivera. Are you
16  familiar with that name?
17   A. No.
18   Q. You don't know who that is?
19   A. No.
20       MR. MEHLER: M-79. Please mark this as
21  Plaintiff's Exhibit 9.
22       (P-9 marked for identification.)
23   Q. Have you seen that document before?
24   A. No.
25   Q. Do you recognize the handwriting?

Pages 82 to 85

Attila Szamosszegi                                                    October 24, 2007

## Page 86

1    A. I think it's Ivan's.
2    Q. Do you remember Anne ever discussing this
3    document with you?
4         MR. DIAZ: Objection to form. Go ahead.
5    A. No.
6         MR. DIAZ: Just because he said he didn't
7    see it before, but go ahead.
8    A. No.
9    Q. You had mentioned, we had discussed South Shore
10   Contractors before?
11   A. Uh-huh.
12   Q. Do you know if they, anybody at South Shore
13   Contractors has any facts relating to this lawsuit?
14        MR. DIAZ: Any facts?
15   A. Any facts. What do you mean facts?
16   Q. Do they know anything about what is alleged in
17   this lawsuit?
18   A. I don't know.
19   Q. You don't know?
20   A. No.
21   Q. You are not aware of them knowing?
22   A. No.
23   Q. What about Garden State Caulking?
24   A. No.
25        MR. MEHLER: Bates No. 747. Please mark

## Page 87

1    this as Plaintiff's Exhibit 10.
2         (P-10 marked for identification.)
3    Q. Do you recognize that document?
4    A. What is it?
5    Q. Tell me if you recognize it first.
6    A. No. I don't recognize it.
7    Q. You have never seen this document before?
8    A. No.
9    Q. You didn't prepare this document?
10   A. Not that I recall. This goes back to '87.
11   Q. Do you know if somebody at Maarv prepared this
12   document?
13   A. No.
14   Q. You don't know?
15   A. I don't know.
16   Q. Do you know if this document was submitted by
17   Maarv to the Bricklayers and Trowel Trades International
18   Pension Fund?
19   A. I don't know.
20   Q. It gives an address of Maarv of Lodi, New Jersey.
21   Was that Maarv's address at one point?
22   A. Not that I recall.
23   Q. Not that you recall?
24   A. No.
25   Q. You don't recognize that address?

## Page 88

1    A. No.
2    Q. And it looks like Waterproofing, Inc. is crossed
3    out and above it it just says Maarv. Do you see that?
4    A. Yeah.
5    Q. Do you have any idea why that would be?
6    A. I don't recognize the paper, period, whether it
7    is crossed out or not.
8    Q. This document is from 1987 if you look in the
9    upper right-hand corner. Was Maarv bound to any
10   agreement with the Bricklayers Union at that time?
11   A. Not that I know.
12   Q. So you don't know why Maarv would file any
13   reports with the IPF at that time?
14   A. No.
15   Q. It lists three last names here, one is Cuomo. Is
16   that the same way you spelled Peter Cuomo?
17   A. Yeah.
18   Q. Another one is Mayfield. Do you have any idea
19   who that is?
20   A. I don't recall.
21   Q. You don't recall any employee by the name
22   Mayfield from Maarv?
23   A. No.
24   Q. At any point?
25   A. No.

## Page 89

1    Q. I think the next one is your name?
2    A. It looks like it, yeah. Not the correct
3    spelling, but...
4         MR. DIAZ: Close.
5    A. Close.
6    Q. Not the correct spelling?
7    A. Absolutely not.
8    Q. So you definitely did not put that information
9    in.
10        Do you know what is being reflected on this
11   document when it says number of paid hours?
12   A. No. I really don't know what it refers, the
13   whole subject.
14   Q. Do you know if contributions were made on your
15   behalf to the IPF during 1987?
16   A. Could have been.
17   Q. Why would they have been?
18   A. At one time I was a union card member,
19   card-carrying union member.
20   Q. When was that?
21   A. I don't know. Seventies.
22   Q. And into the eighties?
23   A. Could be.
24   Q. Well, during that time when you were a union
25   member was Maarv, the company, bound to any agreements

Attila Szamosszegi                                                    October 24, 2007

Page 90

1  with the Bricklayers Union?
2      A.  No.
3      Q.  So why would contributions have been made on your
4  behalf if the company wasn't bound --
5          MR. DIAZ:  Objection to the form.
6      Q.  -- to an agreement?
7          MR. DIAZ:  Same objection.  You are assuming
8  contributions were made and he said he doesn't recognize
9  or is not familiar with the document.
10     Q.  You can answer the question.
11         MR. DIAZ:  Go ahead, you can answer.
12     A.  What was the question?
13     Q.  Do you know why contributions would be made on
14  your behalf?
15     A.  I have no idea.  I don't know.  I don't recall.
16     Q.  Is it your understanding that contributions could
17  be made even if the company was not bound to an
18  agreement?  You don't know?
19     A.  No.  I don't know.
20     Q.  Do you know if during 1987 Maarv had more than
21  three employees?
22     A.  I don't recall.
23     Q.  You don't recall if it had more than three?
24         MR. DIAZ:  He just said -- I am objecting
25  because he answers the question and you ask it again.  I

Page 91

1  am trying to move this along a little bit.
2      A.  No.  I don't.  I don't.
3      Q.  Are you aware of any reports being filed by Maarv
4  with the IPF during the 1980's?
5      A.  I don't recall.
6          MR. MEHLER:  Bates No. 758.  Please mark
7  that as P-11.
8          (P-11 marked for identification.)
9      Q.  Tell me if you recognize that document.  Do you
10  recognize that document?
11     A.  I guess it's the Benefit Fund.
12     Q.  Is that your signature on it?
13     A.  I'm not so sure.
14     Q.  You are not sure?
15     A.  I'm not sure.  No.
16     Q.  Do you remember signing benefit forms like this?
17     A.  I don't recall.
18     Q.  You don't recall if you have ever signed any?
19     A.  Not offhand, no.
20     Q.  Not often but you recall sometimes you signed
21  them?
22     A.  I said not offhand.
23     Q.  Not offhand.  I am sorry.
24         Do you know who prepared this document?
25     A.  No idea.

Page 92

1      Q.  Do you know if this document was submitted to the
2  Local 4 Benefit Funds?
3      A.  No.  I don't.
4      Q.  You don't?
5      A.  I don't.
6      Q.  Do you know if Maarv received this document to
7  fill out from the Local 4 Benefit Funds?
8      A.  No.  I don't know.
9      Q.  Did Maarv file reports with the Local 4 Benefit
10  Funds at any point?
11     A.  I really don't know.  I mean, I don't recall.
12     Q.  This document is for the period beginning May
13  15th, 2000 and ending May 26th, 2000?
14     A.  Yeah.
15     Q.  Was Maarv bound to any agreement with the
16  Bricklayers Union at that time?
17     A.  No.
18     Q.  Do you know why Maarv would have submitted
19  anything to the Benefit Funds at that time?
20     A.  We had to hire some union guys, they are paid the
21  benefits.
22     Q.  Do you recognize the three names on this?
23     A.  No.
24     Q.  It has Peter Cuomo crossed out.  Do you know why
25  he is crossed out?

Page 93

1      A.  No idea.
2      Q.  And you don't know if the other three individuals
3  are union guys or not union guys?
4      A.  Well, I don't recall the names so I assume, you
5  know, if I am paying the benefits over here they
6  probably were union guys.
7      Q.  You would have only paid benefits for union guys?
8      A.  Absolutely.
9      Q.  If you had nonunion guys doing waterproofing work
10  you wouldn't have paid benefits for them?
11     A.  No.
12     Q.  If you could refer back to that.
13     A.  Okay.
14     Q.  Near the top it says Job and Location, The
15  Palisades, Fort Lee, New Jersey?
16     A.  Uh-huh.
17     Q.  Is that the same project that you discussed with
18  John Capo?
19     A.  Yeah.  I assume so.
20     Q.  Did you have more than one project in Fort Lee?
21     A.  No.
22     Q.  Do you remember who the general contractor was on
23  that project?
24     A.  No.  Someone down from South Jersey, some outfit.
25     Q.  I may have asked you this, but did you sub out

Pages 90 to 93

Attila Szamosszegi                                                    October 24, 2007

Page 98

1  they worked for us, yes.
2      Q.  Again, it references The Palisades, Fort Lee,
3  that same project we were speaking about?
4      A.  Yeah.
5          MR. MEHLER:  765.  Please mark this as
6  Plaintiff's Exhibit 14.
7          (P-14 marked for identification.)
8      Q.  Do you recognize this document?
9      A.  Same document.
10     Q.  Same thing?
11     A.  Same thing.
12     Q.  And is your signature again on it?
13     A.  Yeah.  That's my signature.
14     Q.  And it's the same three individuals listed?
15     A.  Absolutely.
16     Q.  For the same project, correct?
17     A.  Yeah.  That's correct.
18     Q.  Do you know whether Maarv paid the $602 at the
19 bottom?
20     A.  I don't know.
21     Q.  Do you remember if Maarv would typically send in
22 a check along with this Benefit Funds form?
23     A.  I don't know.
24     Q.  You don't know?
25     A.  No.

Page 99

1      Q.  Would Anne have been the one to handle that?
2      A.  Definitely.
3          MR. MEHLER:  768.  Please mark this as
4  Plaintiff's Exhibit 15.
5          (P-15 marked for identification.)
6      Q.  Do you recognize this document?
7      A.  How can I not?
8      Q.  Is that your signature?
9      A.  Yeah.
10     Q.  And it's the same three individuals listed again?
11     A.  Yeah.
12     Q.  For the same project in Fort Lee?
13     A.  That is correct.
14     Q.  Do you know whether Maarv paid the 330.75
15 referenced at the bottom of this document?
16     A.  The answer is the same.  I don't know.
17         MR. MEHLER:  770, Plaintiff's Exhibit 16.
18         (P-16 marked for identification.)
19     Q.  Do you recognize this document?
20     A.  Of course.
21     Q.  Your signature again?
22     A.  Yes.
23     Q.  Now it just lists one of the individuals, William
24 Mills?
25     A.  That is correct.

Page 100

1      Q.  This one, I assume it's the same project.  It
2  says Palisades, 100 Old Palisades Avenue, Fort Lee, New
3  Jersey.  Is that the same project?
4      A.  Yeah.
5      Q.  And the total of 673.44.  Do you know if Maarv
6  paid that?
7      A.  I don't know.
8          MR. MEHLER:  776, mark this as Plaintiff's
9  Exhibit 17.
10         (P-17 marked for identification.)
11     Q.  Your signature again?
12     A.  Yes.
13     Q.  Do you know whether Maarv paid the 181.30
14 referenced on the bottom of that?
15     A.  I don't know.
16     Q.  Now, with all these benefit forms we have just
17 gone through you have testified that it's your
18 understanding they were submitted because these were
19 union guys?
20     A.  That is correct.
21     Q.  Tell me why did you feel that you had to file
22 these forms for the union guys if you didn't have an
23 agreement with The Bricklayers?
24     A.  If we took union guys on the job, like such
25 individual, a union foreman explained to us, look, this

Page 101

1  is how much he has to get, my guys, and we just obeyed
2  what we agreed upon.
3      Q.  Your understanding was whenever you hired a union
4  guy you had to submit those forms and pay the
5  contribution in dues?
6      A.  To the union guys, yeah.
7      Q.  Regardless of whether you had an agreement with
8  The Bricklayers?
9      A.  Well, we had a verbal agreement for that
10 particular job for those individuals.
11     Q.  Who was your verbal agreement with?
12     A.  I am sure it was Capo.  If I talked to Capo.  Or
13 even the union guys when they come out they say, Look,
14 here is the form what you have to pay.
15     Q.  Do you remember a specific verbal agreement with
16 Capo?
17     A.  No.  I don't.
18     Q.  Is it your understanding that you would have to
19 submit those forms and pay the dues and contributions
20 regardless of whether you had any agreement with the
21 union?
22     A.  Yeah.  If I hired a union guy, yes.
23     Q.  So tell me, what is your understanding, how would
24 it be different if you actually signed an agreement with
25 the union, how would your obligations be different?

Pages 98 to 101

Attila Szamosszegi                                October 24, 2007

## Page 102

1      A. I don't know. I don't want to speculate on it.
2      Q. Is it your understanding that the union would
3  send guys to a project to work for you even if you
4  didn't have an agreement with them?
5      A. Absolutely.
6      Q. How do you know they would do that?
7      A. Because they just did over there.
8      Q. Although you said you may have had a verbal
9  agreement with Capo?
10     A. I may said. I don't want to speculate on it,
11  but...
12          MR. MEHLER: 222. Plaintiff's Exhibit 18.
13          (P-18 marked for identification.)
14     Q. Tell me if you recognize that document.
15     A. Yes. It's a contribution, check of dues or
16  whatever it is.
17     Q. Being submitted by Maarv to B.A.C. Local 5?
18     A. Yes.
19     Q. That's your signature on it?
20     A. Absolutely.
21     Q. Did you prepare this document?
22     A. No.
23     Q. Who did?
24     A. Most likely Anne.
25     Q. Do you know why this letter was used rather than

## Page 103

1  a form from the union for these contributions?
2      A. I have no idea.
3      Q. Do you know if this document was actually sent to
4  B.A.C. Local 5?
5      A. I just believe the stamp over here, otherwise I
6  wouldn't know.
7      Q. At the top it says Maarv Concrete Restoration on
8  kind of the letterhead. Is that a name Maarv went by at
9  some point?
10     A. It's Maarv Waterproofing, you know. Concrete
11  Restoration.
12     Q. It's the same company?
13     A. Yeah. It's the same company.
14     Q. Was there ever a legal change of the name of
15  Maarv?
16     A. I don't think so. I don't think so.
17     Q. Do you know does your letterhead currently say
18  Maarv Concrete Restoration or does it say Maarv
19  Waterproofing?
20     A. You know, that's a good question. I don't know.
21     Q. This letter is dated April 15th, 2004. Was Maarv
22  bound to an agreement with The Bricklayers Union at that
23  time?
24     A. Not that I know of.
25     Q. Well, you testified previously that your

## Page 104

1  understanding of the Princeton Project that the document
2  you signed was just for that project.
3      A. That is correct.
4      Q. Were these dues and fringe benefits being
5  submitted pursuant to that agreement?
6      A. Yeah. This happened after my sub's check was
7  rejected, as you showed me. So we had to, you know,
8  send in a check. So obviously probably we referred him
9  back to why we did not fill out this form because
10  probably our sub filled it out and sent it in and they
11  sent the check back, you know, stating probably this has
12  to be Maarv, but didn't send a thing so we just send the
13  check out with a note.
14     Q. So you believe that these three employees listed
15  were guys working for Pallos Construction, your sub?
16     A. Definitely they were.
17     Q. And the union wouldn't accept contributions or a
18  report from Pallos so you had to do it?
19     A. Yes.
20     Q. And I think this amount matches up to the amount
21  that Pallos reimbursed you for on that check we looked
22  at earlier?
23     A. That is correct. That is correct.
24     Q. Do you remember how many reports or letters Maarv
25  submitted to the union in relation to that Princeton

## Page 105

1  Project?
2      A. No. I don't recall.
3      Q. Was it more than one?
4      A. I don't know.
5      Q. If you look at the last paragraph it says, Please
6  be advised in error the first check neglected to pay for
7  Check Off Dues for Efrain Rivera. Does that suggest to
8  you there was at least one other check sent in?
9      A. It suggests nothing to me.
10     Q. What do you think the reference to the first
11  check is?
12     A. No idea.
13     Q. Did Pallos reimburse you for all the
14  contributions and dues you paid for their employees?
15     A. For whose employees?
16     Q. Maarv made the contribution and dues payments for
17  the union employees of Pallos?
18     A. Okay.
19     Q. Did Pallos reimburse Maarv for all those
20  payments?
21     A. I think this was the only payments, you know.
22     Q. You think this was the only one?
23     A. Yeah, I think so.
24     Q. You are not aware of any payments that Maarv made
25  that Pallos didn't reimburse them for?

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
Professionals Serving Professionals

Attila Szamosszegi                                          October 24, 2007

Page 110

1    A. I said those persons never worked for us.
2    Q. But you still allowed the auditor in?
3    A. Yes. Stupid me, yes.
4    Q. Why did you allow the auditor in?
5    A. Because they were looking for three persons who
6    never worked for me. It's as simple as that.
7    Q. Did you feel like you were obligated to let them
8    in?
9    A. Feel like I'm obligated? As far as I could see I
10   did nothing wrong.
11   Q. Did you think you had the right to tell them, no,
12   you can't come in?
13   A. At that time I thought I was doing the right
14   thing. Little did I know.
15   Q. As the audit was going on, did Anne come to you
16   with questions about what was happening?
17   A. Not really, not that I recall.
18   Q. Did she come to you saying, Hey, they need these
19   documents, can I give them to them?
20   A. She was the office manager, so she made pretty
21   much decision as far as this is concerned, this
22   particular.
23   Q. Did she ever mention to you that she was having
24   trouble locating any documents?
25   A. Not that I recall. I know they took a lot of

Page 111

1    things out of our office.
2    Q. Did she ever tell you about any problems going on
3    with the audit?
4    A. Yeah. They couldn't find the three persons they
5    were looking for and they were getting frustrated.
6    Q. Did she tell you anything else?
7    A. No. That was the main subject, you know.
8    Because they were getting very testy because they
9    couldn't find the three persons that supposedly worked
10   for us and frustrated them.
11   Q. What did she tell you when the audit was
12   finished?
13   A. What was she supposed to tell? I don't know.
14   Q. Did she tell you that the auditor was satisfied
15   with what they found?
16   A. She just said, Look, they were very frustrated.
17   And I was very frustrated because they came in the
18   pretense of looking for three persons and when they
19   didn't find it they got into everything else.
20   Q. Anne told you that they were looking for three
21   persons?
22   A. No. The auditor, they send a letter. Once she
23   showed me, why is the audit going to take place, it
24   mentioned three persons.
25   Q. Did Anne ever tell you that the auditor was still

Page 112

1    seeking documents after they left your office?
2    A. No.
3    Q. Did Anne ever tell you that there were additional
4    documents she was supposed to send to the auditor?
5    A. No.
6    Q. Did she ever tell you that she refused to provide
7    some documents?
8    A. She was the kindest person. She always did her
9    obligation to the best of her knowledge.
10   Q. Did Anne keep any personal files at the office?
11   A. A diary?
12   Q. Just, I mean files of documents, stuff she worked
13   on that wasn't part of the official company files?
14        MR. DIAZ: Objection to the form. Go ahead.
15   A. Why should she?
16   Q. You are not aware she did?
17   A. That's her office base, not her home.
18   Q. Did Anne ever tell you that the auditor was
19   asking for documents that Maarv just doesn't keep?
20   A. No. She never mentioned anything.
21   Q. Did Anne ever tell you that she received
22   certified letters from the auditor requesting documents?
23   A. No. She never mentioned it.
24   Q. Did she ever tell you that the auditors had
25   certain deadlines for Anne to provide certain documents?

Page 113

1    A. No. Because they came out so they took
2    everything. I believe they were there two and a half
3    days.
4    Q. I am referring to after they left.
5    A. I think they got everything in two and a half
6    days, you know, as far as I know. She never mentioned
7    anything else.
8    Q. Are you aware that Anne told the auditors that
9    Maarv didn't use any subcontractors during 2002 through
10   2005?
11        MR. DIAZ: Just note an objection to the
12   form. The objection is you are assuming Anne made those
13   comments.
14   Q. You can answer.
15   A. I don't know.
16   Q. Maarv did, in fact, use subcontractors during
17   that time period?
18   A. Yes. Yes, we did.
19   Q. Are you aware that Anne informed the auditor that
20   Peter Cuomo was vice-president/secretary of the company?
21        MR. DIAZ: Objection to the form. Go ahead.
22   A. No.
23   Q. Was that accurate, that he was vice-president,
24   secretary?
25   A. I don't know. I never even thought about making

Pages 110 to 113

Attila Szamosszegi                                    October 24, 2007

## Page 114

1  anybody vice-president or secretary, no. I really don't
2  know.
3      Q. He was not vice-president or secretary?
4      A. I don't recall.
5      Q. Are you aware that Anne looked at the W-2's for
6  the company and marked next to each employee's name what
7  job they did, such as whether they were a laborer?
8          MR. DIAZ: Objection to the form. Go ahead.
9      A. No. I am not aware.
10     Q. Are you aware that Anne told the auditor that
11 laborers at Maarv do waterproofing and caulking work?
12         MR. DIAZ: Objection to the form.
13     A. I am thinking she knows who is doing what, she's
14 the office manager. She doesn't even know what caulking
15 is.
16     Q. To the extent she said that she was mistaken?
17     A. If she said it, I don't know. I am not
18 stipulating about it.
19     Q. Well, the laborers, I think you testified
20 previously laborers at Maarv don't do waterproofing and
21 caulking?
22     A. No. The caulkers do the waterproofing and
23 laborers do laboring work.
24         MR. DIAZ: Chuck, we can go through if you
25 want to go up to 1. I don't know how much more you

## Page 115

1  have.
2          MR. MEHLER: I probably will be able to
3  finish by then.
4          MR. DIAZ: I have to leave at 1. If you
5  want to take a break at 1.
6          MR. MEHLER: I have gotten through quicker
7  than I thought. I might be able to finish by then or
8  not much longer.
9          MR. DIAZ: If we go through 1 and then break
10 at 1. Is that okay?
11         (Discussion off the record.)
12 (BY MR. MEHLER:)
13     Q. I think you just testified a minute ago, and
14 correct me if I am wrong, if I am misstating that the
15 laborers do the labor work and the caulkers do the
16 caulking work; is that right?
17     A. Uh-huh.
18     Q. But doesn't Maarv subcontract out all their
19 caulking work now?
20     A. Yeah. Right.
21         MR. DIAZ: Can you give me one minute?
22         MR. MEHLER: Sure.
23         (Brief recess taken.)
24 (BY MR. MEHLER:)
25     Q. Do you know whether caulking and waterproofing

## Page 116

1  work are within the work jurisdiction of the Bricklayers
2  Union?
3      A. I don't know. I assume so, you know, the
4  caulking probably is.
5      Q. At some point did you become aware of the
6  conclusions the auditors had reached?
7      A. The conclusion of what?
8      Q. The amounts that the auditor claimed were owed.
9      A. Well, we got a letter, yeah, you know.
10     Q. What was your reaction when you saw that?
11     A. I believe it was a joke, bad one for that matter.
12     Q. What did you do when you received that letter?
13     A. You do not want to know.
14     Q. Was it a letter from the auditor or from the
15 attorney for the IPF?
16     A. I think an auditor. I am not so sure who sent
17 it, no.
18     Q. Did you call anybody when you received it?
19     A. Yeah. Our attorney.
20     Q. Your attorney?
21     A. Yeah.
22     Q. Anybody else?
23     A. I was looking for attorney. Who else I am going
24 to call, God? No.
25     Q. Did you talk with Anne about it?

## Page 117

1      A. Anne?
2      Q. Yes.
3      A. Yeah. Yeah.
4      Q. What was her reaction?
5      A. She was shocked. Killed her.
6      Q. But you didn't talk to anybody at the union about
7  it directly?
8      A. No.
9      Q. And you didn't talk to anybody at the IPF about
10 it?
11     A. No.
12     Q. Did you ever see the auditor's report that they
13 prepared?
14     A. I had seen something, whether it came from that
15 or from you guys. I don't know.
16     Q. Did you review the report that the auditor
17 prepared?
18     A. Yeah. Because it was -- they listed everybody,
19 whoever walked in front of my office, as a union person.
20     Q. Do you believe that Maarv owes anything in
21 contribution or dues?
22     A. No.
23     Q. Did you discuss the auditor's report with anybody
24 other than your attorney?
25     A. Such as? Who?

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                              Professionals Serving Professionals

## Page 118

1    Q. Anne or Peter or anybody?
2    A. Anne is aware because she opens the mail.
3        MR. MEHLER: Douglas, documents 180 through
4    194. Plaintiff's Exhibit 20.
5        (P-20 marked for identification.)
6        MR. DIAZ: Up to what Bates No.?
7        MR. MEHLER: Up to 194.
8        MR. DIAZ: Okay.
9    A. Yes, what is the question?
10   Q. Have you seen this before?
11   A. I don't think I have seen it. No.
12   Q. I can represent to you that this is the auditor's
13   report.
14   A. Okay.
15   Q. Do you know if anybody at Maarv ever received a
16   copy of this other than after this lawsuit was filed?
17   A. I don't know. Like I said, I don't think I have
18   seen this one.
19   Q. Okay. If you can turn to Page 189.
20   A. Okay. Yes.
21   Q. The top of that says International Trowel Trades
22   Fringe Benefit Funds Summary of Unreported Hours and
23   this page is for 2002. You see it's right there. 2002.
24   You see a list of employees listed?
25   A. Uh-huh.

## Page 119

1    Q. Are some of those Maarv employees?
2    A. They were, yeah.
3    Q. Which ones? We can go through them one by one if
4    you like.
5        Francisco Campos, is that a Maarv employee?
6    A. Yeah. Most of them are, yeah.
7    Q. What type of work did each of them do?
8    A. I don't recall. I don't recall some of the
9    names. I may recall the face but that's about it. I
10   don't know specifically what they did.
11   Q. Did any of them do waterproofing and caulking
12   work?
13   A. Yeah, probably Ivan Pallos.
14   Q. Ivan Pallos was a Maarv employee?
15   A. Back then.
16   Q. Back in 2002?
17   A. Yeah. In that particular job I guess.
18   Q. He subsequently went out and started his own
19   company?
20   A. Yes. He just worked I think -- I believe this is
21   the only time he worked for us.
22   Q. You don't have any involvement in that other
23   company?
24   A. No, I don't.
25   Q. And he no longer has any involvement in your

## Page 120

1    company?
2    A. Absolutely not.
3    Q. Nobody else in there you recognize as doing
4    waterproofing/caulking work in 2002?
5    A. No.
6    Q. Do you believe most of them were laborers?
7    A. Yeah. Welders, laborers, painters.
8    Q. I am sorry, what was the first word?
9    A. Welder.
10   Q. Are you aware that Anne identified them to the
11   auditor as laborers?
12       MR. DIAZ: Objection to the form. Go ahead.
13   A. I am not aware what Anne did.
14   Q. Are you aware whether any of those employees are
15   union members?
16   A. None of them are union members.
17   Q. Let's go to the next page, 190. It lists a lot
18   of the same employees but it also lists you and Peter
19   Cuomo at the bottom.
20   A. Yeah.
21   Q. What type of work did you and Peter Cuomo do in
22   2002?
23   A. I did estimating.
24   Q. Did either of you do work in the field?
25   A. Peter Cuomo.

## Page 121

1    Q. What type of work did he do?
2    A. He is a project manager.
3    Q. He didn't do any waterproofing or caulking?
4    A. No. He is a project manager.
5    Q. Would his responsibilities include overseeing
6    waterproofing and caulking work?
7    A. His job is to oversee everything.
8    Q. Whether it was done by Maarv employees or whether
9    it was being done by Maarv subcontractors?
10   A. That is correct.
11   Q. Turn to the next page. This lists some
12   additional employees.
13       Is there anybody on there that you believe did
14   waterproofing/caulking work in 2003?
15   A. No.
16   Q. Nobody?
17   A. Nobody.
18   Q. Next page, 2004, anybody on there you believe did
19   waterproofing or caulking work in 2004?
20   A. Not that I recall, no.
21   Q. Do you recognize most of these names?
22   A. A majority, yeah. These are people that come and
23   go. They work, I don't know, we got a high turnover as
24   you can see, you know.
25   Q. Would you know the people who did waterproofing

Attila Szamosszegi                                    October 24, 2007

Page 122

1    and caulking work for you?
2        A.  We subbed it out.  We sub out our waterproofing.
3        Q.  But in some instances you did it yourself?
4        A.  Way back in the eighties, yes.  We sub out our
5    waterproofing and caulking.
6        Q.  And all these employees we have covered thus far
7    during these years were employees of Maarv's not
8    employees of subs?
9        A.  No.  They are on my payroll obviously.
10       Q.  Next page, 2005.
11       A.  Okay.
12       Q.  Page 193.
13       A.  Yes.
14       Q.  Any of them do waterproofing or caulking work?
15       A.  We subbed out our work.
16       Q.  Next page, 194.
17       A.  That was a joke over here.
18       Q.  That's what I wanted to ask you about?
19       A.  They came and took upon themselves.  I seen this
20   page somehow.
21       Q.  What does that mean to you -- I am sorry.  What
22   does it mean when it says cleaner-waterproofer?
23       A.  I have no idea.  Everybody is waterproofing or
24   cleaner.  So I don't get it.
25       Q.  It wasn't your understanding that was anybody's

Page 123

1    position at Maarv, cleaner, waterproofer?
2        A.  No.  I just don't know where they got cleaners
3    waterproofer.  Everybody.  That's why when I said it was
4    a joke because they categorized people the way they
5    wanted to categorize.
6        Q.  You don't know where that information came from?
7        A.  Absolutely not.  Not from us.
8        Q.  And Anne never came to you and asked, Hey, they
9    want to know the classification of these employees, what
10   should I tell them?
11       A.  No.
12       Q.  Would you have relied on Anne to provide that
13   information?
14       A.  Well, I was only aware if there was a question.
15       Q.  But if you had known that was a question would
16   you expect Anne to just answer that or would you expect
17   Anne to come to you and figure it out?
18       A.  I don't want to stipulate on it because I really
19   don't know what would be my answer.
20       Q.  Would Anne know that information?
21       A.  Would she know?
22       Q.  Yes.
23       A.  I don't think so.
24       Q.  If you look about halfway down the page it does
25   have a person there, Karczag is the last name, who is

Page 124

1    listed as a caulker.
2        A.  Let me just see.  Yeah.
3        Q.  Is that accurate for that person?
4        A.  No.
5        Q.  That person was not a caulker?
6        A.  No.  This other one, Pallos, Ivan, yeah, he was a
7    caulker.
8        Q.  He was a caulker.  But he is listed -- why would
9    he be listed as a caulker if you subcontracted out all
10   your calking work?
11       A.  Because back when he worked in 2002 probably he
12   was doing the caulking.
13       Q.  Did you have employees that did cleaning work,
14   what you would call cleaning work?
15       A.  What is cleaning?  Housecleaning?
16       Q.  How about cleaning in preparation for restoration
17   or cement restoration?
18       A.  Cleaning what?  What is cleaning?  That's pretty
19   objective, cleaning.
20       Q.  When you subcontracted out your caulking and
21   waterproofing work, would your laborers do anything to
22   get the site or the project ready for that waterproofing
23   work?
24       A.  Absolutely not.
25       Q.  What about your company did some cement

Page 125

1    restoration work?
2        A.  Yes.
3        Q.  Did your laborers do that work or was that work
4    subbed out?
5        A.  Most of it was subbed out.  A lot of work subbed
6    out.
7        Q.  Some of it you did in-house?
8        A.  Yes.
9        Q.  Was there cleaning work associated with that in
10   preparation for the restoration?
11       A.  No.  There is no cleaning work whatsoever.
12   That's why I am kind of shocked.  Cleaner and
13   waterproofer.
14       Q.  Did you ever have your accountant review the
15   auditor's findings?
16       A.  No.
17       Q.  Are all of Maarv's documents kept at the office?
18       A.  Yes.
19       Q.  You don't keep any at home?
20       A.  No.
21       Q.  Are there any documents that are kept at your
22   accountant's office that you don't have at the Maarv
23   office?
24       A.  No.
25       Q.  Does anybody at the company use E-Mail?

Pages 122 to 125

Attila Szamosszegi                                    October 24, 2007

## Page 134

1  this lawsuit?
2    A.  What?
3    Q.  Is there a reason they haven't been produced?
4    A.  What do you mean produced?
5    Q.  Haven't been provided to us in this lawsuit.  We
6  asked for them.
7    A.  Who is us?
8    Q.  The plaintiffs.
9    A.  Well, when they came in they got everything they
10  asked for.
11    Q.  They only covered the years 2002 through 2005.
12  They were not there after -- they were not there to get
13  2006 or 2007.
14    A.  So who asked for them after that?
15    Q.  We have asked for them in this lawsuit.
16    A.  In what form?
17    Q.  In what form?
18    A.  Yeah.
19    Q.  We have asked for them in discovery requests.
20      MR. DIAZ:  I have given you 2006.
21      MR. MEHLER:  I don't think you gave me
22  payroll records.
23      MR. DIAZ:  We gave you W-2's.
24      MR. MEHLER:  You gave me W-2's.
25      THE WITNESS:  That's payroll records.

## Page 135

1  (BY MR. MEHLER:)
2    Q.  Do you maintain payroll records other than W-2's?
3    A.  No.
4    Q.  Those are the only payroll records you maintain,
5  the actual W-2's?
6    A.  Yeah.
7    Q.  That's where the confusion is.
8    A.  Okay.
9    Q.  Do you maintain any sort of cash disbursement
10  records showing what monies are going out of the
11  company?
12    A.  Cash disbursements?
13    Q.  Yes.  Anything showing where the money of the
14  company, where it's being paid out to?
15    A.  I guess the accountants would know, somebody.  I
16  assume we have something, we have to have.
17    Q.  In connection with this lawsuit did you gather
18  from your accountant the financial records for the
19  company?
20    A.  What do you mean financial records?
21    Q.  We asked for cash disbursement records.  So if
22  your accountant has them you had an obligation to get
23  them to us.
24    A.  If he didn't get them to us obviously he doesn't
25  have it.

## Page 136

1    Q.  You believe you asked the accountant for whatever
2  records we requested?
3    A.  Yeah.
4    Q.  Do you have any documents which list by street
5  address all the projects you have done over the last
6  seven years?
7    A.  No.  I don't have that.
8    Q.  Do you have them for the more recent years?
9    A.  Last year or so.
10    Q.  Last year or so?
11    A.  Whatever we still working on, yeah.
12    Q.  Your listings of the projects for 2007?
13    A.  When we are working on, yeah.
14    Q.  Do you have a listing of the general contractors
15  you have worked for?
16    A.  No.
17    Q.  What about the subs you have used?
18    A.  Well, the tax, we got 1099's.  That's what the
19  subs got.
20    Q.  Do you have your 1099 forms?
21    A.  I suppose we have some.
22    Q.  They have not been produced to us in this
23  lawsuit.
24    A.  Okay.
25    Q.  So to the extent you have them you have an

## Page 137

1  obligation to provide those from 2002 to 2007.
2    A.  I don't know if I got them back to 2002, but
3  whatever I got I will forward it to you.
4    Q.  Let me go through the records I have indication
5  of us not getting and you can tell me whether you think
6  you have them or don't have them.
7      Federal 941 quarterly payroll tax returns.
8    A.  Let me make -- whatever I provide you I have
9  that, whatever I provide you.  Whatever I don't provide,
10  couldn't provide probably because we didn't have it.
11      MR. DIAZ:  I will represent I gave him the
12  list that you are referring to now and instructed him to
13  get documents they had responsive to that list.
14    Q.  I guess my question is:  Was that list
15  communicated to the accountant who presumably has some
16  of these documents?
17    A.  Yeah.  They gave me all the W-2's and everything
18  else for the first eight questions.
19    Q.  You remember seeing this list?
20    A.  Yes.  Yes.
21    Q.  And you forwarded it or discussed that list with
22  your accountant?
23    A.  Yes.  Yes.
24    Q.  And he forwarded what info he had?
25    A.  Yes.  And he forwarded it to you.

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
Professionals Serving Professionals

**EXHIBIT C**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al. | |
| Plaintiffs, | CASE NUMBER: 1:07CV00501 |
| v. | JUDGE: Richard J. Leon |
| MAARV WATERPROOFING, INC., | |
| Defendant. | |

## CERTIFICATION OF ATTILA SZAMOSSZEGI IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Attila Szamosszegi, being of full age and upon personal knowledge, do hereby certify as follows:

1.      I am the owner and president of Maarv Waterproofing, Inc. ("Maarv"). There is no board of directors of Maarv.

2.      Maarv is located in Passaic County, New Jersey which is in northern New Jersey and the majority of its work is generally performed in northern New Jersey. Maarv performs little if any work in southern New Jersey which includes Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Ocean, Salem, and Ocean counties.

3.      Maarv has historically subcontracted waterproofing, caulking, and concrete work and does not generally perform this work itself.

4.      Maarv does not employ cement masons, plasters, or fire proofers. Maarv does not employ anyone covering any of the trades in what Plaintiffs have referred to as the "2002 CBA," and specifically did not do so for the time periods in which Plaintiffs contend Maarv was bound to this CBA, and does not perform the type of work covered by the 2002 CBA.

5.      While glancing through the "Local 5 Independent Agreement" that Local 5 had faxed to Maarv, it was difficult for me to read the document and make out its words because it was in fine print and blurry and I was therefore not in fact able to read it.

6.     In or about February of 2004, the only female that would have answered the telephone for Maarv was Ann Paoella. So when Dominick Longo testified that he telephoned Maarv's offices around this time and spoke to a female who he might have told that he was faxing a contract only "in reference to the Princeton parking garage project," that female would have been Ann Paolla, the office manager for Maarv at the time.

7.     No one from any union ever provided me with a copy of a collective bargaining agreement or ever offered me such a copy. I have never executed a collective bargaining agreement and have no experience negotiating such agreements.

8.     The union could have obtained information regarding Maarv such as its federal identification number and workers compensation information from public requests for proposals or "Dodge reports" which list information pertaining to contract bidding relating to construction projects.

9.     Maarv has provided records regarding subcontractors to Plaintiffs and the names and addresses of employees who have worked for Maarv.

10.     During the audit performed on behalf of the Plaintiffs at Maarv, I was available to the auditors and the auditors did see me in the office but they never sought any information from me. Ms. Paoella provided the auditors with whatever documents they requested and which she was able to locate, and would have provided the 2002 payroll records of Maarv. Maarv provided the auditors with all the information they needed to complete the audit, and the auditors never told me that they were still looking for additional documents. I do not recall Maarv receiving any certified letters from the auditors requesting documents.

11.     Ms. Paoella would have written "laborers" next to Maarv employees listed on W-2 documents since Maarv's employees are primarily laborers. Maarv did not tell the auditors that it employed "cleaners" which is how the auditors listed virtually all of Maarv's employees so that they could attempt to "fit them" under the 2002 CBA. Maarv does not employ anyone in the job classification of "cleaner-waterproofer" and this classification did not even exist and was made up by the auditors.

2

12.    Ms. Paoella would have been adamant that Maarv employees did not perform covered work under the 2002 CBA because they did not.

13.    Ms. Paoella would not have stated that the only employees covered by the CBA were the two owners of the company. None of Maarv's employees were covered by the 2002 CBA.

14.    Ms. Paoella would not have told the auditors that Maarv did not use any subcontractors during 2002 through 2005.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment

ATTILA SZAMOSSZEGI

Dated: January 4, 2008

3042467v1

3

# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


Civil Action No. 07-cv-0501 (RJL)


JOHN FLYNN, JAMES BOLAND, GERALD
O'MALLEY, KEN LAMBERT, GERARD SCARANO,
H.J. BRAMLETT, EUGENE GEORGE, PAUL
SONGER, WILLIAM McCONNELL, MATTHEW
AQUILINE, GREGORY R. HESS, MICHAEL
SCHMERBECK, VINCENT DELAZZERO, and
BENJAMIN CAPP,
as Trustees of and on behalf of the
BRICKLAYERS & TROWEL TRADES
INTERNATIONAL PENSION FUND,
    620 F Street, N.W.        ORAL DEPOSITION OF
    Washington, DC 20004     DOMINIC LONGO
    (202) 783-3788,
JIM ALLEN, MATTHEW AQUILINE, LON BEST,
JAMES BOLAND, TED CHAMP, RAYMOND
CHAPMAN, VINCENT DELAZZERO, BRUCE
DEXTER, JOHN FLYNN, EUGENE GEORGE,
GREGORY HESS, FRED KINATEDER, DAN
KWIATKOWSKI, KEN LAMBERT, SANTO
LANZAFAME, DICK LAUBER, WILLIAM
McCONNELL, EDWARD NAVARRO, GERALD
O'MALLEY, JOHN PHILLIPS, CHARLES
RASO, MARK ROSE, KEVIN RYAN, GERARD
SCARANO, MICHAEL SCHMERBECK, PAUL
SONGER, JOSEPH SPERANZA, and FRED
VAUTOUR,
as Trustees of and on behalf of the
INTERNATIONAL MASONRY INSTITUTE,
    620 F Street, N.W.
    Washington, DC 2004
    (202) 783-3788


(CAPTION CONTINUED)


*　　*　　*　　*　　*
Monday, October 22, 2007
*　　*　　*　　*　　*


MASTROIANNI & FORMAROLI, INC.
Certified Court Reporters and Videoconferencing
251 South White Horse Pike, Suite 200
Audubon, New Jersey 08106
856-546-110

Dominic Longo                                              October 22, 2007

**Page 66**

1 but they couldn't understand English, I believe they
2 were Russian at the time. I'm not sure.
3     Q.    Okay.
4     A.    You know, they -- I don't think they
5 spoke English, you know. I think I went up to --
6 somebody was like overseeing them, and I proceeded to
7 that person, who I believe was Attila.
8     Q.    The person wearing the sports jacket?
9     A.    I think so, you know. Well, like I
10 said, this was, this was a very atypical case for me.
11 It's like going to the store someplace and going to
12 7-Eleven. You know, it wasn't much of a really -- it
13 really wasn't much of an operation. He had maybe
14 three guys on the job, three or four guys on the job.
15     Q.    Okay.
16     A.    Where I proceeded to tell them that, you
17 know, this is a union project and this and that, and,
18 you know... I probably said, you know, I have
19 nothing to hide. You really need to put one of my
20 men on as shop steward, or whatever. At the time
21 there was, I believe it was a pleasant, casual
22 conversation. The vast majority of my conversation
23 with owners is very courteous and I try to keep
24 things casual. There was nothing like -- if there's
25 an argument or something, it would have been a little

**Page 67**

1 bit more memorable, but there wasn't.
2     Q.    Okay. Was there any response by this
3 person you spoke to?
4     A.    On the job site?
5     Q.    Yes. You said you spoke to someone that
6 might have been wearing a sports jacket and you --
7     A.    Yeah, we had some conversation. The
8 extent of the conversation, I can't remember
9 specifics of it, but it was, it was -- he was
10 responsive to the idea of signing the contract. He
11 said he had no problem with it.
12     Q.    How did the contract come up?
13     A.    I brought it.
14     Q.    All right. You told me that you told
15 him it was union contract. You really need to put
16 one of my men on as a shop steward. What else -- did
17 you tell him anything else besides that?
18     A.    I probably asked him if he had a signed
19 agreement.
20     Q.    Okay.
21     A.    Okay.
22     Q.    Did you say anything else to this
23 person?
24     A.    I cannot remember specifics what I told
25 this person. I can -- and, again, I can, through the

**Page 68**

1 way I usually handle business, I can assume of how I
2 handled this. If you want to ask me specifics about
3 certain responses or certain questions, I can't
4 answer that.
5     Q.    If you have specifics, that's great. I
6 mean, I understand --
7     A.    Yeah, but I don't have specifics.
8     Q.    I'm just trying to get a general idea of
9 what you said to this person and what he said to you.
10     A.    You know what, I could imagine that I
11 said hi, shook his hand, this and that, and, you
12 know, do you have a contract with the B.A.C. You
13 know this is a union project. I said would you
14 mind -- first of all, I never insist anybody sign a
15 contract. I never say you got to sign. Okay. I
16 probably said -- you know, I probably said you need
17 to sign a union contract on this job. Everything is
18 union.
19     Q.    Okay.
20     A.    I either gave him the contract at the
21 time or faxed it over. Apparently, from the
22 documentation I saw, I probably faxed it over. You
23 know, if you give me your card, I will fax it over.
24 We did talk. I believe he told me that he had a
25 contract with Local 4 at one time.

**Page 69**

1     Q.    Okay.
2     A.    But I think the contract was expired or
3 whatever, and I just told him you need to sign a new
4 contract. It wasn't -- you know, there was no -- I
5 know there seems to be a question of one job
6 agreement, but that never even came up in
7 conversation.
8     Q.    You never told him this was just for one
9 job?
10     A.    No. I have never signed a one-job
11 agreement in the five years I've been in the B.A.C.
12 Never one, with nobody.
13     Q.    Did you say anything else to him other
14 than what you just testified to?
15     A.    I don't believe so. You know, it was
16 just a very common conversation. You know, like I
17 said, it wasn't anything that struck me, that struck
18 me as -- that struck out of the ordinary.
19     Q.    And can you tell me everything this
20 person said to you in response?
21     A.    No, I can't.
22     Q.    Can you even generally? Do you know
23 what the person said to you in response?
24     A.    I believe, you know, he said -- I
25 believe he said that it was no problem or he would

Pages 66 to 69

Dominic Longo                                      October 22, 2007

## Page 70

1   sign the contract. The simple fact of the matter is,
2   you know, that for me to fax it to him, he had to
3   give me his fax number. Probably gave me his card
4   with his fax number on it and said send me the
5   contract, you know, because I wouldn't -- you know,
6   obviously, that appears to be -- you know, I think I
7   did call his office and I think there was a female
8   that responded, okay, and I probably told her, look,
9   I'm faxing the cover sheet over for the contract.
10      Q.    Okay. Do you remember the name of the
11  female?
12      A.    No. No. No. No.
13      Q.    What was the conversation that you had
14  with the female?
15      A.    Probably the simple fact that I am
16  faxing over a contract, just so she was aware that it
17  was coming.
18      Q.    Did you mention to her that the contract
19  was for this --
20      A.    No.
21      Q.    Let me ask the question first. Did you
22  mention this was in reference to the Princeton
23  parking garage project?
24      A.    Might have.
25      Q.    Did she say anything in response?

## Page 71

1       A.    I don't remember any of the
2   conversation. I generally put, when I am making a
3   fax like that, I generally put the job site that I
4   was on so you know, so you are familiar exactly where
5   we are talking about. Not that that has anything to
6   do with a one-job agreement, but it helps as a point
7   of destination.
8       Q.    When you had this conversation with the
9   person on the project was there anyone else present
10  at the time?
11      A.    Well, the workers were there, but they
12  were occupied at the time. I believe, I believe I
13  was just talking just the two of us.
14      Q.    Okay. Was there anyone else with you
15  from the local?
16      A.    No, I don't believe so.
17      Q.    You mentioned you either gave him the
18  contract right there and then or you faxed it to him?
19      A.    Yeah, either way. You know, I thought I
20  handed him the contract, but, you know what, it's
21  very possible that I could have faxed him the
22  contract over.
23      Q.    Okay.
24      A.    I still think I gave -- I think I gave
25  him the contract on the job, but I'm not, I'm not --

## Page 72

1   you know, you want me to swear on my children, no, I
2   can't. But generally, that's the way it would go
3   down.
4       Q.    Okay. Are you familiar with a company
5   called Pallos Construction?
6       A.    No, I'm not.
7       Q.    Do you know who Ivan Pallos is?
8       A.    No.
9       Q.    The person you spoke to, did they have
10  any clothing on or anything else that indicated the
11  company they worked for?
12      A.    I can't remember.
13      Q.    Was there anything that said Maarv
14  Waterproofing on anything they wore?
15      A.    Can't remember.
16      Q.    Did you know that Pallos Construction
17  was the sub on that job for Maarv Waterproofing?
18      A.    I have no knowledge of anything like
19  that.
20      Q.    Okay.
21      A.    I was never, never informed of any, you
22  know, anything that Maarv was doing, doing the act,
23  performing the work.
24      Q.    Okay. You didn't know?
25      A.    No. No. I wasn't -- you know, I dealt

## Page 73

1   with Maarv and the employees that I talked to --
2   well, the employees on the job, as far as I know, and
3   I am not -- and I can't swear to this, but I probably
4   asked one of the employees who he was working for,
5   and I believe he said Maarv.
6       Q.    Was this the person in the sports
7   jacket?
8       A.    No. I think I asked -- you know, I
9   would usually -- I would go up to somebody if I saw
10  him and say, well, who are you working for, and I do
11  remember that he was -- I don't think it was much of
12  a conversation. Or I might have said are you working
13  for Maarv.
14      Q.    Okay.
15      A.    Okay. You know...
16      Q.    Weren't they employees that didn't speak
17  English, you thought maybe they were Russian?
18      A.    Yeah, but if you say are you working for
19  Maarv, they -- Maarv is Maarv, whether it's English
20  or Russian. You know, they usually -- you know.
21      Q.    Okay. The person you spoke to, did he
22  give you his business card or did he have a business
23  card, do you know?
24      A.    Can't remember.
25      Q.    Did he introduce himself as Attila?

Pages 70 to 73

Dominic Longo                                                    October 22, 2007

Page 98

1    another document, which is in the form of Longo-1?
2    That's the procedure?
3        A.    I cannot speak for everybody else.
4        Q.    Do you know whether or not that is the
5    procedure or not?
6        A.    I cannot speak for anybody else.
7    Usually, usually that suffices for everybody.  That
8    is what we usually do.  We offer the people the book
9    if they would like to see it, which is only a matter
10   of working agreements, but usually this is the
11   documentation that is signed and mailed or faxed back
12   to us.
13       Q.    You are referring to Longo-1?
14       A.    Yes.
15       Q.    That is for all contracts?
16       A.    I'm sure it's not for all contracts.  I
17   am going to say for a good number of them.
18       Q.    On Longo-1, Longo-1 specifically
19   mentions a specific contract in the first paragraph.
20   Do you see that?
21            MR. MEHLER:  Objection on the grounds
22   it speaks for itself.
23       Q.    Do you see that it mentions a specific
24   contract?
25            MR. MEHLER:  You can answer.

Page 99

1        A.    You mean at the very top of the page?
2        Q.    No. No. No.  The first three lines.
3        A.    I hereby approve the Collective
4    Bargaining Agreement between the Building Contract
5    Association, New Jersey...
6            Now, what was your question again,
7    please?
8        Q.    My question is do you use that exact
9    language for every contract that you enter into with
10   contractors?
11       A.    At --
12            MR. MEHLER:  Objection to the extent
13   that's not limited by time period.
14       A.    At the time, I believe this was the
15   standard agreement we were using at the time.
16       Q.    Was there any training or was there any
17   direction at the local, Local 5, where someone said
18   do not use the signature page to the contract which
19   was marked as Longo-2?
20       A.    I don't know.
21       Q.    And you said in Longo-1, which you have
22   before you, your understanding was that this
23   signature in Longo-1 referred to the contract which
24   we marked as Longo-2, and that was your
25   understanding.  My question is why was that your

Page 100

1    understanding?
2        A.    Can you explain yourself a little more,
3    please?
4        Q.    Sure.  Mr. Mehler asked you whether or
5    not your understanding was that the signature page
6    document, which you are holding in your hand, he
7    asked you was it your understanding that this
8    document referred to Longo-2, which is this contract
9    I am pointing to right now.
10            MR. MEHLER:  Objection in the sense my
11   specific question to him was whether it was his
12   understanding that by signing Longo-1, which is this
13   document, Maarv was agreeing to the agreement that
14   has been marked as Longo-2.
15            MR. DIAZ:  Okay.  Correct.
16       Q.    And you answered yes, that it was your
17   understanding?
18       A.    Yes.
19       Q.    My question is why was that your
20   understanding?
21       A.    That was my understanding from
22   conversations with business agents that had more
23   experience than me and, at the time, business
24   manager, Chuck Perrone.
25       Q.    In 2004, I guess February 2004, how long

Page 101

1    had you been signing up employers, so to speak, or
2    contractors to Collective Bargaining Agreements, how
3    much experience had you had doing that?
4        A.    I guess five months.
5        Q.    And in that five months, approximately
6    how many contractors did you sign up to agreements?
7        A.    I have no idea.
8        Q.    Any idea we're talking about like 50
9    or --
10       A.    No.
11       Q.    -- like a handful, five or 10, for
12   example?
13       A.    I am not familiar with that.
14            MR. DIAZ:  That is all I have.
15            MR. MEHLER:  I have nothing further.
16            (Deposition concluded at 12:25 p.m.)
17
18
19
20
21
22
23
24
25

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
Professionals Serving Professionals

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al. | |
| Plaintiffs, | CASE NUMBER: 1:07CV00501 |
| v. | JUDGE: Richard J. Leon |
| MAARV WATERPROOFING, INC., | |
| Defendant. | |

## CERTIFICATION OF IVAN PALLOS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Ivan Pallos, being of full age and upon personal knowledge, do hereby certify as follows:

1.     In or about February of 2004, I was working through my company Pallos Construction Company as a subcontractor for Maarv Waterproofing, Inc. ("Maarv") on a garage project in Princeton, New Jersey ("Princeton Parking Garage Project").

2.     Dominick Longo approached me on the Princeton Parking Garage Project job site and told me that the job was a union job and that therefore in order to continue with the job, Maarv needed to use some union men and sign a form or contract that was for that one job only.

3.     I told both Attila Szamosszegi and Ann Paoella of Maarv what Mr. Longo had told me regarding the Princeton Parking Garage Project.

4.     Mr. Longo never provided me with a copy of any collective bargaining agreements and never offered me any such copies.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

IVAN PALLOS

Dated:  January 4, 2008

**EXHIBIT F**

MAARV WATER OCTING INC  P-02

16093241605

000665

NJ0424

## INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
### LOCAL #5 – NEW JERSEY
### INDEPENDENT

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed Independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement, or as they shall be set out from time to time in any such successor Agreements as may be negotiated.  The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its representative on the Board of Trustees such Employer Trustee together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund, Agreement and Declaration of Trust instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its' successor assigns, and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

**MAARV WATERPROOFING INC.**
Company Name

**317 OAK STREET**
Physical Street Address

**PASSAIC, NEW JERSEY    07055**
City                          State          Zip Code

**(973) 470-0686        (973) 470-8716**
Telephone Number           Fax Number

**22-2527189**
Federal Identification Number

**608103-00-5**
New Jersey Employment Compensation Number

**ST. PAUL INSURANCE COMPANY**
Workmen's Compensation Insurance Carrier

Please complete and remit to:
BAC Local #5, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-0500
(609) 324-1805 - Fax

Initial if you have received a full copy of this Collective Bargaining Agreement _____

| Signature | Printed Name | Date |
|---|---|---|
| _(signature)_ ATTILA SZAMOSSZEGI | | FEBRUARY 4, 2004 |
| Officers Signature | Printed Name | Date |
| _(signature)_ | Michael R. Perrone | 2/4/2004 |
| Business Managers Signature | Printed Name | Date |
| _(signature)_ Dominic Longo | Dominic Longo | 2/4/04 |
| Field Representatives Signature | Printed Name | Date |

**EXHIBIT G**

Local NO. 5 - Central & South Jersey

# AGREEMENT BETWEEN

### BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY,

### MASONRY CONTRACTORS OF NEW JERSEY,

### BUILDING CONTRACTORS ASSOCIATION OF ATLANTIC COUNTY,

### OTHER SIGNATORY EMPLOYERS

-and-

### LOCAL UNION NOS. 4, 5 & 2 OF THE INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS

*November 1, 2002 through October 31, 2007*

0709

# Table of Contents

| | ARTICLE NO. | PAGE NO. |
|---|---|---|
| Apprentices | VII | 21 |
| Bonding | XII | 34 |
| Duration/Termination/Amendment | II | 1 |
| Foremen | VIII | 23 |
| General Understanding | XXII | 50 |
| Grievance Procedure | XVI | 44 |
| Hiring Preference | V | 20 |
| Hours Work, Overtime, Shifts, Holidays | XIII | 34 |
| Jointly Trusteed Funds | XI | 25 |
| More Favorable Conditions | XXI | 50 |
| No-Strike/No-Lockout | XIX | 49 |
| Parties | I | 1 |
| Payment of Wages & Fringe Benefits | XIV | 37 |
| Preservation of Work | XVIII | 48 |
| Scope of Work | III | 2 |
| Separability and Savings Provision | XX | 49 |
| Stewards | VI | 21 |
| Subcontracting | XVII | 47 |
| Traveling Contractors | IX | 24 |
| Union Recognition, Union Security, Access | IV | 19 |
| Wages, BACPAC & Local Dues Checkoff | X | 24 |
| Working Conditions | XV | 38 |



0710

# AGREEMENT BETWEEN
## BUILDING CONTRACTORS ASSOCIATION
## OF NEW JERSEY,
## MASONRY CONTRACTORS OF NEW JERSEY,
## BUILDING CONTRACTORS ASSOCIATION
## OF ATLANTIC COUNTY,
## OTHER SIGNATORY EMPLOYERS
## -and-
## LOCAL UNION NOS. 4, 5 & 2
## OF THE INTERNATIONAL UNION OF BRICKLAYERS
## AND ALLIED CRAFTWORKERS

## ARTICLE I
## PARTIES

This Agreement is entered into this *first day of November 2002*, by and between the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey, the Building Contractors Association of Atlantic County (hereinafter referred to as the Association), for and on behalf of their members as set forth in Schedule "A" attached hereto and other contractors who are signatory hereto or who may become signatory hereto (hereinafter referred to as the Employer), and the INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL UNION NOS. 4, 5 & 2 (hereinafter referred to as the Union).

The Association agrees to furnish to the Union a list of all members of the Association denoting those members bound to the terms of this Agreement, the honorary members, independent members, and any other classes or groups of members.

## ARTICLE II
## DURATION - TERMINATION – AMENDMENT

This Agreement shall be effective commencing *November 1st, 2002* and shall continue in full force and effect up to and including *October 31, 2007*, and shall be automatically continued for each successive period of this Collective Bargaining Agreement unless

1



0711

written notice of decision to negotiate a new Agreement in whole or in part, is given in writing by either party to the other not later than sixty (60) days nor more than ninety (90) days prior to the expiration date or any anniversary date thereafter. If the parties fail to reach an agreement in such negotiations, the issues in dispute shall be submitted to the International Masonry Institute's Dispute Settlement Plan for such steps as are deemed appropriate in accordance with the procedures of the Plan. The parties may at any time mutually agree to change or amend any part of this Agreement and such changes or modifications shall not affect the continuing nature of this Agreement.

## ARTICLE III
## SCOPE OF WORK

A. This Agreement shall cover new construction, maintenance, repair and renovation in the State of New Jersey.

B. The Employers bound hereby recognize the Union's claim to all work falling within the jurisdiction of the Union, as defined in Branches of the Trade, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers which is incorporated herein by reference.

C. The installation of Brick and all other masonry units such as blocks, etc., with or without mortar, anywhere on the project shall be the work of Bricklayers & Allied Craftworkers of International Union, Local Nos. 4 & 5.

D. Temporary heat, applicable to all branches of the trade, to protect any Masonry work performed and shall include all masonry materials all year, especially in the winter months (November 15th through March 15th).

E. The trade and territorial jurisdiction for Local No. 4 shall cover new construction, maintenance, repair and renovation for the following trades and counties:

Bricklayers, Cement Masons, Plasterers, Pointer Caulkers, Cleaners, Fire Proofers, Stone Masons, Brick Pavers and Exterior Marble Masons shall be the trade jurisdiction for Bergen, Essex, Hudson, Morris, Passaic, Sussex, Union, Warren, part of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional map maintained by the International Union.

F. The trade and territorial jurisdiction for Local No. 5 shall cover new construction, maintenance, repair and renovation for the following trades and counties:

Bricklayers, Pointer Caulkers, Cleaners, Stone Masons, Brick Pavers and Exterior Marble Masons shall be the trade jurisdiction for, Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer, Monmouth, Ocean, Salem, and parts of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional map maintained by the International Union.

G. The trade and territorial jurisdiction for Local No. 2 shall cover new construction, maintenance, repair and renovation in the following trades and counties:

Atlantic, Burlington, Camden, Cape May, Monmouth, Cumberland, Gloucester, Mercer, Ocean, Salem, and parts of Hunterdon, Middlesex and Somerset for all work falling within the jurisdiction of the Union, as defined in Branches of the Trades for Cement Masons, Plasterers & Fire Proofers, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers.

## Brick Masonry

A. Bricklaying masonry shall consist of, but not be limited to, the following work procedures and installation of the

0712

following materials: The laying of bricks made from any material in, under or upon any structure or form of work where bricks are used, whether in the ground, or over its surface, or beneath water, in commercial buildings, rolling mills, iron works, blasts or smelter furnaces, lime or brick kilns, in mines or fortifications and in all underground work, such as sewers, telegraphy, electric and telephone conduits; including the installation of substitutes for brick such as all carbon materials, Karbate, Impervite or mixtures, all acid resistant materials, all terra cotta and porcelain materials, except where the foregoing materials are manufactured to substitute for tile as provided for under the category of Section 8, C of the Codes of the International Union of Bricklayers and Allied Craftworkers. All cutting of joints, pointing, cleaning and cutting brick walls, fireproofing, block, arching terra cotta cutting and setting, the laying and cutting of all tile, plaster, mineral wool, cork, blocks and glass masonry or any substitutes for the above material, the laying of all pipe sewers or water mains and the filling of all joints on the same when such sewers or conduits are of any vitreous material, burnt clay or cement, or any substitute material used for the above purpose, the installation of all brackets and fasteners is the work of the mason exclusively, the cutting and rubbing and grinding of all kinds of bricks and the setting of all cut-stone trimmings on brick buildings, is bricklayer's work. The preparation and erection of plastic castables or any refractory materials is bricklayer's work.

material if bedded and jointed with one operation. The bedding, jointing and pointing of the above materials shall be the work of the craft installing same.

B. Cleaning, grouting, pointing and other work necessary to achieve and complete the work under the foregoing categories, all waterproofing and black mastic waterproofing, silicone and/or substitutes sandwiched between masonry units in the interior of the wall.

C. All terra cotta called unit tile in sizes over 6" x 12" regardless of method of installation; all quarry tile over 9"x 9" x 1 1/4" in size, split brick or quarry tile or similar

D. All burnt clay extruded cellular products regardless of trade name or method of installation when used as a veneer on structures; all clay products known as terra cotta tile, unit tile, ceramic veneer and machine-made terra cotta and like materials in sizes larger than 6" x 12", regardless of the method of installation. Where the preponderance of material to be installed is of the above size and when material of lesser sizes is to be used in connection therewith, the bricklayers shall install all such materials. Brick paving comes under bricklayers' trade classifications. The parties acknowledge the Union's claim to screeding of sub base regardless of type of material used.

E. Grouting of all Masonry Units, all Leveling Plates for steel columns, all machinery and Precast Panels shall apply to all branches of the trade.

F. The Bricklayer shall perform the complete installation and related finish work of all AACMU. These operations include, but are not limited to; the cutting, fitting and applications of mortar and/or other cementitious materials used for the setting and bonding purposes as well as the actual laying of the AACMU block units into position. The routing, drilling, cutting and patching for all mechanical piping and openings. The preparation, assembly, unloading, selecting or staging of AACMU panels, hooking on, signaling, drilling, cutting, installation of support angles or strut supports, fitting, bedding, landing, setting, leveling, plumbing, aligning, fastening, anchoring (whether by bolt, clip, pin, or weld), insulation, caulking, grouting, patching, cleaning, waterproofing and installation of all AACMU units. This also includes all work operations related to the installation and applications of all coating, covering and veneer systems (both exterior and interior) on all AACMU

units. These work operations include, but are not limited to: preparations of walls, the mixing and applications of any and all finish coating materials by any method (i.e. trowel on, machine, spray on, etc.) or any other device deemed necessary to produce the desired finish surface.

## Stone Masonry

A. Stone Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying of all rip rap, rubble work with or without mortar, setting all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured from such foreign or domestic products as are specified and used in the interior or on the exterior of buildings by architects, and customarily called "stone" in the trade.) Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over 10 inches in height; the dressing of all jambs, corners and ringstones that are roughly dressed upon the beds, joints or reveals and the cutting of a draft upon same for plumbing purposes only; and the cleaning, cutting of joints and pointing of stone work.

B. This is to apply to all work in buildings, sewers, bridges, railroads, bulkheads, breakwaters, jetties, playgrounds, parks, landscaping and curbing or other public works and to all kinds of stone, particularly to the product of the locality where the work is being done. Stonemasons shall have the right to use all tools which they consider necessary in the performance of their work.

C. Cleaning, grouting, pointing and other necessary work to achieve and complete the work under the foregoing categories.

6

## Artificial Masonry

A. Artificial Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The cutting, setting and pointing of cement blocks and all artificial stone or marble, either interior or exterior, when set by the usual custom of the stone mason and marble setter. All cement that is used for backing up external walls, the building of party walls, columns, girders, beams, floors, stairs and arches and all material substituted for the clay or natural stone products, shall be handled by employees in the bargaining unit for which the highest rate of wages shall be demanded.

B. All artificial masonry, the cutting, setting and pointing of all concrete prefabricated slabs, regardless of dimension size, shall be the work of members of this organization, for which the regular wage scale in the jurisdiction where the work is performed shall be paid.

C. Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over ten inches in height, the dressing of all jambs, corners and ringstones, joints, or reveals and the cutting of a draft upon same for plumbing purposes only, and the cleaning, cutting of joints and pointing of stonework.

D. This is to apply to all work on buildings, sewers, bridges, railroads or other public works, and to all kinds of stone, particularly to the products of the locality where the work is being done and the same shall be considered stone masonry.

E. Bricklayers and stone masons shall have the right to use all tools which they consider necessary in the performance of their work.

F. All cement that is used for parging up external walls and

7

G.   The building of party walls, columns, girders, beams, floors, stairs and arches. Gypstell products and cement of precast slabs on roofs or wherever used in building construction of alterations, and all material substituted for the clay or natural stone products. All wall ties and brackets used to anchor brick, block, stone or any type of masonry whether screwed or nailed is the work of the mason, as per the 1962 agreement between the B. & A.C. and Ironworkers herein incorporated by reference.

H.   The laying out and supervising of work for or by the use of any or all of the above materials shall be done by the employees covered hereunder.

## Cement Masons Agreement

A.   Cement masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying out, screeding and finishing of all cement, concrete, brown stone composition, mastic and gypsum materials, also for fireproofing, waterproofing, cement and composition base and vault lights.

B.   The cutting of all cement and concrete for patching and finishing; the bush hammering of all concrete when cast in place, the operation of cement gun, the nozzle and the finishing of all material applied by the guns, and the operation of the cement floor finishing machines. The cement mason shall have the right to use all tools necessary to complete his work.

C.   The operation of the Lazar Screed Machine shall be performed solely by the Cement Masons.

D.   Concrete constructions, such as buildings, bridges,

elevators, smokestacks, curbs, gutters, sidewalks, street paving, alleys and roofs; laying out, setting joists, strips or screed rods for work hereinafter specified; laying and finishing of cement, wearing surfaces of basements, floor yards, driveways, areas and other surfaces where cement finish is to be laid; and where strips have to be set, or material ruled down, or surfaces finished; screening of concrete or fine stuff, asphalt or other preparations that are to be troweled, floated, darbied or bull floated; troweling, floating or finishing of concrete or fire retarding material or waterproofing compound or mixtures; construction of glass vaults or sidewalks, lights, where same is set in cement; excepting the carpenter work, but including pointing, facing and finishing of the surfaces after forms are removed; leveling of all fine materials for facing same; running of all cement base; cutting, patching and finishing of concrete fireproofing on walls, beams, girders and columns; cutting facing and finishing with cement of all concrete surfaces such as arches, beams, girders, walls, pile caps, piers and columns, whether done with trowel, float, gun and nozzle, bushhammer, rubbing or other process; applying cement mortar for damp-proofing, waterproofing for sanitary purposes where not over four (4) feet high whenever cementing with the floor is done in one operation; cutting of all concrete when cement finish is applied; setting of carpet pins and sockets in cement and composition brass or other metallic or wood strips when inserted in floor during the laying of same; rodding and spreading of all concrete and spreading and finishing of all top material; setting of all strips and stakes and grade; pointing, caulking and patching around all steel or metal window frames that touch concrete; handling of the vibrator machine. Washing and treating of all cement surfaces, handling of all machines, trowel machines, riding trowel machines, apparatus or equipment of any kind in connection with or to perform any of the above functions shall be the work of the cement finisher. Any signatory contractor who subcontracts sidewalks and curbs shall, in

9

8

good faith, inform the subcontractor that said work is within the jurisdiction of the Bricklayers & Allied Craftworkers, Local Union Nos. 4 & 2.

E. The pouring of all concrete shall require a mason.

F. When concrete bucket is used in conjunction with a crane, all safety precautions shall be exercised.

G. The aligning of all bolts and the setting of all plates shall be performed by the employees covered hereunder.

H. When flat concrete arches are poured with a crane, a hopper must be used in conjunction with a concrete bucket.

I. On all high rise buildings an exterior scaffold for the cement masons shall be erected complete with guard rails.

J. There shall be no cutting of cement masons crews before pull up is completed.

K. Overtime shall only be with the prior permission of the union and shall be equitably shared by the employees working on the job.

L. No cement worker working alone shall use a straight edge of more than six feet in length. Where a straight edge is longer than six feet, two men shall be used on a straight edge which is between six and eleven feet in length, one additional man shall be used for every additional four feet or fraction thereof of straight edge. On power straight edges or roller-type straight edges, two men shall be utilized up to fourteen feet and one additional man shall be used for each five feet or fraction thereof.

M. The casting and pouring of pre-cast slabs when done on the job site shall be the work of a cement mason.

10

N. Cement masons are to complete, joint and strike up their work, whether this work is done with cement or caulking compound on any other masonry material.

O. The cement masons shall supervise the placing or pouring of all concrete. In the event there is a journeyman already working at the job site who is recognized by the Local Union as a competent cement mason, he may be assigned to such work, otherwise a cement mason shall be hired.

P. When concrete floors are to be hand troweled, the Employer shall provide knee boards such as the type used by cement finishers to handle trowel concrete floors, such knee boards shall measure approximately 12" wide and 30" long or fraction thereof, and shall have handles.

Q. The following work shall be allotted to the cement masons only: The setting of all screeds and forms to determine the proper grade of concrete when held in place by stakes and/or spreaders shall be done by cement finishers. A screed is a strip of wood, metal, etc., used as a guide for leveling or grading a concrete floor, slab or sidewalk.

R. Any bulkhead that is one single board in height, and that has no key attached or which is not notched or fitted shall be set and braced or staked by cement finishers, providing same is used as a screed. The term bulkhead shall mean a form or screed erected for the purpose of separating pours of concrete.

S. The grinding, patching and curing of all floors, the snapping of wall ties, and patching of same and setting of expansion joints.

T. Steps, Landings, Platforms, etc. The setting of forms for steps, landings, platforms, coping, caps and curbs, except where underforms or centers are required, and the placing of all fine materials for facing same, shall be done by

11

0716

cement masons.

U.  Curing and dustproofing of all floors are to be done by cement masons. All epoxy, acid and latex work will be an additional $.50 per hour above scale.

V.  The cement mason shall have the right to use all tools necessary to complete his work. There shall be no restriction as to the use of machinery or tools.

W.  When troweling floors with machine, changing of blades, cleaning and maintaining machine to be done by mason.

X.  No concrete trucks, pumping machine or any other machines are to do any mixing inside any structure without proper ventilation.

Y.  Special Tools: The employer agrees to furnish the following tools for use by his employees: Respirators, goggles, boots, bull floats, brooms, brushes, power chisels, trowel machines, bushhammers, straight edges, rubber floats, rubbing stones, cover tools, special base tools and special edgers. Gloves furnished when using epoxies, acid, latex floor patching or any irritant.

Z.  All wages, waiting time and general working conditions that apply to bricklayers shall also apply to the cement mason.

## Plastering

A.  Level 5 Gypsum Board Finishing is the work of Plasterers.

Level 5 finishing as specified by the Association of the Wall and Ceiling Industries International (AWCI), Ceiling and Interior Systems Construction Association (CISCSA), Gypsum Association (GA), and Painting and Decorating Contractors of America (PDCA), in their "Levels of

12

Gypsum Board Finish Recommended Specification."

Levels Description: All joints and interior angles shall have tape embedded in joint compound and three separate coats of joint compound applied over all joints, angles, fastener heads, and accessories. A thin skim board of joint compound, or a material manufactured especially for this purpose shall be applied to the entire surface. The surface shall be smooth and free of tool marks and ridges. Note: It is recommended that the prepared surface be coated with a primer/sealer prior to the application of finish paint. (See painting specification in this regard.)

The level of finish is recommended where gloss, semi-gloss, enamel or non-textured flat paints are specified or where severe lighting conditions occur.

This highest quality finish is the most effective method to provide a uniform surface and minimize the possibility of joint photographing and of fasteners showing through the final decoration. The work jurisdiction of the plasterer under level 5: Gypsum board finishing shall be that which has heretofore been performed under this Agreement and is further set forth in constitution of the International Union of Bricklayers and Allied Craftworkers of the United States and Canada. The parties agree to be bound by decisions rendered by the "Green Book" Decision of Record rendered by the Hearings Panel (March 1, 1978) under the plan for the settlement of jurisdictional disputes in the construction industry.

B.  All cement plastering, stone texture, stucco work, and pebble dask work, either exterior or interior, shall be done by plastering employees under this contract.

C.  All plastering, including plastering alterations and repairs, and all cement, cachstone, acoustic or any plastic substitute or artificial or imitative composition for, plain surfaces or

13

for moldings, cornices, pilasters panels, capitals, columns, bases, keystones, brackets or centers when applied on any exterior or surface in the usual method of either plastering or stuck work shall be the work of plastering employees.

D. All ornaments including centers, brackets, trusses and keystone shall be placed in position and pointed by plastering employees who are on the job. Cast ornamentation shall be made in a Union shop. No employee shall work on any operation where the stickling of ornamentation has been sublet.

E. All moldings, covers, arrises, chamfers and bullnoses shall run in place wherever possible with a regular mold on proper running strips. When moldings or cornices are to be ornamented proper beds shall be run to secure same.

F. All capitals and bases shall be run on the job if practical to do so.

G. All templates to be used by the plasterer shall be placed in position by the plasterer.

H. All plastering shall consist of not less than three coats as scratch, brown and finish. Before the brown coat is applied, the scratch shall be hard and set. The brown coat shall be made true with a straight edge rod in all upright and ceiling angles: the walls and ceilings shall be properly darbied and floated to an even surface and the angles cut out. The finish coat shall be properly gauged and troweled to the required surface and all angles featheredged true. All interior or exterior plastering shall be left straight and true with rod and darby; rod and darby to be furnished by the contractor. The taping and pointing of sheetrock, compo-board, plaster-board, etc., shall be the work of the plasterer.

I. When Sprayo-Flake or similarly applied acoustics are used the applied acoustic will take the place of the finish coat

14

and will be applied by plastering employees.

J. The operation of all mechanical plastering or troweling machines, pertaining to plaster and all of its substitutes, shall be the work of the plasterer.

K. All safety precautions, goggles, shields, and masks, shall be supplied by the contractor for the health and welfare of the plastering employees operating these machines.

L. Plastering on concrete, fireproofing, brickwork or plaster boards shall be two coat work-brown and finish.

M. The finish coat may be omitted on cellar ceilings provided the brown coat is floated to an even surface. All BIF systems and all related work.

N. Finishing of walls and ceilings shall not be done until the screeds, cornices or covers with which they intersect are in place.

O. Employees shall not install metal corner beads, nor shall they work on any operation where corner beads have been used to form arrises on beams or arches or corners except door or window heads or other continuous openings not over twelve (12) feet in height.

P. On a scaffold area of one hundred and fifty (150) square feet or over, the mortar board shall be raised 30" from the scaffold on a properly constructed stand. On a scaffold area of less than 150 square feet, the mortar board shall be raised at least 12" from the scaffold on a properly constructed stand. No mortar board shall be raised on blocking, and no mortar board or gauging board shall be more than 46" square.

Q. Where beams are sixteen (16) inches or over in depth, the scaffold shall be dropped to a suitable height where the

15

0718

plasterers may execute their work in a proper manner.

R. Any material applied on walls by the plasterers shall not be higher than 6'6" from the floor. Where only the walls have to be plastered, a scaffold 4 planks wide and 6' from the ceiling shall be erected on which the mortar board shall be placed and raised 12" above the scaffold. Positively no hopping planks to be permitted.

S. There shall be a foreman plasterer on all plastering jobs. Plastering foremen shall meet the requirements for foremen as specified herein, and shall be paid as specified herein.

T. Plastering foremen shall see that no gauging is made up later than thirty (30) minutes before 12 o'clock and thirty (30) minutes before quitting time.

U. Plastering work, when sublet, shall be given to a subcontractor who employs employees covered under this contract

V. Plastering contractors shall furnish all the materials required for their work including all screed rods, cornice, rods, darbies and feather edges. No subcontractor shall contract for labor only.

W. Synthetic Plastering Systems: The styrofoam and any other materials which is part of the system that are installed by screws, glue, masonry materials, and including Mechanical System.

## Firebrick

The matters set forth in this section are applicable solely to firebrick work.

A. On all firebrick jobs, when working with regular firebrick and clay, the bricklayers will be permitted an additional

16

fifteen (15) minutes to wash up or twenty-five (25) minutes when working with a carbon, acid proofing, high temperature clay or any other material out of the ordinary such as colored cements, asphalts, tars, plastics, etc. Solvent for washing up and cleaning of tools will be provided for by the employer.
A bricklayer working with carbon or acid proofing materials shall be given a minimum of five (5) minutes wash-up prior to lunch time.

B. All scaffolding inside of furnace shall be solid nailed scaffold. Contractors to furnish safety equipment and have same on job site.

Provisions for adequate scaffolding shall be made so that the lead man does not have to climb over the wall to work on the opposite side of the wall. Adequate scaffolding shall mean standard metal tubular scaffolding or wooden scaffolding consisting of a platform of not less than 2" x 10" planks in width and scaffolding shall remain in place until all paving has been completed.

C. Clay shall be mixed at the furthermost location of the enclosure where refractory brick is being laid. The location to be selected as to both its physical separation from the work area and to its feasibility for performing the mixing function. In coke oven work a separate enclosure is required. All care shall be exercised to reduce dust.

D. When bricklayers are employed laying firebrick, the contractor shall pay for the sharpening of their tools required for the work, and all tools shall be sharpened to the satisfaction of the bricklayer. The contractor shall furnish all chisels over twelve (12) inches in length and all saws when required.

E. On all jobs where conditions are such that a safety man is required by the owner, he shall be mutually agreed upon by

17

0719

bricklayer shall also apply to all branches of the trade.

K.  In addition, all other assignments mutually agreed upon between the Employer and the Union on any other building products or systems related to the scope and type of work covered by this Agreement which may be developed in the future that are determined by these parties to fall within the work jurisdiction of this Agreement.

L.  In the event of territorial jurisdiction or work assignment dispute with any other BAC Local Union, the matter shall be referred to the International Union for binding resolution.

## ARTICLE IV
## UNION RECOGNITION, UNION SECURITY, ACCESS

A.  The Employer hereby recognizes and acknowledges that the Union is the exclusive representative of all its employees in the classifications of work falling within the jurisdiction of the Union, as defined in Article III of this Agreement, and in the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers, for the purpose of collective bargaining as provided for in the Labor Management Relations Act of 1947, as amended.

B.  No later than eight (8) days following the effective date of this Agreement, all present employees must, as a condition of continued employment, be or become members of the Union; all employees hired after the effective date of this Agreement shall be or become and remain members of the Union no later than eight (8) days following the first day of their employment in accordance with the provisions of Section 8 of the National Labor Relations Act, as amended. Failure of any employee to comply with the provisions of this subsection shall, upon request of the Union, result in termination of such employee, provided that the Union has

19

the parties.  For the safety of the bricklayers, said safety man must be a union bricklayer.

F.  All hot work shall be paid at the rate of double time. Fringe benefits shall be based on hours paid.

One hundred degree (100) Fahrenheit or over shall constitute hot work.  When bricklayers are employed on excessive hot work, the contractor shall provide proper counter fatigue aids which shall meet the standards prescribed by the State Medical Board, shall provide proper gloves and protective materials to safeguard bricklayers when they are handling hot work, shall supply wooden shoes or facsimile when working on heated surfaces and contractors shall be responsible for tools, shoes, and clothes of bricklayers which they burn in performance of their duties on said work.  Bricklayers must spell each other on all hot work.

Contractor will also be responsible for clothes, tools and/or shoes that are destroyed or damaged on jobs due to exception conditions and materials.

G.  When electrical grinding stones or carborundums are used, bricklayers shall leave that part of the job until the operation is completed.  In an enclosed area, suction device to be used to remove dust while bricklayers grind.  The employer and union shall arrange to spell bricklayers at ten minute intervals when they are actually performing grinding work.

H.  On stoves and furnaces, or anywhere else where danger of gas exists, approved gas detecting devices will be required.

I.  On all firebrick or acid proofing jobs, the employer shall furnish all bricklayers with gloves.

J.  All general working conditions which apply to the

18

given the employee four (4) days notice that his obligation to make payment has not been met and that his delinquency renders him liable to termination under this section. The Employer shall not be obligated to dismiss an employee for non-membership in the Union: (a) if he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members; or (b) if he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

C. International Union Representatives and the Business Manager and/or other officers of the Union shall have access to the Employer's jobsites at reasonable times in compliance with any special rules and regulations adopted by the owner to ensure that the provisions of this Agreement are observed, provided however, that such representatives shall not unduly interfere with the job progress.

D. It is recognized and agreed by the parties to this Collective Bargaining Agreement that the Local Union is the authorized collective bargaining agent for all its members in connection with issues related to the wages, working conditions, and employee fringe benefit funds.

## ARTICLE V
## HIRING PREFERENCE

The employer agrees that when hiring any employee for any job in the territorial jurisdiction of the agreement he will employ a fair percentage in the territorial jurisdiction of Local No. 4, or Local No. 5 or Local No. 2 of New Jersey. The employer also agrees that when requesting manpower, they must call the Local Union Office by 4:30 p.m. of the previous day.

Any employee who is hired and reports on the job at starting time with his tools and is not started and any employee who reports to and starts work and is thereafter stopped for any reason other than inclement weather, shall be paid a full day's wages at his basic rate of pay.

## ARTICLE VI
## STEWARDS

A. The Employer shall hire a steward for each branch of the trade appointed by the business manager of the Union on all jobs. The steward shall be a working employee and shall, when appropriate, be granted reasonable time to conduct union business. The steward shall not be laid off without reasonable cause, without first consulting the business manager.

B. It is the steward's duty to look after the interests of both parties, to see that the number of men desired by the employer is promptly reported to the business agent, take up all grievances on the job, and try to have the same adjusted. In the event that he cannot, he must report that fact to the business agent. He shall conduct himself in a proper manner at all times when on the projects and shall not be discriminated against, discharged, or laid off for the performance of his duties as such. The steward's employment can only be terminated by the employer after a review of complaint against him between the employer and the business agent.

C. The first Bricklayers & Allied Craftworkers member shall notify the union at the start of each job.

## ARTICLE VII
## APPRENTICES

A. In order to train sufficient skilled mechanics for the

0721

D. Apprentices shall be paid not less than the following percentages of the journeyman's basic wage rate:

First six months or 500 hours:     50% of Journeyman's Basic Wage Rate
Second six months or 500 hours:   55% of Journeyman's Basic Wage Rate
Third six months or 500 hours:    65% of Journeyman's Basic Wage Rate
Fourth six months or 500 hours:   75% of Journeyman's Basic Wage Rate
Fifth six months or 500 hours:    85% of Journeyman's Basic Wage Rate
Sixth six months or 500 hours:    95% of Journeyman's Basic Wage Rate

During the first year of apprenticeship, after the probationary period, fringe benefit contributions shall be required for the Welfare Fund at 50%. No other fringe benefit contributions shall be required for this period. Deductions for check off dues and BACPAC should be made according to Schedule "B" attached hereto. Commencing with the second year of apprenticeship (third six-months), fringe benefit contributions and check off deductions shall be made according to Schedule "B" attached hereto.

E. Apprentices may be required to attend related training classes during period of apprenticeship as directed by the Joint Apprenticeship.

## ARTICLE VIII
## FOREMEN

There shall be a separate foreman on all jobs for each branch of the trade. The employer will determine when the foreman shall not work with tools. Foremen shall be paid the prevailing regular weekly pay (40 hours), between the initial date of employment and the termination date of employment, holidays and inclement weather days included, provided, however, that all foremen must report to work everyday within the work week unless otherwise directed by the Employer. All overtime worked by foremen shall be compensated for at proper overtime rates.

23

industry, the necessity for employment of apprentices and/or apprentice improvers is recognized and encouraged by the parties to this Agreement. Apprentices shall be given a minimum of 32 hours per week to perform the work of brick or block provided the work is available. The employer agrees to employ one apprentice for every five journeymen employed on a job site. It is agreed that the Employer shall abide by the National Apprenticeship Standards, developed for masonry craft training, incorporated herein by reference.

B. All apprentices will be required to attend and successfully complete a pre-job school which shall take place over a period of approximately 12 weeks at a place and at such times as designated by the State Joint Apprenticeship Committee.

C. After 12 weeks of pre-job training, apprentices shall be required to serve a probationary period of 30 days of employment at the trade during which period no fringe benefit contributions will be required. After satisfactory completion of this period, credit will be given for this time served as part of the three year apprenticeship term. During the probationary period, the termination or cancellation of the apprenticeship agreement may be made by the committee at the request of either party to the agreement. After the probationary period, the agreement may be canceled at the request of the apprentice or committee. The committee may cancel the agreement for good cause such as unexcused absences from the job and related training classes if required, lack of progress or interest, and unsafe practices common to the trade. Due notice shall be given to the apprentice with a reasonable opportunity for corrective action. Written notice shall be given to the apprentice and Bureau of Apprenticeship and Training of the final action taken.

22

0722

## ARTICLE IX
## TRAVELING CONTRACTORS

When the Employer has any work specified in Article III of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied Craftworkers, the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the jobsite area. Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Article X of this Agreement but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local Agreement. The Employer shall in all other matters be governed by the provisions established in the jobsite local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in Article III of this Agreement, the full terms and conditions of this Agreement shall apply.

## ARTICLE X
## WAGES, BACPAC, AND LOCAL DUES CHECKOFF

A.  The hourly wage rates for all employees performing work covered under this Agreement shall be as listed on Schedule "B" attached hereto.

B.  The Union shall have the option of allocating a portion of all of the increases in wage rates for the periods beginning November 1, 2002 and all subsequent increases thereafter, among the various benefit funds specified in Article XI.

C.  The Employer shall deduct from the wages of each employee who has signed a check-off authorization conforming to federal law and transmit monthly to the Union (or to any agency designated by said Union for the collection of such money), the sum for each hour paid which the Union has specified, or specifies from time to time and so advises the Employer in writing, as the portion of each employee's Union dues to said Union, to its International Union, or to any other affiliate of the International Union, subject to check-off. The sums transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the name of each person whose dues are being paid and the number of hours each employee has been paid. If the employee does not sign a dues check off authorization card, he shall report to the union hall to pay the weekly dues.

D.  The Employer agrees to deduct an amount from the pay of each employee, who is a union member and who executes a voluntary check-off authorization form for the Bricklayers and Allied Craftworkers Political Action Committee (BACPAC). Deductions shall be in the amount and at the intervals specified on the check-off authorization form. The Employer agrees to transmit BACPAC deductions to the Treasurer of BACPAC, and shall be accompanied by a list of the names of those employees for whom BACPAC deductions have been made and the amount deducted for each employee.

## ARTICLE XI
## JOINTLY TRUSTEED FUNDS

Section 1.
In addition to the wages and other payments herein provided for, the Employer agrees to pay specified contributions to the following designated funds. In the event any of the trust funds to which contributions are required to be made, under this Agreement, is merged with or into another trust fund, the contributions shall be made to the successor fund.

A.  Bricklayers and Trowel Trades International Pension Fund

24

25

10/17/2007  14:56   6093248287                    BAC LOCAL 5                    PAGE  15/30

i. The contribution to the Bricklayers and Trowel Trades International Pension fund (TPF) shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the Bricklayers and Trowel Trades International Pension Fund, which was established under an Agreement and Declaration of Trust, dated 1 July 1972.

B.  Local Pension Fund
1. The contribution to the Local Pension Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the territorial Local Pension Fund which was established under an Agreement and Declaration of Trust. All Local Pension Funds remitted on behalf of an employee shall be forwarded in whole to the employee's Home Local Pension Fund. The Home Local Funds shall credit any excess monies remitted for the Pension Fund to the employee's Annuity Fund.

C.  Local Annuity Fund
1. The contribution to the Local Annuity Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the territorial Local Annuity Fund which was established under an Agreement and Declaration of Trust. All Local Annuity Funds remitted on behalf

26

of an employee shall be forwarded in whole to the employee's Home Local Annuity Fund. The Home Local Funds shall apply any excess monies remitted for the Annuity Fund to the employee's Pension Fund.

D.  Bricklayers and Allied Craftworkers' Statewide Welfare Fund
1. The contribution to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund which was established under an Agreement and Declaration of Trust, dated May 1, 1988.

E.  Industry Advancement Fund
The parties hereto do hereby establish an industry Advancement Fund pursuant to the requirements of the Labor - Management Relations Act, the Internal Revenue Code and all applicable laws and the agreement of the parties for the purpose, in all lawful ways, of promoting the increase of commercial, institutional, public and industrial building construction throughout the State of New Jersey and the adjoining areas within the territorial jurisdiction of the unions by providing building owners, architects, engineers, builders, contractors, private and public funding institutions and agencies, government agencies and any others, directly or indirectly, with the building construction industry information, data and other information to communicate the advantages of sound, durable and economical construction that will provide a high degree of service, utilization and benefit to the public by the utilization of union affiliated contractors. The purpose of

27

the Fund shall be to foster and promote the continued utilization and expansion of union construction, particularly utilizing union members of the Bricklayers & Allied Craftworkers union, in prospective projects throughout the State of New Jersey.

In order to carry out this agreement, the parties hereto shall execute such agreements of trust and other documents necessary in accordance with law, which documents shall include the following terms which are agreed to and incorporated into this contract:

1. The Employer shall make contributions for each hour worked by each member of the Bricklayers & Allied Craftworkers union to the Industry Advancement Fund created hereby as listed on Schedule B attached hereto.

2. The Bricklayers & Allied Craftworkers' Health & Welfare Fund Office shall collect and distribute such funds.

3. Effective November 1, 2002, the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey agree to allocate $.02 of the Industry Advancement Fund contribution to the International Council of Employers of Bricklayers & Allied Craftworkers (I.C.E.). Said contribution shall be forward to I.C.E. by the Masonry Contractors of New Jersey. The remaining contribution shall be divided as follows:

   BCANJ:                                50%
   Masonry Contractors of New Jersey: 50%

In such case as the parties opt to discontinue the $.02 allocation to I.C.E., said $.02 contribution shall

be distributed equally between the BCANJ and the Masonry Contractors of New Jersey.

4. The BCANJ and the Masonry Contractors of New Jersey shall utilize said funds in a manner consistent with the terms of the trust including the lease or purchase of materials, supplies and equipment, the lease of premises or purchase of premises, the employment and retention of professional counsel, the engagement of administrative and other employees, and all other appropriate expenses and expenditures which comply with the purposes of the trust and law. However, in all circumstances, it is the intention hereto that the said Fund shall be used to promote the following industry wide activities for the benefit of the contractors utilizing members of the Bricklayers & Allied Craftworkers union including accident prevention, education, research, public relations, industry relations, labor relations, market development, standardization of contracts and specifications and all other such appropriate activities.

5. Although the Industry Advancement Fund is designated a "contribution" it is expressly understood and agreed that the said sum payable to said Industry Advancement Fund is not intended to be and is not a contribution to employees and no employee of Employer has any proprietary interest in said funds.

6. The Industry Advancement Fund shall pay the Bricklayers & Allied Craftworkers' Health and Welfare fund 2% of all amounts collected as reimbursement for expenses incurred in connection with the collection services rendered. In addition the Bricklayers & Allied Craftworkers' Health & Welfare Fund shall not be responsible for collection

28

0725

10/17/2007  14:56    6093248287    BAC LOCAL 5    PAGE  13/30

of any delinquent amounts owed by any employer.

F. International Masonry Institute (IMI)

1. The masonry industry in the United States and Canada has great and definable needs in the fields of apprenticeship and training, advertising and promotion, research and development, and labor/management relations which must be met if the industry is to grow and prosper. The parties to this agreement believe that the International Masonry Institute is the most effective and efficient instrument for meeting these needs because it offers the greatest possibility of integrating activities in these program areas in an effective manner and coordinating them through a single regional/international system.

2. In order to properly finance IMI programs, the ultimate objective is to provide, through collective bargaining, contributions from the total hourly wage and benefits package, as listed on Schedule "B" attached hereto.

3. With IMI funding from New Jersey, IMI will be able to provide advertising and promotion, research and development, apprenticeship and training, and labor/management relations programs directed specifically to this area. With these principles in mind, the parties agree to contribute the amounts listed on Schedule "B".

The payments required above shall be made to the International Masonry Institute, which was established under an Agreement and Declaration of Trust, 14 March 1981, as the successor trust to the predecessor International Masonry Institute (established under an Agreement and Declaration of Trust, 22 July 1970) and/or to the predecessor

30

International Masonry Apprenticeship Trust (established under an Agreement and Declaration of Trust, 6 November 1974).

G. New Jersey State Apprentice Fund

1. The contribution to the New Jersey State Apprentice Fund shall be listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay. The Apprentice Fund contribution of $.15 shall be suspended for Local No. 2 and deferred to the Defense Fund established by the Union.

2. The payments required above shall be made to established New Jersey State Fund office which was established under an Agreement and Declaration of Trust.

Section 2.
In order to facilitate the establishment of the same wage and fringe benefit structure within Local No. 5, it is agreed that no other funds other than the Welfare, Pension, International Pension, Annuity, Apprentice, IMI, IAP, Labor Management, BACPAC and Defense Funds shall be contributed to as of November 1, 1999. During the term of this agreement, the parties agree to establish uniform wages and fringe benefits for Local No. 4, 5 & 2.

Section 3.
The Employer hereby agrees to be bound by and to the above stated Agreements and Declarations of Trust, as though he had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of these funds pursuant to said Agreements and Declarations of Trust.

Section 4.
The Employer hereby irrevocably designates as its representative on the above stated Boards of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees,

31

0726

10/17/2007  14:56    6093248287    BAC LOCAL 5    PAGE  12/30

together with their successors.

**Section 5.**
For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and all other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable to each fund designated in Section 1 of this Article.

**Section 6.**
Contributions shall be paid on behalf of all covered employees starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, journeymen, apprentices, helpers, trainees and probationary employees.

**Section 7.**
All contributions shall be made at such time and in such a manner as the Trustees require; and the Trustees shall have the authority to have an Independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the funds designated in Section 1 of this Article. Any Employer found, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, to have been substantially inaccurate in reporting shall be charged in full costs of such audit.

**Section 8.**
If the Employer fails to make any contribution specified in this Article, within twenty (20) days after the date required by the Trustees, the Union shall take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of payments due together with attorney's fees and such liquidated damages as may be assessed by the Trustees. In the event a job is stopped due to delinquent fringe benefit payments by the employer, craftworkers shall be compensated a day's wages for

each day the delinquency continues, not to exceed five days. The Employer's liability for payment under this article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided for or set forth elsewhere in this Agreement.

**Section 9.**
Management's appointments to the aforementioned Jointly Trusteed Funds are to be made equally by the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey. The Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey shall only have the right to the appointment of trustees if and when the existing Trust Funds of the predecessor local unions of the International Union of Bricklayers and Allied Craftworkers, Local Unions No. 4 and 5 are merged into statewide benefits funds. Neither the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey shall have the right or authority to appoint trustees to any trust fund of a predecessor local union unless and until a statewide merger of the Trust Funds occur, except if trustees are currently appointed by either the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey, that authority shall remain.

**Section 10.**
The Labor/Management Fund established under an Agreement and Declaration of Trust, shall be used to enhance the economic development and competitiveness of the unionized masonry industry, to assure the effective enforcement of prevailing wage laws and to provide for stable labor-management relations. The parties to this agreement shall appoint trustees to this fund in the same manner in which appointments are made to the Statewide Welfare Fund.

**Section 11.**
The parties agree to establish a Committee to explore the concept and funding mechanism for a Market Recovery Program.

32

0727

10/17/2007  14:56   6093248287                    BAC LOCAL 5                 PAGE  11/30

## ARTICLE XII
## BONDING

Prior to commencing any work covered by this Agreement, the Employer shall obtain a bond in the amount of $25,000, (twenty-five thousand dollars) with a duly qualified bonding company in a form approved by the Union, to secure payment of wages, benefit contributions, and other sums due under this agreement.

## ARTICLE XIII
## HOURS WORK, OVERTIME, SHIFTS, AND HOLIDAYS

A. The standard work day shall consist of eight (8) hours of work with starting and quitting times of either 7:00 a.m. to 3:30 p.m., or 8:00 a.m. to 4:30 p.m., unless otherwise mutually agreed to by the parties, with a 30-minute unpaid lunch hour occurring in the middle of the shift. The standard work week shall consist of five standard work days commencing on Monday and ending on Friday, inclusive. The normal starting and quitting times may be changed by mutual consent of the Employer and the Union.

B. All time worked before and after the established eight (8) hour day, Monday through Friday, and all time worked on Saturday shall be paid at the rate of time and one-half. All hours worked on Sundays and holidays shall be paid at the double time rate. If a craftworker works through any portion of their lunch they shall be paid one hour.

If any of the following trades: Carpenters, Laborers, Ironworkers or Operating Engineers Locals, with whom the BCANJ negotiates, receive a more beneficial overtime rate, the Bricklayers will be paid the higher overtime rate.

C. A make-up day may be worked on Saturday providing it is mutually agreed to by the union and the employer and provided that the following conditions are satisfied:

34

1. A make-up day on Saturday can be utilized provided 24 or more hours are worked during the course of the calendar work week, Monday through Friday.

2. It is not mandatory for an employee to work on a make-up day and it is at their choice and discretion. No negative actions or retribution shall be taken by the employer against any employee who chooses not to work a make-up day.

3. The sole reason for the loss of hours during the calendar work week must be weather conditions to qualify for a make-up day.

4. Any time worked before the established starting time or after the established quitting time on a make-up day shall be paid at the applicable overtime rate. Any hours worked on a Saturday make-up day that exceed 40 hours shall be paid at the applicable overtime rate.

5. If employees are unable to work a make-up day, the local union shall be given the preference to supply the remainder of the employees needed for that day.

6. There shall be no addition to the previously established crew size for the make-up day.

Any employer who violates the above provisions shall be prohibited from utilizing the make-up day for the duration of this Collective Bargaining Agreement. The employer has the right to file an appeal with the Joint Arbitration Board defined in Article XV of this Collective Bargaining Agreement. Said appeal shall be heard within five (5) days from the date filed. During the appeal process the employer shall be prohibited from utilizing the make-up day provision.

35

D. The parties to this Agreement recognize the desirability and in some cases absolute necessity of coordinating the shifts to be worked with the other trades involved on the project and the customer's work schedule. If shift work is necessary and it is mutually agreed to by the union and the employer, the following schedule shall prevail:

When a two shift schedule (including a day shift) is established, the first or day shift shall be established on an eight (8) hour basis. The second shift shall be established on an eight (8) hour basis and paid the base rate plus 15%.

When a three shift schedule is established, and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The day shift shall be established on an eight (8) hour basis, the second shift shall be established on a seven and one-half (7 ½) hour basis, and the third shift shall be established on a seven (7) hour basis. The first shift shall receive the base or regular hourly rate. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

When there is no day shift and a second shift or third shift is established and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The second shift shall be established on an eight (8) hour basis. The third shift shall be established on an eight (8) hour basis. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

The percentage premium, when added to the base rate, shall be termed the regular hourly rate. Shift hours for the second and third shifts shall be such as to conform to the day shift and in no case shall an employee work on more than one shift within a 24 hour period. When an irregular shift must be established, the percentage premium shall be

15% above the base rate.

All time worked before and after a regularly established shift shall be paid at the applicable overtime rate. When a portion of a regular established shift works into Saturday, Sunday or a Holiday, that time worked shall be paid at the established shift rate.

E. The Employer agrees to recognize the following holidays: New Year's Day, President's Day, Memorial Day, Fourth of July, Labor Day, Presidential Election Day, Veterans' Day, Thanksgiving Day, and Christmas Day. Holidays falling on a Sunday shall be observed the following Monday. The above holidays are subject to renegotiation based upon agreements established with other trades.

## ARTICLE XIV
## PAYMENT OF WAGES & FRINGE BENEFITS

All employees working under this Agreement shall be paid in cash or by check weekly on Thursday, or another day if mutually agreed between the business agent and the employer, before quitting time and within 72 hours after the closing of the pay for the week. When employees are unable to work on pay day due to inclement weather, the employee shall be paid before 12 noon in absence of reasonable cause for delay. An employee who has worked more than three days who is being laid off shall be given his final paycheck in full for all hours of employment one hour before layoff. When working overtime, the one hour notice of layoff does not apply. At the discretion of the Union, out of state contractors may be required to have payroll checks drawn on a local bank. Payroll checks will be delivered to the job site. In the event an employer issues a paycheck and there are insufficient funds in the employer's account, the employer, on the next working day, will bring either cash or cashiers checks to the jobsite to cover the paychecks and all penalties. Failure to do so will result in immediate withdrawal of all craftworkers from the job. Employees will be compensated by the employer for all lost time until the

36

matter is resolved. If a second violation occurs, all payrolls shall be in either the form of cash or cashiers checks. Fringe benefits will be paid on a weekly basis, except that Association Members, may pay monthly. Monthly payments shall be due to the fund(s) on or before the fifteenth day of the month immediately following the month during which the contributions were earned. Should an Association Member become delinquent, they may be required by the trustees of the benefits funds to remit weekly payments.

## ARTICLE XV
## WORKING CONDITIONS

A.  Overhead Protection: If any work is being performed overhead, all Employees must be protected on all outside scaffolds by two inch (2") planks, a covering shall be supplied over all stairwells, hatches, shafts, etc., no more than two (2) stories overhead and two (2) stories below in shafts.

B.  Hard hats are to be supplied by each employer. Failure to wear hard hats is cause for dismissal.

C.  Lines: All contractors must furnish the men with lines. The lines must not be raised more than one (1) course at a time. No bricklayer shall spread mortar before the line has been raised. However, a trig brick can be raised one (1) course before raising the line. Lines on a double unit wall shall be used on both sides of a wall eight inches (8") or over in thickness and on all units of masonry over four (4) feet in length.

D.  Portable Sanitation Units: Suitable portable sanitation units shall be erected on all jobs which shall be kept in sanitary condition. Portable sanitation units shall be built in accordance with State or Municipal health laws.

E.  Cutting Tools: Where employees are employed on cutting

38

masonry, the employer shall have all cutting tools sharpened.

F.  In order to protect the health and safety of employees against the effects of silicosis and other respiratory diseases, the dry cutting of masonry units by the means of hand-held, gas-powered, or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be prohibited on all masonry projects. The only exception to this provision will be when the Union and employer determine that the use of water is not feasible. When the Union and employer identify such tasks, the employer must ensure that the engineering and work practice controls are in place to control the dust: such as a vacuum, with high efficiency particulate air (HEPA) filter or another dust control system. It is agreed that in order to protect the health and safety of employees the dry cutting of masonry units by means of hand-held, gas powered or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be done in a designated area away from craftworkers if at all possible. It is the responsibility of the employee to adhere to the established restrictions for said designated areas.

Respirators should only be used as the primary method of protection if other engineering and work practice controls are not feasible. When the respirators are used, in accordance with the OSHA regulations, employers must provide workers with full-face respirators as part of a complete respiratory program that includes the proper selection of respiratory cartridges, and training and fit-testing to ensure that the worker is able to wear a respirator. It is the employee's responsibility to utilize proper protection.

Additionally, in the event the Union and the employer determine that dry-cutting or grinding is necessary, the contractor agrees to perform periodic air monitoring to

39

K.  Caulking:  All pointing and caulking of windows with cement or composition to be done by bricklayers, by either gun, trowel or any other method.

L.  Stone Work:  All renovation, cleaning, and pointing of stone to be done by this union.

M.  The setting, aligning and erection of all precast slabs and the setting and leveling of all bearing plates for structural steel or machinery shall be done by the members of the above local union.

N.  Composite crew on all precast panels.  Setting of all other masonry panels shall be the work of BAC Members.

O.  All brick or block panels shall be erected by union bricklayers.

P.  Waterproofing:  All transparent waterproofing applied to brick or stone work with brush or spray to be done by bricklayers.

Q.  There are to be two men on all blocks weighing 40 lbs. or more.

R.  Scaffolding:  No block 6" or over in size shall be built more than six (6) courses in scaffold height.  Where blocks of 100 lbs. or over are used, a pony scaffold is to be erected when the wall is three (3) feet high, for the easier laying of these blocks to the next scaffold height.  When a BAC member works on a swing scaffold as part of a composite crew, they shall receive the same premium differential as the other trades performing work on the same swing scaffold.

S.  Water:  Water containers and sanitary drinking cups shall be provided on all jobs to be furnished by all contractors at all times.

41

G.  Cutting and Mechanical Devices:  Where air guns or other mechanical devices are used for the purpose of cutting chases, opening, etc., in brick work, such gun or device shall not exceed fifteen (15) lbs. weight.  When such device exceeds fifteen (15) lbs., the employer may use a laborer to assist the bricklayer in handling the gun, but there shall always be one bricklayer on each gun in use.  All cutting, when done by hammer and chisel, shall be done exclusively by the bricklayer.  Where a bull and sledge hammer is used, there shall be a composite crew of bricklayers and laborers.  (The bricklayer foreman shall have complete authority over all men employed in this phase of work.)  All cutting out of brick work, pointing, washing down, caulking cement and lime waterproofing washing of brick, or slabs, used in floor arches shall be done by bricklayers, and where scaffolding is used in the above work wire rope shall be used.

H.  Pointing:  All pointing and joining of brick work shall be done by journeymen who built same, if possible.

I.  Cement Block:  Bricklayers and stone masons to set all cement blocks and all masonry units.

J.  Cork Block:  All cork block (Styrofoam Sheets), and substitutes thereof, shall be laid by bricklayers.

40

ensure that the silica exposure levels do not exceed OSHA permissible exposure limit.  Failure to comply will result in work stoppage.  The employee operating the machine shall be allowed ten (10) minutes to clean up at 12:00 noon and quitting time.

Employees engaged in wet cutting masonry products will be furnished elbow length gloves, an apron and goggles.  No employee shall operate a wet saw unless provided with a wooden platform on which to stand and the saw is properly grounded.

T.  Shanty and Stoves:  Where there are not more than ten (10) men employed on a job, a shanty house shall be erected exclusively for the bricklayer, and it shall contain not less than eighty (80) square feet of floor space.  Where there are more than ten (10) men and not more than twenty (20) men, the shanty house shall contain not less than one hundred and fifty (150) square feet of floor space.  Where there are more than twenty (20) men and not more than thirty (30) men it shall contain not less than two hundred (200) square feet of floor space but where there are more than thirty (30) men employed the same proportion shall apply.  Where there is a shanty and no elevator located in the building it shall not be above the ground floor unless elevator is provided except on alterations where it will be placed to suit the convenience of the contractor.

U.  Ample provision shall be made to protect all bricklayers levels on all outside scaffolds.

V.  It shall be deemed unsafe to run any brick work up more than 6 courses or 16" whichever is less without backing up in cavity walls or any masonry walls which does not utilize a brick header course.

W.  Contractors shall provide a two foot clear, planked working area beyond the building wall when bricklayers or stone masons are working off new footing on or below grade.

X.  There shall be a clothing allowance of fifty cents (.50) per hour minimum on all fire brick work paid by contractor.

Y.  There will be one coffee break in the morning not to exceed ten (10) minutes.

Z.  The employee shall be allowed five (5) minutes to clean up prior to quitting time.

AA.  All mortar tubs will be raised to at least sixteen inches, not to exceed thirty inches.

BB.  All rubber gloves and goggles to be furnished by the contractor for all washing down.

CC.  All work on high stacks, the contractor will pay a premium wage of 22% above the wage scale.

DD.  All scaffolds will be kept at least four (4) inches below the wall.

EE.  If an employee works past the full hour and must stop because of inclement weather conditions, he shall be paid for the full hour, but is not to leave the job until expiration of said hour.  No employee shall start work on the half hour.

FF.  If an employee reports to work and is not started but requested to stay on the job by the contractor, the employee shall be paid for all time prior to starting or until informed that no work shall be performed.

GG.  In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between starting time and 12 noon, men shall be paid until noon.  Employees must, however, remain on the job until noon.  In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between 12:30 p.m. and 3:30 or 4:30 p.m., employees shall be paid until 3:30 or 4:30 p.m.  Employees must remain on the job until 3:30 or 4:30 p.m.

HH.  When a job does not start at the regular starting time, it will be the duty of the Foreman to notify the Shop Steward, personally, two hours after the designated start regarding the work conditions. It is clearly understood and agreed the employer will not send anyone to work on a job working during inclement weather unless all of the men regularly

42

43

0732

employed on that job who showed up for work at starting time are started first. Nothing herein contained shall be construed to deny the saw men, lay-out men and steward regularly employed on the job from working at anytime at their respective job assignments if they are needed.

II. When masons work overtime at the direction of the employer or foreman, they shall receive at least one hour's pay at the applicable overtime rate. Fractions of an hour to be considered a full hour.

JJ. Employees who may be required to work overtime beyond 6:00 p.m. shall be permitted to take an unpaid one-half hour meal period on the job between 6:00 p.m. and 7:00 p.m. The employer may split a crew for the dinner period.

## ARTICLE XVI
## GRIEVANCE PROCEDURE

A. The parties to this Agreement shall establish a Joint Arbitration Board consisting of two representatives of the Building Contractors Association of New Jersey, two representatives of the Masonry Contractors of New Jersey and four representatives selected by the Local Union, to resolve disputes over the interpretation and application of this Agreement. The boards shall meet at least once a month, or on call, to settle complaints, abuses or grievances. It is further agreed that should occasion require any alterations or amendments to this Agreement, the party desiring such alterations or amendments shall submit same in writing to the Board. The Employer and union representatives at a session shall have an equal number of votes on all matters coming before the Joint Arbitration Board, regardless of the number of Employer or Union representatives present at a session.

B. It is specifically agreed that any controversy arising out of this Agreement involving the interpretation of its terms and

44

conditions, shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the union or to the attention of the Union by the Employer within five (5) days after the alleged violation is committed or discovered.

C. Grievances shall be handled in the following manner:

1. The grievance shall be referred to the jobsite union steward and to an employer representative for adjustment.

2. If the grievance cannot be settled pursuant to paragraph 1 of this Section, the grievance shall be referred on the following day to the Business Manager of the Union and the Employer.

3. If the grievance cannot be settled pursuant to paragraph 2 of this Section within three (3) working days excluding weekends and holidays, the grievance shall be submitted within 48 hours to the Joint Arbitration Board for consideration and settlement.

4. If the Joint Arbitration Board cannot reach a satisfactory settlement within five (5) working days, not including weekends and holidays, following a referral of grievance to the Board, it shall immediately select an impartial arbitrator to review with the Board all evidence submitted relating to the dispute and then cast the deciding vote. If the Arbitration Board cannot agree on an impartial arbitrator, then the matter shall be submitted to the American Arbitration Association for a decision. All expenses of the impartial party shall be borne equally by the Employer and the Union. The decision reached by the Joint Arbitration Board

45

with the assistance of the impartial arbitrator shall be final and binding upon all parties.

D.  When a settlement has been reached at any step of this Grievance Procedure, such a settlement shall be final and binding on all parties, provided, however, that in order to encourage the resolution of disputes and grievances at Steps 1 and 2 of this Article, the parties agree that such settlements shall not be precedent-setting.

E.  The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties initiated by the written request of one party to the other, at the appropriate step of the Grievance Procedure. However, failure to process a grievance, or failure to respond within the time limits provided above, without a written request for an extension of time, shall be deemed a waiver of such grievance without prejudice and shall create no precedent in the processing of and/or resolution of like or similar grievances or disputes.

## JURISDICTIONAL DISPUTES

A.  In order to avoid jurisdictional disputes which have such a demoralizing effect upon the progress of the construction work, it is agreed that only B.A.C. Members will be employed on work which is recognized as coming under the jurisdiction of the International Union of Bricklayers and Allied Craftworkers as:

1.  Granted by the A.F.L. - C.I.O.

2.  Determined by a Joint Board consisting of four representatives from the Local Unions, two representatives from the Building Contractors Association of New Jersey and two representatives from the Mason Contractors of New Jersey.

46

3.  As established by practice of Employers within the area designated herein whenever (1) or (2) above are not applicable;

4.  It is the intent of the parties that wherever a job decision shall be deemed to be strongly indicative of the area practice, the Bricklayers & Allied Craftworkers Local Unions will advise all personnel affected to make future assignments accordingly.

5.  It is further the intent of the parties hereto that wherever possible, and whenever the contractor can reasonably foresee a jurisdictional dispute, the contractor will call a pre-job conference with the Local concerned and the contractors agree that when no agreement is reached, at the request of the Union, the contractor will join in the submission of the matter to the Joint Board. In the meantime, the work shall proceed by the craft in possession of the work.

B.  The Employer and the Unions agree to be governed by the terms and conditions of the Agreement, effective May 1, 1995, as amended, creating the Joint Board for the settlement of any jurisdictional dispute; and the decisions of the Joint Board will be followed in good faith.

## ARTICLE XVII
## SUBCONTRACTING

A.  The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement and complies with all of the terms and conditions of this Agreement.

47

B. All charges of violation of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.

## ARTICLE XVIII
## PRESERVATION OF WORK (Anti-Double Breasting)

A. In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

B. All charges of violations of Section A of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in Article XV of this Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in Article XV is empowered, at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as result of the violations, and (2) pay into the affected joint trust funds established under this Agreement any delinquent

48.

contributions to such funds which have resulted from the violations, including such interest as may be prescribed by the trustees or by law. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other sections or articles of this Agreement.

C. If, as a result of violation of this Article, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with Section B above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

## ARTICLE XIX
## NO-STRIKE/NO-LOCKOUT

It is understood and mutually agreed that there shall be no strikes or lockouts over a dispute concerning this Agreement during its term until the grievance procedures described in Article XIV have been exhausted and then only in the event a party fails or refuses to abide by a final decision. This Article shall not apply in those cases where an Employer fails or refuses to make in whole or in part any payments required under this Agreement including all wages, local union fringe benefits or other contributions that have been established through bona fide collective bargaining.

## ARTICLE XX
## SEPARABILITY AND SAVINGS PROVISION

It is the intent of the parties hereto to abide by all applicable Federal and State statutes and rules and regulations made pursuant thereto. If any provision of this Agreement is held invalid by any court or governmental agency having jurisdiction, or if compliance with or enforcement of any provision of this Agreement is

49

0735

Inasmuch as (1) the Union has requested recognition as the majority, Section 9(a), representative of the employees in the bargaining unit described herein and (2) has submitted or offered to show proof of its majority support by those Employees, and (3) the Employer is satisfied that the Union represents the majority of the bargaining unit Employees, the Employer recognizes the Union, pursuant to Section 9(a) of the National Labor Relations Act, as the exclusive collective bargaining agent for all employees within that bargaining unit, on all present and future job sites within that jurisdiction of the Union.

The Employer agrees that if it has not previously done so, at any time during this agreement it will, upon the Union's request for recognition as the Section 9(a) representative of the employees in the bargaining unit described herein, and upon the union's submission of proof of majority support by such employees, voluntarily recognize the Union as the exclusive representative as defined in Section 9 (a) of the National Labor Relations Act, of all the employees within the bargaining unit on all present and future jobsites within the jurisdiction of the Union. When the Union has requested recognition as majority representative, the Employer's recognition will be based on the Union's proof or offer to submit proof. The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board.

We, the undersigned Employer on behalf of the parent firm, all subsidiaries and corporate related firms, companies and/or corporations hereby become signatory to this Agreement and agree to abide by the full terms and conditions of this Agreement effective as of this date.

51

restrained by such tribunal pending a final determination as to its validity, then such provision or provisions shall continue in effect only to the extent permitted and all other provisions of this Agreement shall remain in force and effect.

In the event that any provision of this Agreement is held invalid, or enforcement of or compliance with any provision is restrained, the Union and the Employer shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement, incorporating the substance of such provision to the extent allowable under the law, to be in effect during the period of invalidity or restraint.

## ARTICLE XXI
## MORE FAVORABLE CONDITIONS

The Union hereby agrees that if it affords any conditions of a more favorable means to any other employer with whom it has a collective bargaining agreement who performs the same or similar work, that said more favorable condition shall automatically be incorporated in this Agreement and be afforded all members of the Association covered hereunder.

## ARTICLE XXII.
## GENERAL UNDERSTANDING

The Union agrees to cooperate with the Employer in meeting conditions peculiar to the job in which it may be engaged. It will at all times meet and confer with the Employer, and similarly, the Employer will at all times meet with the Union regarding any questions or misunderstandings that may arise under the performance of this Agreement.

This Agreement constitutes the entire agreement between the parties, and any local or area practices or working rules which may be in conflict with the provisions contained in this Agreement shall be subordinate to this Agreement.

50

10/17/2007  14:56    6093248287        BAC LOCAL 5        PAGE  02/30

53

**WAGE RATES EFFECTIVE NOV 1, 2002 THROUGH OCTOBER 31, 2003**

| | 6 | 7 | 8 | 15 | 26 | 33 | 35 |
|---|---|---|---|---|---|---|---|
| FORMER LOCAL # | | | | | | | |
| JOURNEYMAN: | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 |
| DEPUTY FOREMAN: | $31.35 | $31.35 | $31.35 | $31.35 | $31.35 | $31.35 | $31.35 |
| FOREMAN: | $34.65 | $34.65 | $34.65 | $34.65 | $34.65 | $34.65 | $34.65 |
| EMPLOYER CONTRIBUTIONS: | | | | | | | |
| WELFARE FUND: | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 |
| LOCAL PENSION FUND: | $4.60 | | | $4.50 | | $4.60 | |
| ANNUITY FUND: | $3.00 | $3.00 | $7.50 | $3.00 | $3.00 | $3.00 | $3.00 |
| APPRENTICE FUND: | $0.15 | $0.15 | $0.15 | $0.15 | $0.16 | $0.15 | $0.16 |
| INDUSTRY ADVANCEMENT: | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 |
| LABOR MANAGEMENT TRUST: | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| I.U. PENSION FUND: | $1.60 | $1.50 | $1.50 | $1.50 | $5.00 | $1.50 | $1.60 |
| LMI: | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 |
| ""TOTAL PACKAGE"" | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 |
| DEDUCTIONS AFTER TAXES FROM GROSS WAGES | | | | | | | |
| | JOURNEYMAN | | | DEP FOREMAN | | FOREMAN | |
| LOCAL DUES CHECKOFF: | $1.57 | | $1.66 | | $1.73 | | |
| INTL DUES CHECKOFF: | $0.45 | | $0.45 | | $0.45 | | |
| DEFENSE FUND: | $0.05 | | $0.05 | | $0.05 | | |
| LOCAL BACPAC: | $0.05 | | $0.05 | | $0.05 | | |
| I.U BACPAC: | $0.01 | | $0.01 | | $0.01 | | |
| TOTAL DEDUCTIONS: | $2.13 | | $2.22 | | $2.31 | | |

AFTER TAX DEDUCTIONS NOTE: All former locals have the same deductions with the exception of: Former Local #7: Has a BACPAC of $0.02, making their deductions $2.14

I.U. Reporting Forms: IU Pension, LMI, IU Dues Checkoff, & BACPAC are all to be remitted on IU Remittance. All other benefits are to be remitted to the LOCAL FUND OFFICE where the job is preformed.

52

IN WITNESS WHEREOF, we the authorized officers of the Building Contractors Association of New Jersey, the Masonry Contractors Association of New Jersey, the Building Contractors Association of Atlantic County and the Bricklayers & Allied Craftworkers, Local Unions No. 4, 5 & 2 have hereunto set our hands and seals this 31st  day of October, 2002.

*Authorized Management Representatives*

*Authorized Union Representatives*

Gerald Della Salla, 12653 No. 4

Michael Petrone, Local No. 5

Thomas F. Rhoades, Local No. 2

*The undersigned employer agrees to be bound by all terms of the within agreement:*

_____
*Name of Firm*

_____
*Physical Street Address*

_____
*City*                    *State*                    *Zip Code*

_____
*Phone Number*                         *Fax Number*

_____
*Employer's Federal Identification Number*

_____
*New Jersey Employment Compensation Number*

_____
*Workmen's Compensation Insurance Carrier*

_____
*Date*

## SIGNATURE OF PARTIES

_____
*Member of Firm Signature*     *Printed Name*          *Title*

_____
*Union Officer Signature*       *Printed Name*          *Title*

_____
*Field Representative Signature*   *Printed Name*

### PLEASE COMPLETE & REMIT TO:

*Bricklayers & Allied Craftworkers Local #5*
*3281 Route 206, Suite 3*
*Bordentown, New Jersey 08505*
*(609) 324-0500*
*Fax- (609) 324-1505*

54

0738

**EXHIBIT H**



**CALIBRE**
CPA GROUP
PLLC
CERTIFIED PUBLIC ACCOUNTANTS
AND BUSINESS ADVISORS

1850 K STREET, NW
SUITE 1050
WASHINGTON, DC 20006

202.331.9880 PHONE
202.331.9890 FAX

CIVIC OPERA BUILDING
20 NORTH WACKER DRIVE
SUITE 900
CHICAGO, IL 60606

312.920.9400 PHONE
312.920.9494 FAX

www.calibrecpa.com

 A member of
KS International

August 10, 2006

Mr. Michael Murphy
Director of Revenue Accounting
International Union of Bricklayers and Allied Craftworkers
1776 Eye Street NW
Washington, DC 20006

RE:    Compliance Review of Maarv Waterproofing for the International Trowel
       Trades Fringe Benefit Funds
       (Employer # 281885)

Dear Mr. Murphy:

Enclosed you will find a copy of our compliance review report detailing discrepancies
we noted during our review of the payroll records of Maarv Waterproofing for the
period January 2002 through December 2005.  In addition, we have enclosed an
overview of our compliance procedures and an interest schedule.  Please note that
Maarv Waterproofing has stated that they have not utilized any subcontractors during
the review period.

If there are any questions concerning this engagement, please contact me at your
convenience.

Sincerely,

*Ellen K. Odell*

Ellen K. Odell

Enclosures

**0167**

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN FLYNN, JAMES BOLAND, GERALD O'MALLEY,        )
KEN LAMBERT, GERARD SCARANO, H. J. BRAMLETT,      )
EUGENE GEORGE, PAUL SONGER, CHARLES               )
VELARDO, MATTHEW AQUILINE, GREGORY R. HESS,       )
MICHAEL SCHMERBECK, VINCENT DELAZZERO,            )
and BENJAMIN CAPP,                                )
as Trustees of, and on behalf of, the            )
BRICKLAYERS & TROWEL TRADES INTERNATIONAL         )
PENSION FUND,                                     )
    620 F Street, N.W.                            )
    Washington, DC  20004                         )
    (202) 783-3788,                               )
                                                  )
JIM ALLEN, MATTHEW AQUILINE, LON BEST, JAMES      )
BOLAND, TED CHAMP, RAYMOND CHAPMAN,               )
VINCENT DELAZZERO, BRUCE DEXTER, JOHN             )
FLYNN, EUGENE GEORGE, GREGORY HESS, FRED          )
KINATEDER, DAN KWIATKOWSKI, KEN LAMBERT,          )
SANTO LANZAFAME, DICK LAUBER, WILLIAM             )
MCCONNELL, EDWARD NAVARRO, GERALD                 )
O'MALLEY, JOHN PHILLIPS, CHARLES RASO, MARK       )
ROSE, KEVIN RYAN, GERARD SCARANO, MICHAEL         )
SCHMERBECK, PAUL SONGER, JOSEPH SPERANZA,         )
and FRED VAUTOUR                                  )
as Trustees of, and on behalf of, the            )
INTERNATIONAL MASONRY INSTITUTE,                  )
    620 F Street, N.W.                            )
    Washington, DC  20004                         )
    (202) 783-3788,                               )
                                                  )
    and                                           )
                                                  )
INTERNATIONAL UNION OF BRICKLAYERS AND            )
ALLIED CRAFTWORKERS,                              )
    620 F Street, N.W.                            )
    Washington, DC  20004                         )
    (202) 783-3788,                               )

       Plaintiffs,

Case: 1:07-cv-00501
Assigned To : Leon, Richard J.
Assign. Date : 3/16/2007
Description: FLYNN v. MAARV

2225882.01



v.                                        )
                                          )
MAARV WATERPROOFING, INC.,                )
    68 Colfax Drive                       )
    Clifton, NJ 07013                     )
                                          )
              Defendant.                  )
                                          )

## COMPLAINT

Plaintiffs, by their attorneys, DICKSTEIN SHAPIRO LLP, complaining of the

Defendant, allege as follows:

### CAUSE OF ACTION
### Jurisdiction and Venue

1. This is an action brought by the fiduciaries of the Bricklayers & Trowel Trades

International Pension Fund ("IPF" or "Fund") and the fiduciaries of the International Masonry

Institute ("IMI") to enforce the terms of the Plan and Trust Agreements adopted by the IPF and

IMI, and the provisions of the Employee Retirement Income Security Act of 1974, as amended

("ERISA"), and by the International Union of Bricklayers and Allied Craftworkers ("BAC") to

enforce the provisions of the Labor Management Relations Act ("LMRA"). This action arises

under the laws of the United States, specifically Section 502(a)(3), 502(g)(2), and 515 of ERISA,

29 U.S.C. §§ 1132(a)(3), 1132(g)(2), 1145, and Section 301 of the LMRA, 29 U.S.C. § 185.

Pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), jurisdiction is therefore

conferred on this Court as to the claims brought on behalf of the IPF and IMI. As to the claims

brought on behalf of the BAC, jurisdiction is conferred under Section 301(c) of the LMRA, 29

U.S.C. § 185(c).

2225882.01

2. The IPF and IMI are administered in the District of Columbia. Venue for the claims asserted by the IPF and IMI is conferred on this Court pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), which provides:

> (2) Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

3. BAC maintains its principle office in the District of Columbia. Venue for the claims asserted by the BAC is therefore conferred on this Court pursuant to Section 301(c)(1) of the LMRA, 29 U.S.C. § 185(c)(1).

### Parties

4. Plaintiffs, John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H. J. Bramlett, Eugene George, Paul Songer, Charles Velardo, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent DeLazzero and Ben Capp, Jr., are Trustees of, and sue on behalf of, the IPF. The IPF is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IPF trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IPF in their respective capacities as fiduciaries.

5. The IPF is also authorized to effect collections on behalf of the IMI and BAC, pursuant to a written Assignment of Claims and the *Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers* ("Collection Procedures").

6. Plaintiffs, Jim Allen, Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber,

3

William McConnell, Edward Navarro, Gerald O'Malley, John Phllips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour, are Trustees of, and sue on behalf of the IMI. The IMI is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IMI trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IMI in their respective capacities as fiduciaries.

7.    Plaintiff, BAC, an unincorporated association, is a labor organization within the meaning of 29 U.S.C. § 152(5) and is entitled to bring suit under 29 U.S.C. § 185.

8.    Defendant, Maarv Waterproofing, Inc. is, and at all times hereinafter mentioned was, a company maintaining offices and conducting business in the state of New Jersey.

9.    Defendant employs or has employed members of the International Union of Bricklayers and Allied Craftsmen and its affiliated local unions ("Union").

### Violation Charged

10.    Maarv Waterproofing, Inc. acting through its authorized agents or officers, executed collective bargaining agreements with the Union. Those collective bargaining agreements are annexed hereto as Exhibits A and B and are hereinafter referred to as the "Agreements."

11.    Pursuant to the Agreements, Defendant agreed to make certain payments to the IPF, IMI, and BAC on behalf of covered employees of Defendant.

12.    Having submitted some contributions and dues checkoff payments, Defendant has demonstrated an awareness of the obligation to make those payments.

4

2225882.01

13.    An examination of Defendant's books and records ("audit") performed by the independent accounting firm of Calibre CPA Group PLLC covering the time period January 2002 through December 2005 revealed that Defendant failed to properly submit required reports, contributions, and dues checkoff payments for work performed during this time period.

14.    The total of contributions due the IPF and IMI by Defendant for work performed during the months of January 2002 through December 2005, as determined by the audit, amounts to $218,425.89.

15.    Under the terms of the Plan and Trust Agreements adopted by the IPF and IMI, interest in the amount of $88,721.51 and an additional computation of interest in the amount of $88,721.51, calculated from the Due Date at the rate of 15 percent per annum have been assessed on such delinquent contributions determined due by the audit.

16.    Defendant also owes the BAC delinquent dues checkoff moneys in the amount of $45,671.33 for work performed during January 2002 through December 2005 as determined by the audit.

17.    In addition, Defendant owes the BAC $18,318.51 in interest on delinquent dues checkoff determined due by the audit.

18.    Plaintiffs have brought this action in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1). Plaintiffs have been, and are, incurring additional attorney's fees as a direct result of Defendant's failure to make contributions and dues checkoff payments in accordance with the terms and conditions of the Agreements.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1. For the total amount of $463,312.10, which is constituted as follows:

2225882.01

a.   For unpaid contributions in the amount of $218,425.89 payable to the IPF and IMI for the time period January 2002 through December 2005, plus any and all additional amounts found to be due and owing through the date of judgment (ERISA Section 502(g)(2)(A); Collection Procedures);

b.   For interest in the amount of $88,721.51 assessed on such unpaid contributions, calculated at 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(B); Collection Procedures);

c.   For an additional computation of interest in the amount of $88,721.51, assessed on such unpaid contributions, calculated at the rate of 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(C)(i); Collection Procedures);

d.   For dues checkoff moneys owed to the BAC in the amount of $45,671.33 (29 U.S.C. § 185; Collection Procedures);

e.   For interest in the amount of $18,318.51 on such delinquent dues checkoff moneys (29 U.S.C. § 185; Collection Procedures);

f.   For the costs of filing this action in the amount of $350.00 (ERISA Section 502(g)(2)(D));

g.   For the costs of conducting the audit in the amount of $3,103.35 (ERISA Section 502(g)(2)(D));

2.   In the amount of Five Thousand Dollars ($5,000.00), and such additional amounts as may be incurred, representing attorney's fees and costs of this action (ERISA Section 502(g)(2)(D)).

3.   That Defendant be directed to comply with its obligations to submit all required reports and to make all contributions and dues checkoff payments due and owing to the IPF, IMI, and/or BAC, and to pay the costs and disbursements of this action.

6

4.  Such other relief as this Court deems appropriate, including judgment for any contributions, dues checkoff payments, and/or interest thereon that may accrue subsequent to the filing of this complaint, as well as any resulting statutory damages thereon under ERISA.

Dated:  March **15** , 2007

By: _____

Ira R. Mitzner, DC Bar No. 184564
Charles V. Mehler III, DC Bar No. 475909
 DICKSTEIN SHAPIRO  LLP
 1825 Eye Street, NW
 Washington, DC  20006
 (202) 420-2200

Attorneys for Plaintiffs

7

2225882.01

# ORIGINAL COMPLAINT

# EXHIBIT A

NJ 9997

# AGREEMENT BETWEEN

## BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY

## OTHER SIGNATORY EMPLOYERS

-and-

## LOCAL UNION NOS. 4 & 5
## OF THE
## INTERNATIONAL UNION OF
## BRICKLAYERS AND ALLIED CRAFTWORKERS

*November 1, 1999 through October 31, 2002*

NJ9997

# Table of Contents

|  | ARTICLE NO. | PAGE NO. |
|---|---|---|
| Apprentices | VII | 13 |
| Duration/Termination/Amendment | II | 1 |
| Foremen | VIII | 14 |
| General Understanding | XXI | 30 |
| Grievance Procedure | XV | 26 |
| Hiring Preference | V | 12 |
| Hours Work, Overtime, Shifts, Holidays | XII | 21 |
| Jointly Trusteed Funds | XI | 15 |
| More Favorable Conditions | XX | 30 |
| No-Strike/No-Lockout | XVIII | 29 |
| Parties | I | 1 |
| Payment of Wages & Fringe Benefits | XIII | 23 |
| Preservation of Work | XVII | 29 |
| Scope of Work | III | 1 |
| Separability and Savings Provision | XIX | 30 |
| Stewards | VI | 13 |
| Subcontracting | XVI | 28 |
| Traveling Contractors | IX | 14 |
| Union Recognition, Union Security Access | IV | 12 |
| Wages, BACPAC, and Local Dues Checkoff | X | 15 |
| Working Conditions | XIV | 23 |

NJ9997

## AGREEMENT BETWEEN
## BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY
## OTHER SIGNATORY EMPLOYERS
### -and-
## LOCAL UNION NOS. 4 & 5
## OF THE INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED
## CRAFTWORKERS

### ARTICLE I
### PARTIES

This Agreement is entered into this *first day of November 1999,* by and between the Building Contractors Association of New Jersey, (hereinafter referred to as the Association), for and on behalf of its members as set forth in Schedule "A" attached hereto and other contractors who are signatory hereto or who may become signatory hereto (hereinafter referred to as the Employer), and the INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL UNION NOS. 4 & 5 (hereinafter referred to as the Union).

The Association agrees to furnish to the Union a list of all members of the Association denoting those members bound to the terms of this Agreement, the honorary members, independent members, and any other classes or groups of members.

### ARTICLE II
### DURATION - TERMINATION - AMENDMENT

This Agreement shall be effective commencing *November 1st, 1999* and shall continue in full force and effect up to and including *October 31, 2002,* and shall be automatically continued for each successive period of this Collective Bargaining Agreement unless written notice of decision to negotiate a new Agreement in whole or in part, is given in writing by either party to the other not later than sixty (60) days nor more than ninety (90) days prior to the expiration date or any anniversary date thereafter. If the parties fail to reach an agreement in such negotiations, the issues in dispute shall be submitted to the International Masonry Institute's Dispute Settlement Plan for such steps as are deemed appropriate in accordance with the procedures of the Plan. The parties may at any time mutually agree to change or amend any part of this Agreement and such changes or modifications shall not affect the continuing nature of this Agreement.

### ARTICLE III
### SCOPE OF WORK

A.   This Agreement shall cover new construction, maintenance, repair and renovation in the State of New Jersey.

1

NJ 9997

B.     The Employers bound hereby recognize the Union's claim to all work falling within the jurisdiction of the Union, as defined in Branches of the Trade, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers which is incorporated herein by reference.

C.     The installation of Brick and all other masonry units such as blocks, etc., with or without mortar, anywhere on the project shall be the work of Bricklayers & Allied Craftworkers of International Union, Local Nos. 4 & 5.

D.     Temporary heat, applicable to all branches of the trade, to protect any Masonry work performed and shall include all masonry materials all year, especially in the winter months (November 15th through March 15th).

**Brick Masonry**

A.     Bricklaying masonry shall consist of, but not limited to, the following work procedures and installation of the following materials: The laying of bricks made from any material in, under or upon any structure or form of work where bricks are used, whether in the ground, or over its surface, or beneath water, in commercial buildings, rolling mills, iron works, blasts or smelter furnaces, lime or brick kilns, in mines or fortifications and in all underground work, such as sewers, telegraphy, electric and telephone conduits; including the installation of substitutes for brick such as all carbon materials, Karbate, Impervite or mixtures, all acid resistant materials, all terra cotta and porcelain materials, except where the foregoing materials are manufactured to substitute for tile as provided for under the category of Section 8, C of the Codes of the International Union of Bricklayers and Allied Craftworkers. All cutting of joints, pointing, cleaning and cutting brick walls, fireproofing, block, arching terra cotta cutting and setting, the laying and cutting of all tile, plaster, mineral wool, cork, blocks and glass masonry or any substitutes for the above material, the laying of all pipe sewers or water mains and the filling of all joints on the same when such sewers or conduits are of any vitreous material, burnt clay or cement, or any substitute material used for the above purpose, the installation of all brackets and fasteners is the work of the mason exclusively, the cutting and rubbing and grinding of all kinds of bricks and the setting of all cut-stone trimmings on brick buildings, is bricklayer's work. The preparation and erection of plastic castables or any refractory materials is bricklayer's work.

B.     Cleaning, grouting, pointing and other work necessary to achieve and complete the work under the foregoing categories, all waterproofing and black mastic waterproofing, silicone and/or substitutes sandwiched between masonry units in the interior of the wall.

C.     All terra cotta called unit tile in sizes over 6" x 12" regardless of method of installation; all quarry tile over 9"x 9" x 1 1/4" in size, split brick or quarry tile or similar material if bedded and jointed with one operation. The bedding, jointing and pointing of the above materials shall be the work of the craft installing same.

2

NJ 9997

D.    All burnt clay extruded cellular products regardless of trade name or method of installation when used as a veneer on structures; all clay products known as terra cotta tile, unit tile, ceramic veneer and machine-made terra cotta and like materials in sizes larger than 6" x 12", regardless of the method of installation. Where the preponderance of material to be installed is of the above size and when material of lesser sizes is to be used in connection therewith, the bricklayers shall install all such materials. Brick paving comes under bricklayers' trade classifications.    The parties acknowledge the Union's claim to screeding of sub base regardless of type of material used.

E.    Grouting of all Masonry Units, all Leveling Plates for steel columns, all machinery and Precast Panels shall apply to all branches of the trade.

### Stone Masonry

A.    Stone Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials:   The laying of all rip rap, rubble work with or without mortar, setting all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured from such foreign or domestic products as are specified and used in the interior or on the exterior of buildings by architects, and customarily called "stone" in the trade.) Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over 10 inches in height; the dressing of all jambs, corners and ringstones that are roughly dressed upon the beds, joints or reveals and the cutting of a draft upon same for plumbing purposes only; and the cleaning, cutting of joints and pointing of stone work.

B.    This is to apply to all work in buildings, sewers, bridges, railroads, bulkheads, breakwaters, jetties, playgrounds, parks, landscaping and curbing or other public works and to all kinds of stone, particularly to the product of the locality where the work is being done. Stonemasons shall have the right to use all tools which they consider necessary in the performance of their work.

C.    Cleaning, grouting, pointing and other necessary work to achieve and complete the work under the foregoing categories.

### Artificial Masonry

A.    Artificial Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials:   The cutting, setting and pointing of cement blocks and all artificial stone or marble, either interior or exterior, when set by the usual custom of the stone mason and marble setter. All cement that is used for backing up external walls, the building of party walls, columns, girders, beams, floors, stairs and arches and all material substituted for the clay or natural stone products, shall be handled by employees in the bargaining unit for which the highest rate of wages shall be demanded.

3

NJ 9997

B.   All artificial masonry, the cutting, setting and pointing of all concrete prefabricated slabs, regardless of dimension size, shall be the work of members of this organization, for which the regular wage scale in the jurisdiction where the work is performed shall be paid.

C.   Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over ten inches in height, the dressing of all jams, corners and ringstones, joints, or reveals and the cutting of a draft upon same for plumbing purposes only, and the cleaning, cutting of joints and pointing of stonework.

D.   This is to apply to all work on buildings, sewers, bridges, railroads or other public works, and to all kinds of stone, particularly to the products of the locality where the work is being done and the same shall be considered stone masonry.

E.   Bricklayers and stone masons shall have the right to use all tools which they consider necessary in the performance of their work.

F.   All cement that is used for parging up external walls and block units, installing reinforcing rods and door blocks, and all grouting.

G.   The building of party walls, columns, girders, beams, floors, stairs and arches. Gypstell products and cement of precast slabs on roofs or wherever used in building construction of alterations, and all material substituted for the clay or natural stone products. All wall ties and brackets used to anchor brick, block, stone or any type of masonry whether screwed or nailed is the work of the mason, as per the 1962 agreement between the B. & A.C. and Ironworkers herein incorporated by reference.

H.   The laying out and supervising of work for or by the use of any or all of the above materials shall be done by the employees covered hereunder.

### Cement Masons Agreement

A.   Cement masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying out, screeding and finishing of all cement, concrete, brown stone composition, mastic and gypsum materials, also for fireproofing, waterproofing, cement and composition base and vault lights.

B.   The cutting of all cement and concrete for patching and finishing; the bush hammering of all concrete when cast in place; the operation of cement gun, the nozzle and the finishing of all material applied by the guns, and the operation of the cement floor finishing machines. The cement mason shall have the right to use all tools necessary to complete his work.

C.   The operation of the Lazar Screed Machine shall be performed solely by the Cement Masons.

4

NJ 9994

D.     Concrete constructions, such as buildings, bridges, elevators, smokestacks, curbs, gutters, sidewalks, street paving, alleys and roofs; laying out, setting joists, strips or screed rods for work hereinafter specified; laying and finishing of cement, wearing surfaces of basements, floor yards, driveways, areas and other surfaces where cement finish is to be laid; and where strips have to be set, or material ruled down, or surfaces finished; screening of concrete or fine stuff, asphalt or other preparations that are to be troweled, floated, darbied or bull floated; troweling, floating or finishing of concrete or fire retarding material or waterproofing compound or mixtures; construction of glass vaults or sidewalks, lights, where same is set in cement; excepting the carpenter work, but including pointing, facing and finishing of the surfaces after forms are removed; leveling of all fine materials for facing same; running of all cement base; cutting; patching and finishing of concrete fireproofing on walls, beams, girders and columns; cutting facing and finishing with cement of all concrete surfaces such as arches, beams, girders, walls, pile caps, piers and columns, whether done with trowel, float, gun and nozzle, bushhammer, rubbing or other process; applying cement mortar for damp-proofing, waterproofing for sanitary purposes where not over four (4) feet high whenever cementing with the floor is done in one operation; cutting of all concrete when cement finish is applied; setting of carpet pins and sockets in cement and composition brass or other metallic or wood strips when inserted in floor during the laying of same; rodding and spreading of all concrete and spreading and finishing of all top material; setting of all strips and stakes and grade; pointing, caulking and patching around all steel or metal window frames that touch concrete; handling of the vibrator machine. Washing and treating of all cement surfaces, handling of all machines, trowel machines, riding trowel machines, apparatus or equipment of any kind in connection with or to perform any of the above functions shall be the work of the cement finisher. Any signatory contractor who subcontracts sidewalks and curbs shall, in good faith, inform the subcontractor that said work is within the jurisdiction of the    Bricklayers & Allied Craftworkers,    Local Unions No. 4 & 5.

E.     The pouring of all concrete shall require a mason.

F.     When concrete bucket is used in conjunction with a crane, all safety precautions shall be exercised.

G.     The aligning of all bolts and the setting of all plates shall be performed by the employees covered hereunder.

H.     When flat concrete arches are poured with a crane, a hopper must be used in conjunction with a concrete bucket.

I.     On all high rise buildings an exterior scaffold for the cement masons shall be erected complete with guard rails.

J.     There shall be no cutting of cement masons crews before pull up is completed.

5

NJ 9997

K.     When masons work overtime at the direction of the employer or foreman, they shall receive at least one hour's pay at the applicable overtime rate. Fractions of an hour to be considered a full hour.

L.     Overtime shall only be with the prior permission of the union and shall be equitably shared by the employees working on the job.

M.     Employees who may be required to work overtime beyond 6:00 p.m. shall be permitted to take an unpaid one-half hour meal period on the job between 6:00 p.m. and 7:00 p.m. The employer may split a crew for the dinner period.

N.     Employees discharged or laid off shall be notified and paid off one hour before such discharge or layoff. If not complied with, another hour shall be paid. The one hour notice of layoff does not apply when overtime is worked.

O.     No cement worker working alone shall use a straight edge of more than six feet in length. Where a straight edge is longer than six feet, two men shall be used on a straight edge which is between six and eleven feet in length, one additional man shall be used for every additional four feet or fraction thereof of straight edge. On power straight edges or roller-type straight edges, two men shall be utilized up to fourteen feet and one additional man shall be used for each five feet or fraction thereof.

P.     The casting and pouring of pre-cast slabs when done on the job site shall be the work of a cement mason.

Q.     Cement masons are to complete, joint and strike up their work, whether this work is done with cement or caulking compound on any other masonry material.

R.     The cement masons shall supervise the placing or pouring of all concrete. In the event there is a journeyman already working at the job site who is recognized by the Local Union as a competent cement mason, he may be assigned to such work, otherwise a cement mason shall be hired.

S.     When concrete floors are to be hand troweled, the Employer shall provide knee boards such as the type used by cement finishers to handle trowel concrete floors, such knee boards shall measure approximately 12" wide and 30" long or fraction thereof, and shall have handles.

T.     The following work shall be allotted to the cement masons only: The setting of all screeds and forms to determine the proper grade of concrete when held in place by stakes and/or spreaders shall be done by cement finishers. A screed is a strip of wood, metal, etc., used as a guide for leveling or grading a concrete floor, slab or sidewalk.

U.     Any bulkhead that is one single board in height, and that has no key attached or which is not

NJ 9997

notched or fitted shall be set and braced or staked by cement finishers, providing same is used as a screed. The term bulkhead shall mean a form or screed erected for the purpose of separating pours of concrete.

V.    The grinding, patching and curing of all floors, the snapping of wall ties, and patching of same and setting of expansion joints.

W.    Steps, Landings, Platforms, etc. The setting of forms for steps, landings, platforms, coping, caps and curbs, except where underforms or centers are required, and the placing of all fine materials for facing same, shall be done by cement masons.

X.    Curing and dustproofing of all floors are to be done by cement masons. All epoxy, acid and latex work will be an additional $.50 per hour above scale.

Y.    The cement mason shall have the right to use all tools necessary to complete his work. There shall be no restriction as to the use of machinery or tools.

Z.    When troweling floors with machine, changing of blades, cleaning and maintaining machine to be done by mason.

AA.    No concrete trucks, pumping machine or any other machines are to do any mixing inside any structure without proper ventilation.

BB.    Special Tools: The employer agrees to furnish the following tools for use by his employees: Respirators, goggles, boots, bull floats, brooms, brushes, power chisels, trowel machines, bushhammers, straight edges, rubber floats, rubbing stones, cover tools, special base tools and special edgers. Gloves furnished when using epoxies, acid, latex floor patching or any irritant.

CC.    All wages, waiting time and general working conditions that apply to bricklayers shall also apply to the cement mason.

## Plastering

A.    Level 5 Gypsum Board Finishing is the work of Plasterers.

Level 5 finishing as specified by the Association of the Wall and Ceiling Industries International (AWCI), Ceiling and Interior Systems Construction Association (CISCSA), Gypsum Association (GA), and Painting and Decorating Contractors of America (PDCA), in their "Levels of Gypsum Board Finish Recommended Specification."

Levels Description: All joints and interior angles shall have tape embedded in joint compound and three separate coats of joint compound applied over all joints, angles, fastener

7

NJ9997

heads, and accessories. A thin skim board of joint compound, or a material manufactured especially for this purpose shall be applied to the entire surface. The surface shall be smooth and free of tool marks and ridges. Note: It is recommended that the prepared surface be coated with a primer/sealer prior to the application of finish paint. (See painting specification in this regard.)

The level of finish is recommended where gloss, semi-gloss, enamel or non-textured flat paints are specified or where severe lighting conditions occur.

This highest quality finish is the most effective method to provide a uniform surface and minimize the possibility of joint photographing and of fasteners showing through the final decoration.

The work jurisdiction of the plasterer under level 5: Gypsum board finishing shall be that which has heretofore been performed under this Agreement and is further set forth in constitution of the International Bricklayers and Allied Craftworkers of the United States and Canada. The parties agree to be bound by decisions rendered by the "Green Book" Decision of Record rendered by the Hearings Panel (March 1, 1978) under the plan for the settlement of jurisdictional disputes in the construction industry.

B.   All cement plastering, stone texture, stucco work, and pebble dask work, either exterior or interior, shall be done by plastering employees under this contract.

C.   All plastering, including plastering alterations and repairs, and all cement, caehstone, acoustic or any plastic substitute or artificial or imitative composition for plain surfaces or for moldings, cornices, pilasters panels, capitals, columns, bases, keystones, brackets or centers when applied on any exterior or surface in the usual method of either plastering or stuck work shall be the work of plastering employees.

D.   All ornaments including centers, brackets, trusses and keystone shall be placed in position and pointed by plastering employees who are on the job. Cast ornamentation shall be made in a Union shop. No employee shall work on any operation where the stickling of ornamentation has been sublet.

E.   All moldings, covers, arrises, chamfers and bullnoses shall run in place wherever possible with a regular mould on proper running strips. When moldings or cornices are to be ornamented proper beds shall be run to secure same.

F.   All capitals and bases shall be run on the job if practical to do so.

G.   All templates to be used by the plasterer shall be placed in position by the plasterer.

H.   All plastering shall consist of not less than three coats as scratch, brown and finish. Before

8

NJ 9997

the brown coat is applied, the scratch shall be hard and set. The brown coat shall be made true with a straight edge rod in all upright and ceiling angles: the walls and ceilings shall be properly darbied and floated to an even surface and the angles cut out. The finish coat shall be properly gauged and troweled to the required surface and all angles featheredged true. All interior or exterior plastering shall be left straight and true with rod and darby; rod and darby to be furnished by the contractor. The taping and pointing of sheetrock, compo-board, plaster-board, etc., shall be the work of the plasterer.

I.     When Sprayo-Flake or similarly applied acoustics are used the applied acoustic will take the place of the finish coat and will be applied by plastering employees.

J.     The operation of all mechanical plastering or troweling machines, pertaining to plaster and all of its substitutes, shall be the work of the plasterer.

K.     All safety precautions, goggles, shields, and masks, shall be supplied by the contractor for the health and welfare of the plastering employees operating these machines.

L.     Plastering on concrete, fireproofing, brickwork or plaster boards shall be two coat work-brown and finish.

M.     The finish coat may be omitted on cellar ceilings provided the brown coat is floated to an even surface. All EIF systems and all related work.

N.     Finishing of walls and ceilings shall not be done until the screeds, cornices or covers with which they intersect are in place.

O.     Employees shall not install metal corner beads, nor shall they work on any operation where corner beads have been used to form arrises on beams or arches or corners except door or window heads or other continuous openings not over twelve (12) feet in height.

P.     On a scaffold area of one hundred and fifty (150) square feet or over, the mortar board shall be raised 30" from the scaffold on a properly constructed stand. On a scaffold area of less than 150 square feet, the mortar board shall be raised at least 12" from the scaffold on a properly constructed stand. No mortar board shall be raised on blocking, and no mortar board or gauging board shall be more than 4'6" square.

Q.     Where beams are sixteen (16) inches or over in depth, the scaffold shall be dropped to a suitable height where the plasterers may execute their work in a proper manner.

R.     Any material applied on walls by the plasterers shall not be higher than 6'6" from the floor. Where only the walls have to be plastered, a scaffold 4 planks wide and 6' from the ceiling shall be erected on which the mortar board shall be placed and raised 12" above the scaffold. Positively no hopping planks to be permitted.

9

NJ9997.

S.    There shall be a foreman plasterer on all plastering jobs. Plastering foremen shall meet the requirements for foremen as specified herein, and shall be paid as specified herein.

T.    Plastering foremen shall see that no gauging is made up later than thirty (30) minutes before 12 o'clock and thirty (30) minutes before quitting time.

U.    Plastering work, when sublet, shall be given to a subcontractor who employs employees covered under this contract.

V.    Plastering contractors shall furnish all the materials required for their work including all screed rods, cornice, rods, darbies and feather edges. No subcontractor shall contract for labor only.

W.    Synthetic Plastering Systems: The styrofoam and any other materials which is part of the system that are installed by screws, glue, masonry materials, and including Mechanical System.

### Firebrick

The matters set forth in this section are applicable solely to firebrick work.

A.    On all firebrick jobs, when working with regular firebrick and lay, the bricklayers will be permitted an additional fifteen (15) minutes to wash up or twenty-five (25) minutes when working with a carbon, acid proofing, high temperature clay or any other material out of the ordinary such as colored cements, asphalts, tars, plastics, etc. Solvent for washing up and cleaning of tools will be provided for by the employer.

A bricklayer working with carbon or acid proofing materials shall be given a minimum of five (5) minutes wash-up prior to lunch time.

B.    All scaffolding inside of furnace shall be solid nailed scaffold. Contractors to furnish safety equipment and have same on job site.

Provisions for adequate scaffolding shall be made so that the lead man does not have to climb over the wall to work on the opposite side of the wall. Adequate scaffolding shall mean standard metal tubular scaffolding or wooden scaffolding consisting of a platform of not less than 2" x 10" planks in width, and scaffolding shall remain in place until all paving has been completed.

C.    Clay shall be mixed at the furthermost location of the enclosure where refractory brick is being laid. The location to be selected as to both its physical separation from the work area and to its feasibility for performing the mixing function. In coke oven work a separate enclosure is required. All care shall be exercised to reduce dust.

10

NJ 9997

D.  When bricklayers are employed laying firebrick, the contractor shall pay for the sharpening of their tools required for the work, and all tools shall be sharpened to the satisfaction of the bricklayer. The contractor shall furnish all chisels over twelve (12) inches in length and all saws when required.

E.  On all jobs where conditions are such that a safety man is required by the owner, he shall be mutually agreed upon by the parties. For the safety of the bricklayers, said safety man must be a union bricklayer.

F.  All hot work shall be paid at the rate of double time. Fringe benefits shall be based on hours paid.

One hundred degree (100) Fahrenheit or over shall constitute hot work. When bricklayers are employed on excessive hot work, the contractor shall provide proper counter fatigue aids which shall meet the standards prescribed by the State Medical Board, shall provide proper gloves and protective materials to safeguard bricklayers when they are handling hot work, shall supply wooden shoes or facsimile when working on heated surfaces and contractors shall be responsible for tools, shoes, and clothes of bricklayers which they burn in performance of their duties on said work. Bricklayers must spell each other on all hot work.

Contractor will also be responsible for clothes, tools and/or shoes that are destroyed or damaged on jobs due to exception conditions and materials.

G.  When electrical grinding stones or carborundums are used, bricklayers shall leave that part of the job until the operation is completed. In an enclosed area, suction device to be used to remove dust while bricklayers grind. The employer and union shall arrange to spell bricklayers at ten minute intervals when they are actually performing grinding work.

H.  On stoves and furnaces, or anywhere else where danger of gas exists, approved gas detecting devices will be required.

I.  On all firebrick or acid proofing jobs, the employer shall furnish all bricklayers with gloves.

J.  All general working conditions which apply to the bricklayer shall also apply to all branches of the trade.

K.  In addition, all other assignments mutually agreed upon between the Employer and the Union on any other building products or systems related to the scope and type of work covered by this Agreement which may be developed in the future that are determined by these parties to fall within the work jurisdiction of this Agreement.

L.  In the event of territorial jurisdiction or work assignment dispute with any other BAC Local Union, the matter shall be referred to the International Union for binding resolution.

11

NJ 9997

# ARTICLE IV
## UNION RECOGNITION, UNION SECURITY, ACCESS

A.     The Employer hereby recognizes and acknowledges that the Union is the exclusive representative of all its employees in the classifications of work falling within the jurisdiction of the Union, as defined in Article III of this Agreement, and in the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers, for the purpose of collective bargaining as provided for in the Labor Management Relations Act of 1947, as amended.

B.     No later than eight (8) days following the effective date of this Agreement, all present employees must, as a condition of continued employment, be or become members of the Union; all employees hired after the effective date of this Agreement shall be or become and remain members of the Union no later than eight (8) days following the first day of their employment in accordance with the provisions of Section 8 of the National Labor Relations Act, as amended. Failure of any employee to comply with the provisions of this subsection shall, upon request of the Union, result in termination of such employee, provided that the Union has given the employee four (4) days notice that his obligation to make payment has not been met and that his delinquency renders him liable to termination under this section. The Employer shall not be obligated to dismiss an employee for non-membership in the Union: (a) if he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members; or (b) if he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

C.     International Union Representatives and the Business Manager and/or other officers of the Union shall have access to the Employer's jobsites at reasonable times in compliance with any special rules and regulations adopted by the owner to ensure that the provisions of this Agreement are observed, provided however, that such representatives shall not unduly interfere with the job progress.

# ARTICLE V
## HIRING PREFERENCE

The employer agrees that when hiring any employee for any job in the territorial jurisdiction of the agreement he will employ a fair percentage in the territorial jurisdiction of Local No. 4 or Local No. 5 of New Jersey. The employer also agrees that when requesting manpower, they must call the Local Union Office by 4:30 p.m. of the previous day.

NJ 9997

## ARTICLE VI
## STEWARDS

A.   The Employer shall hire a steward for each branch of the trade appointed by the business manager of the Union on all jobs. The steward shall be a working employee and shall, when appropriate, be granted reasonable time to conduct union business. The steward shall not be laid off without reasonable cause, without first consulting the business manager.

B.   It is the steward's duty to look after the interest of both parties, see that the number of men desired by the employer is promptly reported to the business agent, take up all grievances on the job, and try to have the same adjusted. In the event that he cannot, he must report that fact to the business agent. He shall conduct himself in a proper manner at all times when on the projects and shall not be discriminated against, discharged, or laid off for the performance of his duties as such. The steward's employment can only be terminated by the employer after a review of complaint against him between the employer and the business agent.

C.   The first Bricklayers & Allied Craftworkers member shall notify the union at the start of each job.

## ARTICLE VII
## APPRENTICES

A.   In order to train sufficient skilled mechanics for the industry, the necessity for employment of apprentices and/or apprentice improvers is recognized and encouraged by the parties to this Agreement. Apprentices shall be given a minimum of 32 hours per week to perform the work of brick or block provided the work is available. The employer agrees to employ one apprentice for every five journeymen employed on a job site. It is agreed that the Employer shall abide by the National Apprenticeship Standards, developed for masonry craft training, incorporated herein by reference.

B.   All apprentices will be required to attend and successfully complete a pre-job school which shall take place over a period of approximately 12 weeks at a place and at such times as designated by the State Joint Apprenticeship Committee.

C.   After 12 weeks of pre-job training, apprentices shall be required to serve a probationary period of 30 days of employment at the trade during which period no fringe benefit contributions will be required. After satisfactory completion of this period, credit will be given for this time served as part of the three year apprenticeship term. During the probationary period, the termination or cancellation of the apprenticeship agreement may be made by the committee at the request of either party to the agreement. After probationary period, the agreement may be canceled at the request of the apprentice or committee. The committee may cancel the agreement for good cause such as unexcused absences from the job and related training classes if required, lack of progress or interest, and unsafe practices

13

NJ9994

common to the trade. Due notice shall be given to the apprentice with a reasonable opportunity for corrective action. Written notice shall be given to the apprentice and Bureau of Apprenticeship and Training of the final action taken.

D.    Apprentices shall be paid not less than the following percentages of the journeyman's basic wage rate.

| | |
|---|---|
| First six months or 500 hours: | 50% of Journeyman's Basic Wage Rate |
| Second six months or 500 hours: | 55% of Journeyman's Basic Wage Rate |
| Third six months or 500 hours: | 65% of Journeyman's Basic Wage Rate |
| Fourth six months or 500 hours: | 75% of Journeyman's Basic Wage Rate |
| Fifth six months or 500 hours: | 85% of Journeyman's Basic Wage Rate |
| Sixth six months or 500 hours: | 95% of Journeyman's Basic Wage Rate |

During the first year of apprenticeship, after the probationary period, fringe benefit contributions shall be required for the Welfare Fund at 50%. No other fringe benefit contributions shall be required for this period. Deductions for check off dues and BAC PAC should be made according to Schedule "B" attached hereto. Commencing with the second year of apprenticeship (third six-months), fringe benefit contributions and check off deductions shall be made according to Schedule "B" attached hereto.

E.    Apprentices may be required to attend related training classes during period of apprenticeship as directed by the Joint Apprenticeship.

## ARTICLE VIII
## FOREMEN

There shall be a separate foreman on all jobs for each branch of the trade. The employer will determine when the foreman shall not work with tools. Foremen shall be paid the prevailing regular weekly pay (40 hours), between the initial date of employment and the termination date of employment, holidays and inclement weather days included, provided, however, that all foremen must report to work everyday within the work week unless otherwise directed by the Employer. All overtime worked by foremen shall be compensated for at proper overtime rates.

## ARTICLE IX
## TRAVELING CONTRACTORS

When the Employer has any work specified in Article III of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied Craftworkers, the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the jobsite area. Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Article X of this Agreement

14

NJ 9997

but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local Agreement. The Employer shall in all other matters be governed by the provisions established in the jobsite local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in Article III of this Agreement, the full terms and conditions of this Agreement shall apply.

## ARTICLE X
## WAGES, BACPAC, AND LOCAL DUES CHECKOFF

A.   The hourly wage rates for all employees performing work covered under this Agreement shall be as listed on Schedule "B" attached hereto.

B.   The Union shall have the option of allocating a portion of all of the increases in wage rates for the periods beginning November 1, 1999 and all subsequent increases thereafter, among the various benefit funds specified in Article XI.

C.   The Employer shall deduct from the wages of each employee who has signed a check-off authorization conforming to federal law and transmit monthly to the Union (or to any agency designated by said Union for the collection of such money), the sum for each hour paid which the Union has specified, or specifies from time to time and so advises the Employer in writing, as the portion of each employee's Union dues to said Union, to its International Union, or to any other affiliate of the International Union, subject to check-off. The sums transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the name of each person whose dues are being paid and the number of hours each employee has been paid. If the employee does not sign a dues check off authorization card, he shall report to the union hall to pay the weekly dues.

D.   The Employer agrees to deduct an amount from the pay of each employee, who is a union member and who executes a voluntary check-off authorization form for the Bricklayers and Allied Craftworkers Political Action Committee (BACPAC). Deductions shall be in the amount and at the intervals specified on the check-off authorization form. The Employer agrees to transmit BACPAC deductions to the Treasurer of BACPAC, and shall be accompanied by a list of the names of those employees for whom BACPAC deductions have been made and the amount deducted for each employee.

## ARTICLE XI
## JOINTLY TRUSTEED FUNDS

Section 1.
In addition to the wages and other payments herein provided for, the Employer agrees to pay specified contributions to the following designated funds.

15

NJ 9997

A.    **Bricklayers and Trowel Trades International Pension Fund**
1.    The contribution to the Bricklayers and Trowel Trades International Pension fund (IPF) shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2.    The payments required above shall be made to the Bricklayers and Trowel Trades International Pension Fund, which was established under an Agreement and Declaration of Trust, dated 1 July 1972.

B.    **Local Pension Fund**
1.    The contribution to the Local Pension Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2.    The payments required above shall be made to the territorial Local Pension Fund which was established under an Agreement and Declaration of Trust. All Local Pension Funds remitted on behalf of an employee shall be forwarded in whole to the employee's Home Local Pension Fund. The Home Local Funds shall credit any excess monies remitted for the Pension Fund to the employee's Annuity Fund.

C.    **Local Annuity Fund**
1.    The contribution to the Local Annuity Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2.    The payments required above shall be made to the territorial Local Annuity Fund which was established under an Agreement and Declaration of Trust. All Local Annuity Funds remitted on behalf of an employee shall be forwarded in whole to the employee's Home Local Annuity Fund. The Home Local Funds shall apply any excess monies remitted for the Annuity Fund to the employee's Pension Fund.

D.    **Bricklayers and Allied Craftworkers Statewide Welfare Fund**
1.    The contribution to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2.    The payments required above shall be made to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund which was established under an Agreement and Declaration of Trust, dated May 1, 1988.

E.    **Industry Advancement Fund**
The parties hereto do hereby establish an Industry Advancement Fund pursuant to the requirements of the Labor - Management Relations Act, the Internal Revenue Code and all

16

NJ 9997

applicable laws and the agreement of the parties for the purpose, in all lawful ways, of promoting the increase of commercial, institutional, public and industrial building construction throughout the State of New Jersey and the adjoining areas within the territorial jurisdiction of the unions by providing building owners, architects, engineers, builders, contractors, private and public funding institutions and agencies, government agencies and any others, directly or indirectly, with the building construction industry information, data and other information to communicate the advantages of sound, durable and economical construction that will provide a high degree of service, utilization and benefit to the public by the utilization of union affiliated contractors. The purpose of the Fund shall be to foster and promote the continued utilization and expansion of union construction, particularly utilizing union members of the Bricklayers & Allied Craftworkers union, in prospective projects throughout the State of New Jersey.

In order to carry out this agreement, the parties hereto shall execute such agreements of trust and other documents necessary in accordance with law, which documents shall include the following terms which are agreed to and incorporated into this contract:

1.   The Employer shall make the following contributions for each hour worked by each member of the Bricklayers & Allied Craftworkers union to the Industry Advancement Fund created hereby:

| | |
|---|---|
| Effective November 1, 1999 through December 31, 1999: | $.15 per hour |
| Effective January 1, 2000 through October 31, 2000: | $.20 per hour |
| Effective November 1, 2000 through October 31, 2001: | $.25 per hour |

The parties shall meet to discuss additional increases to the IMI and IAP prior to November 1, 2001. Said increases shall not exceed $.05.

2.   The Bricklayers & Allied Craftworkers' Health & Welfare Fund Office shall collect and distribute such funds.

3.   Effective January 1, 2000, the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey agree to allocate $.01 of the Industry Advancement Fund contribution to the International Council of Employers of Bricklayers & Allied Craftworkers (I.C.E.) Said contribution shall be forward to I.C.E. by the Masonry Contractors of New Jersey. The remaining contribution shall be divided as follows:

| | |
|---|---|
| BCANJ: | 50% |
| Masonry Contractors of New Jersey: | 50% |

In such case as the parties opt to discontinue the $.01 allocation to I.C.E., said $.01 contribution shall be distributed equally between the BCANJ and the Masonry Contractors of New Jersey.

17

NJ 9997

4.   The BCANJ and the Masonry Contractors of New Jersey shall utilize said funds in a manner consistent with the terms of the trust including the lease or purchase of materials, supplies and equipment, the lease of premises or purchase of premises, the employment and retention of professional counsel, the engagement of administrative and other employees, and all other appropriate expenses and expenditures which comply with the purposes of the trust and law. However, in all circumstances, it is the intention hereto that the said Fund shall be used to promote the following industry wide activities for the benefit of the contractors utilizing members of the Bricklayers & Allied Craftworkers union including accident prevention, education, research, public relations, industry relations, labor relations, market development, standardization of contracts and specifications and all other such appropriate activities.

5.   Although the Industry Advancement Fund is designated a "contribution" it is expressly understood and agreed that the said sum payable to said Industry Advancement Fund is not intended to be and is not a contribution to employees and no employee of Employer has any proprietary interest in said funds.

6.   The Industry Advancement Fund shall pay the Bricklayers & Allied Craftworkers' Health and Welfare fund 2% of all amounts collected as reimbursement for expenses incurred in connection with the collection services rendered. In addition the Bricklayers & Allied Craftworkers' Health & Welfare Fund shall not be responsible for collection of any delinquent amounts owed by any employer.

F.   **International Masonry Institute (IMI)**

1.   The masonry industry in the United States and Canada has great and definable needs in the fields of apprenticeship and training, advertising and promotion, research and development, and labor/management relations which must be met if the industry is to grow and prosper. The parties to this agreement believe that the International Masonry Institute is the most effective and efficient instrument for meeting these needs because it offers the greatest possibility of integrating activities in these program areas in an effective manner and coordinating them through a single regional/international system.

2.   In order to properly finance IMI programs, the ultimate objective is to provide, through collective bargaining, contributions from the total hourly wage and benefits package, as listed on Schedule "B" attached hereto.

3.   With IMI funding from New Jersey, IMI will be able to provide advertising and promotion, research and development, apprenticeship and training, and labor/management relations programs directed specifically to this area. With these principles in mind, the parties agree to contribute the amounts listed on Schedule "B"

18

NJ 9997

The payments required above shall be made to the International Masonry Institute, which was established under an Agreement and Declaration of Trust, 14 March 1981, as the successor trust to the predecessor International Masonry Institute (established under an Agreement and Declaration of Trust, 22 July 1970) and/or to the predecessor International Masonry Apprenticeship Trust (established under an Agreement and Declaration of Trust, 6 November 1974).

G.    **New Jersey State Apprentice Fund**

1.    The contribution to the New Jersey State Apprentice Fund shall be listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2.    The payments required above shall be made to established New Jersey State Fund office which was established under an Agreement and Declaration of Trust.

**Section 2.**
In order to facilitate the establishment of the same wage and fringe benefit structure within Local No. 5, it is agreed that no other funds other than the Welfare, Pension, International Pension, Annuity, Apprentice, IMI, IAP, Labor Management, BAC PAC and Defense Funds shall be contributed to as of November 1, 1999.

**Section 3.**
The Employer hereby agrees to be bound by and to the above stated Agreements and Declarations of Trust, as though he had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of these funds pursuant to said Agreements and Declarations of Trust.

**Section 4.**
The Employer hereby irrevocably designates as its representative on the above stated Boards of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

**Section 5.**
For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and all other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable to each fund designated in Section 1 of this Article.

**Section 6.**
Contributions shall be paid on behalf of all covered employees starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, journeymen, apprentices, helpers, trainees and probationary employees.



Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837
TELEPHONE: 732-225-2265 / FAX: 732-225-3105

**BULLETIN**

**BCNJ**
Building Contractors
Association
Of New Jersey

BUILDING CHAPTER,
ASSOCIATED GENERAL
CONTRACTORS
OF AMERICA

NJ9997

Section 7.

All contributions shall be made at such time and in such a manner as the Trustees require; and the Trustees shall have the authority to have an Independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the funds designated in Section 1 of this Article. Any Employer found, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, to have been substantially inaccurate in reporting shall be charged in full costs of such audit.

Section 8.

If the Employer fails to make any contribution specified in this Article, within twenty (20) days after the date required by the Trustees, the Union shall take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of payments due together with attorney's fees and such liquidated damages as may be assessed by the Trustees. In the event a job is stopped due to delinquent fringe benefit payments by the employer, craftworkers shall be compensated a day's wages for each day the delinquency continues, not to exceed five days. The Employer's liability for payment under this article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided for or set forth elsewhere in this Agreement.

Section 9.

Management's appointments to the aforementioned Jointly Trusteed Funds are to be made equally by the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey. The Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey shall only have the right to the appointment of trustees if and when the existing Trust Funds of the predecessor local unions of the International Union of Bricklayers and Allied Craftworkers, Local Unions No. 4 and 5 are merged into statewide benefits funds. Neither the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey shall have the right or authority to appoint trustees to any trust fund of a predecessor local union unless and until a statewide merger of the Trust Funds occur, except if trustees are currently appointed by either the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey, that authority shall remain.

Section 10.

The Labor/Management Fund established under an Agreement and Declaration of Trust, shall be used to enhance the economic development and competitiveness of the unionized masonry industry, to assure the effective enforcement of prevailing wage laws and to provide for stable labor-management relations. The parties to this agreement shall appoint trustees to this fund in the same manner in which appointments are made to the Statewide Welfare Fund.

Section 11.

The parties agree to establish a Committee to explore the concept and funding mechanism for a Market Recovery Program.





NJ9997

## ARTICLE XII
## HOURS WORK, OVERTIME, SHIFTS, AND HOLIDAYS

A.   The standard work day shall consist of eight (8) hours of work with flexible starting and quitting times between the hours of 7:00 a.m. and 4:30 p.m. with a 30-minute unpaid lunch hour occurring in the middle of the shift. The standard work week shall consist of five standard work days commencing on Monday and ending on Friday, inclusive. The normal starting and quitting times may be changed by mutual consent of the Employer and the Union.

B.   All time worked before and after the established eight (8) hour day, Monday through Friday, and all time worked on Saturday shall be paid at the rate of time and one-half. All hours worked on Sundays and holidays shall be paid at the double time rate. If a craftworker works through any portion of their lunch they shall be paid one hour.

   If any of the following trades: Carpenters, Laborers, Ironworkers or Operating Engineers Locals, with whom the BCANJ negotiates, receive a more beneficial overtime rate, the Bricklayers will be paid the higher overtime rate.

C.   A make-up day may be worked on Saturday providing it is mutually agreed to by the union and the employer and provided that the following conditions are satisfied:

1.   A make-up day on Saturday can be utilized provided 24 or more hours are worked during the course of the calendar work week, Monday through Friday.

2.   It is not mandatory for an employee to work on a make-up day and it is at their choice and discretion. No negative actions or retribution shall be taken by the employer against any employee who chooses not to work a make-up day.

3.   The sole reason for the loss of hours during the calendar work week must be weather conditions to qualify for a make-up day.

4.   Any time worked before the established starting time or after the established quitting time on a make-up day shall be paid at the applicable overtime rate. Any hours worked on a Saturday make-up day that exceed 40 hours shall be paid at the applicable overtime rate.

5.   If employees are unable to work a make-up day, the local union shall be given the preference to supply the remainder of the employees needed for that day.

6.   There shall be no addition to the previously established crew size for the make-up day.



**BCANJ**

Building Contractors
Association
Of New Jersey

Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837
TELEPHONE: 732-225-2265 / FAX: 732-225-3105

**BULLETIN**

NJ9997

Any employer who violates the above provisions shall be prohibited from utilizing the make-up day for the duration of this Collective Bargaining Agreement. The employer has the right to file an appeal with the Joint Arbitration Board defined in Article XV of this Collective Bargaining Agreement. Said appeal shall be heard within five (5) days from the date filed. During the appeal process the employer shall be prohibited from utilizing the make-up day provision.

D.    The parties to this Agreement recognize the desirability and in some cases absolute necessity of coordinating the shifts to be worked with the other trades involved on the project and the customer's work schedule.   If shift work is necessary and it is mutually agreed to by the union and the employer, the following schedule shall prevail:

When a two shift schedule (including a day shift) is established, the first or day shift shall be established on an eight (8) hour basis. The second shift shall be established on an eight (8) hour basis and paid the base rate plus 15%.

When a three shift schedule is established, and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The day shift shall be established on an eight (8) hour basis, the second shift shall be established on a seven and one-half (7 ½) hour basis, and the third shift shall be established on a seven (7) hour basis. The first shift shall receive the base or regular hourly rate. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

When there is no day shift and a second shift or third shift is established and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The second shift shall be established on an eight (8) hour basis. The third shift shall be established on an eight (8) hour basis. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

The percentage premium, when added to the base rate, shall be termed the regular hourly rate. Shift hours for the second and third shifts shall be such as to conform to the day shift and in no case shall an employee work on more than one shift within a 24 hour period. When an irregular shift must be established, the percentage premium shall be 15% above the base rate.

All time worked before and after a regularly established shift shall be paid at the applicable overtime rate. When a portion of a regular established shift works into Saturday, Sunday or a Holiday, that time worked shall be paid at the established shift rate.

E.    The Employer agrees to recognize the following holidays: New Year's Day, President's Day, Memorial Day, Fourth of July, Labor Day, Presidential Election Day, Veterans' Day, Thanksgiving Day, and Christmas Day. Holidays falling on a Sunday shall be observed the following Monday. The above holidays are subject to renegotiation based upon agreements established with other trades.



22

TELEPHONE: 732-225-2265 / FAX: 732-225-3105
Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837

Building Contractors
Association
Of New Jersey

BCANJ

BULLETIN

NJ 9997

## ARTICLE XIII
## PAYMENT OF WAGES & FRINGE BENEFITS

All employees working under this Agreement shall be paid in cash or by check weekly on Thursday, or another day if mutually agreed between the business agent and the employer, before quitting time and within 72 hours after the closing of the pay for the week. When employees are unable to work on pay day due to inclement weather, the employee shall be paid before 12 noon in absence of reasonable cause for delay. An employee being laid off shall be given his final paycheck in full for all hours of employment one hour before layoff. When working overtime, the one hour notice of layoff does not apply. In the event an employer issues a paycheck and there are insufficient funds in the employer's account, the employer, on the next working day, will bring either cash or cashiers checks to the jobsite to cover the paychecks and all penalties. Failure to do so will result in immediate withdrawal of all craftworkers from the job. Employees will be compensated by the employer for all lost time until the matter is resolved. If a second violation occurs, all payrolls shall be in either the form of cash or cashiers checks. Fringe benefits will be paid on a weekly basis, except that Association Members may pay monthly. Monthly payments shall be due to the fund(s) on or before the fifteenth day of the month immediately following the month during which the contributions were earned. Should an Association Member become delinquent, they may be required by the trustees of the benefits funds to remit weekly payments.

## ARTICLE XIV
## WORKING CONDITIONS

A.    Overhead Protection: If any work is being performed overhead, all Employees must be protected on all outside scaffolds by two inch (2") planks, a covering shall be supplied over all stairwells, hatches, shafts, etc., no more than two (2) stories overhead and two (2) stories below in shafts.

B.    Hard hats are to be supplied by each employer. Failure to wear hard hats is cause for dismissal.

C.    Lines: All contractors must furnish the men with lines. The lines must not be raised more than one (1) course at a time. No bricklayer shall spread mortar before the line has been raised. However, a trig brick can be raised one (1) course before raising the line. Lines on a double unit wall shall be used on both sides of a wall eight inches (8") or over in thickness and on all units of masonry over four (4) feet in length.

D.    Portable Sanitation Units: Suitable portable sanitation units shall be erected on all jobs which shall be kept in sanitary condition. Portable sanitation units shall be built in accordance with State or Municipal health laws.

E.    Cutting Tools: Where employees are employed on cutting masonry, the employers shall have all cutting tools sharpened.





NJ9997

F.     Where machines are used for the cutting of masonry units, a wet saw shall be used. A dry saw may also be used provided that the proper safety protection is furnished. It is agreed that in order to protect the health and safety of employees the dry cutting of masonry units by means of hand-held, gas powered or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be done in a designated area away from craftworkers if at all possible. It is the responsibility of the employee to adhere to the established restrictions for said designated areas. Dry cutting shall be permissible provided applicable water attachments are used. In all cases, employees shall be provided with proper respirators as part of a complete respiratory protection program which shall include proper selection, fit testing and air monitoring, and eye protection in accordance with OSHA standards. It is the employee's responsibility to utilize proper protection. The employee operating the machine shall be allowed ten (10) minutes to clean up at 12:00 noon and quitting time.

G.     Cutting and Mechanical Devices: Where air guns or other mechanical devices are used for the purpose of cutting chases, opening, etc., in brick work, such gun or device shall not exceed fifteen (15) lbs. weight. When such device exceeds fifteen (15) lbs., the employer may use a laborer to assist the bricklayer in handling the gun, but there shall always be one bricklayer on each gun in use. All cutting, when done by hammer and chisel, shall be done exclusively by the bricklayer. Where a bull and sledge hammer is used, there shall be a composite crew of bricklayers and laborers. (The bricklayer foreman shall have complete authority over all men employed in this phase of work.) All cutting out of brick work, pointing, washing down, caulking cement and lime waterproofing washing of brick, or slabs, used in floor arches shall be done by bricklayers, and where scaffolding is used in the above work wire rope shall be used.

H.     Pointing: All pointing and joining of brick work shall be done by journeymen who built same, if possible.

I.     Cement Block: Bricklayers and stone masons to set all cement blocks and all masonry units.

J.     Cork Block: All cork block (Styrofoam Sheets), and substitutes thereof, shall be laid by bricklayers.

K.     Caulking: All pointing and caulking of windows with cement or composition to be done by bricklayers, by either gun, trowel or any other method.

L.     Stone Work: All renovation, cleaning, and pointing of stone to be done by this union.

M.     The setting, aligning and erection of all precast slabs and the setting and leveling of all bearing plates for structural steel or machinery shall be done by the members of the above local union.

N.     Composite crew on all precast panels. Setting of all other masonry panels shall be the work of BAC Members.



24

NJ9997

O.   All brick or block panels shall be erected by union bricklayers.

P.   Waterproofing: All transparent waterproofing applied to brick or stone work with brush or spray to be done by bricklayers.

Q.   There are to be two men on all blocks weighing 40 lbs. or more.

R.   Scaffolding: No block 6" or over in size shall be built more than six (6) courses in scaffold height. Where blocks of 100 lbs. or over are used, a pony scaffold is to be erected when the wall is three (3) feet high, for the easier laying of these blocks to the next scaffold height.

S.   Water: Water containers and sanitary drinking cups shall be provided on all jobs to be furnished by all contractors at all times.

T.   Shanty and Stoves: Where there are not more than ten (10) men employed on a job, a shanty house shall be erected exclusively for the bricklayer, and it shall contain not less than eighty (80) square feet of floor space. Where there are more than ten (10) men and not more than twenty (20) men, the shanty house shall contain not less than one hundred and fifty (150) square feet of floor space. Where there are more than twenty (20) men and not more than thirty (30) men it shall contain not less than two hundred (200) square feet of floor space but where there are more than thirty (30) men employed the same proportion shall apply. Where there is a shanty and no elevator located in the building it shall not be above the ground floor unless elevator is provided except on alterations where it will be placed to suit the convenience of the contractor.

U.   Ample provision shall be made to protect all bricklayers levels on all outside scaffolds.

V.   It shall be deemed unsafe to run any brick work up more than 6 courses or 16" whichever is less without backing up in cavity walls or any masonry walls which does not utilize a brick header course.

W.   Contractors shall provide a two foot clear, planked working area beyond the building wall when bricklayers or stone masons are working off new footing on or below grade.

X.   There shall be a clothing allowance of fifty cents (.50) per hour minimum on all fire brick work paid by contractor.

Y.   There will be one coffee break in the morning not to exceed ten (10) minutes. There shall be an afternoon coffee break not to exceed five (5) minutes at the place of work.

Z.   All mortar tubs will be raised to at least sixteen inches, not to exceed thirty inches. 

AA.  All rubber gloves and goggles to be furnished by the contractor for all washing down.


Building Contractors
Association
Of New Jersey


TELEPHONE: 732-225-2265 / FAX: 732-225-3105
Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837

25



NJ9997

BB.    All work on high stacks, the contractor will pay a premium wage of 22% above the wage scale.

CC.    All scaffolds will be kept at least four (4) inches below the wall.

DD.    If an employee works past the full hour and must stop because of inclement weather conditions, he shall be paid for the full hour, but is not to leave the job until expiration of said hour.  No employee shall start work on the half hour.

EE.    If an employee reports to work and is not started but requested to stay on the job by the contractor, the employee shall be paid for all time prior to starting or until informed that no work shall be performed.

FF.    In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between starting time and 12 noon, men shall be paid until noon.  Employees must, however, remain on the job until noon.  In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between 12:30 p.m. and 3:30 or 4:30 p.m., employees shall be paid until 3:30 or 4:30 p.m.  Employees must remain on the job until 3:30 or 4:30 p.m.

GG.    When a job does not start at the regular starting time, it will be the duty of the Foreman to notify the Shop Steward, personally, two hours after the designated start regarding the work conditions.  It is clearly understood and agreed the employer will not send anyone to work on a job working during inclement weather unless all of the men regularly employed on that job who showed up for work at starting time are started first.  Nothing herein contained shall be construed to deny the saw men, lay-out men and steward regularly employed on the job from working at anytime at their respective job assignments if they are needed.

### ARTICLE XV
### GRIEVANCE PROCEDURE

A.    The parties to this Agreement shall establish a Joint Arbitration Board consisting of two representatives of the Building Contractors Association of New Jersey, two representatives of the Mason Contractors of New Jersey and four representatives selected by the Local Union, to resolve disputes over the interpretation and application of this Agreement.  The boards shall meet at least once a month, or on call, to settle complaints, abuses or grievances.  It is further agreed that should occasion require any alterations or amendments to this Agreement, the party desiring such alterations or amendments shall submit same in writing to the Board.  The Employer and union representatives at a session shall have an equal number of votes on all matters coming before the Joint Arbitration Board, regardless of the number of Employer or Union representatives present at a session.

B.    It is specifically agreed that any controversy arising out of this Agreement involving the



NJ5997

interpretation of its terms and conditions, shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the union or to the attention of the Union by the Employer within five (5) days after the alleged violation is committed or discovered.

C.  Grievances shall be handled in the following manner:

1.  The grievance shall be referred to the jobsite union steward and to an employer representative for adjustment.

2.  If the grievance cannot be settled pursuant to paragraph 1 of this Section, the grievance shall be referred on the following day to the Business Manager of the Union and the Employer.

3.  If the grievance cannot be settled pursuant to paragraph 2 of this Section within three (3) working days excluding weekends and holidays, the grievance shall be submitted within 48 hours to the Joint Arbitration Board for consideration and settlement.

4.  If the Joint Arbitration Board cannot reach a satisfactory settlement within five (5) working day, not including weekends and holidays, following a referral of the grievance to the Board, it shall immediately select an impartial arbitrator to review with the Board all evidence submitted relating to the dispute and then cast the deciding vote. If the Arbitration Board cannot agree on an impartial arbitrator, then the matter shall be submitted to the American Arbitration Association for a decision. All expenses of the Impartial party shall be borne equally by the Employer and the Union. The decision reached by the Joint Arbitration Board with the assistance of the impartial arbitrator shall be final and binding upon all parties.

D.  When a settlement has been reached at any step of this Grievance Procedure, such a settlement shall be final and binding on all parties, provided, however, that in order to encourage the resolution of disputes and grievances at Steps 1 and 2 of Section C of this Article, the parties agree that such settlements shall not be precedent-setting.

E.  The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties initiated by the written request of one party to the other, at the appropriate step of the Grievance Procedure. However, failure to process a grievance , or failure to respond within the time limits provided above, without a written request for an extension of time, shall be deemed a waiver of such grievance without prejudice and shall create no precedent in the processing of and/or resolution of like or similar grievances or disputes.

## JURISDICTIONAL DISPUTES

A.  In order to avoid jurisdictional disputes which have such a demoralizing effect upon the



NJ9997

progress of the construction work, it is agreed that only B.A.C. Members will be employed on work which is recognized as coming under the jurisdiction of the International Union of Bricklayers and Allied Craftworkers as:

1.      Granted by the A.F.L. - C.I.O.

2.      Determined by a Joint Board consisting of four representatives from the Local Unions, two representatives from the Building Contractors Association of New Jersey and two representatives from the Mason Contractors of New Jersey.

3.      As established by practice of Employers within the area designated herein whenever (1) or (2) above are not applicable;

4.      It is the intent of the parties that wherever a job decision shall be deemed to be strongly indicative of the area practice, the Bricklayers & Allied Craftworkers Local Unions will advise all personnel affected to make future assignments accordingly.

5.      It is further the intent of the parties hereto that wherever possible, and whenever the contractor can reasonably foresee a jurisdictional dispute, the contractor will call a pre-job conference with the Local concerned and the contractors agree that when no agreement is reached, at the request of the Union, the contractor will join in the submission of the matter to the Joint Board. In the meantime, the work shall proceed by the craft in possession of the work.

B.    The Employer and the Unions agree to be governed by the terms and conditions of the Agreement, effective May 1, 1995, as amended, creating the Joint Board for the settlement of any jurisdictional dispute; and the decisions of the Joint Board will be followed in good faith.

## ARTICLE XVI
## SUBCONTRACTING

A.    The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement and complies with all of the terms and conditions of this Agreement.

B.    All charges of violation of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.



BUILDING CHAPTER,
ASSOCIATED GENERAL
CONTRACTORS
OF AMERICA,
WASHINGTON, D.C.



Building Contractors
Association
Of New Jersey

**BCANJ**

**BULLETIN**

28

Raritan Center - Raritan Plaza II - Fieldcrest Avenue - Edison, NJ 08837
TELEPHONE: 732-225-2265 / FAX: 732-225-3105

NJ 9997

## ARTICLE XVII
## PRESERVATION OF WORK (Anti-Double Breasting)

A.  In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

B.  All charges of violations of Section A of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in Article XV of this Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in Article XV is empowered, at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as result of the violations, and (2) pay into the affected joint trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violations, including such interest as may be prescribed by the trustees or by law. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other sections or articles of this Agreement.

C.  If, as a result of violation of this Article, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with Section B above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

## ARTICLE XVIII
## NO-STRIKE/NO-LOCKOUT

It is understood and mutually agreed that there shall be no strikes or lockouts over a dispute concerning this Agreement during its term until the grievance procedures described in Article XIV have been exhausted and then only in the event a party fails or refuses to abide by a final decision. This Article shall not apply in those cases where an Employer fails or refuses to make in whole or in part any payments required under this Agreement including all wages, local union fringe benefits or other contributions that have been established through bona fide collective bargaining.

Raritan Center · Raritan Plaza II · Fieldcrest Avenue · Edison, NJ 08837
TELEPHONE: 732-225-2265 / FAX: 732-225-3105

BULLETIN

Building Contractors
Association
Of New Jersey

BCNJ



NJ9997

## ARTICLE XIX
### SEPARABILITY AND SAVINGS PROVISION

It is the intent of the parties hereto to abide by all applicable Federal and State statutes and rules and regulations made pursuant thereto. If any provision of this Agreement is held invalid by any court or governmental agency having jurisdiction, or if compliance with or enforcement of any provision of this Agreement is restrained by such tribunal pending a final determination as to its validity, then such provision or provisions shall continue in effect only to the extent permitted and all other provisions of this Agreement shall remain in force and effect.

In the event that any provision of this Agreement is held invalid, or enforcement of or compliance with any provision is restrained, the Union and the Employer shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement, incorporating the substance of such provision to the extent allowable under the law, to be in effect during the period of invalidity or restraint.

## ARTICLE XX
### MORE FAVORABLE CONDITIONS

The Union hereby agrees that if it affords any conditions of a more favorable means to any other employer with whom it has a collective bargaining agreement who performs the same or similar work, that said more favorable condition shall automatically be incorporated in this Agreement and be afforded all members of the Association covered hereunder.

## ARTICLE XXI
### GENERAL UNDERSTANDING

The Union agrees to cooperate with the Employer in meeting conditions peculiar to the job in which it may be engaged. It will at all times meet and confer with the Employer, and similarly, the Employer will at all times meet with the Union respecting any questions or misunderstandings that may arise under the performance of this Agreement.

This Agreement constitutes the entire agreement between the parties, and any local or area practices or working rules which may be in conflict with the provisions contained in this Agreement shall be subordinated to this Agreement.

The Employer agrees that if it has not previously done so, it will, upon the Union's submission of evidence of majority status among its employees in the bargaining unit described herein, voluntarily recognize the Union as the exclusive representative as defined in Section 9(a) of the National Labor Relations Act, as amended, of all employees within that bargaining unit on all present and future jobsites within the jurisdiction of the Union. The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board.

NJ 9997

**IN WITNESS WHEREOF,** we the authorized officers of the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey and the Bricklayers & Allied Craftworkers, Local Unions No. 4 & 5 have hereunto set our hands and seals this 31 st day of October, 1999.

*Authorized Management Representatives*

Joseph Natoli, BCANJ

Robert Epifano, BCANJ

Ralph Pastore, BCANJ

Jack Macedo, BCANJ

Jack Kotsis, BCANJ

Joseph Speranza, MC of NJ

Michael Schmerbeck, MC of NJ

Michael Peterson, BCA/AC

*Authorized Union Representatives*

Gerald Della Salla, Local No. 4

John Capo, Local No. 4

Daniel Guerrera, Local No. 4

Sal Renna, Local No. 4

Joseph DiRenzo, Local No. 5

Gerard Scarano, Local No. 5

Michael Perrone, Local No. 5

Richard Tolson, Local No. 5

31

# ORIGINAL COMPLAINT

# EXHIBIT B

V.F. CARO                                              164

## (SIGNATURE PAGE)

# B.A.C. LOCAL #4 NEW JERSEY

## THE UNDERSIGNED EMPLOYER AGREES TO BE BOUND BY ALL TERMS OF THE BARGAINING AGREEMENT.

NAME OF FIRM _____ MAARV WATERPROOFING INC. _____

ADDRESS _____ 317 OAK STREET _____

PASSAIC, NEW JERSEY _____ ZIP CODE 07055 _____

TELEPHONE # ( 973 ) 470-0686 _____ FAX # ( 973 ) 470-8716 _____

EMPLOYER'S FEDERAL I.D. NUMBER _____ 22-2527189 _____

NEW JERSEY EMPLOYMENT I.D. NUMBER _____ 608103-00-5 _____

INSURANCE CARRIER FOR WORKMEN'S COMP    CLARENDON INSURANCE COMPANY
                                        POLICY # WCTRM 905080-00
                                        TERM: 10/18/99 - 10/18/2000

## SIGNATURE OF PARTIES

OFFICERS OF UNION

BUSINESS MANAGERS SIGNATURE _____ DATE _____

FIELD REP. SIGNATURE _____ DATE _____

MEMBER OF FIRM _____ DATE MAY 10, 2000
                 ATTILA SZAMOSSZEGI, PRESIDENT

TITLE _____ PRESIDENT _____

PRINT NAME _____ ATTILA SZAMOSSZEGI _____

## (SIGNATURE PAGE)

**NJ 0424**

## STATE OF NEW JERSEY
### RESIDENTIAL AND LIGHT COMMERCIAL AGREEMENT
Between
### THE MASONRY CONTRACTORS OF NEW JERSEY
### THE BUILDING CONTRACTORS ASSOCIATION of NEW JERSEY
And
### INTERNATIONAL UNION of BRICKLAYERS and
### ALLIED CRAFTWORKERS
### LOCAL UNIONS No. 4, 5 of NEW JERSEY AND LOCAL No. 2 DELAWARE/NJ

To improve mobility of manpower, to increase efficiencies and competitiveness, to foster the principles of collective bargaining, to promote closer working relationships between BAC Local Unions #4, 5 of New Jersey and Local Union #2 Delaware/NJ and signatory employers, to eliminate strikes and lockouts, to provide a peaceful means for settlement of grievances and disputes, to encourage masonry training programs, to promote safe working sites, and to ensure uniform area wage rates, hours, and conditions of employment, we, BAC Local Unions #4, 5 of New Jersey and Local Union #2 Delaware/NJ, the Masonry Contractors of New Jersey, the Building Contractors Association of New Jersey hereby, do adopt, this state of New Jersey Residential and Light Commercial agreement as the basis of our relations. A principle of this agreement is that a fair day's work shall be provided for a fair day's pay.

The International Union of Bricklayers and Allied Craftworkers shall hereinafter be referred to as the BAC or the International Union. Local Unions No. 4, 5 of New Jersey and Local #2 Delaware/NJ shall hereinafter be referred to collectively as the Union. The union residential and light commercial administrative office shall herein after be referred to as the UAO. The Masonry Contractors of New Jersey, the Building Contractors Association of New Jersey shall herein after be referred to as the "Association". Members of the Associations and individual employers who become signatory to this agreement shall herein after be called the "employer". Each employer on whose behalf this agreement has been developed and each future employer who becomes a party by signing the agreement, shall individually be liable and responsible for its own acts and conduct and for any breach or alleged breach of this agreement.



RECEIVED

AUG 1 2005

COLLECTIVE BARGAINING
SERVICES

NJ 0424

## ARTICLE I
## DURATION – TERMINATION – AMENDMENT

This agreement originally executed on the first day of October 1988 between the Masonry Contractors of New Jersey, the Building Contractors Association of New Jersey and former BAC Residential Local # 24 and amended to be effective the first day of November 2004, shall continue in full force and including the thirty-first day of October 2007, and shall be automatically continued yearly thereafter unless written notice of decision to negotiate a new agreement, in whole or in part, is given by either party to the other not later than sixty (60) days nor more than ninety (90) days prior to the expiration date or anniversary date thereafter.  If the parties fail to reach an agreement in such negotiations, the issues in dispute shall be submitted to the International Masonry Institute's Dispute settlement plan for such steps that are deemed appropriate in accordance with the procedures of the plan.  The parties may at any time mutually agree to change or amend any part of this agreement and such changes or modifications shall not effect the continuing nature of this agreement.

## ARTICLE II
## SCOPE

This Agreement shall be in effect within the boundaries of the State on New Jersey.  It is agreed that all work performed under the Bricklayers' National Agreement for Acid Tile Tanks Chests and Linings, Bricklayers' National Agreement for Stacks-Chimneys-Silos. Bricklayers' National Agreement for Refractory Construction, Cement Masons' National Agreement for Stacks-Chimneys-Silos, Cement Masons' National Agreement for Natural Draft Cooling Towers, General Presidents Project Maintenance Agreement, International Panelization Agreement, National Maintenance Agreement, The Nuclear Power Construction Stabilization Agreement and any other project agreement negotiated by the Building and Construction Trades Department AFL-CIO or its affiliates is specifically excluded from the terms of this agreement.

This agreement shall apply to Residential and Light Commercial Projects which are bid and/or negotiated after the effective date of this agreement.  Residential projects are defined for the purpose of this agreement as projects involving the construction, alteration, or repair of single family houses or apartment buildings of no more than (4) stories in height.  This includes all incidental items such as parking areas, streets, and sidewalks.

Light commercial projects are defined for the purpose of this agreement as projects of $900,000.00 or less, that includes all construction of such structures.  The installation of utilities and the installation of equipment both above and below grade level as well as incidental grading, utilities, and paving.  The artificial staging of projects in order to qualify for the light commercial rates and conditions shall not be permitted.

2

NJ 0424

These projects are targeted towards those jobs where the developer, owner or contractor traditionally bid or contracted out masonry work to non-union, or as mutually agreed to by the union and the employer.

The Employer shall notify The Joint Committee when it has successfully bid a light commercial project, which it intends to perform under this agreement. Upon request of the committee the employer shall furnish the committee the F.W. Dodge report (or similar report) of the successful low bidder on the project.

A. This Agreement covers construction work within the jurisdiction of the International Union, as defined in the Constitution of the International Union, as well as all performed by employees represented by the International Union of Bricklayers and Allied Craftworkers.

B. The Employer agrees to assign to employees, Journeyman, BAC Trainees, and support personnel represented by BAC all work which has been historically or traditionally assigned to members of the International Union of Bricklayers and Allied Craftworkers, including but not limited to: all forms of masonry construction, including all brick, stone, concrete, block, glass block, and pointing-cleaning-caulking work, exterior insulation systems such as Dryvit, and like systems applied at the job site or erected in panel form, the complete installation of all forms of masonry panels including the off and/or onsite fabrication, all integral elements of masonry construction and all forms of substituted materials or building systems thereto utilized in all forms of construction, maintenance, repair, and renovation.

C. Autoclaved Aerated Concrete Masonry Units (AACMU). The Bricklayer shall perform the complete installation and related finish work of all AACMU. These operations include, but are not limited to; the cutting, fitting and applications of mortar and/or other cementitious materials used for the setting and bonding purposes as well as the actual laying of the AACMU block units into position. The routing, drilling, cutting and patching for all mechanical piping and openings. The preparation, assembly, unloading, selecting or staging of AACMU panels, hooking on, signaling, drilling, cutting, installation of support angles or strut supports, fitting, bedding, landing, setting, leveling, plumbing, aligning, fastening, anchoring (whether by bolt, clip, pin, or weld), insulation, caulking, grouting, patching, cleaning, waterproofing and installation of all AACMU units. This also includes all work operations related to the installation and applications of all coating, covering and veneer systems (both exterior and interior) on all AACMU units. These work operations include, but are not limited to: preparations of walls, the mixing and applications of any and all finish coating materials by any method (i.e. trowel on, machine, spray on, etc.) or any other device deemed necessary to produce the desired finish surface.

D. In addition, the Employer agrees to assign to employees represented by BAC all other work assignments mutually agreed upon between the Employer and the Union and all such work shall be covered by this agreement.

## ARTICLE III
## MANAGEMENT, RECOGNITION, AND RIGHTS

3

NJ 0424

The Union hereby recognizes and acknowledges that job-site discipline is the responsibility of the Employer. Except as otherwise provided herein, the Employer shall have the right to hire, fire, suspend, or discipline for just cause, direct the working force, and to manage its business in accordance with its best judgement.

## ARTICLE IV
## UNION RECOGNITION, UNION SECURITY, ACCESS

A. **Union Recognition-** The Employer hereby recognizes and acknowledges that the Union is the exclusive representative of all its employees in the classification of work failing within the jurisdiction of the Union, as defined in Article II of this agreement, for the purpose of collective bargaining.

B. **Union Security-** No later than eight (8) days following the effective date of this Agreement, all present employees working under the terms of this agreement, must as a condition of continued employment, be or become members of the Union; all employees hired after the effective date of this agreement shall be or become and remain members of the Union no later than eight (8) days following the first day of their employment in accordance with the provisions of Section 8 of the National Labor Relations Act, as amended.  Failure of any employee to comply with the provisions of this article shall, upon the request of the Union, result in termination of such employee.  The employer shall not be obligated to dismiss an employee for non-membership in the Union: (a) if he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members, or (b) if he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

C. **Union Access to Job-** International Union representatives and the Business Manager and/or other representatives of the Local Union shall have access to the Employer's job sites at reasonable times in compliance with any reasonable rules and regulations adopted by the owner to ensure that the provisions of this Agreement are observed, provided, however, that such representatives shall not unduly interfere with the job progress.

## ARTICLE V
## RESIDENTIAL AND LIGHT COMMERCIAL EMPLOYEES-COMMERCIAL EMPLOYEES

A. It is understood by the Union that the Employer desires to maintain a permanent workforce of steady employees, who shall be defined for purposes of this Agreement as "residential and light commercial employees".  Including BAC trainees, hired with the expectation that they shall be employed by the Employer on a continuous basis to the extent that work is available on projects throughout the state of New Jersey.

B. It is agreed that the Employer may, in addition to those residential and light commercial employees described in Section A of this article, hire employees, who

NJ 0424

shall be defined for purposes of this Agreement as "Commercial employees" who reside or are normally employed in the territorial jurisdiction of the Local Union in which the job-site is located. Such commercial employees must be skilled in the type of masonry work to be done by the Employer on the project before they can be referred for employment.

C. The Employer agrees that within thirty (30) days from his execution of this Agreement he will furnish The Union Administrative Office with a signed statement listing its residential and light commercial employees by normal craft assignment, specifying their most recent date of hire. The Employer shall notify, in writing, the UAO of any additions to or deletions from this list within twenty-four (24) hours of such change.

D. Any charges of violations of this article shall be processed in accordance with the procedure for handling grievances as described in article V of this Agreement.

## ARTICLE VI
## HIRING, FOREMAN, STEWARDS, BAC TRAINEES

A. **HIRING**
1. The Employer agrees that the Union Administration Office shall be the exclusive and sole source of employees. The Employer may request by name, specific individuals who will be referred, if available.
2. The parties agree that if the UAO is unable within forty-eight hours of a request, excluding weekends and holidays, to refer the skilled employees required for the project, then the Employer is free to secure the additional employees necessary to complete the project. If the UAO is unable is unable to refer employees within forty-eight (48) hours and the Employer secures additional employees, he will within the twenty-four (24) hours, from the time of hire, excluding weekends and holidays, furnish the UAO with a signed statement listing its new employees by name, social security number, classification, date of hire, and location of job-site. The UAO agrees whenever requested, to assist the Employer in securing the craftworkers required to meet the specific project manpower needs. The Employer shall be permitted to recruit additional skilled employees from other areas for the project if the UAO cannot provide the required number of employees.
3. It is understood that the Employer shall have the right to determine the competency and qualifications of applicants referred by the UAO. The selection of applicants for referral to jobs shall not be based on, or in any way affected by, Union membership, bylaws, rules, regulation, constitutional provisions or any other aspect or obligation of Union membership, policies, or requirements. Nor shall the selection or hiring of such employees be based on or in any way effected by race, creed, color, sex, age, or national origin.

5

B.  Where five or more employees including BAC trainees are employed on a job one of them shall be the foreman.  The foreman shall be selected by and be the representative of the Employer, and shall be a journeyman mechanic of the trade they supervise.

C.  The Employer shall hire a steward appointed by the UAO on all jobs.  The steward shall be a working employee and shall, when appointed, be granted reasonable time to conduct union business.

D.  In order to train sufficient skilled mechanics for the needs of the masonry industry, the necessity for employment of BAC Trainees is recognized and encouraged by the parties to this Agreement.  It is agreed that the Employer shall abide by the National Apprentice Standards developed for the masonry craft training.

E.  Residential and Light Commercial BAC Trainees recruited into the Local as of November 1st 2004, or later, will be placed at a wage rate based upon an evaluation conducted by the International Masonry Institute.

BAC Trainees signed prior to November 1st, 2004 will have the option to be evaluated and placed according to the International Masonry Institute's evaluation and scoring system.


# ARTICLE VII
## WAGES, PAYDAY, TRAVEL, AND SUBSISTENCE

A.  The hourly wage rate for employees classified as residential and light commercial employees performing work covered under this Agreement shall be as follows:

See Attached Wage Sheet

1.  All employees shall be classified as residential and light commercial employees unless it is mutually agreed between the Employer and the Union that specific employees should classified as Commercial Employees.

2.  On strictly residential projects, Commercial Employees shall receive same wage and fringe package as residential employees.  This applies to any and all Commercial Employees working for any contractor signatory to this Agreement.  Any deviation from this is addressed in Article XI, section B: 1-4.

3.  The hourly wage rate for employees classified as foreman shall be not less than one dollar ($1.00) higher than the wage rate for journeyman employees.

B.  The Union shall have the option of allocating a portion of the wage rates among the various benefit funds specified in Article IX.

C.  All employees working under this Agreement shall be paid in cash or by check weekly on Friday before quitting time and within 72 hours after the closing of the pay

NJ 0424

for the week. An employee being laid off shall be given his final paycheck in full for all hours of employment one hour before layoff.

**D. Travel and Subsistence-** Normally the Union Administrative Office will provide the necessary workforce for all projects throughout the State of New Jersey and no travel pay will be paid. In certain geographic areas involving long distances between project job-sites and employee residences, travel pay will be established before the work commences by the employer and UAO on a "per-job" basis. Employees referred to jobs shall report to a location designated by the Employer.

When requested to stay away from home overnight, the employee shall be reimbursed for meals and lodging at reasonable rates to be established before the work commences by the Employer and UAO on a "per-job" basis.

**ARTICLE VIII**
**HOURS OF WORK, OVERTIME, SHIFTS, AND HOLIDAYS**

A. The standard work day shall consist of eight (8) hours of work between the hours of 7:00 a.m. and 5:30 p.m. with 30-minute unpaid lunch hour occurring the middle of the shift. The standard workweek shall consist of five standard workdays commencing on Monday and ending on Friday, inclusive. The normal starting and quitting times may be changed by mutual consent of the Employer and the Union.

1. Except as provided in Section 2 and 3 below, all time worked before and after the established eight (8) hour work day, Monday through Friday, and all time worked on Saturday shall be paid for at the rate of one and one half times the base wage rate in effect. All time worked on Sundays and on holidays specified in Section C of this article shall be paid for at the rate of double the hourly base rate in effect.

2. At the option of the Employer, Saturday may be used as a make up day for hours lost due to weather conditions or conditions beyond the control of the Employer. Employers desiring to utilize this provision must provide the Union Administrative Office and employees performing work under this agreement on that project twenty-four (24) hours notice prior to invoking this schedule. Employers utilizing Saturday to make up to lost time, must provide employees with the opportunity to work eight (8) hours. When an employee of his own accord fails to work on any day or any part of any day of the workweek Monday through Friday, then such employee, if he works on Saturday of the week during which such absence occurs, shall be paid the straight time rate, provided that all time worked before and after the established eight (8) hour work day Monday through Saturday or more than forty (40) hours of straight time work per week shall be paid one and one half times the base wage rate in effect.

7

NJ 0424

3. At the option of the Employer a ten hour four day work week schedule may be utilized and Friday may be used as a make up day for hours lost due to weather conditions or conditions beyond the control of the Employer. Employers desiring to utilize this provision must provide the UAO and employees performing work covered by this agreement on that project twenty-four (24) hours notice prior to invoking this schedule. Employers utilizing Friday to makeup for lost time, must provide employees with the opportunity to work eight (8) hours. When an employee of his own accord fails to work on any day or part of any day of the workweek Monday through Thursday, then such employee, if he works on Friday during the week during which such absence occurs, shall be paid the straight time rate, provided that all time worked before and after the established ten (10) hour work day Monday through Thursday or in excess of eight (8) hours on Friday or more than forty (40) hours of straight time work Monday through Friday and all time worked on Saturday shall be paid one and one half times the base wage rate in effect.

4. Employees shall not be discharged or disciplined for refusing work scheduled outside the standard workday or standard workweek including denial of unemployment compensation. Any employee discharged or disciplined for refusing such work shall be made whole for his loss by the Employer.

**B. Shifts-** Shift work may be performed at option of the Employer, but when performed it must continue for a period of not less than five consecutive work days, Saturday and Sunday, if worked can be used for establishing the five day minimum shift work period. The straight time workweek shall be considered to start with the day shift on Monday and end with the conclusion of the second or third on the fifth day. In the event the second or third shift of any regular workday shall extend into a holiday, employees shall be paid at the regular shift rate.

1. The first shift shall be regular day shift insofar as computing wage payments is concerned, and the first day shift shall work regular eight hour shift, with a one half hour unpaid lunch period through the shift.

2. If two work shifts are established, the second shift shall consist of seven and one half hours of continuous work, with a one half hour unpaid lunch period midway through the shift. Employees working on the second shift shall receive eight hours times the base straight time rate plus $.25 for each of those eight hours.

3. If two work shifts are established, the third shift shall consist of seven hours of continuous work plus one half hour unpaid lunch period midway through the shift. Employees working on the third shift shall receive eight hours times the basic straight time rate plus $.50 for each of those eight hours.

4. Time worked in excess of seven and one half on the second shift and seven hours on the third shift shall be paid at the appropriate overtime rate.

5. In computing overtime pay on shift work, the overtime rate of pay shall be based upon the wage rate established for the shift involved less the shift differentials.

C. The Employer agrees to recognize the following holidays: New Years Day, President's Day, Memorial Day, Independence Day, Labor Day, Veterans Day, Presidential Election Day, Thanksgiving Day, and Christmas Day.

## ARTICLE IX
## JOINTLY TRUSTED FUNDS

1. In addition to wages and other payments herein provided for, the Employer agrees to pay the specified contributions to the following designated funds.

A. Bricklayers and Trowel Trades International Pension Fund.

(1) The contribution to the Bricklayers and Trowel Trades International Pension Fund (IPF) shall be a total of one dollar and fifty cents ($1.50) for each hour or portion thereof, of which a covered employee receives pay.
(2) The payments required above shall be made to the Bricklayers and Trowel Trades International Pension Fund, which was established under an Agreement and Declaration of Trust, dated 1 July 1972.

B. Bricklayers and Trowel Trades International Health Fund.

(1) The contribution to the Bricklayers and Trowel Trades International Health Fund shall be a total of five dollars and forty cents ($5.40) for each hour or portion thereof, for which a covered employee receives pay. (See attached wage sheet for increases).

(2) The payments required above shall be made to the Bricklayers and Trowel Trades International Health Fund, which was established under an Agreement and Declaration of Trust, dated 5 July 1988.

C. **Annuity-** Beginning November 1, 1995 contributions on behalf of all covered employees, will be made to the Bricklayers and Trowel Trades International Retirement savings plan. (See attached wage sheet for amounts per hour).

**D. International Masonry Institute**
(1) The masonry industry in the United States and Canada has great and definable needs in the fields of apprenticeship and training, advertising and promotions, research and development, and labor/management relations, which must be met if the industry is to grow and prosper. The parties to this agreement believe that the International Masonry Institute is the most effective and efficient instrument for meeting these needs because it offers the greatest possibility of integrating activities in these program areas in an effective manner and coordinating them through a single region/international system.

9



(2) In order to properly finance IMI programs, the ultimate objective is to provide, through collective bargaining contributions equal to three per cent of the basic wage, however, this figure is a goal that can only be reached in stages over a period of time.

(3) As contributions from this geographical area increase, IMI will be able to devote a portion of those monies to advertising and promotions, research and development, apprenticeship and training, and labor/management relations programs directed specifically to this area.

(4) In this agreement, the parties intend to take a first step toward the overall objective by establishing a realistic level of support for IMI.  With these principles in mind, the parties agree as follows:

(A) Effective 1 November 2004, the contribution to the International Masonry Institute shall be twenty cents ($.20) for each hour, or portion thereof, for which a covered employee receives pay. (See attached wage sheet for increases).

(B) In addition, there shall be the implementation of an Industry Advancement Fund contribution of $.11 per hour effective November 1, 2004 as defined below:

**E.  Industry Advancement Fund**
The parties hereto do hereby establish an Industry Advancement Fund in accordance with the Industry Advancement Fund Trust Agreement and Declaration of Trust pursuant to the requirements of the Labor - Management Relations Act, the Internal Revenue Code and all applicable laws and the agreement of the parties for the purpose, in all lawful ways, of promoting the increase of residential and light commercial, institutional, public and industrial building construction throughout the State of New Jersey and the adjoining areas within the territorial jurisdiction of the unions by providing building owners, architects, engineers, builders, contractors, private and public funding institutions and agencies, government agencies and any others, directly or indirectly, with the building construction industry information, data and other information to communicate the advantages of sound, durable and economical construction that will provide a high degree of service, utilization and benefit to the public by the utilization of union affiliated contractors.  The purpose of the Fund shall be to foster and promote the continued utilization and expansion of union construction, particularly utilizing union members of the Bricklayers & Allied Craftworkers union, in prospective projects throughout the State of New Jersey.

In order to carry out this agreement, the parties hereto shall execute such agreements of trust and other documents necessary in accordance with law, which documents shall include the following terms which are agreed to and incorporated into this contract:

1. The Employer shall make contributions for each hour worked by each member of the Bricklayers & Allied Craftworkers union to the Industry Advancement Fund created hereby.

NJ 0424

2. Effective November 1, 2004, the Masonry Contractors of New Jersey and the Building Contractors Association of New Jersey agree to allocate $.01 of the Industry Advancement Fund contribution to the International Council of Employers of Bricklayers & Allied Craftworkers (I.C.E.). Said contribution shall be forward to I.C.E. by the Masonry Contractors of New Jersey. The remaining contribution shall be divided as follows:

> Masonry Contractors of New Jersey: 50%
> BCANJ:                           50%

In such case as the parties opt to discontinue the $.01 allocation to I.C.E., said $.01 contribution shall be distributed equally between the Masonry Contractors of New Jersey and the Building Contractors Association of New Jersey.

3. The Masonry Contractors of New Jersey and the Building Contractors Association of New Jersey shall utilize said funds in a manner consistent with the terms of the trust including the lease or purchase of materials, supplies and equipment, the lease of premises or purchase of premises, the employment and retention of professional counsel, the engagement of administrative and other employees, and all other appropriate expenses and expenditures which comply with the purposes of the trust and law. However, in all circumstances, it is the intention hereto that the said Fund shall be used to promote the following industry wide activities for the benefit of the contractors utilizing members of the Bricklayers & Allied Craftworkers union including accident prevention, education, research, public relations, industry relations, labor relations, market development, standardization of contracts and specifications and all other such appropriate activities.

4. Although the Industry Advancement Fund is designated a "contribution" it is expressly understood and agreed that the said sum payable to said Industry Advancement Fund is not intended to be and is not a contribution to employees and no employee of Employer has any proprietary interest in said funds.

5. The Industry Advancement Fund shall pay the Bricklayers & Allied Craftworkers' local with jurisdiction over the job site, Local No. 4, 5 or 2, 2% of all amounts collected as reimbursement for expenses incurred in connection with the collection services rendered. In addition the Bricklayers & Allied Craftworkers' Local No. 4, 5 of New Jersey and Local #2 Delaware/NJ shall not be responsible for collection of any delinquent amounts owed by any employer.

**Section 2-** The Employer hereby agrees to be bound by and to the above stated Agreements and Declaration of Trusts, as though he had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of these funds pursuant to said Agreements and Declarations of Trusts.

NJ 0424

**Section 3-** The Employer hereby irrevocably designates as its representative on the above stated Boards of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

**Section 4-** For the purpose of this Article, each hour paid for, and all other hours for which pay is received by the employee in accordance with this agreement, shall be counted as hours for which contributions are payable to each fund designated in Section 1 of this Article.

**Section 5-** Contributions shall be paid on behalf of all covered employees starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, journeymen, BAC trainees, helpers and probationary employees.

**Section 6-** All contributions shall be made at such time and in such a manner as the Trustees require; and the Trustees shall have the authority to have an independent Certified Public Accountant audit the time books, payroll, and wage records of the Employer for the purpose of determining the accuracy of contributions to the funds designated in Section 1 of this Article. Any Employer found, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, to have been substantially inaccurate in reporting shall be charged in full costs of such audit.

**Section 7-** If the Employer fails to make any contribution specified in this Article, within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of payments due together with attorney's fees and such liquidated damages as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided for or set forth elsewhere in this agreement.

## ARTICLE X
## LOCAL AGREEMENTS

A. Whenever the Employer participates directly in local negotiations, he shall be affected by the events which occur during that process including any economic action and shall be bound to the terms of any agreement that is consummated from such negotiations, which are not in conflict with the provisions of this Agreement.

B. Whenever the Employer works in an area where he does not participate directly in local negotiations, there shall be no stoppage of work on the Employer's project by the Local Union or any lockout by the Employer by reason of any dispute over wages, benefit contributions, or working conditions which may occur between the Local Union and contractors other than the employer.

NJ 0424

1. When the Employer, in order to meet residential or light commercial manpower needs hires commercial employees as defined in Article V.B. of this agreement, the employer shall pay all benefit fund contributions to the home trust funds designated by such employees at the applicable home trust fund rates.

(I)     Each commercial employee shall file within the Employer a statement on a form prepared by the Union designating his or her home trust funds.

(II)    The Employer agrees to be bound by the terms, conditions, and provisions of such home trust fund agreements (copies of which will be available to the Employer upon request), and to make the contributions called for to said funds at the rate and in the manner specified; to irrevocably designate as its representatives on the board of trustees of such trusts, such trustees as are named in said agreements as employer trustees, together with their successors selected in the manner provided in said agreements, and to be bound by all actions which are not in conflict with the terms of this agreement taken by said trustees pursuant to the said agreements.

(III)   The Employer agrees to furnish upon request of the Union verification of the payments of said contributions to home health and welfare, pension, annuity, and vacation plans. The Union and applicable trust funds shall have the right to audit the Employer's records to determine that the proper wage rate and fund contributions have been made in accordance with the terms of this agreement.

2. Nothing contained in the paragraphs above is intended to require the Employer to become signatory to a collective bargaining agreement, nor is any signatory Employer required to assign his bargaining rights or become a member of any local employer group or local association as a condition for making such contributions.

3. The Employer agrees to sign upon the request of the home base fund administrator an assent of participation agreements covering the home benefit contributions.

### ARTICLE XI
### ADMINISTRATION OF AGREEMENT

A. The Union and the Employer agree that a major objective of this Agreement is to increase the employment opportunities for the membership of the Union and to encourage signatory Employers to bid and negotiate for more masonry projects in order to expand the amount of masonry work being done under the terms of collective bargaining agreements. The Union and the Employer agree to aggressively work together with the greatest degree of cooperation possible to achieve these goals. The Union and the Employer, through cooperative efforts, agree to discourage project delays, loss of wages, and impediments to job-site progress, which could result in lost employment opportunities.

B. In order to further these principles the Union and Employer agree:

NJ 0424

1. To cooperate in meeting conditions peculiar to a job or protect on which the Employer may be bidding, negotiating, or have under contract. They will at all times meet to confer respecting any questions or misunderstanding that may arise under the performance of this Agreement.

2. That whenever the Employer is bidding or negotiating for a masonry project where non-union competing work forces are determined to be the likely contractor for the project, the Union will meet with the Employer to consider, special conditions for that project for signatory Employers and employees represented by the Union.

3. That the Union will consider, special conditions of employment and rates of wages and contributions on projects which require the Employer to cover and heat all or major portions of a masonry project in order to provide full-time continuous employment for employees represented by the Union.

4. That any special conditions of employment or wage and contribution rates granted under the provisions of this Agreement for a specific project or geographic area will be available to any and all other Employers signatory to this Agreement for that project or geographic area upon their request.

**C. Joint Committee**
1. To facilitate the implementation of special conditions of employment mentioned in the paragraphs above the parties agree that there shall be established a Joint Committee consisting of four (4) employer representatives, one (1) International Union Representative and the Business Managers of BAC Local Unions No. 4 and 5 New Jersey and Local #2 Delaware/NJ.

The Joint Committee shall have two Co-chairman; one selected by the Association the other International Union Representative assigned to the committee by the International Union. The Joint Committee shall meet regularly on a quarterly basis and at such other times, as the Co-Chairman deems necessary or appropriate. Quarterly meetings may be suspended or postponed by mutual agreement of the Co-Chairmen, except that the Co-Chairmen may not suspend more than three quarterly meetings in succession. The Joint Committee will determine when and how special conditions of employment are to be considered and implemented. The Joint Committee may upon written request, review and when determined necessary, suspend a provision or provisions of this agreement relating to starting times or work schedules when such provisions are found to be inconsistent with the schedule required by an owner or general contractor that has been agreed to by other building trades crafts working on the project. Decisions of the Joint Committee pertaining to special conditions shall be final and binding upon all parties to this agreement.

2. The Joint Committee shall also be charged with promoting an understanding of the needs of the Union and the Employers in the implementation of this Agreement, and to respond to any questions raised regarding the meaning and intent of this Agreement. All decisions of the Joint Committee, which address or clarify the

NJ 0424

meaning and intent of this Agreement, shall be immediately distributed to signatory Employers by the Joint Committee with the understanding that any actions required by such decision will be promptly implemented. Except as provided in Article VIII, Section E, Paragraph 1, decisions of the Joint Committee can only be made to resolve questions or disputes regarding the meaning or intent of specific provisions of this Agreement and cannot be made to add to, omit from, or alter the provisions of this Agreement.

## ARTICLE XII
## INTERNATIONAL MASONRY INSTITUTE
## DISPUTES SETTLEMENT PLAN

The Union, the Association and the signatory Employers agree to recognize, be bound by, and support the International Masonry Institute's Disputes Settlement Plan.

The Plan continues a relationship between labor and management in the masonry industry establishing procedures to improve collective bargaining between the parties in various labor agreements in the industry, to provide joint procedures for the mediation and conciliation of disputes in the negotiations of collective bargaining agreements, and to provide for final resolution of disputes over terms of collectively bargained agreements. Executed copies of the Plan are available upon request to parties signatory to this Agreement.

## ARTICLE XIII
## BONDING

Prior to commencing any work covered by this Agreement, the Employer shall obtain a bond in the amount of $25,000.00 (twenty-five thousand dollars) with a duly qualified bonding company in a form approved by the Union, to secure payment of wages, benefit contributions, and other sums due under this Agreement.

## ARTICLE XIV
## DUES CHECK-OFF / BAC-PAC CHECK-OFF

The Employer shall deduct from the wages of each employee who has signed a check-off authorization form conforming to federal law, and transmit monthly to the applicable Local Union (or to any agency designated by said Local Union for the collection of money), the sum for each hour paid which the Local Union has specified, or specifies from time to time and so advises the Employer in writing, as the portion of said employee's union dues to said Local Union, to the International Union, or to any other affiliates of the International Union, subject to check-off. The sums transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the name of each person whose dues are being paid and the number of hours each employee has been paid.

The Employer agrees to deduct an amount from the pay of each employee, who is a Union member and who executes a voluntary check-off authorization form for the Bricklayers and Allied Craftworkers Political Action Committee (BACPAC). Deductions shall be in the amount and at the intervals specified on the transmittal BACPAC deductions to the treasurer of BACBAC in care of the Bricklayers and Trowel Trades International Pension Fund. These transmittals shall occur on a basis, and shall be accompanied by a list of the names of those employees for whom BACPAC deductions have been made and the amount deducted for each employee.

The deductions shall continue for the life of this Agreement for those employees who sign BACPAC authorization forms unless they are revoked individually and in writing.

## ARTICLE XV
## GRIEVANCE PROCEDURE

A. It is specifically agreed that any controversy arising during the effective period of this Agreement involving the application or interpretation of any of its terms and conditions, other than a jurisdictional dispute over the assignment of work, shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the Union Administrative Office by each Employer within five (5) working days after the alleged violation is committed or should reasonably have been discovered.

B. A grievance shall be resolved in accordance with the following procedures:

Step 1- The grievance shall be referred to the job-site Union steward and to the Employer's representative at the job-site for settlement.

Step 2- If the grievance cannot be settled within twenty-four (24) hours pursuant to Step 1 of this procedure, the grievance shall be referred on the following working day to the UAO and to the Employer's representative.

Step 3- If the grievance cannot be settled pursuant to Step 2 of this procedure within three (3) working days, excluding weekends and holidays, the grievance shall be submitted within two (2) working days to the Joint Committee provided for in Article XI of this Agreement which shall attempt to resolve the matter.

Step 4- If the matter is not resolved by the Joint Committee, the dispute will be submitted to the International Masonry Institute's Dispute Settlement Plan for resolution under the Plan's operating procedures referred to in Article XV of this Agreement. The decision reached in accordance with the Plan's procedures shall be binding upon all parties.

C. The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties, initiated by a written request of one party to the other, at the appropriate step of the Grievance Procedure. Failure to file or process a grievance within the time limits provided shall be deemed a waiver of such grievance

NJ 0424

without prejudice, but shall create no precedent in the processing of and/or resolution of like or similar grievances or disputes.

**D.** In order to encourage the resolution of disputes and grievances at Steps 1 and 2 of Section B of this Grievance Procedure, the parties agree that such settlement shall not be precedent setting.

**E.** When a settlement has been reached at any step of this Grievance Procedure, such a settlement shall be final and binding on all parties.

**F.** It is expressly understood by the parties hereto that the procedure for adjustment of grievances set out in this Article is exclusive and supersedes and other plan, Method or procedure.

**ARTICLE XVI**
**SUBCONTRACTING**

**A.** The Employer agrees not be sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement and complies with all of the terms and conditions of this Agreement.

**B.** All charges of violations of this Article shall be considered as a dispute, and shall be processed in accordance with the provisions of Article XV of this Agreement covering the procedure for handling of grievances, and the final and binding resolution of disputes.

**ARTICLE XVII**
**PRESERVATION OF WORK**

In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them, to protect the benefits to which employees are entitled under this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work and benefits, it is hereby agreed as follows: if and when the Employer shall perform any work of the type covered by this Agreement at any construction site (I) under its own name, or (II) under the name of another entity (whether a corporation, company, partnership, or any other business entity, including a joint venture) wherein he Employer, including its owners and stockholders (other than a corporation that is primarily engaged in industrial production). Officers, directors, or partners exercise either directly or indirectly (such as though family members) any significant degree of ownership, management, or control. The terms and conditions of this Agreement shall be applicable to all such work.

**A.** A charge of violation of this Article may be filed by the Union and/or the trustees of any of the joint trust funds provided for in this Agreement, and shall be considered as

17

NJ 0424

a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes as provided in Article XII of this Agreement.  As a remedy for violations of this Article, the Umpire provided for in Article XII is empowered, at the request of the Union and/or the trustees of the joint trust funds, to require an Employer to (a) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations, and (b) pay into affect contributory funds established under this Agreement or any such funds which have resulted from the violations.  Provisions for this remedy herein does not make such remedy the exclusive remedy available to the Union for violations of the Article, nor does it make the same or other remedies unavailable to the Union for violation of other sections or other articles of this Agreement.  However, the Union expressly agrees that it will not engage in strikes, picketing, or other economic actions to enforce the provisions of this Article.

B.  If, as a result of violations of this Article, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with Section A above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

## ARTICLE XVIII
## TRAVELING CONTRACTORS

When the Employer has any work specified in Article II of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied Craftworkers, the Employer agrees to abide by the full terms and conditions of the Agreement in effect at the job-site area.  Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Article VII of this Agreement but in no case less than the established minimum wage scale of the local agreement covering the territory in which such work is being performed plus all contributions specified in the job-site local agreement.  If employees are sent to work on a project in an area where there is no local agreements covering the work specified in Article II of this Agreement, the full terms and conditions of this Agreement shall apply.

## ARTICLE XIX
## NO STRIKE, NO LOCKOUT

It is understood and mutually agreed that there shall be no strikes or lockouts over a dispute concerning this Agreement during its term until the grievance procedures described in Article XV have been exhausted and then only in the event a party fails or refuses to abide by a final decision.  This Article shall not apply in those cases where the Employer fails or refuses to make in whole or in part any payments required under this

NJ 0424

agreement including all wages, fringe benefits or other contributions that have been established through bona fide collective bargaining.

There shall be no stoppage of work on the Employer's project by the Union, or any lockout by the Employer by reason of any dispute which may occur between the Union and a contractor or area contractors other than the Employer, provided that refusal by any employee to pass through a lawfully permitted picket line will not constitute a violation of this Agreement.

### ARTICLE XX
### SAVINGS CLAUSE

If any provision of this Agreement shall violate any applicable stature or is held invalid by any court or governmental agency have jurisdiction, when such provision shall be void in the jurisdiction of such court or agency and the Employer and the Union agree that upon a ruling of invalidity they will renegotiate immediately to replace the voided provision to the extent allowable under the law; such ruling of invalidity shall not affect the validity of the remainder of this Agreement. Where a money item is involved and not substituted is possible, it is agreed that the benefit originally provided shall be replaced with one of equal worth.

### ARTICLE XXI
### SAFETY

The Union and the Employer agree that safety of the workplace is of paramount importance and the Employer and the Union agree to abide by all appropriate federal, state, provincial, and local safety laws and regulations and any and all safety regulations established by an owner or his representative at particular job-site.

### ARTICLE XXII
### GENERAL UNDERSTANDING

This State of New Jersey Residential and Light Commercial Agreement constitutes the entire agreement between the parties for all employees performing work as defined in Article II of this Agreement and any local or area collective bargaining agreement which may be in conflict with the provisions contained in this Agreement shall be subordinated to this Agreement.

The Employer agrees that if it has not previously done so, it will, upon the Union's submission of evidence of majority status among its employees in the bargaining unit described herein, voluntarily recognize the Union as the exclusive representative as defined in Section 9(a) of the National Labor Relations Act, as amended, of all employees within that bargaining unit on all present and future job-sites within the jurisdiction of the Union. The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board.

NJ 0424

## JOB-SITE CONDITIONS

1. FROM JUNE 1 THROUGH SEPTEMBER 15 DRINKING WATER, OTHER THAN A HOSE WILL BE SUPPLIED ON ALL JOBS BY THE CONTRACTOR.

2. APPROPRIATE EXTENSION LADDERS WILL BE SUPPLIED BY THE CONTRACTOR ON ANY JOBS WHERE SCAFFOLDING EXCEEDS TWO SECTIONS IN HEIGHT.

3. 12" BLOCK LAID FROM GROUND OR ON SCAFFOLDING IN EXCESS OF 6 COURSES WILL BE LAID BY A TEAM OF TWO MASONS.

4. SHOW UP TIME- IF THE EMPLOYEES SHOW UP READY, WILLING AND ABLE TO WORK AND CANNOT DO SO DUE TO ANY REASONS OTHER THAN WEATHER, AND NO ADVANCED NOTICE IS GIVEN, THE EMPLOYEES WILL BE ENTITLED TO, TWO (2) HOURS PAY.

5. COFFEE BREAKS- ONE 10 MINUTE MID-MORNING BREAK SHALL BE THE STANDARD PRACTICE.

NJ 0424

**In Witness Whereof,** we the authorized officers of the Masonry Contractors of New Jersey, the Building Contractors Association of New Jersey and the Union have hereunto set forth our hands and seals this _1st_ day of _April_ 2005.

**Authorized Management
Bargaining Representatives**

_[signature]_
Michael Schmerbeck
Masonry Contractors of New Jersey

_[signature]_
Jack Kocsis
Building Contractors Association
of New Jersey

**Authorized Union
Bargaining Representatives**

_[signature]_
Michael R. Perrone
Bricklayers and Allied Craftworkers
Local Union #5

_[signature]_
John Capo
Bricklayers and Allied Craftworkers
Local Union #4

_[signature]_
Pete Altadonna
Bricklayers and Allied Craftworkers
Local Union #2

NJ 0424

**INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS**
**LOCAL'S # 5 & 4 - NEW JERSEY AND LOCAL # 2 - DELAWARE/NEW JERSEY**
**RESIDENTIAL AND LIGHT COMMERCIAL**

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2004, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Locals No. 4, 5, & 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed Independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement, or as they shall be set out from time to time in any such successor Agreements as may be negotiated. The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its' representative on the Board of Trustees such Employer Trustees together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund, Agreement and Declaration of Trust instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its' successor assigns, and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

_____
**Company Name**

_____
**Physical Street Address**

**Please complete and remit to:**
BAC Local #5, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-0500
(609) 324-1505 - Fax

_____
**City**                    **State**          **Zip Code**

_____
**Telephone Number**        **Fax Number**

_____
**Federal Identification Number**

_____
**New Jersey Employment Compensation Number**

_____
**Workmen's Compensation Insurance Carrier**

Initial if you have received a full copy of this Collective Bargaining Agreement _____

_____
**Officers Signature**        **Printed Name**        **Date**

_____
**Business Managers Signature**    **Printed Name**    **Date**

_____
**Field Representatives Signature**    **Printed Name**    **Date**

MAARV WATER PROOFING INC.

000665

NJ0424

## INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
### LOCAL #5 – NEW JERSEY
#### INDEPENDENT

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed Independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement, or as they shall be set out from time to time in any such successor Agreements as may be negotiated. The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its representative on the Board of Trustees such Employer Trustees together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund, Agreement and Declaration of Trust instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its' successor assigns, and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

**MAARV WATERPROOFING INC.**
Company Name

**317 OAK STREET**
Physical Street Address

**PASSAIC, NEW JERSEY     07055**
City                    State          Zip Code

**(973) 470-0686        (973) 470-8716**
Telephone Number        Fax Number

**22-2527189**
Federal Identification Number

**608103-00-5**
New Jersey Employment Compensation Number

**ST. PAUL INSURANCE COMPANY**
Workmen's Compensation Insurance Carrier

Please complete and remit to:
BAC Local #5, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-9500
(609) 324-1805 - Fax

Initial if you have received a full copy of this Collective Bargaining Agreement _____

| Officers Signature | ATTILA SZAMOSSZEGI | FEBRUARY 4, 2004 |
| Business Managers Signature | Michael R. Perrone | 2/4/2004 |
| Field Representatives Signature | Dominic Longo | 2/4/04 |
|  | Printed Name | Date |

New Jersey
# BRICKLAYERS & ALLIED CRAFTWORKERS
### Local Union #5

NJ 0424

3281 Route 206, Suite 3
Bordentown, New Jersey 08505



Office- (609) 324-0500
Fax- (609) 324-1505

### RESIDENTIAL/LIGHT COMMERCIAL RATES EFFECTIVE NOV 1, 2004 TO OCT 31,2005

|  | Journeyman | 95% | 85% | 75% | 65% | 55% | 50% |
|---|---|---|---|---|---|---|---|
| RATE: | $22.50 | $21.38 | $19.13 | $16.88 | $14.63 | $12.38 | $11.25 |

********************EMPLOYER CONTRIBUTIONS********************

|  | | | | | | | |
|---|---|---|---|---|---|---|---|
| WELFARE: | $5.40 | $5.40 | $5.40 | $5.40 | $5.40 | $5.40 | $5.40 |
| IU PENSION: | $1.50 | $1.50 | $1.50 | $1.50 | $1.50 | $1.50 | $1.50 |
| ANNUITY: | $0.50 | $0.50 | $0.50 | $0.50 | $0.50 | $0.50 | $0.50 |
| I. M. I. : | $0.20 | $0.20 | $0.20 | $0.20 | $0.20 | $0.20 | $0.20 |
| I. A. P. : | $0.11 | $0.11 | $0.11 | $0.11 | $0.11 | $0.11 | $0.11 |

| TOTAL PACKAGE: | $30.21 | $29.09 | $26.84 | $24.59 | $22.34 | $20.09 | $18.96 |
|---|---|---|---|---|---|---|---|

***************DUES CHECK-OFF IS 4.5% OF THE TOTAL PACKAGE***************

| DUES CHECK-OFF: | $1.36 | $1.31 | $1.21 | $1.11 | $1.01 | $0.91 | $0.86 |
|---|---|---|---|---|---|---|---|

As of November 1, 2004, members recruited into the Residential/Light Commercial Local will be placed at a wage rate based on an evaluation conducted bu the International Masonry Institute to determine applicants ability to command such wage.

Residential/Light Commercial members signed prior to November 1, 2004 will have the option, if desired to be evaluated and placed according to results from their evaluation.

Next percentage level of wage rate is reached when 600 hours is recorded for a member. Members may re-evaluate no sooner than 1 year after their last evaluation.

# BRICKLAYERS & ALLIED CRAFTWORKERS

## New Jersey

### LOCAL UNION #5

3281 Route 206, Suite 3
Bordentown, NJ 08505

Office – (609) 324-0500
Fax – (609) 324-1505

RECEIVED JAN 0 8 2002



RECEIVED
JAN 0 8 '02
COLLECTIVE BARGAINING SERVICES

24 NJ 1

8-23-02
NJ Ø1Ø4
AØ

## Residential Local #24, New Jersey Rates Effective Nov 1, 2001 Through Oct 31, 2004

### Nov 1, 2001 through Oct 31, 2002

| | |
|---|---|
| Wage: | $17.00 |
| Welfare: | $4.00 |
| Pension: | $1.50 |
| Annuity: | $.50 |
| I.M.I.: | $.20 |
| Total: | $23.20 |

Dues check-off is 4.5% of the total package or $1.05 per hour for a journeyman.

### Nov 1, 2002 through Oct 31, 2003

| | |
|---|---|
| Wage: | $17.10 |
| Welfare: | $4.50 |
| Pension: | $1.50 |
| Annuity: | $.50 |
| I.M.I.: | $.20 |
| Total: | $23.80 |

Dues check-off is 4.5% of the total package or $1.08 per hour for a journeyman.

### Nov 1, 2003 through Oct 1, 2004

| | |
|---|---|
| Wage: | $17.20 |
| Welfare: | $5.00 |
| Pension: | $1.50 |
| Annuity: | $.50 |
| I.M.I.: | $.20 |
| Total: | $24.40 |

Dues check-off is 4.5% of the total package or $1.10 per hour for a journeyman.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Nancy M. Mayer-Whittington
Clerk

## NOTICE OF RIGHT TO CONSENT TO TRIAL
## BEFORE UNITED STATES MAGISTRATE JUDGE

The substantial criminal caseload in this Court and the requirements of the criminal Speedy Trial Act frequently result in a delay in the trial of civil cases. Aware of the hardship and expense to the parties, counsel, and witnesses caused by the delays which are beyond the control of the Court, this notice is to advise you of your right to a trial of your case by a United States Magistrate Judge. By statute, 28 U.S.C. § 636(c), Fed.R.Civ.P.73 and Local Rule 502, the parties, by consent, can try their case by means of a jury trial or bench trial before a United States Magistrate Judge. Appeals from judgments and final orders are taken directly to the United States Court of Appeals for the District of Columbia Circuit, in the same manner as an appeal from a judgment of a District Judge in a civil case.

### WHAT IS THE PROCEDURE?

One of the matters you are required to discuss at the meet-and-confer conference mandated by Local Rule 206 is whether the case should be assigned to a United States Magistrate Judge for all purposes, including trial.

All parties must consent before the case is assigned to a Magistrate Judge for trial. You may consent at any time prior to trial. If you expressly decline to consent or simply fail to consent early in the case, you are **not** foreclosed from consenting later in the case. However, a prompt election to proceed before a Magistrate Judge is encouraged because it will facilitate a more orderly scheduling of the case.

Attached is a copy of the "Consent to Proceed Before a United States Magistrate Judge for All Purposes" form. Your response should be made to the Clerk of the United States District Court only.

### WHAT IS THE ADVANTAGE?

The case will be resolved sooner and less expensively. The earlier the parties consent to assigning the case to a Magistrate Judge the earlier a firm and certain trial date can be established, even if the case is to be tried to a jury.

Upon the filing of the consent form and with the approval of the District Judge, the case will be assigned for all purposes to a Magistrate Judge.

CO-942A
Rev 3/95
Rev 7/99

Rev. 4/06

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

# INITIAL ELECTRONIC CASE FILING
# ·ORDER

Subsequent filings in this case must be made electronically using the Court's Electronic Case Filing System (ECF) pursuant to Local Rule 5.4.

ORDERED that counsel shall:

- Submit in paper, the original and copy of the complaint/notice of removal/petitions for habeas corpus and any accompanying papers **(not including summons and civil cover sheets)**. Additionally, litigants are hereby required to provide those filings in PDF Format on a floppy disk or CD-Rom compact disk. The disk should be clearly labeled with the case number (if known) and the name of the parties. If unable to deliver the filing on a disk at the time of the new case filing, counsel should e-mail the initiating document and accompanying papers to dcd_cmecf@dcd.uscourts.gov by the close of business the day the new case was filed. Failure to supply electronic copies of the new case in a timely manner, will result in the attorney's name being added to the attorney non-compliant list and shared with the Court's ECF Judge's Committee. **Regardless of what option counsel chooses, the complaint/notice** of removal and accompanying papers must come to the Court as PDF documents. Each exhibit to the new case shall be in a separate PDF file. Failure to submit PDF versions of the complaint/notice of removal and other documents will delay the opening of the case in ECF.

- Register, if not previously registered, to become an electronic filer by completing and returning the enclosed ECF Registration Form found on the Court's Website at (www.dcd.uscourts.gov). The login and password are case specific and can be used for all cases.

- **Make all subsequent filings electronically. This is mandatory.**

- Have a PACER (Public Access to Court Electronic Records) account, in order to view dockets and documents. Call 1-800-676-6856 or visit www.pacer.psc.uscourts.gov for additional information.

- Schedule a training class at the Courthouse by going to the Court's ECF Internet Website (www.dcd.uscourts.gov/ecf.html). Also, filing instructions and an interactive tutorial can be found at this Internet Website.

## LEON, J. RJL

_____
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## ELECTRONIC CASE FILES
**Attorney/Participant Registration Form**

## LIVE SYSTEM

This form shall be used to register for an account on the Court's Electronic Case Files (ECF) system and to subscribe to the ECF EMail (Listserver) notification service. Registered attorneys and other participants will have privileges both to electronically submit documents, and to view and retrieve electronic docket sheets and documents for all cases assigned to the Electronic Case Files system. Listserver subscribers receive email messages whenever the Court wishes to electronically notify ECF registrants of pertinent ECF information.

The following information is required for registration:

If you are appointed pro bono or pro hac vice, please provide the case number: _____

First Name/Middle Initial/Last Name    _____  ____  _____

Last four digits of Social Security Number  _____

DC Bar ID#:  _____

Firm Name  _____

Firm Address  _____

_____

_____

Voice Phone Number  _____

FAX Phone Number  _____

Internet E-Mail Address  _____

By submitting this registration form, the undersigned agrees to abide by the following rules:

1.      This system is for use only in cases permitted by the ***U.S. District Court for the District of Columbia.*** It may be used to file and view electronic documents, docket sheets, and notices. Please visit the Court's ECF Internet, www.dcd.uscourts.gov, website to schedule training.

2.      Pursuant to Federal Rule of Civil Procedure 11, every pleading, motion, and other paper (except list, schedules, statements or amendments thereto) shall be signed by at least one attorney of record or, if the party is not represented by an attorney, all papers shall be signed by the party. An attorney's/participant's password issued by the court combined with the user's identification, serves as and constitutes the attorney's/participant's signature. Therefore, an attorney/participant must protect and secure the password issued by the court.

If there is any reason to suspect the password has been compromised in any way, it is the duty and responsibility of the attorney/participant to immediately notify the court. This should include the resignation or reassignment of the person with authority to use the password. The Court will immediately delete that password from the electronic filing system and issue a new password.

3.    An attorney's/participant's registration will not waive conventional service of a summons and complaint, subpoena, or other judicial process; submit the client to the jurisdiction of the Court; or operate as a consent to accept service of pleadings, documents, and orders in actions in which such attorney/participant has not entered an appearance.   An attorney's/participant's registration will constitute a waiver in law only of conventional service of other non-process pleadings, documents, and orders in the case.   The attorney/participant agrees to accept, on behalf of the client, service of notice of the electronic filing by hand, facsimile or authorized e-mail.

4.    Upon receipt of your login and password, you are strongly encouraged to change your password, which may be done through the Utilities function, to a name easily recalled. **You may be subjected to a fee, should the Clerk's Office have to create a new password for you, or alternatively, you may be required to appear in person to receive your new password.**

5.    Attorneys who are active members of the bar of this Court, or government attorneys who are employed or retained by the United States, or who have been permitted to proceed *pro hac vice*, must file pleadings electronically.

Please return this form to:           U.S. District Court for the District of Columbia
                                         Attn:   Attorney Admissions
                                         333 Constitution Avenue NW, Room 1825
                                         Washington, DC  20001

Or FAX to:                     Peggy Trainum
                                         U.S. District Court for the District of Columbia
                                         (202) 354-3023

Applicant's Signature    _____

_____    _____    _____
Full Last Name                   Initial of       Last 4 Digits SS#
                               First Name

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, et al. | |
| Plaintiffs, | CASE NUMBER: 1:07CV00501 |
| v. | JUDGE: Richard J. Leon |
| MAARV WATERPROOFING, INC., | |
| Defendant. | |

## LOCAL RULE 7(K) STATEMENT

Pursuant to Local Rule 7(k), the following persons are entitled to be served with orders, judgments, and stipulations:

Ira R. Mitzner, Esquire
Charles V. Mehler, III, Esquire
DickStein Shapiro LLP
1825 Eye Street NW
Washington, DC 20006-5403

BY:    /s/ Alexander Nemiroff
ALEXANDER NEMIROFF
Bar No. 454408

2997126v1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN FLYNN,  et al. | |
| Plaintiffs, | CASE NUMBER:  1:07CV00501 |
| v. | JUDGE:  Richard J. Leon |
| MAARV WATERPROOFING, INC., | |
| Defendant. | |

<u>ORDER</u>

AND NOW, this _____ day of _____, 2008, upon consideration of Plaintiffs' Motion for Partial Summary Judgment and Defendant's opposition to the same, it is hereby ORDERED that said motion is DENIED.

So Ordered:


_____
, J.

3048576v1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN FLYNN, et al. | |
| Plaintiffs, | CASE NUMBER: 1:07CV00501 |
| v. | JUDGE: Richard J. Leon |
| MAARV WATERPROOFING, INC., | |
| Defendant. | |

**<u>CERTIFICATE OF SERVICE</u>**

I, Alexander Nemiroff, hereby certify that on this 10th day of January 2008, I caused the foregoing to be electronically filed with the Court and, therefore, the aforementioned document is available for viewing and downloading from the Electronic Case Filing System.

s/ Alexander Nemiroff
ALEXANDER NEMIROFF

3055610v1