IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| JOHN FLYNN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-00501 (RJL) |
| | ) | |
| MAARV WATERPROOFING, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

## PLAINTIFFS' REPLY MEMORANDUM
## IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

January 28, 2008

Ira R. Mitzner, DC Bar No. 184564
Charles V. Mehler III, DC Bar No. 475909
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D.C. 20006
(202) 420-2234

*Attorneys for Plaintiffs*

DSMDB-2385047v02

## ARGUMENT

**I.   Mr. Szamosszegi's Newly-Manufactured Position That He Could Not Read The Document He Signed Because It Was "In Fine Print And Blurry" Should Be Stricken As A "Sham Declaration" Contrary To His Deposition Testimony**

In its Opposition, Maarv asserts for the very first time in this litigation that Mr. Szamosszegi could not read the Local 5 Independent Agreement he signed because it was "in fine print and blurry."  *See* D. Mem. 1, 3, 6, 8, 10-14; Certification of Attila Szamosszegi in Opposition to Plaintiff's Motion for Partial Summary Judgment, ¶ 5.  This stunning new position, supported by a declaration, is nothing more than a desperate, eleventh hour ploy to overcome Mr. Szamosszegi's damning deposition testimony and thereby avoid entry of partial summary judgment.  Because this newfound position is directly at odds with that prior sworn deposition testimony, it constitutes a "sham declaration" which should be stricken and not considered by the Court.  *See, e.g.*, Fed.R.Civ.P. 56(g).

Parties opposing a summary judgment motion cannot create issues of fact by submitting a self-serving affidavit or declaration contracting their own prior deposition testimony.  *See, e.g., S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495-96 (5th Cir. 1996).[1]  These principles underlie Federal Rule of Civil Procedure 56(g), which authorizes courts not merely to disregard or strike sham summary judgment affidavits, but to go further and find the offender in contempt and liable for the attorney's fees and costs incurred by the opposing party as a result of the sham affidavit.  Consistent with this rule, Plaintiffs ask this Court to impose appropriate relief.

---

[1] *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995) ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy"); *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991) ("[w]hen, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists"); *Dilberti v. United States*, 817 F.2d 1259, 1263 (7th Cir. 1987) ("it is well-established that a party cannot create a genuine issue of material fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony").

During his deposition, Mr. Szamosszegi was asked directly, and more than once, whether he had read the Local 5 Independent Agreement before signing it.  In response, Mr. Szamosszegi testified that he had only "glanced" through it and that he "wasn't really paying too much attention" because he believed it pertained to work done solely by his subcontractor.  Most importantly, Mr. Szamosszegi *never said anything suggesting that he was unable to read the document because the print was too fine or blurry*:

> Q.  Did you read over this document before you signed it?
>
> A.  I just glanced through it, you know.  No, I did not.
>
> * * *
>
> Q.  Did you read this page before you signed it?
>
> A.  Probably I glanced through it but it wasn't – I didn't think since I was told it's for this particular job I wasn't really paying that much attention since my sub is doing the job, not me, so one small job, I said okay sign.

*See* P.SMF ¶ 45 (quoting Szamosszegi Dep. at 53-55).  Similarly, when asked what the first paragraph of the Local 5 Independent Agreement meant to him when he signed, Mr. Szamosszegi responded that it was "[a] lot of mumbo-jumbo" without ever suggesting that he didn't know what it meant because it was too blurry or in too fine a print to read.[2]  *See* P.SMF ¶ 66 (quoting Szamosszegi Dep. at 54-55).  And when asked whether, when he signed the Local 5 Independent Agreement, he noticed the reference to a collective bargaining agreement in the first paragraph, Mr. Szamosszegi did not even suggest an inability to read the document for any reason:

> Q.  When you signed Plaintiff's Exhibit 4 did you notice that language regarding this collective bargaining agreement with Locals 4, 5 and 2 in the first paragraph?

---

[2]  During the deposition, Mr. Szamosszegi did not have any difficulty reading the Local 5 Independent Agreement.  He testified, for instance, that "What I see now it [the Local 5 Independent Agreement] doesn't get into any specifics."  *See* Szamosszegi Dep. at 55, attached as Ex. A.

DSMDB-2385047v02

> A. I can't recall.  As I stated, it was one particular job so I wasn't really, you know, paying too much attention.

*See* P.SMF ¶ 67 (quoting Szamosszegi Dep. at 59).  Mr. Szamosszegi also testified that he had his office manager, the deceased Anne Paoella, review the Local 5 Independent Agreement before he signed it – again without saying anything about his or his officer manager's inability to read the document because it was in a fine print and blurry.  *See* Szamosszegi Dep. at 61, attached as Exhibit A.[3]

If it was Maarv's position that Mr. Szamosszegi was incapable of reading the Local 5 Independent Agreement because it was "in fine print and blurry," Mr. Szamosszegi should have testified to this when asked whether he read the document before signing it.  Plaintiffs' counsel could then have pursued this matter, cross-examining Mr. Szamosszegi on his professed failure of eyesight [the document, attached as Exhibit B, is in small print, but is perfectly legible].  Instead, Mr. Szamosszegi testified that he merely "glanced" at the document, without suggesting that this was because the document was in too fine a print or too blurry *and while providing an entirely different reason for his conduct* – because his subcontractor was the one doing the job and Mr. Szamosszegi, as a result, "wasn't really paying that much attention."  Because this testimony sets forth, clearly and unambiguously, Mr. Szamosszegi's professed reason for not reading the Local 5 Independent Agreement, there was no need or motivation for Plaintiff's counsel to question Mr. Szamosszegi further on why he didn't do more than glance at the

---

[3]  Maarv's interrogatory responses (attached as Ex. C) are also at odds with Maarv's newfound position.  Interrogatory No. 4 asked Maarv to "[s]tate the basis for, and all facts supporting" its claim that it was not bound to the 2002 CBA.  Maarv's response (never amended or supplemented) did not even hint at its newfound position that the Local 5 Independent Agreement could not be read because it was "in fine print and blurry":

> ANSWER:    It was represented that the "2004 Agreement" was a one project agreement only and I was never provided a copy of any such agreement and the agreement is otherwise unlawful.  Maarv Waterproofing specifically reserves its right to amend this response as discovery develops.

DSMDB-2385047v02

document before signing it.  Mr. Szamosszegi stated his position, under oath, and Plaintiffs are entitled to rely on this sworn testimony.

It is unfair, improper, and contrary to Rule 56(g) for Maarv to now abandon Mr. Szamosszegi's sworn deposition testimony and proffer, long after discovery and the opportunity to cross-examine Mr. Szamosszegi have passed, an entirely new reason for Mr. Szamosszegi's failure to do anything more than glance at the Local 5 Independent Agreement he signed.  This tactic runs counter to the purpose of discovery and summary judgment.  Consistent with Rule 56(g), a primary reason courts exclude "sham" declarations is because of a concern that the utility and purpose of summary judgment will be thwarted if parties are able to submit affidavits contradicting prior deposition testimony.  *See, e.g., Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991); *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168-69 (7th Cir. 1996).  The courts have emphasized that sworn deposition testimony tends to be more reliable than affidavits because it is subject to cross examination and, unlike affidavits, does not consist of statements drafted by the lawyer rather than live testimony from the witness. *See, e.g., Russell v. Acme-Evans Co.*, 51 F.3d 64, 67 (7th Cir. 1995).  Consistent with these authorities, Mr. Szamosszegi's revelation that he could not read the Local 5 Independent Agreement because it was "in fine print and blurry" should be stricken or, at a minimum, not considered on summary judgment.  Moreover, the Plaintiffs should be awarded their attorney's fees incurred in responding to this last-minute retreat from sworn testimony.

## II.    In Any Event, The Claim That The Local 5 Independent Agreement Was "In Fine Print And Blurry" Actually Weakens Maarv's Fraud In The Execution Argument

A required element of a fraud in the execution defense is "excusable ignorance" of the document signed, meaning that the party had neither knowledge "nor reasonable opportunity" to learn the nature or contents of the document.  As explained in Plaintiffs' opening brief, Mr. Szamosszegi's sworn deposition testimony precludes any conclusion that he signed the Local 5

4

Independent Agreement with "excusable ignorance." This testimony demonstrates that Mr. Szamosszegi, who is not only the owner, President, and sole officer of Maarv but also a former member of the Bricklayers union, was presented with a document which contained numerous provisions inconsistent with the local union's supposed representations that the agreement covered just one project. *See* P.SMF ¶¶ 56-70, 19. This inconsistency should have led him to follow-up with the union, to request a full copy of the 2002 CBA referenced in the document he was signing,[4] or to show the agreement to an attorney. It is undisputed that he did none of these things, not even reading the document because he "wasn't really paying that much attention." *Id.* ¶¶ 42, 45, 47-49, 68. On these facts, there is no basis for contending that Mr. Szamosszegi's professed ignorance was "excusable" or that he had no "reasonable opportunity" to find out what he was signing.[5]

Maarv obviously believes that its newly-manufactured position – that the Local 5 Independent Agreement was in such "fine print and blurry" that it could not be read – helps it overcome these facts and establish fraud in the execution. But that is not the case. This new

---

[4] Maarv mischaracterizes the depositions by stating that the local union's practice is to not offer or provide copies of CBAs to employers. *See* D.Mem. 3. The undisputed testimony is that the practice is to offer a copy of the full CBA to employers, and provide a copy to any employer that says it wants one. *See* Longo Dep. 98, attached as Ex. D; Perrone Dep. 15-16, 24, attached as Ex. E. It is undisputed that Maarv never asked the union for a copy of the 2002 CBA. *See* P.SMF ¶ 68. Also, while Maarv seeks to attach significance to the fact that Mr. Szamosszegi was not presented with the signature page contained on page 54 of the 2002 CBA, the unrebutted evidence is that the local union used the Local 5 Independent Agreement signed by Mr. Szamosszegi in place of that signature page. *See* Longo Dep. 96-98; Perrone Dep. 32-33.

[5] Maarv point to a minor difference in the title of the 2002 CBA and the CBA referenced in the first paragraph of the Local 5 Independent Agreement - the inclusion of one additional employers association in the title of the 2002 CBA. *See* D.Mem. 4, 6-7. But this is a mere inadvertent typographical error, as it is undisputed that the 2002 CBA is the CBA referenced in the first paragraph of the Local 5 Independent Agreement. *See* Longo Dep. 83, 96, 98; Perrone Dep. 38. Even Maarv has admitted that the 2002 CBA is the document referenced in the Local 5 Independent Agreement. *See* P.SMF ¶ 61. And regardless of the specific title, Mr. Szamosszegi signed a document which said that, by signing, he was agreeing that he had read the CBA referenced in the first paragraph, was agreeing to become a party to that CBA, and was agreeing to make the contributions required by that CBA, yet he never asked for a copy of that CBA or did anything to determine the provisions of that CBA.

DSMDB-2385047v02

contention actually *completely destroys* Maarv's fraud in the execution argument.   If Mr. Szamosszegi received a document that was so blurry he couldn't read it, all he had to do was ask for a legible copy.  Instead, he said nothing and just signed a document he claims he could not read.  Such facts preclude a finding that Mr. Szamosszegi's ignorance was "excusable."  If the "excusable ignorance" standard means *anything*, it means that you cannot choose to sign an agreement you admittedly are unable to read, then later claim that you didn't know what you were signing.  It is black letter law that a party cannot circumvent its duty to read the documents it signs by claiming that the words were illegible or otherwise unreadable.   As stated by one court, in words that could have been written for this case:

> The contract is difficult to read in its original form.  However, Defendant should have arranged for a contract in larger print or should have magnified the copy in its possession.  Defendant cannot claim that it is not bound by these [contracts] because it blindly signed contracts without taking any responsibility to read or understand the terms therein.

*General Electric Capital Corp. v. Marketing Research & Management, Inc.*, No. 1:00CV00983, 2001 WL 604195, *2 (M.D.N.C. May 16, 2001), attached as Exhibit F.  Indeed, even blind or illiterate persons will be bound to the contracts they sign.[6]  Thus, to the extent that this Court considers or credits Maarv's newly-preferred contention that the Local 5 Independent Agreement could not be read because it was "in fine print and blurry," partial summary judgment in favor of the Plaintiffs is even *more* appropriate.

---

[6] *See Paper Express, Ltd. v. Pfankuch Maschinen*, 972 F.2d 753, 757 (7th Cir. 1992) (even a blind or illiterate person, or a person who cannot read the language of the contract, will be bound by a contract he signs, as "a party who agrees to terms in writing without understanding or investigating those terms does so at his own peril");  *see also, e.g., Howard v. Citifinancial, Inc.*, 195 F. Supp. 2d 811, 822 (S.D. Miss. 2002) ("the rule that one 'knows' what he signs does not change when one cannot read or has trouble reading.  Rather, such person has a duty to find someone to read the contract to him.  Failure to do so is negligence.");  *see also* P.Mem. at 19.

DSMDB-2385047v02

III.    **Maarv Fails To Explain The Decisions Demonstrating That This Case Involves Fraud In The Inducement, A Defense Not Assertable Against Funds, Rather Than Fraud In The Execution**

Plaintiff's opening brief analyzed in detail the decision in *Bricklayers and Allied Craftworkers Local 2 v. C.G. Yantch, Inc.*, 316 F. Supp. 2d 130, 147-48 (N.D.N.Y. 2003), where a court, faced with virtually identical facts, found that the employer's defense was one of fraud in the inducement, not fraud in the execution. *See* P.Mem. 14. Maarv makes little to no effort to distinguish this case (or the other fraud in the inducement cases cited by Plaintiffs), merely asserting that the *Yantch* case is somehow different because there the local union official allegedly misrepresented to the employer the consequences of signing the agreement. *See* D.Mem. 11. But that is exactly what Maarv alleges occurred here.

In both *Yantch* and the present case, the employer signed a one page document stating that, by signing, the employer would become bound to the collective bargaining agreement referenced in the agreement and would make the contributions required by that agreement. In both *Yantch* and the present case, the employer claimed not to have read the one page document before signing it based on the oral assurances of a local union official that signing would obligate the employer to make contributions only for a few workers on one particular project. The cases are virtually indistinguishable.[7] As found in *Yantch*, "[s]o long as an employer knowingly signs an agreement that requires it to contribute to an employee benefit plan," it may not escape this obligation on the basis of misrepresentations regarding the scope of this contribution obligation.[8]

---

[7] Maarv's effort to distinguish *Yantch* on the basis of its newly-created assertion that the document here was "in fine print and blurry" should be rejected for the reasons stated above in the sham declaration section. And contrary to Maarv's suggestion, many fraud in the inducement cases, including *Yantch*, the cases cited in *Yantch*, and other cases cited Plaintiffs' opening brief, involve employers who claim they never received a copy of agreements to which they became bound by signing a shorter document. *See, e.g., Yantch*, 316 F. Supp. 2d at 147; P.Mem. 16, n.12 (citing *Down to Earth*, 2006 WL 1373169, *3 n.4 and *Lonnie Cromwell Masonry*, 2002 WL 31761565, *3, attached to P.Mem. as Exs. A and B).

[8] Contrary to Maarv's mischaracterization, Plaintiffs' argument is not that this case involves fraud in the inducement because Mr. Szamosszegi knew he was signing a "collective bargaining agreement" – it is fraud in the inducement because, among other reasons, he knew he was signing an agreement requiring some contributions (*see* SMF ¶ 71), a key element under *Yantch*.

DSMDB-2385047v02

*Yantch*, 316 F. Supp. 2d at 146; *see also* P.Mem. 15.  This Court should follow *Yantch* and find that these facts – misrepresentations regarding the scope of a document that Maarv admittedly knew required some contributions (*see* SMF ¶ 71) – constitute fraud in the inducement, a defense not assertable against ERISA funds such as the Plaintiffs.  *See* P.Mem. 11-15.

Unlike *Yantch*, the cases cited by Maarv in support of its contention that the union committed fraud in the execution involve quite different facts.  In *Capozza Tile Co. v. Joy*, 223 F. Supp. 2d 307, 315-19 (D. Maine 2002), the funds' motion for summary judgment was denied where there was evidence that the employer, who received and signed only a signature page, had requested a full copy of the agreement, that the union specifically told the employer that there was no need to read the rest of the agreement and that he would send it later, and that the employer specifically told the union official that he could not afford to take on any contribution obligations other than for four employees they had specifically discussed.  Because these facts supported the employer's argument that he had been tricked into signing an agreement quite different than one that merely fulfilled his stated intent to preserve the pension benefits of four employees, fraud in the execution potentially existed and summary judgment could not be granted.  *Capozza*, 223 F. Supp. 2d at 319.

*Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501 (9th Cir. 1984), did not, as suggested by Maarv, involve allegations that an employer had agreed to a collective bargaining agreement that it believed was just a one project agreement.  Rather, it involved an individual who thought he was signing merely forms to make him a member of the union as an owner-operator so that he could rent out certain equipment, when in fact what he was signing an entirely different type of document binding his business to a collective bargaining agreement.  *Gilliam*, 737 F.2d at 1503.  Ultimately, the individual never became a member of the union, never made any union contributions, and never employed any union members.  *Id.*  Fraud in the execution

applied inasmuch as the representation of the union caused the employer to mistakenly believe that the document he was signing didn't require any contributions. *Id.* at 1504-05. Significantly, the Ninth Circuit itself later distinguished *Gilliam* on the ground that the employer there justifiably thought that what he was signing involved only an application for union membership. In that later decision, *Operating Engineers Pension Trust v. Cecil Backhoe Service, Inc.*, 795 F.2d 1501, 1504-05 (9th Cir. 1986), the court noted that "[p]arties to collective bargaining agreements are conclusively presumed to have equal bargaining strength," that union business agents have no "duty to explain to the employer the terms, conditions, or consequences of a collective bargaining agreement," and that "[i]t is not a defense to claim that a union representative misrepresented the effect of signing an agreement."

Finally, in *Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel, Inc.*, 976 F. Supp. 683, 685, 690 (E.D. Mich. 1997), the employer signed a document, in the face of an imminent strike, that it believed, based on the local union president's representations, only covered a particular project. Unlike the present case, however, the name of the particular project was written by the union official right at the top of the document. *Nyeholt*, 976 F. Supp. at 686. Moreover, *the local union president in that case flatly admitted during his deposition that the document was a one-project agreement. Id.* It is also notable that while Maarv tries to attribute an underhanded motive to the union's use of the Local 5 Independent Agreement to get Maarv signed to the general CBA, the court in *Nyeholt* specifically acknowledged and endorsed unions' use of "short form agreements" of this sort:

> Typically, an employer's assent to be bound by a collective bargaining agreement is found in his or her signing of a "short form agreement." Put simply, short form agreements are agreements wherein a smaller, usually independent contractor (i.e., Nyeholt Steel) consents to be bound by a collective bargaining agreement negotiated by a union (i.e., Local No. 25) and multi-employer bargaining groups representing contractors within a particular jurisdiction (i.e., the Associations). *Carpenters Local v. W.D. George Const. Co.*, 792 F.2d 64, 68-69 (6th Cir. 1986).

9

*Nyeholt*, 976 F. Supp. at 688.[9]

**IV.    Maarv's Assertions That It Owes No Damages Even If It Is Bound To The 2002 CBA Are Without Merit**

In a few sentences on the last page of its brief, Maarv asserts that even if it is bound to the 2002 CBA, it owes no damages because the Local 5 Independent Agreement states that it applies "within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers," and Maarv "rarely if ever" performed work within that local. *See* D.Mem. 15. This argument should be disregarded, as it also has never been made before in this litigation, despite interrogatory questions specifically asking Maarv to identify all errors in the auditor's damages calculations. *See* Maarv's Response to Interrogatory Nos. 10, 11, 13, attached as Exhibit C. Regardless, this argument is without merit. In opposing the Plaintiffs' summary judgment motion, Maarv has provided nothing other than Mr. Szamosszegi's conclusory assertions of where Maarv worked or how "rarely" Maarv may have worked in Local 2. Maarv never addresses the pages of detailed documentation in the audit report outlining all of the specific employee hours for which contributions are owed, and admits that the audit report was never even shown to Maarv's accountant. *See* Szamosszegi Dep. 125. Moreover, the Local 5 Independent Agreement does not say that it requires contributions for only Local 2 work. It states that contributions are required as set forth in the 2002 CBA, which imposes an obligation to make contributions for covered work performed within Local 2, Local 4, and Local 5, as well as, pursuant to the agreement's "traveling contractors clause," in "any area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied

---

[9] In addition to fitting within the definition of a "short form agreement" as described in *Nyeholt*, the document Maarv signed was specifically described by the local union official as a "short version of a contract." *See* Longo Dep. 81, 89.

10

Craftworkers." *See* Exhibit G, at Article IX; P.SMF ¶¶ 63, 78; *Flynn v. Dick Corp.*, 481 F.3d 824, 831 (D.C. Cir. 2007) (upholding the Bricklayers traveling contractors clause).[10]

Maarv also asserts that it owes no damages because the jurisdiction of Local 2 only encompasses "Cement Masons, Plasterers & Fire Proofers," and Maarv did not employ any workers in these trades (*see* D.Mem. 15) – *another* new argument that should be ignored because it was never asserted by Maarv previously despite written discovery asking Maarv to identify all errors in the damages calculations. *See* Maarv's Response to Interrogatory Nos. 10, 11, 13, attached as Exhibit C. In any event, the argument is frivolous. The reference to "Cement Masons, Plasterers & Fire Proofers" is not part of the description of the *territorial* jurisdiction of Local 2; it is a description of the *trade* jurisdiction of Local 2. *See* 2002 CBA at Article III(G), attached as Exhibit G. While the Local 5 Independent Agreement contains a reference to the *territorial* jurisdiction of Local 2, it does not contain any language even arguably suggesting that its scope is limited to the *trade* jurisdiction of Local 2. *See* Exhibit B. Rather, it encompasses all terms and conditions, including all the numerous trades, of the 2002 CBA.[11]

---

[10] Even if there were a question as to whether the Local 5 Independent Agreement limits the contribution obligation to Local 2 work, damages would still be owed for whatever work Maarv performed within that local. This Court would still be able to enter partial summary judgment on the overriding issue in this case – whether Maarv is bound to the 2002 CBA – with damages to be determined.

[11] In the Facts, though not the Argument, section of its brief Maarv asserts that the audit incorrectly labeled most Maarv workers as "cleaners-waterproofers." *See* D.Mem. 5. But the auditor's declaration and report state that classification of Maarv's employees was done by Maarv's now-deceased office manager, Anne Paoella, who identified Maarv's employees as laborers doing waterproofing and caulking work. *See* P.SMF ¶ 123. For this reason, the hours worked by these individuals were included in the damage calculations. *Id.* ¶ 128. Maarv never responds to the detailed damages evidence presented by the auditor and admits that it never even showed the audit report to its accountant. *See* Szamosszegi Dep. 125. Rather, Maarv's only response to Plaintiffs' evidence is Mr. Szamosszegi's speculation (despite his deposition admissions that he doesn't know what Anne told the auditors, *see* Szamosszegi Dep. 109-112) that Ms. Paoella "would have been adamant" that Maarv employees did not perform covered work under the 2002 CBA. *See* Certification of Attila Szamosszegi in Opposition to Plaintiff's Motion for Partial Summary Judgment, ¶ 12. Similarly, although Mr. Szamosszegi asserts that Maarv performs its work through subcontractors, Ms. Paoella told the auditors otherwise. *See* P.SMF ¶ 130. Regardless, because Article XVII of the 2002 CBA (attached as Ex. G) required Maarv to subcontract only to union companies, any breach of this obligation by Maarv would still subject it to liability for delinquent contributions. *See, e.g., Flynn v. Dick Corp.*, 481 F.3d 824, 832 (D.C. Cir. 824) (finding the employer

DSMDB-2385047v02

## CONCLUSION

For the foregoing reasons, as well as those stated in Plaintiffs' opening memorandum, the Plaintiffs' motion for partial summary judgment on the 2002 CBA should be granted and judgment entered in favor of the Plaintiffs in the amount of $129,308.05, plus reasonable attorney's fees and expenses, in an amount to be determined.

Respectfully submitted,

Dated: January 28, 2008                    By:

Ira R. Mitzner, DC Bar No. 184564
Charles V. Mehler III, DC Bar No. 475909
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006-5403
(202) 420-3674

*Counsel for Plaintiffs*

---

liable under a similar subcontracting clause for the benefit contributions that would have been paid had Maarv not breached the clause); *Chi. Painters & Decorators Pension, Health & Welfare & Deferred Sav. Plan Trust Funds v. Karr Bros., Inc.*, 755 F.2d 1285, 1290 (7th Cir. 1985) (same); *Trs. of the Teamsters Constr. Workers Local No. 13 v. Hawg N Action, Inc.*, 651 F.2d 1384, 1386-87 (10th Cir. 1981) (same).

DSMDB-2385047

EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____    CASE NO.: 1:07CV00501(RJL)

JOHN FLYNN, JAMES BOLAND,
GERALD O'MALLEY, KEN LAMBERT,
GERARD SCARANO, H.J. BRAMLETT,
EUGENE GEORGE, PAUL SONGER,
WILLIAM McCONNELL, MATTHEW
AQUILINE, GREGORY R. HESS,
MICHAEL SCHMERBECK, VINCENT
DELAZZERO, and BENJAMIN CAPP,
as Trustees of, and on behalf        ORAL DEPOSITION OF
of, the
BRICKLAYERS & TROWEL TRADES
INTERNATIONAL PENSION FUND,          ATTILA SZAMOSSZEGI
    620 F Street, N.W.
    Washington, DC 20004
    202-783-3788,
                                        *   *   *   *   *
JIM ALLEN, MATTHEW AQUILINE,         OCTOBER 24, 2007
LON BEST, JAMES BOLAND, TED            *   *   *   *   *
CHAMP, RAYMOND CHAPMAN,
VINCENT DELAZZERO, BRUCE
DEXTER, JOHN FLYNN, EUGENE
GEORGE, GREGORY HESS, FRED
KINATEDER, DAN KWIATKOWSKI,
KEN LAMBERT, SANTO LANZAFAME,
DICK LAUBER, WILLIAM McCONNELL,
EDWARD NAVARRO, GERALD O'MALLEY,
JOHN PHILLIPS, CHARLES RASO,
MARK ROSE, KEVIN RYAN, GERARD
SCARANO, MICHAEL SCHMERBECK,
PAUL SONGER, JOSEPH SPERANZA,
and FRED VAUTOUR
as trustees of, and on behalf
of, the
INTERNATIONAL MASONRY INSTITUTE
    620 F Street, N.W.
    Washington, D.C. 20004
    202-783-3788

_____
(Caption Continued)

MASTROIANNI & FORMAROLI, INC.
Certified Court Reporting and Video Conferencing
251 South White Horse Pike - Suite 200
Audubon, New Jersey 08106
856-546-1100

Attila Szamosszegi                                    October 24, 2007

| Page 50 |
|---|

1   project?
2      A.  No.  I never met anybody.
3      Q.  You never met with a Dominic Longo?
4      A.  No.
5      Q.  Do you know Dominic Longo?
6      A.  No, I don't.
7      Q.  Do you recognize that name?
8      A.  Well, recently just.
9      Q.  Just from the lawsuit?
10     A.  Yeah.
11     Q.  How did it come about that you signed this
12  agreement?
13     A.  How did it come about?
14     Q.  Yes.
15     A.  What I recall is my secretary told me one day she
16  talked to a person called Ivan Pallos, he was from
17  Pallos Construction Company.
18     Q.  Your secretary spoke with somebody from Pallos
19  Construction?
20     A.  Right.  Pallos Construction was doing the work on
21  the Princeton Parking Garage.
22     Q.  What work were they doing?
23     A.  Caulking.
24     Q.  Were they doing it as your subcontractor?
25     A.  Yes.

| Page 51 |
|---|

1      Q.  So your secretary -- which secretary was this?
2      A.  Anne.
3      Q.  Was she the office manager at that time, as well?
4      A.  Yes.
5      Q.  So she got a call from somebody at Pallos
6  Construction?
7      A.  And they said, Look, they are going to send up an
8  agreement for this particular job and we have to hire a
9  union guy and they wouldn't accept his signatures.
10     Q.  Wouldn't accept Pallos?
11     A.  Pallos.  They want Maarv to sign the paper,
12  agreement for that job.  So it was faxed up to us and
13  Anne filled it out and I signed it.
14     Q.  Was that the only discussion you had with Anne
15  about this?
16     A.  I think so.
17     Q.  Did you ever talk with anybody at Pallos yourself
18  about this?
19     A.  I talked to Ivan.
20     Q.  That was the head of the company?
21     A.  Yeah.
22     Q.  What did he tell you?
23     A.  He said he talked to gentleman from the union and
24  they came out, they have a check regarding that he needs
25  to hire a union guy.

| Page 52 |
|---|

1      Q.  Because it was a union job?
2      A.  I guess union was slow.
3      Q.  What do you mean the union was slow?
4      A.  The jobs are slow so a lot of union members
5  sitting in the union hall so they come around and they
6  ask you to take one of their guys.
7      Q.  Did you or Pallos feel obligated to take on a
8  union guy?
9      A.  I don't know what Pallos felt.
10     Q.  What about you?
11     A.  Well, I subbed it out to him the whole job so I
12  couldn't care less one way or the other what he does.
13  It's his job.
14     Q.  Did this person from Pallos ever say whether it
15  was Dominic Longo he had talked with?
16     A.  Yeah.  He implied they had a talk and they ask
17  him to tell Maarv to sign the paper for this particular
18  job, you know, sign the page or whatever you call it.
19     Q.  Did he give the -- did he mention the name
20  Dominic Longo to you?
21     A.  I don't recall whether he mentioned it or not,
22  you know.
23     Q.  Did he ever explain to you why the union wouldn't
24  accept Pallos Construction as the signature on this?
25     A.  No.  He just said they want Maarv to sign it.

| Page 53 |
|---|

1      Q.  And Anne never explained that to you either?
2      A.  Explained what?
3      Q.  Why the union wouldn't accept Pallos Construction
4  on this page?
5      A.  Not that I recall.  No.
6      Q.  Did you ask Pallos -- after you received this
7  page marked as Plaintiff's Exhibit 4, did you ask the
8  person at Pallos Construction any questions about what
9  was on this page?
10     A.  What was on this page?
11     Q.  Yes.
12     A.  No.  We just talked about general, what is this.
13  He says, Look, we need to sign it for this job because
14  we have a union guy, he had to hire a union guy and in
15  order for me to do that we have to sign this page.
16     Q.  Had he already hired a union guy?
17     A.  No.  After that -- I don't know.  I really don't
18  know.  That's a good question.  I don't know.
19     Q.  Did you ever discuss with the person from Pallos
20  Construction what Plaintiff's Exhibit 4 meant?
21     A.  He said that's the agreement with the union for
22  that particular job.
23     Q.  And he specifically said for that particular job?
24     A.  Yes.  Yes.
25     Q.  Did you read over this document before you signed

Pages 50 to 53

Attila Szamosszegi                                October 24, 2007

Page 54

1  it?
2      A. I just glanced through it, you know. No, I did
3  not.
4      Q. Did you ever call anybody at the union about this
5  page before signing it?
6      A. No.
7      Q. If you look at the first paragraph.
8      A. Okay.
9      Q. I know it's small writing. It says, The
10  undersigned employer has read and hereby approves the
11  signed collective bargaining agreement between the
12  Building Contractors Association of New Jersey and the
13  Masonry Contractors Association of New Jersey dated
14  November 1st, 2002, and Bricklayers and Allied
15  Craftworkers Locals No. 4, No. 5 of New Jersey and Local
16  No. 2 of Delaware-New Jersey and any successor
17  collective bargaining agreement subsequently negotiated
18  between said parties and herewith accepts and becomes
19  one of the parties thereto and agrees to be bound by all
20  the terms and conditions of the effective collective
21  bargaining agreement and such successor agreements as
22  may be negotiated from time to time.
23      What did that paragraph mean to you?
24      MR. DIAZ: Objection to the form. You are
25  assuming he even read it.

Page 55

1      A. A lot of mumbo-jumbo. I don't even know what is
2  the collective bargaining. What am I agreeing to? This
3  is one page over here. What I see it now it doesn't get
4  into any specifics.
5      Q. Did you read this page before you signed it?
6      A. Probably I glanced through it but it wasn't -- I
7  didn't think since I was told it's for this particular
8  job I wasn't really paying that much attention since my
9  sub is doing the job, not me, so one small job, I said
10  okay sign.
11      Q. You were told by Pallos Construction that it was
12  for one job?
13      A. Excuse me?
14      Q. You were told by Pallos Construction that this
15  just covered one job?
16      A. I think it was yeah, Pallos, and also I believe,
17  as I said, Anne talked to them.
18      Q. Anne talked to Pallos?
19      A. And probably Anne talked to the union guys.
20      Q. Do you know whether she talked to the union guys?
21      A. Do I know?
22      Q. Yes.
23      A. What?
24      Q. Do you know whether Anne talked to the union guys
25  or are you speculating?

Page 56

1      A. No. She mentioned something this is the one job.
2  That's why I signed it. Ivan called and the union
3  called this is one job, fill out and send back to them.
4      Q. Anne specifically told you she spoke with the
5  union?
6      A. Yeah. Otherwise I wouldn't have signed it. I
7  had no gain by it. What do I have to gain by it?
8      Q. Who did she say she spoke with at the union?
9      A. I don't know. She said union official. She
10  didn't get into specifics.
11      Q. She was told both by a union official and by
12  Pallos Construction that this was for one job?
13      A. Right. That is correct.
14      Q. Did you personally speak with anybody at the
15  union about this?
16      A. No, I haven't. I didn't feel like I need to.
17      Q. Pallos Construction also told you that they had
18  spoken with the union who told them it was for one job?
19      A. Right. That is correct.
20      Q. And I believe you testified previously that the
21  person Pallos said they spoke with was Dominic Longo?
22      A. If that's what the job came in, I don't know. I
23  didn't testify because I don't know.
24      Q. Do you know whether Anne ever spoke with anyone
25  from the International Bricklayers Union about this

Page 57

1  document?
2      A. Why should she? Where would she get a phone
3  number from?
4      MR. DIAZ: Do you know?
5      Q. I am just wondering if you know if she did?
6      A. No. No.
7      Q. You don't know whether she did?
8      A. No. I don't know.
9      Q. And you never spoke with anybody from the
10  international union?
11      A. Nope.
12      Q. And you are not aware of Pallos ever speaking
13  with anybody from the international union?
14      A. Not that I am aware of.
15      Q. Do you know whether Anne ever spoke with anyone
16  from the Bricklayers and Trowel Trades International
17  Pension Fund regarding this document?
18      A. Not until they show up at our office.
19      Q. For the audit?
20      A. Yeah.
21      Q. You personally never spoke with anybody from the
22  IPF?
23      A. No.
24      Q. Are you aware of Pallos ever speaking with
25  anybody from the IPF?

Pages 54 to 57

Attila Szamosszegi                                    October 24, 2007

Page 58

1    A. I don't know. I can't speak on his behalf.
2    Q. But you are not aware of anyone from the IPF,
3  which is the International Pension Fund, ever telling
4  you that this document covered just one project?
5    A. Come again? I am sorry.
6    Q. You are not aware of anyone from the IPF, which
7  is the International Pension Fund, ever telling you or
8  Anne or Pallos Construction that this document covered
9  just one project?
10    A. Why would they know we even exist?
11    Q. I want to make sure you are not aware of any
12  evidence of that?
13    A. How would they know we even exist?
14    Q. You are not aware of anyone from the
15  international union ever talking to them and saying this
16  was for one project?
17    A. We don't deal with the international. We dealt
18  with the local union.
19    Q. So your answer would be no, you are not aware of
20  any evidence; is that correct?
21    A. Yes.
22    Q. Let me show you another document.
23        MR. MEHLER: Douglas, it's 709 to 738.
24        Mark that as Plaintiff's Exhibit 5, please.
25        (P-5 marked for identification.)

Page 59

1    Q. Take a look at that. Let me know when you are
2  ready.
3    A. This is? What am I looking at?
4    Q. This is a collective bargaining agreement with
5  Locals 4, 5 and 2 of the Bricklayers.
6    A. Okay. Do I need to read it through?
7    Q. No. I won't ask you about the specific terms.
8  Just read through and let me know if you are familiar
9  with it.
10    A. No. I am not.
11    Q. Have you seen it before?
12    A. No.
13    Q. Did you understand that by signing Plaintiff's
14  Exhibit 4 you were agreeing to Plaintiff's Exhibit 5?
15    A. No. It was for one job. One particular job,
16  Princeton.
17    Q. When you signed Plaintiff's Exhibit 4 did you
18  notice that language regarding this collective
19  bargaining agreement with Locals 4, 5 and 2 in the first
20  paragraph?
21    A. I can't recall. As I stated, it was one
22  particular job so I wasn't really, you know, paying too
23  much attention.
24    Q. Do you know if anyone ever got anything in
25  writing from the union saying that Plaintiff's Exhibit 4

Page 60

1  just covered that one particular job?
2    A. I don't know.
3    Q. You are not aware of any documents?
4    A. No. I am not aware of.
5    Q. Did you ever ask the union for a copy of the
6  agreement referenced in the first paragraph of
7  Plaintiff's Exhibit 4?
8    A. I wasn't even aware of this agreement.
9    Q. So when you signed Plaintiff's Exhibit 4 you
10  thought you were signing a collective bargaining
11  agreement but just for that one project?
12        MR. DIAZ: Objection to the form.
13    A. Well, I am signing a union paper for that
14  particular job, yeah.
15    Q. What did you think that union paper required?
16    A. Hire the union guy and pay his guys.
17    Q. What about fringe benefits contribution?
18    A. And the fringe benefits, whatever on that
19  particular job for union guys.
20    Q. Did it require you pay a particular wage rate to
21  the employees?
22    A. I am sure.
23    Q. Did you understand the agreement as allowing you
24  to hire nonunion guys for that job, as well?
25        MR. DIAZ: Objection to the form. What

Page 61

1  agreement are we referring to?
2        MR. MEHLER: Plaintiff's Exhibit 4.
3        MR. DIAZ: Okay. Objection to the
4  agreement, but go ahead.
5    A. What was the question again?
6    Q. By signing Plaintiff's Exhibit 4 did you
7  understand it as requiring you to hire only union guys
8  or you could also hire nonunion guys?
9    A. Also nonunion.
10    Q. And if nonunion guys were hired, did you believe
11  that dues needed to be paid for them?
12    A. No.
13    Q. Did you believe that fringe benefit contribution
14  needed to be paid for them?
15    A. No.
16    Q. Did you believe that a certain wage rate had to
17  be paid to them?
18    A. No. As far as I was concerned this was for union
19  guys only. That's why we had to hire the union guy. As
20  far as I know it informs us and the union guy gets so
21  much money and benefits, I guess. And that's it.
22    Q. Did you have anybody else in your office review
23  Plaintiff's Exhibit 4 before you signed it?
24    A. Anne. Anne.
25    Q. Did you have your attorney review it?

Pages 58 to 61

Attila Szamosszegi                                    October 24, 2007

## Page 106

1   A. I don't know.
2   Q. You don't know?
3   A. I don't recall anything else.
4   Q. Would you be aware if Pallos still owed you money
5   that they hadn't paid?
6   A. Probably.
7   Q. Do you know whether there is a copy of this
8   document anywhere in Maarv's offices?
9   A. No. This is it.
10  Q. Did you search for documents related to -- like
11  this?
12  A. Yeah. Anne put everything together, whatever is
13  required over there when they came in and audited us.
14      MR. MEHLER: 755, Plaintiff's Exhibit 19.
15      (P-19 marked for identification.)
16  Q. Do you recognize this document?
17  A. Yeah. By just looking at it, yeah.
18  Q. What is it?
19  A. Let me read it. It's the Benefit Funds.
20  Q. You see up in the upper right-hand corner it says
21  Weekly Shop Steward Report?
22  A. Okay.
23  Q. Do you know what a Shop Steward Report is?
24  A. Yeah. That's a union representative.
25  Q. Something the union representative submits to the

## Page 107

1   union?
2   A. Yes.
3   Q. And is it a union representative who is working
4   on the job?
5   A. Yes.
6   Q. Who decides on who the shop steward is; is it the
7   employer?
8   A. The union.
9   Q. The union?
10  A. The union.
11  Q. And it reflects at the bottom William Mills is
12  the shop steward?
13  A. Okay. Then he is the stop steward.
14  Q. I think you testified previously you don't
15  recognize that name?
16  A. No.
17  Q. Do you know what information is supposed to be
18  included on a Shop Steward Report?
19  A. No. Besides what I am looking at over here?
20  Q. Do you know what employees are supposed to be
21  listed on a Shop Steward Report?
22  A. I guess who is on the job.
23      MR. DIAZ: Note the instruction not to
24  guess. Either you know or you do not.
25  A. I don't know.

## Page 108

1   Q. Do you know why Peter Cuomo would be listed on
2   this Shop Steward Report?
3   A. Probably he worked on the job.
4   Q. Was he a member of the union?
5   A. No.
6   Q. Did you see any Shop Steward Reports at the time
7   the Fort Lee project was going on?
8   A. No, I haven't.
9   Q. Is that something as the employer you would
10  typically see?
11      MR. DIAZ: Objection to the form. Go ahead.
12  A. I don't know because I don't have too many union
13  jobs so, you know.
14  Q. Have there been union jobs where you have
15  received copies of the Shop Steward Reports?
16  A. I don't know.
17  Q. Have you personally received benefit statements
18  from any Bricklayer Funds?
19  A. No.
20  Q. But contributions have been made on your behalf
21  in the past I think you testified to previously?
22  A. I don't recall seeing anything.
23  Q. Now, you are aware that a few years back the
24  plaintiffs in this lawsuit hired an auditor to look at
25  your books and records?

## Page 109

1   A. Yeah.
2   Q. When did you become aware of that?
3   A. When they called.
4   Q. Did they call and speak with you?
5   A. No. They spoke to Anne.
6   Q. Do you remember who contacted her specifically?
7   A. No.
8   Q. Was Anne the one at Maarv that dealt with the
9   auditor?
10  A. Absolutely, yeah.
11  Q. Did you deal with the auditor at all?
12  A. No.
13  Q. Did you meet the auditor?
14  A. I might see them over there, but, you know.
15  Q. Did you speak with the auditor on the phone?
16  A. No.
17  Q. It was Anne dealing with it?
18  A. Yeah.
19  Q. Did Anne keep you updated on what was going on
20  with the audit?
21  A. Some, but you know she mentioned they were
22  looking for three persons who worked for us supposedly.
23  That's why they coming down to look for those three
24  particular persons.
25  Q. What did you tell her when she said that to you?

Pages 106 to 109

Attila Szamosszegi                                          October 24, 2007

Page 110

1   A. I said those persons never worked for us.
2   Q. But you still allowed the auditor in?
3   A. Yes. Stupid me, yes.
4   Q. Why did you allow the auditor in?
5   A. Because they were looking for three persons who
6   never worked for me. It's as simple as that.
7   Q. Did you feel like you were obligated to let them
8   in?
9   A. Feel like I'm obligated? As far as I could see I
10  did nothing wrong.
11  Q. Did you think you had the right to tell them, no,
12  you can't come in?
13  A. At that time I thought I was doing the right
14  thing. Little did I know.
15  Q. As the audit was going on, did Anne come to you
16  with questions about what was happening?
17  A. Not really, not that I recall.
18  Q. Did she come to you saying, Hey, they need these
19  documents, can I give them to them?
20  A. She was the office manager, so she made pretty
21  much decision as far as this is concerned, this
22  particular.
23  Q. Did she ever mention to you that she was having
24  trouble locating any documents?
25  A. Not that I recall. I know they took a lot of

Page 111

1   things out of our office.
2   Q. Did she ever tell you about any problems going on
3   with the audit?
4   A. Yeah. They couldn't find the three persons they
5   were looking for and they were getting frustrated.
6   Q. Did she tell you anything else?
7   A. No. That was the main subject, you know.
8   Because they were getting very testy because they
9   couldn't find the three persons that supposedly worked
10  for us and frustrated them.
11  Q. What did she tell you when the audit was
12  finished?
13  A. What was she supposed to tell? I don't know.
14  Q. Did she tell you that the auditor was satisfied
15  with what they found?
16  A. She just said, Look, they were very frustrated.
17  And I was very frustrated because they came in the
18  pretense of looking for three persons and when they
19  didn't find it they got into everything else.
20  Q. Anne told you that they were looking for three
21  persons?
22  A. No. The auditor, they send a letter. Once she
23  showed me, why is the audit going to take place, it
24  mentioned three persons.
25  Q. Did Anne ever tell you that the auditor was still

Page 112

1   seeking documents after they left your office?
2   A. No.
3   Q. Did Anne ever tell you that there were additional
4   documents she was supposed to send to the auditor?
5   A. No.
6   Q. Did she ever tell you that she refused to provide
7   some documents?
8   A. She was the kindest person. She always did her
9   obligation to the best of her knowledge.
10  Q. Did Anne keep any personal files at the office?
11  A. A diary?
12  Q. Just, I mean files of documents, stuff she worked
13  on that wasn't part of the official company files?
14      MR. DIAZ: Objection to the form. Go ahead.
15  A. Why should she?
16  Q. You are not aware did?
17  A. That's her office base, not her home.
18  Q. Did Anne ever tell you that the auditor was
19  asking for documents that Maarv just doesn't keep?
20  A. No. She never mentioned anything.
21  Q. Did Anne ever tell you that she received
22  certified letters from the auditor requesting documents?
23  A. No. She never mentioned it.
24  Q. Did she ever tell you that the auditors had
25  certain deadlines for Anne to provide certain documents?

Page 113

1   A. No. Because they came out so they took
2   everything. I believe they were there two and a half
3   days.
4   Q. I am referring to after they left.
5   A. I think they got everything in two and a half
6   days, you know, as far as I know. She never mentioned
7   anything else.
8   Q. Are you aware that Anne told the auditors that
9   Maarv didn't use any subcontractors during 2002 through
10  2005?
11      MR. DIAZ: Just note an objection to the
12  form. The objection is you are assuming Anne made those
13  comments.
14  Q. You can answer.
15  A. I don't know.
16  Q. Maarv did, in fact, use subcontractors during
17  that time period?
18  A. Yes. Yes, we did.
19  Q. Are you aware that Anne informed the auditor that
20  Peter Cuomo was vice-president/secretary of the company?
21      MR. DIAZ: Objection to the form. Go ahead.
22  A. No.
23  Q. Was that accurate, that he was vice-president,
24  secretary?
25  A. I don't know. I never even thought about making

Pages 110 to 113

Attila Szamosszegi                                    October 24, 2007

Page 122

1    and caulking work for you?
2        A. We subbed it out. We sub out our waterproofing.
3    Q. But in some instances you did it yourself?
4        A. Way back in the eighties, yes. We sub out our
5    waterproofing and caulking.
6        Q. And all these employees we have covered thus far
7    during these years were employees of Maarv's not
8    employees of subs?
9        A. No. They are on my payroll obviously.
10    Q. Next page, 2005.
11       A. Okay.
12    Q. Page 193.
13       A. Yes.
14    Q. Any of them do waterproofing or caulking work?
15       A. We subbed out our work.
16    Q. Next page, 194.
17       A. That was a joke over here.
18    Q. That's what I wanted to ask you about?
19       A. They came and took upon themselves. I seen this
20    page somehow.
21    Q. What does that mean to you -- I am sorry. What
22    does it mean when it says cleaner-waterproofer?
23       A. I have no idea. Everybody is waterproofing or
24    cleaner. So I don't get it.
25    Q. It wasn't your understanding that was anybody's

Page 123

1    position at Maarv, cleaner, waterproofer?
2        A. No. I just don't know where they got cleaners
3    waterproofer. Everybody. That's why when I said it was
4    a joke because they categorized people the way they
5    wanted to categorize.
6        Q. You don't know where that information came from?
7        A. Absolutely not. Not from us.
8        Q. And Anne never came to you and asked, Hey, they
9    want to know the classification of these employees, what
10    should I tell them?
11       A. No.
12    Q. Would you have relied on Anne to provide that
13    information?
14       A. Well, I was only aware if there was a question.
15    Q. But if you had known that was a question would
16    you expect Anne to just answer that or would you expect
17    Anne to come to you and figure it out?
18       A. I don't want to stipulate on it because I really
19    don't know what would be my answer.
20    Q. Would Anne know that information?
21       A. Would she know?
22    Q. Yes.
23       A. I don't think so.
24    Q. If you look about halfway down the page it does
25    have a person there, Karczag is the last name, who is

Page 124

1    listed as a caulker.
2        A. Let me just see. Yeah.
3    Q. Is that accurate for that person?
4        A. No.
5    Q. That person was not a caulker?
6        A. No. This other one, Pallos, Ivan, yeah, he was a
7    caulker.
8    Q. He was a caulker. But he is listed -- why would
9    he be listed as a caulker if you subcontracted out all
10   your calking work?
11       A. Because back when he worked in 2002 probably he
12   was doing the caulking.
13    Q. Did you have employees that did cleaning work,
14   what you would call cleaning work?
15       A. What is cleaning? Housecleaning?
16    Q. How about cleaning in preparation for restoration
17   or cement restoration?
18       A. Cleaning what? What is cleaning? That's pretty
19   objective, cleaning.
20    Q. When you subcontracted out your caulking and
21   waterproofing work, would your laborers do anything to
22   get the site or the project ready for that waterproofing
23   work?
24       A. Absolutely not.
25    Q. What about your company did do some cement

Page 125

1    restoration work?
2        A. Yes.
3    Q. Did your laborers do that work or was that work
4    subbed out?
5        A. Most of it was subbed out. A lot of work subbed
6    out.
7    Q. Some of it you did in-house?
8        A. Yes.
9    Q. Was there cleaning work associated with that in
10   preparation for the restoration?
11       A. No. There is no cleaning work whatsoever.
12   That's why I am kind of shocked. Cleaner and
13   waterproofer.
14    Q. Did you ever have your accountant review the
15   auditor's findings?
16       A. No.
17    Q. Are all of Maarv's documents kept at the office?
18       A. Yes.
19    Q. You don't keep any at home?
20       A. No.
21    Q. Are there any documents that are kept at your
22   accountant's office that you don't have at the Maarv
23   office?
24       A. No.
25    Q. Does anybody at the company use E-Mail?

Pages 122 to 125

EXHIBIT B

1920270.01

FOR BAC LOCAL 5 NJ    16093241605

MAARV WATER PROOFING INC.    P-02

000665

NJ0424

## INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
### LOCAL #5 – NEW JERSEY
### INDEPENDENT

The undersigned Employer has read and hereby approves the signed Collective Bargaining Agreement between the Building Contractors Association of New Jersey and the Masonry Contractors Association of New Jersey dated November 1, 2002, and Bricklayers and Allied Craftworkers Locals No. 4, No. 5 of New Jersey and Local No.2 of Delaware-New Jersey; and any successor Collective Bargaining Agreement subsequently negotiated between said parties and herewith accepts and becomes one of the parties thereto and agrees to be bound by all the terms and conditions of the effective Collective Bargaining Agreement and such successor Agreements as may be negotiated from time to time.

This Agreement and such successor Agreements shall be applicable within the territorial jurisdiction assigned to Local No. 2 by the International Union of Bricklayers and Allied Craftworkers. The life of this signed Independent Agreement is to be coextensive with the terms and conditions set out in the aforementioned Collective Bargaining Agreement, or as they shall be set out from time to time in any such successor Agreements as may be negotiated. The employer recognizes the Union pursuant to Section 9(a) of the National Labor Relations Act as the exclusive bargaining agent for all employees within the bargaining unit on all present and future sites within the jurisdiction of the Local Union.

The undersigned Employer further agrees to the payment of all Employee fringe benefit hourly contributions as specified in the effective Collective Bargaining Agreement, or as such hourly contributions may be increased or decreased in accordance with the provisions of the Collective Bargaining Agreement.

The undersigned Employer agrees to be bound by the applicable Declaration of Trust of each Trust Fund and hereby irrevocably designates as its representative on the Board of Trustees such Employer Trustee together with their successors as selected in the manner provided within the applicable Agreement and Declaration of Trust of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund and agrees to be bound by all actions taken by the Board of Trustees pursuant to the provisions of each Trust Fund. Agreement and Declaration of Trust instrument.

This signed Independent Agreement shall be binding upon the Employer named herein, and its successor assigns, and no provision herein contained shall be nullified or affected in any manner as a result of a consolidation, sale, transfer, assignment, encumbrance, joint venture, or any combination or other disposition of the Corporation or Company.

**MAARV WATERPROOFING INC.**
Company Name

**317 OAK STREET**
Physical Street Address

**PASSAIC, NEW JERSEY    07055**
City                     State        Zip Code

**(973) 470-0686        (973) 470-8716**
Telephone Number         Fax Number

**22-2527189**
Federal Identification Number

**608103-00-5**
New Jersey Employment Compensation Number

**ST. PAUL INSURANCE COMPANY**
Workmen's Compensation Insurance Carrier

Please complete and remit to:
BAC Local #5, New Jersey
3281 Route 206, Suite 3
Bordentown, NJ 08505
(609) 324-0500
(609) 324-1505 - Fax

Initial if you have received a full copy of this Collective Bargaining Agreement _____

_____    ATTILA SZAMOSSZEGI    FEBRUARY 4, 2004
Officers Signature          Printed Name              Date

_____    Michael R. Perrone    2/4/2004
Business Managers Signature    Printed Name            Date

_____    Dominic Longo    2/4/04
Field Representatives Signature    Printed Name         Date

EXHIBIT
Longo-1
10/23/07 DS
PENGAD 800-631-6989

Longo 1

EXHIBIT C

1920270.01

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN,  et al.,<br><br>                                   Plaintiffs,<br>v.<br>MAARV WATERPROOFING, INC.,<br>                                   Defendant. | CASE NUMBER:  1:07CV00501<br>JUDGE:  Richard J. Leon |

## <u>DEFENDANT'S RESPONSES TO  PLAINTIFF'S INTERROGATORIES</u>

Defendant Maarv Waterproofing, Inc. ("Maarv") hereby answers Plaintiffs'

interrogatories as follows:

## I.   GENERAL OBJECTIONS

1.     Maarv objects to Plaintiffs' interrogatories to the extent that they seek information

protected by the attorney-client privilege, the attorney work product doctrine, or other applicable

privileges and doctrines.

2.     Maarv objects to Plaintiffs' interrogatories to the extent they are duplicative, onerous,

overly broad and unduly burdensome.

3.     Maarv objects to Plaintiffs' interrogatories to the extent that they seek confidential,

proprietary, trade secret, financial or commercially sensitive business information

## II.   ANSWERS

1.     State the beginning and ending date of each and every period of your membership

in the BCANJ.

**ANSWER:     Maarv is not a member in the Building Contractors' Association of New
                        Jersey.**

2.      Identify any and all documents pertaining to the commencement or termination of your membership in BCANJ and/or regarding BCANJ's authority to negotiate collective bargaining agreements on your behalf.

**ANSWER:      See response to interrogatory 1.**

3.      State the basis for, and all facts supporting, your contention that you are not bound to the 2000 Agreement either because the purported signature of Maarv's President on that agreement is not authentic, or for any other reason.

**ANSWER:      I did not sign any 2000 agreement.**

4.      State the basis for, and all facts supporting, your contention that you are not bound to the 2004 Agreement either because Maarv's President executed it based on the union's representation that it was a one-project agreement, because Maarv was never provided a copy of the 2004 Agreement, or for any other reason.

**ANSWER:      It was represented that the "2004 Agreement" was a one project agreement only and I was never provided a copy of any such agreement and the agreement is otherwise unlawful. Maarv Waterproofing specifically reserves its right to amend this response as discovery develops.**

5.      Identify all current or former Maarv officers, directors, or employees possessing the authority to review, approve, or execute collective bargaining agreements during the relevant period. Include in your answer the titles or positions of such individuals, their last known business addresses (if not currently with Maarv), and their business and home phone numbers.

**ANSWER:      Attila Szamosszegi.**

6.      Identify all persons with knowledge of facts relevant to Maarv' s review, approval, and/or execution of the 2000 Agreement, 2004 Agreement, and/or any other Agreement(s) with the International Union of Bricklayers (or any local affiliates), to which

Maarv considered itself signatory during the relevant period. Include in your answer the last known business address, and business and home phone numbers of the identified individuals.

**ANSWER:** **Maarv objects to this interrogatory on the grounds that Maarv never executed a 2000 Agreement and never considered itself a signatory to any agreements with the International Union of Bricklayers or any local affiliates. Subject to and without waiving the foregoing objections, Attila Szamosszei has knowledge of the 2004 Agreement so defined.**

7. Identify who provided and/or inserted the address, telephone, employer's federal ID number, New Jersey employment ID number, and "insurance carrier for workmen's comp" (with policy number and term) that are set forth on the signature page to the 2000 Agreement, and state whether these facts on the 2000 Agreement are accurate.

**ANSWER:** **Unknown.**

8. State whether you recognize the handwriting reflected in the signature above the name "Attila Szamosszegi" on the signature page of the 2000 Agreement and, if so, identify whose handwriting it is.

**ANSWER:** **No.**

9. Identify all individuals authorized to sign documents on behalf of Attila Szamosszegi.

**ANSWER:** **Attila Szamosszegi.**

10. Identify any and all inaccuracies and/or errors that you claim exist in the procedures, findings, and conclusions of the Audit, including, but not limited to, any errors regarding the number of hours listed for Mr. Krystake, Mr. Kaszony, and any other employees.

**ANSWER:** **See prior correspondence to Plaintiffs' counsel identifying inaccuracies and errors. Maarv reserves the right to supplement this answer based on any other information as may be developed during discovery.**

11.    Identify all facts supporting your contention that the audit 'just lists all [Maarv]

employees and their hours of work" without establishing a connection between these Maarv

employees and Bricklayer Locals 4 and 5.

**ANSWER:    Maarv objects to this interrogatory on the grounds that the audit is reflected
in a document that speaks for itself.  Subject to and without waiving said
objection, the audit documents themselves show no connection between any
Maarv employees and Locals 4 or 5.**

12.    Identify all facts supporting your contention that contributions previously

identified by Plaintiffs as those made by Maarv in connection with a Princeton parking garage

project were not made on behalf of Maarv employees.

**ANSWER:    The workers listed were never employed by Maarv. These are employees of
South Shore Contractors.  South Shore has the contract with the union, not
Maarv.**

13.    Identify all facts supporting your contention that managers and the President of

Maarv should not have been included in the Audit.

**ANSWER:    Maarv never had a collective bargaining agreement with the union and the
managers and the President perform supervisory functions.**

14.    Identify each and every individual currently or formerly employed by Maarv

during the relevant period and describe, in detail, the type and nature of work performed by each

individual.

**ANSWER:    Maarv objects to this interrogatory as overly broad with respect to its
request for each and every current or former employee, and as vague and
ambiguous with respect to the phrase "relevant period" that is undefined.
Subject to and without waiving said objections, Maarv is in the process of
determining which individuals it employed in 2004 and will provide same.**

15.    As to each current and/or former employee of Maarv during the relevant period,

identify, by employee, whether Maarv considered each employee covered by the 2000 and/or

2004 Agreements for purposes of fringe benefit contributions, and the periods in which Maarv

considered the employee a member of BAC.

**ANSWER:** See response to interrogatory 14. By way of further answer, Maarv did not consider any of its employees covered by any collective bargaining agreements.

16. Identify all jurisdictions, by city and state, where Maarv performed work during the relevant period, including for each jurisdiction: (a) the name of the project on which work was performed; (b) the city and Street address of the job location; (c) the time period in which such work was performed; and (d) the number of employees working at each job site.

**ANSWER:** Maarv objects to this interrogatory as vague and ambiguous with respect to the phrase "relevant period" that is undefined. Subject to and without waiving said objections, Maarv recalls the work on the Princeton, New Jersey garage project.

17. Identify all persons with knowledge of facts relevant to the maintenance of employee and contributions records at Maarv during the relevant period. Your answer should include the last known business address of the individual (if no longer employed with Maarv), along with the business and home phone numbers of each identified individual.

**ANSWER:** Maarv objects to this interrogatory as vague and ambiguous as there is no maintenance of contributions records and the "relevant period" is undefined. Subject to and without waiving said objections, employee records are maintained by Maarv.

18. State the basis for, including but not limited to, all facts supporting, each of the denials in your Answer of the allegations set forth in the Complaint in this matter.

**ANSWER:** See all responses to these interrogatories and the documents produced by Plaintiffs. Maarv reserves the right to supplement this answer based on any other information as may be developed during discovery.

19. State the basis for, including but not limited to, all facts supporting, your Third Affirmative Defense that "Plaintiff has failed to exhaust its administrative remedies."

**ANSWER:** See documents regarding the collection of delinquent contributions.

20. State the basis for, including but not limited to, all facts supporting, your Sixth Affirmative Defense that "Plaintiff has failed to mitigate its damages."

**ANSWER:** Plaintiffs have failed to timely advise of any alleged delinquent contributions.

21.    State the basis for, including but not limited to, all facts supporting, your Seventh Affirmative Defense that "any agreements with the Plaintiffs were procured by fraud by Plaintiffs."

**ANSWER:** Plaintiffs advised that the 2004 agreement was a one project agreement only and this agreement also speaks for itself. Maarv expects other facts to be developed through discovery.

22.    Provide the name, last known business addresses, and business and home phone numbers, of all persons with knowledge of facts regarding any claims or defenses in this lawsuit, along with a summary of each such person's knowledge relevant to this lawsuit.

**ANSWER:**   See Maarv's Initial Disclosures.

ARCHER & GREINER
One Centennial Square
Haddonfield, NJ 08033
(856) 795-2121
Attorneys for Defendant

BY:_____
ALEXANDER NEMIROFF
Bar No. 454408
PETER L. FRATTARELLI
DOUGLAS DIAZ
Admitted *pro hac vice*
One Centennial Square
Haddonfield, New Jersey 08033
(856) 795-2121
Attorneys for Defendant

Dated: September 27, 2007

EXHIBIT D

Dominic Longo                                                October 22, 2007

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No. 07-cv-0501 (RJL)

_____

JOHN FLYNN, JAMES BOLAND, GERALD
O'MALLEY, KEN LAMBERT, GERARD SCARANO,
H.J. BRAMLETT, EUGENE GEORGE, PAUL
SONGER, WILLIAM McCONNELL, MATTHEW
AQUILINE, GREGORY R. HESS, MICHAEL
SCHMERBECK, VINCENT DELAZZERO, and
BENJAMIN CAPP,
as Trustees of and on behalf of the
BRICKLAYERS & TROWEL TRADES
INTERNATIONAL PENSION FUND,
    620 F Street, N.W.          ORAL DEPOSITION OF
    Washington, DC 20004       DOMINIC LONGO
    (202) 783-3788,
JIM ALLEN, MATTHEW AQUILINE, LON BEST,
JAMES BOLAND, TED CHAMP, RAYMOND
CHAPMAN, VINCENT DELAZZERO, BRUCE
DEXTER, JOHN FLYNN, EUGENE GEORGE,
GREGORY HESS, FRED KINATEDER, DAN
KWIATKOWSKI, KEN LAMBERT, SANTO
LANZAFAME, DICK LAUBER, WILLIAM
McCONNELL, EDWARD NAVARRO, GERALD
O'MALLEY, JOHN PHILLIPS, CHARLES
RASO, MARK ROSE, KEVIN RYAN, GERARD
SCARANO, MICHAEL SCHMERBECK, PAUL
SONGER, JOSEPH SPERANZA, and FRED
VAUTOUR,
as Trustees of and on behalf of the
INTERNATIONAL MASONRY INSTITUTE,
    620 F Street, N.W.
    Washington, DC 2004
    (202) 783-3788

_____

(CAPTION CONTINUED)

\*   \*   \*   \*   \*
Monday, October 22, 2007
\*   \*   \*   \*   \*

MASTROIANNI & FORMAROLI, INC.
Certified Court Reporters and Videoconferencing
251 South White Horse Pike, Suite 200
Audubon, New Jersey 08106
856-546-110

Dominic Longo                                    October 22, 2007

Page 78

1    A.    Report of hours.  It's a simple form
2    where you put the name of the member, Social Security
3    and the amount of hours worked by the day and date,
4    strictly for tracking.
5        Q.    And where does that go to?  Where does
6    that report get submitted?
7        A.    It gets submitted to Local 5, and from
8    there it's submitted to the pension and welfare
9    boards.
10       Q.    Does Mr. Rivera still do work through
11   the local?
12       A.    Yes, he does.
13       Q.    Do you know what job he is presently on?
14       A.    No, I don't.
15       Q.    Okay.  Do you know his address?
16       A.    Not offhand.  The office will have it.
17       Q.    Okay.
18       A.    Usually, the list I deal with is
19   strictly phone number lists.
20       Q.    All right.  After you had Mr. Rivera go
21   to the job in Princeton did you have any
22   communications with Maarv Waterproofing again?
23       A.    I don't think so.
24       Q.    Okay.  The lawsuit is the first time
25   they came up again, to you at least?

Page 79

1        A.    I might have made -- I think I made a
2    follow-up phone call on benefits.
3        Q.    Do you know when that was?
4        A.    No.  You know, relatively maybe a month
5    or two after it, you know, a simple phone call which
6    I make all the time saying, you know, you are
7    delinquent X amount of benefits.
8        Q.    Did you make that phone call, or you
9    said you think you made it?
10       A.    I made that phone call.
11       Q.    Okay.  And who did you speak to?
12       A.    I cannot remember at this time.
13       Q.    Was it a man or a woman?
14       A.    I believe it was a woman, I believe.
15       Q.    Can you tell me what you said in the
16   phone call and what the other person said in
17   response?
18       A.    Basically, I said, you know, benefits
19   for the job, and basically I believe they said okay.
20   Again, it was just -- you know, when you have a
21   dispute, you tend to remember things a little more
22   than just like if things go along like they are
23   supposed to go along.
24       Q.    Okay.  You said this was a couple months
25   after the contract was signed?

Page 80

1        A.    I would think so.
2        Q.    Yes.
3        A.    Most likely they came up delinquent on
4    the sheet and then, you know...
5        Q.    What sheet?
6        A.    We have a delinquency sheet.
7        Q.    And you said they were delinquent in
8    respect to benefits.  Is that the benefits on the
9    Princeton job?
10       A.    Yes, which they paid.
11       Q.    So you received payment after the phone
12   call?
13       A.    Yes.
14       Q.    Did you have any other communications
15   with Maarv Waterproofing after that?
16       A.    No.
17            MR. DIAZ:  Let's mark a few documents
18   here.  Longo-1.
19            (Exhibit No. Longo-1, Cover sheet for
20   agreement with Local No. 5, was marked for
21   identification.)
22       Q.    We have given you what we have marked as
23   Longo-1, Mr. Longo.
24       A.    Yes.
25       Q.    Take a moment and look at that and tell

Page 81

1    me if you are familiar with that document.
2        A.    Yes, I am.
3        Q.    Can you tell me what this document is?
4        A.    It's the cover sheet for an agreement
5    with Local No. 5, and I believe it also covered Local
6    2 and Local 4.
7        Q.    What do you mean when you say it's a
8    cover sheet?
9        A.    It's the short version of the contract.
10       Q.    It's a short version of a contract.
11       A.    Uh-huh.
12       Q.    Of which contract?
13       A.    Of the local agreement for Local No. 5.
14       Q.    Do you know whose handwriting that is up
15   on the top?  It says Maarv Waterproofing, Inc. and
16   then there's some numbers and letters.
17       A.    You mean up here?
18       Q.    Yes.
19       A.    No.
20            MR. MEHLER:  For the record, you are
21   referring to the upper-right-hand corner of the
22   document.
23       A.    Right here, you mean?
24       Q.    Right here in the upper-right-hand
25   corner, see it says Maarv Waterproofing, Inc.?

Pages 78 to 81

Dominic Longo                                                    October 22, 2007

Page 82

1    A.    Yes.
2    Q.    And the numbers next to that, do you
3  know whose handwriting that is?
4    A.    No.
5    Q.    Is your signature on this document?
6    A.    Yes.
7    Q.    Okay.
8         MR. DIAZ:  We can mark this as Longo-2.
9         (Exhibit No. Longo-2, Contract, was
10  marked for identification.)
11   Q.    All right.  Mr. Longo, I have given you
12  what we have marked as Longo-2.  I am just going to
13  represent this is the contract that was attached to
14  the first amended complaint, I think, as Exhibit B.
15   A.    This is just a copy of the contract.
16   Q.    Okay.
17   A.    Am I correct?
18   Q.    I don't know.  I'm sorry, this was the
19  contract that was submitted to the first amended
20  complaint as Exhibit B from the International.  Have
21  you seen this document before?
22   A.    I'm not sure.  I have to look at it.
23   Q.    Okay.  Take your time.
24   A.    This appears to be just a standard
25  working agreement.

Page 83

1    Q.    Okay.  Is this the contract
2  referenced --
3         MR. MEHLER:  You want to take a look at
4  that?
5         MR. DIAZ:  Sorry.
6    Q.    Take a moment.
7         MR. MEHLER:  Yes, it's what was
8  attached as Exhibit B.
9    Q.    Is Longo-2, the contract that we marked
10  as Longo-2, is that the contract that is referenced
11  in Longo-1?
12   A.    Yes.
13   Q.    Longo-2, it notes it's an agreement
14  between Building Contractors Association of New
15  Jersey, Masonry Contractors of New Jersey and
16  Building Contractors Association of Atlantic County.
17  And the Atlantic County part is not in the signature
18  page document or Longo-1.
19        MR. MEHLER:  Just a standing objection.
20  I assume you are going to ask him questions about
21  these two documents.
22        MR. DIAZ:  All right.
23        MR. MEHLER:  Objection on the grounds
24  that these documents speak for themselves.
25        MR. DIAZ:  Okay.  That's fine.

Page 84

1    Q.    My question is, at least what I am
2  seeing is, is the contract, which is Longo-2, do you
3  see where it says Building Contractors Association of
4  Atlantic County?
5    A.    Yeah.
6    Q.    And if you look on Longo-1 and the first
7  paragraph, I am not seeing Building Contractors
8  Association of Atlantic County referenced there, so I
9  am trying to understand which contract Longo-1 is
10  referring to.
11   A.    Building Contractors Association and
12  other signatory employers.  I don't know.  And
13  Local 4, 5 and 2.  I don't know what to tell you.
14   Q.    Okay.  You don't --
15   A.    Other than you mean with the Atlantic
16  County?
17   Q.    Yes, that's the contract that I have, at
18  least that was attached to the first amended
19  complaint, and I'm trying to see -- if you are
20  telling me this is -- Longo-2 is what is referenced
21  in Longo-1, I am trying to understand why the
22  reference to Atlantic County is not in Longo-1, if
23  you know.
24   A.    No, I don't know.
25   Q.    Did you ever give what has been marked

Page 85

1  as Longo-2 to Maarv Waterproofing?
2    A.    I gave Maarv the latest up-to-date
3  agreement I had at the time.
4    Q.    Which would have been what?
5    A.    I'm not sure.  I knew, you know, there
6  was -- I don't know.  I don't -- I wasn't involved in
7  the negotiations or the writing up of the book one
8  way or the other, so.  It's something you might have
9  to discuss with Tolson maybe.
10        MR. MEHLER:  I believe he is just
11  asking you what you gave the individual you believe
12  was Attila.
13   A.    I'm not, I'm not positive.
14   Q.    Are you --
15   A.    You know, you are asking me whether,
16  whether...
17   Q.    Did you even give him a contract?
18   A.    Yeah.
19   Q.    Are you sure?
20   A.    Yes.  How you do you think -- no
21  disrespect, how do you think he got it?
22   Q.    I don't know.  Well, let's try this way.
23        MR. DIAZ:  We can mark this as Longo-3.
24        Exhibit No. Longo-3, Copy of the fax
25  sent to Maarv Waterproofing, was marked for

Pages 82 to 85

Dominic Longo                                                                October 22, 2007

Page 86

1    identification.)
2        Q.    I've given you what we have marked as
3    Longo-3.
4        A.    Uh-huh.
5        Q.    Do you recognize that document?
6        A.    Yes, I do.
7        Q.    Can you tell me what that is?
8        A.    It appears to be the copy of the fax
9    that I sent Maarv Waterproofing.
10       Q.    Okay. And on the first page, is that
11   your handwriting?
12       A.    Some of it is and some of it is not.
13       Q.    Which is your handwriting?
14       A.    Review and sign, Dominic Longo, phone
15   number. Princeton PG and Building A project is not,
16   is not my handwriting.
17       Q.    Okay. How about the information on the
18   top where it's got the name, R Waterproofing, cc
19   Attila from --
20       A.    That's mine.
21       Q.    Number of pages, including cover, five.
22   It's checked for review and please reply. Is that
23   your handwriting as well?
24       A.    Yeah.
25       Q.    Okay. I asked if you sent him the

Page 87

1    contract because the fax shows five pages, and the
2    first page --
3        A.    I wouldn't fax him the contract.
4        Q.    You wouldn't fax him the contract.
5        A.    No.
6        Q.    Why not?
7        A.    Documentation is too long for a general
8    fax. I believe I asked Attila if he wanted a copy of
9    the contract and he said no.
10       Q.    He said no. So now you remember that
11   you specifically asked Attila if he wanted the
12   contact?
13       A.    I said I believe.
14       Q.    You believe.
15       A.    Okay. Now, again, now the thing is with
16   this over here, that if I sent him -- correct me if I
17   am wrong here. If I sent him a fax, okay, and then
18   he filled in different, you know, filled in
19   information here, and I think there's no problem in
20   seeing that there's two different types of
21   handwriting.
22       Q.    You are saying that the Princeton PG and
23   Building A project is not your handwriting; is that
24   correct?
25       A.    Absolutely not.

Page 88

1        Q.    Okay. But you never faxed him a
2    Collective Bargaining Agreement?
3        A.    No, that's correct. I didn't fax him
4    any, you know...
5        Q.    You are saying that you think you
6    offered him the Collective Bargaining --
7        A.    I think. Now, the fact that -- okay.
8    You know, I think the documentations in the cover
9    letter, I think, is quite, quite sufficient to -- the
10   other thing here is just a working agreement.
11           MR. MEHLER: Just to clarify, when you
12   say collective bargaining, you are talking about
13   Longo-2 or something of that sort.
14       Q.    My question before, do you remember
15   sending Longo-2 to Mr. Attila?
16       A.    No, I did not fax him.
17       Q.    Okay. Did you give Attila Longo-2?
18       A.    I am not sure. Okay. In all honesty, I
19   can't remember if I gave him a book or not.
20       Q.    And if you did give him a Collective
21   Bargaining Agreement do you know which one it was?
22       A.    Can I see both of them and I will tell
23   you which one?
24       Q.    Well, Longo-2 is the contract. Longo-1
25   is the, what you referred to before as the cover

Page 89

1    letter.
2        A.    Well, it's a short, short version. It's
3    basically -- it's the contract minus the working
4    rules and regulations, I believe.
5            MR. DIAZ: We can do Longo-4.
6        A.    Now, on Longo-3 here -- is this Longo-3.
7            MR. MEHLER: Longo-3.
8        A.    On Longo-3, again, I would like to
9    reiterate that that is not my handwriting in the
10   middle.
11       Q.    Okay.
12       A.    Clearly.
13           (Exhibit No. Longo-4, handwritten
14   document on I. Pallos Construction letterhead,
15   Attention Local #5, numbered M-79, was marked for
16   identification.)
17       Q.    I have given you Longo-4, but before we
18   get to Longo-4, let's go back to Longo-2 for a
19   second. If you can look at the contract again. Look
20   at the last page on Longo-2.
21       A.    Right.
22       Q.    Bates No. 738.
23       A.    Yes.
24       Q.    Is that the signature page for this
25   contract which is Longo-2?

info@mfreporting.com                    Mastroianni & Formaroli, Inc.                    856-546-1100
                                    Professionals Serving Professionals

Dominic Longo                                    October 22, 2007

Page 94

1    Q.   Do you know of a company named Garden
2  State Caulking, Inc.?
3    A.   The name is familiar.
4    Q.   Okay. I am going to ask you if you are
5  familiar with any contributions they have paid or
6  haven't paid?
7    A.   No.
8    Q.   Are you aware of any disputes with that
9  company at all?
10   A.   No. Again, caulk companies come in and
11  out. They are very hard to keep track of.
12   Q.   Give me a second. I think I am wrapping
13  up here. Longo-1 --
14   A.   Yes.
15   Q.   -- which is, I am calling it a signature
16  page, have you had any other contractors sign the
17  same type of --
18   A.   Yes.
19   Q.   -- agreement or page? You have?
20   A.   Yes.
21   Q.   Do you know who those contractors are?
22   A.   Not off the top of my head.
23   Q.   Okay.
24       MR. DIAZ: I think that's all I have.
25       MR. MEHLER: I probably have a couple.

Page 95

1  Why don't we take a five or ten minute-break.
2       (Recess.)
3  (Examination of MR. LONGO by MR. MEHLER:)
4    Q.   I just want to clarify a couple
5  things --
6    A.   Okay.
7    Q.   -- that you testified to. Mr. Longo --
8  let me make sure I get this straight. Your memory is
9  Longo-1, which is this exhibit --
10   A.   Yes.
11   Q.   -- is what you provided to Maarv,
12  whether via fax or handing it to them?
13   A.   That is absolutely correct.
14   Q.   And that's what came back to the office
15  signed?
16   A.   Yes.
17   Q.   Now, this document has various pieces of
18  information about, purportedly about the company. It
19  has an address, telephone number, a federal
20  identification number, a New Jersey employer
21  compensation number, a worker's compensation
22  insurance carrier number. Would the union or you
23  have had that information or would that have had to
24  come from the company?
25   A.   That would have to come from the

Page 96

1  company.
2    Q.   Now, was it your understanding that by
3  having Maarv or somebody from Maarv sign this page,
4  they were agreeing to the Collective Bargaining
5  Agreement which has been identified as Longo-2?
6    A.   Correct.
7    Q.   And is it common that you or the local
8  would have an employer sign a document like Longo-1
9  rather than the signature page attached to Longo-2?
10   A.   That is correct.
11   Q.   Did you ever tell anyone at Maarv that
12  by signing Longo-1, they were agreeing to a
13  Collective Bargaining Agreement just for that one
14  project?
15   A.   Absolutely not.
16       MR. MEHLER: I don't think I have
17  anything further.
18  (Examination of MR. LONGO by MR. DIAZ:)
19   Q.   Why would it be common for you to use
20  the signature page, which has been marked as Longo-1,
21  instead of the actual signature page of the contract?
22   A.   Actually, we have a book that has all
23  the contracts in them. We have probably hundreds of
24  contracts, and it's much easier for us to store it
25  like this than like that.

Page 97

1    Q.   What would be the problem with taking
2  off the last page of the contract that is marked as
3  Longo-2, which is one page, and faxing that page to
4  Maarv Waterproofing?
5    A.   As far as I am concerned, I am not
6  really sure, but I would think that the documentation
7  on this page over here would be a lot more
8  satisfactory than the last page over there.
9    Q.   Okay. But why didn't you just send the
10  actual signature page of the actual contract to Maarv
11  Waterproofing?
12       MR. MEHLER: Objection. Asked and
13  answered. You can answer.
14   A.   It's not standard procedure.
15   Q.   Who sets the standard -- who sets the
16  procedure?
17   A.   Procedure was set before I got there.
18   Q.   Okay. So you are telling me the
19  procedure of Local 5 is not to send the signature
20  page to the actual contract, but the procedure
21  instead is to use --
22   A.   The procedure is --
23   Q.   Let me finish the question.
24   A.   Okay.
25   Q.   But the procedure instead is to use

Pages 94 to 97

Dominic Longo                                          October 22, 2007

Page 98

1  another document, which is in the form of Longo-1?
2  That's the procedure?
3      A.   I cannot speak for everybody else.
4      Q.   Do you know whether or not that is the
5  procedure or not?
6      A.   I cannot speak for anybody else.
7  Usually, usually that suffices for everybody.  That
8  is what we usually do.  We offer the people the book
9  if they would like to see it, which is only a matter
10 of working agreements, but usually this is the
11 documentation that is signed and mailed or faxed back
12 to us.
13     Q.   You are referring to Longo-1?
14     A.   Yes.
15     Q.   That is for all contracts?
16     A.   I'm sure it's not for all contracts.  I
17 am going to say for a good number of them.
18     Q.   On Longo-1, Longo-1 specifically
19 mentions a specific contract in the first paragraph.
20 Do you see that?
21          MR. MEHLER:  Objection on the grounds
22 it speaks for itself.
23     Q.   Do you see that it mentions a specific
24 contract?
25          MR. MEHLER:  You can answer.

Page 99

1      A.   You mean at the very top of the page?
2      Q.   No. No. No.  The first three lines.
3      A.   I hereby approve the Collective
4  Bargaining Agreement between the Building Contract
5  Association, New Jersey...
6          Now, what was your question again,
7  please?
8      Q.   My question is do you use that exact
9  language for every contract that you enter into with
10 contractors?
11     A.   At --
12          MR. MEHLER:  Objection to the extent
13 that's not limited by time period.
14     A.   At the time, I believe this was the
15 standard agreement we were using at the time.
16     Q.   Was there any training or was there any
17 direction at the local, Local 5, where someone said
18 do not use the signature page to the contract which
19 was marked as Longo-2?
20     A.   I don't know.
21     Q.   And you said in Longo-1, which you have
22 before you, your understanding was that this
23 signature in Longo-1 referred to the contract which
24 we marked as Longo-2, and that was your
25 understanding.  My question is why was that your

Page 100

1  understanding?
2      A.   Can you explain yourself a little more,
3  please?
4      Q.   Sure.  Mr. Mehler asked you whether or
5  not your understanding was that the signature page
6  document, which you are holding in your hand, he
7  asked you was it your understanding that this
8  document referred to Longo-2, which is this contract
9  I am pointing to right now.
10          MR. MEHLER:  Objection in the sense my
11 specific question to him was whether it was his
12 understanding that by signing Longo-1, which is this
13 document, Maarv was agreeing to the agreement that
14 has been marked as Longo-2.
15          MR. DIAZ:  Okay.  Correct.
16     Q.   And you answered yes, that it was your
17 understanding?
18     A.   Yes.
19     Q.   My question is why was that your
20 understanding?
21     A.   That was my understanding from
22 conversations with business agents that had more
23 experience than me and, at the time, business
24 manager, Chuck Perrone.
25     Q.   In 2004, I guess February 2004, how long

Page 101

1  had you been signing up employers, so to speak, or
2  contractors to Collective Bargaining Agreements, how
3  much experience had you had doing that?
4      A.   I guess five months.
5      Q.   And in that five months, approximately
6  how many contractors did you sign up to agreements?
7      A.   I have no idea.
8      Q.   Any idea we're talking about like 50
9  or --
10     A.   No.
11     Q.   -- like a handful, five or 10, for
12 example?
13     A.   I am not familiar with that.
14          MR. DIAZ:  That is all I have.
15          MR. MEHLER:  I have nothing further.
16          (Deposition concluded at 12:25 p.m.)
17
18
19
20
21
22
23
24
25

Pages 98 to 101

EXHIBIT E

Michael Robert Perrone                                    October 23, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 07-CV-0501(RJL)

| | |
|---|---|
| JOHN FLYNN, JAMES BOLAND, GERALD O'MALLEY, KEN LAMBERT, GERARD SCARANO, H.J. BRAMLETT, EUGENE GEORGE, PAUL SONGER, WILLIAM MC CONNELL, MATTHEW AQUILINE, GREGORY R. HESS, MICHAEL SCHMERBECK, VINCENT DELAZZERO, and BENJAMIN CAPP, as Trustees of, and on behalf of the BRICKLAYERS & TROWEL TRADES INTERNATIONAL PENSION FUND, 620 F Street, NW, Washington, DC 20004 (202)783-3788, JIM ALLEN, MATTHEW AQUALINE, LON BEST, JAMES BOLAND, TED CHAMP, RAYMOND CHAPMAN, VINCENT DELAZZERO, BRUCE DEXTER, JOHN FLYNN, EUGENE GEORGE, GREGORY HESS, FRED KINATEDER, DAN KWIATKOWSKI, KEN LAMBERT, SANTO LANZAFAME, DICK LAUBER, WILLIAM MC CONNELL, EDWARD NAVARRO, GERALD O'MALLEY, JOHN PHILLIPS, CHARLES RASO, MARK ROSE, KEVIN RYAN, GERARD SCARANO, MICHAEL SCHMERBECK, PAUL SONGER, JOSEPH SPERANZA, and FRED VAUTOUR as Trustees of, and | ORAL DEPOSITION OF<br><br>MICHAEL ROBERT PERRONE |

\*      \*      \*      \*

Tuesday, October 23, 2007

\*      \*      \*      \*

MASTROIANNI & FORMAROLI, INC.
Certified Court Reporting and Videoconferencing
251 South White Horse Pike, Suite 200
Audubon, New Jersey 08106
(856) 546-1100

Michael Robert Perrone                                      October 23, 2007

**Page 14**

1  situation?
2      A. I would survey the situation, try to get them to
3  sign. I would, you know, come to the conclusion whether
4  it's a prevailing wage job or a private funded job, I
5  would decide what my course of action would be, if any
6  at all --
7      Q. Okay.
8      A. -- to achieve the results that we would want.
9      Q. Has there ever been communication, I'll just deal
10 with you, ever been communication from you when you were
11 a field rep when you'd come across a union job where you
12 tell the sub on the job that he has to do this union or
13 he has to use union men because it's a union job?
14     A. Uh-huh, yeah.
15     Q. Have you ever communicated something, sum and
16 substance to that extent?
17     A. Yeah, to a degree. A new contractor may come on
18 the job and say, you know, well, I wasn't told that this
19 was all union or what have you, and, you know, I would
20 inform him that, yes, this is a union job. You should
21 have known or you should have been told, and, you know,
22 at that point, I would proceed just like I would with
23 any other contractor.
24     Q. Okay. Let me turn to the actual contracts,
25 collective bargaining agreements. In your experience or

**Page 15**

1  what you did when you were field rep, what actual
2  document or documents would you give to a contractor in
3  an effort to sign them up?
4      A. Well, what I did was, well, I would have to go
5  back to my previous business manager, Joe DiRienzo. His
6  policy was that we never signed one job agreements, and
7  we never worked what we call split gangs.
8      Q. Okay.
9      A. And I continued that. I followed that to the
10 letter, and when I took over, that was my program too.
11     Q. What is split gangs? What do you mean by that?
12     A. Split gangs means that the union guys would work
13 with nonunion people.
14     Q. Okay.
15     A. Never works out, never.
16     Q. And what if any documents would you present to
17 the contractor at hand to get that person to sign, sign
18 an agreement?
19     A. What I would do is I would talk to the employer
20 and just tell him that these are our wage sheets. These
21 are our rate sheets as far as fringe benefits. I would
22 give him a copy of the contract, if he so choosed (sic),
23 if he asked for it.
24        If he did not ask for it, I would, you know, give
25 them a copy of the signature page, and, you know, if

**Page 16**

1  he -- if he wanted a copy of the agreement, you know,
2  certainly it was there.
3      Q. Okay.
4      A. And you know, actually, the signature page which
5  I have in my hand is the person in question, and sign
6  it, go to work, pay the fringe benefits. That's it.
7      Q. The signature page or pages that you use when you
8  were field rep, were they the signature pages to the --
9  to the relevant contract? What I mean by that, were
10 they the actual signature page from the actual contract?
11     A. To my knowledge, yes.
12     Q. Have you ever seen contracts where the signature
13 page is the last page of the contract, you can kind of
14 like tear it out, for example?
15     A. Yes, yes.
16     Q. Is that what you would use or did use?
17     A. That's what we would use of Local 5.
18     Q. Okay. Were other locals -- do they do it
19 differently?
20     A. I can only speak for Local 5. Prior to the
21 restructuring, you know, that was the reason for the
22 restructuring. People were using, you know, different
23 managers were using different methods to achieve the
24 same goal, but the reason for the restructuring was that
25 everybody does the same thing now.

**Page 17**

1      Q. Okay. Was there ever any training given on what
2  documents to use to sign up contractors or how you would
3  do that?
4      A. What -- well, what we started doing and then I
5  got into it further when I became the business manager
6  was that any new field reps went to leadership classes
7  sponsored by our international union. They were made
8  aware of RICO laws, things like that, but the actual
9  training was on the job.
10     Q. Okay.
11     A. If any of the field reps had any questions, they
12 knew that they would call me.
13     Q. When you were a field rep, did you maintain the
14 collective bargaining agreement somewhere or the
15 signature pages?
16     A. Yeah. Well, usually we worked, you know, we had
17 our pertinent documents that had to be signed at a
18 moment's notice. We carried them in our cars and in our
19 trunks.
20     Q. Okay. So you, if you were on the -- on a site,
21 and you wanted to sign someone up and they're agreeable,
22 you'd have a signature page ready to go in your car?
23     A. Yes.
24     Q. Let me -- Maarv Waterproofing, are you familiar
25 with that company?

Pages 14 to 17

Michael Robert Perrone                                    October 23, 2007

## Page 22

1    A. Not since this all started with Chuck, and, you
2  know.
3    Q. Let me start then that time period. Since this
4  lawsuit started, has Mr. Longo had any discussions with
5  you regarding this lawsuit or Maarv Waterproofing?
6    A. Well, the only thing I asked him, you know, I
7  called him in just like I would call anybody else in and
8  said, what's going on here? All of a sudden, we're
9  being asked questions.
10   Q. Okay.
11   A. And --
12   Q. You've had a recent discussion with Mr. Longo
13 regarding this lawsuit?
14   A. Yes, and the only answer to that question was I
15 don't know any more about it than you do, and that's
16 what brought Chuck in, and we just got whatever we had.
17   Q. Okay. Approximately when did you have this
18 conversation you're referring to with Mr. Longo?
19   A. God, a couple weeks back.
20   Q. Okay. This is not a test at all, but can you
21 tell me what you remember of that conversation, what you
22 said to him, what he said to you?
23   A. Well, the actual, what brought all this on was
24 that I had talked to Chuck, and he had asked me, you
25 know, about Maarv Waterproofing, and there was a

## Page 23

1  question of fringe benefits paid, and was there an
2  agreement signed and all that, and, you know, when we --
3  when I saw the name of the contractor and got this out,
4  you know, I talked to Dominic.
5    Q. Okay.
6    A. And I says, I don't know any more about this than
7  you. What's going on? And he said I got the same call
8  you did.
9    Q. Did Mr. Longo in the conversation you're
10 describing, did Mr. Longo relate to you the
11 circumstances in which he said he signed Maarv
12 Waterproofing to a contract?
13   A. Yeah, it didn't seem like anything out of the
14 norm. Went on the job, came in contact with a -- with
15 an employer that had people on the job, and, you know,
16 got them to sign the agreement. It didn't seem like
17 anything out of the norm.
18   Q. All right. I'm trying to understand now
19 everything that Mr. Longo told you in this conversation.
20       He told you that he went on the job site and came
21 into contact with the employer and signed him to a
22 contract?
23   A. As I know it, yes.
24   Q. Did he tell you anything else?
25   A. No, nothing.

## Page 24

1    Q. Did he tell you whether or not he gave the
2  contract, the actual collective bargaining agreement to
3  the employer?
4    A. No.
5    Q. He didn't tell you that one way or the other?
6    A. No, but it's standard if an employer asks for the
7  complete full agreement, we have thousands of them.
8    Q. Did Mr. Longo tell you how he gave a contract to
9  Maarv Waterproofing?
10   A. No.
11   Q. For example, mail or fax?
12   A. No.
13   Q. Other than Mr. Longo, have you had conversations
14 with anyone else regarding this case other than Mr.
15 Mehler as well?
16   A. The only other person now since the restructuring
17 is my supervisor mRichard E. Tolson.
18   Q. What discussions -- can you describe the
19 discussions you had with Mr. Tolson?
20   A. He asked me exactly what, do you know anything
21 about Maarv Waterproofing, and I said it doesn't ring a
22 bell to me.
23   Q. Okay.
24   A. And that was it. And then the call came from
25 Chuck and everything, and I ended up here.

## Page 25

1    Q. Anything else communicated between you and Mr.
2  Tolson?
3    A. No.
4    Q. Did Mr. Longo tell you -- strike that. Did Mr.
5  Longo tell you that he actually met with the owner or
6  principal of Maarv Waterproofing?
7    A. That, I don't -- I can't say. All I know is that
8  he said he met on the job with Maarv Waterproofing.
9  Now, who he met with, I don't know, but apparently
10 whomever had the authority to sign this agreement. So
11 what their title is, I don't know.
12   Q. The document I put in front of you, this one
13 right here, which we've marked Longo-1, have you ever
14 used a document -- strike that.
15       Have you ever used -- well, in 2004, you weren't
16 still a field rep in 2004, you were a business manager?
17   A. Yes.
18   Q. When you were a field rep, did you ever use a
19 document that is reflected in Longo-1?
20   A. Could you repeat that, please?
21   Q. Sure. When you were a field rep --
22   A. Yes.
23   Q. -- you mentioned you used signature pages.
24   A. Right, right.
25   Q. Did you ever use the document such as the one

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
Professionals Serving Professionals

Michael Robert Perrone                                    October 23, 2007

Page 30

1    Q. Yeah, they do actually.
2    A. But there's a window where if an employer wishes
3    not to be part of the bargaining agreement, he or she
4    has to notify in writing within a specific period of
5    time, and then there's certain stipulations and things
6    like that.
7    Q. Let me backtrack. Are you aware of any
8    decertification petitions on behalf of employees --
9    A. Employees?
10   Q. -- or workers.
11   A. From my union?
12   Q. Yeah.
13   A. No.
14   Q. Okay.
15   A. In other words, they would not basically say I
16   quit. What they would, you know, basically not pay
17   their dues, and they would be dropped for nonpayment of
18   dues.
19   Q. Okay.
20   A. I've never had somebody -- not to my
21   recollection. I've never had a written letter saying I
22   no longer want to be part of this union. I've never had
23   that from a member.
24   Q. Okay. Are you aware of any companies that are or
25   were unionized that recognized, for example, Local 5

Page 31

1    where in that specific company, the employees of that
2    company sought to desert Local 5 as their bargaining
3    rep?
4    A. Not to my recollection, no.
5    Q. Okay. I take it if you're not familiar with
6    Maarv Waterproofing, at least not until this litigation,
7    you would not be familiar with any employees of Maarv
8    Waterproofing?
9    A. No, not personally.
10   Q. I think I just have a few documents, and then I'm
11   done. I'm just going to start by showing you this. I'm
12   showing you a signature page agreement, and it looks
13   like there's a date of May of 2000. Have you ever seen
14   this document before?
15   A. I've seen this document, which was presented to
16   me by Chuck, asking me basically the same thing, did I
17   ever see this document before. Not until he showed it
18   to me, I've never seen it.
19         MR. DIAZ: Okay. Let's mark this as
20   Perrone-3.
21         (Exhibit No. Perrone-3, Signature Page, BAC
22   Local No. 4 New Jersey, 5/10/00, was marked for
23   identification.)
24   BY MR. DIAZ:
25   Q. All right. We've marked as Perrone-3, it's Bates

Page 32

1    numbered 0159, and it's a signature page. It says "BAC
2    Local #4 New Jersey" on the top. And I think, Mr.
3    Perrone, you testified that before this litigation
4    you've never seen what we've marked as Perrone-3?
5    A. No.
6    Q. Has Local 5 ever used any documents similar to
7    the one you see before you at Perrone-3?
8    A. No, these are the only documents that we've ever
9    used. I guess you're referring to Longo-1?
10   Q. Longo-1, right.
11   A. Okay.
12   Q. A company named Garden State Caulking, Inc., did
13   you ever hear of that company?
14   A. No.
15   Q. All right. I think I'm zero for 3 on that one in
16   prior deps. All right. That's all I have.
17         MR. MEHLER: I just have a couple
18   questions. Just a couple follow-up.
19   (EXAMINATION OF MR. PERRONE BY MR. MEHLER:)
20   Q. Looking at Longo-1 and the last page of
21   Perrone-2, is it your understanding that Local 5, if
22   they had an employer sign Longo-1, they would not have
23   them sign the last page of this other -- of Perrone-2?
24   A. No, no. We added this, this language here for
25   people that you, know, didn't get books -- I mean the

Page 33

1    contract books and stuff.
2    Q. You would use this in place of this signature
3    page?
4    A. Yes.
5    Q. Okay.
6    A. That was the norm.
7    Q. And this signature page that's Page 54 to
8    Perrone-2, I believe you testified previously that at
9    one point at least, field reps would use this signature
10   page?
11   A. Yes, I guess it would be kind of an exceptional
12   situation. If they didn't have any of these and they
13   had a contract book and an employer would just turn
14   around and say, look, just let me sign the agreement. I
15   want to get going. I've got to get going. Just send me
16   the rate sheets.
17   Q. What about prior to when Longo-1 was created, was
18   there a time when Longo-1 had not been created yet?
19         MR. DIAZ: Objection to the form as to what
20   time.
21   Q. Or has Local 5 always used Longo-1, as far as you
22   know?
23   A. To my recollection, always used Longo-1.
24   Q. I have nothing further.
25   (CONTINUED EXAMINATION OF MR. PERRONE BY MR. DIAZ:)

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                               Professionals Serving Professionals

Michael Robert Perrone                                         October 23, 2007

## Page 38

1  the Masonry Contractors Association of New Jersey, but
2  it doesn't -- it doesn't reference this group called
3  Building Contractors Association of Atlantic County.
4  That's not in the first paragraph here of Longo-1. Do
5  you know why that is?
6  A. No.
7  Q. All right. That's all I have.
8  (CONTINUED EXAMINATION OF MR. PERRONE BY MR. MEHLER:)
9  Q. One last question. When an employer signs
10  Longo-1, your understanding is what they're agreeing to
11  is the agreement that's been marked as Perrone-2?
12  A. Yes.
13  Q. Okay. I have nothing further.
14  (CONTINUED EXAMINATION OF MR. PERRONE BY MR. DIAZ:)
15  Q. Do you tell that to the employer?
16  A. I as business manager would not be dealing with
17  those employers, the field reps.
18  Q. When you were a field rep, would you tell the
19  employer?
20  A. Sure.
21  Q. When would you tell them that?
22  A. If they asked.
23  Q. If they asked, you tell them?
24  A. Yes.
25  Q. Thank you. That's all I have.

## Page 40

1  C E R T I F I C A T E
2
3  I, NORA M. GALLAGHER, a Certified Court Reporter of
4  the State of New Jersey, do hereby certify that prior to
5  the commencement of the examination, MICHAEL ROBERT
6  PERRONE was duly sworn by me to testify the truth, the
7  whole truth, and nothing but the truth.
8  I DO FURTHER CERTIFY that the foregoing is a true and
9  accurate transcript of the testimony as taken
10  stenographically by and before me at the time, place,
11  and on the date hereinbefore set forth, to the best of
12  my ability.
13  I DO FURTHER CERTIFY that I am neither a relative nor
14  employee nor attorney nor counsel of any of the parties
15  to this action, and that I am neither a relative nor
16  employee of such attorney or counsel, and that I am not
17  financially interested in the action.
18
19
20  _____
    NORA M. GALLAGHER,
21  A Certified Court Reporter of the
    State of New Jersey
22  Certificate No. XI00091100
23
24
25

## Page 39

1  MR MEHLER: That's it. Thank you.
2  (Testimony concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

info@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
Professionals Serving Professionals

EXHIBIT F

Page 2 of 4

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2001 WL 604195 (M.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**

General Elec. Capital Corp. v. Marketing Research
& Management, Inc.
M.D.N.C.,2001.
Only the Westlaw citation is currently available.
United States District Court, M.D. North Carolina.
GENERAL ELECTRIC CAPITAL
CORPORATION, as servicing agent for Danka
Master Trust 1997-A, Plaintiff,
v.
MARKETING RESEARCH & MANAGEMENT,
INC., a North Carolina Corporation, Defendant.
**No. Civ. 1:00CV00983.**

May 16, 2001.

*MEMORANDUM OPINION*

BULLOCK, J.

*\*1* This matter is before the court on Plaintiff
General Electric Capital Corporation's ("Plaintiff"
or "GE Capital") motion to dismiss Defendant
Marketing Research & Management, Inc.'s ("
Defendant" or "MRM") counterclaim and Plaintiff's
motion for summary judgment on Plaintiff's claims
for breach of contract and recovery of property.
Defendant's motion for leave to file a third-party
complaint is also before the court. For the following
reasons, Plaintiff's motion to dismiss will be
granted, Plaintiff's motion for summary judgment
will be granted, and Defendant's motion for leave to
file a third-party complaint will be denied as moot.

FACTS

GE Capital brought this action on September
29, 2000, as a servicing agent for the Danka Master
Trust 1997-A ("Master Trust"). MRM is a North
Carolina corporation with its principal place of

business in Research Triangle Park. On December
9, 1997, and January 8, 1998, Defendant entered
two written lease agreements with Danka Office
Imaging Company ("Originator") involving office
equipment and a related software licensing
agreement. The first lease was for a 5TKB Kodak
Image Source 110DA Copier and the second lease
was for a 51872 1592 Printer, Finisher, and Print
Server 275, and 151B73 System Components.
Originator assigned its rights but not its liabilities to
Danka Office Imaging Trust which then transferred
its interest in the leases to the Danka Master Trust
1997-A. Defendant was notified of the transfer to
the Master Trust by letter dated May 16, 2000.
(Compl.Ex. 7). GE Capital is authorized to act as
servicing agent for the Master Trust with respect to
equipment leases. Plaintiff claims that Defendant
has fallen into arrears under both lease agreements.

Defendant admits that it is in arrears on these
leases but maintains that the leases were unreadable,
the equipment is defective, and that it has suffered a
loss of business and profit as a result. Defendant
claims that the manufacturer of the equipment,
Kodak, is not a "separate business entity" from
Danka Office Imaging Company. (Pl.'s Resp. to
Def.'s Mot. to Dismiss and for Summ. J. ¶ 4). In
1996, Originator purchased the division of Kodak
that manufactured the leased machines. Defendant
argues that this corporate relationship should
obligate Originator to provide "proper customer
information with the lease."(*Id.*) Defendant
contends that because Originator's subsidiary is
responsible for servicing the leased equipment,
Originator is an integral part of this case and it
should be named as a party in this action.

Defendant asserts that it "had two separate
service agreements with an unnamed party who is in
someway affiliated with the Plaintiff."(Def.'s
Answer ¶ 36). Defendant's third-party complaint
clarifies that Defendant had two separate service
agreements with Danka Office Imaging Company.
(Def.'s Third-Party Compl. ¶ 8). Defendant claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2001 WL 604195 (M.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

that it is entitled to indemnification from Originator for any damages due to GE Capital. Further, Defendant counterclaims that Plaintiff breached its contract to lease a machine fit for the purpose for which it was intended resulting in over $300,000.00 of damages.


### DISCUSSION


I.  *GE Capital's Motion to Dismiss MRM's Counterclaim*

**\*2** Under Rule 12(b)(6), dismissal is improper " unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In considering a motion to dismiss, the court accepts as true all well-pleaded allegations and views the complaint in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993)." 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." ' *Revene v. Charles County Comm'rs,* 882 F.2d 870, 872 (4th Cir.1989) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

Defendant has asserted a breach of contract claim against GE Capital. In response, Plaintiff argues that under the lease agreements GE Capital is not liable to MRM for defective equipment claims. Because this is a diversity case under 28 U.S.C. § 1332, North Carolina law controls. Under North Carolina law, if "a contract is in writing and free from ambiguity, interpretation is for the court. ' When competent parties contract at arms length upon a lawful subject, as to them the contract is the law of their case." ' *Briggs v. American & Efird Mills, Inc.,* 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960) (quoting *Suits v. Old Equity Life Ins. Co.,* 249 N.C. 383, 106 S.E.2d 579, 582 (1959)).

The contract provides that MRM must make

rental payments to Danka regardless of the condition of the leased equipment. (Def.'s Ex. A at ¶¶ 5, 7). Paragraph 5 states in part that MRM is " UNCONDITIONALLY OBLIGATED TO PAY ALL RENT PAYMENTS DUE UNDER THIS AGREEMENT ... NO MATTER WHAT HAPPENS, EVEN IF THE EQUIPMENT OR SOFTWARE IS DAMAGED OR DESTROYED, IF IT IS DEFECTIVE OR IF YOU HAVE TEMPORARY OR PERMANENT LOSS OF ITS USE."Paragraph 7 also states in part:
    THE EQUIPMENT IS BEING LEASED TO YOU IN *AS-IS CONDITION.*YOU AGREE THAT WE DO NOT MANUFACTURE THE EQUIPMENT OR SOFTWARE, THAT WE DO NOT REPRESENT THE MANUFACTURER OR VENDOR ... WE HAVE NOT MADE AND DO NOT MAKE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND ... You should contact the manufacturer or vendor of the Equipment and the owner of the software for a description of your warranty rights ... You agree to settle any dispute you may have regarding performance of the Equipment with the manufacturer or vendor of the Equipment.

Even if the Originator were liable for the defective equipment, GE Capital is merely the servicing agent for an assignee that has been assigned the rights, but not the liabilities of the lease agreements. (Compl.¶¶ 4, 8, 12).*See*N.C. Gen.Stat. § 25-2A-407.

MRM argues that the contract was unreadable without magnification and that it was anticipated that "those in the hectic world of commerce will not read it."(Pl.'s Resp. at ¶ 3). This argument is unpersuasive. In the context of two commercial entities entering a contract at arm's length and operating in the "world of commerce," parties are responsible for reading a contract they enter. "Both parties to such a commercial contract have a duty to read the contract carefully and are presumed to understand it."*Cara's Notions, Inc. v. Hallmark Cards, Inc.,* 140 F.3d 566, 571 (4th Cir.1998) (applying both North Carolina and Missouri law). The contract is difficult to read in its original minute form. However, Defendant should have arranged for a contract in larger print or should

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4 of 4

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 604195 (M.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

have magnified the copy in its possession. Defendant cannot claim that it is not bound by these leases because it blindly signed contracts without taking any responsibility to read or understand the terms therein. *SeeMills v. Lynch,* 259 N.C. 359, 130 S.E .2d 541 (1963) (stating that a person signing a written instrument is under a duty to read it).

*\*3* Based on the unambiguous explicit language of the contracts Plaintiff is not responsible for any losses incurred by Defendant due to defective machinery leased from Danka Office Imaging Company and manufactured by Kodak. Therefore, Defendant's counterclaim will be dismissed.

II. *GE Capital's Motion for Summary Judgment*

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.Fed.R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The non-moving party may survive a motion for summary judgment by producing "evidence from which a [fact finder] might return a verdict in his favor."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Anderson,* 477 U.S. at 255. However, "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the [fact finder] could reasonably find for the plaintiff." *Id.* at 252.

GE Capital argues that under the express terms of the written lease agreements at issue, the assignee of the Originator is not liable for any of the duties or obligations which may otherwise be the responsibility of the Originator. The clear language of Paragraph 22 of both leases describes the effect of an assignment of the lease and that "the new owner will not be subject to any claims, defenses, or set-offs that [MRM] may have against [Danka Office Imaging Company]." (Pl.'s Ex. 1 at ¶ 22). *See*N.C. Gen.Stat. § 25-2A-407. Further, when

given notice of the assignment, the lease required MRM to pay the assignee all rent payments upon direction of Originator. (Pl.'s Ex. 1 at ¶ 22).

By signing the leases, Defendant was bound to their terms as discussed above. Defendant offers no legal authority whatsoever for the proposition that the plain language contained in the contracts is not enforceable or should be ignored. Accordingly, Plaintiff's motion for summary judgment will be granted.

CONCLUSION

For the foregoing reasons, Plaintiff's motion to dismiss Defendant's counterclaim will be granted, and Plaintiff's motion for summary judgment will be granted. Because these rulings will dispose of this case, Defendant's motion for leave to file a third-party complaint will be denied as moot.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

M.D.N.C.,2001.
General Elec. Capital Corp. v. Marketing Research & Management, Inc.
Not Reported in F.Supp.2d, 2001 WL 604195 (M.D.N.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT G

EXHIBIT

Perrone-2
10/23/07 NS

PENGAD 800-631-6989

# Local NO. 5 - Central & South Jersey

# AGREEMENT BETWEEN

### BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY,

### MASONRY CONTRACTORS OF NEW JERSEY,

### BUILDING CONTRACTORS ASSOCIATION OF ATLANTIC COUNTY,

### OTHER SIGNATORY EMPLOYERS

-and-

### LOCAL UNION NOS. 4, 5 & 2
### OF THE
### INTERNATIONAL UNION OF
### BRICKLAYERS AND ALLIED CRAFTWORKERS

*November 1, 2002 through October 31, 2007*

0709

# Table of Contents

| | ARTICLE NO. | PAGE NO. |
|---|---|---|
| Apprentices | VII | 21 |
| Bonding | XII | 34 |
| Duration/Termination/Amendment | II | 1 |
| Foremen | VIII | 23 |
| General Understanding | XXII | 50 |
| Grievance Procedure | XVI | 44 |
| Hiring Preference | V | 20 |
| Hours Work, Overtime, Shifts, Holidays | XIII | 34 |
| Jointly Trusteed Funds | XI | 25 |
| More Favorable Conditions | XXI | 50 |
| No-Strike/No-Lockout | XIX | 49 |
| Parties | I | 1 |
| Payment of Wages & Fringe Benefits | XIV | 37 |
| Preservation of Work | XVIII | 48 |
| Scope of Work | III | 2 |
| Separability and Savings Provision | XX | 49 |
| Stewards | VI | 21 |
| Subcontracting | XVII | 47 |
| Traveling Contractors | IX | 24 |
| Union Recognition, Union Security, Access | IV | 19 |
| Wages, BACPAC & Local Dues Checkoff | X | 24 |
| Working Conditions | XV | 38 |



## AGREEMENT BETWEEN
## BUILDING CONTRACTORS ASSOCIATION
## OF NEW JERSEY,
## MASONRY CONTRACTORS OF NEW JERSEY,
## BUILDING CONTRACTORS ASSOCIATION
## OF ATLANTIC COUNTY,
## OTHER SIGNATORY EMPLOYERS
### -and-
## LOCAL UNION NOS. 4, 5 & 2
## OF THE INTERNATIONAL UNION OF BRICKLAYERS
## AND ALLIED CRAFTWORKERS

### ARTICLE I
### PARTIES

This Agreement is entered into this *first day of November 2002*, by and between the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey, the Building Contractors Association of Atlantic County (hereinafter referred to as the Association), for and on behalf of their members as set forth in Schedule "A" attached hereto and other contractors who are signatory hereto or who may become signatory hereto (hereinafter referred to as the Employer), and the INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL UNION NOS. 4, 5 & 2 (hereinafter referred to as the Union).

The Association agrees to furnish to the Union a list of all members of the Association denoting those members bound to the terms of this Agreement, the honorary members, independent members, and any other classes or groups of members.

### ARTICLE II
### DURATION - TERMINATION – AMENDMENT

This Agreement shall be effective commencing *November 1st, 2002* and shall continue in full force and effect up to and including *October 31, 2007*, and shall be automatically continued for each successive period of this Collective Bargaining Agreement unless

1



0711

written notice of decision to negotiate a new Agreement in whole or in part, is given in writing by either party to the other not later than sixty (60) days nor more than ninety (90) days prior to the expiration date or any anniversary date thereafter. If the parties fail to reach an agreement in such negotiations, the issues in dispute shall be submitted to the International Masonry Institute's Dispute Settlement Plan for such steps as are deemed appropriate in accordance with the procedures of the Plan. The parties may at any time mutually agree to change or amend any part of this Agreement and such changes or modifications shall not affect the continuing nature of this Agreement.

## ARTICLE III
## SCOPE OF WORK

A. This Agreement shall cover new construction, maintenance, repair and renovation in the State of New Jersey.

B. The Employers bound hereby recognize the Union's claim to all work falling within the jurisdiction of the Union, as defined in Branches of the Trade, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers which is incorporated herein by reference.

C. The installation of Brick and all other masonry units such as blocks, etc., with or without mortar, anywhere on the project shall be the work of Bricklayers & Allied Craftworkers of International Union, Local Nos. 4 & 5.

D. Temporary heat, applicable to all branches of the trade, to protect any Masonry work performed and shall include all masonry materials all year, especially in the winter months (November 15th through March 15th).

E. The trade and territorial jurisdiction for Local No. 4 shall cover new construction, maintenance, repair and renovation for the following trades and counties:

Bricklayers, Cement Masons, Plasterers, Pointer Caulkers, Cleaners, Fire Proofers, Stone Masons, Brick Pavers and Exterior Marble Masons shall be the trade jurisdiction for Bergen, Essex, Hudson, Morris, Passaic, Sussex, Union, Warren, part of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional map maintained by the International Union.

F. The trade and territorial jurisdiction for Local No. 5 shall cover new construction, maintenance, repair and renovation for the following trades and counties:

Bricklayers, Pointer Caulkers, Cleaners, Stone Masons, Brick Pavers and Exterior Marble Masons shall be the trade jurisdiction for, Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer, Monmouth, Ocean, Salem, and parts of Hunterdon, Middlesex and Somerset counties, as indicated on the jurisdictional map maintained by the International Union.

G. The trade and territorial jurisdiction for Local No. 2 shall cover new construction, maintenance, repair and renovation in the following trades and counties:

Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer, Monmouth, Ocean, Salem, and parts of Hunterdon, Middlesex and Somerset for all work falling within the jurisdiction of the Union, as defined in Branches of the Trades for Cement Masons, Plasterers & Fire Proofers, Code 1 of the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers.

### Brick Masonry

A. Bricklaying masonry shall consist of, but not be limited to, the following work procedures and installation of the

0712

following materials: The laying of bricks made from any material in, under or upon any structure or form of work where bricks are used, whether in the ground, or over its surface, or beneath water, in commercial buildings, rolling mills, iron works, blasts or smelter furnaces, lime or brick kilns, in mines or fortifications and in all underground work, such as sewers, telegraphy, electric and telephone conduits; including the installation of substitutes for brick such as all carbon materials, Karbate, Impervite or mixtures, all acid resistant materials, all terra cotta and porcelain materials, except where the foregoing materials are manufactured to substitute for tile as provided for under the category of Section 8, C of the Codes of the International Union of Bricklayers and Allied Craftworkers. All cutting of joints, pointing, cleaning and cutting brick walls, fireproofing, block, arching terra cotta cutting and setting, the laying and cutting of all tile, plaster, mineral wool, cork, blocks and glass masonry or any substitutes for the above material, the laying of all pipe sewers or water mains and the filling of all joints on the same when such sewers or conduits are of any vitreous material, burnt clay or cement, or any substitute material used for the above purpose, the installation of all brackets and fasteners is the work of the mason exclusively, the cutting and rubbing and grinding of all kinds of bricks and the setting of all cut-stone trimmings on brick buildings, is bricklayer's work. The preparation and erection of plastic castables or any refractory materials is bricklayer's work.

B.  Cleaning, grouting, pointing and other work necessary to achieve and complete the work under the foregoing categories, all waterproofing and black mastic waterproofing, silicone and/or substitutes sandwiched between masonry units in the interior of the wall.

C.  All terra cotta called unit tile in sizes over 6" x 12" regardless of method of installation; all quarry tile over 9"x 9" x 1 1/4" in size, split brick or quarry tile or similar

material if bedded and jointed with one operation. The bedding, jointing and pointing of the above materials shall be the work of the craft installing same.

D.  All burnt clay extruded cellular products regardless of trade name or method of installation when used as a veneer on structures; all clay products known as terra cotta tile, unit tile, ceramic veneer and machine-made terra cotta and like materials in sizes larger than 6" x 12", regardless of the method of installation. Where the preponderance of material to be installed is of the above size and when material of lesser sizes is to be used in connection therewith, the bricklayers shall install all such materials. Brick paving comes under bricklayers' trade classifications. The parties acknowledge the Union's claim to screeding of sub base regardless of type of material used.

E.  Grouting of all Masonry Units, all Leveling Plates for steel columns, all machinery and Precast Panels shall apply to all branches of the trade.

F.  The Bricklayer shall perform the complete installation and related finish work of all AACMU. These operations include, but are not limited to, the cutting, fitting and applications of mortar and/or other cementitious materials used for the setting and bonding purposes as well as the actual laying of the AACMU block units into position. The routing, drilling, cutting and patching for all mechanical piping and openings. The preparation, assembly, unloading, selecting or staging of AACMU panels, hooking on, signaling, drilling, cutting, installation of support angles or strut supports, fitting, bedding, landing, setting, leveling, plumbing, aligning, fastening, anchoring (whether by bolt, clip, pin, or weld), insulation, caulking, grouting, patching, cleaning, waterproofing and installation of all AACMU units. This also includes all work operations related to the installation and applications of all coating, covering and veneer systems (both exterior and interior) on all AACMU

0713

units. These work operations include, but are not limited to: preparations of walls, the mixing and applications of any and all finish coating materials by any method (i.e. trowel on, machine, spray on, etc.) or any other device deemed necessary to produce the desired finish surface.

## Stone Masonry

A. Stone Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying of all rip rap, rubble work with or without mortar, setting all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured from such foreign or domestic products as are specified and used in the interior or on the exterior of buildings by architects, and customarily called "stone" in the trade.) Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over 10 inches in height; the dressing of all jambs, corners and ringstones that are roughly dressed upon the beds, joints or reveals and the cutting of a draft upon same for plumbing purposes only; and the cleaning, cutting of joints and pointing of stone work.

B. This is to apply to all work in buildings, sewers, bridges, railroads, bulkheads, breakwaters, jetties, playgrounds, parks, landscaping and curbing or other public works and to all kinds of stone, particularly to the product of the locality where the work is being done. Stonemasons shall have the right to use all tools which they consider necessary in the performance of their work.

C. Cleaning, grouting, pointing and other necessary work to achieve and complete the work under the foregoing categories.

6

## Artificial Masonry

A. Artificial Masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The cutting, setting and pointing of cement blocks and all artificial stone or marble, either interior or exterior, when set by the usual custom of the stone mason and marble setter. All cement that is used for backing up external walls, the building of party walls, columns, girders, beams, floors, stairs and arches and all material substituted for the clay or natural stone products, shall be handled by employees in the bargaining unit for which the highest rate of wages shall be demanded.

B. All artificial masonry, the cutting, setting and pointing of all concrete prefabricated slabs, regardless of dimension size, shall be the work of members of this organization, for which the regular wage scale in the jurisdiction where the work is performed shall be paid.

C. Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over ten inches in height, the dressing of all jambs, corners and ringstones, joints, or reveals and the cutting of a draft upon same for plumbing purposes only, and the cleaning, cutting of joints and pointing of stonework.

D. This is to apply to all work on buildings, sewers, bridges, railroads or other public works, and to all kinds of stone, particularly to the products of the locality where the work is being done and the same shall be considered stone masonry.

E. Bricklayers and stone masons shall have the right to use all tools which they consider necessary in the performance of their work.

F. All cement that is used for parging up external walls and

7

0714

block units, installing reinforcing rods and door blocks, and all grouting.

G. The building of party walls, columns, girders, beams, floors, stairs and arches. Gypstell products and cement of precast slabs on roofs or wherever used in building construction of alterations, and all material substituted for the clay or natural stone products. All wall ties and brackets used to anchor brick, block, stone or any type of masonry whether screwed or nailed is the work of the mason, as per the 1962 agreement between the B. & A.C. and Ironworkers herein incorporated by reference.

H. The laying out and supervising of work for or by the use of any or all of the above materials shall be done by the employees covered hereunder.

## Cement Masons Agreement

A. Cement masonry shall consist of, but not be limited to, the following work procedures and installation of the following materials: The laying out, screeding and finishing of all cement, concrete, brown stone composition, mastic and gypsum materials, also for fireproofing, waterproofing, cement and composition base and vault lights.

B. The cutting of all cement and concrete for patching and finishing; the bush hammering of all concrete when cast in place; the operation of cement gun, the nozzle and the finishing of all material applied by the guns, and the operation of the cement floor finishing machines. The cement mason shall have the right to use all tools necessary to complete his work.

C. The operation of the Lazar Screed Machine shall be performed solely by the Cement Masons.

D. Concrete constructions, such as buildings, bridges,

8

elevators, smokestacks, curbs, gutters, sidewalks, street paving, alleys and roofs; laying out, setting joists, strips or screed rods for work hereinafter specified; laying and finishing of cement, wearing surfaces of basements, floor yards, driveways, areas and other surfaces where cement finish is to be laid; and where strips have to be set, or material ruled down, or surfaces finished; screening of concrete or fine stuff, asphalt or other preparations that are to be troweled, floated, darbied or bull floated; troweling, floating or finishing of concrete or fire retarding material or waterproofing compound or mixtures; construction of glass vaults or sidewalks, lights, where same is set in cement; excepting the carpenter work, but including pointing, facing and finishing of the surfaces after forms are removed, leveling of all fine materials for facing same; running of all cement base; cutting, patching and finishing of concrete fireproofing on walls, beams, girders and columns; cutting facing and finishing with cement of all concrete surfaces such as arches, beams, girders, walls, pile caps, piers and columns, whether done with trowel, float, gun and nozzle, bushhammer, rubbing or other process; applying cement mortar for damp-proofing, waterproofing for sanitary purposes where not over four (4) feet high whenever cementing with the floor is done in one operation; cutting of all concrete when cement finish is applied; setting of carpet pins and sockets in cement and composition brass or other metallic or wood strips when inserted in floor during the laying of same; rodding and spreading of all concrete and spreading and finishing of all top material, setting of all strips and stakes and grade; pointing, caulking and patching around all steel or metal window frames that touch concrete; handling of the vibrator machine. Washing and treating of all cement surfaces, handling of all machines, trowel machines, riding trowel machines, apparatus or equipment of any kind in connection with or to perform any of the above functions shall be the work of the cement finisher. Any signatory contractor who subcontracts sidewalks and curbs shall, in

9

good faith, inform the subcontractor that said work is within the jurisdiction of the    Bricklayers & Allied Craftworkers,    Local Union Nos. 4 & 2.

E. The pouring of all concrete shall require a mason.

F. When concrete bucket is used in conjunction with a crane, all safety precautions shall be exercised.

G. The aligning of all bolts and the setting of all plates shall be performed by the employees covered hereunder.

H. When flat concrete arches are poured with a crane, a hopper must be used in conjunction with a concrete bucket.

I. On all high rise buildings an exterior scaffold for the cement masons shall be erected complete with guard rails.

J. There shall be no cutting of cement masons crews before pull up is completed.

K. Overtime shall only be with the prior permission of the union and shall be equitably shared by the employees working on the job.

L. No cement worker working alone shall use a straight edge of more than six feet in length. Where a straight edge is longer than six feet, two men shall be used on a straight edge which is between six and eleven feet in length, one additional man shall be used for every additional four feet or fraction thereof of straight edge. On power straight edges or roller-type straight edges, two men shall be utilized up to fourteen feet and one additional man shall be used for each five feet or fraction thereof.

M. The casting and pouring of pre-cast slabs when done on the job site shall be the work of a cement mason.

10

N. Cement masons are to complete, joint and strike up their work, whether this work is done with cement or caulking compound on any other masonry material.

O. The cement masons shall supervise the placing or pouring of all concrete. In the event there is a journeyman already working at the job site who is recognized by the Local Union as a competent cement mason, he may be assigned to such work, otherwise a cement mason shall be hired.

P. When concrete floors are to be hand troweled, the Employer shall provide knee boards such as the type used by cement finishers to handle trowel concrete floors, such knee boards shall measure approximately 12" wide and 30" long or fraction thereof, and shall have handles.

Q. The following work shall be allotted to the cement masons only: The setting of all screeds and forms to determine the proper grade of concrete when held in place by stakes and/or spreaders shall be done by cement finishers. A screed is a strip of wood, metal, etc., used as a guide for leveling or grading a concrete floor, slab or sidewalk.

R. Any bulkhead that is one single board in height, and that has no key attached or which is not notched or fitted shall be set and braced or staked by cement finishers, providing same is used as a screed. The term bulkhead shall mean a form or screed erected for the purpose of separating pours of concrete.

S. The grinding, patching and curing of all floors, the snapping of wall ties, and patching of same and setting of expansion joints.

T. Steps, Landings, Platforms, etc. The setting of forms for steps, landings, platforms, coping, caps and curbs, except where underforms or centers are required, and the placing of all fine materials for facing same, shall be done by

11

0716

cement masons.

U. Curing and dustproofing of all floors are to be done by cement masons. All epoxy, acid and latex work will be an additional $.50 per hour above scale.

V. The cement mason shall have the right to use all tools necessary to complete his work. There shall be no restriction as to the use of machinery or tools.

W. When troweling floors with machine, changing of blades, cleaning and maintaining machine to be done by mason.

X. No concrete trucks, pumping machine or any other machines are to do any mixing inside any structure without proper ventilation.

Y. Special Tools: The employer agrees to furnish the following tools for use by his employees: Respirators, goggles, boots, bull floats, brooms, brushes, power chisels, trowel machines, bushhammers, straight edges, rubber floats, rubbing stones, cover tools, special base tools and special edgers. Gloves furnished when using epoxies, acid, latex floor patching or any irritant.

Z. All wages, waiting time and general working conditions that apply to bricklayers shall also apply to the cement mason.

## Plastering

A. Level 5 Gypsum Board Finishing is the work of Plasterers.

Level 5 finishing as specified by the Association of the Wall and Ceiling Industries International (AWCI), Ceiling and Interior Systems Construction Association (CISCSA), Gypsum Association (GA), and Painting and Decorating Contractors of America (PDCA), in their "Levels of

Gypsum Board Finish Recommended Specification."

Levels Description: All joints and interior angles shall have tape embedded in joint compound and three separate coats of joint compound applied over all joints, angles, fastener heads, and accessories. A thin skim board of joint compound, or a material manufactured especially for this purpose shall be applied to the entire surface. The surface shall be smooth and free of tool marks and ridges. Note: It is recommended that the prepared surface be coated with a primer/sealer prior to the application of finish paint. (See painting specification in this regard.)

The level of finish is recommended where gloss, semi-gloss, enamel or non-textured flat paints are specified or where severe lighting conditions occur.

This highest quality finish is the most effective method to provide a uniform surface and minimize the possibility of joint photographing and of fasteners showing through the final decoration. The work jurisdiction of the plasterer under level 5: Gypsum board finishing shall be that which has heretofore been performed under this Agreement and is further set forth in constitution of the International Union of Bricklayers and Allied Craftworkers of the United States and Canada. The parties agree to be bound by decisions rendered by the "Green Book" Decision of Record rendered by the Hearings Panel (March 1, 1978) under the plan for the settlement of jurisdictional disputes in the construction industry.

B. All cement plastering, stone texture, stucco work, and pebble dask work, either exterior or interior, shall be done by plastering employees under this contract.

C. All plastering, including plastering alterations and repairs, and all cement, cashstone, acoustic or any plastic substitute or artificial or imitative composition for plain surfaces or

12

13

0717

for moldings, cornices, pilasters panels, capitals, columns, bases, keystones, brackets or centers when applied on any exterior or surface in the usual method of either plastering or stuck work shall be the work of plastering employees.

D. All ornaments including centers, brackets, trusses and keystone shall be placed in position and pointed by plastering employees who are on the job. Cast ornamentation shall be made in a Union shop. No employee shall work on any operation where the stickling of ornamentation has been sublet.

E. All moldings, covers, arrises, chamfers and bullnoses shall run in place wherever possible with a regular mold on proper running strips. When moldings or cornices are to be ornamented proper beds shall be run to secure same.

F. All capitals and bases shall be run on the job if practical to do so.

G. All templates to be used by the plasterer shall be placed in position by the plasterer.

H. All plastering shall consist of not less than three coats as scratch, brown and finish. Before the brown coat is applied, the scratch shall be hard and set. The brown coat shall be made true with a straight edge rod in all upright and ceiling angles: the walls and ceilings shall be properly darbied and floated to an even surface and the angles cut out. The finish coat shall be properly gauged and troweled to the required surface and all angles featheredged true. All interior or exterior plastering shall be left straight and true with rod and darby; rod and darby to be furnished by the contractor. The taping and pointing of sheetrock, compo-board, plaster-board, etc., shall be the work of the plasterer.

I. When Sprayo-Flake or similarly applied acoustics are used the applied acoustic will take the place of the finish coat

14

and will be applied by plastering employees.

J. The operation of all mechanical plastering or troweling machines, pertaining to plaster and all of its substitutes, shall be the work of the plasterer.

K. All safety precautions, goggles, shields, and masks, shall be supplied by the contractor for the health and welfare of the plastering employees operating these machines.

L. Plastering on concrete, fireproofing, brickwork or plaster boards shall be two coat work- brown and finish.

M. The finish coat may be omitted on cellar ceilings provided the brown coat is floated to an even surface. All EIF systems and all related work.

N. Finishing of walls and ceilings shall not be done until the screeds, cornices or covers with which they intersect are in place.

O. Employees shall not install metal corner beads, nor shall they work on any operation where corner beads have been used to form arrises on beams or arches or corners except door or window heads or other continuous openings not over twelve (12) feet in height.

P. On a scaffold area of one hundred and fifty (150) square feet or over, the mortar board shall be raised 30" from the scaffold on a properly constructed stand. On a scaffold area of less than 150 square feet, the mortar board shall be raised at least 12" from the scaffold on a properly constructed stand. No mortar board shall be raised on blocking, and no mortar board or gauging board shall be more than 46" square.

Q. Where beams are sixteen (16) inches or over in depth, the scaffold shall be dropped to a suitable height where the

15

plasterers may execute their work in a proper manner.

R.   Any material applied on walls by the plasterers shall not be higher than 6'6" from the floor. Where only the walls have to be plastered, a scaffold 4 planks wide and 6' from the ceiling shall be erected on which the mortar board shall be placed and raised 12" above the scaffold. Positively no hopping planks to be permitted.

S.   There shall be a foreman plasterer on all plastering jobs. Plastering foremen shall meet the requirements for foremen as specified herein, and shall be paid as specified herein.

T.   Plastering foremen shall see that no gauging is made up later than thirty (30) minutes before 12 o'clock and thirty (30) minutes before quitting time.

U.   Plastering work, when sublet, shall be given to a subcontractor who employs employees covered under this contract.

V.   Plastering contractors shall furnish all the materials required for their work including all screed rods, cornice, rods, darbies and feather edges. No subcontractor shall contract for labor only.

W.   Synthetic Plastering Systems: The styrofoam and any other materials which is part of the system that are installed by screws, glue, masonry materials, and including Mechanical System.

## Firebrick

The matters set forth in this section are applicable solely to firebrick work.

A.   On all firebrick jobs, when working with regular firebrick and clay, the bricklayers will be permitted an additional

16

fifteen (15) minutes to wash up or twenty-five (25) minutes when working with a carbon, acid proofing, high temperature clay or any other material out of the ordinary such as colored cements, asphalts, tars, plastics, etc. Solvent for washing up and cleaning of tools will be provided for by the employer.
A bricklayer working with carbon or acid proofing materials shall be given a minimum of five (5) minutes wash-up prior to lunch time.

B.   All scaffolding inside of furnace shall be solid nailed scaffold. Contractors to furnish safety equipment and have same on job site.

C.   Provisions for adequate scaffolding shall be made so that the lead man does not have to climb over the wall to work on the opposite side of the wall. Adequate scaffolding shall mean standard metal tubular scaffolding or wooden scaffolding consisting of a platform of not less than 2" x 10" planks in width and scaffolding shall remain in place until all paving has been completed.

D.   Clay shall be mixed at the furthermost location of the enclosure where refractory brick is being laid. The location to be selected as to both its physical separation from the work area and to its feasibility for performing the mixing function. In coke oven work a separate enclosure is required. All care shall be exercised to reduce dust.

E.   When bricklayers are employed laying firebrick, the contractor shall pay for the sharpening of their tools required for the work, and all tools shall be sharpened to the satisfaction of the bricklayer. The contractor shall furnish all chisels over twelve (12) inches in length and all saws when required.

F.   On all jobs where conditions are such that a safety man is required by the owner, he shall be mutually agreed upon by

17

bricklayer shall also apply to all branches of the trade.

K. In addition, all other assignments mutually agreed upon between the Employer and the Union on any other building products or systems related to the scope and type of work covered by this Agreement which may be developed in the future that are determined by these parties to fall within the work jurisdiction of this Agreement.

L. In the event of territorial jurisdiction or work assignment dispute with any other BAC Local Union, the matter shall be referred to the International Union for binding resolution.

## ARTICLE IV
## UNION RECOGNITION, UNION SECURITY, ACCESS

A. The Employer hereby recognizes and acknowledges that the Union is the exclusive representative of all its employees in the classifications of work falling within the jurisdiction of the Union, as defined in Article III of this Agreement, and in the Constitution, Rules of Order and Codes of the International Union of Bricklayers and Allied Craftworkers, for the purpose of collective bargaining as provided for in the Labor Management Relations Act of 1947, as amended.

B. No later than eight (8) days following the effective date of this Agreement, all present employees must, as a condition of continued employment, be or become members of the Union; all employees hired after the effective date of this Agreement shall be or become and remain members of the Union no later than eight (8) days following the first day of their employment in accordance with the provisions of Section 8 of the National Labor Relations Act, as amended. Failure of any employee to comply with the provisions of this subsection shall, upon request of the Union, result in termination of such employee, provided that the Union has

19

the parties. For the safety of the bricklayers, said safety man must be a union bricklayer.

F. All hot work shall be paid at the rate of double time. Fringe benefits shall be based on hours paid.

One hundred degree (100) Fahrenheit or over shall constitute hot work. When bricklayers are employed on excessive hot work, the contractor shall provide proper counter fatigue aids which shall meet the standards prescribed by the State Medical Board, shall provide proper gloves and protective materials to safeguard bricklayers when they are handling hot work, shall supply wooden shoes or facsimile when working on heated surfaces and contractors shall be responsible for tools, shoes, and clothes of bricklayers which they burn in performance of their duties on said work. Bricklayers must spell each other on all hot work.

Contractor will also be responsible for clothes, tools and/or shoes that are destroyed or damaged on jobs due to exception conditions and materials.

G. When electrical grinding stones or carborundums are used, bricklayers shall leave that part of the job until the operation is completed. In an enclosed area, suction device to be used to remove dust while bricklayers grind. The employer and union shall arrange to spell bricklayers at ten minute intervals when they are actually performing grinding work.

H. On stoves and furnaces, or anywhere else where danger of gas exists, approved gas detecting devices will be required.

I. On all firebrick or acid proofing jobs, the employer shall furnish all bricklayers with gloves.

J. All general working conditions which apply to the

18

given the employee four (4) days notice that his obligation to make payment has not been met and that his delinquency renders him liable to termination under this section. The Employer shall not be obligated to dismiss an employee for non-membership in the Union: (a) if he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members; or (b) if he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

C.  International Union Representatives and the Business Manager and/or other officers of the Union shall have access to the Employer's jobsites at reasonable times in compliance with any special rules and regulations adopted by the owner to ensure that the provisions of this Agreement are observed, provided however, that such representatives shall not unduly interfere with the job progress.

## ARTICLE V
## HIRING PREFERENCE

D.  It is recognized and agreed by the parties to this Collective Bargaining Agreement that the Local Union is the authorized collective bargaining agent for all its members in connection with issues related to the wages, working conditions, and employee fringe benefit funds.

The employer agrees that when hiring any employee for any job in the territorial jurisdiction of the agreement he will employ a fair percentage in the territorial jurisdiction of Local No. 4, or Local No. 5 or Local No. 2, of New Jersey. The employer also agrees that when requesting manpower, they must call the Local Union Office by 4:30 p.m. of the previous day.

20

Any employee who is hired and reports on the job at starting time with his tools and is not started and any employee who reports to and starts work and is thereafter stopped for any reason other than inclement weather, shall be paid a full day's wages at his basic rate of pay.

## ARTICLE VI
## STEWARDS

A.  The Employer shall hire a steward for each branch of the trade appointed by the business manager of the Union on all jobs. The steward shall be a working employee and shall, when appropriate, be granted reasonable time to conduct union business. The steward shall not be laid off without reasonable cause, without first consulting the business manager.

B.  It is the steward's duty to look after the interests of both parties, to see that the number of men desired by the employer is promptly reported to the business agent, take up all grievances on the job, and try to have the same adjusted. In the event that he cannot, he must report that fact to the business agent. He shall conduct himself in a proper manner at all times when on the projects and shall not be discriminated against, discharged, or laid off for the performance of his duties as such. The steward's employment can only be terminated by the employer after a review of complaint against him between the employer and the business agent.

C.  The first Bricklayers & Allied Craftworkers member shall notify the union at the start of each job.

## ARTICLE VII
## APPRENTICES

A.  In order to train sufficient skilled mechanics for the

21

D.  Apprentices shall be paid not less than the following percentages of the journeyman's basic wage rate:

First six months or 500 hours:      50% of Journeyman's Basic Wage Rate
Second six months or 500 hours:     55% of Journeyman's Basic Wage Rate
Third six months or 500 hours:      65% of Journeyman's Basic Wage Rate
Fourth six months or 500 hours:     75% of Journeyman's Basic Wage Rate
Fifth six months or 500 hours:      85% of Journeyman's Basic Wage Rate
Sixth six months or 500 hours:      95% of Journeyman's Basic Wage Rate

During the first year of apprenticeship, after the probationary period, fringe benefit contributions shall be required for the Welfare Fund at 50%. No other fringe benefit contributions shall be required for this period. Deductions for check off dues and BACPAC should be made according to Schedule "B" attached hereto. Commencing with the second year of apprenticeship (third six-months), fringe benefit contributions and check off deductions shall be made according to Schedule "B" attached hereto.

E.  Apprentices may be required to attend related training classes during period of apprenticeship as directed by the Joint Apprenticeship.

## ARTICLE VIII
## FOREMEN

There shall be a separate foreman on all jobs for each branch of the trade. The employer will determine when the foreman shall not work with tools. Foremen shall be paid the prevailing regular weekly pay (40 hours), between the initial date of employment and the termination date of employment, holidays and inclement weather days included, provided, however, that all foremen must report to work everyday within the work week unless otherwise directed by the Employer. All overtime worked by foremen shall be compensated for at proper overtime rates.

23

industry, the necessity for employment of apprentices and/or apprentice improvers is recognized and encouraged by the parties to this Agreement. Apprentices shall be given a minimum of 32 hours per week to perform the work of brick or block provided the work is available. The employer agrees to employ one apprentice for every five journeymen employed on a job site. It is agreed that the Employer shall abide by the National Apprenticeship Standards, developed for masonry craft training, incorporated herein by reference.

B.  All apprentices will be required to attend and successfully complete a pre-job school which shall take place over a period of approximately 12 weeks at a place and at such times as designated by the State Joint Apprenticeship Committee.

C.  After 12 weeks of pre-job training, apprentices shall be required to serve a probationary period of 30 days of employment at the trade during which period no fringe benefit contributions will be required. After satisfactory completion of this period, credit will be given for this time served as part of the three year apprenticeship term. During the probationary period, the termination or cancellation of the apprenticeship agreement may be made by the committee at the request of either party to the agreement. After the probationary period, the agreement may be canceled at the request of the apprentice or committee. The committee may cancel the agreement for good cause such as unexcused absences from the job and related training classes if required, lack of progress or interest, and unsafe practices common to the trade. Due notice shall be given to the apprentice with a reasonable opportunity for corrective action. Written notice shall be given to the apprentice and Bureau of Apprenticeship and Training of the final action taken.

22

## ARTICLE IX
### TRAVELING CONTRACTORS

When the Employer has any work specified in Article III of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied Craftworkers, the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the jobsite area. Employees covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Article X of this Agreement but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local Agreement. The Employer shall in all other matters be governed by the provisions established in the jobsite local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in Article III of this Agreement, the full terms and conditions of this Agreement shall apply.

## ARTICLE X
### WAGES, BACPAC, AND LOCAL DUES CHECKOFF

A.  The hourly wage rates for all employees performing work covered under this Agreement shall be as listed on Schedule "B" attached hereto.

B.  The Union shall have the option of allocating a portion of all of the increases in wage rates for the periods beginning November 1, 2002 and all subsequent increases thereafter, among the various benefit funds specified in Article XI.

C.  The Employer shall deduct from the wages of each employee who has signed a check-off authorization conforming to federal law and transmit monthly to the Union (or to any agency designated by said Union for the collection of such money), the sum for each hour paid which the Union has specified, or specifies from time to time and so advises the Employer in writing, as the portion of each employee's Union dues to said Union, to its International Union, or to any other affiliate of the International Union, subject to check-off. The sums transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the name of each person whose dues are being paid and the number of hours each employee has been paid. If the employee does not sign a dues check off authorization card, he shall report to the union hall to pay the weekly dues.

D.  The Employer agrees to deduct an amount from the pay of each employee, who is a union member and who executes a voluntary check-off authorization form for the Bricklayers and Allied Craftworkers Political Action Committee (BACPAC). Deductions shall be in the amount and at the intervals specified on the check-off authorization form. The Employer agrees to transmit BACPAC deductions to the Treasurer of BACPAC, and shall be accompanied by a list of the names of those employees for whom BACPAC deductions have been made and the amount deducted for each employee.

## ARTICLE XI
### JOINTLY TRUSTEED FUNDS

Section 1.
In addition to the wages and other payments herein provided for, the Employer agrees to pay specified contributions to the following designated funds. In the event any of the trust funds to which contributions are required to be made, under this Agreement, is merged with or into another trust fund, the contributions shall be made to the successor fund.

A.  **Bricklayers and Trowel Trades International Pension Fund**

i. The contribution to the Bricklayers and Trowel Trades International Pension fund (IPF) shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the Bricklayers and Trowel Trades International Pension Fund, which was established under an Agreement and Declaration of Trust, dated 1 July 1972.

B. Local Pension Fund

1. The contribution to the Local Pension Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the territorial Local Pension Fund which was established under an Agreement and Declaration of Trust. All Local Pension Funds remitted on behalf of an employee shall be forwarded in whole to the employee's Home Local Pension Fund. The Home Local Funds shall credit any excess monies remitted for the Pension Fund to the employee's Annuity Fund.

C. Local Annuity Fund

1. The contribution to the Local Annuity Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the territorial Local Annuity Fund which was established under an Agreement and Declaration of Trust. All Local Annuity Funds remitted on behalf

26

of an employee shall be forwarded in whole to the employee's Home Local Annuity Fund. The Home Local Funds shall apply any excess monies remitted for the Annuity Fund to the employee's Pension Fund.

D. Bricklayers and Allied Craftworkers' Statewide Welfare Fund

1. The contribution to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund shall be as listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay.

2. The payments required above shall be made to the Bricklayers and Allied Craftworkers' Statewide Welfare Fund which was established under an Agreement and Declaration of Trust, dated May 1, 1988.

E. Industry Advancement Fund

The parties hereto do hereby establish an Industry Advancement Fund pursuant to the requirements of the Labor - Management Relations Act, the Internal Revenue Code and all applicable laws and the agreement of the parties for the purpose, in all lawful ways, of promoting the increase of commercial, institutional, public and industrial building construction throughout the State of New Jersey and the adjoining areas within the territorial jurisdiction of the unions by providing building owners, architects; engineers, builders, contractors, private and public funding institutions and agencies, government agencies and any others, directly or indirectly, with the building construction industry information, data and other information to communicate the advantages of sound, durable and economical construction that will provide a high degree of service, utilization and benefit to the public by the utilization of union affiliated contractors. The purpose of

27

the Fund shall be to foster and promote the continued utilization and expansion of union construction, particularly utilizing union members of the Bricklayers & Allied Craftworkers union, in prospective projects throughout the State of New Jersey.

In order to carry out this agreement, the parties hereto shall execute such agreements of trust and other documents necessary in accordance with law, which documents shall include the following terms which are agreed to and incorporated into this contract:

1. The Employer shall make contributions for each hour worked by each member of the Bricklayers & Allied Craftworkers union to the Industry Advancement Fund created hereby as listed on Schedule B attached hereto.

2. The Bricklayers & Allied Craftworkers' Health & Welfare Fund Office shall collect and distribute such funds.

3. Effective November 1, 2002, the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey agree to allocate $.02 of the Industry Advancement Fund contribution to the International Council of Employers of Bricklayers & Allied Craftworkers (I.C.E.). Said contribution shall be forward to I.C.E. by the Masonry Contractors of New Jersey. The remaining contribution shall be divided as follows:

    BCANJ:                                    50%
    Masonry Contractors of New Jersey:  50%

In such case as the parties opt to discontinue the $.02 allocation to I.C.E., said $.02 contribution shall

28

be distributed equally between the BCANJ and the Masonry Contractors of New Jersey.

4. The BCANJ and the Masonry Contractors of New Jersey shall utilize said funds in a manner consistent with the terms of the trust including the lease or purchase of materials, supplies and equipment, the lease of premises or purchase of premises, the employment and retention of professional counsel, the engagement of administrative and other employees, and all other appropriate expenses and expenditures which comply with the purposes of the trust and law. However, in all circumstances, it is the intention hereto that the said Fund shall be used to promote the following industry wide activities for the benefit of the contractors utilizing members of the Bricklayers & Allied Craftworkers union including accident prevention, education, research, public relations, industry relations, labor relations, market development, standardization of contracts and specifications and all other such appropriate activities.

5. Although the Industry Advancement Fund is designated a "contribution" it is expressly understood and agreed that the said sum payable to said Industry Advancement Fund is not intended to be and is not a contribution to employees and to employee of Employer has any proprietary interest in said funds.

6. The Industry Advancement Fund shall pay the Bricklayers & Allied Craftworkers' Health and Welfare fund 2% of all amounts collected as reimbursement for expenses incurred in connection with the collection services rendered. In addition the Bricklayers & Allied Craftworkers' Health & Welfare Fund shall not be responsible for collection

29

of any delinquent amounts owed by any employer.

F. International Masonry Institute (IMI)

1. The masonry industry in the United States and Canada has great and definable needs in the fields of apprenticeship and training, advertising and promotion, research and development, and labor/management relations which must be met if the industry is to grow and prosper. The parties to this agreement believe that the International Masonry Institute is the most effective and efficient instrument for meeting these needs because it offers the greatest possibility of integrating activities in these program areas in an effective manner and coordinating them through a single regional/international system.

2. In order to properly finance IMI programs, the ultimate objective is to provide, through collective bargaining, contributions from the total hourly wage and benefits package, as listed on Schedule "B" attached hereto.

3. With IMI funding from New Jersey, IMI will be able to provide advertising and promotion, research and development, apprenticeship and training, and labor/management relations programs directed specifically to this area. With these principles in mind, the parties agree to contribute the amounts listed on Schedule "B".

The payments required above shall be made to the International Masonry Institute, which was established under an Agreement and Declaration of Trust, 14 March 1981, as the successor trust to the predecessor International Masonry Institute (established under an Agreement and Declaration of Trust, 22 July 1970) and/or to the predecessor

30

International Masonry Apprenticeship Trust (established under an Agreement and Declaration of Trust, 6 November 1974).

G. New Jersey State Apprentice Fund

1. The contribution to the New Jersey State Apprentice Fund shall be listed on Schedule "B" attached hereto for each hour or portion thereof, for which a covered employee receives pay. The Apprentice Fund contribution of $.15 shall be suspended for Local No. 2 and deferred to the Defense Fund established by the Union.

2. The payments required above shall be made to established New Jersey State Fund office which was established under an Agreement and Declaration of Trust.

Section 2.
In order to facilitate the establishment of the same wage and fringe benefit structure within Local No. 5, it is agreed that no other funds other than the Welfare, Pension, International Pension, Annuity, Apprentice, IMI, IAP, Labor Management, BACPAC and Defense Funds shall be contributed to as of November 1, 1999. During the term of this agreement, the parties agree to establish uniform wages and fringe benefits for Local No. 4, 5 & 2.

Section 3.
The Employer hereby agrees to be bound by and to the above stated Agreements and Declarations of Trust, as though he had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of these funds pursuant to said Agreements and Declarations of Trust.

Section 4.
The Employer hereby irrevocably designates as its representative on the above stated Boards of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees,

31

together with their successors.

Section 5.
For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and all other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable to each fund designated in Section 1 of this Article.

Section 6.
Contributions shall be paid on behalf of all covered employees starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, journeymen, apprentices, helpers, trainees and probationary employees.

Section 7.
All contributions shall be made at such time and in such a manner as the Trustees require; and the Trustees shall have the authority to have an Independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the funds designated in Section 1 of this Article. Any Employer found, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, to have been substantially inaccurate in reporting shall be charged in full costs of such audit.

Section 8.
If the Employer fails to make any contribution specified in this Article, within twenty (20) days after the date required by the Trustees, the Union shall take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of payments due together with attorney's fees and such liquidated damages as may be assessed by the Trustees. In the event a job is stopped due to delinquent fringe benefit payments by the employer, craftworkers shall be compensated a day's wages for

each day the delinquency continues, not to exceed five days. The Employer's liability for payment under this article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided for or set forth elsewhere in this Agreement.

Section 9.
Management's appointments to the aforementioned Jointly Trusteed Funds are to be made equally by the Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey. The Building Contractors Association of New Jersey and the Masonry Contractors of New Jersey shall only have the right to the appointment of trustees if and when the existing Trust Funds of the predecessor local unions of the International Union of Bricklayers and Allied Craftworkers, Local Unions No. 4 and 5 are merged into statewide benefits funds. Neither the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey shall have the right or authority to appoint trustees to any trust fund of a predecessor local union unless and until a statewide merger of the Trust Funds occur, except if trustees are currently appointed by either the Building Contractors Association of New Jersey or the Masonry Contractors of New Jersey, that authority shall remain.

Section 10.
The Labor/Management Fund established under an Agreement and Declaration of Trust, shall be used to enhance the economic development and competitiveness of the unionized masonry industry, to assure the effective enforcement of prevailing wage laws and to provide for stable labor-management relations. The parties to this agreement shall appoint trustees to this fund in the same manner in which appointments are made to the Statewide Welfare Fund.

Section 11.
The parties agree to establish a Committee to explore the concept and funding mechanism for a Market Recovery Program.

32

0727

## ARTICLE XII
## BONDING

Prior to commencing any work covered by this Agreement, the Employer shall obtain a bond in the amount of $25,000, (twenty-five thousand dollars) with a duly qualified bonding company in a form approved by the Union, to secure payment of wages, benefit contributions, and other sums due under this agreement.

## ARTICLE XIII
## HOURS WORK, OVERTIME, SHIFTS, AND HOLIDAYS

A. The standard work day shall consist of eight (8) hours of work with starting and quitting times of either 7:00 a.m. to 3:30 p.m., or 8:00 a.m. to 4:30 p.m., unless otherwise mutually agreed to by the parties, with a 30-minute unpaid lunch hour occurring in the middle of the shift. The standard work week shall consist of five standard work days commencing on Monday and ending on Friday, inclusive. The normal starting and quitting times may be changed by mutual consent of the Employer and the Union.

B. All time worked before and after the established eight (8) hour day, Monday through Friday, and all time worked on Saturday shall be paid at the rate of time and one-half. All hours worked on Sundays and holidays shall be paid at the double time rate. If a craftworker works through any portion of their lunch they shall be paid one hour.

If any of the following trades: Carpenters, Laborers, Ironworkers or Operating Engineers Locals, with whom the BCANJ negotiates, receive a more beneficial overtime rate, the Bricklayers will be paid the higher overtime rate.

C. A make-up day may be worked on Saturday providing it is mutually agreed to by the union and the employer and provided that the following conditions are satisfied:

34

1. A make-up day on Saturday can be utilized provided 24 or more hours are worked during the course of the calendar work week, Monday through Friday.

2. It is not mandatory for an employee to work on a make-up day and it is at their choice and discretion. No negative actions or retribution shall be taken by the employer against any employee who chooses not to work a make-up day.

3. The sole reason for the loss of hours during the calendar work week must be weather conditions to qualify for a make-up day.

4. Any time worked before the established starting time or after the established quitting time on a make-up day shall be paid at the applicable overtime rate. Any hours worked on a Saturday make-up day that exceed 40 hours shall be paid at the applicable overtime rate.

5. If employees are unable to work a make-up day, the local union shall be given the preference to supply the remainder of the employees needed for that day.

6. There shall be no addition to the previously established crew size for the make-up day.

Any employer who violates the above provisions shall be prohibited from utilizing the make-up day for the duration of this Collective Bargaining Agreement. The employer has the right to file an appeal with the Joint Arbitration Board defined in Article XV of this Collective Bargaining Agreement. Said appeal shall be heard within five (5) days from the date filed. During the appeal process the employer shall be prohibited from utilizing the make-up day provision.

35

D. The parties to this Agreement recognize the desirability and in some cases absolute necessity of coordinating the shifts to be worked with the other trades involved on the project and the customer's work schedule. If shift work is necessary and it is mutually agreed to by the union and the employer, the following schedule shall prevail:

When a two shift schedule (including a day shift) is established, the first or day shift shall be established on an eight (8) hour basis. The second shift shall be established on an eight (8) hour basis and paid the base rate plus 15%.

When a three shift schedule is established, and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The day shift shall be established on an eight (8) hour basis, the second shift shall be established on a seven and one-half (7 ½) hour basis, and the third shift shall be established on a seven (7) hour basis. The first shift shall receive the base or regular hourly rate. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

When there is no day shift and a second shift or third shift is established and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The second shift shall be established on an eight (8) hour basis. The third shift shall be established on an eight (8) hour basis. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

The percentage premium, when added to the base rate, shall be termed the regular hourly rate. Shift hours for the second and third shifts shall be such as to conform to the day shift and in no case shall an employee work on more than one shift within a 24 hour period. When an irregular shift must be established, the percentage premium shall be

15% above the base rate.

All time worked before and after a regularly established shift shall be paid at the applicable overtime rate. When a portion of a regular established shift works into Saturday, Sunday or a Holiday, that time worked shall be paid at the established shift rate.

E. The Employer agrees to recognize the following holidays: New Year's Day, President's Day, Memorial Day, Fourth of July, Labor Day, Presidential Election Day, Veterans' Day, Thanksgiving Day, and Christmas Day. Holidays falling on a Sunday shall be observed the following Monday. The above holidays are subject to renegotiation based upon agreements established with other trades.

## ARTICLE XIV
## PAYMENT OF WAGES & FRINGE BENEFITS

All employees working under this Agreement shall be paid in cash or by check weekly on Thursday, or another day if mutually agreed between the business agent and the employer, before quitting time and within 72 hours after the closing of the pay for the week. When employees are unable to work on pay day due to inclement weather, the employee shall be paid before 12 noon in absence of reasonable cause for delay. An employee who has worked more than three days who is being laid off shall be given his final paycheck in full for all hours of employment one hour before layoff. When working overtime, the one hour notice of layoff does not apply. At the discretion of the Union, out of state contractors may be required to have payroll checks drawn on a local bank. Payroll checks will be delivered to the job site. In the event an employer issues a paycheck and there are insufficient funds in the employer's account, the employer, on the next working day, will bring either cash or cashiers checks to the jobsite to cover the paychecks and all penalties. Failure to do so will result in immediate withdrawal of all craftworkers from the job. Employees will be compensated by the employer for all lost time until the

36

0729

matter is resolved. If a second violation occurs, all payrolls shall be in either the form of cash or cashiers checks. Fringe benefits will be paid on a weekly basis, except that Association Members, may pay monthly. Monthly payments shall be due to the fund(s) on, or before the fifteenth day of the month immediately following the month during which the contributions were earned. Should an Association Member become delinquent, they may be required by the trustees of the benefits funds to remit weekly payments.

## ARTICLE XV
## WORKING CONDITIONS

A. Overhead Protection: If any work is being performed overhead, all Employees must be protected on all outside scaffolds by two inch (2") planks, a covering shall be supplied over all stairwells, hatches, shafts, etc., no more than two (2) stories overhead and two (2) stories below in shafts.

B. Hard hats are to be supplied by each employer. Failure to wear hard hats is cause for dismissal.

C. Lines: All contractors must furnish the men with lines. The lines must not be raised more than one (1) course at a time. No bricklayer shall spread mortar before the line has been raised. However, a trig brick can be raised one (1) course before raising the line. Lines on a double unit wall shall be used on both sides of a wall eight inches (8") or over in thickness and on all units of masonry over four (4) feet in length.

D. Portable Sanitation Units: Suitable portable sanitation units shall be erected on all jobs which shall be kept in sanitary condition. Portable sanitation units shall be built in accordance with State or Municipal health laws.

E. Cutting Tools: Where employees are employed on cutting

38

masonry, the employer shall have all cutting tools sharpened.

F. In order to protect the health and safety of employees against the effects of silicosis and other respiratory diseases, the dry cutting of masonry units by the means of hand-held, gas-powered, or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be prohibited on all masonry projects. The only exception to this provision will be when the Union and employer determine that the use of water is not feasible. When the Union and employer identify such tasks, the employer must ensure that the engineering and work practice controls are in place to control the dust: such as a vacuum, with high efficiency particulate air (HEPA) filter or another dust control system. It is agreed that in order to protect the health and safety of employees the dry cutting of masonry units by means of hand-held, gas powered or electrical, portable "chop saws" and skill saws, and the dry grinding of masonry materials shall be done in a designated area away from craftworkers if at all possible. It is the responsibility of the employee to adhere to the established restrictions for said designated areas.

Respirators should only be used as the primary method of protection if other engineering and work practice controls are not feasible. When the respirators are used, in accordance with the OSHA regulations, employers must provide workers with full-face respirators as part of a complete respiratory program that includes the proper selection of respiratory cartridges, and training and fit-testing to ensure that the worker is able to wear a respirator. It is the employee's responsibility to utilize proper protection.

Additionally, in the event the Union and the employer determine that dry-cutting or grinding is necessary, the contractor agrees to perform periodic air monitoring to

39

0730

ensure that the silica exposure levels do not exceed OSHA permissible exposure limit. Failure to comply will result in work stoppage. The employee operating the machine shall be allowed ten (10) minutes to clean up at 12:00 noon and quitting time.

Employees engaged in wet cutting masonry products will be furnished elbow length gloves, an apron and goggles. No employee shall operate a wet saw unless provided with a wooden platform on which to stand and the saw is properly grounded.

G.  Cutting and Mechanical Devices: Where air guns or other mechanical devices are used for the purpose of cutting chases, opening, etc., in brick work, such gun or device shall not exceed fifteen (15) lbs. weight. When such device exceeds fifteen (15) lbs., the employer may use a laborer to assist the bricklayer in handling the gun, but there shall always be one bricklayer on each gun in use. All cutting, when done by hammer and chisel, shall be done exclusively by the bricklayer. Where a bull and sledge hammer is used, there shall be a composite crew of bricklayers and laborers. (The bricklayer foreman shall have complete authority over all men employed in this phase of work.) All cutting out of brick work, pointing, washing down, caulking cement and lime waterproofing washing of brick, or slabs, used in floor arches shall be done by bricklayers, and where scaffolding is used in the above work wire rope shall be used.

H.  Pointing: All pointing and joining of brick work shall be done by journeymen who built same, if possible.

I.  Cement Block: Bricklayers and stone masons to set all cement blocks and all masonry units.

J.  Cork Block: All cork block (Styrofoam Sheets), and substitutes thereof, shall be laid by bricklayers.

40

K.  Caulking: All pointing and caulking of windows with cement or composition to be done by bricklayers, by either gun, trowel or any other method.

L.  Stone Work: All renovation, cleaning, and pointing of stone to be done by this union.

M.  The setting, aligning and erection of all precast slabs and the setting and leveling of all bearing plates for structural steel or machinery shall be done by the members of the above local union.

N.  Composite crew on all precast panels. Setting of all other masonry panels shall be the work of BAC Members.

O.  All brick or block panels shall be erected by union bricklayers.

P.  Waterproofing: All transparent waterproofing applied to brick or stone work with brush or spray to be done by bricklayers.

Q.  There are to be two men on all blocks weighing 40 lbs. or more.

R.  Scaffolding: No block 6" or over in size shall be built more than six (6) courses in scaffold height. Where blocks of 100 lbs. or over are used, a pony scaffold is to be erected when the wall is three (3) feet high, for the easier laying of these blocks to the next scaffold height. When a BAC member works on a swing scaffold as part of a composite crew, they shall receive the same premium differential as the other trades performing work on the same swing scaffold.

S.  Water: Water containers and sanitary drinking cups shall be provided on all jobs to be furnished by all contractors at all times.

41

AA.  All mortar tubs will be raised to at least sixteen inches, not to exceed thirty inches.

BB.  All rubber gloves and goggles to be furnished by the contractor for all washing down.

CC.  All work on high stacks, the contractor will pay a premium wage of 22% above the wage scale.

DD.  All scaffolds will be kept at least four (4) inches below the wall.

EE.  If an employee works past the full hour and must stop because of inclement weather conditions, he shall be paid for the full hour, but is not to leave the job until expiration of said hour.  No employee shall start work on the half hour.

FF.  If an employee reports to work and is not started but requested to stay on the job by the contractor, the employee shall be paid for all time prior to starting or until informed that no work shall be performed.

GG.  In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between starting time and 12 noon, men shall be paid until noon.  Employees must, however, remain on the job until noon.  In the event that due to failure or breakdown of machinery or equipment a work stoppage occurs between 12:30 p.m. and 3:30 or 4:30 p.m., employees shall be paid until 3:30 or 4:30 p.m.  Employees must remain on the job until 3:30 or 4:30 p.m.

HH.  When a job does not start at the regular starting time, it will be the duty of the Foreman to notify the Shop Steward, personally, two hours after the designated start regarding the work conditions.  It is clearly understood and agreed the employer will not send anyone to work on a job working during inclement weather unless all of the men regularly

43

T.  Shanty and Stoves:  Where there are not more than ten (10) men employed on a job, a shanty house shall be erected exclusively for the bricklayer, and it shall contain not less than eighty (80) square feet of floor space.  Where there are more than ten (10) men and not more than twenty (20) men, the shanty house shall contain not less than one hundred and fifty (150) square feet of floor space.  Where there are more than twenty (20) men and not more than thirty (30) men it shall contain not less than two hundred (200) square feet of floor space but where there are more than thirty (30) men employed the same proportion shall apply.  Where there is a shanty and no elevator located in the building it shall not be above the ground floor unless elevator is provided except on alterations where it will be placed to suit the convenience of the contractor.

U.  Ample provision shall be made to protect all bricklayers levels on all outside scaffolds.

V.  It shall be deemed unsafe to run any brick work up more than 6 courses or 16" whichever is less without backing up in cavity walls or any masonry walls which does not utilize a brick header course.

W.  Contractors shall provide a two foot clear, planked working area beyond the building wall when bricklayers or stone masons are working off new footing on or below grade.

X.  There shall be a clothing allowance of fifty cents (.50) per hour minimum on all fire brick work paid by contractor.

Y.  There will be one coffee break in the morning not to exceed ten (10) minutes.

Z.  The employee shall be allowed five (5) minutes to clean up prior to quitting time.

42

0732

employed on that job who showed up for work at starting time are started first. Nothing herein contained shall be construed to deny the saw men, lay-out men and steward regularly employed on the job from working at anytime at their respective job assignments if they are needed.

II. When masons work overtime at the direction of the employer or foreman, they shall receive at least one hour's pay at the applicable overtime rate. Fractions of an hour to be considered a full hour.

JJ. Employees who may be required to work overtime beyond 6:00 p.m. shall be permitted to take an unpaid one-half hour meal period on the job between 6:00 p.m. and 7:00 p.m. The employer may split a crew for the dinner period.

## ARTICLE XVI
## GRIEVANCE PROCEDURE

A. The parties to this Agreement shall establish a Joint Arbitration Board consisting of two representatives of the Building Contractors Association of New Jersey, two representatives of the Masonry Contractors of New Jersey and four representatives selected by the Local Union, to resolve disputes over the interpretation and application of this Agreement. The boards shall meet at least once a month, or on call, to settle complaints, abuses or grievances. It is further agreed that should occasion require any alterations or amendments to this Agreement, the party desiring such alterations or amendments shall submit same in writing to the Board. The Employer and union representatives at a session shall have an equal number of votes on all matters coming before the Joint Arbitration Board, regardless of the number of Employer or Union representatives present at a session.

B. It is specifically agreed that any controversy arising out of this Agreement involving the interpretation of its terms and

44

conditions, shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the union or to the attention of the Union by the Employer within five (5) days after the alleged violation is committed or discovered.

C. Grievances shall be handled in the following manner:

1. The grievance shall be referred to the jobsite union steward and to an employer representative for adjustment.

2. If the grievance cannot be settled pursuant to paragraph 1 of this Section, the grievance shall be referred on the following day to the Business Manager of the Union and the Employer.

3. If the grievance cannot be settled pursuant to paragraph 2 of this Section within three (3) working days excluding weekends and holidays, the grievance shall be submitted within 48 hours to the Joint Arbitration Board for consideration and settlement.

4. If the Joint Arbitration Board cannot reach a satisfactory settlement within five (5) working days, not including weekends and holidays, following a referral of the grievance to the Board, it shall immediately select an impartial arbitrator to review with the Board all evidence submitted relating to the dispute and then cast the deciding vote. If the Arbitration Board cannot agree on an impartial arbitrator, then the matter shall be submitted to the American Arbitration Association for a decision. All expenses of the impartial party shall be borne equally by the Employer and the Union. The decision reached by the Joint Arbitration Board

45

10/17/2007  14:56    6093248287                    BAC LOCAL 5                    PAGE  05/30

with the assistance of the impartial arbitrator shall be final and binding upon all parties.

D. When a settlement has been reached at any step of this Grievance Procedure, such a settlement shall be final and binding on all parties, provided, however, that in order to encourage the resolution of disputes and grievances at Steps 1 and 2 of Section C of this Article, the parties agree that such settlements shall not be precedent-setting.

E. The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties initiated by the written request of one party to the other, at the appropriate step of the Grievance Procedure. However, failure to process a grievance, or failure to respond within the time limits provided above, without a written request for an extension of time, shall be deemed a waiver of such grievance without prejudice and shall create no precedent in the processing of and/or resolution of like or similar grievances or disputes.

## JURISDICTIONAL DISPUTES

A. In order to avoid jurisdictional disputes which have such a demoralizing effect upon the progress of the construction work, it is agreed that only B.A.C. Members will be employed on work which is recognized as coming under the jurisdiction of the International Union of Bricklayers and Allied Craftworkers as:

1. Granted by the A.F.L. - C.I.O.

2. Determined by a Joint Board consisting of four representatives from the Local Unions, two representatives from the Building Contractors Association of New Jersey and two representatives from the Mason Contractors of New Jersey.

46

3. As established by practice of Employers within the area designated herein whenever (1) or (2) above are not applicable;

4. It is the intent of the parties that wherever a job decision shall be deemed to be strongly indicative of the area practice, the Bricklayers & Allied Craftworkers Local Unions will advise all personnel affected to make future assignments accordingly.

5. It is further the intent of the parties hereto that wherever possible, and whenever the contractor can reasonably foresee a jurisdictional dispute, the contractor will call a pre-job conference with the Local concerned and the contractors agree that when no agreement is reached, at the request of the Union, the contractor will join in in the submission of the matter to the Joint Board. In the meantime, the work shall proceed by the craft in possession of the work.

B. The Employer and the Unions agree to be governed by the terms and conditions of the Agreement, effective May 1, 1995, as amended, creating the Joint Board for the settlement of any jurisdictional dispute; and the decisions of the Joint Board will be followed in good faith.

## ARTICLE XVII
## SUBCONTRACTING

A. The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement and complies with all of the terms and conditions of this Agreement.

47

0734

B. All charges of violation of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.

### ARTICLE XVIII
### PRESERVATION OF WORK (Anti-Double Breasting)

A. In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

B. All charges of violations of Section A of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and the final binding resolution of disputes, as provided in Article XV of this Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in Article XV is empowered, at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as result of the violations, and (2) pay into the affected joint trust funds established under this Agreement any delinquent

48.

contributions to such funds which have resulted from the violations, including such interest as may be prescribed by the trustees or by law. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violation of this Section; nor does it make the same or other remedies unavailable to the Union for violations of other sections or articles of this Agreement.

C. If, as a result of violation of this Article, it is necessary for the Union and/or the trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with Section B above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the fund trustees, plus costs of the litigation, which have resulted from the bringing of such court action.

### ARTICLE XIX
### NO-STRIKE/NO-LOCKOUT

It is understood and mutually agreed that there shall be no strikes or lockouts over a dispute concerning this Agreement during its term until the grievance procedures described in Article XIV have been exhausted and then only in the event a party fails or refuses to abide by a final decision. This Article shall not apply in those cases where an Employer fails or refuses to make in whole or in part any payments required under this Agreement including all wages, local union fringe benefits or other contributions that have been established through bona fide collective bargaining.

### ARTICLE XX
### SEPARABILITY AND SAVINGS PROVISION

It is the intent of the parties hereto to abide by all applicable Federal and State statutes and rules and regulations made pursuant thereto. If any provision of this Agreement is held invalid by any court or governmental agency having jurisdiction, or if compliance with or enforcement of any provision of this Agreement is

49.

Inasmuch as (1) the Union has requested recognition as the majority, Section 9(a), representative of the employees in the bargaining unit described herein and (2) has submitted or offered to show proof of its majority support by those Employees, and (3) the Employer is satisfied that the Union represents the majority of Union, pursuant to Section 9(a) of the National Labor Relations Act, as the exclusive collective bargaining agent for all employees within that bargaining unit, on all present and future job sites within that jurisdiction of the Union.

The Employer agrees that if it has not previously done so, at any time during this agreement it will, upon the Union's request for recognition as the Section 9(a) representative of the employees in the bargaining unit described herein, and upon the union's submission of proof of majority support by such employees, voluntarily recognize the Union as the exclusive representative as defined in Section 9 (a) of the National Labor Relations Act, of all the employees within the bargaining unit on all present and future jobsites within the jurisdiction of the Union. When the Union has requested recognition as majority representative, the Employer's recognition will be based on the Union's proof or offer to submit proof. The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Relations Board.

We, the undersigned Employer on behalf of the parent firm, all subsidiaries and corporate related firms, companies and/or corporations hereby become signatory to this Agreement and agree to abide by the full terms and conditions of this Agreement effective as of this date.

restrained by such tribunal pending a final determination as to its validity, then such provision or provisions shall continue in effect only to the extent permitted and all other provisions of this Agreement shall remain in force and effect.

In the event that any provision of this Agreement is held invalid, or enforcement of or compliance with any provision is restrained, the Union and the Employer shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement, incorporating the substance of such provision to the extent allowable under the law, to be in effect during the period of invalidity or restraint.

## ARTICLE XXI
## MORE FAVORABLE CONDITIONS

The Union hereby agrees that if it affords any conditions of a more favorable means to any other employer with whom it has a collective bargaining agreement who performs the same or similar work, that said more favorable condition shall automatically be incorporated in this Agreement and be afforded all members of the Association covered hereunder.

## ARTICLE XXII
## GENERAL UNDERSTANDING

The Union agrees to cooperate with the Employer in meeting conditions peculiar to the job in which it may be engaged. It will at all times meet and confer with the Employer, and similarly, the Employer will at all times meet with the Union regarding any questions or misunderstandings that may arise under the performance of this Agreement.

This Agreement constitutes the entire agreement between the parties, and any local or area practices or working rules which may be in conflict with the provisions contained in this Agreement shall be subordinate to this Agreement.

51

50

0736

IN WITNESS WHEREOF, we the authorized officers of the Building Contractors Association of New Jersey, the Masonry Contractors of New Jersey, the Building Contractors Association of Atlantic County and the Bricklayers & Allied Craftworkers, Local Unions No. 4, 5 & 2 have hereunto set our hands and seals this 31st day of October, 2002.

*Authorized Management Representatives*

Joseph Nicolli, BCANJ

Karl Kocis, Jr., BCANJ

Michael Schmierbock, MC of NJ

Michael P[...], BCAJAC

*Authorized Union Representatives*

Gerald Della Balla, Local No. 4

Michael Perrone, Local No. 5

Thomas F. Rhoades, Local No. 2

52

| *****WAGE RATES EFFECTIVE NOV 1, 2002 THROUGH OCTOBER 31, 2003***** | | | | | | | |
|---|---|---|---|---|---|---|---|
| FORMER LOCAL # | 6 | 7 | 8 | 15 | 26 | 33 | 35 |
| JOURNEYMAN: | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 | $29.35 |
| DEPUTY FOREMAN: | $31.95 | $31.95 | $31.95 | $31.95 | $31.95 | $31.95 | $31.95 |
| FOREMAN: | $34.55 | $34.55 | $34.55 | $34.55 | $34.55 | $34.55 | $34.55 |
| EMPLOYER CONTRIBUTIONS***** | | | | | | | |
| WELFARE FUND: | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 | $5.25 |
| LOCAL PENSION FUND: | $4.50 | $4.50 | *********** | *********** | $4.50 | $4.50 | *********** |
| ANNUITY FUND: | $3.00 | $3.00 | $7.50 | $3.00 | $3.00 | $3.00 | $7.50 |
| APPRENTICE FUND: | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 | $0.15 |
| INDUSTRY ADVANCEMENT: | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 | $0.28 |
| LABOR MANAGEMENT TRUST: | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| I.U. PENSION FUND: | $1.50 | $1.50 | $1.50 | $6.00 | $1.50 | $1.50 | $1.50 |
| I.M.I. | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 |
| **TOTAL PACKAGE** | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 | $44.78 |
| | *****DEDUCTIONS AFTER TAXES FROM GROSS WAGES***** | | | | | | |
| | JOURNEYMAN | | DEP FOREMAN | | FOREMAN | | |
| LOCAL DUES CHECKOFF: | $1.57 | | $1.68 | | $1.75 | | |
| INT'L DUES CHECKOFF: | $0.45 | | $0.45 | | $0.45 | | |
| DEFENSE FUND: | $0.05 | | $0.05 | | $0.05 | | |
| LOCAL BAC/PAC: | $0.05 | | $0.05 | | $0.05 | | |
| I.U BAC/PAC: | $0.01 | | $0.01 | | $0.01 | | |
| TOTAL DEDUCTIONS: | $2.13 | | $2.22 | | $2.31 | | |
| AFTER TAX DEDUCTIONS NOTE: | All former locals have the same deductions with the exception of one: | | | | | | |
| Former Local #7: | Has a BAC/PAC of $0.02, making their deductions $2.14 | | | | | | |
| I.U. Reporting Forms: | IU Pension, I.M.I., IU Dues Checkoff, & BAC/PAC are all to be remitted on IU Remittance | | | | | | |
| | All other benefits are to be remitted to the LOCAL FUND OFFICE where the job is preformed. | | | | | | |

53

0737

*The undersigned employer agrees to be bound by all terms of the within agreement:*

_____
Name of Firm

_____
Physical Street Address

_____
City                    State              Zip Code

_____
Phone Number                       Fax Number

_____
Employer's Federal Identification Number

_____
New Jersey Employment Compensation Number

_____
Workmen's Compensation Insurance Carrier

_____
Date

### SIGNATURE OF PARTIES

_____
Member of Firm Signature     Printed Name          Title

_____
Union Officer Signature      Printed Name          Title

_____
Field Representative Signature   Printed Name

### PLEASE COMPLETE & REMIT TO:

**Bricklayers & Allied Craftworkers Local #5**
**3281 Route 206, Suite 3**
**Bordentown, New Jersey 08505**
**(609) 324-0500**
**Fax- (609) 324-1505**

54

0738